# **Exhibit 1**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

AVIOVISION N.V.,

         Plaintiff,

v.

INTELLECTUAL VENTURES II LLC,

         Defendant.

C.A. No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff AvioVision N.V. ("AvioVision") seeks a declaratory judgment that AvioVision does not directly or indirectly infringe United States Patent No. 11,032,000 (the "'000 patent") and that the '000 patent (attached as Exhibit A) is invalid as follows:

## NATURE OF THE ACTION

1. This is an action for a declaratory judgment of non-infringement and invalidity arising under the patent laws of the United States, Title 35 of the United States Code. AvioVision requests this relief because defendant Intellectual Ventures II LLC ("IV") has filed a lawsuit against AvioVision's customer, Southwest Airlines Co. ("Southwest"), claiming that AvioVision's aircraft interface device ("AID") called AvioCast infringes the '000 patent. *Intellectual Ventures I LLC et al. v. Southwest Airlines Co.*, No. 3:25-cv-02885-L-BN (N.D. Tex. Oct. 24, 2025) (the "Southwest Action"). On December 22, 2025, IV filed an Amended Complaint for Patent Infringement (the "Amended Complaint," attached as Exhibit B) in the Southwest Action, directly accusing AvioVision's AvioCast of patent infringement. Southwest Action, D.I. 97 ("AC"), Exhibit 14. These accusations impact AvioVision's business and relationships with its customers,

– 1 –

and create a justiciable controversy between AvioVision and IV.

## THE PARTIES

2.     Plaintiff AvioVision N.V. is a Belgian corporation with its corporate headquarters at Herkenrodesingel 8/D.3.01, 3500 Hasselt, Belgium.

3.     AvioVision is a technology company founded in 2009 that develops and provides digital solutions for the aviation industry, including a suite of Electronic Flight Bag ("EFB") and related applications used by pilots, flight crews, and airline operational staff to manage flight information and data.  Its integrated software platform enables aviation professionals to create, organize, and share electronic flight folders, exchange real-time operational data, and streamline workflows across flight, cabin, and ground operations, with the goal of improving efficiency and safety for airlines and their personnel.

4.     Defendant Intellectual Ventures II LLC is a limited liability company organized and existing under the laws of the State of Delaware, with a claimed principal place of business at 14360 SE Eastgate Way, Bellevue, Washington, 98007.

5.     IV alleges that it is "the owner of all rights, title, and interest in and to" the '000 patent.  Southwest Action, AC ¶¶ 5, 39.

6.     IV is a patent holding and licensing entity that acquires patents from third parties and seeks to generate revenue through licensing and litigation.  IV does not design, manufacture, or sell products or services that practice the patents it asserts.  Instead, IV asserts its patents against operating companies and end users, including by filing infringement actions against customers of alleged suppliers, and seeks monetary compensation based on alleged use of patented technology.

7.     With respect to the '000 patent in particular, this patent originated with a third party, IPWireless, Inc., and was subsequently acquired by IV.  IV has not alleged it was involved in the

research, development, or commercialization of any products practicing the technology described in the '000 patent.

8.      In the Southwest Action, IV has asserted eight separate patents in a single lawsuit, including the '000 patent.  The assertion of numerous patents at once substantially increases the complexity, scope, and cost of the litigation, regardless of the merits of any individual patent.  This approach places pressure on suppliers and end users alike to resolve the dispute based on litigation burden and risk aggregation, rather than on a focused assessment of whether any particular asserted claim is actually infringed.

## JURISDICTION AND VENUE

9.      This is an action for declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*. and the Patent Laws of the United States, 35 U.S.C. § 1 *et seq*.

10.      This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1338(a), and 2201(a).    An actual, substantial, immediate, and continuing controversy exists between AvioVision and IV that requires a declaration of rights by this Court regarding the '000 patent.

11.      The litigation brought by IV against Southwest directly accuses AvioVision's AvioCast of patent infringement, impacting AvioVision's business and relationships with its customers.

