**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

INTELLECTUAL VENTURES I LLC and
INTELLECTUAL VENTURES II LLC,

*Plaintiffs,*

v.

SOUTHWEST AIRLINES CO.,

*Defendant.*

**Civil Action No. 3:25-CV-02885-L-BN**
**(consolidated with 3:25-cv-03097-L)**

**JURY TRIAL DEMANDED**

# PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS


**Page**

**I. INTRODUCTION ........................................ 1**

**II. '844 PATENT ........................................ 1**

A. '844 PATENT BACKGROUND ........................................ 1

B. DISPUTED CLAIM TERMS ........................................ 2

*1. "root image" ........................................ 2*

*2. "leaf images" / "said leaf images including only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image" ........................................ 4*

*3. "merging the blocks of said root image with the blocks of respective leaf images to create cohesive respective application environments" ....... 6*

*4. "caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory" ........................................ 8*

**III. '722 PATENT ........................................ 10**

A. '722 PATENT BACKGROUND ........................................ 10

B. '722 DISPUTED CLAIM TERMS ........................................ 10

*1. "respond to the live object of the data representation by determining an object identifier (ID) of the live object" ........................................ 10*

*2. "register for updates of the live object with the routing network" ........... 11*

*3. "input source" /"identify a category of the update message based on the input source" ........................................ 13*

*4. "input source" ........................................ 15*

*5. "gateway device" ........................................ 16*

**IV. '582 PATENT ........................................ 17**

A. '582 PATENT BACKGROUND ........................................ 17

B. 'DISPUTED CLAIM TERMS ........ 18

*1. "distributing descriptions of all of said partitions to each of a plurality of subtask processors" ........ 18*

*2. "first come/first-served basis" ........ 19*

*3. "description of all said partition" ........ 20*

**V. '080 PATENT ........ 22**

A. '080 PATENT BACKGROUND ........ 22

B. DISPUTED CLAIM TERMS ........ 23

*1. "distributed sequential computing program" ........ 23*

*2. "distributed parallel computing program" ........ 25*

**VI. '000 PATENT ........ 26**

A. '000 PATENT BACKGROUND ........ 26

B. DISPUTED CLAIM TERMS ........ 26

*1. "time interval" ........ 26*

**VII. CONCLUSION ........ 29**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Airlines, Inc. et al. v. Intellectual Ventures II LLC*,
Case IPR2025-00931 (PTAB Apr. 30, 2025) ....................4, 31

*Dow Chem. Co. v. Sumitomo Chem. Co., Ltd.*,
257 F.3d 1364 (Fed. Cir. 2001) ....................21

*Exxon Chem. Patents, Inc. v. Lubrizol Corp.*,
64 F.3d 1553 (Fed. Cir. 1995) ....................27

*Intellectual Ventures I LLC et al. v. American Airlines, Inc.*,
Civil Action No. 4:24-cv-00980-ALM (E.D. Tex.) .................... *passim*

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004) ....................7

*Luminara Worldwide, LLC v. Liown Elecs. Co. Ltd.*,
814 F.3d 1343 (Fed. Cir. 2016) ....................22

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) .................... *passim*

*SIPCO, LLC v. Emerson Electric Co.*,
794 F. App'x 946 (Fed. Cir. 2019) ....................27

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
299 F.3d 1313 (Fed. Cir. 2002) ....................7, 28

*Thorner v. Sony Computer Ent. Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012) ....................3, 16

# I. INTRODUCTION[1]

Plaintiffs Intellectual Ventures I LLC and Intellectual Ventures II LLC (collectively, "Intellectual Ventures," "IV," or "Plaintiffs"), submit this brief in support of its proposed constructions for the disputed claim terms of the Patents-in-Suit, as described below.

The Court should adopt each of IV's proposed constructions, which are properly grounded in the intrinsic record and, where appropriate, provide helpful clarity to a person of ordinary skill in the art ("POSITA"). In contrast, Defendant Southwest Airlines Co., (hereinafter "SW" or "Defendant") propound constructions that improperly read limitations into the claims from the specification, are based on misinterpreting the patent's prosecution histories, or are otherwise unsupported by the intrinsic record.

# II. '844 PATENT

## A. '844 Patent Background

The '844 Patent discloses storing data blocks of a root image on a first storage unit and storing data blocks of leaf images on a second storage unit, where the leaf image includes additional data blocks that are not contained in the root image, including changes made to the blocks of the root image. Ex. 1 ('844 Patent) at Abstract. If blocks are unchanged, then they are not stored on the leaf image. *Id.* at 11:35-38. Blocks of a root image that are accessed by one or more compute nodes may be cached, such that subsequent attempts to access the blocks by the same compute node (or other nodes) result in significant speed improvements. *Id.* at 6:38-49. A method for generally implementing a system as described is disclosed in Figure 3A, reproduced

---

[1] IV did not include the '282 Patent terms. In view of Judge Mazzant's recent claim construction order concerning the same patent, IV intends to move to sever and stay the '282 Patent. *See* Ex. 3. IV proposed that the parties remove all '282 Patent terms from the JCCS and related briefing, but Southwest has not yet provided its position. IV reserves all rights, including the right to amend or supplement its briefing, should the '282 Patent remain in the case.

below. As shown, blocks of a root image are stored in a first storage unit at step **310** and blocks that are, e.g., changed or are new, are part of a leaf image that is stored in a second storage unit at step **320.** *Id.* at 7:58-67. To the extent blocks are accessed, they are stored in cache at step **322,** where they can be retrieved on subsequent access attempts, for example, at steps **324, 326,** and **328.** *Id.* at 8:1-12.

### B. Disputed Claim Terms

#### 1. "root image"

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | a base image of the application environment operating at the block level below the file system |

The Court should reject SW's attempt to construe "root image" as "a base image of the application environment operating at the block level below the file system." SW's construction departs from the plain and ordinary meaning by adding requirements that a root image (1) be a "base image of the application environment" and (2) operate "at the block level below the file system." Neither limitation is required by the claim language, and SW cannot establish the lexicography or clear and unmistakable disavowal necessary to impose them. The independent claims generally recite a first storage unit for storing blocks of a root image of a compute node, where the blocks include "sections of data," and where "a file of the root image" includes "at least one block." *See, e.g.,* Ex. 1 at 7:14-19. In other words, a block can correspond to a file. The claims also generally recite that changes to the blocks of the root image are stored in a leaf image, and that the application environment is created by merging the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit. *See, e.g., id.* at 7:21-32. Nothing in this claim language requires a root image itself to operate below the file system. The claims expressly identify the relevant characteristics and use of the root image without imposing the additional architectural limitation SW proposes.

