# Exhibit 3

# United States District Court
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| INTELLECTUAL VENTURES I LLC and INTELLECTUAL VENTURES II LLC | § | |
| *Plaintiffs*, | § | |
| | § | Civil Action No. 4:24cv980 |
| v. | § | Judge Mazzant |
| AMERICAN AIRLINES, INC. | § | |
| *Defendant.* | § | |

**MEMORANDUM OPINION AND ORDER**

On January 22, 2026, the Court held a hearing to determine the proper construction of the disputed claim terms in U.S. Patent No. 8,332,844 (the "'844 Patent"), U.S. Patent No. 8,407,722 (the "'722 Patent"), U.S. Patent No. 7,949,785 (the "'785 Patent"), U.S. Patent No. 7,324,469 (the "'469 Patent"), U.S. Patent No. 7,257,582 (the "'582 Patent") (collectively, the "Asserted Patents"). Having reviewed the arguments made by the parties at the hearing and in their claim construction briefing (Dkt. Nos. 77, 82, 86, 114, 120)[1], having considered the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence, the Court hereby issues this Claim Construction Memorandum and Order. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

[1] Citations to the parties' filings are to the filing's number in the docket (Dkt. No.) and pin cites are to the page numbers assigned through ECF.

TABLE OF CONTENTS

I. BACKGROUND ..... 3

II. APPLICABLE LAW ..... 8

III. LEVEL OF ORDINARY SKILL IN THE ART ..... 13

IV. CONSTRUCTION OF AGREED TERMS ..... 14

V. CONSTRUCTION OF DISPUTED TERMS ..... 14

A. "root image" ..... 14

B. "input source" ..... 18

C. "identify a category of the update message based on the input source" ..... 20

D. "network address" ..... 21

E. "network route director" ..... 26

F. "a remote location experiencing a relatively high volume of transient traffic" ..... 30

G. "a relatively high volume of transient traffic" ..... 32

H. "partition" ..... 36

I. "description of all said partitions" ..... 38

J. "simultaneously executing at least a respective one of the subtasks of the computer-executable process in each of at least some of said processors on a respective one of the partitions" ..... 42

K. "on a first-come/first-served basis" ..... 44

VI. CONCLUSION ..... 45

## I. BACKGROUND

Plaintiffs Intellectual Ventures I LLC and Intellectual Ventures II LLC ("IV" or "Plaintiff") alleges that Defendant American Airlines, Inc.'s ("AA" or "Defendant") infringes the Asserted Patents. Before the start of the January 22, 2026 hearing, the Court provided the parties with preliminary constructions with the aim of focusing the parties' arguments and facilitating discussion.

The '884 Patent, titled "Root Image Caching and Indexing for Block-Level Distributed Application Management," was filed on February 21, 2007, and issued on December 11, 2012. The '884 Patent relates to providing "an operating system-independent system and method for distributing an application environment to a compute node." '844 Patent at 2:49–51.

The Abstract of the '884 Patent states:

> Described herein is technology for, among other things root image caching and indexing for block-level distributed application management. The technology involves storing blocks of a root image on a first storage unit and storing blocks of leaf images on respective second storage units. The leaf images include additional data blocks not previously contained in the root image and changes made by respective compute nodes to the blocks of the root image. The technology includes caching blocks of the root image that have been accessed by at least one compute node. The technology also includes receiving indexing results pertaining to the root image from one compute node and providing the results for other compute nodes.

Claim 7 of the '884 Patent is an illustrative claim and recites the following elements (disputed term in italic):

> 7. A method for providing data to a plurality of compute nodes, comprising:
> storing blocks of a *root image* of said compute nodes on a first storage unit;
> storing leaf images for respective compute nodes on respective second storage units, said leaf images including only additional data blocks not previously contained in said *root image* and changes made by respective compute nodes to the

> blocks of the *root image*, wherein said leaf images of respective compute nodes do not include blocks of said *root image* that are unchanged by respective compute nodes; and
> caching blocks of said *root image* that have been accessed by at least one of said compute nodes in a cache memory.

The ’722 Patent, titled “Asynchronous Messaging Using a Node Specialization Architecture in the Dynamic Routing Network,” was filed on March 30, 2006, and issued on March 26, 2013. The ’722 Patent relates “to transferring information through digital networks and in particular to transferring information for remotely updating content at client devices through the digital networks.” ’722 Patent at 1:24–27.

The Abstract of the ’722 Patent states:

> A network routes update messages containing updates to properties of live objects from input sources to clients having the objects. When the clients receive live objects, the clients identify the object IDs associated with the objects and register the object IDs with the routing network. The routing network is adapted to selectively send update messages to nodes in the network and the nodes forward the messages to the clients. One implementation uses a hierarchy of registries to indicate which nodes and clients receive which update messages. Another implementation assigns update messages to one or more of N categories and nodes to one or more of M types, and the gateways maintain mapping between categories and types. To ensure that clients receive all of the update messages for which they register, the clients connect to client proxies that in turn connect to at least one node of each type.

Claim 14 of the ’772 Patent is an illustrative claim and recites the following elements (disputed terms in italic):

> 14. A method comprising:
> providing, using a processing device of an *input source*, a data representation to a client device, different from the *input source*, coupled to a routing network, wherein the data representation includes at least one live object recognizable by the client device, and causing the client device to respond to the live object of the data representation by determining an object identifier (ID) of the live object and to register for updates of the live object with the routing network, such that registering the client device with the routing network provides

> client connection information to a node in the routing network; and
>
> sending, using the processing device of the *input source*, an update message to the routing network, wherein the update message identifies the live object and contains update data that updates a property of the live object,
>
> wherein a gateway device at the routing network is configured to *identify a category of the update message based on the input source*, to determine a node type to which the identified category maps, and to route the update message to the node, having the node type, at the routing network,
>
> wherein the node is configured to identify the client device as a registered device and to route the update message to the client device, and
>
> wherein the client device processes the update message upon receipt to update the property of the live object at the client device.

The ’785 Patent, titled “Secure Virtual Community Network system,” was filed on March 31, 2003, and issued on May 24, 2011. The ’785 Patent relates to a network services system “that allows local and remote entities to communicate and collaborate from various locations.” ’785 Patent at 5:48–49.

The Abstract of the ’785 Patent states:

> A private virtual dynamic network is provided for computing devices coupled to public networks or private networks. This enables computing devices anywhere in the world to join into private enterprise intranets and communicate with each other. In one embodiment, the present invention provides a separate private virtual address realm, seen to each user as a private network, while seamlessly crossing public and private network boundaries. One implementation of the present invention uses an agent to enable an entity to participate in the network without requiring the member to add new hardware or software.

Claim 30 of the ’785 Patent is an illustrative claim and recites the following elements (disputed terms in italic):

> 30. A virtual network manager, comprising:
>
> a network interface configured for data communication via a virtual network that is defined by a domain name having an associated public *network address*;

> a memory and a processor to implement a register module configured to register devices in a virtual network, the register module further configured to:
> receive a registration request from an agent associated with a device;
> distribute a virtual *network address* to the device when the device is registered in the virtual network, the device being identified to other devices in the virtual network by the virtual *network address*; and
> a DNS server for the virtual network, the DNS server configured to receive a DNS request from a first device in the virtual network, and return a *network address* associated with a *network route director*, a private *network address* associated with a second device in the virtual network, and a virtual *network address* associated with the second device.

The ’469 Patent, titled “Satellite Distributed High Speed Internet Access,” was filed on September 27, 2004, and issued on January 29, 2008. The ’469 Patent relates to “rural ‘Hotspots’ (such as Wi-Fi access, for example) to enable wireless and hardwired, satellite distributed Internet access for anyone with a PC or other web-ready device (wireless ready or cabled) and a valid credit card.” ’469 Patent at 1:34–38.

