**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **INTELLECTUAL VENTURES I LLC and INTELLECTUAL VENTURES II LLC,** | § | |
| | § | |
| ***Plaintiffs,*** | § | **Civil Action No. 3:25-cv-02885-L-BN** |
| | § | |
| **v.** | § | **Consolidated with 3:25-cv-03097-L** |
| | § | |
| **SOUTHWEST AIRLINES CO.,** | § | **JURY TRIAL DEMANDED** |
| | § | |
| ***Defendant.*** | § | |

---

**DEFENDANT SOUTHWEST AIRLINES CO.'S**
**RESPONSIVE CLAIM CONSTRUCTION BRIEF**

---

**TABLE OF CONTENTS**


I. INTRODUCTION .......... 1

II. RELEVANT LEGAL STANDARDS .......... 2

A. Lexicography .......... 3

B. Prosecution Disclaimer .......... 3

III. DISPUTED CONSTRUCTIONS .......... 5

A. U.S. Patent No. 8,332,844 .......... 5

1. blocks of a "root image" / "leaf image" ('844 Patent at Claim 7) .......... 11

2. "merging the blocks of said root image with the blocks of respective leaf images" ('844 Patent at Claim 11) .......... 15

3. "caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory" ('844 Patent at Claim 7) .......... 16

B. U.S. Patent No. 8,407,722 .......... 17

1. "input source" / "identify a category of the update message based on the input source" (Claim 14) .......... 18

2. "gateway device" (Claim 14) .......... 21

C. U.S. Patent No. 7,257,582 .......... 23

1. "distributing descriptions of all of said partitions to each of a plurality of subtask processors" (Claim 1) .......... 24

2. "first-come/first-served basis" (Claim 1) .......... 27

3. "description of all said partitions" (Claim 1) .......... 29

D. U.S. Patent No. 7,712,080 .......... 32

1. "distributed sequential computing program" (Claims 1, 7, and 9) .......... 34

2. "distributed parallel computing program" (Claims 1, 4, 5, 6, 9, and 17) .......... 38

E. U.S. Patent No. 11,032,000 .......... 41

1. "time interval" (Claims 1 and 13) .......... 42

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Ancora Techs., Inc. v. Apple, Inc.*,
744 F.3d 732 (Fed. Cir. 2014)....................36

*Aortic Innovations LLC v. Edwards Lifesciences Corp.*,
159 F.4th 1 (Fed. Cir. 2025)....................1

*AstraZeneca LP v. Apotex, Inc.*,
633 F.3d 1042 (Fed. Cir. 2010)....................3

*Aylus Networks, Inc. v. Apple Inc.*,
856 F.3d 1353 (Fed. Cir. 2017).................... *passim*

*Barkan Wireless IP Holdings, L.P. v. Samsung Elecs. Co.*,
2019 WL 497902 (E.D. Tex. Feb. 7, 2019)....................5

*Becton Dickinson & Co. v. Tyco Healthcare Grp., LP*,
616 F.3d 1249 (Fed. Cir. 2010)....................22

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*,
262 F.3d 1258 (Fed. Cir. 2001)....................3

*Boss Indus., Inc. v. Yamaha Motor Corp. U.S.A.*,
333 F. App'x 531 (Fed. Cir. 2009)....................42

*Computer Docking Station Corp. v. Dell, Inc.*,
519 F.3d 1366 (Fed. Cir. 2008)....................4, 20, 21, 28

*Cont'l Auto. Sys., Inc. v. Intellectual Ventures II LLC*,
IPR2022-01130, 2023 WL 8432718 (PTAB Dec. 4, 2023)....................41, 42, 43

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
192 F.3d 973 (Fed. Cir. 1999)....................4, 40, 43

*Every Penny Counts, Inc. v. Am. Express Co.*,
563 F.3d 1378 (Fed. Cir. 2009)....................35

*Fenner Invs., Ltd. v. Cellco P'ship*,
778 F.3d 1320 (Fed. Cir. 2015)....................4

*Genuine Enabling Tech. LLC v. Nintendo Co.*,
29 F.4th 1365 (Fed. Cir. 2022)....................4

*GPNE Corp. v. Apple Inc.*,
830 F.3d 1365 (Fed. Cir. 2016)....................9

*Indacon, Inc. v. Facebook, Inc.*,
824 F.3d 1352 (Fed. Cir. 2016)....................3, 11, 29

*Intellectual Ventures II LLC v. American Airlines, Inc.*,
No. 4:24-cv-00980 (E.D. Tex.).................... *passim*

*Irdeto Access, Inc. v. Echostar Satellite Corp.*,
383 F.3d 1295 (Fed. Cir. 2004)....................11

*Iridescent Networks, Inc. v. AT&T Mobility, LLC*,
933 F.3d 1345 (Fed. Cir. 2019)....................34, 38

*Jonsson v. Stanley Works*,
903 F.2d 812 (Fed. Cir. 1990)....................42

*Lexington Luminance LLC v. Amazon.com Inc.*,
601 F. App'x 963 (Fed. Cir. 2015) ....................3

*Magnolia Med. Techs., Inc. v. Kurin, Inc.*,
169 F.4th 1094 (Fed. Cir. 2026) ....................22

*Marine Polymer Techs., Inc. v. HemCon, Inc.*,
672 F.3d 1350 (Fed. Cir. 2012) (en banc)....................36, 44

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) ....................1

*MBO Labs., Inc. v. Becton, Dickinson & Co.*,
474 F.3d 1323 (Fed. Cir. 2007)....................4

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
357 F.3d 1340 (Fed. Cir. 2004).................... *passim*

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008)....................1, 2, 35

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003)....................3, 4, 21

*Pacing Techs., LLC v. Garmin Int'l, Inc.*,
778 F.3d 1021 (Fed. Cir. 2015)....................9

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)....................2, 3, 10

*Poly-Am., L.P. v. API Indus., Inc.*,
839 F.3d 1131 (Fed. Cir. 2016)....................10

*Puradigm, LLC v. DBG Grp. Invs. LLC*,
No. 2024-2299, 2026 WL 890566 (Fed. Cir. Apr. 1, 2026) ....................................................4

*Purdue Pharma L.P. v. Endo Pharms. Inc.*,
438 F.3d 1123 (Fed. Cir. 2006)..........................................................................................4

*Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*,
824 F.3d 999 (Fed. Cir. 2016)............................................................................................7

*SightSound Techs., LLC v. Apple, Inc.*,
809 F.3d 1307 (Fed. Cir. 2015)........................................................................................42

*Standard Oil Co. v. Am. Cyanamid Co.*,
774 F.2d 448 (Fed. Cir. 1985)............................................................................................4

*Techtronic Indus. Co. v. Int'l Trade Comm'n*,
944 F.3d 901 (Fed. Cir. 2019).....................................................................9, 11, 25, 37

**Other Authorities**

37 C.F.R. § 41.37 ..........................................................................................................19

## I. INTRODUCTION

This case turns on where IV's patent rights begin and end. Patent claims define "the metes and bounds of the patentee's invention," and claim construction fixes those boundaries as a matter of law. *Aortic Innovations LLC v. Edwards Lifesciences Corp.*, 159 F.4th 1, 8 (Fed. Cir. 2025). IV's campaign targeting dozens of companies across unrelated industries depends on claim interpretations that push the asserted patents beyond the invention described, claimed, and preserved in the intrinsic record. Claim construction is therefore necessary to enforce those limits and define the proper scope of IV's patent rights.

IV seeks ambiguity, not construction: it contends no disputed term requires a specific definition, urging "plain and ordinary meaning" for every term. That position would leave the disputed terms undefined and allow IV's experts to argue to the jury that the patents cover whatever IV needs them to cover. But "[t]he interpretation and construction of patent claims, which define the scope of the patentee's rights under the patent, ***is a matter of law exclusively for the court***." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc) (emphasis added), *aff'd*, 517 U.S. 370 (1996); *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute.").

The Court should reject IV's no-construction approach for two reasons. First, "plain and ordinary meaning" does not resolve a claim-scope dispute when the parties do not agree on what that meaning is. It merely shifts to competing experts and the jury what the law requires the Court to decide as a matter of law.

Second, IV's proposed constructions improperly expand the claims beyond the scope defined in the patents and recapture subject matter that IV or its predecessors disclaimed during prosecution or in recent IPR proceedings. Where the patent specification defines a term, that

definition controls. Where the patentee distinguished the prior art or otherwise limited the claimed invention to obtain allowance or defend the claims before the Patent Office, the patentee must be held to those representations. Prosecution disclaimer exists to prevent precisely the result IV seeks here: claims may not be "construed one way in order to obtain their allowance and in a different way against accused infringers." *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1360 (Fed. Cir. 2017). Binding authority requires that the Court resolve these disputes now, rather than adopt a "plain meaning" that leaves claim scope to expert testimony and trial argument. *O2 Micro*, 521 F.3d at 1360-61.

Southwest's constructions, by contrast, are grounded in the patents' own written descriptions and the representations made to the Patent Office throughout the life of these patents, which establish specific, bounded meanings for each disputed term. The Court should therefore resolve the parties' claim-construction disputes now, enforce the boundaries established by the intrinsic record, and adopt Southwest's proposed constructions.

## II. RELEVANT LEGAL STANDARDS

Claim terms are generally given their ordinary and customary meaning—that is, the meaning they would have had to a person of ordinary skill in the art ("POSITA") at the time of the invention, viewed in the context of the patent and its intrinsic record. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-17 (Fed. Cir. 2005) (en banc). If a term has an accepted meaning in the art, that ordinarily governs unless the patentee has assigned the term a different meaning or disavowed claim scope in the specification or during prosecution. *Id.* at 1316.

The Asserted Patents concern computers and networking. A person of ordinary skill in the art as of their respective priority dates would have had a bachelor's degree in electrical engineering,

computer science, or a similar field, and/or two or more years of industry experience in networking and distributed computing. Additional experience may substitute for education and vice versa.[1]

The disputes here principally implicate two doctrines that determine claim scope from the intrinsic record: (1) lexicography and (2) prosecution disclaimer.

### A. Lexicography

A patentee may assign a claim term a meaning different from the meaning it would otherwise possess. When the specification does so, "the inventor's lexicography governs." *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1051-52 (Fed. Cir. 2010) (quoting *Phillips*, 415 F.3d at 1316). An express definition is not required. *Id.* A patentee may define a term by implication when it uses that term throughout the specification in a manner consistent with only one meaning. *Id.* (quoting *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1271 (Fed. Cir. 2001)). And when a term has no well-understood meaning in the art, it "cannot be construed broader than the disclosure in the specification." *Indacon, Inc. v. Facebook, Inc.*, 824 F.3d 1352, 1357 (Fed. Cir. 2016). Apart from lexicography, the specification may itself narrow otherwise available claim scope. Where the specification reveals an intentional disclaimer or disavowal, the patentee's expressed intention governs. *Phillips*, 415 F.3d at 1316.