12.      This Court has general personal jurisdiction over IV under the laws of the State of Delaware and consistent with the underlying due process principles of the United States Constitution because IV is a limited liability company organized and existing under the laws of the State of Delaware.

13.      Venue is proper in this District under at least 28 U.S.C. §§ 1391(b), (c), because IV

is a resident of this District.

## THE '000 PATENT

14.     On June 8, 2021, the United States Patent and Trademark Office ("PTO") issued the '000 patent, entitled "Communications in a Wireless Network." *See* Ex. A.

15.     According to PTO assignment records, on May 19, 2017, IV acquired the rights to the '000 patent's family from Intellectual Ventures Holding 81 LLC.   Intellectual Ventures Holding 81 LLC acquired those rights from IPWireless, Inc. through an April 27, 2012 assignment agreement.

16.     The '000 patent relates to a communications network in which a user equipment ("UE"), in a time interval that it is not sending information over a physical uplink shared channel, sends an uplink physical signal based on received resource allocation information.   Ex. A, Abstract.   The uplink physical signal is used to determine channel conditions by a base station, and the UE receives, on a downlink control channel, control information that is based on the determined channel conditions.   *Id.*   The '000 patent discusses using a physical layer common control channel ("PLCCH") to form a feedback system, and a dedicated timeslot that groups all of the user-originated control signals transmitted in a designated time interval, known as "UL_Beacon" signals, from multiple UEs in a specific uplink timeslot. *Id.* at 2:43-55.

17.     Figure 2 of the '000 patent illustrates the timeslot arrangement as described in the '000 patent:



FIG. 2

*Id.*, Fig. 2 (highlights added).

18.    Critically, the UL_Beacon is transmitted in a dedicated uplink control timeslot separate from the physical uplink shared channel ("PUSCH"). *Id.* at 2:37-41; 4:60-5:4. This is shown in Figure 2, above, where the UL_Beacon 216 (green) is provided its own timeslot, separate from timeslots 214 for PUSCH data (yellow). *See also, id.* at 6:3-6 ("The uplink frame comprises a UL_Beacon control timeslot 216, an access control timeslot 218, and normal traffic carrying timeslots 214.")

19.    Claim 1 recites:

[1.pre][1] A user equipment (UE) comprising:

[1.1] a receiver and a processor are configured to receive resource allocation information associated with an uplink physical signal, wherein the uplink physical signal and a physical uplink shared channel have different resources;

[1.2] a transmitter and the processor are configured to send, over the physical uplink shared channel, data in assigned time intervals;

---

[1] The numbers in brackets are added for ease of reference.

[1.3] the transmitter and the processor are further configured, in a time interval that it is not sending information over the physical uplink shared channel, to send the uplink physical signal based on the received resource allocation information, wherein the uplink physical signal is used to determine channel conditions by a base station and in the same time interval that the uplink physical signal is sent, a plurality of UEs transmit uplink physical signals in the same time interval; and

[1.4] the receiver and the processor are further configured to receive, on a physical control channel, control information, wherein the control information is based on the determined channel conditions, wherein physical control channels are transmitted in a same time slot with other physical channels in a plurality of predetermined time slots in a downlink frame, wherein other time slots of the downlink frame do not include a physical control channel, wherein a number of bits sent over the physical control channel is based on a number of fields of control information to be sent to the UE.

*Id.* at 9:55-10:17.

20.    The other independent claim that IV has asserted against AvioCast, claim 13, recites:

[13.pre] A method performed by user equipment (UE), the method comprising:

[13.1] receiving resource allocation information associated with an uplink physical signal, wherein the uplink physical signal and a physical uplink shared channel have different resources;

[13.2] sending, over the physical uplink shared channel, data in assigned time intervals;

[13.3] sending, in a time interval that it is not sending information over the physical uplink shared channel, the uplink physical signal based on the received resource allocation information, wherein the uplink physical signal is used to determine channel conditions by a base station and in the same time interval that the uplink physical signal is sent, a plurality of UEs transmit uplink physical signals in the same time interval; and

[13.4] receiving, on a physical control channel, control information, wherein the control information is based on the determined channel conditions, wherein physical control channels are transmitted in a same time slot with other physical channels in a plurality of predetermined time slots in a downlink frame, wherein other time slots of the downlink frame do not include a physical control

channel, wherein a number of bits sent over the physical control channel is based on a number of fields of control information to be sent to the UE.