In the Background section, the specification describes the root image as "a read-only base image (or 'root' image) of the application environment" that is "accessible by all compute nodes in the cluster," and that when changes are made to data in the root image, those changes are stored in a 'leaf' image unique to that compute node." *Id.* at 1:58-2:3. But that passage does not purport to define "root image" or clearly express an intent to make every characteristic in that description a requirement of the claim term. *See Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). Indeed, SW's construction selectively extracts only part of the description. Although the passage describes a "read-only base image" that is "accessible by all compute nodes," SW does not propose that a root image must be "read-only" or accessible by all compute nodes. SW cannot treat selected characteristics from this descriptive passage as definitional while disregarding the others. The specification also describes embodiments where the root image is modified, for example, during reconciliation where a root image and a leaf image are combined "to form a new root image." Ex. 1 at 6:31-37. That disclosure further confirms that the Background's description of a particular implementation does not establish a definition of "root image." Nor does the specification require a root image to operate "at the block level below the file system." To the contrary, the specification states that "[b]y storing data at the block level, embodiments are able to operate beneath the file system." *Id*. at 7:58-62 (emphasis added). "Able to" describes a capability, not a mandatory requirement. The specification therefore does not provide the clear lexicography or disavowal necessary. *See Phillips v. AWH Corp*., 415 F.3d 1303, 1323 (Fed. Cir. 2005).

Indeed, in construing this same term in the '844 Patent, the court in *Intellectual Ventures I LLC et al. v. American Airlines, Inc.*, Civil Action No. 4:24-cv-00980-ALM (E.D. Tex.) (the "*American* CC") rejected the same attempt to require a root image to operate beneath the file

system. The court explained that the proposed limitation was "not based on any claim language" and that the specification states only that embodiments "are able to operate" beneath the file system, "not that [they] must do so." Ex. 2 (7/28/26 American Claim Construction order) at 33. The Court therefore concluded that requiring a root image to operate beneath the file system "would introduce an unwarranted limitation." *Id*. SW's materially identical limitation should be rejected.

SW's position is also inconsistent with the position it took when challenging the '844 Patent before the Patent Trial and Appeal Board ("PTAB"). In *American Airlines, Inc. et al. v. Intellectual Ventures II LLC*, Case IPR2025-00931 (PTAB Apr. 30, 2025), SW did not contend that "root image" required its present narrowing construction, or that the term must be limited to an image "operating at the block level below the file system," when seeking to invalidate the patent. SW cannot persuasively maintain before the PTAB that no express construction was necessary to evaluate the claims under *Phillips*, while now insisting that this Court must narrow otherwise clear claim language by importing limitations that appear nowhere in the claims. Permitting SW to obtain the benefit of a broader reading when challenging validity and then advocate a materially narrower reading in this proceeding would be unjust. At minimum, SW's prior position confirms that its present construction is not compelled by the intrinsic record and should be rejected. Accordingly, SW has not met its burden to justify departing from the plain and ordinary meaning of "root image," and its proposed construction should be rejected.

**2. "leaf images" / "said leaf images including only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image"**

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | a node-specific image of the application environment operating at the block level below the file system |

IV's plain and ordinary meaning construction is likewise appropriate for the disputed "leaf images" limitation. The claim language itself already specifies the relevant relationship between the leaf images and the compute nodes, reciting "leaf images of respective compute nodes," and expressly specifies what the leaf images include: "only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image." Ex. 1 at 11:33-35. SW's construction nevertheless rewrites that detailed claim language to require "a node-specific image of the application environment operating at the block level below the file system." SW cannot establish the lexicography or clear and unmistakable disavowal necessary to impose those additional limitations.

The specification does not supply what the claims omit. Although the specification describes a "leaf" image as "unique to" a particular compute node, *id*. at 1:58–2:3, the claims themselves already expressly address that relationship by reciting "leaf images of respective compute nodes." That disclosure therefore provides no basis for SW's additional requirement that a leaf image be an "image of the application environment operating at the block level below the file system." Indeed, the claims themselves expressly address the relationship between the leaf images and the "respective compute nodes," making SW's reformulation unnecessary. Nor does the intrinsic record require a leaf image itself to "operat[e] at the block level below the file system." As discussed below, the specification states only that, "[b]y storing data at the block level, *embodiments* are able to operate beneath the file system." *Id*. at 7:58–62 (emphasis added). That permissive description of what embodiments "are able to" do does not define a "leaf image" or require every claimed leaf image to operate beneath the file system.

Moreover, in construing the related term "root image" in this same patent, the *American* CC rejected an attempt to impose the same "below the file system" requirement SW advances here.

Ex. 2 at 30-33. In doing so, the court considered the same disclosure at 7:58–62 and concluded that it describes an embodiment that is "able to operate" beneath the file system, "not that it must do so," and that imposing such a requirement would constitute an "unwarranted limitation." *Id*. SW identifies no basis for reaching a different conclusion from the same intrinsic evidence. Moreover, as discussed above, SW did not advance this narrowing construction in IPR2025-00931, instead maintaining no express constructions were necessary.

#### 3. "merging the blocks of said root image with the blocks of respective leaf images to create cohesive respective application environments"

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | combining the root image and the leaf image at the block level below the file system |

IV's plain and ordinary meaning construction is appropriate because claim 11 of the '844 Patent already specifies what is being merged ("blocks of said] root image with blocks of respective leaf image") and the result (to create the "application environment[]"). The claim language does not require any further qualification. SW's proposed construction should be rejected because it requires that the merging occur 'at the block level below the file system,' even though that requirement appears nowhere in the claim language. Nor can SW meet its burden to justify that departure from the term's ordinary meaning based on lexicography or clear and unmistakable disavowal. *See* Ex. 1 at 7:58-62. This passage describes that "embodiments ***are able to operate*** beneath the file system," not that they must operate beneath the file system. In other words, the cited language is permissive, not mandatory. Regardless, while that passage describes merging occurring "at an operational level between the file system of a compute node and the first storage unit, the corresponding second storage unit, and the cache" (Ex. 1 at 8:13-18), this is descriptive of one embodiment, not a definitional statement limiting the claims. Nothing in either passage reflects a clear intent to redefine the ordinary term "merging" or a clear and unmistakable

disavowal of merging performed in some other manner. The Federal Circuit has repeatedly cautioned against importing limitations from the specification into the claims, particularly where, as here, the patentee has not acted as its own lexicographer or made a clear disavowal of claim scope. *See Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."); *see also Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1328 (Fed. Cir. 2002) (holding absent lexicographic definition or disclaimer "[w]e have 'cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification.'").