The Abstract of the ’469 Patent states:

> A satellite distributed high-speed Internet “Hotspot” enables wireless and hardwired, satellite distributed Internet access for anyone with a PC or other web-ready device (wireless ready or cabled) and a valid credit card or prepaid coupon. The Hotspots can be located anywhere there is 120 volt electricity available or access to the sun for a solar panel and enough space to house the transceiver and mount a satellite dish. Upon connecting to the Hotspot, the user is directed to a remote server for log-on and validation of the user's account. During validation, the remote server verifies that prepaid access time remains in the user's account. Upon validation, the user may browse the web until the prepaid access time runs out. Alternatively, an account may be set up on a "continue until canceled" basis, wherein the user's credit card will be charged for the amount of time used during each session.

Claim 24 of the ’469 Patent is an illustrative claim and recites the following elements (disputed terms in italic):

> 24. An Internet Hotspot comprising:
> a satellite dish communicating with the Internet via one or more data links with a satellite;
> at least one router operatively coupled to the satellite dish;
> a subscriber access unit operatively coupled between the satellite dish and the at least one router, the subscriber access unit being capable of authenticating a subscription account associated with a user prior to allowing the user access to the Internet; and
> a web-ready device operatively coupled to the at least one router, the web-read device having a browser application operating thereon for accessing the Internet;
> wherein the satellite dish, at least one router and the subscriber access unit are located in *a remote location a experiencing a relatively high volume of transient traffic*;
> wherein the user may authenticate the subscription account and access the Internet at the remote location by establishing a data connection between the web-ready device and the router.

The ’582 Patent, titled “Load Balancing with Shared Data,” was filed on February 27, 2003, and issued on August 14, 2007. The ’582 Patent relates “to the field of sharing data and workload between possibly heterogeneous computer systems.” ’582 Patent at 1:11–13.

The Abstract of the ’582 Patent states:

> The input of a computer executable process, is logically subdivided, without reading, into a plurality of partitions which are distributed to a plurality of processors in which respective subtasks including the reading of those partitions, are carried out. The method allows distribution of processing of a large amount of data to a plurality of processors cooperating in a way that the load imposed on each processor is proportional to its capacity to do the work.

Claim 1 of the ’582 Patent is an illustrative claim and recites the following elements (disputed terms in italic):

> 1. A method of effecting on a preexisting input file a computer-executable process comprised of a plurality of subtasks, the method comprising the steps of:
> (a) automatically determining file allocation and logically subdividing records of said input file into a plurality of *partitions*;
> (b) distributing *descriptions of all of said partitions* to each of a plurality of subtask processors

(c) *simultaneously executing at least a respective one of the subtasks of the computer-executable process in each of at least some of said processors* on a respective one of the partitions with each subtask reading and processing the respective *partition* so as to process the respective *partition* and produce respective subtask output and;

d) thereafter repeating step (c) in at least some of the subtask processors each with another unprocessed *partition on a first-come/first-served basis*; and

(e) generating at least one output combining all of the subtask outputs and reflecting the processing of all of said subtasks.

## II. APPLICABLE LAW

### A. Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) (quotation marks omitted) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") *cert. granted, judgment vacated,* 135 S. Ct. 1846 (2015).

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)) *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id*.

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But,

"'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alts., Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the

particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are not helpful to a court. *Id*. Extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*. The Supreme Court has explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331–32 (2015).

### B. Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."[2] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Sols.*, 750 F.3d at 1309.

[2] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

### C. Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA)

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). If it does not, the claim fails § 112, ¶ 2 and is therefore invalid as indefinite. *Id.* at 901. Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application for the patent was filed. *Id.* at 911. As it is a challenge to the validity of a patent, the failure of any claim in suit to comply with § 112 must be shown by clear and convincing evidence. *BASF Corp. v. Johnson Matthey Inc.,* 875 F.3d 1360, 1365 (Fed. Cir. 2017). "[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012).

When a term of degree is used in a claim, "the court must determine whether the patent provides some standard for measuring that degree." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015) (quotation marks omitted). Likewise, when a subjective term is used in a claim, "a court must determine whether the patent's specification supplies some standard for measuring the scope of the [term]." *Ernie Ball, Inc. v. Earvana, LLC*, 502 F. App'x 971, 980 (Fed. Cir. 2013) (citations omitted). The standard "must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

## III. LEVEL OF ORDINARY SKILL IN THE ART

It is well established that patents are interpreted from the perspective of one of ordinary skill in the art ("POSITA"). *See Phillips*, 415 F.3d at 1313 ("[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."). The Federal Circuit has advised that the "[f]actors that may be considered in determining the level of skill in the art include: (1) the educational level of the inventors; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; (5) sophistication of the technology; and (6) education level of active workers in the field." *Env'tl Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 696 (Fed. Cir. 1983). "These factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art." *Daiichi Sankyo Co. Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

Defendant's expert, Dr. Michael Goodrich, opines that a POSITA "would have had a Bachelor's degree in electrical engineering, computer science, or the like, and/or two or more years of industry experience in networking and distributed computing. Additional experience may make

up for a lack of education and vice versa." (Dkt. No. 82-6 at ¶ 21). Plaintiff's expert, Dr. Joseph Camp, states that "[f]or purposes of this declaration, I have applied the standard described in Dr. Goodrich's declaration." (Dkt. No. 77-12 at ¶ 36).

Having considered Defendant's proposal, and the factors that may be considered in determining the level of skill in the art, the Court finds a POSITA would have a Bachelor's degree in electrical engineering, computer science, or the like, and/or two or more years of industry experience in networking and distributed computing. Additional education may substitute for industry experience, or vice versa.

## IV. CONSTRUCTION OF AGREED TERMS

The Parties informed the Court that they currently do not agree on any constructions. (Dkt. No. 67 at 1).

## V. CONSTRUCTION OF DISPUTED TERMS

The parties dispute the meaning and scope of eleven terms or phrases in the Asserted Patents. Each dispute is addressed below.

### A. "root image"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "root image" | Plain and ordinary meaning, no construction necessary. | "a read-only base set of data blocks, operating beneath the file system, that provide the common portion of the application environment" |

#### 1. Analysis

The term "root image" appears in Asserted Claims 7 and 11 of the '844 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The parties dispute whether the term "root image" requires construction. The parties agree that a root image includes "blocks" as recited in Claim 7. (Dkt. No. 86 at 4).

Plaintiff argues that Defendant's construction incorrectly relies on partial lexicography that does not apply, and imports limitations into the claims from embodiments. (Dkt. No. 77 at 11). Specifically, Plaintiff contends that Defendant incorrectly introduces multiple additional limitations including the language "read-only," "operating beneath the file system," and "common portion of the application environment." *Id.*

The '844 Patent discloses storing data blocks of a root image on a first storage unit and storing data blocks of leaf images on a second storage unit, where the leaf image includes additional data blocks that are not contained in the root image, including changes made to the blocks of the root image. '844 Patent at Abstract. Claim 7 recites that if blocks are unchanged, then they are not stored on the leaf image. *Id*. at 11:35–38. The specification further states that "[t]he root image contains data initially common to the compute nodes 220a-n," and "[t]he root image is not changed by compute nodes 220a-n." *Id.* at 5:28–30.

The specification also states that "the data stored in the root image is *by definition common to all the compute nodes* 220a-n." *Id.* at 7:27–28 (emphasis added). Similarly, the specification discloses that "because of the commonality of the root image and the fact that its contents are not directly changed, certain operations performed on the root image (e.g., indexing) only need to be performed once by one compute node." *Id.* at 10:37–40; *see also*, *id.* at 9:17–19 ("Since the root image is common to all the computer nodes, any re-indexing of the root image would be redundant and a waste of resources."). The commonality of the root image addressed the "major problem" with the prior art of having to update "a number of copies of the boot image." *Id.* at 1:64–67.