### B. Prosecution Disclaimer

Prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Aylus Networks*, 856 F.3d at 1359 (quoting

[1] Judge Mazzant issued two claim-construction orders in another case involving the same Asserted Patents. *See Intellectual Ventures II LLC v. American Airlines, Inc.*, No. 4:24-cv-00980, Dkt. 127 (E.D. Tex. Feb. 19, 2026) and Dkt. 177 (E.D. Tex. July 28, 2026). Those orders are informative but do not bind this Court. This Court must independently construe the disputed terms on the record presented here, including statements to the Patent Office not previously considered. *See Lexington Luminance LLC v. Amazon.com Inc.*, 601 F. App'x 963, 969 (Fed. Cir. 2015) (vacating adoption of another district court's claim construction "without performing its own analysis").

*Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003)). For disclaimer to attach, the patentee's disavowal must be "clear and unmistakable." *Omega*, 334 F.3d at 1325-26. The doctrine protects the public's reliance on "definitive statements made during prosecution." *Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1374 (Fed. Cir. 2022) (quoting *Omega*, 334 F.3d at 1324).

Disclaimer may arise through amendment or argument. *Aylus Networks*, 856 F.3d at 1359; *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985). In particular, a patentee may surrender claim scope by distinguishing the claimed invention from the prior art. *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1330 (Fed. Cir. 2007). Such arguments identify, "in the inventor's own words[,] what the invention is not." *Id.*; *see also Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008); *Purdue Pharma L.P. v. Endo Pharms. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006). An argument distinguishing prior art is "given the same weight" as a claim amendment. *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 979 (Fed. Cir. 1999).

Disclaimer does not depend on whether the examiner relied on the patentee's representation or whether the representation formed the stated basis for allowance. "[T]he interested public has the right to rely on the inventor's statements made during prosecution, without attempting to decipher whether the examiner relied on them, or how much weight they were given." *Fenner Invs., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1325 (Fed. Cir. 2015); *accord Puradigm, LLC v. DBG Grp. Invs. LLC*, No. 2024-2299, 2026 WL 890566, at *3 (Fed. Cir. Apr. 1, 2026). A court therefore "cannot construe the claims to cover subject matter broader than that which the patentee itself regarded as comprising its inventions and represented to the PTO." *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004); *accord Elkay*, 192 F.3d at 980.

The same principles apply to related Patent Office proceedings and related patents. Statements made by a patent owner during inter partes review, whether before or after institution, may be considered in claim construction and may support prosecution disclaimer. *Aylus Networks*, 856 F.3d at 1362.[2] And the prosecution history of one patent "is relevant to an understanding of the scope of a common term in a second patent stemming from the same parent application." *Microsoft*, 357 F.3d at 1349.

## III. DISPUTED CONSTRUCTIONS

The disputes below involve five unrelated patents covering different technologies: data storage, messaging systems, distributed data processing, parallel computing, and wireless communications. Although IV presents "plain and ordinary meaning" as a simple answer, that label does not resolve the parties' disputes. Some of the disputed terms have no accepted meaning in the art, and others were given a specific meaning by the patentees or were narrowed through the applicants' statements to the Patent Office. In each instance, the term's meaning must be drawn from the patents' written descriptions and the statements made during prosecution and IPR, not from a generalized appeal to plain meaning. Since IV filed its opening claim-construction brief, the parties have narrowed the disputed terms and filed an Amended Joint Claim-Construction and Prehearing Statement. Dkt. 165. The following sections address the narrowed disputes reflected in that filing.

### A. U.S. Patent No. 8,332,844

The central dispute for the '844 Patent is whether its claims require operations at the block

[2] IV argues that because Southwest did not propose an express construction of certain terms in IPR petitions, it cannot seek to construe them now. That is wrong—a statement that no construction is needed to resolve a petition does not "give[] rise to any admission or estoppel." *Barkan Wireless IP Holdings, L.P. v. Samsung Elecs. Co.*, 2019 WL 497902, at *12 n.9 (E.D. Tex. Feb. 7, 2019).

level, beneath the file system. The answer is yes—because the patent itself says so, because IV told the Patent Office so in multiple proceedings, and because allowing file-system-level operations would permit IV to reclaim the very scope the patent was designed to surpass. The ’844 Patent (Appx. 20-36) and the ’282 Patent (Appx. 10-19) share a common specification lineage[3] and concern organizing and storing information in distributed application environments. The parties dispute the architectural layer at which the claimed operations occur. Southwest contends that the intrinsic record requires those operations to occur at the block level, beneath the file system, and precludes a “plain and ordinary meaning” broad enough to encompass file-system-level operations of the kind distinguished in the specification and prosecution history.

The intrinsic record begins with the patentees’ first related application—U.S. Application No. 11/026,622 (the “’622 Application”), titled *Branching Store File System*—filed on December 30, 2004.[4] Appx. 37-76; *see Microsoft*, 357 F.3d at 1349 (“[T]he prosecution history of one patent is relevant to an understanding of the scope of a common term in a second patent stemming from the same parent application.”). The ’622 Application disclosed root/leaf image merging at the file-system level, describing “a root file system containing the operating environment or base image of a distributed application,” “dedicated leaf images,” and “a filter that controls accesses of the distributed application by the compute nodes.” Appx. 44. When a compute node wrote data, the system used file-level copy-on-write: “the entire original file is copied from the root image into the change volume” and “the write operation is then performed on the copy.” *Id.* at 56-57. The

[3] The ’844 Patent is a continuation-in-part of the ’282 Patent. IV intends to move to sever and stay the ’282 Patent pending appeal of the indefiniteness findings in the *American Airlines* case. *See* Dkt. 161 at 1 n.1. The ’282 Patent is therefore not presently submitted for construction, but Southwest reserves its right to seek construction of its terms if the patent is later asserted.

[4] The ’282 Patent is a continuation-in-part of the ’622 Application.

Examiner repeatedly rejected the ’622 Application based on the prior art, and the applicants ultimately abandoned it.

While the ’622 Application was pending, the inventors filed a continuation-in-part application that became the ’282 Patent, changing the fundamental focus to apply the root/leaf image concept at the block level—beneath the file system. The ’282 Patent is titled ***Block-Level** I/O Subsystem for Distributed Application Environment Management*.[5] It describes a system with compute nodes, storage units, and “union block devices” (“UBDs”). ’282 Patent at Abstract, 2:16-27, Fig. 1. UBDs “are effectively low-level drivers,” *id.* at 4:41-45, that “create[] the application environment by merging the blocks of the root image stored on the first storage unit with the leaf image stored on the second storage unit.” *Id.* at 2:27-30. Because UBDs “operate below the file system, they are concerned merely with the blocks of data themselves, rather than files they form.” *Id.* at 4:48-51. “As a result,” the system is “completely file system, and thus operating system, independent.” *Id.*

To survive *inter partes* review (“IPR”) of the ’282 Patent at the Patent Office, IV *repeatedly* emphasized block-level operations as a critical distinction from the prior art: “[t]he critical question is … whether [the prior art] actually teaches ***the claim-required creation of an ‘application environment’ by block-level merging*** of a root image and a leaf image into a cohesive image.” Appx. 587 (*American Airlines, Inc. v. Intellectual Ventures II LLC*, IPR2026-00043, Paper 8 (PTAB Jan. 20, 2026)) (citing ’282 Patent at 6:8-16, 7:24-33); *accord id.* at 588 (distinguishing “***the claimed block-level merge***” from the prior art), 601-602 (stating “***the claims require*** that the union block device ‘creates the application environment by ***merging’ root-image and leaf-image blocks via a low-level driver beneath the file system***”), 607 (distinguishing “***the claimed block-***

[5] The Federal Circuit permits “us[ing] the title of a patent to aid in claim construction.” *Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*, 824 F.3d 999, 1003 n.2 (Fed. Cir. 2016).

***level merge***”), 609 (referring to “the claimed block-level image merge”), 613-614 (distinguishing prior art from “the claimed block-level creation of the application environment”). IV’s stance on the requirement of block-level operations was clear and unambiguous: “[t]he intrinsic record ties ‘application environment’ to a specific claim-required output created by ***block-level root/leaf merging***.” *Id.* at 602-603; *see also id.* at 600 (“The ’282 Patent uses [the term ‘the application environment’] to describe ***a specific, claim-required output*** … created by a union block device ***through block-level merging*** of a shared root image and a leaf image.”).

The ’844 Patent—titled *Root Image Caching and Indexing for* ***Block-Level*** *Distributed Application Management*—likewise describes and claims block-level operations. A continuation-in-part of the ’282 Patent, the ’844 Patent claims additional techniques “for root image caching and indexing in a block-level distributed application environment.” ’844 Patent at 5:12-14; *see* Appx. 631 (*American Airlines, Inc. v. Intellectual Ventures II LLC*, IPR2025-00931, Paper 9 (PTAB Aug. 29, 2025)) (IV explaining that “[t]he ’844 Patent addressed the shortcomings associated with creating and storing a unique operating system for each compute node at the file system level through use of ‘root image caching and indexing for block-level distributed application management.’”) (quoting ’844 Patent at 2:35-37).

As with the ’282 Patent, the ’844 Patent’s asserted advance over file-system-level systems was block-level operation: “[b]y *storing data at the block level*, embodiments are able to operate *beneath the file system* and thus are designed to be file system and operating system independent.” ’844 Patent at 7:58-62 (emphasis added); *see id.* at 9:44-47 (“Thus, the file system actually seen by the compute node is a product of merging the root image portion and the leaf image portion together at the block level.”); *see also* Appx. 627 (IPR2025-00931, Paper 9) (“The claimed inventions solved long-standing inefficiencies in managing multiple compute nodes, enabling

scalable, *operating-system-independent* deployment without the waste and duplication that characterized prior systems.") (emphasis added).

Now, in seeking to construe the claims more broadly, IV argues that because the patent states that embodiments "***are able to*** operate beneath the file system," block-level operation is ***merely optional***. Dkt. 161 at 3, 5, 6, 8 (quoting '844 Patent at 7:58-62). But the sentence itself states cause and effect: "By *storing data at the block level*, embodiments are able to operate *beneath the file system* and thus are designed to be file system and operating system independent." '844 Patent at 7:58-62. That is, the claimed block-level storage is what enables the touted file-system and operating-system independence, and the patent discloses no embodiment operating at the file system level.