*Id.* at 11:15-40.

21.    IV has not asserted the '000 patent's two other independent claims, claims 7 and 19, against AvioCast.  These claims are directed to a network device (*e.g.*, a base station) that communicates with a UE.  Instead of sending uplink signals, these claims require, *inter alia*, receiving "in a time interval that it is not receiving information over the physical uplink shared channel" "the uplink physical signal."

22.    The '000 patent thus claims systems and methods in which, among other things, the uplink physical signal is sent (or received) in a time interval that it is not sending information over the PUSCH.

### AVIOVISION DOES NOT INFRINGE THE '000 PATENT

23.    IV alleges that Southwest infringes the '000 patent by using AvioVision's "Aircraft Interface Device (AID), known as AvioCast."  Southwest Action, AC, Exhibit 14, *e.g.*, 3-4.  The chart accompanying the Amended Complaint showing IV's infringement allegations regarding the '000 patent is attached as Exhibit C.

24.    Similarly, IV served on Southwest its "Second Amended Preliminary Infringement Contentions" ("IV's Infringement Contentions") in the Southwest Action on May 28, 2025.  In these contentions, IV alleges that Southwest infringes claims 1-6 and 13-18 of the '000 patent by using AvioVision's "Aircraft Interface Device (AID), known as AvioCast."  Exhibit 11 to IV's Infringement Contentions (attached as Exhibit D) at, *e.g.*, 3-4.

25.    In Exhibits C and D, IV accuses AvioVision's AvioCast device of infringement, alleging that, "[o]n information and belief, Southwest airplanes are installed with an Aircraft Interface Device (AID) that provides LTE ground connectivity and acts as a UE in an LTE

network." Ex. C at 3; Ex. E at 3. More particularly, IV alleges that AvioCast includes a 4G modem that "connects the system while it [is] on the ground and it generates a wifi network to which the mobile devices used by the different crew connect to." Ex. C at 4; Ex. D at 4.

26. IV then cites to various 3GPP standards-related documents to allegedly show that a UE in an LTE network meets the limitations of the '000 patent's claims. *See* Exs. C and D, *passim*. Among other things, IV repeatedly cites to a "UE sounding procedure" and the transmission of a "Sounding Reference Symbol (SRS)" as infringing functionality. *See, e.g.*, Ex. C at 10; Ex. D at 10. IV alleges that because the AvioCast is an LTE UE, it infringes by implementing certain LTE functionality found in LTE standards documents.

27. IV's allegations of infringement against AvioVision's AvioCast product are incorrect. Accordingly, AvioVision denies infringement and seeks a declaratory judgment that the claims of the '000 patent are not infringed.

28. IV alleges that AvioCast infringes independent claim 1 and claim 13 of the '000 patent based on its purported operation in accordance with LTE standards, including the transmission of Sounding Reference Symbols ("SRS") and uplink data over the PUSCH. *See* Exs. C and E.

29. Claim 1 and claim 13 require, among other things, that a user equipment transmit an "uplink physical signal" ***"in a time interval that it is not sending information over the physical uplink shared channel."*** This limitation imposes an express temporal restriction: the claimed uplink physical signal must be transmitted during a time interval in which no PUSCH transmission occurs.

30. Even assuming, *arguendo*, that AvioCast operates in accordance with LTE standards and that the alleged "uplink physical signal" corresponds to an LTE SRS, AvioCast does

not and cannot satisfy this limitation.  Under LTE, SRSs are transmitted in the same transmission time interval (*e.g.*, the same subframe or timeslot) as uplink data transmissions on the PUSCH, occupying different frequency resources within the same time interval.