The surrounding claim language reinforces that conclusion. Claim 11 itself specifies both the objects of the claimed merging "blocks of said root image" and "blocks of respective leaf images" and what that merging accomplishes: creating the application environments. *See* Claim 11. Thus, the claim expressly states what is merged and the claimed result, but does not require the merging to occur at any particular 'operational level' or 'below the file system." Adding SW's limiting language would impermissibly narrow the claim by importing structural limitations not present in the claim itself. *See Liebel-Flarsheim Co. v. Medrad, Inc*., 358 F.3d 898, 906 (Fed. Cir. 2004) ("[C]laims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'"). Further, SW's proposed construction adds unnecessary ambiguity to these terms. The phrase "using a mechanism beneath the file system" replaces readily understandable claim language with an undefined architectural requirement that the claims themselves never recite.

The court's construction of the '844 Patent in the *American* CC confirms the proposed limitation is improper. There, the court considered the same disclosure at 7:58–62 and rejected the argument that it requires operation beneath the file system, explaining that the specification states only that the embodiment is "able to operate" beneath the file system, "not that it must do so." Ex. 3 at 17. The court concluded that importing a below-the-file-system requirement unsupported by the claim language "would introduce an unwarranted limitation." *Id*. Although the disputed term there was "root image," SW relies on the same intrinsic disclosure to impose the same architectural restriction on "merging." Nothing in that disclosure converts the described capability of an embodiment into a mandatory limitation on the claimed merging operation.

#### 4. "caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory"

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | caching blocks of the root image that have been accessed by at least one of said compute nodes in a cache memory at the block level below the file system |

SW's inclusion of "at the block level below the file system" is unnecessary and improperly narrows the claim language. Claim 11 already specifies exactly what is cached, where it is cached, and the condition triggering that caching: "caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory." Ex. 1 at 11:39-40. The claim does not additionally require that this caching occur "below the file system."

Nor does the specification establish lexicography or clear and unmistakable disavowal requiring SW's additional limitation. As discussed above, the specification states that "[b]y storing data at the block level, embodiments are able to operate beneath the file system." *Id*. at 7:58-62 (emphasis added). The statement that "embodiments are able to operate" beneath the file system describes a capability, not a mandatory requirement that the claimed caching must occur there.

And the specification's separate description of merging at "an operational level between the file system" and the storage units and cache, *id.* at 8:13–18, does not state that the caching operation itself must occur at that level.

Indeed, the specification separately describes the caching operation without imposing SW's proposed limitation. It explains that blocks of the root image accessed by one or more compute nodes may be cached so that subsequent attempts to access those blocks can be served from the cache. *See* Ex. 1 at 6:38-49.

Nothing in that description defines "caching" as occurring beneath the file system. Another court's prior construction of the '844 Patent reinforces this conclusion. In *Intellectual Ventures I LLC v. American Airlines, Inc*., the court considered the same disclosure at 7:58–62 and held that the statement that embodiments "are able to operate beneath the file system" describes a capability, not a requirement. Ex. 2 at 17. The court therefore rejected the proposed below-the-file-system restriction as an "unwarranted limitation" unsupported by the claim language. *Id*. The same reasoning applies here: nothing in the separately claimed caching limitation requires that caching occur beneath the file system. The prior American Airlines claim-construction ruling further supports that conclusion. Although the disputed term there was "root image," the court rejected the same attempt to impose a requirement that the claimed architecture operate below the file system. Ex. 3 at 45-48. SW identifies no different intrinsic evidence that would justify importing that rejected architectural restriction into the separately claimed "caching" operation here. As explained above, SW position is also inconsistent with the position it took in IPR2025-00931.

SW therefore cannot convert a disclosed capability of certain embodiments into a mandatory architectural limitation on otherwise clear claim language. SW has not met its burden to justify departing from the term's plain and ordinary meaning.

## III. ’722 PATENT

### A. ’722 Patent Background

U.S. Patent No. 8,407,722 (“’722 Patent”) is titled “Asynchronous Messaging Using a Node Specialization Architecture in the Dynamic Routing Network” and was filed as Application No. 11/396,251 on March 30, 2006.

The ’722 Patent discloses transferring information for remotely updating content to client devices through digital networks. Ex. 4 (’722 Patent) at 1:24-27. A client device receives a live object from an input source, and in response identifies object IDs associated with the object and registers the object IDs with a routing network that is adapted to send update messages to nodes in the network that then forward the messages to the client. *Id.* at Abstract. Messages from an input source are assigned to one or more categories tracked by a gateway, such that when a gateway receives update messages from input sources and identifies the one or more categories, it routes the messages to the appropriate client(s). This routing “utilizes bandwidth efficiently because the update messages are provided to the clients only when the live objects change.” *Id.* at 3:18-20.

### B. ’722 Disputed Claim Terms

#### 1. “respond to the live object of the data representation by determining an object identifier (ID) of the live object”

| Plaintiffs’ Proposed Construction | Defendant’s Proposed Construction |
|---|---|
| Plain and ordinary meaning, no construction necessary | parse the data representation to identify an object identifier of the live object |

SW’s proposed construction improperly narrows the claim by replacing the claimed requirement of “determining” an object identifier with a requirement to “parse the data representation to identify” that identifier. Claim 14 does not recite “parsing,” and SW bears the burden of establishing a basis in the intrinsic record for adding that limitation. It cannot do so absent lexicography or clear and unmistakable disavowal.

The surrounding claim language confirms that no further construction is necessary. Claim 14 recites a "data representation" that "includes at least one live object recognizable by the client device" and requires the client device to "respond to the live object of the data representation by determining an object identifier (ID) of the live object." Ex. 4 at 23:59-61. The claim therefore specifies both what triggers the response and what the response entails. Nothing in that language requires the particular process of "parsing" the data representation that SW seeks to add.