These aspects of the disclosure are generally captured in the language of Claim 7. Claim 7 recites, in part, "*storing blocks of a root image* of said compute nodes on a first storage unit," and "storing leaf images" that "*includ[e]* only additional data blocks not previously contained in said

root image and *changes made by respective compute nodes to the blocks of the root image*." *Id.* at 11:29–34 (emphasis added). Per the claim language, a root image includes blocks of data, and any changes to those blocks are stored in the leaf image. Claim 7 further recites that the "leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes." *Id.* at 11:36–38. Accordingly, a "root image" is "a common set of data blocks that are unchanged by the plurality of compute nodes."

Defendant argues that the patentees defined "root image" in the specification as "a *read-only base image* (or 'root' image) *of the application environment*[.]" (Dkt. No. 82 at 10) (citing '844 Patent at 2:13–14) (emphasis added in original). According to Defendant, the specification teaches that the root image contains data "initially common to the compute nodes," and that this commonality is essential to the claimed system's efficiency. *Id.* (citing '844 Patent at 5:27–32, 10:37–43). The Court agrees that the intrinsic evidence indicates that the commonality of the root image is the claimed system. However, as discussed above, this is captured in the claim language and the Court's construction.

Defendant did not provide a persuasive reason to explicitly redraft the claims to include a "read-only" limitation. *See Lionra Techs. Ltd. v. Cisco Sys., Inc.,* No. 2:24-CV-00097-JRG, 2025 U.S. Dist. LEXIS 90408, at *8 (E.D. Tex. May 10, 2025) ("To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term.") (quoting *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014)). Indeed, Claims 6, 13, 18, and 22 recite that it is the "first storage unit" that is read-only. Likewise, Claim 27 recites that the "root image portion is read-only." Thus, when the patentees wanted to recite "read-only," they explicitly did so in the claims.

Defendant next argues that the specification teaches that "by storing data at the block level,

embodiments are able to operate beneath the file system and thus are designed to be file system and operating system independent." (Dkt. No. 82 at 10) (citing '844 Patent at 7:58–62). According to Defendant, this is the definition of what it means to store "data at the block level" (*i.e.*, "operate beneath the file system"). *Id.* at 10 (citing *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1051-52 (Fed. Cir. 2010)). Defendant further argues that the specification distinguishes root images from the files themselves. *Id.* (citing '884 Patent at 5:51–3, 7:58–62). Defendant contends that using images to operate at the block level is a fundamental aspect of the invention that enables the claimed advantages. *Id.* at 11 (citing Dkt. No. 80-6 at ¶ 10; Dkt. No. 82-7 at ¶¶ 35-36).

The Court notes that Defendant's limitation is not based on any claim language. Claim 7 does not recite the language "file system." Instead, Defendant's construction improperly incorporates one embodiment. Specifically, the disclosure at column 7, lines 58-62 describes an embodiment shown in Figure 3, and recites step 310 that "involves storing blocks of a root image of the compute node on a first storage unit. By storing data at the block level, *embodiments are able to operate beneath the file system and thus are designed to be file system and operating system independent*." '844 Patent at 7:58–62 (emphasis added).

Notably, the specification indicates that this embodiment is *able* to operate at a layer beneath the file system, not that it must do so. Claim 7 recites that blocks of data are stored, it does not require "operating beneath the file system." This would introduce an unwarranted limitation. The patentees appeared to understand a "file system level" to mean a "per file basis." '844 Patent at 2:27–28. As discussed above, a "root image" is "a common set of data blocks unchanged by the plurality of compute nodes." It is the commonality of the root image that is the claimed system, and overcomes the "per file basis."

Finally, regarding Defendant's "common portion of the application environment"

proposal, the Court rejects it. The specification does not recite "common" and "portion" in combination. Instead, it refers to "the commonality of the root image and the fact that its contents are not directly changed." '844 Patent at 10:37–38. As recited in Claim 7, a root image includes blocks of data, and changes to those blocks are stored in the leaf image. Claim 7 further recites that the "leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes." *Id.* at 11:36–38. Accordingly, a "root image" is "a common set of data blocks unchanged by the plurality of compute nodes."

**2. Court's Construction**

For the reasons set forth above, the Court construes the term **"root image"** to mean **"a common set of data blocks that are unchanged by the plurality of compute nodes."**

**B. "input source"**

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "input source" | Plain and ordinary meaning, no construction necessary. | "information provider and/or dynamic content provider" |

**1. Analysis**

The term "input source" appears in Asserted Claim 14 of the '722 Patent. The parties dispute whether the term "input source" requires construction. Plaintiff argues that Defendant's construction is wrong because there is no lexicography, and it unnecessarily limits the meaning of "input source" to an embodiment. (Dkt. No. 77 at 14).

Defendant contends that the patentees expressly defined the term "input source" twice in the specification. (Dkt. No. 82 at 12) (citing '722 Patent at 3:15–16, 11:21–24). Defendant further contends that the patentees used the notation "i.e.," which means "that is," and indicates what follows is a definition of "input source." *Id.* at 13 (citing '722 Patent at 13:26–28). Defendant argues that the patentees are bound by their express definition of "input source." *Id.*

The Court finds that the patentees did not explicitly define the term "input source" in the specification. Claim 14 recites sending, "an update message to the routing network" using the processing device of the input source. While the specification provides examples of an input source including an "information provider" and a "dynamic content provider," it does not limit an "input source" to those examples. Instead, the specification "*generically refer[s]*" to an "information provider" or a "dynamic content provider" as an "input source," but it does not limit an input source to these two examples. '722 Patent at 3:15–18 (emphasis added). Indeed, the specification states that "FIG. 7 illustrates multiple input sources (labeled 710A-D) representative of sources providing messages to the routing network 110, *such as* an information provider 710A and a dynamic content provider 710B." *Id.* at 15:44–47 (emphasis added).

Thus, Figure 7 illustrates various "input sources 710" that are involved in sending messages to clusters, including an information provider 710A, dynamic content provider 710B, and other unnamed input sources 710C and 710D. Similarly, Figure 3 illustrate a "high-level diagram" of "[m]ultiple input sources (labeled 210A-C)" that send update messages to the routing network. *Id.* at 12:23–28, Figure 3. Another portion of the specification also states "that the information provider 108 or *other entity*" can provide the update message. *Id.* at 9:41–43 (emphasis added). This indicates that an input source may be an information provider, a dynamic content provider, or another input source. It would be improper to limit an "input source" to the two examples Defendant proposes. *Thorner*, 669 F.3d at 1366 ("We do not read limitations from the specification into claims; we do not redefine words.").

#### 2. Court's Construction

For the reasons set forth above, the terms **"input source"** is given its **plain and ordinary meaning.**

### C. "identify a category of the update message based on the input source"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "identify a category of the update message based on the input source" | Plain and ordinary meaning, no construction necessary. | "identify a category of the update message based on the information provider or dynamic content provider but not on the category/topic of the message content" |

#### 1. Analysis

The phrase "identify a category of the update message based on the input source" appears in Asserted Claim 14 of the '722 Patent. The parties dispute whether Defendant's proposal "but not on the category/topic of the message content" is required based on prosecution estoppel. Defendant argues that the patentees distinguished prior art on the grounds that the prior art "teaches identifying categories based on category/topic of the message content." Specifically, the patentees argued the following:

> This section of Chandra [prior art reference], relied on by the Examiner, discloses that if the ***data content of the message*** matches the specified values of the subscription, then the message is delivered to the one or more subscribers (or clients) of that subscription. This is not the same as "identify a category of the update message based on the input source," as recited in claims 26, 33, 39, 45, 51, and 57, using their respective language.
>
> The Examiner, for example, on page 3 of the Office Action, relies on the above sections of Chandra to allegedly show "identifying each category based on the category/topic of the message content." By this statement, the Examiner appears to agree that Chandra teaches identifying categories **based on category/topic of the message content**. In contrast, claims 26, 33, 39, 45, 51, and 57 recite, *inter* alia, "identify a category of the update message based on the input source," using their respective language.