The remainder of the specification reinforces that architecture. Every disclosed embodiment routes compute-node access through a UBD. A compute node "mounts its instantiation of the application environment via its respective UBD," and because those UBDs "operate below the file system, they are concerned merely with the blocks of data themselves, rather than files they form." *Id.* at 5:59-6:3. The specification reiterates, "*by operating at the block level,* embodiments of the present disclosure provide file system and operating system independent systems and methods for distributing an application environment to a compute node." *Id.* at 10:1-4.

The specification's repeated description of the invention confirms that scope. When a patentee "describes the features of the 'present invention' as a whole," that description "limits the scope of the invention." *Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1024-25 (Fed. Cir. 2015); *accord GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1370-71 (Fed. Cir. 2016). The same is true where the specification discloses a single architecture and disparages the alternative. *See Techtronic Indus. Co. v. Int'l Trade Comm'n*, 944 F.3d 901, 907-09 (Fed. Cir. 2019). Where

"[e]very embodiment described in the specification" has the feature and "every section of the specification indicates [its] importance," those "facts provide together a proper reason to limit the claims." *Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1137 (Fed. Cir. 2016). Given the prosecution history, requiring block-level operations beneath the file system is not improperly importing a limitation; it is construing the claims "in view of the specification, of which they are a part." *Phillips*, 415 F.3d at 1315.

Independently, IV's own statements to the Patent Office require block-level operation. IV told the Patent Office: "Because [union block devices] 230*a-n* operate <u>*below the file system, they are concerned merely with the blocks of data themselves, rather than files they form*</u>. As a result, system 200 is completely file system, and thus operating system, independent." Appx. 634 (IPR2025-00931, Paper 9); *accord id.* at 627. IV told the Patent Office that "the ['844] patent's block-level root/leaf composition" was a "claim-critical feature." *Id.* at 642; *see id.* at 647 (distinguishing prior art because it lacked "the challenged claims' in-path union that presents a merged root/leaf view *beneath the file system*") (emphasis added); *see also id.* at 663 ("the union block devices operate as low-level, block-layer drivers beneath the file system"), 665 (explaining that the UBD "sits beneath each compute node's file system (functioning at the 'block' layer) and merges a shared root image with respective leaf images to 'create' a node's runtime file system"; "Union *block* devices are 'low-level drivers' that operate below the file system (at the block layer) and make the system operating system independent, which is how the claimed merging occurs 'at an operational level' between [each node's] file system and the storage units."). IV's current position ignores—and flatly contradicts—its positions in the IPR.

The Court must construe the disputed terms in line with the intrinsic record. IV's proposed "plain and ordinary meaning" constructions would permit its experts to opine that the claims

encompass saving, caching, and merging at the file-system level—including the file-level root/leaf approach abandoned in the ’622 Application and later disavowed by IV in IPR proceedings. The Court should therefore construe the claims to require block-level operations beneath the file system rather than leave that claim-scope dispute for competing expert testimony before the jury.

### 1. blocks of a “root image” / “leaf image” (’844 Patent at Claim 7)

| Southwest’s Construction | IV’s Construction |
| --- | --- |
| **“a base image of the application environment operating at the block level below the file system” / “a node-specific image of the application environment operating at the block level below the file system”** | **Plain and ordinary meaning** |

Although IV proposes plain and ordinary meaning for “root image” and “leaf image,” IV identifies no accepted meaning in the art for either term. Where a claim term lacks such an accepted meaning, it “cannot be construed broader than the disclosure in the specification.” *Indacon*, 824 F.3d at 1357; *see also Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004) (“absent such an accepted meaning [in the art], we construe a claim term only as broadly as provided for by the patent itself”).

The claim language itself repeatedly requires operations on blocks. Claim 7 recites (1) “storing **blocks** of a root image,” (2) storing leaf images containing additional data “**blocks**” and changes to the “**blocks** of the root image,” and (3) “caching **blocks** of said root image.” The specification confirms that these operations occur beneath the file system: “[b]y *storing data at the block level*, embodiments are able to operate *beneath the file system* and thus are designed to be file system and operating system independent.” ’844 Patent at 7:58-62. *See Techtronic Indus. Co.*, 944 F.3d at 907 (“[W]here the inventor … has manifested that the invention does or does not include a particular aspect, that intention ‘is regarded as dispositive.’”).

Claim 7 does not merely describe what a leaf image contains; it recites a negative limitation that leaf images include "***only*** additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes." '844 Patent at 11:29-38 (emphasis added). The word "only" and the "do not include" clause create a negative limitation prohibiting storage of unchanged root-image blocks on the leaf-image storage device. That requirement is incompatible with file-system operations that save all blocks in a file, as confirmed by the specification's example:

> For example, a particular file on the root image may comprise twenty blocks of data (e.g., blocks 1-20). One compute node (e.g., compute node 220a) desires to make a change to this file which involves a modification of only a few specific blocks of the file (e.g., blocks 4-9). In this example, only the modified blocks (e.g., blocks 4-9) will be stored in the compute node's leaf image (e.g., leaf image stored on second storage device 250a) plus some small overhead.

'844 Patent at 5:51-58.

The negative limitation is incompatible with file-system-level copy-on-write architectures that respond to a modification by copying the file—including unchanged blocks—to a writable layer. If, for example, a 20-block file is modified only in blocks 4-9, such an architecture copies all 20 blocks, including 14 unchanged root-image blocks, whereas Claim 7 expressly provides that the leaf image "do[es] not include blocks of said root image that are unchanged." The claimed architecture instead operates at the block level, permitting changed blocks to be stored without copying the file's unchanged blocks into the leaf image.

The prosecution history confirms the significance of that negative limitation. The applicants added "only" to Claim 7 and all other independent claims in an August 31, 2010 amendment to distinguish Chang. Appx. 208 ('844 File History). They explained that Chang's "client image copies" include "blocks of the root image that are unchanged by a compute node (e.g., the common

OS and application blocks for storing the base boot image).” *Id.* at 218-24. Chang thus stored full base images alongside client-specific data—including unchanged blocks—the precise result the claim’s negative limitation prohibits. The Examiner’s Statement of Reasons for Allowance identified the “only” limitation as part of the “unique combination of features” rendering the claims “non-obvious over the art of record,” quoting Claim 7’s “only additional data blocks” and “do not include blocks of said root image that are unchanged” recitals. *Id.* at 243. The applicants later confirmed that the only substantive amendments were those made before the July 2012 interview; the July 2012 amendments “were directed to matters of form and to improve the clarity of the claims, and were not required to overcome the art of record.” *Id.* at 229.

The specification also contrasts the claimed system with prior-art “branching store file system[s]”—including the system described in the ’622 Application[6]—that store data “at the file system level (i.e., on a ‘per file’ basis).” ’844 Patent at 2:12-28. Because those systems operate at the file-system level, “a separate version of the system must be created for each unique operating system.” *Id.* at 2:28-32. The ’844 Patent addresses that deficiency by performing operations at the block level, beneath the file system. *See id.* at 2:51-57. IV’s proposed “plain and ordinary meaning” constructions would permit an expert to opine that the claims encompass the very file-system-level operations the specification distinguishes from the claimed invention.

IV’s own statements to the Patent Office disavowed file-level operation. In opposing IPR of the ’844 Patent, IV argued that a “boot cache” in the prior art “is fundamentally different from the [’844] patent’s **block-level root/leaf** composition with per-node leaf images that exclude unchanged root blocks, a cache of ‘blocks of the root image’ used across nodes, and an index-

[6] *See also* ’282 Patent at 1:58-2:12 (distinguishing the claimed invention from the ’622 Application).

once/share mechanism for the root image." Appx. 642 (IPR2025-00931, Paper 9) (emphasis added); *see id.* at 653 (arguing the prior art "point[s] a POSITA away from persistent, shared boot-block caching across users and sessions").

IV's reliance on Judge Mazzant's orders in *American Airlines* is misplaced for two reasons. First, he rejected IV's "plain and ordinary meaning" position and construed "root image" as "a common set of data blocks that are unchanged by the plurality of compute nodes"—a construction that defines the root image in terms of data blocks, consistent with Southwest's block-level construction. *American Airlines*, Dkt. 127 at 18 (Appx. 874); *id.*, Dkt. 177 at 33 (Appx. 936). Judge Mazzant also construed the '282 Patent's "low-level driver"—the union block device through which the claimed merging occurs—as a "driver that operates below the file system." *Id.* at 932. That construction further confirms that the claimed merging occurs beneath the file system.

Second, Judge Mazzant did not consider the full intrinsic record presented here, including IV's statements to the Patent Office that the '844 Patent's "block-level root/leaf composition" and "in-path union" operate "beneath the file system"—statements not presented in its *American Airlines* briefing. *See* Appx. 642, 647, 663, 665 (IPR2025-00931, Paper 9). Nor did either order separately construe the disputed "leaf images" phrase. The Court must consider the complete record and construe the claims consistently with IV's own representations to the Patent Office.

Accordingly, "root image" and "leaf image" should be construed so that the claimed operations involving those images occur at the block level, beneath the file system. Adopting IV's "plain and ordinary meaning" would leave that disputed scope unresolved, permit IV to recapture disclaimed subject matter, and defer the dispute to expert testimony and trial. The Court should therefore construe "root image" to mean *a base image of the application environment operating*

*at the block level below the file system* and "leaf image" to mean *a node-specific image of the application environment operating at the block level below the file system*.

### 2. "merging the blocks of said root image with the blocks of respective leaf images" ('844 Patent at Claim 11)

| Southwest's Construction | IV's Construction |
|---|---|
| **"combining the root image and the leaf image at the block level below the file system"** | **Plain and ordinary meaning** |

IV contends that "merging the blocks" should receive its plain and ordinary meaning, but that position ignores the intrinsic record IV itself created. Dkt. 161 at 6. Claim 11 of the '844 Patent recites "merging the blocks of said root image with the blocks of respective leaf images to create cohesive respective application environments." The specification and prosecution history require this merging operation to occur at the block level below the file system.