31.    Because AvioCast transmits uplink data over the PUSCH during the same time interval in which any SRS is transmitted, AvioCast does not transmit an "uplink physical signal" "in a time interval [in which the user equipment] is not sending information over" the PUSCH, as expressly required by claims 1 and 13.

32.    This limitation of claims 1 and 13 cannot be met merely because different uplink signals occupy different resources within the same time interval; rather, these claims require the absence of PUSCH transmission during the relevant time interval altogether.  Accordingly, even under IV's own theory of infringement and even assuming compliance with LTE standards, AvioCast does not practice claims 1 or 13 of the '000 patent.  Because AvioCast does not practice independent claims 1 and 13 of the '000 patent, it also does not practice asserted claims 2-5 and 14-18, which depend on the independent claims.

33.    The '000 patent includes two other independent claims:  claims 7 and 19.  However, these claims are directed to a base station that communicates with a UE.  IV has not (and cannot) argue that the AvioCast product is a network device like a base station and therefore IV has not even tried to assert these claims in the Southwest Action.  Regardless, these claims require receiving "the uplink physical signal" "in a time interval that it is not receiving information over the physical uplink shared channel."  For the same reasons as discussed above regarding claims 1 and 13, LTE systems implementing SRSs do not satisfy the temporal limitations of claims 7 and 19.  The SRS is sent (and received) in the same time interval as the PUSCH.

34.    For these and other reasons, AvioVision has not infringed and does not infringe any

claim of the '000 patent either directly, contributorily, or by inducement, literally or under the doctrine of equivalents, including through its making, use, importation into the United States, sale, or offer for sale of the accused AvioCast product, or any other AvioVision products.

**THE '000 PATENT IS INVALID**

**A.    The '000 Patent Fails to Claim Patentable Subject Matter**

35.    The '000 patent addresses a perceived issue in frequency-division duplex ("FDD") wireless systems, namely that uplink-downlink reciprocity may be reduced because uplink and downlink transmissions occur on different frequencies and may be separated in time.  The claimed solution is not a new radio technology, but a rearrangement of when existing control and feedback signals are transmitted.  The patent describes a UE transmitting a user-originated control signal, referred to as a "UL_Beacon," during time intervals when the UE is not transmitting data on the PUSCH, and a base station returning feedback such as power-control information on a downlink PLCCH.  Ex. A at 4:49-5:19.

36.    The specification confirms that this purported solution does not introduce new hardware, waveforms, modulation techniques, or signal-processing algorithms.  The "UL_Beacon" is a control signal transmitted in a designated time interval, and the "PLCCH" is a downlink control channel carrying feedback derived from that signal.  The '000 patent acknowledges that the claimed system and method may be implemented using generic processors and software, with functionality distributed arbitrarily among components.  *Id*. at 7:44-47, 7:59-8:62.

37.    The claims are directed to the abstract idea of scheduling and exchanging conventional control and feedback information between a user device and a base station. Independent claim 1, for example, recites a UE that (i) receives resource-allocation information, (ii) transmits data on a shared uplink channel in assigned intervals, (iii) transmits a control signal

– 10 –

in intervals when it is not transmitting data, and (iv) receives control information derived from that signal on a downlink control channel. Stripped of technical labels, the claim concerns a process of deciding when to transmit known control signals and feedback using existing wireless components, not a concrete technological improvement.

38. The claims are directed to an abstract idea, making it ineligible under 35 U.S.C. § 101, as explained by *Alice* step one. They recite functional objectives—receiving allocation information, transmitting data, transmitting a control signal when data is not being sent, and receiving feedback—implemented using conventional wireless components, without reciting any specific means for achieving those results.