Nor should the ordinary word "determining" be replaced with SW's narrower "parse . . . to identify" formulation merely because the specification may describe parsing in particular embodiments. The '722 Patent uses the term parse as part of the description of the embodiment (at 14:22-25 ("Fig. 6 is a flow chart illustrating the steps performed by an embodiment of the activation module 124."). Furthermore, parsing is described as optional. *Id.* at 14:33-35 ("the activation module 124 preferably parses 610 of the webpage…"). Thus, the specification itself characterizes parsing as a preferred implementation, not a requirement of "determining" an object identifier. SW's construction would improperly convert that expressly preferred feature into a mandatory claim limitation. SW's IPR petition further confirms that this newly asserted "parsing" limitation is not required. In IPR 2025-[00931], SW applied the *Phillips* standard. Nor does SW identify any lexicography or clear and unmistakable disavowal that would justify limiting the broader claim language to that preferred embodiment. The Court should therefore give the disputed phrase its plain and ordinary meaning.

**2. "register for updates of the live object with the routing network"**

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning, no construction necessary | communicate to the routing network a vector containing the identified object identifier |

IV's plain and ordinary meaning construction is appropriate because claim 14 itself specifies both what the client device does "register for updates of the live object with the routing network" and the claimed result of that registration: "registering the client device with the routing network provides client connection information to a node in the routing network." Ex. 4 at 23:63-65. The claim language does not require any further qualification.

SW nevertheless seeks to add a specific implementation requirement: that registration must "communicate to the routing network a vector containing the identified object identifier." But claim 14 does not recite a "vector" at all. SW's argument again appears to rely on the Figure 6 embodiment discussed above. *See supra*. But that embodiment does not establish that use of a vector is mandatory, and SW therefore bears the burden of demonstrating that the patentee clearly defined registration to require such a vector or clearly and unmistakably disavowed registration accomplished in some other manner. *See* Ex. 4 at 14:55–59.

To the extent the specification describes embodiments in which registration information is communicated using a vector, that does not make the vector a limitation of the claim. Nothing in the claim language requires that particular data structure, and SW identifies no lexicography or clear disavowal limiting "register for updates" to that implementation. SW likewise did not identify this purported "vector" requirement in its IPR petition. Applying *Phillips*, SW proposed an express construction only for "activation module" and represented that no express construction of the other challenged claims was necessary because they were allegedly obvious "under any reasonable construction." In Ex 11 at 10-12. Yet SW now contends that registration must use the particular "vector" implementation disclosed in the specification. SW's failure to identify this purportedly necessary limitation when challenging the patent under the same *Phillips* standard

further undermines its contention that the intrinsic record requires that limitation now. SW's proposed construction should be rejected and the term given its plain and ordinary meaning.

#### 3. "input source" /"identify a category of the update message based on the input source"

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning, no construction necessary | identify a category of the update message based on the information provider or dynamic content provider but not on the category/topic of the message content |

For this claim term, the parties dispute SW's attempt to rewrite "based on the input source" to require identification "based on the information provider or dynamic content provider but not on the category/topic of the message content." SW's construction should be rejected because it both improperly narrows "input source," as discussed below, and overstates the effect of the prosecution history. Although the prosecution history distinguishes identifying a category based on the input source from identifying a category based on the data content of the message, it does not require the input source to be the exclusive basis for identifying the category.

The '722 Patent specification describes many ways of identifying a category of an update message. Indeed, it expressly tells us so: "[t]here are multiple ways to assign the messages into categories." Ex. 4 at 18:52-60; *see also id.* at 19:6-8 ("In one embodiment, the gateway 724 uses a combination of multiple techniques to determine the message categories, node types, and/or mappings."). Examples of those methods include the following:

- "One way is to assign all messages from a given input source 710 into certain category." *Id.* at 18:53-54.
- "Another way is to explicitly specify the category in the object ID for the message." *Id.* at 18:54-55.
- "Yet another way is to utilize a hashing function or lookup table to partition messages into categories based on object IDs or other values. For example, in one embodiment a hash function is applied to the object ID to generate an integer between 1 and N, and this integer is the message category." *Id.* at 55-58.

- "For example, *a lookup table can be used to encode a priori knowledge about categories, types, and/or mappings and a hash table can be used to route messages for which there is no a priori knowledge.* Continuing this example, assume that certain messages are assigned to a given category based on a table lookup, while other messages are assigned to categories based on a hashing function. In this example, the gateway 724 looks up the object ID (or other information, such as an input source ID) of an arriving message in a lookup table to determine if it has a specified category. If the object ID is stored in the lookup table, the gateway 724 determines the mappings for the category and routes the messages to the nodes of the appropriate types. If the objectID is not stored in the lookup table, the gateway 724 utilizes a hash function on the objectID (or other information) to determine the message category." *Id.* at 19:8-23 (emphasis added).

There is no real dispute that the '722 Patent specification describes multiple ways of identifying a category of an update message. The term in dispute merely requires that the identification of a category of the update message be done based on the input source. The recited identification can be based on other information as well, and the claim language does not limit such identification. Specifically, SW relies on the following passage from the '722 Patent Prosecution History to support its proposed language:

> The Examiner, for example, on page 3 of the Office Action, relies on the above sections of Chandra to allegedly show "identifying each category based on the category/topic of the message content." By this statement, the Examiner appears to agree that Chandra teaches identifying categories **based on category/topic of the message content**. In contrast, claims 26, 33, 39, 45, 51, and 57 recite, *inter* alia,

Ex. 5 ('722 Patent Prosecution History, Applicant Response Dated February 9, 2012) at 18. In this statement, the Applicant merely notes that the prior art fails to disclose the pending claim language "identify a category of the update message based on the input source" because it identifies categories "based on category/topic of the message content." Claim 14 does not preclude identification of a category based on a category or topic of message content, as long as the identification is also "based on the input source." The Court should therefore reject SW's construction. SW's IPR position points in the same direction as described above, where SW did

not seek a construction. SW's failure to identify this purported exclusivity requirement further undermines its contention that the intrinsic record requires that limitation.