Dkt. No. 82-8 at 19-20 (emphasis in original). The Court agrees that the patentees clearly and unmistakably argued that the phrase "identify a category of the update message based on the input source" is "not the same" as the "***data content of the message.***" *Id.* This is a clear characterization on what this limitation is not. *Comput. Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374

(Fed. Cir. 2008) ("A patentee could [make a disclaimer], for example, by clearly characterizing the invention in a way to try to overcome rejections based on prior art").

Plaintiff argues that Defendant's construction "is wrong because it would re-write this term to require that the category identification can be based ***only*** on the input source." (Dkt. No. 86 at 6) (emphasis in original). Plaintiff contends that Defendant cites no authority that "based on" should mean "based only on." *Id.* According to Plaintiff, there is nothing in the claims, specification, and prosecution that limits this term to Defendant's construction, in particular the language "but not on the category/topic of the message content." *Id.*

As discussed above, the patentees clearly and unmistakably argued that the phrase "identify a category of the update message based on the input source" is "not the same" as "***data content of the message.***" (Dkt. No. 82-8 at 19) (emphasis in original). To the extent that Plaintiff argues that they are the same, the Court rejects that argument. Claim 14 requires the recited gateway device to be configured to "identify a category of the update message based on the input source." However, neither the claim language nor the prosecution history require that the category identification be based only on the input source, as Defendant's construction would require. Finally, the Court addressed the parties' dispute regarding the definition of "input source" in the previous section.

#### 2. Court's Construction

For the reasons set forth above, the Court construes the phrase **"identify a category of the update message based on the input source"** to mean **"identify a category of the update message based on the input source, which is not the same as the data content of the message."**

### D. "network address"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "network address" | Plain and ordinary meaning, no construction necessary. | "Internet protocol or IP address" |

**1. Analysis**

The term "network address" appears in Asserted Claims 30 and 37 of the '785 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The parties dispute whether a "network address" is necessarily an IP address.

The '785 Patent discloses private virtual dynamic networks and enabling communications within such networks. '785 Patent at Abstract. The specification provides a block diagram in Figure 4, which shows a Virtual Community Network (VCN) that allows devices, such as devices A, B, and X, to communicate as if they were on the same physical local network.




*Id.* at Figure 4. As illustrated, devices A, B, and X may direct connections to each other through an application IP interface ("IPa," "IPb," and "IPx") within a virtual domain, where "dashed lines

represent direct communication paths seen to applications running on A, B and X." *Id.* at 9:36–41. Devices A and B may have dynamic or static private network addresses, and device X may be coupled directly to the Internet and may have a public network address. *Id*. at 9:15–17. The Summary of the Invention further states the following:

> A system is disclosed that allows local and remote entities to communicate and collaborate from various locations. In one embodiment, the system makes use of a virtual subnet with a virtual address realm. The virtual address realm allows two or more users to communicate securely via at least one public network, whether the users are both coupled directly to the public network, both coupled directly to separate private networks or whether one is in a public network and one is in a private network. *The virtual address realm uses virtual addresses to identify the devices on the virtual subnet.* Although the devices are in different physical subnets, from the point of view of the applications the devices of the virtual subnet appear to be in one local subnet.

*Id.* at 5:48–60 (emphasis added). As indicated, the system disclosed is a Virtual Community Network ("VCN") that is in essence "a private dynamic network which acts as a private LAN for computing devices coupled to public networks or private networks." *Id.* at 8:67–9:3. To do this, the VCN has to be able to identify the respective devices, and it does so with network addresses. Specifically, Claim 30 recites the following "network address[es]':

> 30. A virtual network manager, comprising:
> a network interface configured for data communication via a virtual network that is defined by a domain name having *an associated public network address;*
> a memory and a processor to implement a register module configured to register devices in a virtual network, the register module further configured to:
> receive a registration request from an agent associated with a device;
> distribute *a virtual network address* to the device when the device is registered in the virtual network, the device being identified to other devices in the virtual network by *the virtual network address*; and
> a DNS server for the virtual network, the DNS server configured to receive a DNS request from a first device in the virtual network, and return *a network address* associated with a network route director, *a private network address* associated

> with a second device in the virtual network, and *a virtual network address* associated with the second device.

*Id.* at 36:37–56 (emphasis added). Each of these addresses identifies a device in a network. Indeed, that is the purpose of a network address, whether it be a virtual, public, or private network address. *See, e.g., id.* at 12:9–11 ("Virtual IP addressing is used to establish unique connection identities for community connected devices."), 12:55–57 ("The virtual address realm is the set of addresses that can be used to identify and send communications to other members of the VCN."), 14:15–17 ("The virtual IP address received is used to identify the member in the VCN."), 33:4–6 ("The destination address would be equal to the private IP address in the LAN that is used to identify device $M_9$"). Accordingly, the Court construes "network address" to mean "address that identifies a device in a network."

Defendant contends that the only term in dispute is the "network address" associated with a network route director as recited in Claim 30. (Dkt. No. 82 at 19). Plaintiff correctly argues that this is problematic, because it proposes to construe "network address" for one instance, but ignores the other instances where a type of "network address" is recited in Claim 30. (Dkt. No. 77 at 20). Plaintiff contends that without a compelling reason to do so, it is wrong to construe the same term in different ways. *Id.* The Court agrees. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning."). Moreover, neither the intrinsic nor extrinsic evidence indicates that the term "network address" should be construed as Defendant proposes.

Defendant first argues that at Step 656 in Figure 7, the VCN Manager provides a triplet of addresses: (1) a public IP address for the Network Route Director; (2) a private IP address; and (3) a virtual IP address for the destination. (Dkt. No. 82 at 17) (citing '785 Patent at 8:16–17).

According to Defendant, this step directly tracks the language of Claim 30, which recites that the DNS server "return[s] *a network address associated with a network route director*, a private network address associated with a second device in the virtual network, and a virtual network address associated with the second device." *Id.* (citing '785 Patent at 36:52–56) (emphasis in original). Defendant contends that Figure 7 and Claim 30 show that "network address" refers to an IP address. *Id.* Defendant further argues that the same is confirmed in Step 2406 of Figure 24. *Id.* (citing '785 Patent at 14:34–40, 31:24–33).

The Court agrees that the only embodiments of the VCN disclosed refers to using an IP address. However, the claim language that Defendant argues "tracks" the specification indicates that the patentees intentionally choose to use the term "network address," and not the term "IP Address." Contrary to Defendant's contention, the terms "network address" and "IP address" are not used interchangeably in the specification. (Dkt. No. 82 at 18). In fact, the term "network address" only appears in the claims, and the term "network addresses" appears in only two locations in the specification. '785 Patent at 1:57–59, 10:45–48. Neither recitation is definitional, and neither instance expressly refers to an "Internet protocol or IP address." There is no indication that the patentees intended to define a network address to mean an IP address. Instead, Defendant relies on a single embodiment to argue that a "network address" should be redrafted as an IP address. It is well established that "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

Finally, Defendant argues that in its response to an Office Action during reexamination, the patentees explained that "the response from the DNS server includes a numeric IP address,"

and further explained that "a DNS request is responsible for resolving a domain name, such as www.example.com, into its corresponding IP address (e.g., 93.184.216.34) so that devices can locate and communicate with the server hosting the desired resource." (Dkt. No. 82 at 18) (citing Dkt. No. 82-9 at 13-14). According to Defendant, this shows that the "network address" described in the claims is defined as an IP address associated with the Network Route Director returned by a DNS server. *Id.* at 18. Defendant also argues that this definition is consistent with the general definition of "network address" *Id.* (citing Dkt. No. 82-10 at 2). Defendant contends that IP addresses are the core type of network addresses used to locate devices on the Internet or within an internal network. *Id.* at 19.