IV has repeatedly characterized the claimed operation that way before the Patent Office. *E.g.*, Appx. 587 (IPR2026-00043, Paper 8) (distinguishing the prior art as not teaching "the claim-required creation of an 'application environment' by **block-level merging** of a root image and a leaf image into a cohesive image") (emphasis added) (citing '282 Patent at 6:8-16, 7:24-33), 588 (referring to "the claimed creation of the application environment through root/leaf **block merging**") (emphasis added), 600 ("The '282 Patent uses [the term 'the application environment'] to describe a specific, claim-required output: a cohesive image presented to a compute node that is created by a union block device through **block-level merging** of a shared root image and a leaf image") (emphasis added), 602-603 ("The intrinsic record ties 'application environment' to a specific claim-required output created by block-level root/leaf merging"), 609 ("the claimed block-level image merge"); Appx. 647 (IPR2025-00931, Paper 9) (distinguishing prior art that operates "in contrast to the challenged claims' in-path union that presents a merged root/leaf view *beneath the file system*") (emphasis added); *see also Microsoft*, 357 F.3d at 1349 ("[T]he prosecution

history of one patent is relevant to an understanding of the scope of a common term in a second patent stemming from the same parent application.”). IV’s statements distinguishing the prior art based on “**claim-required**” block-level merging constitute a clear and unmistakable disclaimer of broader claim scope. *See Aylus Networks*, 856 F.3d at 1362 (“statements made by a patent owner during an IPR proceeding, whether before or after an institution decision, can be considered for claim construction and relied upon to support a finding of prosecution disclaimer”).

The ’844 Patent’s specification independently confirms that construction. It explains that “creating a new boot image does not require copying the contents of the root image,” but instead “involves registering a new UBD with the system, which occurs very quickly.” ’844 Patent at 2:40-65. As described above, UBDs are low-level drivers operating at the block level beneath the file system. “Because UBDs … operate below the file system, they are concerned merely with the blocks of data themselves, rather than files they form.” ’844 Patent at 5:66-6:3. “As a result,” the system is “completely file system, and thus operating system, independent.” *Id.* Most directly, “the file system actually seen by the compute node is a product of merging the root image portion and the leaf image portion together **at the block level**.” ’844 Patent at 9:44-47 (emphasis added).

The record shows that the merging step requires *combining the root image and the leaf image at the block level below the file system*.

### 3. “caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory” (’844 Patent at Claim 7)

| Southwest’s Construction | IV’s Construction |
|---|---|
| **“caching blocks of the root image that have been accessed by at least one of said compute nodes in a cache memory at the block level below the file system”** | **Plain and ordinary meaning** |

Despite its prior limiting statements to the Patent Office, IV seeks a “plain and ordinary meaning” for this term as well. Dkt. 161 at 8. Claim 7 recites “caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory.”

During the IPR, IV distinguished prior art by emphasizing block-level operations, arguing a "boot cache" in the prior art "is fundamentally different from the challenged patent's block-level root/leaf composition with per-node leaf images that exclude unchanged root blocks, a cache of 'blocks of the root image' used across nodes, and an index-once/share mechanism for the root image." Appx. 642 (IPR2025-00931, Paper 9); *see id.* at 653 (arguing the prior art "point[s] a POSITA away from persistent, shared boot-block caching across users and sessions"). Ultimately, the Patent Trial and Appeal Board ("PTAB") agreed with IV's arguments that the Petition did not sufficiently establish that a POSITA would have had a motivation to combine the cited prior art to arrive at the claimed caching step. Appx. 733 (IPR2025-00931, Paper 11 (PTAB Nov. 21, 2025)) (quoting IV's expert declarant as stating that the prior art's cache would have to be modified "so that it caches only blocks of the shared root image, not generic OS data, and so that it is consumed through a block level merge with each node's leaf beneath the file system"). Accordingly, Southwest's proposed construction—*caching blocks of the root image that have been accessed by at least one of said compute nodes in a cache memory at the block level below the file system*—is required by the intrinsic record, while IV's "plain and ordinary meaning" ignores it.

### B. U.S. Patent No. 8,407,722[7]

The '722 Patent (Appx. 246-78)—titled *Asynchronous Messaging Using a Node Specialization Architecture in the Dynamic Routing Network*—concerns "transferring information for remotely updating content at client devices through the digital networks." '722 Patent at 1:24-

[7] As reflected in the Amended Joint Claim-Construction and Prehearing Statement (Dkt. 165), the parties no longer seek construction of "respond to the live object of the data representation by determining an object identifier (ID) of the live object," "register for updates of the live object with the routing network," or the standalone term "input source." Southwest therefore addresses only the two '722 Patent terms that remain in dispute: "input source" / "identify a category of the update message based on the input source," and "gateway device."

27. The patent describes a publish-subscribe messaging system in which client devices receive web pages containing "live objects," which are "real-time dynamically-updateable objects … identified by an object identifier, or object ID." *Id.* at 5:27-31. "When the clients receive live objects, the clients identify the object IDs associated with the objects and register the object IDs with the routing network." *Id.* at Abstract. The routing network "maintains a registry indicating which clients have registered for which object IDs," and selectively forwards update messages to those clients. *Id.* at 5:32-48. When a gateway receives update messages from an input source, the gateway "routes the messages to the nodes of the types to which the categories are mapped." *Id.* at 3:43-46; *see also id.* at Abstract.

**1. "input source" / "identify a category of the update message based on the input source" (Claim 14)**

| Southwest's Construction | IV's Construction |
|---|---|
| **"identify a category of the update message based on the information provider or dynamic content provider but not on the category/topic of the message content"** | **Plain and ordinary meaning** |

IV proposes "plain and ordinary meaning" for the disputed phrase and opposes Southwest's construction, including its definition of "input source" and its exclusion of categorization based on message content. Dkt. 161 at 13, 15. IV's proposed construction does not account for either the specification's express definition of "input source" or the prosecution disclaimer limiting source-based categorization.

Claim 14 recites that a gateway device at the routing network is configured to "identify a category of the update message based on the input source." '722 Patent at 24:3-5. The specification expressly defines "input source" as "the information provider or a dynamic content provider (generically referred to as an 'input source')." *Id.* at 3:15-16. It likewise refers to an "information provider 108/dynamic content provider 116 (generically referred to as an 'input source 210')" and

"the input source 210, i.e., the information provider 108 and/or dynamic content provider 116." *Id.* at 11:22-24, 13:26-28. Thus, "input source" means the information provider and/or dynamic content provider—not the category or subject matter of the message.

The specification separately explains that the claimed gateway categorizes messages **based on that input source**. Claim 14 requires the gateway "to identify a category of the update message based on the input source" and then route the message by mapping categories to node types. Consistently, the specification states: "When a gateway receives messages from input sources, the gateway identifies the categories of the messages and routes the messages to the nodes of the types to which the categories are mapped." *Id.* at 3:43-50.

Critically, the specification also distinguishes source-based categorization from other categorization techniques: "There are multiple ways to assign the messages into categories. One way is to assign all messages from a given input source … into a certain category. Another way is to explicitly specify the category in the object ID for the message. Yet another way is to utilize a hashing function or lookup table to partition messages into categories based on object IDs or other values." *Id.* at 18:52-58. Claim 14 expressly selects the first approach—identifying the message category "based on the input source."

The prosecution history confirms the distinction between source-based and content-based categorization. To overcome a prior-art rejection, the applicants repeatedly contrasted identifying a category based on the input source with Chandra's categorization based on message content:

> This section of Chandra [prior art reference], relied on by the Examiner, discloses that if the ***data content of the message*** matches the specified values of the subscription, then the message is delivered to the one or more subscribers (or clients) of that subscription. This is not the same as "identify a category of the update message <u>based on the input source</u>," as recited in claims 26, 33, 39, 45, 51, and 57, using their respective language.

> The Examiner, for example, on page 3 of the Office Action, relies on the above sections of Chandra to allegedly show "identifying each category based on the category/topic of the message content." ***By this statement, the Examiner appears to agree that Chandra teaches identifying categories <u>based on category/topic of the message content</u>. In contrast, claims 26, 33, 39, 45, 51, and 57 recite, inter alia, "identifying a category of the update message <u>based on the input source</u>," using their respective language***.

Appx. 449-50 (Dec. 30, 2011 Reply to Office Action) (underlines in original, other emphasis added). Those statements clearly distinguished categorization based on the input source from categorization based on the message content and therefore limit the scope IV may now assert. *See Aylus Networks*, 856 F.3d at 1359-60; *Computer Docking Station*, 519 F.3d at 1374.

After the Examiner disagreed and maintained the rejection, the applicants appealed the Examiner's rejection to the PTAB, arguing that "[r]ather than teaching or suggesting at least 'identify a category of the update message ***based on the input source***,' as respectfully recited in claims, Chandra teaches identifying categories ***based on the category/topic of the message content***." Appx. 317 (Brief on Appeal Under 37 C.F.R. § 41.37, filed May 31, 2012); *accord id.* at 316 ("The Office committed reversible errors as the references lack at least the claimed identifying based on input source and rather Chandra teaches using a category/topic of message content"; "Chandra[] merely teaches using a category/topic of message content"), 317 ("Chandra discloses a method for 'routing messages within a network using the data content of the message'"), 318, 325-26.

Thereafter, the Examiner withdrew the rejection and allowed the claims. IV cannot now recapture the claim scope surrendered in distinguishing Chandra. *See Computer Docking Station*, 519 F.3d at 1374 ("A patentee could [make a disclaimer], for example, by clearly characterizing the invention in a way to try to overcome rejections based on prior art.").

IV argues that the prosecution history establishes only that categorization cannot rest on message content "alone," because "based on" does not mean "based only on." No reasonable reader would interpret the statements that way. The applicants repeatedly told the Examiner and the Board that categorization "based on the input source" **"is not the same as"** categorization "based on the category/topic of the message content." Those statements were made to distinguish Chandra and obtain allowance. IV cannot now erase that distinction by treating content-based categorization as within the ordinary scope of the limitation. *See Aylus Networks*, 856 F.3d at 1359-60; *Computer Docking Station*, 519 F.3d at 1374.

Prosecution disclaimer does not require the patentee to have used the word "only"; it requires a "clear and unmistakable" distinction from the prior art. *Omega*, 334 F.3d at 1325-26. The applicants made that distinction by repeatedly telling the Patent Office that source-based categorization "is not the same as" content-based categorization—a disclaimer Judge Mazzant recognized in construing the same phrase in the *American Airlines* case. *American Airlines*, Dkt. 127 at 20-21 (Appx. 856-902).

Southwest's proposed construction gives effect to both: the specification's express definition of "input source" and the applicants' disclaimer distinguishing source-based categorization from categorization based on message content. The Court should therefore construe the phrase to mean *identify a category of the update message based on the information provider or dynamic content provider but not on the category/topic of the message content*.