39. Additionally, the asserted claims fail *Alice* step two, because they lack an inventive concept. A claim must include something "significantly more" than the abstract idea itself, *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 217-18 (2014), and the use of conventional, well-understood networking components is not an inventive concept.

40. Here, the claims invoke standard wireless elements— "receiver," "processor," "transmitter," "base station," "uplink shared channel," and "physical control channel"—operating in their expected manner to exchange information. The '000 patent concedes that these functions may be implemented using general-purpose processors and software, foreclosing any suggestion of unconventional hardware or architecture. Ex. A at 7:59-8:62.

41. Nothing in the claims changes how these components operate; the claims merely use these components to achieve the result of exchanging information between a terminal and a base station. The claims do not recite, for example, a new protocol, modulation scheme, or physical-layer technology. Nor does the ordered combination supply an inventive concept. The claimed sequence of receiving allocation information, transmitting data, transmitting a control

– 11 –

signal in other intervals, and receiving feedback reflects a routine time-division communication loop. Such conventional coordination of transmission and feedback cannot render an abstract idea patent-eligible.

42. Because the claims of the '000 patent recite only generic wireless networking components performing their ordinary roles to implement an abstract scheduling and feedback concept, they lack an inventive concept and are invalid under 35 U.S.C. § 101.

**B.      The Claims of the '000 Patent are Invalid in Light of Prior Art**

43. On information and belief IV has alleged that the asserted claims of the '000 patent have an effective filing date of December 27, 2006.

44. At least the following references either anticipate and/or render obvious the asserted claims of the '000 patent:

45. Krishnan, U.S. Patent No. 6,928,062 ("Krishnan") (Exhibit E)

46. Shin, U.S. Patent Application Pub. No. 2008/0081655 ("Shin") (Exhibit F)

47. Kuchibhotla, U.S. Patent Application Pub. No. 2008/0084853 ("Kuchibhotla") (Exhibit G) (collectively, the "Exemplary Prior Art")

48. Each Exemplary Prior Art reference anticipates and/or renders obvious the '000 patent claims.

49. For example, Krishnan was filed on January 10, 2003 and issued on August 9, 2005. Krishnan is prior art to the '000 patent under at least pre-AIA 35 U.S.C. §§ 102(a), (b), and/or (e). Krishnan, entitled "Uplink Pilot and Signaling Transmission in Wireless Communication Systems," discloses techniques for transmitting uplink pilot and signaling information in OFDM-based wireless communication systems. Ex. E, Abstract. Krishnan teaches partitioning usable uplink subbands into multiple disjoint groups and assigning different groups to different terminals, allowing multiple user devices to transmit uplink pilot signals simultaneously on separate

frequency resources within the same uplink time interval. *Id.* at 2:41-49. The access point receives these uplink pilot transmissions and derives channel estimates for each terminal based on the assigned subbands, which may be interpolated to obtain channel estimates for the entire usable band and used for uplink and/or downlink transmission, including power control and rate control. *Id.* at 2:50-58. Krishnan further discloses that this approach may be used for uplink signaling information such as rate-control information and acknowledgments, relying on OFDM frame structures, known pilot symbols, and standard channel-estimation techniques. *Id.* at 2:60-3:22.

50. Krishnan discloses or renders obvious each element of claim 1 of the '000 patent including elements [1.pre] (*see, e.g.*, Ex. E at 3:66-4:14; Fig. 1); [1.1] (*see, e.g.*, *id.* at 1:44-52; 3:66-4:14; 4:21-57; 11:5-14; 16:30-17:10; Figs. 1, 2, and 7); [1.2] (*see, e.g.*, *id.* at 4:21-57; 16:30-17:10); [1.3] (*see, e.g.*, *id.* at 1:44-52; 3:66-4:14; 4:21-57; 9:53-10:20; 16:30-17:10; Fig. 1); and [1.4] (*see, e.g.*, *id.* at 4:21-57; 9:53-10:20; 11:40-51; 16:30-17:10). Krishnan similarly discloses each element of the other asserted claims of the '000 patent.