### 4. "input source"

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning, no construction necessary | information provider and/or dynamic content provider |

The claim term "input source" does not require construction and should be construed to have its ordinary and customary meaning, i.e., a source of input. SW's proposed construction based on lexicography is wrong because (i) there is no lexicography and (ii) it unnecessarily limits the meaning of "input source" to a particular embodiment.

Indeed, SW's proposed construction has already been considered and rejected in construing this same term in the '722 Patent. In the *American* CC, the defendant likewise proposed construing "input source" as "information provider and/or dynamic content provider." Ex. 3 at 19. The Court rejected that construction, holding that "the patentees did not explicitly define the term 'input source'" and that the specification's references to information providers and dynamic content providers are examples that do not exclude other input sources. *Id*. The court accordingly gave "input source" its plain and ordinary meaning. *Id.* SW proposes the same construction here, and it should be rejected for the same reasons.

SW's IPR petition provides still further reason to reject that same narrowing construction for the reasons described above. Claim 14 recites, in part, "providing, using a processing device of *an input source,* a data representation to a client device … [that] includes at least one live object recognizable by the client device." Ex. 4 at 23:55-59 (emphasis added). Thus, on its face, claim 14 recites an "input source" that provides a "data representation" that includes a "live object" to a "client device." While the '722 Patent specification provides *examples* of an input source including an "information provider" and a "dynamic content provider," it does not limit an "input source" to

those examples. For example, the specification "*generically refer[s]*" to an "information provider" or a "dynamic content provider" as an "input source," but it does not define an input source as such. *Id.* at 3:15-18 (emphasis added). Further, Figure 7 describes various "input sources **710"** that are involved in sending messages to clusters, including an information provider **710A,** dynamic content provider **710B,** and *undefined* input sources **710C** and **710D.**




*Id.* at Figure 7 (annotations added). While an input source *can* be an information provider or a dynamic content provider, the specification describes other potential sources of input. *Thorner*, 669 F.3d at 1366 ("We do not read limitations from the specification into claims; we do not redefine words.").

**5. "gateway device"**

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning, no construction necessary | a component of the routing network situated between the input source and the node |

The term "gateway device" requires no construction because claim 14 itself specifies both the location and functions of the claimed device. The claim expressly recites "a gateway device at the routing network" and then specifies that the gateway device is configured "to identify a category of the update message based on the input source, to determine a node type to which the identified category maps, and to route the update message to the node, having the node type, at the routing network." Ex. 4 at 24:1–7. Nothing in that language additionally requires the gateway

device to be physically or logically "situated between the input source and the node," as SW proposes.

The specification likewise does not define a "gateway device" as a component "situated between the input source and the node" or clearly and unmistakably disclaim gateways arranged in any other manner. Rather, consistent with the claim language, the specification describes gateways by the functions they perform within the routing network, including maintaining mappings between message categories and node types and routing messages to appropriate nodes. Ex. 4 at 19:4-5. Indeed, the specification describes the gateway as part of the routing-network architecture and focuses on its role in receiving, categorizing, and routing messages; it does not state that being physically or logically "situated between" an input source and a node defines what makes a device a "gateway device. SW cannot import a particular network topology from an embodiment into otherwise clear claim language absent lexicography or clear disavowal. *See Phillips*, 415 F.3d at 1323. Accordingly, "gateway device" should receive its plain and ordinary meaning. SW's IPR position further undermines its newly asserted topological limitation as described above.

## IV. <u>'582 PATENT</u>

### A. <u>'582 Patent Background</u>

U.S. Patent No. 7,257,582 ("'582 Patent") is titled "Load Balancing with Shared Data" and was filed as Application No. 10/375,893 on February 27, 2003. The '582 Patent discloses parallel processing and includes logically subdividing an input file into partitions that are distributed to processors that execute subtasks in parallel, including reading the partitions. Ex. 6 ('582 Patent) at Abstract. Upon executing a partition, a processor may obtain an unprocessed partition, including on a first-come/first-served basis, until subtask execution completes and output is combined. *Id.* at 1:61-2:14. The input file can be stored in a directly attached storage" or on a "network attached

storage." *Id.* at 2:28-30. The parallel processing can involve various types of processes, including sort processes, statistical analysis processes, report generation processes, and database query processes. *Id.* at 2:30-33. The processors can be associated with their own respective computer or can be part of a multi-processor system. *Id.* at 2:33-37.

### B. <u>'Disputed Claim Terms</u>

#### 1. "distributing descriptions of all of said partitions to each of a plurality of subtask processors"

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | providing each subtask processor with a control file specifying the logical partitions of the input file |

SW's proposed construction improperly rewrites the claimed "descriptions" as a particular "control file." Claim 1(b) already clearly states what is required "distributing descriptions of all of said partitions to each of a plurality of subtask processors." Ex. 6 at 6:50–51. Nothing in that language requires the descriptions to take the form of a "control file," much less a particular control file "specifying the logical partitions of the input file." SW therefore bears the burden of identifying lexicography or clear and unmistakable disavowal requiring that additional structure.

The intrinsic record does not supply that requirement. Indeed, in construing the related phrase "description of all said partitions" in this same claim, the court *in Intellectual Ventures I LLC v. American Airlines, Inc*. recognized that the amended claim language itself requires that "descriptions" of the partitions—not the partitions themselves—be distributed to the subtask processors. Ex. 3 at 14. Nothing in that decision, or the claim language, requires those descriptions to be embodied in a "control file." SW's proposal therefore improperly substitutes a particular implementation for the broader language chosen by the patentee.

SW's IPR position further undermines that attempt. Applying the same Phillips standard, Petitioners stated that they "do not believe explicit construction is needed to resolve this petition."

Ex. 3 at 28-31. SW did not contend that "distributing descriptions" required providing each processor with a particular "control file." The term should receive its plain and ordinary meaning.

### 2. "first come/first-served basis"

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "a subtask processor independently selects the next available partition to process without coordination from any central controller or scheduler and without relying on load information" |

SW's proposed construction should be rejected because another court has already construed the identical "first-come/first-served basis" limitation in claim 1 of the '582 Patent and held that it should receive its plain and ordinary meaning. *See Intellectual Ventures I LLC v. American Airlines, Inc.*, Ex. 3 at 44. The court expressly rejected the defendant's attempt to add requirements concerning how the next unprocessed partition is selected as "unnecessary and unwarranted," and ultimately held that "on a first-come/first-served basis" requires no further construction. *Id*. SW nevertheless proposes an even more restrictive construction, requiring that a subtask processor act "independently" and "without coordination from any central controller or scheduler and without relying on load information.".