The Court finds that Defendant's own extrinsic evidence contradicts its argument. The computer-dictionary.org definition defines "network address" as a "portion" of an IP address and not the IP address itself. (Dkt. No. 82-10 at 2). Defendant does not persuasively address this inconsistency. Regarding the prosecution history, the Court finds that the patentees distinguished an HTTPS request from a DNS request. To the extent that Plaintiff argues that an HTTPS request is the same as a DNS request, the Court rejects that argument. Other than the HTTPS request disclaimer, the Court finds that the patentees did not define or limit the term "network address" to an "IP address." Accordingly, the Court rejects Defendant's construction.

**2. Court's Construction**

For the reasons set forth above, the Court construes the term **"network address"** to mean **"address that identifies a device in a network."**

**E. "network route director"**

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "network route director" | Plain and ordinary meaning, no construction necessary.<br><br>Alternatively,<br>"one or more components that interface with the public side of the Internet and allow communication to a device that is in a private network"<br>(Dkt. No. 120 at 1). | "a publicly addressable device configured to route encapsulated packets to and from entities located in a private network portion of a virtual network" |

**1. Analysis**

The term "network route director" appears in Asserted Claim 30 of the '785 Patent. The parties dispute whether the term "network route director" requires construction. The Court agrees with Defendant that "Network Route Director" is a coined term. Plaintiff does not reasonably dispute this conclusion. Given this, the analysis begins by determining "whether the intrinsic evidence provides objective boundaries to the scope of the term." *Iridescent Networks, Inc. v. AT&T Mobility, LLC*, 933 F.3d 1345, 1353 (Fed. Cir. 2019).

The specification includes a section titled "Route Directors" that provides the following description:

> Route Directors
>
> *Route directors allow communication to a member that is in a private network.* The PRD resides within a private network, behind the NAT device. *The NRD resides on the public side of the NAT device.* The NAT device can be a Network Address Port Translation (NAPT) NAT device or a basic NAT where only addresses are translated.
>
> Note that devices with public addresses do not require Route Directors (RDs). In the context of FIG. 5B, devices $M_A$ and $M_E$ do not require either a PRD or NRD, since they reside in the public address space. Likewise, $M_X$ does not require the PRD for its domain 540, since it has a public address (or is statically mapped to a public address at the NAT device 515).

'785 Patent at 25:30–40 (emphasis added). Similarly, the specification states that "[t]he Network

Route Director (NRD) 520 is a stand-alone unit that runs on the public side of the Internet enabling Member Agents and Group Agents (discussed below) to be reached inside one or more private networks from the public network." *Id.* at 11:9–13; *see also*, *id.* at 13:51–54 ("As noted above, Network Route Directors (NRDs) 520 facilitate routing traffic into and out of private address domains without requiring reconfiguration of a firewall 517 protecting the domain 550"). The specification contrasts an NRD with "Private Route Director ('PRD') 530," which "is an element that runs *inside a private network* enabling access to machines inside the private network from machines outside the private network." *Id.* at 11:13–17 (emphasis added). An example of an NRD and PRD is illustrated in Figure 5a.

Fig. 5a




*Id.* at Figure 5a (highlight added). Accordingly, a POSITA would understand that the claimed "network route director" is a unit that runs on the public side of the Internet that allows communication to a device that is in a private network.

Plaintiff argues that if the term requires construction, it should be construed to mean a "device configured to facilitate routing traffic into and out of private address domains." (Dkt. No. 88 at 8-9) (citing '785 Patent at 13:51–59). Given Plaintiff's construction, the parties dispute whether the "network route director" is "a publicly addressable device," and whether it must be "configured to route encapsulated packets to and from entities located in a private network portion of a virtual network."

As discussed above, the specification distinguishes between a Network Route Directors (NRD) and a Private Route Director (PRD), with the NRD residing on the public side of the NAT device (*i.e., "*public side of the Internet."). '785 Patent at 25:30–40. Plaintiff argues that Claim 39 recite a "network route director" that is "public," and thus it is incorrect to include "a publicly addressable device." (Dkt. No. 86 at 8). The Court notes that Claim 39 depends on Claim 38. Claim 38 does not recite a "network route director," but instead recites a "route director." Claim 39 further recites "the route director" is "a public network route director." As indicated in the specification, a router director may either be public or private. There is nothing inconsistent with further limiting the "route director" in Claim 38, to a "public network route director" versus a "private route director."

Regarding Defendant's "configured to route encapsulated packets to and from entities located in a private network portion of a virtual network" language, the Court finds that there is nothing in the claims that require the network route director to be configured in such a manner. The claims only require that the DNS server return a network address that is associated with the network route director. Likewise, the specification does not require that the route director actually route packets. The specification states that the "Network Route Director" "*enable[es]* Member Agents and Group Agents … to be reached inside one or more private networks from the public

networks." '785 Patent at 11:10–14 (emphasis added). Likewise, the specification states that the network route director "facilitat[es]" routing traffic. *Id.* at 13:51–54. Defendant's reliance on an *ex parte* proceeding where the Applicant stated that the "problem of the current invention [ ] is how to route through a route director to the virtual address" is not particularly relevant, because this statement does not conflict with the specification's disclosures, nor does it define the term "network route director." (Dkt. No. 82 at 20) (citing Dkt. No. 82-9 at 20). Accordingly, the Court rejects this aspect of Defendant's construction.

Finally, during the claim construction hearing Plaintiff argued for a modification to the Court's preliminary construction for this term. Plaintiff suggested changing "a unit that runs on" to "one or more components that interface with." (Dkt. No. 120 at 1). To supports it change, Plaintiff argued that the specification states that "[a]ny combination of NRDs and PRDs may be used to improve network efficiency." '785 Patent at 34:19–20. The Court agrees with Plaintiff's suggestion of "one or more" based on the intrinsic evidence. Accordingly, the Court construes "network route director" to mean "one or more units that run on the public side of the Internet that allow communication to a device that is in a private network."

#### 2. Court's Construction

For the reasons set forth above, the Court construes the term **"network route director"** to mean **"one or more units that run on the public side of the Internet that allow communication to a device that is in a private network."**

### F. "a remote location experiencing a relatively high volume of transient traffic"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "a remote location experiencing a relatively high volume of transient traffic" | Plain and ordinary meaning, no construction necessary. | "a fixed remote location experiencing a relatively high volume of transient traffic" |

**1. Analysis**

The phrase "a remote location experiencing a relatively high volume of transient traffic" appears in Asserted Claim 24 of the '469 Patent. The parties dispute whether a "remote location" must be a permanent "fixed" location. The specification states that a "Hotspot" as recited in Claim 24, is focused on "enabl[ing] wireless and hard-wired, satellite distributed Internet access for anyone with a PC or other web-ready device (wireless ready or cabled) and a valid credit card." '469 Patent at 1:34–38. The specification further discloses that the Hotpots can be located virtually anywhere. Specifically, the specification states that "[t]he 'Hotspots' *can be located anywhere there is 120 volt electricity available or access to the sun for a solar panel and enough space to house the transceiver and mount a satellite dish*." *Id.* at 1:38–41 (emphasis added). The specification provides a list of potential locations including "rest areas, restaurants, truck stops, rural hotels, conference centers, motels and state park lodges." *Id.* at 1:41–44.

As indicated, the specification does not restrict the Hotspots from being located at non-fixed locations, as long as there is electricity available or solar access and sufficient space to house equipment. Indeed, the background of the '469 Patent explains that in the past, "[a]nyone in transmit, such as salesman, executive, truckers and private individuals ha[d] virtually no access while traveling, especially in rural areas." *Id.* at 1:21–30. Defendant's "fixed" language is not recited in the claim or the specification, and contradicts the disclosure that "[h]otspots can be located anywhere." *Id.* at 1:38. Simply stated, there is nothing in the intrinsic evidence that indicates that Claim 24 should be redrafted as "a fixed remote location," instead of the recited "remote location."