**2. "gateway device" (Claim 14)**

| Southwest's Construction | IV's Construction |
|---|---|
| **"a component of the routing network situated between the input source and the node"** | **Plain and ordinary meaning** |

IV seeks plain and ordinary meaning for "gateway device," but that position would allow IV to avoid the prosecution disclaimer distinguishing the gateway device from other network

components. Dkt. 161 at 16. Claim 14 of the ’722 Patent recites “wherein a gateway device at the routing network is configured to identify a category of the update message based on the input source, to determine a node type to which the identified category maps, and to route the update message to the node, having the node type, at the routing network.” By separately reciting a gateway device, client device, node, and input source, the claim language itself requires that these be distinct components. *See Magnolia Med. Techs., Inc. v. Kurin, Inc.*, 169 F.4th 1094, 1101-02 (Fed. Cir. 2026); *Becton Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) (“Where a claim lists elements separately, the clear implication of the claim language is that those elements are distinct components of the patented invention.”) (internal quotation marks omitted).

The prosecution history underscores this point. During prosecution, the Examiner twice rejected the pending claims based on the Trenbeath prior art. Appx. 357-78 (January 15, 2010 Non-final Rejection), Appx. 379-411 (June 17, 2010 Final Rejection). In an April 19, 2010 Response to the Examiner’s first rejection, the applicants amended the claims to recite a “gateway <u>device</u>,” instead of just “gateway,” and argued “Trenbeath does not disclose at least ‘a ***<u>gateway device</u>*** configured to … route the update message … a ***<u>node device</u>*** configured to … ***receive*** the update message ***from the gateway device*** … and route the data ***from the node device to the <u>client</u>***.’” Appx. 353-54 (April 19, 2010 Response to Office Action).

When the Examiner maintained the rejection, *see* Appx. 381, the applicants again distinguished the claimed routing network because it contains “a gateway and a node” with different functions: “[t]he function of the gateway is to route update messages to a node,” while “[t]he function of the node is to identify a client device that has registered to receive a message update and route the update message to the client device.” Appx. 427 (Aug. 16, 2010 Response to

Office Action) ("In Trenbeath the routing network's only functionality is to route a message from the publication client to the subscription client and *vise* [sic] *versa*."). The applicants' claim amendments provide clear and unmistakable evidence that the gateway device and node device are separate, physical elements of the claimed routing network configured such that the gateway device functions to route update messages to a node device.

Southwest's construction gives effect to the claim language and prosecution history by treating the gateway device as a distinct routing-network component situated between input source and the node. IV's plain-meaning proposal would leave room to collapse separately recited elements into a single device. The Court should therefore adopt Southwest's construction.

### C. U.S. Patent No. 7,257,582

The '582 Patent (Appx. 456-465)—titled *Load Balancing with Shared Data*—relates to distributed data processing and the concept of processing tasks on a "first-come/first-served" basis. The patent describes splitting a preexisting input file into logical partitions, making descriptions of those partitions available to the processors executing subtasks, having subtasks claim unallocated partitions on a first-come/first-served basis, and combining the outputs. '582 Patent at Abstract, Claim 1. Claim 1 requires "(a) automatically determining file allocation and logically subdividing records of said input file into a plurality of partitions;" "(b) distributing descriptions of all of said partitions to each of a plurality of subtask processors"; "(c) simultaneously executing at least a respective one of the subtasks of the computer-executable process in each of at least some of said processors on a respective one of the partitions"; and "(d) thereafter repeating step (c) in at least some of the subtask processors each with another unprocessed partition on a first-come/first-served basis." *Id.* at 6:44-61.

**1. "distributing descriptions of all of said partitions to each of a plurality of subtask processors" (Claim 1)**

| Southwest's Construction | IV's Construction |
|---|---|
| **"providing each subtask processor with a control file specifying the logical partitions of the input file"** | **Plain and ordinary meaning** |

IV contends this technical phrase requires no construction, but nowhere in IV's brief does it identify or explain what that "plain and ordinary meaning" is, causing ambiguity. Merely construing the phrase as "plain and ordinary meaning" leaves open the parties' central dispute: whether "distributing descriptions" involves system-wide exposure of partition information or centralized control. Dkt. 161 at 18. The specification and prosecution history require exposure of the control file to each subtask processor so that work can be claimed without a central scheduler.

Step (b) of claim 1 recites "distributing descriptions of all of said partitions to each of a plurality of subtask processors." This step requires advance distribution to all subtask processors—before execution begins—of the information that identifies every partition and defines its boundaries within the input file. After the file is logically subdivided in step (a), the system distributes not the partition data itself, but descriptive information specifying how each partition is defined, and it distributes that information to every subtask processor. '582 Patent at 6:44-61. Because step (d) directs processors to take "another unprocessed partition on a first-come/first-served basis," each processor must already possess system-wide visibility into which partitions exist and which remain unallocated. That visibility is achieved through the comprehensive, prior distribution required by step (b). *Id.* at 6:59-61.

As shown in Fig. 1, the "Split step" is used "to create the control file 4 specifying a logical partition of the input," and the "[i]nput files 9 are, thus, logically partitioned." '582 Patent at 3:13-35, Fig. 1. "When the split step terminates, the various Sub Tasks … can be activated," either "by the split step … or by an external scheduler," at which point, "[e]ach Sub Task finds the

subdivision of the input in the control file 4." *Id.* at 3:64-4:1. "Each such Sub Task then repeatedly tries to allocate for itself and then process, an input partition that has not been allocated yet." *Id.* at 4:1-3. Figure 4's narrative illustrates the same operation: *e.g.*, "Sub Task 2 updates the control file to take responsibility of Input 1," later "Sub Task 2 takes responsibility (using the control file) for Input 2 and starts processing it." *Id.* at 6:23-27, Fig. 4.

This intrinsic record shows that "descriptions of all of said partitions" are the partition-identifying characteristics distributed via the control file so that each subtask can determine what exists and what remains unallocated. Read in this context, "distributing descriptions of all of said partitions to each of a plurality of subtask processors" requires "providing each subtask processor with a control file specifying the logical partitions of the input file."

During prosecution, the applicants distinguished prior-art systems that rely on a centralized, load-metric control routine and characterized the '582 Patent's claimed approach as distributing work "without a special load process." They explained to the Examiner:

> The primary difference between the instant invention and the [prior art] is that these systems rely on a special control process that uses load information to distribute the load between processors that share the load. With the instant invention as defined in the claims there is no such special process. The prior art's load information is not created with the process of the instant invention. Instead, the load sharing is done as a byproduct of the fact that the load-sharing process take parts of the load on a first-come/first-served basis.
>
> The amended claims, refer to a distribution of a description of the work to be done. The sharing process can use such a description to distribute the load without a special load process.
>
> For these reasons the instant invention is clearly allowable over the cited art.

Appx. 467-68. The concept of "distributing descriptions" cannot encompass a "special control process that uses load information" because the applicants drew that distinction. *See Techtronic*

*Indus. Co.*, 944 F.3d at 907-09 ("An inventor may also disavow claim scope 'by distinguishing the claimed invention over the prior art.'").

Judge Mazzant already rejected IV's attempt to treat that file-history statement as merely permissive. In the *American Airlines* case, the court held that the same prosecution argument was a "clear and unmistakable disclaimer," rejected IV's contention that the amended claims still permitted a centralized load process using load information, and construed "description of all said partitions" to require use "in distributing the load without a special load process." *American Airlines*, Dkt. 127 at 38-41 (Appx. 894-97). That ruling confirms that the applicants' statement—"with the instant invention as defined in the claims there is no such special process"—limits claim scope; it was not a description of an optional embodiment.

Moreover, the applicants amended step (b) to change the object of distribution from "distributing said partitions … " to "distributing <u>descriptions of all of</u> said partitions to each of a plurality of subtask processors …." Appx. 478 (underlining added by applicants). That amendment distinguishes distributing the data partitions themselves from distributing information that identifies the partitions for allocation purposes—the latter being precisely what the control file does. *See* '582 Patent at 3:52-4:3, 6:23-27, Fig. 1, Fig. 4. Thus, step (b) requires distribution of descriptions of the partitions (*i.e.*, the control file) to each processor, not distribution of the partitions themselves.

IV's reliance on the *American Airlines* order is again misplaced. Dkt. 161 at 18. There, the court construed the narrower term "description of all said partitions"—not the step (b) limitation at issue here, which additionally recites *how* those descriptions are "distribut[ed] … to each of a plurality of subtask processors." *American Airlines*, Dkt. 127 at 38-41 (Appx. 894-97). If anything, the order confirms the premise underlying Southwest's construction: that the amended claim

requires distributing *descriptions* of the partitions, not the partitions themselves. Southwest's construction simply gives effect to the specification's exclusive disclosure of how that distribution is accomplished—through a control file that each subtask processor consults to identify and claim unallocated partitions. '582 Patent at 3:64-4:3, 6:23-27, Fig. 4.

Accordingly, both the specification and the prosecution history support Southwest's construction of step (b): "*providing each subtask processor with a control file specifying the logical partitions of the input file*."

**2. "first-come/first-served basis" (Claim 1)**

| Southwest's Construction | IV's Construction |
|---|---|
| **"a subtask processor independently selects the next available partition to process without coordination from any central controller or scheduler and without relying on load information"** | **Plain and ordinary meaning** |

IV seeks plain and ordinary meaning for "first-come/first-served basis," but the Court's construction must clarify that this phrase forecloses central coordination. Dkt. 161 at 19.

Southwest's construction is consistent with the Patent's specification, which states, *e.g.*, "[e]ach Sub Task finds the subdivision of the input in the control file," and "repeatedly tries to allocate for itself and then process, an input partition that has not been allocated yet." '582 Patent at 3:64-4:1, 4:1-3. Similarly, the specification describes the example depicted in Figure 4 by describing the function of two subtasks. *Id*. at 6:14-37, Fig. 4. The specification states, in relevant part, that Sub Task 2 is faster than Sub Task 1 such that "[w]hile Sub Task 1 processes Input 2, Sub Task 2 finishes the processing of Input 1, takes responsibility for Input 3 and processes it, then it takes responsibility for Input 4 and starts processing it." *Id.* at 6:28-31. In other words, a subtask independently claims the next available unprocessed partition "on a first come/first served" basis.

Crucially, to overcome an Examiner's rejection during prosecution of the '582 Patent, the applicants used an analogy to traffic control at an intersection to illustrate what they meant by "first-come/first-served." Appx. 467-68. According to the applicants' analogy, the claimed invention is like "a four-way stop so that the individual drivers determine who can go and when," while the applicants argued the prior art requires a control process like "a traffic light that determines who can go when." *Id.* To more specifically distinguish the claims from the prior art, the applicants argued that the cited prior art systems "rely on a special control process that uses load information to distribute the load between processors that share the load," while "in the instant invention as defined in the claims there is no such special process." *Id.* "The prior art's load information is not created with the process of the instant invention. Instead, the load sharing is done as a byproduct of the fact that the load-sharing process takes parts of the load on a first-come/first-served basis." *Id.* Further, the applicants argued "[t]his is a major improvement since in addition to *eliminating the control process* it also eliminates the need to *collect and maintain load information*, which is very difficult to do and almost impossible to define so as to anticipate all possible processors that might execute subtasks." *Id*. (emphasis added). Continuing, the applicants further characterized their invention: "The amended claims, refer to a *distribution of a description of the work to be done*. The sharing process can use such a description to distribute the load *without a special load process*." *Id.* (emphasis added).