51. As another example, Shin was filed on September 27, 2007 and was published on April 3, 2008 and claims priority to provisional applications, filed on October 3, 2006 and October 27, 2006. Shin is prior art to the '000 patent under at least pre-AIA 35 U.S.C. § 102(e). Shin, entitled "Combined Open Loop/Closed Loop (CQI-Based) Uplink Transmit Power Control with Interference Mitigation for E-UTRA," describes uplink transmit power control techniques for E-UTRA (LTE) wireless systems in which a wireless transmit/receive unit ("WTRU") transmits uplink data and control information to a serving base station ("eNodeB") and receives corresponding downlink control and feedback. Ex. F, Abstract. Shin discloses that the WTRU transmits uplink signals on both an uplink shared data channel and an uplink control channel, while the eNodeB derives channel quality and interference measurements from received uplink signals

and returns feedback, including uplink grant information, power-control parameters, and target signal-to-interference ratios, over a downlink control channel. *See id.*, ¶¶ 0013-0016, 0033-0034. Shin teaches that uplink control and feedback mechanisms are implemented using transmission timing intervals, and reference signals, with control signaling rates adjustable based on system requirements and channel conditions. *Id.*, ¶¶ 0007-0008, 0016-0017, 0030, 0036-0041. Shin further explains that these functions may be carried out by WTRU and eNodeB components, such as receivers, transmitters, and processors. *Id.*, ¶¶ 0012-0015, 0044-0046, Fig. 1.

52.    Shin discloses or renders obvious each element of claim 1 of the '000 patent including elements [1.pre] (*see, e.g.*, Ex. F, ¶¶ 0012-0013, Fig. 1); [1.1] (*see, e.g.*, *id.*, ¶¶ 0012-0018, 0043, Figs. 1-2); [1.2] (*see, e.g.*, *id.*, ¶¶ 0007-0008, 0013, 0040-0041); [1.3] (*see, e.g.*, *id.*, ¶¶ 0012-0018, 0043, Figs. 1-2); and [1.4] (*see, e.g.*, *id.*, ¶¶ 0012-0018, 0043, Figs. 1-2). Shin similarly discloses each element of the other asserted claims of the '000 patent.

53.    As a third example, Kuchibhotla was filed October 4, 2006 and published April 10, 2008. Kuchibhotla is prior art to the '000 patent under at least pre-AIA 35 U.S.C. § 102(e). Kuchibhotla, entitled "Radio Resource Assignment in Control Channel in Wireless Communication Systems," describes techniques for communicating radio resource assignments to wireless devices using a composite control channel that includes multiple "control channel elements," where each element contains resource-assignment information (*e.g.*, a codeword) addressed to a single wireless communication entity. *See* Ex. G, ¶¶ 0011-0018. Kuchibhotla explains that a scheduler allocates resources in time and frequency (including in OFDM/OFDMA-like systems and LTE/E-UTRA contexts) and that channel-quality information (*e.g.*, CQI or another metric) may be reported by the UE to support time/frequency scheduling decisions. *Id.* It further teaches that each frame may correspond to a transmission time interval ("TTI") and

discusses TTIs segmented into sub-frames (*e.g.*, 1 ms TTI segmented into two 0.5 ms sub-frames) and signaling mechanisms for communicating resource assignments when a frame/TTI is composed of concatenated sub-frames. *Id.*, ¶ 0014-0015. Kuchibhotla also discloses combining and decoding multiple control channel elements (including use of CRC checks and soft-combining techniques such as Chase combining or max-ratio combining) when needed to recover resource-assignment information addressed to a device. *Id.*, ¶¶ 0020-0026. Finally, Kuchibhotla describes dynamically allocating a portion of the control channel for radio resource assignment in each frame by embedding bit sequences within the frame (with the location/identity of the bit sequence indicating the portion/size of control signaling) and varying that allocation across frames constituting a radio frame. *Id.*, ¶¶ 0029-0034, Fig. 5.