Step (d) of claim 1 recites "thereafter repeating step (c) in at least some of the subtask processors each with another unprocessed partition on a first-come/first-served basis." Ex. 6 at 6:59-61. Step (e) recites "generating at least one output combining all of the subtask outputs and reflecting the processing of all of said subtasks." *Id.* at 6:62-64. Nothing in steps (c) or (d) requires that the processor act "independently," prohibits coordination with a central controller or scheduler, or prohibits reliance on load information. Those are additional restrictions SW seeks to impose on otherwise straightforward claim language. Additionally, SW's proposed construction is inconsistent with the multiple descriptions in the '582 Patent specification that allow for the inclusion of an internal or external scheduler that considers dependencies:

> The various parts of the Equivalent Process 101 are depicted here as consecutive steps in one procedure but alternative embodiments could replace them by dependent 15 tasks controlled by a job scheduler. In this case, the wait step would be replaced by a dependency of the Merge step 105 on the completion of Sub Task 103, Sub Task 201 and Sub Task 202.

Ex. 6 at 3:13-19.

> When the split step terminates, the various Sub Tasks (in this case: 103, 202.203) can be activated. This activation can 65 be initiated by the split step 102 itself or by an external scheduler.

*Id.* at 3:64-67. These disclosures undermine SW's categorical attempt to exclude coordination by any central controller or scheduler. The patent expressly contemplates embodiments employing both a job scheduler and an external scheduler, without stating that the presence of such scheduling is incompatible with processing partitions on a "first-come/first-served basis." SW cannot construe "first-come/first-served" to exclude embodiments that the specification expressly contemplates."

SW's IPR position provides additional confirmation as explained above. SW did not contend that "first-come/first-served" required independent selection without scheduler coordination or reliance on load information.

### 3. "description of all said partition"

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | statements giving a characteristic(s) of all of the well-defined parts of the input file for use in distributing the load without a special load process, wherein such statements are distinct from the input file itself |

The Court should adopt the plain and ordinary meaning of the term "description of all said Partitions" and reject SW's proposal to construe the term as "statements giving a characteristic(s) of all well-defined parts of the input file for use in distributing the load without a special load wherein such statements are distinct from the input file itself."

Claim 1(b) recites "distributing descriptions of all of said partitions to each of a plurality of subtask processors." Ex. 6 at 6:50-51. The language that SW attempts to add to this term is nowhere in the claim or the specification. Moreover, there is nothing in this claim to justify construing this term. In combination with the above construction of the term "partition," "description of all said partitions" does not require construction beyond its plain and ordinary meaning.

SW's proposed construction improperly adds multiple limitations to this claim term. Specifically, the negative limitation "without a special load process" and the limitation "wherein such statements are distinct from the input file itself" are not supported by intrinsic evidence. Further, SW's reliance on a single layman dictionary definition for constructing "description" is improper given the technical nature of the '582 Patent and the technical relationship between the "descriptions" and the "partitions." *See Dow Chem. Co. v. Sumitomo Chem. Co., Ltd.*, 257 F.3d 1364, 1372-1373 (Fed. Cir. 2001) ("We have previously cautioned against the use of non-scientific dictionaries, 'lest dictionary definitions ... be converted into technical terms of art having legal, not linguistic significance.'") (citation omitted).

SW relies on the file history to import the limitation "without a special load process." However, a closer review of the '582 Patent Prosecution History confirms that insertion of this limitation into claim 1 is not supported. During prosecution, the Applicant distinguished prior art, in part, based on the "first-come/first-served basis" limitation. The Applicant also added clarification to the "distribution" limitation, shown below with annotations:

> The amended claims, refer to a distribution of a description of the work to be done. The sharing process can use such a description to distribute the load without a special load process.

Ex. 7 ('582 Patent Prosecution History, March 6, 2007 Applicant Response) at 7. The prosecution history does not establish a clear and unmistakable disclaimer requiring operation "without a special load process." To the contrary, the Applicant explained that "the sharing process can use such a description to distribute the load without a special load process." Ex. 3 at 45 (emphasis added). "Can use" describes what the claimed approach permits; it does not clearly and unmistakably require the exclusion of a special load process in every instance. *See also Luminara Worldwide, LLC v. Liown Elecs. Co. Ltd.,* 814 F.3d 1343, 1353 (Fed. Cir. 2016) (finding no reason to depart from plain and ordinary meaning where specification described feature as optional and no evidence in prosecution history that is to the contrary).

As described above, SW's position in its IPR challenge to the '582 Patent further undermines its attempt to transform this prosecution statement into mandatory claim limitations. SW's proposed construction is also wrong because there is nothing to support making the "description" "distinct from the input file itself." The amended claim distinguishes the "descriptions" that are distributed from the "partitions" they describe, but that does not establish SW's broader requirement that the descriptions themselves must be "distinct from the input file itself." The claim does not require that the descriptions be stored separately from, or otherwise be distinct from, the input file. The claims merely require that "descriptions" of the partitions are distributed to the subtask processors. SW's reliance on 3:52-59 does not otherwise lead to a different conclusion. Indeed, that disclosure relates to determination of a "logical partition" and that the "reading" of an input file is generally reserved to a subtask that processes reads the partition allocated to the subtask. Therefore, this disclosure indicates that the patent does not place restrictions on the nature of the term, requiring the term to maintain its plain and ordinary meaning.

## V. <u>'080 PATENT</u>

### A. <u>'080 Patent Background</u>

The ’080 Patent generally relates to computer programming and specifically systems and methods for parallel distributed programming, making them more efficient. The ’080 Patent makes parallel distributed programming efficient by including at least one distributed shared variable located across multiple memories and one or more distributed programs configured to operate across multiple processors. The parallel distributed programs can also include one or more self-migrating threads configured to migrate from one processor to another. Ex. 8 (’080 Patent) at 2:8-19.