Defendant argues that the specification contemplates only fixed remote locations, *i.e.*, "areas that experience high volume transient traffic, such as rest areas, restaurants, truck stops,

rural hotels, conference centers, motels and state park lodges." *Id.* at 1:42–44. Defendant contends that a POSITA "would have understood 'remote location' in the context of claim 24 of the '469 Patent to mean 'a fixed remote location.'" (Dkt. No. 82 at 22) (citing Dkt. No. 82-6 at ¶ 89). According to Defendant, the specification confirms that the hotspot remains stationary, while the user moves to and from it. *Id.* (citing '469 Patent at 3:55–59). Defendant contends that every "remote location" contemplated by the specification is a fixed remote location from which users come and go. *Id.*

As discussed above, the Court agrees that a POSITA would understand that a remote location need not be "fixed." The plain and ordinary meaning of a "remote location" does not require a fixed or non-fixed location. Instead, Claim 24 only requires that it must be a remote location. Dkt. No. 77-13 at ¶¶ 43–49; Dkt. No. 86-3 at ¶¶ 16-19. Indeed, the specification discloses that "*[t]he 'Hotspots' can be located anywhere* there is 120 volt electricity available or access to the sun for a solar panel and enough space to house the transceiver and mount a satellite dish." '469 Patent at 1:38–41. It would be improper to limit the types of "remote locations" *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004) ("As we explained above, it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited."). Accordingly, the Court finds that Defendant failed to provide a persuasive reason to redraft Claim 24 as it proposes.

#### 2. Court's Construction

For the reasons set forth above, the phrase **"a remote location experiencing a relatively high volume of transient traffic"** is given its **plain and ordinary meaning.**

### G. "a relatively high volume of transient traffic"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "a relatively high volume of transient traffic" | Plain and ordinary meaning, no construction necessary. Not indefinite. | Indefinite as to "relatively high" and "transient" |

**1. Analysis**

The phrase "a relatively high volume of transient traffic" appears in Asserted Claim 24 of the '469 Patent. The parties dispute whether the phrase is indefinite under Section 112. When a term of degree is in a claim, "the patent must provide some standard for measuring that degree such that the claim language provides enough certainty to one of skill in the art when read in the context of the invention." *GE Lighting Sols., LLC v. Lights of Am., Inc.*, 663 Fed. App'x 938, 940 (Fed. Cir. 2016) (cleaned up). In other words, "the patent must provide that additional information in the form of objective boundaries" to be sufficiently definite. *Id.* The Court finds that the intrinsic and extrinsic evidence does not provide any "objective baseline" to enable a POSITA to differentiate "a relatively high volume of transient traffic" from other levels of volume and non-transient traffic.

Plaintiff argues that the specification provides multiple examples of locations that experience "high volume transient traffic," including "rest areas, restaurants, truck stops, rural hotels, conference centers, motels and state park lodges." (Dkt. No. 77 at 25) (citing '469 Patent at 1:41–44, 1:52–54, 3:2–4, 3:6–8, 3:52–55). Plaintiff contends that a POSITA would appreciate and readily understand that some of these exemplary locations have different volumes of traffic, and whether that traffic is transient or not. *Id.* Plaintiff also argues that extrinsic sources confirm that the terms "relatively high" and "transient" have well-understood meanings that are consistent with the '469 Patent specification. *Id.* (citing Dkt. No. 77-10, Dkt. No. 77-11).

Plaintiff further contends that "[a]n example of a location having a proportionally high volume of transitory traffic could be for example a rural truck stop that has hundreds of daily

unique visitors." (Dkt. No. 77 at 26). Plaintiff argues that Defendant fails to consider the claims as a whole, and needs to evaluate surrounding claim language to understand its scope. *Id.* Plaintiff contends that a claim term reciting a relative degree of a thing (*e.g.*, a relatively high volume of transient traffic) does not require specific threshold values or quantile values to be definite. *Id.* at 27.

Defendant argues that neither Claim 24 nor the specification provide any boundaries on what constitutes "a relatively high volume of transient traffic." (Dkt. No. 82 at 23). Defendant contends that a rural restaurant may see a few dozen patrons per day, while a conference center may see many thousands. *Id.* at 24. Defendant further argues that a rural restaurant's patrons may visit for an hour, and a conference center's patrons may stay for days on end. *Id.* Defendant questions if both quantities are "a relatively high volume," and if both visits are "transient?" *Id.* at 24 (citing Dkt. No. 82-11 at 83:19-84:12; Dkt. No. 82-6 at ¶ 98).

The Court finds that the specification does not provide guidance that would clarify the meaning of the term "a relatively high volume of transient," or provide a baseline of comparison to allow a POSITA to differentiate between a "relatively high volume" from different volumes of traffic. The specification fails to identify any objective metes and bounds of "relatively high" or "transient." Accordingly, a POSITA cannot determine whether traffic is high enough or transient enough to infringe, which renders Claim 24 indefinite under Section 112.

Indeed, adding "relatively" to "high" does nothing to clarify the scope of what is claimed, because a POSITA cannot differentiate between "relatively high" and other volumes of traffic. *Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1381 (Fed. Cir. 2018) ("[A] term of degree that is purely subjective and depends on the unpredictable vagaries of any one person's opinion is indefinite.") (cleaned up). Neither the specification nor Plaintiff explain what

the boundary is between "relatively high" and not relatively high, and between "transient" and not transient. Indeed, the only reference to "transient" in the specification is by reference to the varied examples above. These are insufficient to provide a standard for measuring the scope of the term. *Cypress Lake Software, Inc. v. Samsung Electronics America, Inc.*, 382 F. Supp. 3d 586, 610 (E.D. Tex. 2019) (finding a term indefinite where the "intrinsic evidence does not provide an objective criterion for determining what is 'more convenient' or 'permits a user to conveniently enter' the second user input").

Plaintiff argues that Defendant "fails to consider the claims as a whole," because it fails to "evaluate surrounding claim language to understand its scope." Dkt. No. 77 at 21. But the "surrounding claim language" fails to provides objective benchmarks by which "relatively high" or "transient" could be measured. Instead, Plaintiff hypothesizes new examples that only further confuse the analysis, concluding that "a residential manager of a rural hotel" would "not be included," but failing to explain by what analysis it came to this conclusion. *Id.* Indeed, Plaintiff's expert suggests that a "residential manager of a rural hotel" would be included if his residence lasted a "season." *See* Dkt.77-13 at ¶ 55. This begs the question of the difference between "relatively high volume of transient traffic" and normal or low volume of non-transient traffic. Finally, Plaintiff does not present any argument that the prosecution history addresses the "relatively high volume of transient traffic" phrase in any meaningful way that would give clarity to its scope.

In discussing "how much imprecision" Section 112(2) tolerates, the Supreme Court considered "the inherent limitations of language" on the one hand, and "afford[ing] clear notice of what is claimed" on the other hand. *Nautilus*, 572 U.S. at 899. Applying this, courts require claims to "provide objective boundaries for those of skill in the art." *Interval Licensing*, 766 F.3d at 1371.

Here, the "inherent limitations of language" are not at issue, and the patentee could have provided some objective boundaries for what he considered "a relatively high volume of transient traffic" to mean. He did not. Accordingly, the Court finds that "the claim language might mean several different things and no informed and confident choice is available among the contending definitions." *Id.* (quoting *Nautilus,* 572 U.S. at 911 & n.8) (internal quotations omitted). Thus, the Court finds that nothing in the record provides objective boundaries for those of skill in the art.