These statements clearly and unmistakably disclaim from claim 1 systems that coordinate scheduling (a) with a central controller or scheduler, and (b) using load information. *See Computer Docking Station*, 519 F.3d at 1374 ("A patentee could [make a disclaimer], for example, by clearly characterizing the invention in a way to try to overcome rejections based on prior art"). Southwest's construction reflects those disclaimers and clarifies the claim language.

IV cites the *American Airlines* claim construction order as foreclosing Southwest's proposed construction. Dkt. 161 at 19. Although that court gave "on a first-come/first-served basis" its plain and ordinary meaning, it did not independently analyze the prosecution-history disclaimer relating to this term. Instead, the court expressly folded the disclaimer into its construction of the separate term "description of all said partitions," stating that it had "resolved the parties['] dispute when addressing the disputed term 'description of all said partitions.'" *American Airlines*, Dkt. 127 at 44-45 (Appx. 900-901). That analysis yielded only a single limitation—that the descriptions be used "in distributing the load without a special load process"—and the court did not substantively evaluate whether the applicants' disavowal also forecloses coordination by a central controller or scheduler, which Southwest's construction makes explicit. Nor did the court have the benefit of IV's statements to the Patent Office, which the order does not address. The *American Airlines* order therefore does not foreclose Southwest's construction of this term.

Thus, Southwest's construction clarifies the claim language and reflects the clear disclaimer in the file history, and the Court should construe "first-come/first-served" to mean *a subtask processor independently selects the next available partition to process without coordination from any central controller or scheduler and without relying on load information*.

**3. "description of all said partitions" (Claim 1)**

| Southwest's Construction | IV's Construction |
|---|---|
| **"statements giving a characteristic(s) of all of the well-defined parts of the input file for use in distributing the load without a special load process, wherein such statements are distinct from the input file itself"** | **Plain and ordinary meaning** |

IV proposes plain and ordinary meaning but does not identify what that "plain and ordinary meaning" is. Dkt. 161 at 20. Because the phrase "description of all said partitions" is a technical term in the context of the '582 Patent with no accepted ordinary meaning to a person of skill in the art, the Court should construe it consistent with "the disclosure in the specification." *Indacon*, 824

F.3d at 1357. The intrinsic record supplies a specific meaning that the Court should adopt. Claim 1(b) requires "distributing descriptions of all of said partitions to each of a plurality of subtask processors," and the intrinsic record supports each part of Southwest's construction.

First, the '582 Patent defines a "partition" as "a well-defined part of the input or output." '582 Patent at 3:36-41, 6:44-51. Citing the same portion of the specification, IV confirmed this understanding during an IPR: "in the context of the '582 Patent, a logical partition is a <u>*well-defined*</u> part of the input file." Appx. 753 (emphasis added by IV) (IPR2025-00785) (PTAB Aug. 11, 2025) (Patent Owner's Preliminary Response)); *see id*. at 767 (arguing "Nothing in Kurowski discloses logically <u>*subdividing records of 'a preexisting input file'*</u> into "a plurality of partitions' wherein each partition is a 'well-defined' part of the input file such as 'ranging from one relative byte address to another relative byte address").

Second, an amendment made during prosecution of claim 1 informs the claim's construction. As originally filed, claim element 1(b) recited "distributing said partitions to a plurality of processors." Appx. 478. With a substantive amendment to overcome a prior-art rejection, the applicants amended the claim to require "distributing <u>descriptions of all of</u> said partitions to <u>each of</u> a plurality of <u>subtask</u> processors." Appx. 478 (underlining added by applicants). In other words, the applicants changed claim 1 from distributing the actual *partitions* to distributing *descriptions of* the partitions to the subtask processors; after that amendment, the claim requires that it is the *descriptions* of the partitions that are used to distribute the load. The Court's construction must give effect to this amendment: what is distributed is information describing the partitions, not the partitions or the data in the partitions. *See Aylus Networks*, 856 F.3d at 1359 (disclaimer may arise through amendment or argument). Consistent with that requirement, the specification states: "Note

that the logical partition does not rely on actual reading of the file. The actual reading of the file is reserved to the subtasks which read the partitions allocated to them." '582 Patent at 3:52-54.

Finally, as explained above, the applicants expressly tied the descriptions to load distribution without a special load process. The applicants distinguished prior art that used "a special control process that uses load information," whereas "with the instant invention as defined in the claims there is no such special process"; instead, "[t]he sharing process can use such a description to distribute the load without a special load process." Appx. 467-68. In the *American Airlines* case, Judge Mazzant held that these statements were a clear and unmistakable disclaimer and construed this same term to require a "description of all said partitions for use in distributing the load without a special load process." *American Airlines*, Dkt. 127 at 38-41 (Appx. 894-897).

IV's other arguments fare no better. IV contends that the applicants' statement that "the sharing process can use such a description to distribute the load without a special load process" is merely permissive and cannot support a disclaimer. Dkt. 161 at 21-22. But the disavowal does not turn on the word "can"; it turns on the applicants' unequivocal representation that, unlike the prior art's "special control process that uses load information," "with the instant invention as defined in the claims there is no such special process." Appx. 467-68. IV also argues that Southwest relies on a single lay dictionary to define "description." Southwest's construction, however, derives from the intrinsic record—the step (b) amendment and the specification—which independently supplies the term's meaning, not from any dictionary.

Ultimately, Southwest's construction adheres to Judge Mazzant's construction with additional clarification: *statements giving a characteristic(s) of all of the well-defined parts of the input file for use in distributing the load without a special load process, wherein such statements are distinct from the input file itself*.

**D. U.S. Patent No. 7,712,080**

The ’080 Patent (Appx. 482-498)—titled *Systems and Methods for Parallel Distributed Programming*—describes an approach to creating a parallel distributed program that the inventors refer to as “navigational programming.” ’080 Patent at 3:13-15. The patent teaches that a “parallel distributed program” is “a software application for operation on multiple processors that uses multiple memory areas,” *id.* at 1:25-28, and contrasts the invention with two prior art methods: (i) prior art message passing, and (ii) prior art distributed shared memory (“DSM”). The inventors dubbed the invention “navigational programming.” *See* ’080 Patent at 1:30-2:4, 3:13-15.

In prior art message passing programs, threads—*i.e.*, the part of the software that executes a program—“communicate and cooperate with each other by sending and receiving ‘messages’” that carry data between the processors on which the threads execute. *Id.* at 1:30-40, Fig. 1(a). The threads remain stationary and coordinate operations with other threads through “messages.” *Id.*

In prior art distributed shared memory programs, a memory space “which may span across multiple memories in different processors … is dedicated for multiple threads or tasks to access, i.e., it is a globally accessible memory space built on distributed memories.” *Id.* at 1:53-58, Fig. 1(b). A thread on one processor can therefore “access data in a memory on another processor … without having to establish another thread.” *Id.* at 1:58-61. In other words, in DSM programs, all relevant *data* is taken directly *to each of the threads*.[8]

The claimed navigational programs, by contrast, utilize “threads or tasks that can migrate from one processor to another.” *Id.* at 3:16-18. Using migrating threads, a thread may perform its computations on one processor, and if the thread needs to access memory belonging to another processor, the thread can suspend its computations, migrate to the other processor, and then resume

[8] The patent uses the terms “threads” or “tasks” interchangeably. ’080 Patent at 1:57, 3:13-18.

its computations. *Id.* at 3:22-28, Fig. 2. In other words, as the name suggests, in navigational programs, the *threads* “navigate” (or “migrate”) to the *data*.

The ’080 Patent states that one aspect of navigational programming is “distributed sequential computing (‘DSC’), which is computing using a single locus of computation over distributed data, possibly stored in a DSV [distributed shared variable].” *Id.* at 3:50-53. A DSV “is logically a single variable that includes several variables that may be physically distributed across multiple memories.” *Id.* at 3:37-39. Fig. 2 of the ’080 Patent depicts DSV “A” stored across Processor 1 and Processor 2, and thread “M” migrating from Processor 1 to Processor 2: “if the algorithm operates on Processor 1 and needs to access data on Processor 2, a single thread, M, can migrate to Processor 2 to access the data in the memory of Processor 2 and then continue the computations.” *Id.* at 3:53-59. In that example, thread M employs “a single locus of computation.” *Id.* at 3:50-53.

Because a DSC program uses only a single locus of computation, a DSC program operates *sequentially*—at a given moment, one thread is executing the program at one processor, and the computation advances only as that thread migrates from processor to processor. *Id.* at 3:50-59; Figs. 2, 3(a)-(b). A DSC program therefore does not itself perform operations in parallel. The ’080 Patent achieves parallelism by running more than one DSC program at the same time. The ’080 Patent describes this second aspect of navigational programming as “distributed parallel computing (‘DPC’), which is computing using multiple concurrent DSC programs.” ’080 Patent at 5:57-59. Parallelism, in other words, does not come from any change in how an individual DSC program executes. Each composing program remains what it was—a single, sequential locus of computation that migrates to the data—and “original code structure and data structure may be

preserved by virtue of using DSC programs." *Id.* at 5:59-62. Parallelism instead comes from running several such programs at the same time.

The patent describes "transformations … to convert a DSC application into a DPC application utilizing multiple DSC threads running sequentially or concurrently, thus utilizing parallelization and pipeline opportunities in the sequential computation." *Id.* at 7:36-40. Figs. 3-5 depict three such transformations. In the first, once the thread completes the portion of the computation that produces the intermediate result the next node needs, "the thread can clone itself" and "have the clone hop to the next node carrying the intermediate result and continue the computation" while the original thread continues its remaining computation on the current node. *Id.* at 7:41-8:2, Figs. 3(a)-(b). The second exploits a pipeline opportunity by splitting the thread in two, with the first thread hopping to the next node and signaling an event that allows the second to proceed. *Id.* at 8:3-18, Figs. 4(a)-(b). The third performs a parallel reduction, in which each node computes a partial result and "the total result can be collected by a separate DSC thread." *Id.* at 8:19-25, Figs. 5(a)-(b). In each case, the threads that run concurrently are themselves self-migrating DSC threads. A DPC program is therefore a collection of sequential DSC programs run concurrently.