54.    Kuchibhotla discloses or renders obvious each element of claim 1 of the '000 patent including elements [1.pre] (*see, e.g.*, Ex. G at Abstract, ¶¶ 0009-0010); [1.1] (*see, e.g.*, *id.* at Abstract, ¶¶ 0009-0010, 0012, 0030-0033); [1.2] (*see, e.g.*, *id.*, ¶¶ 0012, 0030-0033); [1.3] (*see, e.g.*, *id.*, ¶¶ 0012, 0030-0033); and [1.4] (*see, e.g.*, *id.*, ¶¶ 0012, 0030-0035). Kuchibhotla similarly discloses each element of the other asserted claims of the '000 patent.

55.    For these and other reasons, the claims of the '000 patent are invalid under 35 U.S.C. §§ 102 and 103 as anticipated and rendered obvious by the prior art.

### C.    The Claims of the '000 Patent are Indefinite

56.    Claims 1, 7, 13, and 19 (*i.e.*, all of the '000 patent's independent claims) require sending or receiving "the uplink physical signal" in "a time interval that is not sending [or receiving for claims 7 and 19] information over the physical uplink shared channel."

57.    To the extent this claim requirement does not mean that the UE transmits the uplink physical signal in a timeslot separate from those used for PUSCH, the claims are indefinite because it leaves a skilled artisan without reasonable certainty as to the timing requirement. *See Nautilus,*

*Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014); *WSOU Invs. LLC v. Google LLC, 2023 WL 6210607*, at *7 (Fed. Cir. Sept. 25, 2023).

58.     The specification confirms that the patentee understood how to describe separate transmission periods.  The '000 patent depicts distinct, non-overlapping timeslots for different channels: "The uplink frame includes a UL_Beacon control timeslot 216, an access control timeslot 218, and normal traffic carrying timeslots 214."  Ex. A at 6:3-6; *see also id.*, Fig. 2 (depicting distinct timeslots).  The specification thus teaches transmission in separate, distinct timeslots—the UL_Beacon is transmitted in its own dedicated timeslot 216, while PUSCH data is transmitted in the separate "normal traffic carrying timeslots 214."  *Id.*

59.     To the extent IV argues that the claim language does not recite "separate timeslots" or any other comprehensible temporal separation, the claim is indefinite because it effectively requires the UE to transmit the uplink physical signal during a time interval defined by the absence of a transmission over PUSCH, without providing an objective boundary for the interval (as opposed to reciting a separate, dedicated timeslot in which no PUSCH data is being transmitted). *Nautilus*, 572 U.S. at 901.

60.     For these and other reasons, the claims of the '000 patent fail are invalid for failure to meet the statutory requirements of 35 U.S.C. § 112.

**<u>COUNT I</u>**

*(Declaratory Judgment of Non-Infringement of the '000 Patent)*

61.     AvioVision restates and incorporates by reference the allegations in paragraph 1 through 60 of this Complaint as if fully set forth herein.

62.     IV claims to own all right, title, and interest in the '000 patent.

63.     As set forth above, IV has asserted that AvioVision and its products infringe one or

more claims of the '000 patent.

64.     AvioVision and its products, including AvioCast, do not and did not directly or indirectly infringe any claim of the '000 patent, literally or under the doctrine of equivalents.

65.     As described above, all of the claims of the '000 patent require the transmission or receipt of an "uplink physical signal" "in a time interval that it is not sending information over the physical uplink shared channel."  In the Southwest Action, IV has not shown that AvioCast operates in accordance with LTE standards or that the alleged "uplink physical signal" corresponds to an LTE SRS.  However, even if AvioCast operates in accordance with LTE standards and the alleged "uplink physical signal" corresponds to an LTE SRS, AvioCast does not and cannot satisfy this limitation.  Under LTE, SRSs are transmitted in the same transmission time interval as uplink data transmissions on the PUSCH, occupying different resources within the same time interval.