### B. <u>Disputed Claim Terms</u>

#### 1. “distributed sequential computing program”

| Plaintiffs’ Proposed Construction | Defendant’s Proposed Construction |
|---|---|
| Plain and ordinary meaning | a program that executes sequentially across distributed memory by navigating to the processor that owns the needed memory and then resuming execution there |

The Court should reject SW’s proposal to construe the term as “a program that executes sequentially across distributed memory by navigating to the processor that owns the needed memory and then resuming execution there,” and adopt its plain and ordinary meaning. Claim 1 states “developing at least one distributed sequential computing program to access the at least one distributed shared variable.” Ex. 8 at 11:11-12. A POSITA would understand this term refers to a program that performs computation sequentially while accessing distributed data. This claim language confirms that a distributed sequential computing program is capable of accessing distributed shared data and later serving as a basis for parallel execution. Ex. 8 at 11:5-30.[3] Nothing in claim 1 requires the program to navigate to the processor that owns particular memory or to resume execution at that processor.

Nor does the specification impose SW’s additional navigation requirement. The specification describes “distributed sequential computing (‘DSC’)” as “computing using a single

locus of computation over distributed data, possibly stored in a DSV." *Id.* at 3:50–53. SW's proposed construction goes materially beyond that description by requiring the program to navigate to the processor that owns the needed memory and resume execution there. The specification then gives an example in which "a single thread, M, can migrate to Processor 2 to access the data in the memory of Processor 2 and then continue the computations." *Id.* at 3:54–59 (emphasis added). The word "can" describes one implementation; it does not redefine every distributed sequential computing program to require processor-to-processor migration.

The dependent claims further support IV's construction. Claim 2 expressly requires that each distributed sequential computing program include "at least one self-migrating thread" that is "capable of migrating among at least one processor." Ex. 8 at 11:30-34. Thus, when the patentees intended to require processor-to-processor migration, they expressly recited that functionality. Claim 1, by contrast, requires only a "distributed sequential computing program" that "access[es]" the distributed shared variable; it does not require a self-migrating thread or otherwise recite processor-to-processor migration. SW's construction improperly imports such migration functionality into the broader language of claim 1.

As used in the patent, "distributed sequential computing program" describes the manner of computation, sequential execution, rather than imposing a rigid structural or architectural limitation on how or where computation must occur. SW's construction should be rejected. SW's present position is also inconsistent with the position taken in IPR2025-01511. There, SW argued that no claim construction was necessary and stated that it had "accorded all of the claim terms their plain and ordinary meaning to a POSITA." Ex. 9 (IPR2025-01511, Ex. 1003) at ¶¶ 42–43. SW did not contend that "distributed sequential computing program" required navigation to the processor owning the needed memory or resumption of execution there. SW's failure to identify

those purportedly necessary limitations when challenging the same patent under the plain and ordinary meaning further undermines its attempt to impose them now.

### 2. "distributed parallel computing program"

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | program that computes using multiple concurrent distributed sequential computing programs operating without terminating and resuming thread processes |

The claim term "distributed parallel computing program" does not require construction and should be construed to have its ordinary and customary meaning i.e. a program that enables parallel processing through concurrent execution. SW's proposal provided days before IV's opening brief was due is vague and ambiguous and attempts to equate descriptive statements related to embodiments to import limitations into the claim term. The '080 Patent describes "distributed parallel computing" ("DPC") as "computing using multiple concurrent DSC programs." This description is consistent with the ordinary technical meaning of distributed parallel computing because it focuses on concurrency and parallel execution through the composition of distributed sequential programs.

But SW's construction goes beyond that description by additionally requiring the distributed parallel computing program to be "operating without terminating and resuming thread processes." The specification does not define "distributed parallel computing program" to require those additional architectural limitations and there is no definitional or lexicography and SW provides no indication regarding why this new argument should be included in the claim language.

Moreover, another court has already considered and rejected a similar attempt to impose additional claim language - "multiple processors/nodes and multiple memories" requirements on this exact term. American proposed a similar construction SW advances here. Ex. 2 at 40. The court rejected those additional requirements, explaining that the specification "does not state that

every distributed parallel computing program must operate across each of those resources" and expressly discloses that "a DPC application targeted to multi-processor environments may be utilized on a uni-processor and operates as a multi-threaded application." *Id*. The court therefore concluded that a distributed parallel computing program construed the term as "program that computes using multiple concurrent distributed sequential computing programs." *Id*. The same reasoning applies here and forecloses the additional architectural limitations SW seeks to impose. SW's present position is also difficult to reconcile with its position in IPR2025-01511, that the term should be given its plain meaning as described above.

## VI. <u>'000 PATENT</u>

### A. <u>'000 Patent Background</u>

The '000 Patent generally relates to wireless communications between user equipment ("UEs") and a base station. It addresses challenges associated with efficiently determining channel conditions for multiple UEs while managing uplink and downlink signaling resources. *See* Ex. 10 ('000 Patent) at 2:20-24. The patent includes both apparatus and method claims directed to this wireless signaling scheme. As described in the patent, UEs transmit uplink physical signals during a defined portion of a frame, *i.e.,* a scheduled uplink interval, which may be organized into time slots distinct from those used for uplink data transmission. *Id.* at 2:32-42. These uplink physical signals enable the base station to determine channel conditions for the UEs. *Id.* Based on those channel conditions, the base station transmits control information to the UEs over a physical control channel in designated portions of a downlink frame, to instruct them how and when to transmit. *Id.* The patent describes these operations as being performed by configured components of the UE, including the receiver, transmitter, and processor. *See id.* at Claim 1.

### B. <u>Disputed Claim Terms</u>

#### 1. "time interval"

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Timeslot |

SW first attempts to narrow the term "time interval" to mean "timeslot." This position is not supported by the intrinsic record. The patent uses different terminology "time interval" and "time slot," confirming that the patentee understood these as distinct terms with distinct meanings. *Exxon Chem. Patents, Inc. v. Lubrizol Corp.,* 64 F.3d 1553, 1557 (Fed. Cir. 1995) (a court "must give meaning to all the words in [the] claims.") Courts presume that different claim terms have different meanings, and Defendant offers no basis to overcome that presumption. *See SIPCO, LLC v. Emerson Electric Co.,* 794 F. App'x 946, 949-50 (Fed. Cir. 2019) (nonprecedential) ("we presume that those two terms have different meanings").