#### 2. Court's Construction

The phrase **"a relatively high volume of transient traffic"** is indefinite for failing to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

### H. "partition"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "partition" | Plain and ordinary meaning, no construction necessary. | "well-defined part of the input file" |

#### 1. Analysis

The term "partition" appears in Asserted Claim 1 of the '582 Patent. The parties dispute whether the patentee acted as his own lexicographer by defining "partition" as a "well-defined part of the input file." Defendant argues that the patentee expressly defined the term "partition" as follows:

> A logical partition in this context *is* a well-defined part of the input or output. A very simple way to define a partition, which in many cases is the most efficient, would be to define the partitions as consecutive ranges on the input or output, ranging from one relative byte address to another relative byte address or from one relative track address to another.

'582 Patent at 3:36–41 (emphasis added). Defendant contends that the patentees use of the term "is" signifies that the patentee was acting as his own lexicographer. (Dkt. No. 82 at 28). According to Defendant, the patentee clearly, deliberately, and precisely defined the term "partition" as a

"well-defined part of the input file." *Id.*

Plaintiff argues that "the patent uses partition in accordance with its plain meaning, for example, 'the input file 0 is logically partitioned into six partitions,' and 'output partitions are logically allocated on an output file.'" (Dkt. No. 77 at 28-29) (citing '582 Patent at 5:34–35, 6:17–18). Plaintiff contends that the same paragraph states that "*other partition definitions* can be used with no impact on the rest of the embodiment." (*Id.* at 29) (citing '582 Patent at 3:46–47) (emphasis in original). Plaintiff further argues that Defendant's construction limits "partition" to a particular embodiment. *Id.*

The Court finds that the term "partition" should be construed to mean a "defined part of the input file." The specification discloses parallel processing and includes logically subdividing an input file into partitions that are distributed to processors that execute subtasks in parallel, including reading the partitions. '582 Patent at Abstract. The specification states that this efficiently uses "any number of potentially heterogeneous computers, taking the available capacity of each of these computers into account while optimizing execution." *Id.* at 1:51–54. As Defendant correctly argues, the specification states that "[a] logical partition in this context is a well-defined part of the input or output." *Id.* at 3:36–37. The Court agrees that this provides context for the disputed term.

However, Plaintiff correctly argues that the specification further states that "[o]ther partition definitions can be used with no impact on the rest of the embodiment." *Id.* at 3:46–47. The specification provides examples of how the partitions can be defined. *See, e.g.*, 582 at 3:37-41 ("A very simple way to define a partition, which in many cases is the most efficient, would be to define the partitions as consecutive ranges on the input or output, ranging from one relative byte address to another relative byte address or from one relative track address to another."). Thus, the

intrinsic evidence indicates that a partition is "defined part of the input file." Requiring the partitions to be "well-defined" would appear to limit the claims to an embodiment.

**2. Court's Construction**

For the reasons set forth above, the Court construes the term **"partition"** to mean **"defined part of the input file."**

**I. "description of all said partitions"**

| <u>Disputed Term</u> | <u>Plaintiff's Proposal</u> | <u>Defendant's Proposal</u> |
|---|---|---|
| "description of all said partitions" | Plain and ordinary meaning, no construction necessary. | "statements giving a characteristic(s) of all of the well-defined parts of the input file for use in distributing the load without a special load process, wherein such statements are distinct from the input file itself" |

**1. Analysis**

The term "description of all said partitions" appears in Asserted Claim 1 of the '582 Patent. The parties dispute whether the term "description of all said partitions" requires construction. Defendant contends that the proper construction includes the following four parts: (i) statements giving a characteristic(s) of; (ii) well-defined parts of the input file; (iii) for use in distributing the load without a special load process; and (iv) wherein such statements are distinct from the input file itself.

Regarding Defendant's first proposal of "statements giving a characteristic(s) of," the Court finds that it is unnecessary. Defendant argues that the patentees did not provide a special definition for the term "descriptions" in the specification. (Dkt. No. 82 at 30). Defendant contends that a POSITA would have understood that the term "descriptions" to have its ordinary meaning, which as defined by Merrian-Websters, is "a statement or account giving the characteristics of someone or something." *Id.* (citing Dkt. No. 82-13; Dkt. No. 82-6 at ¶ 73). Plaintiff argues that

Defendant does not justify how the definition from a single layman dictionary definition applies to the technical nature of this patent and term. (Dkt. No. 86 at 12). The Court agrees, and rejects this portion of Defendant's construction. *See U.S. Surgical Corp. v. Ethicon, Inc.,* 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy.").

Regarding Defendant's second proposal of "all of the well-defined parts of the input file," the Court addressed the dispute with the previous term. As discussed above, the intrinsic evidence indicates that a partition is a "defined part of the input file." Requiring the partitions to be "well-defined" would appear to limit the claims to an embodiment.

Regarding Defendant's negative limitation of "for use in distributing the load without a special load process," the Court finds that the patentee clearly and unmistakably disavowed using load information. Specifically, the patentee responded to the examiner's rejection of the claims by distinguishing prior art and arguing the following:

> *The primary difference between the instant invention and the process disclosed in [the prior art]* is that *these systems rely on a special control process that uses load information to distribute the load between processors that share the load. With the instant invention as defined in the claims there is no such process*. The prior art's load information is not created with the process of the instant invention. Instead, the load sharing is done as a byproduct of the fact that the load-sharing process take parts of the load on a first-come/first-served basis.
>
> A comparison would be to a road intersection where, according to the prior art, there is a traffic light that determines who can go when. The instant is more like such an intersection with a four-way stop so that the individual drivers determine who can go and when.
>
> This is a major improvement since in addition to *eliminating the control process it also eliminates the need to collect and*

> *maintain load information*, which it is very difficult to do and almost impossible to define so as to anticipate all possible processors that might execute the subtasks."
>
> *The amended claims, refer to a distribution of a description of the work to be done. The sharing process can use such a description to distribute the load without a special load process.*
>
> For these reasons the instant invention is clearly allowable over the cited art.

(Dkt. No. 82-14 at 7-8) (emphasis added). The Court agrees that this argument to overcome the prior art is a clear and unmistakable disclaimer. *Comput. Docking Station Corp. v. Dell, Inc.,* 519 F.3d 1366, 1374 (Fed. Cir. 2008) ("A patentee could [make a disclaimer], for example, by clearly characterizing the invention in a way to try to overcome rejections based on prior art"). Accordingly, "description of all said partitions" is "for use in distributing the load without a special load process"

Plaintiff contends that there was no disclaimer of claim scope, because "[w]hile the text of the file history removes the requirement for a centralized load process that uses load information to make scheduling decisions, it does not preclude centralized coordination or the use of load information in making scheduling decisions." (Dkt. No. 77 at 31). Plaintiff's argument ignores the prosecution history statement. As discussed above, the patentee argued during prosecution that the prior art required a "special control process that uses load information to distribute the load," whereas, with "the instant invention as defined in the claims there is no such special process." (Dkt. No. 82-14 at 7). The patentee argued this distinction to the examiner, and there by excluded this from the scope of the claims.

Regarding Defendant's final proposal of "wherein such statements are distinct from the input file itself," the Court rejects it. Defendant argues that its proposal is necessary, because the patentee disclaimed claim scope by amending the claims from requiring "distributing said

partitions" to requiring "distributing descriptions of all of said partitions." Defendant contends that the originally filed, claim 1(b) referred to distributing the partitions themselves: "(b) *distributing said partitions* to a plurality of processors and activating respective subtasks of the computer-executable process in each of said processors, each subtask reading and processing said partitions on a first come first serve basis." (Dkt. No. 82 at 32) (citing Dkt. No. 82-15). Defendant argues that after the examiner rejected Claim 1 over the cited prior art, the applicant amended claim 1(b) to specify that *descriptions* of the partitions are distributed, not the partitions themselves. *Id.* (citing Dkt. No. 82-14 at 2).