**1. "distributed sequential computing program" (Claims 1, 7, and 9)**

| Southwest's Construction | IV's Construction |
|---|---|
| **"a program that executes sequentially across distributed memory by navigating to the processor that owns the needed memory and then resuming execution there"** | **Plain and ordinary meaning** |

The parties disagree regarding whether the claims require a program that navigates to the processor that owns the needed memory and resumes execution there.[9] IV asks for plain and

[9] IV concedes in its Opening Claim Construction Brief that "this term refers to a program that performs computation sequentially while accessing distributed data." Dkt. 161 at 23.

ordinary meaning,[10] but "distributed sequential computing program" is a "coined term that has no ordinary meaning." *Iridescent Networks, Inc. v. AT&T Mobility, LLC*, 933 F.3d 1345, 1351 (Fed. Cir. 2019); *see* '080 Patent at 3:50-54 (coining the term "distributed sequential computing program"). Plain and ordinary meaning is inappropriate for coined terms because they have "no ordinary meaning in the industry." *Id.* (looking to the specification and prosecution history "to determine the meaning of" a coined term). And IV's conduct in *American Airlines* confirms that "plain and ordinary meaning" is inappropriate. There, IV agreed that the term means a "program using a single locus of computation over distributed data." *American Airlines*, Dkt. 177 at 16 (Appx. 919). If the term had a plain meaning, IV would not have needed to agree to a construction at all. The question is therefore not whether "distributed sequential computing program" requires construction, but which construction best reflects the intrinsic record. IV's agreed-to construction in *American Airlines* leaves open the question of what a "single locus of computation" is; Southwest's construction—"a program that executes sequentially across distributed memory by navigating to the processor that owns the needed memory and then resuming execution there"—explains how that definition operates in practice, in simpler and less jargon-laden terms. *See Every Penny Counts, Inc. v. Am. Express Co.*, 563 F.3d 1378, 1383 (Fed. Cir. 2009) (explaining the need to further interpret a claim construction where the construction did not fully resolve the parties' dispute); *O2 Micro*, 521 F.3d at 1361-62.

Starting with the claim language, claim 1 requires a "distributed sequential computing program" to "access" a "distributed shared variable" whose constituent variables "may be physically distributed across multiple memories." The claim thus requires the capability for *sequential computation* over data stored across *physically distributed memories*. As the

[10] *Id.*

computation proceeds, the DSC program must be capable of reaching the distributed memory locations containing the data needed for the computation, rather than being confined to data stored at a single memory location.

IV contends that claim differentiation forecloses any migration limitation, arguing that because dependent claim 2 recites a "self-migrating thread … capable of migrating among at least one processor," claim 1 must impose no migration requirement at all. Dkt. 161 at 24. But claim differentiation does not require eliminating migration from claim 1. Claim 2 adds the narrower requirement that DSC be implemented using a "self-migrating thread." The specification itself distinguishes the broader DSC concept from that particular implementation, stating that "[a] self-migrating thread *may be utilized* to perform DSC." '080 Patent at 3:53-54 (emphasis added). Thus, claim 2 narrows the manner in which DSC is implemented; it does not broaden claim 1 to encompass programs in which the locus of computation never moves to the distributed data. *See Marine Polymer Techs., Inc. v. HemCon, Inc.*, 672 F.3d 1350, 1359 (Fed. Cir. 2012) (en banc) (claim differentiation "is not a hard and fast rule" and may be overcome by the written description or prosecution history).

Turning to the specification, the patentee expressly defines "distributed sequential computing" as "computing using a single locus of computation over distributed data," illustrated by a "self-migrating thread" that, when operating on Processor 1 and needing data on Processor 2, "can migrate to Processor 2 to access the data … and then continue the computations." *Id.* at 3:50-59. A "program" is "a set of instructions." *Ancora Techs., Inc. v. Apple, Inc.*, 744 F.3d 732, 734 (Fed. Cir. 2014). Thus, a "distributed sequential computing program" is a set of instructions that performs computing with a single locus of computation—*i.e.*, a single thread—over distributed data. Southwest's construction translates that technical definition into concrete terms: sequential

execution across distributed memory by navigating to the processor that owns the needed memory and resuming execution there. That is exactly what the specification describes.

IV's statements to the Patent Office confirm that thread migration is the central aspect of a DSC program. Describing the '080 Patent to the Patent Office, IV stated:

> The '080 Patent describes a foundational concept referred to as "distributed sequential computing" ("DSC"), which is computing using a single locus of computation over distributed data, where a self-migrating thread may ***perform DSC by migrating between processors to access distributed portions of the DSV***. The specification also emphasizes the "pivot-computes" principle, which it defines as the principle under which computation takes place on the node that owns the large-sized data, rather than moving the large portion of data to a different node for computation. In this way, ***navigational programming and DSC are presented as preserving original code structure and data structure while allowing the locus of computation to move to the data***."

Appx. 961 (internal citations omitted) (emphasis added).

The contrast between the claimed invention and the prior art further confirms Southwest's construction. *See Techtronic Indus. Co.*, 944 F.3d at 907-09 ("An inventor may also disavow claim scope 'by distinguishing the claimed invention over the prior art.'"). The patentees identified two prior-art approaches to writing a parallel distributed program: message passing, in which multiple threads on multiple processors "communicate and cooperate with each other by sending and receiving 'messages,'" and distributed shared memory, in which a thread on one processor reaches remote data "without having to establish another thread" by pulling that data across. *Id.* at 1:31-2:2, Figs. 1(a)-(b). Against that backdrop, the patentees described their approach as one that "includes the programming and use of self-migrating threads or tasks, which are threads or tasks that can migrate from one processor to another." *Id.* at 3:13-18. Migration to the data is the feature that separates a DSC program from what the patentees themselves characterized as prior art.

IV's plain-meaning construction is improper. If a "distributed sequential computing program" did not require the thread to migrate to the processor that owns the needed memory, then the term

would read onto the prior art in either of two ways. A program in which multiple threads stayed put and exchanged data would be a message passing program. And a program in which a single thread stayed put and had remote data delivered to it would be a distributed shared memory program—the very approach the patentees criticized as inefficient because it "may require a transfer of large amounts of data" across the network. *Id.* at 1:61-2:2. A construction that leaves the claims covering both approaches the patentees distinguished cannot be correct.

Southwest's construction merely adopts the patentees' definitional language and consistent usage: a "distributed sequential computing program" (1) executes sequentially as a single locus of computation, (2) operates across distributed memory (*e.g.*, via DSVs), and (3) reaches remote data by navigating to the processor that owns the data and resuming execution there. Southwest's construction—*a program that executes sequentially across distributed memory by navigating to the processor that owns the needed memory and then resuming execution there*—best clarifies the claim language. The Court should adopt it.

#### 2. "distributed parallel computing program" (Claims 1, 4, 5, 6, 9, and 17)[11]

| Southwest's Construction | IV's Construction |
|---|---|
| **"program that computes using multiple concurrent distributed sequential computing programs operating without terminating and resuming thread processes"** | **Plain and ordinary meaning** |

The parties disagree regarding whether the claims require a program operating without terminating and resuming thread processes.[12] IV asks for "plain and ordinary meaning" of the term

[11] As reflected in the Amended Joint Claim-Construction and Prehearing Statement (Dkt. 165), Southwest's construction "distributed parallel computing program" now incorporates its proposed construction of "parallel processing and/or operations" rather than seeking a separate construction of that phrase.

[12] IV does not dispute that "distributed parallel computing" is "computing using multiple concurrent DSC programs." Dkt. 161 at 25. IV instead contends that Southwest's "construction goes beyond that description by additionally requiring the distributed parallel computing program to be 'operating without terminating and resuming thread processes.'" *Id.*

"distributed parallel computing program,"[13] but "distributed parallel computing program" is a "coined term that has no ordinary meaning in the industry." *Iridescent Networks*, 933 F.3d at 1351; *see* '080 Patent at 5:57-59 (coining the term "distributed parallel computing program"). Plain and ordinary meaning is inappropriate for coined terms, *id.* (looking to the specification and prosecution history "to determine the meaning of" a coined term), and in any event, IV's "plain and ordinary meaning" position ignores the patentee's express definition and the prosecution history in which the patentee disclaimed claim scope to overcome prior art. Claim 1 is directed to "[a] method of developing a distributed parallel computing program," created by "transforming the at least one distributed sequential computing program into at least one distributed parallel computing program by spawning at least one child distributed sequential computing program." '080 Patent at 11:13-18. The patentee acted as its own lexicographer by defining "distributed parallel computing" as "computing using multiple concurrent DSC programs." '080 Patent at 5:58-59. The remaining phrase—"operating without terminating and resuming thread processes"—follows directly from the patentee's clear disclaimer of claim scope during prosecution.

In a July 22, 2008 Office Action, the Examiner rejected then-pending claims 1-6, 9-10, and 15-22 based on Pan in view of Suzuki and further in view of Fukuda. The Examiner acknowledged that Pan did not expressly disclose a parallel distributed application, but asserted that Suzuki supplied the missing "same parallel distributed approach" through self-migrating threads that "autonomously navigate over networks and resume their native-mode executions at each destination." Appx. 503-504 (Office Action, July 22, 2008).

The applicants responded on January 21, 2009 by drawing an express line between Suzuki's sequential migrate-resume framework and the claimed concurrent parallel processing. They

[13] *Id.*

explained that Suzuki's self-migrating-thread paradigm "operates in a sequential sense and not in the parallel sense," because "in order for a thread to recommence, i.e., resume, it must have been terminated prior to migration"—whereas parallel processing, according to the applicants, enables "many calculations to be carried out simultaneously, i.e., without terminating and resuming thread processes." Appx. 519-20 (Response to Office Action, Jan. 21, 2009). The applicants amended claims 1 and 15 to require that the DPC program "concurrently uses" the original and spawned child DSCs "to perform parallel processing and/or operations." Appx. 528-532 (Amendment, Sept. 2, 2009). The Examiner subsequently allowed claims 1-6, 9-10, 15-22, and 26-27 (renumbered as claims 1-18). Appx. 542-43 (Notice of Allowance, Dec. 14, 2009).

IV's reliance on Judge Mazzant's construction of this term in the parallel *American Airlines* litigation is misplaced. Dkt. 161 at 25-26. There, Judge Mazzant construed "distributed parallel computing program" to mean "program that computes using multiple concurrent distributed sequential computing programs"—but he did so based solely on the specification's definition of "distributed parallel computing" as "computing using multiple concurrent DSC programs," and he did not consider the prosecution history. *American Airlines*, Dkt. 177 at 38-40 (Appx. 941-943). The only additional limitation the court addressed and rejected was American's proposal to require the program to be "configured to operate across multiple processors/nodes and multiple memories"—an architectural limitation the court declined to impose because the specification discloses that "a DPC application targeted to multi-processor environments may be utilized on a uni-processor." *Id.* at 39 (quoting '080 Patent at 6:1-4). American did not propose the "without terminating and resuming thread processes" limitation Southwest advances here, and it did not argue that the applicants disclaimed claim scope through their January 21, 2009 statements distinguishing Suzuki. The prosecution history that compels Southwest's construction was thus

never presented to Judge Mazzant on this term, and neither his order nor the agreed constructions addresses it. His construction accordingly does not foreclose—and is not inconsistent with—the additional limitation the disclaimer requires; it simply resolves a different dispute. Just as a court "cannot construe the claims to cover subject matter broader than that which the patentee itself regarded as comprising its invention[] and represented to the PTO," *Microsoft*, 357 F.3d at 1350, IV cannot use an order that omitted the prosecution history to recapture the scope it surrendered to obtain allowance.

IV's "plain and ordinary meaning" would sever the term from both the patentee's definitions and the prosecution record. Accepting IV's construction would recapture surrendered claim scope and allow the claims to be construed one way before the Patent Office and another way before this Court. *See Aylus Networks*, 856 F.3d at 1359-60; *Elkay*, 192 F.3d at 979 (argument distinguishing prior art is given the same weight as a claim amendment). The disclaimer was clear and unmistakable: "parallel" meant concurrent execution without terminating and resuming thread processes. The Court should reject IV's plain-meaning position and construe "distributed parallel computing program" as a *program that computes using multiple concurrent distributed sequential computing programs operating without terminating and resuming thread processes*.

**E. U.S. Patent No. 11,032,000**

The '000 Patent (Appx. 545-59)—titled Communications in a Wireless Network—concerns enabling active feedback control between a base station and user equipment ("UE") in wireless communication systems. '000 Patent at 2:25-29. It specifically addresses how to expand a Time Division Duplex ("TDD") system—where uplink and downlink communications occur on the same frequency and benefit from channel reciprocity—to operate in Frequency Division Duplex ("FDD") mode, where uplink and downlink use different frequencies and reciprocity is lost. *Id.* at 1:23-40, 4:5-23. To compensate for the loss of reciprocity, the patent discloses a closed-loop

control scheme in which the UE transmits an uplink beacon (“UL_Beacon”) and receives feedback information on a physical layer control channel (“PLCCH”). *Id.* at 2:25-55, 4:45-5:4. Critically, the UL_Beacon is transmitted in a dedicated uplink control timeslot separate from the physical uplink shared channel (“PUSCH”). *Id.* at 2:37-41, 4:60-5:4; *see also id.* at Fig. 2 (showing UL_Beacon separated from PUSCH data by timeslot).

### 1. “time interval” (Claims 1 and 13)

| Southwest’s Construction | IV’s Construction |
|---|---|
| **“timeslot”** | **Plain and ordinary meaning** |

The Court should construe “time interval” as “timeslot,” consistent with the PTAB’s construction of the same term in an IPR of the ’000 Patent’s grandparent, U.S. Patent No. 8,811,356 (“the ’356 Patent”) (the “’356 Patent IPR”). *See Cont’l Auto. Sys., Inc. v. Intellectual Ventures II LLC*, IPR2022-01130, 2023 WL 8432718, at *8, *12 (PTAB Dec. 4, 2023). Claim 1 of the ’000 Patent recites that “the transmitter and the processor are further configured, in a ***time interval*** that it is not sending information over the physical uplink shared channel, to send the uplink physical signal based on the received resource allocation information[.]” ’000 Patent at 9:64-10:1 (emphasis added). Claim 13 similarly requires “sending, in a time interval that it is not sending information over the physical uplink shared channel, the uplink physical signal based on the received resource allocation information[.]” *Id.* at 11:23-26 (emphasis added). The ’356 Patent and ’000 Patent share a common specification and inventor and use the same figures and terminology. Where multiple patents derive from the same parent and share common terms, courts interpret the claims consistently across the family. *See SightSound Techs., LLC v. Apple, Inc.*, 809 F.3d 1307, 1316 (Fed. Cir. 2015); *Boss Indus., Inc. v. Yamaha Motor Corp. U.S.A.*, 333 F. App’x 531, 536-37 (Fed. Cir. 2009); *Jonsson v. Stanley Works*, 903 F.2d 812, 818 (Fed. Cir. 1990).

In the ’356 Patent IPR decision, the PTAB construed “time interval” as “timeslot,” noting that the patent owner treated the terms interchangeably. *Cont’l Auto.*, 2023 WL 8432718, at *9, *12. As in the ’356 Patent record, the term “interval” does not appear in the ’000 Patent’s shared specification and is used only in the claims and Abstract. *Id.* at *10; ’000 Patent at Abstract. This further supports looking to how the specification describes the relevant *time resource*. The intrinsic evidence in this family consistently depicts a dedicated UL_Beacon control timeslot separated from the traffic (PUSCH) timeslots in the uplink frame. *See Cont’l Auto.*, 2023 WL 8432718, at *10 (citing ’356 Patent at 2:29-33, 5:15-19); *cf.* ’000 Patent at 2:37-41, 5:27-32. In substance, the claimed “time interval” is the assigned timeslot in which the UL_Beacon (or analogous uplink control signal) is transmitted, and it is distinct from the timeslots used to carry uplink shared-channel data. *See Cont’l Auto.*, 2023 WL 8432718, at *10-11.

The PTAB also relied on prosecution history from the ’356 Patent in which Patent Owner explained that the recited “time interval” corresponds to the period allocated for uplink control (*e.g.*, UL_Beacon) transmission rather than uplink shared-channel data. *See id.* at *11. That reading accords with the common specification, which states that the UE allocates resources so that the physical control signal is separate from the uplink (shared) physical channel—*i.e.*, a dedicated control timeslot that groups UL_Beacon transmissions from multiple UEs and separates them from standard uplink data channels. *See id.* (citing ’356 Patent at 4:49-60, 2:35-42); *cf.* ’000 Patent at 2:45-49, 4:60-64. Figure 2 in both patents reinforces the same point by depicting a UL_Beacon control timeslot 216 distinct from normal traffic carrying timeslots 214. *See Cont’l Auto.*, 2023 WL 8432718, at *10 (citing ’356 Patent at 5:58-60); *cf.* ’000 Patent at 6:3-6, Fig. 2.

Most directly, IV is bound by its own characterization of the term. In the ’356 Patent IPR, IV told the Board that “[t]he term ‘time interval’ and ‘time slot’ are used synonymously in the ’356

Patent. In every instance, the term refers to a time slot within a frame." Appx. 841 (IPR2022-01130, Patent Owner Preliminary Response). Such a clear and unmistakable surrender of any construction of "time interval" broader than "time slot" made during an IPR supports a finding of prosecution disclaimer. *Aylus Networks*, 856 F.3d at 1362 (statements made during an IPR "can be considered for claim construction and relied upon to support a finding of prosecution disclaimer"). Because the '000 Patent descends from the same application as the '356 Patent and recites "time interval" in materially identical limitations, IV's disclaimer applies with equal force here. *Elkay*, 192 F.3d at 980 ("When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation."). Having told the Patent Office that "time interval" means "time slot," IV cannot recapture any broader scope now.

IV's contrary arguments do not withstand the intrinsic record. IV contends that "time interval" must be broader than "time slot" because the patentee used both terms, invoking the presumption that different terms carry different meanings. Dkt. 161 at 27. But that presumption is overcome by the patentee's own definitional statements and the specification. *Marine Polymer*, 672 F.3d at 1359 ("[C]laim differentiation is not a hard and fast rule and will be overcome by a contrary construction dictated by the written description or prosecution history."). Nor do the specification's embodiments support a broader reading. The "fractionation" embodiment and the embodiment providing more than one UL_Beacon slot per frame are both described exclusively in terms of "timeslots," and neither uses the term "time interval" at all. '000 Patent at 5:47-49, 5:54-57. IV's argument that the specification does not require "all relevant transmissions to occur within one single time slot" (Dkt. 161 at 28) is beside the point. Southwest's proposed construction does not limit the claims in this way. Instead, consistent with the intrinsic record, including each

embodiment in the specification, Southwest's construction confirms that "time interval" means "timeslot."

Judge Mazzant reached a substantially similar result in the parallel *American Airlines* litigation, construing the '000 Patent's "time interval" / "time intervals" terms (claims 1, 6, and 13) as a "time slot within a frame." *American Airlines*, Dkt. 177 at 40-45 (Appx. 943-948). While IV notes that Judge Mazzant rejected the argument that the claimed "time interval" is "limited to a single time slot in a single frame" (Dkt. 161 at 29), this is beside the point. IV tries to inject into Southwest's proposed construction an extra limitation that it does not require; Southwest's proposal is entirely consistent with Judge Mazzant's construction.

Given the PTAB's reasoned construction of this term in the grandparent '356 Patent, IV's statements to the PTAB, the shared specification and figures, and the prosecution history, the most faithful and administrable construction here is "*timeslot*." In the alternative, and consistent with Judge Mazzant's construction of the same term, the Court may construe "time interval" as "time slot within a frame." Either construction gives effect to IV's own statements and the shared specification.

Date: August 28, 2026

Respectfully submitted,

*/s/ S. Wallace Dunwoody*
Michael C. Wilson
Texas Bar No. 21704590
mwilson@munckwilson.com
S. Wallace Dunwoody
Texas Bar No. 24040838
wdunwoody@munckwilson.com
Lucas R. Dombroski
Texas Bar No. 24142846
ldombroski@munckwilson.com
**Munck Wilson Mandala, LLP**
2000 McKinney Avenue, Suite 1900
Dallas, TX 75201
(972) 628-3600
(972) 628-3616 fax

David G. Henry
Texas Bar No. 09479355
dhenry@munckwilson.com
**Munck Wilson Mandala, LLP**
510 Austin Avenue, Suite 3100
Waco, TX 76701
(254) 362-2300
(254) 362-2304 fax

Tri T. Truong
Texas Bar No. 24102969
ttruong@munckwilson.com
**Munck Wilson Mandala, LLP**
807 Las Cimas Parkway, Suite 300
Austin, TX 78756
737-201-1600
737-201-1601 fax

*Attorneys for Southwest Airlines Co.*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 28, 2026, the foregoing document has been served on all counsel of record via electronic mail.

*/s/ S. Wallace Dunwoody*
S. Wallace Dunwoody

8216303