66.     An actual, substantial, immediate, and continuing controversy exists between AvioVision and IV regarding non-infringement of the '000 patent within the meaning of 28 U.S.C. § 2201.

67.     A judicial declaration of non-infringement is necessary and appropriate so that AvioVision may ascertain its rights regarding the '000 patent.

## COUNT II

*(Declaratory Judgment of Invalidity of the '000 Patent)*

68.     AvioVision restates and incorporates by reference the allegations in paragraph 1 through 67 of this Complaint as if fully set forth herein.

69.     IV claims to own all right, title, and interest in the '000 patent.

70.     One or more claims of the '000 patent fail to meet one or more of the conditions of patentability, or to otherwise satisfy the requirements set forth in Part II of Title 35 of the United

– 17 –

States Code, including 35 U.S.C. §§ 101, 102, 103, and 112, and the rules, regulations, and laws pertaining thereto.

71.    As described above, the claims of the '000 patent are directed to an abstract idea at *Alice* step one.  They recite functional objectives—receiving allocation information, transmitting data, transmitting a control signal when data is not being sent, and receiving feedback—implemented using conventional wireless components, without reciting any specific means for achieving those results.  Additionally, the asserted claims fail *Alice* step two, because they lack an inventive concept.  The claims of the '000 patent recite only generic wireless networking components performing their ordinary roles to implement an abstract scheduling and feedback concept.  The claims of the '000 patent lack an inventive concept.  For at least these reasons, the claims of the '000 patent are invalid under 35 U.S.C. § 101.

72.    As described above, the claims of the '000 patent are also invalid as anticipated and/or obvious under 35 U.S.C. §§ 102 and 103 in light of certain prior art.  For example, the Krishnan, Shin, and Kuchibhotla references disclose and/or render obvious each limitation of each asserted claim, rendering these claims invalid.

73.    As described above, the claim term "configured, in a time interval that it is not sending information over the physical uplink shared channel, to send the uplink physical signal based on the received resource allocation information," is indefinite to the extent it does not mean transmitting the uplink physical signal in a separate timeslot than PUSCH data.  For at least these reasons, the claims of the '000 patent are invalid under 35 U.S.C. § 112.

74.    An actual, substantial, immediate, and continuing controversy exists between AvioVision and IV regarding invalidity of the '000 patent within the meaning of 28 U.S.C. § 2201.

75.    A judicial declaration of invalidity is necessary and appropriate so that AvioVision

may ascertain its rights regarding the '000 patent.

## PRAYER FOR RELIEF

WHEREFORE, AvioVision N.V. prays for judgment and relief as follows:

A.    Declaratory judgment that AvioVision does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of United States Patent No. 11,032,000;

B.    Declaratory judgment that the claims of United States Patent No. 11,032,000 are invalid and unenforceable;

C.    Judgment in favor of AvioVision and against Intellectual Ventures II LLC on AvioVision's claims;

D.    An injunction against Intellectual Ventures II LLC, and all persons acting on its behalf or in concert with it, restraining them from further prosecuting or instituting any action alleging that any AvioVision product, service, or technology, or others' use thereof, infringes any claim of United States Patent No. 11,032,000;

E.    Finding that this is an exceptional case under 35 U.S.C. § 285;

F.    Awarding AvioVision its costs and attorneys' fees in connection with this action; and

G.    Such further and additional relief as the Court deems just and proper.

## JURY DEMAND

AvioVision demands a jury trial on all issues and claims so triable.

Dated: February 4, 2026

MCCARTER & ENGLISH, LLP

*/s/ Daniel M. Silver*

OF COUNSEL:

Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com

Andrew D. Gish
Benu Wells
Christopher Gerson
GISH PLLC
41 Madison Avenue, Floor 31
New York, NY 10010
(212) 518-2000
andrew@gishpllc.com
benu.wells@gishpllc.com
chris.gerson@gishpllc.com

*Attorneys for Plaintiff*