Nothing in the intrinsic record equates "time interval" with "time slot." The intrinsic evidence described below confirms that the term "time interval" is a defined temporal allocation within the frame during which uplink physical signals are transmitted. By contrast, "time slot" is a specific defined unit of time within the communication standard (*e.g.,* 3GPP) as defined by the standard. Ex. 10 at 43:22-44:1. The patentee used the term "time slot" in other claims, and chose the language "time interval" instead. *See e.g. id*. at claims 1, 7, 13, and 19 (claims using "time slot").

The '000 Patent specification discloses multiple embodiments relevant to understanding the term "time interval" that demonstrate flexibility in how uplink transmission opportunities are allocated. In Figure 2, the uplink beacon is transmitted within a single time slot. *See* Fig. 2 (showing the UL-Beacon transmitted within a time slot); Ex. 10 at 6:3-6 ("The uplink frame comprises a UL_Beacon control timeslot 216"); *see also* Ex. 10 at 45:12-47:8, 59:1-9.

Defendant's proposed construction appears to focus on this embodiment. However, even if this was the only embodiment, there are no disclaimers or disavowals in the specification that

would serve to limit this one embodiment to define the broader term "time interval." *Teleflex*, 299 F.3d at 1328 (holding absent lexicographic definition or disclaimer "We have 'cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification.'"). This is not a single embodiment case.

In the second embodiment (Figure 3), the specification describes a "fractionation" approach in which the same UL_Beacon timeslot is reused across different frames with different UEs transmitting in different frames. *See* Fig. 3; 6:7 ("Figure 3 illustrates the case where the fractionation phase is 3" explaining that terminals 1, 2, and 3 occur in different frames); Ex. 10 at 46:4-16. Finally, in the third embodiment, instead of reusing a single slot across frames, the system provides multiple UL_Beacon slots within the same frame. *See id*. at 5:47-49; ("In particular, this may also apply for the case where there are more than one UL_Beacon timeslot per, frame."); Ex. 10 at 46:12-22. Thus, the patent discloses different approaches to allocating uplink beacon resources, including (1) using a single time slot, (2) "fractionating" that slot across multiple frames so different UEs transmit at different times, and (3) providing multiple beacon time slots within a single frame to accommodate additional UEs. These distinct embodiments demonstrate that the claimed "time interval" is not limited to a single time slot in a single frame as Defendant argues is required by the '000 Patent specification. The patent describes a flexible temporal framework, not a rigid one-timeslot-per-transmission structure, and a "time interval" is therefore not limited to requiring all relevant transmissions to occur within one single time slot. Thus, Defendant improperly attempts to import limitations to a single embodiment contrary to established law. The term "time slot" and "time interval" are not interchangeable.

These distinct embodiments also demonstrate that the claimed "time interval" cannot be limited to requiring all relevant transmission opportunities to be contained within one single time

slot. The patent expressly contemplates different time-slot allocations, including different time slots across frames and multiple UL-Beacon time slots within a frame. Thus, even where a time interval is implemented using time slots, the intrinsic evidence does not support SW's attempt to impose a rigid single-timeslot requirement.

The prior claim-construction ruling in *Intellectual Ventures I LLC v. American Airlines, Inc*. confirms this point. Although the court construed "time interval" as a "time slot within a frame," it expressly rejected the argument that the claimed "time interval" is "limited to a single time slot in a single frame." Ex. 2 at 40-45. Instead, the court explained that the specification "describes a flexible temporal framework, not a rigid one-timeslot-per-transmission structure." *Id*. Thus, even under that court's construction, "time interval" does not require all relevant transmissions to be contained within one single time slot.

Defendant's reference to the *Inter Partes Review* proceedings on another patent is also unavailing. In any case, as explained above the intrinsic record does not support limiting the term to the Figure 2 embodiment.

## VII. <u>CONCLUSION</u>

For the foregoing reasons, IV's respectfully requests that the Court adopt its proposed constructions.

Dated: August 14, 2026

RESPECTFULLY SUBMITTED,

By: */s/ Jonathan K. Waldrop*

Jonathan K. Waldrop (CA Bar No. 297903)
(Admitted *pro hac vice*)
jwaldrop@kasowitz.com
Marcus A. Barber (CA Bar No. 307361)
(Admitted *pro hac vice*)
mbarber@kasowitz.com
John W. Downing (CA Bar No. 252850)
(*Pro hac vice* forthcoming)
jdowning@kasowitz.com

Heather S. Kim (CA Bar No. 277686)
(Admitted *pro hac vice*)
hkim@kasowitz.com
ThucMinh Nguyen (CA Bar No. 304382)
(*Pro hac vice* forthcoming)
tnguyen@kasowitz.com
**KASOWITZ LLP**
101 California Street, Suite 3950
San Francisco, California 94111
Telephone: (415) 421-6140
Facsimile: (415) 358-4408

Jeceaca An (NY Bar No. 5849898)
(*Pro hac vice* forthcoming)
jan@kasowitz.com
**KASOWITZ LLP**
1633 Broadway
New York, NY 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800

Paul G. Williams (GA Bar No. 764925)
(Admitted *pro hac vice*)
pwilliams@kasowitz.com
**KASOWITZ LLP**
1230 Peachtree Street, N.E., Suite 2445
Atlanta, Georgia 30309
Telephone: (404) 260-6102
Facsimile: (404) 393-9752

William D. Ellerman (TX Bar No. 24007151)
wellerman@CJSJLAW.com
**CHERRY JOHNSON SIEGMUND JAMES PLLC**
8140 Walnut Hill Lane, Suite 105
Dallas, TX 75231
Telephone: 254-732-2242
Facsimile: 866-627-3509

Mark D. Siegmund (TX Bar No. 24117055)
msiegmund@cjsjlaw.com
**CHERRY JOHNSON SIEGMUND JAMES PLLC**
7901 Fish Pond Rd., 2nd Floor
Waco, Texas 76710
Telephone: 254-732-2242
Facsimile: 866-627-3509

***Attorneys for Plaintiffs***
***INTELLECTUAL VENTURES I LLC***
***INTELLECTUAL VENTURES II LLC***

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing instrument was served or delivered electronically to all counsel of record on this 14th day of August, 2026, via the Court's CM/ECF system.

*/s/ Jonathan K. Waldrop*
Jonathan K. Waldrop