The Court notes that the claim language as amended requires that "descriptions" of the partitions are distributed to the subtask processors. The plain and ordinary meaning of the amendment is both clear and included in the claim language. Defendant argues that the specification shows that "descriptions" of partitions are different from the partitions themselves. *Id.* (citing '582 Patent at 3:52–59). The Court finds that Defendant's reliance on the specification does not lead to a different conclusion. That disclosure relates to determination of a "logical partition," and that the reading and processing of the partition is recited in step 1(c) in Claim 1. The only limitation that was not captured by the claim amendment was the "description of all said partitions without a special load process." Accordingly, the Court rejects this portion of Defendant's construction.

**2. Court's Construction**

For the reasons set forth above, the Court construes the term **"description of all said partitions"** to mean **"description of all said partitions for use in distributing the load without a special load process."**

### J. "simultaneously executing at least a respective one of the subtasks of the computer-executable process in each of at least some of said processors on a respective one of the partitions"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "simultaneously executing at least a respective one of the subtasks of the computer-executable process in each of at least some of said processors on a respective one of the partitions" | Plain and ordinary meaning, no construction necessary. Not indefinite. | Indefinite. |

#### 1. Analysis

The phrase "simultaneously executing at least a respective one of the subtasks of the computer-executable process in each of at least some of said processors on a respective one of the partitions" appears in Asserted Claim 1 of the '582 Patent. The parties dispute whether the phrase is indefinite. Defendant argues that Claim 1(c) requires "*simultaneously* executing *at least a respective one of the subtasks* of the computer-executable process in each of at least some of said processors on a respective one of the partitions." (Dkt. No. 82 at 33) (emphasis in original). Defendant contends that a POSITA would have understood that simultaneously executing sub tasks can only occur when there are at least two sub task processors executing at the same time, by the plain and ordinary meaning of "simultaneously." *Id.* (citing Dkt. No. 82-6 at ¶ 82).

Defendant further argues that the phrase "*at least* a respective *one* of the subtasks" includes instances where there is only *one* sub task. *Id.* (emphasis in original). According to Defendant, a POSITA would be unable to reasonably determine what it means to *simultaneously* execute *one* subtask by itself, as is encompassed by claim 1(c). *Id.* at 34 (citing Dkt. No. 82-6 at ¶ 82; Dkt. No. 82-7 at ¶¶ 58-59). The Court disagrees with Defendant's analysis.

The preamble of Claim 1 of the '582 Patent recites, in part, a method of "effecting" a "computer-executable process comprised of *a plurality of subtasks*." '582 Patent at 6:44–46 (emphasis added). Claim 1 further recites "distributing descriptions of all of said partitions to each

of *a plurality of subtask processors*" and "simultaneously executing *at least a respective one of the subtasks* of the computer-executable process *in each of at least some of said processors* on a respective one of the partitions." *Id*. at 6:50–55. For the "simultaneously …" limitation recited in step (c), the language "the subtasks" refers to the "a plurality of subtasks" recited in the preamble, and the language "said processors" refers to the "plurality of subtask processors" recited in step (b) of Claim 1. Thus, Claim 1 can be understood to require at least two subtasks and at least two subtask processors. *See SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*, 983 F.3d 1367, 1377 (Fed. Cir. 2021) ("'[A] plurality of' requires two or more.").

As recited in the claim, the disputed phrase requires executing, *in "each" of the subtask processors*, at least one subtask. In other words, each subtask processor has at least one subtask being executed, with that execution of two or more subtasks on two or more subtask processors occurring "simultaneously." The language "at least some of said processors" does not change the meaning of this term because a "plurality" of processors means there can be two *or more* processors, and "some" includes at least two, but possibly more processors. This meaning is consistent with the specification's description of performing processes in parallel or simultaneously. '582 Patent at 1:29–54, 5:54–65.

The Court agrees that Defendant's entire argument is based on its incorrect interpretation that the claim only requires one subtask to execute. As discussed, the phrase requires executing, *in "each" of the subtask processors,* at least one subtask. Defendant ignores that Claim 1 recites both a plurality of subtasks and a plurality of subtask processors. A plurality requires two or more, and therefore Claim 1 requires at least two subtasks and at least two subtask processors. Defendant's interpretation is incorrect and inconsistent with the claim language and specification. Accordingly, the Court finds that Defendant failed to prove by clear and convincing evidence that

the term is indefinite.

2. **Court's Construction**

The Court finds that the phrase **"simultaneously executing at least a respective one of the subtasks of the computer-executable process in each of at least some of said processors on a respective one of the partitions"** is not indefinite, and is given its **plain and ordinary meaning**.

**K. "on a first-come/first-served basis"**

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "on a first-come/first-served basis" | Plain and ordinary meaning, no construction necessary. | "selecting the earliest unprocessed partition for execution without the use of a control process that uses load information for such selection" |

1. **Analysis**

The phrase "on a first-come/first-served basis" appears in Asserted Claim 1 of the '582 Patent. The parties dispute whether the term "on a first-come/first-served basis" requires construction. Defendant contends that the proper construction includes the following two parts: "(i) selecting the earliest unprocessed partition for execution (ii) without the use of a control process that uses load information for such selection." (Dkt. No. 82 at 34).

Regarding Defendant's proposal of "selecting the earliest unprocessed partition for execution," the Court finds that it is unnecessary and unwarranted. Defendant argues that Claim 1(d) provides no guidance as to how to determine which "unprocessed partition" is "first-come," because the specification teaches that some sub tasks may run faster than others. (Dkt. No. 82 at 35). Defendant further contends that without any construction, the phrase "on a first-come/first-served basis" would be indefinite, because it provides no guidance for determining which unprocessed partition is "first-come." *Id.* The Court disagrees.

Step (c) of Claim 1 recites "simultaneously executing at least a respective one of the subtasks of the computer-executable process in each of at least some of said processors on a respective one of the partitions with each subtask reading and processing the respective partition so as to process the respective partition and produce respective subtask output." Step (d) of Claim 1 further recites "thereafter repeating step (c) in at least some of the subtask processors each with another unprocessed partition on a first-come/first-served basis." Thus, as recited in the claim, the partition that is processed next is the unprocessed partition that was created first in time. That is the plain and ordinary meaning of "on a first-come/first-served basis." Indeed, the specification provides an example of this claim language by disclosing the processing order of Input 1-6. '582 Patent at 6:14–37 ("Input 1" is processed first, then "Input 2," then "Input 3," then "Input 4," then "Input 5," and, last, "Input 6.").

Regarding Defendant's negative limitation of "without the use of a control process that uses load information for such selection," the Court addressed the disclaimer with the disputed term "description of all said partitions." As discussed above, the patentee explicitly referred to "description of all said partitions" language in distinguishing the prior art. Specifically, the patentee argued that "[t]he amended claims, refer to a distribution of a description of the work to be done. The sharing process can use such a description to distribute the load without a special load process." (Dkt. No. 82-14 at 8). Accordingly, the Court resolved the parties dispute when addressing the disputed term "description of all said partitions."

### 2. Court's Construction

For the reasons set forth above, the phrase **"on a first-come/first-served basis"** is given its **plain and ordinary meaning.**

## VI. CONCLUSION

The Court adopts the constructions above for the disputed terms of the Asserted Patents. Furthermore, the parties should ensure that all testimony that relates to the terms addressed in this Order is constrained by the Court's reasoning. However, in the presence of the jury the parties should not expressly or implicitly refer to each other's claim construction positions and should not expressly refer to any portion of this Order that is not an actual construction adopted by the Court. The references to the claim construction process should be limited to informing the jury of the constructions adopted by the Court.

**IT IS SO ORDERED.**

**SIGNED this 19th day of February, 2026.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE