**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **INTELLECTUAL VENTURES I LLC and INTELLECTUAL VENTURES II LLC,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**SOUTHWEST AIRLINES CO.,**<br><br>**Defendant.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Civil Action No. 3:25-cv-02885-L-BN**<br><br>**Consolidated with 3:25-cv-03097-L**<br><br>**JURY TRIAL DEMANDED** |

**APPENDIX IN SUPPORT OF DEFENDANT SOUTHWEST AIRLINES CO.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**

| Exhibit No. | Description | Appx. Pages |
|---|---|---|
| **A** | Declaration of S. Wallace Dunwoody | Appx. 5-9 |
| **A-1** | U.S. Patent No. 7,721,282 | Appx. 10-19 |
| **A-2** | U.S. Patent No. 8,332,844 | Appx. 20-36 |
| **A-3** | U.S. Application No. 11/026,622 | Appx. 37-76 |
| **A-4** | Applicant Arguments/Remarks Made in an Amendment to the application for U.S. Patent No. 7,721,282 on October 8, 2009 | Appx. 77-95 |
| **A-5** | Excerpts of prosecution history of U.S. Patent No. 8,332,844 | Appx. 96-245 |
| **A-6** | U.S. Patent No. 8,407,722 | Appx. 246-278 |
| **A-7** | Applicant Arguments/Remarks Made in an Amendment to the application for U.S. Patent No. 8,407,722 on February 9, 2012 | Appx. 279-302 |
| **A-8** | Applicant's Brief on Appeal Under 37 C.F.R. § 41.37 for the application for U.S. Patent No. 8,407,722 filed on May 31, 2012 | Appx. 303-337 |
| **A-9** | April 19, 2010 Response to Office Action in the prosecution of U.S. Patent No. 8,407,722 | Appx. 338-356 |
| **A-10** | January 15, 2010 Non-Final Office Action in the prosecution of U.S. Patent No. 8,407,722 | Appx. 357-378 |

| Exhibit No. | Description | Appx. Pages |
|---|---|---|
| **A-11** | June 16, 2010 Final Office Action in the prosecution of U.S. Patent No. 8,407,722 | Appx. 379-411 |
| **A-12** | August 16, 2010 Response to Office Action in the prosecution of U.S. Patent No. 8,407,722 | Appx. 412-430 |
| **A-13** | February 9, 2012 Reply to December 30, 2011 Office Action in the prosecution of U.S. Patent No. 8,407,722 | Appx. 431-455 |
| **A-14** | U.S. Patent No. 7,257,582 | Appx. 456-465 |
| **A-15** | Applicant Arguments/Remarks Made in an Amendment of the application for U.S. Patent No. 7,257,582 on March 6, 2007 | Appx. 466-476 |
| **A-16** | Applicant's Claim Amendments to the application for U.S. Patent No. 7,257,582 on March 6, 2007 | Appx. 477-481 |
| **A-17** | U.S. Patent No. 7,712,080 | Appx. 482-498 |
| **A-18** | July 22, 2008 Office Action in the prosecution of U.S. Patent No. 7,712,080 | Appx. 499-509 |
| **A-19** | January 21, 2009 Response to Office Action in the prosecution of U.S. Patent No. 7,712,080 | Appx. 510-521 |
| **A-20** | September 2, 2009 Amendment in the prosecution of U.S. Patent No. 7,712,080 | Appx. 522-535 |
| **A-21** | December 14, 2009 Notice of Allowability in the prosecution of U.S. Patent No. 7,712,080 | Appx. 536-544 |
| **A-22** | U.S. Patent No. 11,032,000 | Appx. 545-559 |
| **A-23** | Patent Owner's Preliminary Response in *American Airlines, Inc. v. Intellectual Ventures II LLC*, IPR2026-00043, Paper 8 (PTAB Jan. 20, 2026) | Appx. 560-620 |
| **A-24** | Patent Owner's Preliminary Response in *American Airlines, Inc. v. Intellectual Ventures II LLC*, IPR2025-00931, Paper 9 (PTAB Aug. 29, 2025) | Appx. 621-692 |
| **A-25** | Decision Denying Institution of Inter Partes Review in *American Airlines, Inc. v. Intellectual Ventures II LLC*, IPR2025-00931, Paper 11 (PTAB Nov. 21, 2025) | Appx. 693-743 |
| **A-26** | Patent Owner's Preliminary Response in IPR2025-00785 (PTAB Aug. 11, 2025) | Appx. 744-811 |
| **A-27** | U.S. Patent No. 8,811,356 | Appx. 812-826 |
| **A-28** | Patent Owner's Preliminary Response in *Toyota Motor Corp. v. Intellectual Ventures II LLC*, IPR2022-01130, Paper 10 (PTAB Oct. 5, 2022) | Appx. 827-855 |
| **A-29** | Claim Construction Opinion and Order, *Intellectual Ventures II LLC v. American Airlines, Inc.*, No. 4:24-cv-00980, Dkt. 127 (E.D. Tex. Feb. 19, 2026) | Appx. 856-902 |

| Exhibit No. | Description | Appx. Pages |
|---|---|---|
| **A-30** | Claim Construction Opinion and Order, *Intellectual Ventures II LLC v. American Airlines, Inc.*, No. 4:24-cv-00980, Dkt. 177 (E.D. Tex. July 28, 2026) | Appx. 903-953 |
| **A-31** | Patent Owner's Preliminary Response in *American Airlines, Inc. v. Intellectual Ventures II LLC*, IPR2025-01511, Paper 8 (PTAB Dec. 29, 2025) | Appx. 954-1002 |

Date: August 28, 2026

Respectfully submitted,

*/s/ S. Wallace Dunwoody*

Michael C. Wilson
State Bar No. 21704590
mwilson@munckwilson.com
S. Wallace Dunwoody
State Bar No. 24040838
wdunwoody@munckwilson.com
Lucas R. Dombroski
Texas Bar No. 24142846
ldombroski@munckwilson.com
**Munck Wilson Mandala, LLP**
2000 McKinney Avenue, Suite 1900
Dallas, TX 75201
(972) 628-3600
(972) 628-3616 fax

David G. Henry
Texas Bar. No. 09479355
dhenry@munckwilson.com
**Munck Wilson Mandala, LLP**
510 Austin Avenue, Suite 3100
Waco, Texas 76701
(254) 362-2300
(254) 362-2304 fax

Tri T. Truong
Texas State Bar No. 24102969
ttruong@munckwilson.com
**Munck Wilson Mandala, LLP**
807 Las Cimas Parkway, Suite 300
Austin, Texas 78756
737-201-1600
737-201-1601 fax

*Attorneys for Southwest Airlines Co.*

## CERTIFICATE OF SERVICE

On August 28, 2026, this document was filed and served on all counsel of record using the Court's CM/ECF system.

*/s/ S. Wallace Dunwoody*

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **INTELLECTUAL VENTURES I LLC and INTELLECTUAL VENTURES II LLC,** | § | |
| | § | |
| **Plaintiffs,** | § | **Civil Action No. 3:25-cv-02885-L-BN** |
| | § | |
| **v.** | § | **Consolidated with 3:25-cv-03097-L** |
| | § | |
| **SOUTHWEST AIRLINES CO.,** | § | **JURY TRIAL DEMANDED** |
| | § | |
| **Defendant.** | § | |

**DECLARATION OF S. WALLACE DUNWOODY**

I, S. Wallace Dunwoody, declare as follows:

1. I am an attorney licensed to practice law in the State of Texas and am admitted before this Court. I am an attorney with the law firm Munck Wilson Mandala LLP, and counsel for Defendant Southwest Airlines Co. ("Southwest"). I submit this Declaration in support of Southwest's Appendix in Support of its Responsive Claim Construction Brief.

2. I have personal knowledge of the facts herein. If called as a witness, I would testify to the following facts:

3. Attached as **Exhibit A-1** is a true and correct copy of U.S. Patent No. 7,721,282.

4. Attached as **Exhibit A-2** is a true and correct copy of U.S. Patent No. 8,332,844.

5. Attached as **Exhibit A-3** is a true and correct copy of U.S. Application No. 11/026,622.

6. Attached as **Exhibit A-4** is a true and correct copy of Applicant Arguments/Remarks Made in an Amendment to the application for U.S. Patent No. 7,721,282 on October 8, 2009.

7. Attached as **Exhibit A-5** is a true and correct copy of relevant portions of prosecution history of U.S. Patent No. 8,332,844, including the August 31, 2010 Amendment and Response to Final Office Action and Request for Continued Examination and the Examiner's Statement of Reasons for Allowance.

8. Attached as **Exhibit A-6** is a true and correct copy of U.S. Patent No. 8,407,722.

9. Attached as **Exhibit A-7** is a true and correct copy of Applicant Arguments/Remarks Made in an Amendment to the application for U.S. Patent No. 8,407,722 on February 9, 2012.

10. Attached as **Exhibit A-8** is a true and correct copy of Applicant's Brief on Appeal Under 37 C.F.R. § 41.37 for the application for U.S. Patent No. 8,407,722 filed on May 31, 2012.

11. Attached as **Exhibit A-9** is a true and correct copy of the April 19, 2010 Response to Office Action in the prosecution of U.S. Patent No. 8,407,722.

12. Attached as **Exhibit A-10** is a true and correct copy of the January 15, 2010 Non-Final Office Action in the prosecution of U.S. Patent No. 8,407,722.

13. Attached as **Exhibit A-11** is a true and correct copy of the June 16, 2010 Final Office Action in the prosecution of U.S. Patent No. 8,407,722.

14. Attached as **Exhibit A-12** is a true and correct copy of the August 16, 2010 Response to Office Action in the prosecution of U.S. Patent No. 8,407,722.

15. Attached as **Exhibit A-13** is a true and correct copy of the February 9, 2012 Reply to December 30, 2011 Office Action in the prosecution of U.S. Patent No. 8,407,722.

16. Attached as **Exhibit A-14** is a true and correct copy of U.S. Patent No. 7,257,582.

17. Attached as **Exhibit A-15** is a true and correct copy of Applicant Arguments/Remarks Made in an Amendment of the application for U.S. Patent No. 7,257,582 on March 6, 2007.

18. Attached as **Exhibit A-16** is a true and correct copy of Applicant's Claim Amendments to the application for U.S. Patent No. 7,257,582 on March 6, 2007.

19. Attached as **Exhibit A-17** is a true and correct copy of U.S. Patent No. 7,712,080.

20. Attached as **Exhibit A-18** is a true and correct copy of the July 22, 2008 Office Action in the prosecution of U.S. Patent No. 7,712,080.

21. Attached as **Exhibit A-19** is a true and correct copy of the January 21, 2009 Response to Office Action in the prosecution of U.S. Patent No. 7,712,080.

22. Attached as **Exhibit A-20** is a true and correct copy of the September 2, 2009 Amendment in the prosecution of U.S. Patent No. 7,712,080.

23. Attached as **Exhibit A-21** is a true and correct copy of the December 14, 2009 Notice of Allowability in the prosecution of U.S. Patent No. 7,712,080.

24. Attached as **Exhibit A-22** is a true and correct copy of U.S. Patent No. 11,032,000.

25. Attached as **Exhibit A-23** is a true and correct copy of the Patent Owner's Preliminary Response in *American Airlines, Inc. v. Intellectual Ventures II LLC*, IPR2026-00043, Paper 8 (PTAB Jan. 20, 2026).

26. Attached as **Exhibit A-24** is a true and correct copy of the Patent Owner's Preliminary Response in *American Airlines, Inc. v. Intellectual Ventures II LLC*, IPR2025-00931, Paper 9 (PTAB Aug. 29, 2025).

27. Attached as **Exhibit A-25** is a true and correct copy of the Decision Denying Institution of Inter Partes Review in *American Airlines, Inc. v. Intellectual Ventures II LLC*, IPR2025-00931, Paper 11 (PTAB Nov. 21, 2025).

28. Attached as **Exhibit A-26** is a true and correct copy of the Patent Owner's Preliminary Response in IPR2025-00785 (PTAB Aug. 11, 2025).

29. Attached as **Exhibit A-27** is a true and correct copy of U.S. Patent No. 8,811,356.

30. Attached as **Exhibit A-28** is a true and correct copy of the Patent Owner's Preliminary Response in *Toyota Motor Corp. v. Intellectual Ventures II LLC*, IPR2022-01130, Paper 10 (PTAB Oct. 5, 2022).

31. Attached as **Exhibit A-29** is a true and correct copy of the Claim Construction Opinion and Order, *Intellectual Ventures II LLC v. American Airlines, Inc.*, No. 4:24-cv-00980, Dkt. 127 (E.D. Tex. Feb. 19, 2026).

32. Attached as **Exhibit A-30** is a true and correct copy of the Claim Construction Opinion and Order, *Intellectual Ventures II LLC v. American Airlines, Inc.*, No. 4:24-cv-00980, Dkt. 177 (E.D. Tex. July 28, 2026).

33. Attached as **Exhibit A-31** is a true and correct copy of the Patent Owner's Preliminary Response in *American Airlines, Inc. v. Intellectual Ventures II LLC*, IPR2025-01511, Paper 8 (PTAB Dec. 29, 2025).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 28th day of August 2026, in Dallas, Texas.

*/s/ S. Wallace Dunwoody*
S. Wallace Dunwoody

# EXHIBIT A-1

US007721282B1

(12) **United States Patent**
**Kulkarni et al.**

(10) **Patent No.: US 7,721,282 B1**
(45) **Date of Patent: May 18, 2010**

(54) **BLOCK-LEVEL I/O SUBSYSTEM FOR DISTRIBUTED APPLICATION ENVIRONMENT MANAGEMENT**

(75) Inventors: **Pradip Kulkarni**, Pune (IN); **Mukul Kumar**, Pune (IN); **Adhir Potdar**, Maharahstra (IN); **Richard Au**, Woodside, CA (US); **James M. Mott**, Austin, TX (US); **Tung M. Nguyen**, Cupertino, CA (US)

(73) Assignee: **Panta Systems, Inc.**, Santa Clara, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1084 days.

(21) Appl. No.: **11/395,816**

(22) Filed: **Mar. 30, 2006**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 11/026,622, filed on Dec. 30, 2004.

(51) **Int. Cl.**
***G06F 9/445*** (2006.01)
*G06F 9/44* (2006.01)

(52) **U.S. Cl.** ........................ **717/176**; 717/175; 709/203

(58) **Field of Classification Search** ......... 717/172–177, 717/149; 709/203–204
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,113,523 A * 5/1992 Colley et al. .................. 712/12
5,127,104 A * 6/1992 Dennis ....................... 712/201
5,764,902 A * 6/1998 Rothrock .................... 709/205
5,999,734 A * 12/1999 Willis et al. ................. 717/149
6,018,747 A * 1/2000 Burns et al. ................. 707/203
6,195,680 B1 * 2/2001 Goldszmidt et al. ......... 709/203
6,292,941 B1 * 9/2001 Jollands ...................... 717/176
6,502,238 B1 * 12/2002 Pavan et al. ................ 717/149
6,606,744 B1 * 8/2003 Mikurak ..................... 717/174
6,779,177 B1 * 8/2004 Bahrs et al. ................ 717/173
6,990,513 B2 * 1/2006 Belfiore et al. ............. 709/203
7,127,712 B1 * 10/2006 Noble et al. ............... 717/173
7,150,015 B2 * 12/2006 Pace et al. ................. 717/176
7,155,714 B2 * 12/2006 Makris et al. .............. 717/176
7,200,715 B2 * 4/2007 Kleiman et al. ............ 711/114
7,246,351 B2 * 7/2007 Bloch et al. ................ 717/175
7,263,551 B2 * 8/2007 Belfiore et al. ............. 709/219
7,331,047 B2 * 2/2008 Chu et al. .................. 717/178
7,454,462 B2 * 11/2008 Belfiore et al. ............. 709/203
7,467,293 B2 * 12/2008 Zhang et al. ................... 713/1
7,475,274 B2 * 1/2009 Davidson ....................... 714/4
7,496,739 B1 * 2/2009 Raghavan et al. ............. 713/1

OTHER PUBLICATIONS

Ohta et al, "Improving parallel write by node level request scheduling", IEEE, pp. 196-203, 2009.*
Li et al, "Design issue of a novel toolkit for parallel application performance monitoring and analysis in cluster and grid environments", IEEE ISPAN, pp. 1-6, 2005.*

(Continued)

*Primary Examiner*—Anil Khatri

(57) **ABSTRACT**

An embodiment of the present invention is directed to a system for distributing an application environment to a compute node. The system includes a first storage unit for storing blocks of a root image of the compute node and a second storage unit for storing a leaf image comprising new data blocks and changes to the blocks of the root image. The system further includes a union block device for interfacing between the compute node and the first and second storage units to distribute the application environment to the compute node. The union block device creates the application environment by merging the blocks of the root image stored on the first storage unit with the leaf image stored on the second storage unit.

**30 Claims, 3 Drawing Sheets**



## OTHER PUBLICATIONS

Zhu et al, "Scheduling divisible loads in the dynamic heterogenous grid environment", ACM Infoscale, pp. 1-10, 2006.*

Chen et al, "Exploiting high level coherence information to optimize distributed shared state", ACM PPpPP, pp. 131-142, 2003.*

* cited by examiner


100
120a
120b
120n
130a
130b
130n
UBD 1
UBD 2
UBD n
140
150a
150b
150c

Figure 1


200
Root Node
(Base Application Environment Distribution)
140
Branch Node 1
(Service Group Application Environments)
210
Branch Node 2
(Service Group Application Environments)
220
Service Group 2.1
(Application Environments)
221
Leaf Node 1-1 (configuration files) 150a
Leaf Node 1-2 (configuration files) 150b
Leaf Node 1-3 (configuration files 150c
Leaf Node 2-1 (configuration files) 150d
Leaf Node 2-2 (configuration files) 150e
Leaf Node 2-3 (configuration files) 150f
Leaf Node 2.1-1 (configuration files) 150g
Leaf Node 2.1-2 (configuration files) 150h
Leaf Node 2.1-3 (configuration files) 150i

Figure 2


300
Store blocks of a root image of a compute node.
310
Store a leaf image on a second storage unit.
320
Merge the blocks of the root image with the blocks of the leaf image to create an application environment.
330
Deliver the application environment to the compute node.
340
Modify the leaf image in response to the compute node's access to its instance of the application environment.
350
Optionally, reconcile the root image and the leaf image to form a new root image.
360

Figure 3

# BLOCK-LEVEL I/O SUBSYSTEM FOR DISTRIBUTED APPLICATION ENVIRONMENT MANAGEMENT

## CLAIM OF PRIORITY UNDER 35 U.S.C. §120

The present Application for Patent is a Continuation-in-Part of patent application Ser. No. 11/026,622 entitled "BRANCING STORE FILE SYSTEM" filed Dec. 30, 2004, pending, and assigned to the assignee hereof and hereby expressly incorporated by reference herein.

## BACKGROUND

1. Field of the Invention

Embodiments of the present invention relate to the field of networked computing. Specifically, embodiments of the present invention relate to distributed application environment deployment in a multi-computer system.

2. Background

Over the years, as the interne has expanded and computers have multiplied, the need for clustered computing such as High Performance Computing (HPC) has increased. Clustered computing involves multiple compute nodes, usually a server grid, that work together to achieve a common task. For example, several (typically hundreds of) compute nodes may be clustered together to share the load of serving a high-traffic website. In large-scale systems such as this, a trend in software deployment is to centralize data management on a globally accessible file system with stateless computing nodes. A common example of this is Operating System (OS) software image management, where the compute nodes are activated with the distributed application environment by either diskless booting protocols or remote software installation to local storage. Under this architecture, a boot image is required for each compute node in the cluster. The boot image necessarily contains the kernel; it may additionally contain the application software that is intended to be run on the compute node.

The primary concern in clustered computing is low cluster bring-up time. The software that provides the boot images for the cluster typically stores a master boot image. It may then either pre-create clones of this master image for each such server, or it may create them "on the fly."

Creating a boot image on the fly involves copying the entire contents of the master image, which are typically in the range of 5-15 GB. Even with a significant amount of bandwidth by today's standards, this method will result in a large bring-up time.

Pre-creating a boot image for each server is advantageous from the point of view of cluster bring-up time. However, since one often does not know in advance how many servers will ever be booted, this scheme may result in wasted disk space.

Regardless of which of the preceding methods is used, both suffer from the same major problem—updating the boot image(s) for the cluster is cumbersome, as it means updating a number of copies of the boot image.

A Branching Store File System, as described in patent application Ser. No. 11/026,622 entitled "BRANCING STORE FILE SYSTEM" filed Dec. 30, 2004, pending, and assigned to the assignee hereof, was developed as a solution to the above problem. In a branching store file system, a read-only base image (or "root" image) of the application environment is created. The root image is accessible by all compute nodes in the cluster. Changes made by a compute node to the root image are stored in a "leaf" image unique to that compute node. A filter operates between the compute nodes and the file system(s), which merges the changes recorded on the leaf images with the root image and delivers the result to the appropriate compute node. From the point of view of the compute node, it is running its own unique and cohesive instance of the application environment. While this system allows for creation of boot images on the fly without severely diminishing bring-up time, a separate version of the system must be created for each unique operating system. Thus, migrating a computing cluster from one operating system to another is much more complicated than simply installing a new root image containing the new OS.

## SUMMARY

An embodiment of the present invention is directed to a system for distributing an application environment to a compute node (e.g., a server or a thin-client workstation). The system includes a first storage unit for storing blocks of a root image (e.g., an operating system) of the compute node and a second storage unit for storing a leaf image comprising new data blocks and changes to the blocks of the root image. The system further includes a union block device for interfacing between the compute node and the first and second storage units to distribute the application environment to the compute node. The union block device creates the application environment by merging the blocks of the root image stored on the first storage unit with the leaf image stored on the second storage unit.

Another embodiment of the present invention is directed to a method for distributing an application environment to a compute node. The method includes storing blocks of a root image of the compute node on a first storage unit and storing a leaf image comprising new data blocks and changes to the blocks of the root image on a second storage unit. The method further includes merging the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit to create the application environment. The application environment is created by merging the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit. Lastly, the application environment is delivered to the computer node.

Thus, embodiments of the present invention provide an operating system-independent system and method for distributing an application environment to a compute node. By utilizing a root-leaf system of application environment storage, embodiments of the present invention allow creation of boot images on the fly without significantly diminishing bring-up time. This is due to the fact that creating a new boot image does not require copying the contents of the root image. Rather it involves registering a new UBD with the system, which occurs very quickly. Moreover, updating the boot image for the entire cluster simply involves updating the root image.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a diagram of a system for distributing an application environment, in accordance with an embodiment of the present invention.

FIG. **2** is a tree structure that illustrates a branching system, in accordance with an embodiment of the present invention.

FIG. **3** is a flowchart illustrating a process **300** for distributing an application environment to a compute node, in accordance with an embodiment of the present invention.

## DETAILED DESCRIPTION

Reference will now be made in detail to the preferred embodiments of the invention, examples of which are illustrated in the accompanying drawings. While the invention will be described in conjunction with the preferred embodiments, it will be understood that they are not intended to limit the invention to these embodiments. On the contrary, the invention is intended to cover alternatives, modifications and equivalents, which may be included within the spirit and scope of the invention as defined by the claims. Furthermore, in the detailed description of the present invention, numerous specific details are set forth in order to provide a thorough understanding of the present invention. However, it will be obvious to one of ordinary skill in the art that the present invention may be practiced without these specific details. In other instances, well known methods, procedures, components, and circuits have not been described in detail as not to unnecessarily obscure aspects of the present invention.

Some portions of the detailed descriptions that follow are presented in terms of procedures, logic blocks, processing, and other symbolic representations of operations on data bits within a computer or digital system memory. These descriptions and representations are the means used by those skilled in the data processing arts to most effectively convey the substance of their work to others skilled in the art. A procedure, logic block, process, etc., is herein, and generally, conceived to be a self-consistent sequence of steps or instructions leading to a desired result. The steps are those requiring physical manipulations of physical quantities. Usually, though not necessarily, these physical manipulations take the form of electrical or magnetic signals capable of being stored, transferred, combined, compared, and otherwise manipulated in a computer system or similar electronic computing device. For reasons of convenience, and with reference to common usage, these signals are referred to as bits, values, elements, symbols, characters, terms, numbers, or the like with reference to the present invention.

It should be borne in mind, however, that all of these terms are to be interpreted as referencing physical manipulations and quantities and are merely convenient labels and are to be interpreted further in view of terms commonly used in the art. Unless specifically stated otherwise as apparent from the discussion herein, it is understood that throughout discussions of the present embodiment, discussions utilizing terms such as "determining" or "outputting" or "transmitting" or "recording" or "locating" or "storing" or "displaying" or "receiving" or "recognizing" or "utilizing" or "generating" or "providing" or "accessing" or "checking" or "notifying" or "delivering" or the like, refer to the action and processes of a computer system, or similar electronic computing device, that manipulates and transforms data. The data is represented as physical (electronic) quantities within the computer system's registers and memories and is transformed into other data similarly represented as physical quantities within the computer system memories or registers or other such information storage, transmission, or display devices.

Embodiments of the present invention provide methods and systems for distributing an application environment to one or more compute nodes. FIG. **1** is a diagram of a system **100** for distributing an application environment. In a preferred embodiment, system **100** is implemented in a multi-computer system, such as an HPC cluster. In one embodiment, the application environment includes an operating system. In other embodiments, the application environment may contain other applications. System **100** has a number of compute nodes **120***a-n* coupled to first storage unit and a corresponding second storage unit **150***a-n* though a corresponding union block device (UBD) **130***a-n*. To compute nodes **120***a-n*, it appears that they have access to their own version of a distributed application. However, a separate and complete boot image is not created and stored for each compute node **120***a-n*.

System **100** has a first storage unit **140** for storing blocks of a root image of an application environment. The root image contains data initially common to the compute nodes **120***a-n*. The root image is not changed by compute nodes **120***a-n*. For example, in one embodiment, compute nodes **120***a-n* have read-only access to the first storage unit.

Moreover, each compute node **120***a-n* has a corresponding second storage unit **150***a-n* for storing a leaf image. The first storage unit **140** and second storage units **150***a-n* may each be contained on separate physical storage devices, on separate logical spaces on the same storage device, or any combination thereof. The leaf image may contain blocks of new data, blocks of changed data, or other blocks of data unique to the individual compute node. The leaf image may also contain a block modification log. In other words, a leaf image will describe the changes made by the respective compute node **120***a-n* to its instance of the application environment. Thus, when a compute node (e.g., node **120***a*) makes changes involving the root image, modifications are made to that compute node's leaf image (e.g., leaf image stored on second storage device **150***a*). With respect to changes to the root image, only the specific blocks that are changed are stored in the leaf image. For example, a particular file on the root image may comprise twenty blocks of data (e.g., blocks **1-20**). One compute node (e.g., compute node **120***a*) desires to make a change to this file which involves a modification of only a few specific blocks of the file (e.g., blocks **4-9**). In this example, only the modified blocks (e.g., blocks **4-9**) will be stored in the compute node's leaf image (e.g., leaf image stored on second storage device **150***a*) plus some small overhead.

A compute node **120***a-n* mounts its instantiation of the application environment via its respective UBD **130***a-n*. The UBDs **130***a-n* are effectively low-level drivers that operate as an interface between the first and second storage devices and the file system of each compute node **120***a-n*. The file system may reside on the server side of the system **100**. The file system may also reside on each of the compute nodes **120***a-n*. Because UBDs **130***a-n* operate below the file system, they are concerned merely with the blocks of data themselves, rather than files they form. As a result, system **100** is completely file system, and thus operating system, independent.

UBDs **130***a-n* determine what leaf image (from the appropriate second storage unit **150**) is needed for portions of the application environment that their respective compute nodes **120***a-n* have changed. UBDs **130***a-n* also locate the portions of the application environment that are not changed by their respective their respective compute nods **120***a-n*. These portions may reside in the root image. There may also be intermediate images (not depicted in FIG. **1**) comprising versions of the root image from which a compute node's instance of the application environment is derived. Further, UBDs **130***a-n* create a new leaf image on a respective second storage unit **150***a-n* when their respective compute nodes **120***a-n* make changes to their instantiations of the application environment. In one embodiment, the UBSs **130***a-n* obtain the information necessary to create the application from a block modification log located in its respective leaf image.

UBDs **130***a-n* may also modify the leaf image in response to their respective compute node's access to its instance of the application environment. For example, upon receiving a write request from their respective compute nodes for a sector X, the UBDs **130***a-n* will create an appropriate persistent mapping for sector X and then write sector X onto their respective second storage units **150***a-n*, where sector X can then be modified. It will be appreciated that the data block being modified may already exist in the leaf image, in which case it does not need to be mapped and copied from the root image before modification.

By providing an application environment to multiple compute nodes via a branching store system, embodiments allow for a more streamlined update/patch procedure. In one embodiment, first storage device **140** may be refreshed with a new operating system patch, thereby automatically refreshing the image for all dependent compute nodes.

Application Groups

An embodiment of the present invention provides for application groups (AG). An AG is a way to provide a group of compute nodes their own instantiation of an application environment, while allowing versions of the application environment to be frozen from time to time. Thus, an archive of the application environment is created.

At creation time, an AG comprises the original root image. A number of leaf images are created to match the desired capacity demand of the AG. The leaf images can be created very quickly and require very little storage because the leaf images reflect only the changes to the root instance.

FIG. **2** is a tree structure **200** that illustrates a branching system, in accordance with an embodiment of the present invention. Some nodes are read-only, others are read-write-modify. A node may change from read-write-modify to read-only. For example, creating a new edition of the AG may be accomplished by freezing a current leaf image structure and creating a new set of leaf images therefrom. Referring now to FIG. **2**, the root node **140** (also referred to herein as the root image) is the base application environment. As previously discussed, the root node **140** is not modified by compute nodes for which the application environment is distributed.

The first level of the exemplary tree structure **200** comprises first branch node **210** and second branch node **220**. Branch node **210** has three leaf nodes **150***a-c*. The leaf nodes **150** may be for blocks from configuration files, for example. The compute nodes **150** can boot from the configuration files. The leaf nodes are also referred to herein as leaf images. In another embodiment, the leaf nodes **150** comprise block modification logs.

The branch node **220** also has three leaf nodes **150***d-f*, which are analogous to the leaf nodes **150***a-c*. However, branch node **220** also has a service group **221**, which reflects a change to the application environment. The service group **221** has leaf nodes **150***g-i*.

Embodiments provide for additional advanced features. In one embodiment for example, a particular branch, rather than the entire tree structure back to the root, is refreshed with an update to the application environment contained thereon, thereby automatically refreshing its dependent compute nodes. In another embodiment, a leaf node or a branch node may be completely detached from the original structure to make a new and completely independent branch.

FIG. **3** is a flowchart illustrating a process **300** for distributing an application environment to a compute node, in accordance with an embodiment of the present invention. Steps of process **300** may be stored as instructions on a computer readable medium and executed on a computer processor. Step **310** is storing blocks of a root image of the compute node on a first storage unit. By storing data at the block level, embodiments are able to operate beneath the file system and thus are designed to be file system and operating system independent.

Step **320** is storing a leaf image on a second storage unit. The leaf image includes, but is not limited to, new data blocks for the compute node and blocks of the root image that the compute node has changed. The leaf image includes a block modification log in one embodiment.

Step **330** is merging the blocks of the root image with the blocks of the leaf image to create the application environment. Once the application environment has been created, it will appear to the compute node as one cohesive image rather than a base image plus its additions, deletions, and modifications. To the compute node, it appears that it has access to its own unique version of an application. However, a separate and complete boot image is not actually stored for the compute node.

Step **340** is delivering the application environment to the compute node. Step **340** may comprise a low-level driver determining which data blocks are needed for the compute node's instance of the application environment and delivering the application environment to the compute via the compute node's file system.

Step **350** is modifying the leaf image in response to the compute node's access to its instance of the application environment. The modifying of the leaf image may include copying one or more data blocks from the root image to the leaf image, and modifying the data block in the leaf image. It will be appreciated that the data block being modified may already exist in the leaf image, in which case it does not need to be copied from the root image before modification.

Step **360** is reconciling the root image and the leaf image to form a new root image. This may be desirable if, for example, the leaf image has grown to exceed a particular disk quota. Furthermore, if there are multiple compute nodes that access the root image, each having their own respective leaf image, and there is substantial commonality between the leaf images, it may also be beneficial to reconcile the leaf images with the root image.

Thus, by operating at the block level, embodiments of the present invention provide a file system and operating system independent system and method for distributing an application environment to a compute node. By utilizing a branching store system of application environment distribution, embodiments of the present invention allow creation of boot images on the fly without significantly diminishing bring-up time. This is due to the fact that creating a new boot image does not require copying the contents of the root image, but rather it involves registering a new UBD with the system, which occurs very quickly. Moreover, updating the boot image for the entire cluster simply involves updating the root image.

Embodiments of the present invention also allow for scalability and redundancy. For example, a server containing the root image may only have the resources to supply the root image to 100 compute nodes. Thus, in order to implement a 200-compute node system, two servers, each containing a copy of the root image, are used. This scalability provided by embodiments also lends itself to dynamic scaling. In other words, the number of root images required for a specific configuration can change based on the I/O workload, and new root images can be created on the fly accordingly. Moreover, additional servers containing the root image may be added into the system to provide redundancy and increase reliability. As an added security measure, some of the root nodes may be located remotely from each other (e.g., half located in a main office and half in a satellite office). In addition, it is possible to copy the contents of one or more leaf nodes into a non-UBD (regular block device) copy (e.g., for use as an isolated backup).

The previous description of the disclosed embodiments is provided to enable any person skilled in the art to make or use the present invention. Various modifications to these embodiments will be readily apparent to those skilled in the art, and the generic principles defined herein may be applied to other embodiments without departing from the spirit or scope of the invention. Thus, the present invention is not intended to be limited to the embodiments shown herein but is to be accorded the widest scope consistent with the principles and novel features disclosed herein.

What is claimed is:

**1**. A system for distributing an application environment comprising:

a compute node comprising a computer system;

a first storage unit for storing blocks of a root image of the compute node, wherein the first storage unit comprises a first non-volatile memory, wherein the root image comprises a computer program, wherein the blocks comprise sections of data, and wherein a file of the root image comprises at least one block;

a second storage unit for storing a leaf image, the leaf image comprising new data blocks and changes to the blocks of the root image, wherein the second storage unit comprises a second non-volatile memory; and

a union block device for interfacing between the compute node and the first and second storage units to distribute the application environment to the compute node, wherein the union block device comprises a driver, wherein the union block device creates the application environment by merging the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit; the union block device comprises a low-level driver for interfacing between the first and second storage units and the file system of the compute node; and the union block device, upon receiving a write request from the compute node for a sector X, creates an appropriate persistent mapping for sector X.

**2**. The system as recited in claim **1** wherein the compute node comprises a server.

**3**. The system as recited in claim **1** wherein the compute node comprises a thin-client workstation.

**4**. The system as recited in claim **1** wherein the root image comprises an operating system.

**5**. The system as recited in claim **1** wherein the root image is concurrently accessible to a plurality of compute nodes.

**6**. The system as recited in claim **1** wherein the first storage unit is remotely located from the compute node.

**7**. The system as recited in claim **1** wherein the second storage unit is remotely located from the compute node.

**8**. The system as recited in claim **1** wherein the second storage unit contains a block modification log for the compute node.

**9**. The system as recited in claim **1** wherein the first storage unit in contained within a first partition on a hard disk and the second storage unit is contained within a second partition on the hard disk.

**10**. The system as recited in claim **1** wherein the union block device writes sector X on the second storage unit.

**11**. The system as recited in claim **1** wherein the system operates in a high performance computing cluster.

**12**. The system as recited in claim **1** wherein the system operates in a grid computing cluster.

**13**. The system as recited in claim **1** wherein the first storage unit is read only.

**14**. The system as recited in claim **1** further comprising an intermediate image between the root image and the leaf image, wherein the intermediate image comprises an application environment service group.

**15**. A method for distributing an application environment comprising:

storing blocks of a root image of a compute node on a first storage unit, wherein the compute node comprises a computer system, and wherein the first storage unit comprises a first non-volatile memory, wherein the root image comprises a computer program, wherein the blocks comprise sections of data, and wherein a file of the root image comprises at least one block;

storing a leaf image comprising new data blocks and changes to the blocks of the root image on a second storage unit, wherein the second storage unit comprises a second non-volatile memory;

merging the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit to create the application environment; and

delivering the application environment to the compute node; wherein the modifying comprises: upon receiving a write request from the compute node for a sector X, creating an appropriate persistent mapping for sector X; and writing sector X on the second storage unit.

**16**. The method as recited in claim **15** further comprising: modifying the leaf image in response to the compute node's access to the application environment.

**17**. The method as recited in claim **15** further comprising: reconciling the root image and the leaf image to form a new root image.

**18**. The method as recited in claim **15** wherein the compute node comprises a server.

**19**. The method as recited in claim **15** wherein the compute node comprises a thin-client workstation.

**20**. The method as recited in claim **15** wherein the root image comprises an operating system.

**21**. The method as recited in claim **15** wherein the root image is concurrently accessible to a plurality of compute nodes.

**22**. The method as recited in claim **15** wherein the first storage unit is remotely located from the compute node.

**23**. The method as recited in claim **15** wherein the second storage unit is remotely located from the compute node.

**24**. The method as recited in claim **15** wherein the second storage unit contains a block modification log for the compute node.

**25**. The method as recited in claim **15** wherein the first storage unit is contained within a first partition on a hard disk and the second storage unit is contained within a second partition on the hard disk.

**26**. The method as recited in claim **15** wherein merging occurs at an operational level between the first and second storage units and file system of the compute node.

**27**. The method as recited in claim **15** wherein the method operates in a high performance computing cluster.

**28**. The method as recited in claim **15** wherein the system operates in a grid computing cluster.

**29**. The method as recited in claim **15** wherein the first storage unit is read only.

**30**. The method as recited in claim **15** further comprising: creating an intermediate image on a third storage unit between the root image and the leaf image, wherein the intermediate image comprises an application environment service group.

* * * * *

# EXHIBIT A-2

US008332844B1

(12) **United States Patent**
**Kulkarni et al.**

(10) **Patent No.: US 8,332,844 B1**
(45) **Date of Patent: Dec. 11, 2012**

(54) **ROOT IMAGE CACHING AND INDEXING FOR BLOCK-LEVEL DISTRIBUTED APPLICATION MANAGEMENT**

(75) Inventors: **Pradip Kulkarni**, Pune (IN); **Mukul Kumar**, Pune (IN); **Adhir Potdar**, Pune (IN); **Richard Au**, Woodside, CA (US); **Tung Nguyen**, Cupertino, CA (US)

(73) Assignee: **Emendable Assets Limited Liability Company**, Wilmington, DE (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1193 days.

(21) Appl. No.: **11/709,477**

(22) Filed: **Feb. 21, 2007**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 11/395,816, filed on Mar. 30, 2006, now Pat. No. 7,721,282, which is a continuation-in-part of application No. 11/026,622, filed on Dec. 30, 2004, now abandoned.

(51) **Int. Cl.**
*G06F 9/445* (2006.01)
(52) **U.S. Cl.** ........................................................ **717/176**
(58) **Field of Classification Search** .................. 345/557; 717/176
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,113,523 A | 5/1992 | Colley | |
| 5,127,104 A | 6/1992 | Dennis | |
| 5,175,852 A | 12/1992 | Johnson et al. | |
| 5,764,902 A | 6/1998 | Rothrock | |
| 5,974,547 A | 10/1999 | Klimenko | |
| 5,999,734 A | 12/1999 | Willis | |
| 6,018,747 A | 1/2000 | Burns | |
| 6,101,576 A * | 8/2000 | Kobayashi et al. | 711/122 |
| 6,195,680 B1 | 2/2001 | Goldszmidt | |
| 6,292,941 B1 | 9/2001 | Jollands | |
| 6,421,777 B1 * | 7/2002 | Pierre-Louis et al. | 713/2 |
| 6,442,605 B1 | 8/2002 | Rodriguez | |
| 6,502,238 B1 | 12/2002 | Pavan et al. | |
| 6,597,956 B1 | 7/2003 | Aziz | |
| 6,606,744 B1 | 8/2003 | Mikurak | |
| 6,745,192 B1 | 6/2004 | Libenzi | |
| 6,751,658 B1 * | 6/2004 | Haun et al. | 709/222 |
| 6,779,177 B1 | 8/2004 | Bahrs | |
| 6,871,219 B2 | 3/2005 | Noordergraaf | |
| 6,938,057 B2 | 8/2005 | Gusler | |
| 6,986,005 B2 | 1/2006 | Vo | |
| 6,990,513 B2 | 1/2006 | Belfiore | |

(Continued)

OTHER PUBLICATIONS

Calzarossa, M., and M. Kubát, "Processor Allocation in Parallel Systems," Proceedings of the IEEE International Conference on Computer Systems and Software Engineering (COMPEURO '91), Bologna, Italy, May 13-16, 1991, pp. 133-137.

(Continued)

*Primary Examiner* — Edward Martello
(74) *Attorney, Agent, or Firm* — Christensen O'Connor Johnson Kindness PLLC

(57) **ABSTRACT**

Described herein is technology for, among other things root image caching and indexing for block-level distributed application management. The technology involves storing blocks of a root image on a first storage unit and storing blocks of leaf images on respective second storage units. The leaf images include additional data blocks not previously contained in the root image and changes made by respective compute nodes to the blocks of the root image. The technology includes caching blocks of the root image that have been accessed by at least one compute node. The technology also includes receiving indexing results pertaining to the root image from one compute node and providing the results for other compute nodes.

**27 Claims, 6 Drawing Sheets**



U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,990,573 | B2 | 1/2006 | Cherian | |
| 7,127,712 | B1 | 10/2006 | Noble | |
| 7,150,015 | B2 | 12/2006 | Pace | |
| 7,155,714 | B2 | 12/2006 | Makris | |
| 7,200,715 | B2 | 4/2007 | Kleiman | |
| 7,246,221 | B1 | 7/2007 | Soltis | |
| 7,246,351 | B2 | 7/2007 | Bloch | |
| 7,263,551 | B2 | 8/2007 | Belfiore | |
| 7,269,664 | B2 | 9/2007 | Hutsch et al. | |
| 7,290,258 | B2 | 10/2007 | Steeb | |
| 7,331,047 | B2 | 2/2008 | Chu | |
| 7,334,157 | B1 | 2/2008 | Graf | |
| 7,430,610 | B2 | 9/2008 | Pace | |
| 7,454,462 | B2 | 11/2008 | Belfiore | |
| 7,467,293 | B2 | 12/2008 | Zhang | |
| 7,475,274 | B2 | 1/2009 | Davidson | |
| 7,496,739 | B1 | 2/2009 | Raghavan | |
| 7,499,988 | B2 | 3/2009 | Keohane | |
| 7,536,686 | B2 | 5/2009 | Tan | |
| 7,549,055 | B2 | 6/2009 | Zimmer | |
| 7,590,653 | B2 | 9/2009 | Sparks | |
| 7,668,938 | B1 | 2/2010 | Phillips | |
| 7,685,148 | B2 | 3/2010 | Engquist | |
| 7,870,106 | B1 * | 1/2011 | Nguyen et al. | 707/694 |
| 2002/0016891 | A1 | 2/2002 | Noel | |
| 2002/0083120 | A1 | 6/2002 | Soltis | |
| 2002/0087813 | A1 | 7/2002 | Harris | |
| 2002/0087846 | A1 | 7/2002 | Nickolls | |
| 2003/0046511 | A1 | 3/2003 | Buch | |
| 2003/0126242 | A1 * | 7/2003 | Chang | 709/222 |
| 2003/0130832 | A1 | 7/2003 | Schulter | |
| 2003/0233648 | A1 | 12/2003 | Earl | |
| 2004/0015899 | A1 | 1/2004 | May | |
| 2004/0078779 | A1 | 4/2004 | Dutt | |
| 2004/0088473 | A1 | 5/2004 | Ogle | |
| 2004/0199919 | A1 | 10/2004 | Tovinkere | |
| 2005/0128319 | A1 | 6/2005 | Morino | |
| 2005/0131962 | A1 | 6/2005 | Deshpande | |
| 2006/0173993 | A1 | 8/2006 | Henseler | |
| 2008/0229040 | A1 | 9/2008 | Honma | |

OTHER PUBLICATIONS

Chen, D., et al., "Exploiting High-Level Coherence Information to Optimize Distributed Shared State," Proceedings of the 9th ACM Symposium on Principles and Practice of Parallel Programming, San Diego, Jun. 11-13, 2003, pp. 131-142.

Cohen, A., and M. Woodring, "Win32 Multithreaded Programming," O'Reilly Online Catalog, Chapter 1, <http://www.oreilly.com/catalog/multithread/excerpt/ch01.html> [retrieved Nov. 21, 2006], pp. 1-8.

Couturier, R., et al., "A Compiler for Parallel Unity Programs Using OpenMp," Proceedings of the International Conference on Parallel and Distributed Processing Techniques and Applications, Las Vegas, Nevada, Jun. 28-Jul. 1, 1999, pp. 1992-1998.

Ismail, I.M., and J.A. Davis, "Program-Based Static Allocation Policies for Highly Parallel Computers," Proceedings of the 1995 IEEE Fourteenth Annual International Phoenix Conference on Computers and Communications, Scottsdale, Arizona, Mar. 28-31,1995, pp. 61-68.

Kandemir, M., et al., "Minimizing Data and Synchronization Costs in One-Way Communication," IEEE Transactions on Parallel and Distributed Systems 11(12):1232-1251, Dec. 2000.

Li, K.-C., et al., "Design Issue of a Novel Toolkit for Parallel Application Performance Monitoring and Analysis in Cluster and Grid Environments," Proceedings of the 8th International Symposium on Parallel Architectures, Algorithms and Networks (ISPAN'05), Las Vegas, Nev., Dec. 7-9, 2005, 6 pages.

Nguyen, T.M., et al., "Branching Store File System," U.S. Appl. No. 11/026,622, filed Dec. 30, 2004.

Ohta, K., et al., "Improving Parallel Write by Node Level Request Scheduling," Proceedings of the 9th IEEE/ACM International Symposium on Cluster Computing and the Grid, Shanghai, May 18-21, 2009, pp. 196-203.

OpenMP Fortran Application Program Interface (Version 2.0), Nov. 2000, <http://www.openmp.org/drupal/mp-documents/fspec20.pdf>, pp. 1-3 and 34-36.

OpenMP Fortran Application Program Interface (Version 2.0), Nov. 2000, <http://www.openmp.org/drupal/mp-documents/fspec20.pdf>, pp. 1-3, 18-19, 25-27, 34-37, and 67.

"Sequent's NUMA-Q SMP™ Architecture," Sequent Computer Systems, Inc., 1997, <http://parallel.ru/ftp/computers/sequent/NUMA_SMP_REV.pdf>, pp. 1-18.

Sivathanu, G., et al., "Ensuring Data Integrity in Storage: Techniques and Applications," Proceedings of the 2005 ACM Workshop on Storage Security and Survivability (StorageSS '05), Alexandria, Va., Nov. 7-10, 2005, pp. 26-36.

Zhu, T., et al., "Scheduling Divisible Loads in the Dynamic Heterogeneous Grid Environment," Proceedings of the First International Conference on Scalable Information Systems, Hong Kong, May 29-Jun. 1, 2006, 10 pages.

* cited by examiner


100
106
104
102
System Memory
Volatile
Non-Volatile
Processing Unit
Removable Storage 108
Non-Removable Storage 110
Output Device(s) 116
Input Device(s) 114
Communication Connection(s) 112

FIG. 1


200
220a
220b
220n
230a
230b
230n
UBD1
UBD2
UBDn
240
241
250a
250b
250n
251a
251b
251n
Cache 260
Cache 261

FIG. 2


300
310
Store blocks of a root image of a compute node.
320
Store a leaf image on a second storage unit.
322
Cache blocks of the root image that have been accessed by a compute node.
324
Receive a read request from a compute node.
326
Is a portion of the data requested currently stored in cache?
Yes
328
Serve that portion of the requested data from the cache.
No
330
Merge the blocks of the root image, the blocks of the leaf image, and the blocks of the cache, if any, to create an application environment.
340
Deliver the application environment to the compute node.
345
Update the cache based on the read request.
A

FIG. 3A


300
A
350
Modify the leaf image in response to the compute node's access to its instance of the application environment.
352
Receive indexing results pertaining to the root image from a compute node.
354
Store the indexing results on a shared storage unit.
356
Provide the indexing results to other compute nodes.
360
Optionally, reconcile the root image and the leaf image to form a new root image.

FIG. 3B


345
Will the amount of data in the cache plus new data to be added exceed a threshold value?
410
Yes
Remove the least recently accessed data from the cache.
420
No
430
Cache the portion of the requested data that is not currently stored in the cache.

FIG. 4


500
510
Receive data blocks of a file system.
520
Index a root image portion of the file system.
530
Store the indexing results on a shared storage unit accessible by another compute node.
540
Provide the indexing results to another compute node.
550
Index a leaf image portion of the file system.
560
Re-index the file system by re-indexing the leaf image portion and merging the re-indexing results with the indexing results of the root portion.

FIG. 5

# ROOT IMAGE CACHING AND INDEXING FOR BLOCK-LEVEL DISTRIBUTED APPLICATION MANAGEMENT

## CLAIM OF PRIORITY UNDER 35 U.S.C. §120

The present application for patent is a continuation-in-part of application Ser. No. 11/395,816, entitled "BLOCK-LEVEL I/O SUBSYSTEM FOR DISTRIBUTED APPLICATION ENVIRONMENT MANAGEMENT," filed Mar. 30, 2006, now U.S. Pat. No. 7,721,282, assigned to the assignee hereof and hereby expressly incorporated by reference herein.

## REFERENCE TO CO-PENDING APPLICATIONS FOR PATENT

The present application for patent is related to the following U.S. patent application:

"VIRUS SCANNING FOR BLOCK-LEVEL DISTRIBUTED APPLICATION MANAGEMENT," by Kulkarni et al., filed Feb. 28, 2007, now U.S. Pat. No. 8,065,737, assigned to the assignee hereof and expressly incorporated by reference herein.

## BACKGROUND

### Background

Over the years, as the internet has expanded and computers have multiplied, the need for clustered computing such as High Performance Computing (HPC) has increased. Clustered computing involves multiple compute nodes, usually a server grid, that work together to achieve a common task. For example, several (typically hundreds of) compute nodes may be clustered together to share the load of serving a high-traffic website. In large-scale systems such as this, a trend in software deployment is to centralize data management on a globally accessible file system with stateless computing nodes. A common example of this is Operating System (OS) software image management, where the compute nodes are activated with the distributed application environment by either diskless booting protocols or remote software installation to local storage. Under this architecture, a boot image is required for each compute node in the cluster. The boot image necessarily contains the kernel; it may additionally contain the application software that is intended to be run on the compute node.

The primary concern in clustered computing is low cluster bring-up time. The software that provides the boot images for the cluster typically stores a master boot image. It may then either pre-create clones of this master image for each such server, or it may create them "on the fly."

Creating a boot image on the fly involves copying the entire contents of the master image, which are typically in the range of 5-15 GB. Even with a significant amount of bandwidth by today's standards, this method will result in a large bring-up time.

Pre-creating a boot image for each server is advantageous from the point of view of cluster bring-up time. However, since one often does not know in advance how many servers will ever be booted, this scheme may result in wasted disk space.

Regardless of which of the preceding methods is used, both suffer from the same major problem—updating the boot image(s) for the cluster is cumbersome, as it means updating a number of copies of the boot image.

Additionally, once some compute nodes have booted, they will often engage in redundant activities with respect to each other. For example, assume that a cluster involves 20 compute nodes each running the same operating system and using substantially similar hardware. The 20 compute nodes will generally need to access much of the same data (e.g., drivers, library files, etc.). Moreover, when each of the 20 compute nodes index their file systems, the index results will only vary slightly to the extent that each compute node has developed its own "personality." Thus, to the extent that there is redundancy in the operations of the compute nodes, CPU resources, disk space, and data bus bandwidth are wasted.

In a branching store file system, a read-only base image (or "root" image) of the application environment is created. The root image is accessible by all compute nodes in the cluster. Changes made by a compute node to the root image are stored in a "leaf" image unique to that compute node. A filter operates between the compute nodes and the file system(s), which merges the changes recorded on the leaf images with the root image and delivers the result to the appropriate compute node. From the point of view of the compute node, it is running its own unique and cohesive instance of the application environment. While this system allows for creation of boot images on the fly without severely diminishing bring-up time, a separate version of the system must be created for each unique operating system because data is stored at the file system level (i.e., on a "per file basis"). Thus, migrating a computing cluster from one operating system to another is much more complicated than simply installing a new root image containing the new OS.

## SUMMARY

Described herein is technology for, among other things root image caching and indexing for block-level distributed application management. The technology involves storing blocks of a root image on a first storage unit and storing blocks of leaf images on respective second storage units. The leaf images include additional data blocks not previously contained in the root image and changes made by respective compute nodes to the blocks of the root image. The technology includes caching blocks of the root image that have been accessed by at least one compute node. The technology also includes receiving indexing results pertaining to the root image from one compute node and providing the results for other compute nodes.

Thus, embodiments of the present disclosure provide an operating system-independent system and method for distributing an application environment to a compute node. By utilizing a root-leaf system of application environment storage, embodiments of the present disclosure allow creation of boot images on the fly without significantly diminishing bring-up time. This is due to the fact that creating a new boot image does not require copying the contents of the root image. Rather it involves registering a new UBD with the system, which occurs very quickly. Bring up time, and access time in general, can be further improved by caching commonly accessed the portions of the root image. Moreover, updating the boot image for the entire cluster simply involves updating the root image. Additionally, because of the commonality of the root image and the fact that its contents are not directly changed, certain operations performed on the root image (e.g., indexing) only need to be performed once by one compute node. Thereafter, the results of that operation can be

shared with the other compute nodes in the cluster, thus saving the other compute nodes valuable time and resources.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a diagram of a suitable system on which embodiments may be implemented.

FIG. **2** is a diagram of a system, for root image caching and indexing in a block-level distributed application environment, in accordance with various embodiments of the present disclosure.

FIGS. **3**A-**3**B are flowcharts illustrating a process for root image caching and indexing in a block-level distributed application environment, in accordance with various embodiments of the present disclosure.

FIG. **4** illustrates a flowchart for a process for updating the cache based on a read request, in accordance with an embodiment of the present disclosure.

FIG. **5** illustrates a flowchart for a process for indexing a root image, in accordance with various embodiments of the present disclosure.

## DETAILED DESCRIPTION

Reference will now be made in detail to various embodiments of the disclosure, examples of which are illustrated in the accompanying drawings. While the disclosure will be described in conjunction with the various embodiments, it will be understood that they are not intended to limit the scope of the claims to these embodiments. On the contrary, the disclosure is intended to cover alternatives, modifications and equivalents, which may be included within the spirit and scope of the disclosure as defined by the claims. Furthermore, in the detailed description of the present disclosure, numerous specific details are set forth in order to provide a thorough understanding of the present disclosure. However, it will be obvious to one of ordinary skill in the art that the present disclosure may be practiced without these specific details. In other instances, well-known methods, procedures, components, and circuits have not been described in detail so as not to unnecessarily obscure aspects of the present disclosure.

Some portions of the detailed descriptions that follow are presented in terms of procedures, logic blocks, processing, and other symbolic representations of operations on data bits within a computer or digital system memory. These descriptions and representations are the means used by those skilled in the data processing arts to most effectively convey the substance of their work to others skilled in the art. A procedure, logic block, process, etc., is herein, and generally, conceived to be a self-consistent sequence of steps or instructions leading to a desired result. The steps are those requiring physical manipulations of physical quantities. Usually, though not necessarily, these physical manipulations take the form of electrical or Magnetic signals capable of being stored, transferred, combined, compared, and otherwise manipulated in a computer system or similar electronic computing device. For reasons of convenience, and with reference to common usage, these signals are referred to as bits, values, elements, symbols, characters, terms, numbers, or the like with reference to the present disclosure.

It should be borne in mind, however, that all of these terms are to be interpreted as referencing physical manipulations and quantities and are merely convenient labels and are to be interpreted further in view of terms commonly used in the art. Unless specifically stated otherwise as apparent from the discussion herein, it is understood that throughout discussions of the present embodiment, discussions utilizing terms such as "determining" or "outputting" or "transmitting" or "recording" or "locating" or "storing" or "displaying" or "receiving" or "recognizing" or "utilizing" or "generating" or "providing" or "accessing" or "checking" or "notifying" or "delivering" or the like, refer to the action and processes of a computer system, or similar electronic computing device, that manipulates and transforms data. The data is represented as physical (electronic) quantities within the computer system's registers and memories and is transformed into other data similarly represented as physical quantities within the computer system memories or registers or other such information storage, transmission, or display devices.

Briefly stated, described herein is technology for, among other things root image caching and indexing for block-level distributed application management. The technology involves storing blocks of a root image on a first storage unit and storing blocks of leaf images on respective second storage units. The leaf images include additional data blocks not previously contained in the root image and changes made by respective compute nodes to the blocks of the root image. The technology includes caching blocks of the root image that have been accessed by at least one compute node. The technology also includes receiving indexing results pertaining to the root image from one compute node and providing the results for other compute nodes.

### Example Compute Node Operating Environment

With reference to FIG. **1**, an example system for implementing embodiments includes a general purpose computing system environment, such as compute node **100**. In its most basic configuration, compute node **100** typically includes at least one processing unit **102** and memory **104**. Depending on the exact configuration and type of compute node, memory **104** may be volatile (such as RAM), non-volatile (such as ROM, flash memory, etc.) or some combination of the two. This most basic configuration is illustrated in FIG. **1** by dashed line **106**. Additionally, compute node **100** may also have additional features/functionality. For example, compute node **100** may also include additional storage (removable and/or non-removable) including, but not limited to, magnetic or optical disks or tape. Such additional storage is illustrated in FIG. **1** by removable storage **108** and non-removable storage **110**. Computer storage media includes volatile and nonvolatile, removable and non-removable media implemented in any method or technology for storage of information such as computer readable instructions, data structures, program modules or other data. Memory **104**, removable storage **108** and nonremovable storage **110** are all examples of computer storage media. Computer storage media includes, but is not limited to, RAM, ROM, EEPROM, flash memory or other memory technology, CD-ROM, digital versatile disks (DVD) or other optical storage, magnetic cassettes, magnetic tape, magnetic disk storage or other magnetic storage devices, or any other medium which can be used to store the desired information and which can be accessed by compute node **100**. Any such computer storage media may be part of compute node **100**.

Compute node **100** may also contain communications connection(s) **112** that allow it to communicate with other devices. Communications connection(s) **112** is an example of communication media. Communication media typically embodies computer readable instructions, data structures, program modules or other data in a modulated data signal such as a carrier wave or other transport mechanism and includes any information delivery media. The term "modulated data signal" means a signal that has one or more of its characteristics set or changed in such a manner as to encode information in the signal. By way of example, and not limi-

tation, communication media includes wired media such as a wired network or direct-wired connection, and wireless media such as acoustic, RF, infrared and other wireless media. The term computer readable media as used herein includes both storage media and communication media. Compute node **100** may also have input device(s) **114** such as a keyboard, mouse, pen, voice input device, touch input device, etc. Output device(s) **116** such as a display, speakers, printer, etc. may also be included. All these devices are well known in the art and need not be discussed at length here.

Example Systems

FIG. **2** is a diagram of a system **200** for root image caching and indexing in a block-level distributed application environment, in accordance with various embodiments of the present disclosure. In one embodiment, system **200** is implemented in a multi-computer system, such as an HPC cluster. In one embodiment, the application environment includes an operating system. In other embodiments, the application environment may contain other applications. System **200** has a number of compute nodes **220***a-n* coupled to first storage unit **240** and a corresponding second storage unit **250***a-n* though a corresponding union block device (UBD) **230***a-n*. To the compute nodes **220***a-n*, it appears that they have access to their own version of a distributed application environment. However, a separate and complete boot image is not created and stored for each compute node **220***a-n*.

System **200** has a first storage unit **240** for storing blocks of a root image of an application environment. The root image contains data initially common to the compute nodes **220***a-n*. The root image is not changed by compute nodes **220***a-n*. For example, in one embodiment, compute nodes **220***a-n* have read-only access to the first storage unit **240**.

Moreover, each compute node **220***a-n* has a corresponding second storage unit **250***a-n* for storing a leaf image. The first storage unit **240** and second storage units **250***a-n* may each be contained on separate physical storage devices, on separate logical spaces on the same storage device, or any combination thereof. Regardless, the first storage unit **240** and the second storage units **250***a-n* may be contained within a single storage appliance. The leaf image may contain blocks of new data, blocks of changed data, or other blocks of data unique to the individual compute node. The leaf image may also contain a block modification log. In other words, a leaf image will describe the changes made by the respective compute node **220***a-n* to its instance of the application environment. Thus, when a compute node (e.g., node **220***a*) makes changes involving the root image, modifications are made to that compute node's leaf image (e.g., leaf image stored on second storage device **250***a*). With respect to changes to the root image, only the specific blocks that are changed are stored in the leaf image. For example, a particular file on the root image may comprise twenty blocks of data (e.g., blocks **1-20**). One compute node (e.g., compute node **220***a*) desires to make a change to this file which involves a modification of only a few specific blocks of the file (e.g., blocks **4-9**). In this example, only the modified blocks (e.g., blocks **4-9**) will be stored in the compute node's leaf image (e.g., leaf image stored on second storage device **250***a*) plus some small overhead.

A compute node **220***a-n* mounts its instantiation of the application environment via its respective UBD **230***a-n*. In one embodiment, UBDs **230***a-n* are effectively low-level drivers that operate as an interface between the first and second storage devices and the file system of each compute node **220***a-n*. The file system may reside on the server side of the system **200**. The file system may also reside on each of the compute nodes **220***a-n*. Because UBDs **230***a-n* operate below the file system, they are concerned merely with the blocks of data themselves, rather than files they form. As a result, system **200** is completely file system, and thus operating system, independent.

UBDs **230***a-n* determine what leaf image (from the appropriate second storage unit **250**) is needed for portions of the application environment that their respective compute nodes **220***a-n* have changed. UBDs **230***a-n* also locate the portions of the application environment that are not changed by their respective compute nodes **220***a-n*. These portions may reside in the root image. There may also be intermediate images (not depicted in FIG. **2**) comprising versions of the root image from which a compute node's instance of the application environment is derived. Further, UBDs **230***a-n* create a new leaf image on a respective second storage unit **250***a-n* when their respective compute nodes **220***a-n* make changes to their instantiations of the application environment. In one embodiment, the UBDs **230***a-n* obtain the information necessary to create the application environment from a block modification log located in its respective leaf image.

UBDs **230***a-n* may also modify the leaf image in response to their respective compute node's access to its instance of the application environment. For example, upon receiving a write request from their respective compute nodes for a sector X, the UBDs **230***a-n* will create an appropriate persistent mapping for sector X and then write sector X onto their respective second storage units **250***a-n*, where sector X can then be modified. It will be appreciated that the data block being modified may already exist in the leaf image, in which case it does not need to be mapped and copied from the root image before modification.

By providing an application environment to multiple compute nodes via a branching store system, embodiments allow for a more streamlined update/patch procedure. In one embodiment, first storage device **240** may be refreshed with a new operating system patch, thereby automatically refreshing the image for all dependent compute nodes.

Caching

An embodiment of the present disclosure provides for caching of portions of the root image. Because several compute nodes in a cluster may often access the same data (e.g., same drivers, same library files, etc.) on the root image, tremendous speed improvements can be realized by caching such data in cache **260**. For example, by current standards, it is common for a storage disk to achieve a data transfer rate around 76 MB/s, whereas cache memory can achieve speeds up to and greater than 800 MB/s. In one embodiment, the cache may be contained within a single storage appliance, along with the first storage unit **240** and the second storage units **250***a-n*.

The value of such caching becomes even more apparent in the context of initial boot sequences. For example, a cluster of 20 compute nodes may be booted for the first time. Since it is a first boot, the cache is empty. The first compute node to boot (e.g., compute node **220***a*) will therefore load its data directly from the pertinent disks (e.g., first storage unit **240** and second storage unit **250***a*). While the first compute node is loading its data, its reads are intercepted and cached on a per-block basis in cache **260**. Thereafter, when a second compute node (e.g., compute node **220***b*) goes to boot, any data required by the second compute node that was previously accessed by the first compute node can be served out of the cache **260** rather than the first storage unit. It is appreciated that to the extent that the configurations of the first and second compute nodes are substantially the same, the relationship between the data requested by the second compute node and the data stored in the cache **260** approaches a 1:1 ratio (i.e., a greater than ten-fold improvement in root image access time is realized).

It is further appreciated that the entire contents of the root image may not necessarily be accessed to achieve a boot (e.g., unused drives and the like). Therefore, the data capacity of cache **260** can be much less than that of the first storage unit **240**.

As new data is accessed on the root image that is not currently stored in the cache **260**, the cache **260** may thereafter be updated with the new data. Moreover, as the amount of data in the cache **260** approaches or exceeds a threshold value, certain data will need to be removed from the cache **260** to make way for the new data. The data to be removed, deleted, overwritten, etc., may be selected the basis of, for example, how recently the data was accessed, how frequently the data has been accessed, or a combination of both. It should be appreciated that other cache arbitration algorithms known in the art may similarly be used.

Indexing

An embodiment of the present disclosure provides for indexing the root image. From the standpoint of seek time, it is beneficial for each compute node to have access to an index of its file system. In a traditional clustered computing situation, each compute node would independently index its file system. To the extent that each compute node in a cluster has similar operating environments to the others, indexing performed on common data is therefore redundant.

As an added benefit of the architecture **200** depicted in FIG. **2**, because the data stored in the root image is by definition common to all the compute nodes **220***a-n*, one compute node (e.g., compute node **220***a*) can index the contents of the root image and then provide the indexing results to the other compute nodes (e.g., compute nodes **220***b-n*). Thereafter, the compute nodes **220***a-n* need only be concerned with indexing their respective leaf image, which are relatively small compared to the root image. Moreover, in embodiments where the first storage unit **240** is read-only, the root image will not have to be re-indexed because the contents of the root image do not change. It is appreciated that the indexing results can be provided to the other compute nodes in a number of ways. For example, the results may be stored on a shared storage unit (such as, but not limited to, cache **260**), the results may provided directly to the other compute nodes, etc. Moreover, the initial indexing of the root image does not have to be performed by a compute node. For example, the indexing may be performed by a dedicated indexing host.

Example Methods

FIGS. **3**A-**3**B are flowcharts illustrating a process **300** for root image caching and indexing in a block-level distributed application environment, in accordance with various embodiments of the present disclosure. Although specific operations are disclosed in process **300**, such operations are exemplary. Process **300** may not include all of the operations illustrated by FIGS. **3**A-**3**B. Also, process **300** may include various other operations and/or variations of the operations shown by FIGS. **3**A-**3**B. Likewise, the sequence of the operations of process **300** can be modified. Steps of process **306** may be stored as instructions on a computer readable medium and executed on a computer processor.

Step **310** involves storing blocks of a root image of the compute node on a first storage unit. By storing data at the block level, embodiments are able to operate beneath the file system and thus are designed to be file system and operating system independent.

Step **320** involves storing a leaf image on a second storage unit. The leaf image includes, but is not limited to, new data blocks for the compute node and blocks of the root image that the compute node has changed. The leaf image includes a block modification log in one embodiment.

Step **322** involves caching blocks of the root image that have been accessed by a compute node. In doing so, embodiments improve the access time for subsequent compute nodes requesting to access the same blocks of data.

Step **324** involves receiving a read request from a compute node. At step **326**, a determination is made as to whether the data requested by the compute node is currently stored in the cache. If a portion of the data is currently stored in the cache, that portion is then served from the cache (step **328**), thus improving the access time with respect to that portion of data as compared to otherwise retrieving it from a storage unit such as a hard disk.

Step **330** involves merging the blocks of the root image, the blocks of the leaf image, and the relevant blocks of the cache, if any, to create the application environment. In other words, the merging occurs at an operational level between the file system of a compute node and the first storage unit, the corresponding second storage unit, and the cache. Once the application environment has been created, it will appear to the compute node as one cohesive image rather than a base image plus its additions, deletions, and modifications. To the compute node, it appears that it has access to its own unique version of an application environment. However, a separate and complete boot image is not actually stored for the compute node.

Step **340** involves delivering the application environment to the compute node. Step **340** may comprise a low-level driver determining which data blocks are needed for the compute node's instance of the application environment and delivering the application environment to the compute via the compute node's file system.

Step **345** involves updating the cache based on the read request. For instance, to the extent that a compute node has accessed root image data not currently stored in the cache, the cache should be updated to include that cache. In some cases, the amount of data in the cache may approach a capacity limit, either due to the physical capacity of the cache itself or due to threshold limit set in software.

FIG. **4** illustrates a flowchart for a process **345** for updating the cache based on a read request, in accordance with an embodiment of the present disclosure. It should be appreciated that the steps illustrated in FIG. **4** are exemplary and the updating performed in block **345** of process **300** may be achieved in many other ways as well. Process **345** may not include all of the operations illustrated by FIG. **4**. Also, process **345** may include various other operations and/or variations of the operations shown by FIG. **4**. Likewise, the sequence of the operations of process **345** can be modified. Steps of process **345** may be stored as instructions on a computer, readable medium and executed on a computer processor.

At step **410**, a determination is made as to whether the amount of data currently in the cache plus new data to be added exceeds a threshold value (physical or software-imposed). If the threshold value will be exceeded, the least recently accessed data is removed from the cache (step **420**). This sequence repeats until there is adequate headroom in the cache to accommodate the new data. Once it is determined that the amount of data currently in the cache plus the new data to be added will not exceed the threshold value, FIG. **4** proceeds to step **430**. Step **430** involves caching the portion of the requested data that is not currently stored in the cache (i.e., the "new data").

With reference again to FIG. **3**B, step **350** involves modifying the leaf image in response to the compute node's access to its instance of the application environment. The modifying of the leaf image may include copying one or more data

blocks from the root image to the leaf image, and modifying the data block in the leaf image. It will be appreciated that the data block being modified may already exist in the leaf image, in which case it does not need to be copied from the root image before modification.

Step **352** involves receiving indexing results pertaining to the root image from a compute node. Step **356** involves providing the indexing results to other compute nodes. It is appreciated that this may be done in a number of ways. For example, the indexing results may be provided directly to the compute nodes. Alternatively, the indexing results may be stored on a shared storage unit (step **354**) and then provided to the compute nodes via the shared storage unit. By receiving the indexing result of the root image from one compute node and providing it to the rest of the compute nodes, valuable time, resources, and bandwidth are saved for the other compute nodes. Since the root image is common to all the compute nodes, any re-indexing of the root image would be redundant and a waste of resources.

Step **360** involves reconciling the root image and the leaf image to form a new root image. This may be desirable if, for example, the leaf image has grown to exceed a particular disk quota. Furthermore, if there are multiple compute nodes that access the root image, each having their own respective leaf image, and there is substantial commonality between the leaf images, it may also be beneficial to reconcile the leaf images with the root image.

FIG. **5** illustrates a flowchart for a process **500** for indexing a root image, in accordance with various embodiments of the present disclosure. Although specific operations are disclosed in process **500**, such operations are exemplary. Process **500** may not include all of the operations illustrated by FIG. **5**. Also, process **500** may include various other operations and/or variations of the operations shown by FIG. **5**. Likewise, the sequence of the operations of process **500** can be modified. Steps of process **500** may be stored as instructions on a computer readable medium and executed on a computer processor.

Step **510** involves receiving data blocks of a file system at a compute node. The data blocks include a root image portion in the leaf image portion. As described above, the leaf image portion includes additional data blocks not previously contained in the root image portion and also changes made by the compute node to the blocks of the root image. Thus, the file system actually seen by the compute node is a product of merging the root image portion in the leaf image portion together at the block level.

Step **520** involves the compute node indexing the root image portion of its file system. In such a case, the compute node is to some extent agnostic to the fact that its file system is divided between a root image portion and a leaf image portion. At step **540**, the compute node provides the indexing results of the root image portion to another compute node. It is appreciated that this may be achieved a number of ways. For example, the first compute node may simply provide the indexing results to the second compute node directly. Alternatively, the first compute node may store the indexing results on a shared storage unit that is accessible by the second compute node (step **530**).

Thereafter, the compute node may complete its indexing of its file system by indexing the leaf image portion of the file system (step **550**). Further down the road, the benefits of indexing the root image separately from the leaf image are realized when the compute node requires that its file system be re-indexed. At step **560**, the compute node re-indexes its file system by re-indexing its corresponding leaf image portion with the previous indexing results of the root portion.

Thus, by operating at the block level, embodiments of the present disclosure provide file system and operating system independent systems and methods for distributing an application environment to a compute node. By utilizing a branching store system of application environment distribution, embodiments of the present disclosure allow creation of boot images on the fly without significantly diminishing bring-up time. This is due to the fact that creating a new boot image does not require copying the contents of the root image, but rather it involves registering a new UBD with the system, which occurs very quickly. Bring up time, and access time in general, can be further improved by caching commonly accessed the portions of the root image. Moreover, updating the boot image for the entire cluster simply involves updating the root image.

Embodiments of the present disclosure also allow for scalability and redundancy. For example, a server containing the root image may only have the resources to supply the root image to 100 compute nodes. Thus; in order to implement a 200-compute node system, two servers, each containing a copy of the root image, are used. This scalability provided by embodiments also lends itself to dynamic scaling. In other words, the number of root images required for a specific configuration can change based on the I/O workload, and new root images can be created on the fly accordingly. Moreover, additional servers containing the root image may be added into the system to provide redundancy and increase reliability. For example, and with reference to FIG. **2**, cache **261**, first storage unit **241**, and second storage units **251***a-n* provide failover/redundancy security for system **200**. As an added security measure, some of the root nodes may be located remotely from each other (e.g., half located in a main office and half in a satellite office). In addition, it is possible to copy the contents of one or more leaf nodes into a non-UBD (regular block device) copy (e.g., for use as an isolated backup).

Moreover, because of the commonality of the root image and the fact that its contents are not directly changed, certain operations performed on the root image (e.g., indexing) only need to be performed once by one compute node. Thereafter, the results of that operation can be shared with the other compute nodes in the cluster, thus saving the other compute nodes valuable time and resources.

The previous description of the disclosed embodiments is provided to enable any person skilled in the art to make or use the present disclosure. Various modifications to these embodiments will be readily apparent to those skilled in the art, and the generic principles defined herein may be applied to other embodiments without departing from the spirit or scope of the disclosure. Thus, the present disclosure is not intended to be limited to the embodiments shown herein but is to be accorded the widest scope consistent with the principles and novel features disclosed herein.

What is claimed is:

**1**. A system for providing data to a plurality of compute nodes, the system comprising:

a first storage unit configured to store blocks of a root image of said compute nodes;

a plurality of second storage units configured to store leaf images of respective compute nodes, said leaf images including only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of said root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes; and

a cache configured to cache blocks of said root image previously accessed by at least one of said compute nodes.

**2**. The system as recited in claim **1** wherein said cache is configured to store X most recently accessed blocks of said root image, and wherein X represents a cache threshold value.

**3**. The system as recited in claim **1** wherein said first storage unit, said second storage units, and said cache are contained within a single storage appliance.

**4**. The system as recited in claim **1** further comprising:

a plurality of union block devices configured to interface between respective compute nodes and said first storage unit, respective second storage units, and said cache to distribute application environments to the compute nodes, wherein said union block devices are configured to create said application environments by merging the blocks of said root image with the blocks of respective leaf images.

**5**. The system as recited in claim **4** wherein said union block devices comprise low-level drivers for interfacing between the file systems of respective compute nodes and said first storage unit, respective second storage units, and said cache.

**6**. The system as recited in claim **1** wherein said first storage unit is read-only.

**7**. A method for providing data to a plurality of compute nodes, comprising:

storing blocks of a root image of said compute nodes on a first storage unit;

storing leaf images for respective compute nodes on respective second storage units, said leaf images including only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes; and

caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory.

**8**. The method as recited in claim **7** further comprising:

receiving a read request from at least one of said compute nodes, wherein a first portion of the data requested is currently stored in said cache memory; and

providing said first portion of said data to said at least one of said compute nodes from said cache memory.

**9**. The method as recited in claim **8** further comprising:

updating said cache memory based on said read request.

**10**. The method as recited in claim **9** wherein a second portion of the data requested is not currently stored in said cache memory and said updating comprises:

caching said second portion in said cache memory; and

removing the least recently accessed data from said cache memory if the amount of data in said cache memory is above a threshold value.

**11**. The method as recited in claim **7** further comprising:

merging the blocks of said root image with the blocks of respective leaf images to create cohesive respective application environments.

**12**. The method as recited in claim **11** wherein said merging occurs at an operational level between file systems of the respective compute nodes and said first storage unit, respective second storage units, and said cache memory.

**13**. The method as recited in claim **7** wherein said first storage unit is read-only.

**14**. A system for indexing file systems for a plurality of compute nodes, the system comprising:

a first storage unit configured to store blocks of a root image of said compute nodes;

a plurality of second storage units configured to store leaf images of respective compute nodes, said leaf images comprising only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of said root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes; and

a plurality of union block devices corresponding to said compute nodes, said union block devices configured to interface between said compute nodes and said first and second storage units to distribute said file systems to said compute nodes, wherein said union block devices are configured to create said file systems by merging the blocks of said root image stored on the first storage unit with the blocks of respective leaf images stored on respective second storage units, and wherein further at least one of said compute nodes is configured to index said root image and provide the indexing results to another of said compute nodes.

**15**. The system as recited in claim **14** wherein said first storage unit and said second storage units are contained within a single storage appliance.

**16**. The system as recited in claim **14** further comprising:

a plurality of union block devices configured to interface between respective compute nodes and said first storage unit and respective second storage units, said union block devices configured to distribute application environments to the compute nodes, wherein said union block devices are configured to create said application environments by merging the blocks of said root image with the blocks of respective leaf images.

**17**. The system as recited in claim **16** wherein said union block devices comprise low-level drivers for interfacing between the file systems of respective compute nodes and said first storage unit, respective second storage units, and said cache.

**18**. The system as recited in claim **14** wherein said first storage unit is read-only.

**19**. A method for indexing file systems for a plurality of compute nodes, comprising:

storing blocks of a root image of said compute nodes on a first storage unit;

storing leaf images for respective compute nodes on respective second storage units, said leaf images comprising only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image, wherein said leaf images for respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes;

merging the blocks of said root image with the blocks of respective leaf images stored on respective second storage units to create respective file systems for respective compute nodes;

receiving indexing results pertaining to said root image from one of said compute nodes; and

providing said indexing results to the others of said compute nodes.

**20**. The method as recited in claim **19** further comprising:

storing said indexing results on a shared storage unit.

**21**. The method as recited in claim **19** wherein said merging occurs at an operational level between respective file systems of the compute nodes and said first storage unit and respective second storage units.

**22**. The method as recited in claim **19** wherein said first storage unit is read-only.

**23**. A computer-readable storage medium having instructions stored thereon that, in response to execution by at least one computing device, cause the at least one computing device to:

receive data blocks of a file system, said data blocks comprising a root image portion and leaf image portion, said leaf image portion comprising only additional data blocks not previously contained in said root image portion and, changes made by said first compute node to the blocks of said root image, wherein said leaf image portion does not include blocks of said root image that are unchanged by said first compute node, wherein said file system is the result of merging said root image portion and said leaf image portion together at the block-level;

index said root image portion; and

provide the results of said indexing to a second compute node, wherein said logic encoded in the one or more tangible media comprise computer executable instructions executed by the first compute node.



**24**. The computer-readable storage medium of claim **23**, wherein the instructions further cause the at least one computing device to store said results of said indexing on a shared storage unit accessible by said second compute node.

**25**. The computer-readable storage medium of claim **23**, wherein the instructions further cause the at least one computing device to index said leaf image portion.

**26**. The computer-readable storage medium of claim **25**, wherein the instructions further cause the at least one computing device to re-index said file system by re-indexing said leaf image portion and merging the results of said re-indexing of said leaf image portion with said results of said indexing of said root image portion.

**27**. The computer-readable storage medium of claim **23** wherein said root image portion is read-only.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION



PATENT NO. : 8,332,844 B1
APPLICATION NO. : 11/709477
DATED : December 11, 2012
INVENTOR(S) : Kulkarni et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On Title Page 2, item (56), under “OTHER PUBLICATIONS”, in Column 2, Lines 28-30, delete “OpenMP Fortan.............34-36.”.

In the Specifications:

In Column 3, Line 8, delete “system,” and insert -- system --, therefor.

In Column 3, Line 54, delete “Magnetic” and insert -- magnetic --, therefor.

In Column 7, Line 55, delete “306” and insert -- 300 --, therefor.

In Column 8, Line 50, delete “computer, readable” and insert -- computer readable --, therefor.

In the Claims:

In Column 13, Line 11, in Claim 23, delete “and,” and insert -- and --, therefor.

Signed and Sealed this
Eleventh Day of June, 2013

Teresa Stanek Rea
*Acting Director of the United States Patent and Trademark Office*

# EXHIBIT A-3

Attorney Docket No.:PNTA-P002

# Declaration and Power of Attorney for a Patent Application

## Declaration

As below named inventor, I hereby declare that my residence post office address, and citizenship are as stated below my name. Further, I hereby declare that I believe I am the original, first and sole inventor (if only one name is listed below) or an original, first and joint inventor (if plural names are listed below) of the subject matter which is claimed and for which a patent is sought on the invention entitled:

BRANCHING STORE FILE SYSTEM

the specification of which:

__X__ is attached hereto, or
_____ was filed on ________________ as application serial no. ________________ : and
_____ was amended on ________________

I hereby state that I have reviewed and understand the contents of the above identified specification, including the claims, as amended by any amendment referred to above; and

I acknowledge the duty to disclose information which is material to the examination of this application in accordance with Title 37, Code of Federal Regulations, Section 1.56.

## Foreign Priority Claim

I hereby claim foreign priority benefits under Title 35, United States Code Section 119 of any foreign application(s) for patent or inventor's certificate listed below and have also identified below any foreign application for patent or inventor's certificate having a filing date before that of the application on which priority is claimed:

| Number | Country | Date Filed | Priority Claimed | |
|---|---|---|---|---|
| | | | _____ yes | _____ no |
| | | | _____ yes | _____ no |

## U.S. Priority Claim

I hereby claim the benefit under Title 35, United States Code, Section 120 and 119(e) of any United States application(s) listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in the prior United States application in the manner provided by the first paragraph of Title 35, United States Code, Section 112, I acknowledge the duty to disclose material information as defined in Title 37, Code of Federal Regulations, Section 1.56(a) which occurred between the filing date of the prior application and the national or PCT international filing date of this application:

| Serial Number | Filing Date | Status (patented/pending/abandoned) |
|---|---|---|
| | | |
| | | |

BEST AVAILABLE COPY

Attorney Docket No.:PNTA-P002

## Power of Attorney

As a named inventor, I hereby appoint practitioners associated with this Customer Number:

**41066**

as attorney(s) or agent(s) to represent the undersigned before the United States Patent and Trademark Office (USPTO) in connection with any and all patent applications assigned only to the undersigned according to the USPTO assignment records or assignment documents attached to this form in accordance with 37 CFR 3.73(b).

Send Correspondence to:

**WAGNER, MURABITO & HAO LLP**
Two North Market Street
Third Floor
San Jose, California 95113
(408) 938-9060

## Signatures

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

Full Name of Sole/First Inventor: Tung M. NGUYEN

Inventor's Signature [signature] Date 12/27/2004

Residence Cupertino, CA Citizenship USA
(City State)

P.O. Address 22346 Mc. Clellan Road, Cupertino, CA 95014

Full Name of Second Inventor: Richard AU

Inventor's Signature [signature] Date 12/23/2004

Residence Woodside, CA Citizenship USA
(City State)

P.O. Address 389 Moore Road, Woodside, CA 94062

Full Name of Third Inventor: Eric POUYOUL

Inventor's Signature [signature] Date 12-27-2004

Residence San Francisco, CA Citizenship France
(City State)

P.O. Address 350 Day Street, San Francisco, CA 94131

**BEST AVAILABLE COPY**

BRANCHING STORE FILE SYSTEM

ABSTRACT

A branch and store file system. The file system includes a root file system having a base image of a distributed application. The base image is read-only accessible by compute nodes. The file system also has leaf images of the distributed application for respective ones of the compute nodes. The leaf images include changes made to instances of the base image by respective compute nodes. The file system also has a filter that controls accesses of the distributed application by the compute nodes. The compute nodes' respective instances of the distributed application are based on the base image and the compute node's leaf image.

UNITED STATES PATENT APPLICATION FOR

# BRANCHING STORE FILE SYSTEM

Inventors:

Tung M. Nguyen
Richard Au
Eric Pouyoul

Prepared by:

WAGNER, MURABITO & HAO, LLP
TWO NORTH MARKET STREET
THIRD FLOOR
SAN JOSE, CALIFORNIA 95113
(408) 938-9060

# BRANCHING STORE FILE SYSTEM

## FIELD OF THE INVENTION

[0001] Embodiments of the present invention relate to the field of networked computing. Specifically, embodiments of the present invention relate to distributed application deployment in a multi-computer system.

## BACKGROUND ART

[0002] In large-scale systems, a trend in software deployment is to centralize Operating System (OS) software image management on a globally accessible file system with stateless computing nodes. The compute nodes are activated with the distributed application by either diskless booting protocols or remote software installation to local storage.

[0003] One approach to software image management is to use a single image with global process dispatch to lightweight OS node computing environments. A second approach is to dedicate one image per compute node.

[0004] Neither of the two general approaches provides fault isolation between different instances of the distributed application while being scalable and efficient. For example, the single OS image approach does not provide fault isolation between different instances of the distributed application. Moreover, a single OS image is a bottleneck that becomes worse as the size of the system grows.

[0005] The multiple OS image approach does not use system resources efficiently and is also difficult and time-consuming to install and maintain. For example, multiple OS images result in duplicated storage; therefore, system resources are not used efficiently. Moreover, using multiple OS images adds overhead to software installation and maintenance. Therefore, while multiple OS images provide isolation between instances of the distributed application, system resources are not used efficiently and installation and maintenance is time-consuming.

SUMMARY OF THE INVENTION

[0006] A branching store file system is disclosed. In one embodiment in accordance with the present invention, the file system includes a root file system containing the operating environment or base image of a distributed application, any number of shared branch images, and at least one dedicated leaf image for each compute node. The base image and shared branch images are read-only accessible by compute nodes. Shared branch images contain changes made to the base image which are visible to all compute nodes. The dedicated leaf images include further changes made to the base or branch images, visible only by respective compute nodes. The file system also has a filter that controls accesses of the distributed application by the compute nodes. A compute node's instance of the distributed application is based on the base image, branch image(s), and the compute node's leaf image(s).

[0007] In another embodiment of the present invention, the branching store file system has branch modification logs for changes to the distributed application. The system has a root file system with a root metadata structure and a root data structure. The entries in the root metadata structure point to associated entries in the root data structure. The branching store file system also has branch modification logs for respective compute nodes. A given branch modification log has a branch data structure comprising modified data files reflecting changes made to

an instance of the root data structure by a compute node. The branch modification log also has a branch metadata structure comprising unmodified and modified entries. The modified entries reflect changes made by the compute node to its instance of the root data structure. Further, the unmodified entries point to associated entries in the root data structure and the modified entries point to associated ones of the modified data files.

[0008] In another embodiment of the present invention, the branching store file system comprises a base instance of a distributed application and change volumes for changes made by compute nodes to their respective instances of the distributed application. The system also has a filter program code that directs accesses of the compute nodes' respective instances of the distributed application.

BRIEF DESCRIPTION OF THE DRAWINGS

[0009] The accompanying drawings, which are incorporated in and form a part of this specification, illustrate embodiments of the invention and, together with the description, serve to explain the principles of the invention:

[0010] Figure 1 is a diagram of a branching store file system with leaf images, in accordance with an embodiment of the present invention.

[0011] Figure 2 is a diagram of a branching store file system using branch modification logs, in accordance with an embodiment of the present invention.

[0012] Figure 3 illustrates an exemplary branching store architecture using branch modification logs, in accordance with an embodiment of the present invention.

[0013] Figure 4 is a diagram of branching store file system employing copy on write to change volumes, in accordance with an embodiment of the present invention.

[0014] Figure 5 is a tree structure that illustrates a branching file system, in accordance with an embodiment of the present invention.

[0015] Figure 6 is diagram illustrating modules and structures of a file system, in accordance with an embodiment of the present invention.

[0016] Figure 7 is flowchart illustrating a process of a branching file system, in accordance with an embodiment of the present invention.

DETAILED DESCRIPTION OF THE INVENTION

[0017] In the following detailed description of embodiments of the present invention, a branching store file system, numerous specific details are set forth in order to provide a thorough understanding of the present invention. However, it will be recognized by one skilled in the art that the present invention may be practiced without these specific details or with equivalents thereof. In other instances, well-known methods, procedures, and components have not been described in detail as not to unnecessarily obscure aspects of the present invention.

NOTATION AND NOMENCLATURE

[0018] Some portions of the detailed descriptions that follow are presented in terms of procedures, steps, logic blocks, processing, and other symbolic representations of operations on data bits that can be performed on computer memory. These descriptions and representations are the means used by those skilled in the data processing arts to most effectively convey the substance of their work to others skilled in the art. A procedure, computer executed step, logic block, process, etc., is here, and generally, conceived to be a self-consistent sequence of steps or instructions leading to a desired result. The steps are those requiring physical manipulations of physical quantities. Usually, though not necessarily, these quantities take the form of electrical or magnetic signals capable of being stored, transferred, combined, compared, and otherwise manipulated in a computer system. It

has proven convenient at times, principally for reasons of common usage, to refer to these signals as bits, values, elements, symbols, characters, terms, numbers, or the like.

[0019] It should be borne in mind, however, that all of these and similar terms are to be associated with the appropriate physical quantities and are merely convenient labels applied to these quantities. Unless specifically stated otherwise as apparent from the following discussions, it is appreciated that throughout the present invention, discussions utilizing terms such as "removing" or "creating" or "generating" or "freezing" or "restoring" or "computing" or "resolving" or "communicating" or "determining" or "maintaining" or " providing" or "storing" or "constructing" or "performing" or "initializing" or "selecting" or "forming" or the like, refer to the action and processes of a computer system, or similar electronic computing device, that manipulates and transforms data represented as physical (electronic) quantities within the computer system's registers and memories into other data similarly represented as physical quantities within the computer system memories or registers or other such information storage, transmission or display devices.

[0020] Embodiments of the present invention provide methods and systems for distributed application deployment in a multi-compute node environment. Embodiments of the present invention provide isolation and

fault containment typical of multiple OS image approaches with operation performance typical of a single OS image approach. Furthermore, embodiments of the present invention allow the flexibility to customize the application environment that is unmatched by either approach. Embodiments of the present invention are highly scalable. Embodiments of the present invention provide these advantages and others not specifically mentioned above but described in the sections to follow.

[0021] Figure 1 is a diagram of branching store system 100 in accordance with an embodiment of the present invention for enabling distributed application deployment in a multi-computer system 116. The branching store system 100 has a number of compute nodes 114 coupled to file system 102 through a filter 110. To the compute nodes 114 it appears that they have access to their own version of a distributed application 117. However, the file system 102 does not store a separate and complete version of the distributed application 117 for each compute node 114.

[0022] The branching store system 100 has a file system 102 containing a base image or instance 104 of a distributed application. The base instance 104 is not changed by compute nodes 114. For example, the compute nodes 114 have read-only access to the base image 104. However, if changes are made to the base image 104, those changes are essentially instantaneously known to the compute nodes 114.

[0023] Moreover, the file system 102 has a number of leaf images 105. For example, each compute node 114a-n has a corresponding leaf image 105a-n. A given leaf image 105 describes changes made by the respective compute node 114 to its instance of the distributed application. Thus, when a compute node (e.g., node 114a) make changes involving the base image 104, modifications are made to that compute node's leaf image (e.g., leaf image 105a). A leaf image 105 may comprise versions of entire files of the distributed application; however, this is not required. In one embodiment, the changes in the leaf image 105 are performed on a data block-by-data block basis. In another embodiment, the changes in the leaf image 105 are performed on a file-by-file basis. There may also be intermediate images (not depicted in Fig. 1) between the base image 104 and the leaf images 105.

[0024] A compute node 114 mounts its instantiation of the distributed application via the filter 110. The filter 110 determines what leaf image 105 is needed for portions of the distributed application that the compute node 114 has changed. The filter 110 also locates the portions of the distributed application that are not changed by the compute node 114. These portions may reside in the base image 104. There may also be intermediate images (not depicted in Fig. 1) comprising versions of the base image 104 from which a compute node's instance of the distributed application is derived.

Further, the filter 110 creates new leaf images 105 when a compute node 114 makes changes to its instantiation of the distributed application.

[0025] By maintaining a separate instance of the distributed application for each compute node 114, embodiments of the present invention provide fault isolation between instances of the distributed application. Furthermore, by recording only changes in the leaf images, embodiments of the present invention conserve system resources. Furthermore, updates to the base image are provided to the compute nodes nearly instantaneously.

[0026] Figure 2 is a diagram of branching store system 200 in accordance with an embodiment of the present invention in which a branch modification log is used to record changes to the base instance of the distributed application. The system 200 has a number of compute nodes 114a-n coupled to network 112 that have access to a file system 102 through a filter 110. To the compute nodes 114a-n, it appears that they have access to their own version of a distributed application 117a-n, respectively. However, the file system 102 does not store a separate and complete version of the distributed application 117 for each compute node 114.

[0027] The branching store system 100 has a file system 102 containing a base image or instance 104 of a distributed application (e.g., a base operating system). Briefly, the base image 104 contains data and

metadata for the base image 104 of the distributed application. The base image 104 is not changed by compute nodes 114. For example, the compute nodes 114 have read-only access to the base image 104. However, if changes are made to the base image 104, those changes are essentially instantaneously known to the compute nodes 114.

[0028] Moreover, the file system 102 has a number of branch modification logs 205a-n. For example, each compute node 114a-n has a corresponding branch modification log 205a-n. The branch modification log 205 is one embodiment of a leaf image (Fig. 1, 105). A given branch modification log (e.g., 205a) describes changes made by the respective compute node (e.g., 114a) to its instance of the distributed application (e.g.,117). Thus, when a compute node 114 make changes involving the base image 104, modifications are made to that compute node's branch modification log 205. A compute node's instance is thus defined by at least a portion of the base image 104 and its branch modification log 205. This is indicated by the groupings 108a-n. It will be understood that a compute node's instance of the distributed application does not typically include all of the grouping 108. For example, some of the base image 104 may be copied into a branch modification log 205 and modified therein.

[0029] A branch modification 205 contains metadata and data for a respective compute node's instance of the distributed application. However,

the data in a given branch modification log 205 only reflects differences between the data in the base image 104 and the given compute node's instance of the distributed application, in this embodiment. A compute node 114 mounts its instance of the distributed application as pointed to by its branch modification log 205. For example, a compute node 117a accesses the base image 104 for data that is unchanged and accesses its branch modification log 205a for data that the compute node 114a has changed. Thus, this embodiment traverses inodes to determine the location of data for a compute node's instance of a distributed application.

[0030] Figure 3 illustrates an exemplary branching store architecture 150, in accordance with an embodiment of the present invention. The exemplary branching store architecture 150 may be used in the system depicted in Figure 1 or Figure 2, although systems 100 and 200 are not limited to this architecture 150. The branching store architecture 150 has a root file system 104 (also referred to herein as a base image) and a branch modification log 205. The branch modification log 205 is one embodiment of a leaf image (Fig. 1, 105). Typically, there will be many branch modification logs 205, such that one is available for each compute node in the system.

[0031] The root file system 104 has a root metadata structure 205 and a root data structure 210. Entries in the root metadata structure 205 point to associated entries in the root data structure 210. The root data structure

210 comprises the base instance of the distributed application. Neither the root data structure 210 nor the root metadata structure 205 are modified by compute nodes. However, a system management node or the like may modify the root file system 104, such that changes to the distributed application are easily and rapidly deployed to compute nodes.

[0032] The branch modification log 205 has a branch data structure 310 comprising modified data reflecting changes made to an instance of the root data structure by a compute node. For example, when a compute node makes changes to its instance of the distributed application data is added or modified in the branch data structure 310 for that compute node.

[0033] The branch modification log 205 also comprises a branch metadata structure 305 comprising unmodified entries 320 and modified entries 315. The modified entries 315 reflect changes made to the instance of the distributed application by the compute node. Thus, a modified entry 135 may be an entry that has a modification attribute attached to the entry. A modified entry 315 points to an associated modified data block 325. For example, if an entry has an attribute indicating that it is a modified entry, then inodes are followed to the correct block 325 in the branch data structure 310.

[0034] The unmodified entries 325 point to associated entries in the root data structure 210. For example, if an entry does not have an attribute indicating that it is a modified entry, then the file lookup is re-directed such that inodes are followed to the root data structure 210.

[0035] The instance of the distributed application is thus defined by the branch metadata structure 305, wherein an unmodified portion of the distributed application resides in the root data structure 210 and a modified portion of the distributed application resides in the branch data structure 310.

[0036] Figure 4 is a diagram of branching store system 400 in accordance with an embodiment of the present invention in which a copy on write to change volumes 405 are used to record changes to the base instance of the distributed application. Changes to a compute node's instance of the distributed application, may also be kept as a database referred to as a change volume 405.

[0037] The file system 102 comprises a base image 104 of a distributed application 104 (e.g., a base OS) and a number of change volumes 405a-n. When a compute node 114 performs a write operation on a file, the entire original file is copied from the root image 104 into the change volume 405, if

the file does not already exist in the change volume 405. The write operation is then performed on the copy in the change volume 405.

[0038] When a compute node 114 mounts the distributed application, the compute node 114 mounts at least a portion of the base image 104 and the change volume 405. Access to files in a compute node's instance of the distributed application may proceed by first determining if the file exists in the compute node's 114 change volume 405, then determining if the file is in the base image 104.

[0039] There is a filter 110 at each compute node 114, in this embodiment. Alternatively, there could be a single filter 110 at the file system 102. The implementation of the filter 110 in this embodiment may be different than the implementation of the filter 110 of system 200 of Figure 2.

Application Groups

[0040] An embodiment of the present invention provides for application groups (AG). An AG is a way to provide a group of compute nodes their own instantiation of an application, while allowing versions of the application to be frozen from time to time. Thus, an archive of the application is created.

[0041] At creation time, an AG comprises the original root file system. A number of leaf nodes or images are created to match the desired capacity

demand of the AG. The leaf images can be created very quickly and require very little storage because the leaf image reflect changes to the root instance. In one embodiment, the leaf images comprise BMLs. In another embodiment, the leaf images comprise change volumes.

[0042] Figure 5 is a tree structure 500 that illustrates a branching file system, in accordance with an embodiment of the present invention. Some nodes are read-only, others are read-write-modify. A node may change from read-write-modify to read-only. For example, creating a new edition of the AG may be accomplished by freezing a current leaf image structure and creating a new set of leaf images. The frozen node is then made read-only. Referring now to Figure 5, the root node 104 (also referred to herein as a base image) is the base distributed application. As previously discussed, the root node 104 is not modified by compute nodes for which the application is distributed.

[0043] The first level of the exemplary tree structure 500 comprises first branch node 604 and branch node 606, which represent two different application service groups. Compute nodes have read only access to the service group applications represented by branches 604 and 606. Branch node 604 has three leaf nodes 105a, 105b, 105c. The leaf nodes 105 may be for configuration files, for example. The compute nodes can boot off from the configuration files. The leaf nodes are also referred to herein as leaf images.

In one embodiment, the leaf nodes 105 are change volumes. In another embodiment, the leaf nodes 105 are branch modification logs.

[0044] The branch node 606 also has three leaf nodes 605d, 605e, 605f, which are analogous to the leaf nodes 605a-c associated with branch node 604. However, branch node 606 also has a service group 620, which reflects a change to the application. The service group 620 has leaf nodes 605g, 605h, and 605i.

[0045] Figure 6 is diagram illustrating components of a file system 600, in accordance with an embodiment of the present invention. The file system 600 may be used in a copy-on-write embodiment, such as the system 400 depicted in Figure 4. However, it will be understood that the system 400 if Figure 4 is not limited to file system 600. The filter 602 presents the view to the compute nodes of a regular file system. In one embodiment, the filter presents the view of a UNIX file system.

[0046] The file system 600 also has a table of locations 606, which indicates the locations of branch nodes. The file system has an XML document that indicates the locations. The XML document can be sent to compute nodes.

[0047] Also stored are base addresses 608, application addresses 610, and change addresses 612. The file system has a networking layer 614 for interfacing on the network (Fig. 4, 112).

[0048] Figure 7 is flowchart illustrating a process 700 of branching file system access, in accordance with an embodiment of the present invention. Steps of process 700 may stored as instructions on a computer readable medium and executed on a computer processor. Step 710 is creating a root file system comprising a root image of an application.

[0049] Step 720 is creating leaf images that are configured to record changes to the root image of the application. The leaf images comprise branch modification logs in one embodiment. In another embodiment, the leaf images comprise change volumes.

[0050] Step 730 is creating a directory configured to access instances of the application for respective compute nodes. A respective compute node's application instance comprises at least a portion of the root image and the respective compute node's leaf image.

[0051] Step 740 is providing the compute nodes with respective instances of the application. Step 740 may comprise a filter determining

which files or data blocks are needed for a given compute node's instance of the application.

[0052] Step 750 is modifying one of the leaf images in response to a corresponding compute node's access to its instance of the application. The modifying of the leaf image may include copying a file from the root image to the first leaf image and then modifying the file in the first leaf image. However, this step is not so limited. The modifying may also be performed by copying one or more data blocks from the root image to a leaf image, and modifying the data block in the leaf image. It will be appreciated that the file or data block being modified may already exists in the leaf image, in which case it does not need to be copied from the base image before modification.

[0053] The preferred embodiment of the present invention, branching store file system, is thus described. While the present invention has been described in particular embodiments, it should be appreciated that the present invention should not be construed as limited by such embodiments, but rather construed according to the below claims.


100
116
MULTI-COMPUTER SYSTEM
COMPUTE a Node 117a
COMPUTE b Node 117b
COMPUTE n Node 117n
114
Filter - 110
105a
105b
105n
BASE Image
104
102

Figure 1


200
116
MULTI-COMPUTER SYSTEM
COMPUTE a
Node 117a
COMPUTE b
Node 117b
COMPUTE n
Node 117n
114
NETWORK
112
110
FILTER
BML 205a
BML 205b
108b
BML 205n
108a
BASE Image
108n
102
104

Figure 2

TITLE: "BRANCHING STORE FILE SYSTEM"
INVENTOR(S): Tung M. Nguyen, Richard Au, and Eric Pouyoul
USSN: n/a Attorney Docket #: PNTA-P002






Figure 3


400
116
MULTI-COMPUTER SYSTEM
COMPUTE
Node A
110
COMPUTE
Node B
110
COMPUTE
Node n
110
NETWORK
112
405a
405b
405n
BASE OS
Image
102
104

Figure 4


500
Root Node (Base Application Distribution) 104
Branch Node 1 (Service Group Applications) 504
Branch Node 2 (Service Group Applications) 506
Leaf Node 1-1 (configuration files) 105a
Leaf Node 1-2 (configuration files) 105b
Leaf Node 1-3 (configuration files) 105c
Leaf Node 2-1 (configuration files) 105d
Leaf Node 2-2 (configuration files) 105e
Leaf Node 2-3 (configuration files) 105f
Service Group 2.1 (Applications) 520
Leaf Node 2.1-1 (configuration files) 105g
Leaf Node 2.1-2 (configuration files) 105h
Leaf Node 2.1-3 (configuration files) 105i

Figure 5

600


FILTER
110
TABLE OF LOCATIONS
XML document
604
(BRANCH NODES)
606
Base Addresses
608
Application Addresses
610
Change Addresses
612
NETWORKING LAYER
614

Figure 6


700
Create a root file system comprising a root image of an application
710
Create leaf images that are configured to record changes to the root image of the application
720
Create a directory configured to access instances of the application for respective compute nodes
730
Provide the compute nodes with respective instances of the application
740
Modify one of the leaf images in response to a corresponding compute node's access to its instance of the application
750

Figure 7

CLAIMS

What is Claimed, is:

1. A branching store file system, comprising:

a root file system comprising a base image of a distributed application, wherein said base image is read-only accessible by compute nodes;

leaf images comprising modified portions of said distributed application for respective ones of said compute nodes, wherein an instance of said distributed application for a first of said compute nodes is based on said base image and at least one of said leaf images; and

a filter that controls access of instances of said distributed application for said compute nodes.

2. The system of Claim 1, wherein said leaf images comprise branch modification logs for said respective ones of said compute nodes.

3. The system of Claim 1, wherein said leaf images comprise change volumes for said respective ones of said compute nodes.

4. The system of Claim 1, wherein said filter is implemented at said compute nodes.

5. The system of Claim 1, wherein said filter is implemented at said root file system.

6. The system of Claim 1, further comprising intermediate images between said base image and said leaf images, wherein said intermediate images comprise application service groups.

7. The system of Claim 6, wherein access of said compute nodes to said intermediate images is read-only.

8. The system of Claim 1, wherein said distributed application comprises an operating system.

9. The system of Claim 1, wherein said base image is concurrently accessible to a plurality of said compute nodes.

10. The system of Claim 1, wherein said leaf images are configured to be modified on a block-by-block basis.

11. The system of Claim 1, wherein said leaf images are configured to be modified on a file-by-file basis.

12. A branching store file system, comprising:

a root file system having a root metadata structure and a root data structure, said entries in said root metadata structure pointing to associated unmodified data in said root data structure; and

a branch modification log for respective ones of compute nodes, comprising:

a branch data structure comprising modified data reflecting changes made to an instance of said root data structure by said branch modification log's respective compute node; and

a branch metadata structure comprising unmodified and modified entries, said unmodified entries pointing to associated portions of said unmodified data in said root data structure, and said modified entries pointing to associated portions of said modified data in said branch data structure, wherein an instance of a distributed application for a first of said compute nodes is defined by said branch metadata structure.

13. The system of Claim 12, further comprising a filter that directs accesses of said distributed application from compute nodes to a respective compute node's instantiation of the distributed application.

14. The system of Claim 12, wherein said distributed application comprises an operating system.

15. The system of Claim 13, wherein said filter is configured to traverse inodes to said root data structure for accesses to said un-modified data.

16. The system of Claim 13, wherein said filter is configured to traverse inodes to said branch data structure for accesses to said modified data.

17. The system of Claim 12, wherein access to said root data structure by said compute nodes is read-only and access to said branch data structure is read-write-modify by said branch modification log's respective compute node.

18. The system of Claim 12, wherein ones of said modified entries have a modification attribute attached.

19. The system of Claim 12, wherein said branch modification log is configured to receive updates to said modified data on a block-by-block basis.

20. A branching store file system, comprising:

a root file system comprising a base instance of a distributed application;

change volumes for respective ones of compute nodes and comprising modified versions of files of said distributed application; and

a filter program code that directs accesses of said compute nodes' respective instances of said distributed application, wherein said compute nodes' respective instances of said distributed application are based on said base instance and respective ones of said change volumes.

21. The system of Claim 20, further comprising a table of locations indicating locations of said change volumes.

22. The system of Claim 20, wherein said base instance is concurrently accessible to a plurality of said compute nodes.

23. The system of Claim 20, wherein said compute nodes have read-only access to files in said base instance.

24. The system of Claim 21, wherein said distributed application comprises an operating system.

25. The system of Claim 20, wherein said filter performs a copy-on-write to one of the change volumes when a compute node writes to said compute node's instantiation of said distributed application.

26. The system of Claim 20, wherein said change volumes are modified on a file-by-file basis.

27. A computer-implemented method of distributed application deployment, said method comprising:

creating a root file system comprising a root image of an application;

creating a plurality of leaf images that are configured to record changes to said root image of the application for respective compute nodes;

creating a directory configured to access instances of said application for said respective compute nodes, wherein a respective one of the compute node's instance of said application comprises at least a portion of said root image and the respective compute node's leaf image; and

providing said compute nodes with said respective instances of said application.

28. The method of Claim 27, wherein said leaf images comprise branch modification logs.

29. The method of Claim 28, wherein said providing said compute nodes with respective instances of said application comprises traversing inodes as indicated by said branch modification logs.

30. The method of Claim 27, wherein said leaf images comprise change volumes.

31. The method of Claim 30, wherein said providing said compute nodes with respective instances of said application comprises consulting a table of locations.

32. The method of Claim 27, wherein said application comprises an operating system.

33. The method of Claim 27, wherein access to said root image by said compute nodes is read-only.

34. The method of Claim 27, further comprising freezing a version of said distributed application.

35. The method of Claim 34, further comprising creating new leaf nodes that are children of said frozen version of said distributed application.

36. The method of Claim 27, further comprising modifying a first of said leaf images in response to a corresponding compute node's access to its instance of the application.

37. The method of Claim 36, wherein said modifying comprises a copying a file from said root image to said first leaf image and then modifying said file in said first leaf image.

38. The method of Claim 36, wherein said modifying comprises a copying a data block from said root image to said first leaf image and then modifying said data block data block in said first leaf image.

# EXHIBIT A-4

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| Applicant | : Kulkarni, et al. | Confirmation | : 2625 |
| Serial No. | : 11/395,816 | Examiner | : Khatri, Anil |
| Filing Date | : 03/30/2006 | Art Unit | : 2191 |

Attorney Docket No. : PNTA-P006

-------------------------------------------------------------------------------------------------------

For: BLOCK-LEVEL I/O SUBSYSTEM FOR DISTRIBUTED APPLICATION ENVIRONMENT MANAGEMENT

AMENDMENT AND RESPONSE TO OFFICE ACTION

Commissioner for Patents & Trademarks
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Sir:

In response to the Office Action mailed July 8, 2009, please consider the following amendments and remarks in the above captioned patent application.

**Amendments to the Specification** begin on Page 2 of this paper.

**Amendments to the Claims** are reflected in the listing of Claims which begins on page 4 of this paper, followed by Applicants' remarks.

## Amendments to the Specification

Please replace Paragraph 0009 with the following:

[0009] An embodiment of the present invention is directed to a system for distributing an application environment to a compute node (e.g., a server or a thin-client workstation). The system includes a first storage unit for storing blocks of a root image (e.g., an operating system) of the compute node and a second storage unit for storing a leaf image comprising new data blocks and changes to the blocks of the root image. The system further includes a union block device for interfacing between the compute node and the first and second storage units to distribute the application environment to the compute node. The union block device creates the application environment by merging the blocks of the root image stored on the first storage unit with the leaf image stored on the second storage unit.

Please add the following paragraph between Paragraphs 0009 and 0010:

Another embodiment of the present invention is directed to a method for distributing an application environment to a compute node. The method includes storing blocks of a root image of the compute node on a first storage unit and storing a leaf image comprising new data blocks and changes to the blocks of the root image on a second storage unit. The method further includes merging the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit to create the application environment. The application environment is created by merging

the blocks of the root image stored on the first storage unit with the blocks fo the leaf image stored on the second storage unit. Lastly, the application environment is delivered to the computer node.

**Amendments to the Claims**

1. (Currently amended) A system for distributing an application environment ~~to a compute node~~ comprising:

a compute node comprising a computer system;

a first storage unit for storing blocks of a root image of the compute node, wherein the first storage unit comprises a first non-volatile memory, wherein the root image comprises a computer program, wherein the blocks comprise sections of data, and wherein a file of the root image comprises at least one block;

a second storage unit for storing a leaf image, the leaf image comprising new data blocks and changes to the blocks of the root image, wherein the second storage unit comprises a second non-volatile memory; and

a union block device for interfacing between the compute node and the first and second storage units to distribute the application environment to the compute node, wherein the union block device comprises a driver, wherein the union block device creates the application environment by merging the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit.

2. (Original) The system as recited in Claim 1 wherein the compute node comprises a server.

3. (Original) The system as recited in Claim 1 wherein the compute node comprises a thin-client workstation.

4. (Original) The system as recited in Claim 1 wherein the root image comprises an operating system.

5. (Original) The system as recited in Claim 1 wherein the root image is concurrently accessible to a plurality of compute nodes.

.

6. (Original) The system as recited in Claim 1 wherein the first storage unit is remotely located from the compute node.

7. (Original) The system as recited in Claim 1 wherein the second storage unit is remotely located from the compute node.

8. (Original) The system as recited in Claim 1 wherein the second storage unit contains a block modification log for the compute node.

9. (Original) The system as recited in Claim 1 wherein the first storage unit in contained within a first partition on a hard disk and the second storage unit is contained within a second partition on the hard disk.

10. (Original) The system as recited in Claim 1 wherein the union block device comprises a low-level driver for interfacing between the first and second storage units and the file system of the compute node.

11. (Original) The system as recited in Claim 1 wherein the union block device, upon receiving a write request from the compute node for a sector X, creates an appropriate persistent mapping for sector X.

12. (Original) The system as recited in Claim 11 wherein the union block device writes sector X on the second storage unit.

13. (Original) The system as recited in Claim 1 wherein the system operates in a high performance computing cluster.

14. (Original) The system as recited in Claim 1 wherein the system operates in a grid computing cluster.

15. (Original) The system as recited in Claim 1 wherein the first storage unit is read only.

16. (Original) The system as recited in Claim 1 further comprising an intermediate image between the root image and the leaf image, wherein the intermediate image comprises an application environment service group.

17. (Currently amended) A method for distributing an application environment ~~to a compute node~~ comprising:

storing blocks of a root image of <u>a</u>[[the]] compute node on a first storage unit<u>, wherein the compute node comprises a computer system, and wherein the first storage unit comprises a first non-volatile memory, wherein the root image comprises a computer program, wherein the blocks comprise sections of data, and wherein a file of the root image comprises at least one block</u>;

storing a leaf image comprising new data blocks and changes to the blocks of the root image on a second storage unit<u>, wherein the second storage unit comprises a second non-volatile memory</u>;

merging the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit to create the application environment; and

delivering the application environment to the compute node.

18. (Original) The method as recited in Claim 17 further comprising:

modifying the leaf image in response to the compute node's access to the application environment.

19. (Original) The method as recited in Claim 18 wherein the modifying comprises:

upon receiving a write request from the compute node for a sector X, creating an appropriate persistent mapping for sector X; and

writing sector X on the second storage unit.

20. (Original) The method as recited in Claim 17 further comprising:

reconciling the root image and the leaf image to form a new root image.

21. (Original) The method as recited in Claim 17 wherein the compute node comprises a server.

22. (Original) The method as recited in Claim 17 wherein the compute node comprises a thin-client workstation.

23. (Original) The method as recited in Claim 17 wherein the root image comprises an operating system.

24. (Original) The method as recited in Claim 17 wherein the root image is concurrently accessible to a plurality of compute nodes.

.

25. (Original) The method as recited in Claim 17 wherein the first storage unit is remotely located from the compute node.

26. (Original) The method as recited in Claim 17 wherein the second storage unit is remotely located from the compute node.

27. (Original) The method as recited in Claim 17 wherein the second storage unit contains a block modification log for the compute node.

28. (Original) The method as recited in Claim 17 wherein the first storage unit is contained within a first partition on a hard disk and the second storage unit is contained within a second partition on the hard disk.

29. (Original) The method as recited in Claim 17 wherein merging occurs at an operational level between the first and second storage units and file system of the compute node.

30. (Original) The method as recited in Claim 17 wherein the method operates in a high performance computing cluster.

31. (Original) The method as recited in Claim 17 wherein the system operates in a grid computing cluster.

32. (Original) The method as recited in Claim 17 wherein the first storage unit is read only.

33. (Original) The method as recited in Claim 17 further comprising:

creating an intermediate image on a third storage unit between the root image and the leaf image, wherein the intermediate image comprises an application environment service group.

## REMARKS

Claims 1-33 are pending. Claims 1 and 17 are amended. No new matter has been added as a result of these amendments.

## Specification Objections

The Summary of the invention is objected to because it is allegedly identical and verbatim to the abstract. Applicants have therefore amended paragraph 0009 and added a new paragraph between paragraph 0009 and 0010 that describes another embodiment of the invention. Further, Applicants respectfully point out that paragraph 0010 provides additional information related to the advantages of the invention over the prior art by explaining the nature of the invention (e.g., rather than copying the contents of the root image to create a new boot image, a new UBD is registered, which occurs very quickly).

## Claim Rejections – 35 U.S.C. §101

Claims 1-33 are rejected under 35 U.S.C. 101 for allegedly disclosing a claimed invention that is an abstract idea. The rejection contends that Claims 1-33 are non-statutory because they do not disclose how a system will be able to process and carry out its intended results incorporating a processor, memory and medium. The rejection therefore, contends that Claims 1-33 recite "storage unit," "node," and "union block device" without showing how and where they are performed. Applicants have amended Claims 1 and 17 to further define the claim terms and their functionality.

Claim Rejections – 35 U.S.C. §112

Claims 1-16 are rejected under 35 U.S.C 112, second paragraph, for allegedly providing insufficient antecedent basis for the limitation "union block device." The rejection alleges this term is unclear and vague. Applicants have amended Claim 1 to further define the union block device as a "low level driver." Support for this amendment is found in Paragraph 0020 of Applicants' Specification. Paragraph 0020 also further describes the union block device and a sample embodiment (i.e., low level driver). As described in Applicants' Specification, and as known in the art, low-level drivers may be used in data acquisition, such as with the individual blocks making up files (data) within the root images and leaf images, as claimed in Claim 1.

Claim Rejections – 35 U.S.C. §103

Claims 1-33 are rejected under 35 U.S.C. 103(a) as being allegedly unpatentable over Paven (US 6,502,238), hereinafter "Paven," in view of Davidson (US 7,475,274), hereinafter "Davidson." Applicants respectfully assert that Claims 1-33 are patentable over the combination of Paven and Davidson in view of the following.

Applicants respectfully point out that the Examiner has the burden of establishing a prima case of obviousness. To establish a prima facie case of obviousness, three basic criteria must be met. First, there must be some suggestion or motivation, either in the references themselves or in the knowledge generally available to one of ordinary skill in the art, to modify the reference or to combine reference teachings. Second, there must be a reasonable expectation of success. Finally, the prior art reference (or references when

combined) must teach or suggest all the claim features. The teaching or suggestion to make the claimed combination and the reasonable expectation of success must both be found in the prior art, and not based on Applicant's disclosure. In re Vaeck, 947 F.2d 488, 20 USPQ2d 1438 (Fed. Cir. 1991). See MPEP 2100-126. Specifically, "all words in a claim must be considered when judging the patentability of that claim against the prior art." *In re Wilson*, 424 F.2d., 1382 (CCPA 1970).

Moreover, in response to the recent U.S. Supreme Court decision in *KSR Int'l Co. v. Teleflex, Inc*. (U.S. 2007), new guidelines were set forth for examining obviousness under 35 U.S.C. 103. The U.S. Supreme Court reaffirmed the *Graham* factors and, while not totally rejecting the "teachings, suggestion, or motivation" test, the Court appears to now require higher scrutiny on the part of the U.S. Patent & Trademark Office. In accordance with the recently submitted guidelines, it is "now necessary to identify the reason" why a person of ordinary skill in the art would have combined the elements of cited references, or at least describe the pertinence of the elements set forth in the cited disclosure, in the manner presently claimed.

Applicants contend that the combination of Paven and Davidson fail to teach or suggest all the claimed elements of Claims 1-33 in view of the following rationale.

Claim 1:

Amended Claim 1 recites in part:

> a compute node comprising a computer system;
>
> a first storage unit for storing blocks of a root image of the compute node, wherein the first storage unit comprises a first non-volatile memory;
>
> a second storage unit for storing a leaf image, the leaf image comprising new data blocks and changes to the blocks of the root image, wherein the second storage unit comprises a second non-volatile memory, wherein the root image comprises a computer program, and wherein the blocks comprise sections of data; and
>
> a union block device for interfacing between the compute node and the first and second storage units to distribute the application environment to the compute node, wherein the union block device comprises a driver, wherein the union block device creates the application environment by merging the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit (emphasis added).

Applicants respectfully assert that Pavan does not teach or suggest "a first storage unit for storing blocks of a root image…; a second storage unit for storing a leaf image… comprising new data blocks and changes to the blocks of the root image…; and a union block device for interfacing between the compute node and the first and second storage units to distribute the application environment to the compute node, …wherein the union block device creates the application environment by merging the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit," as claimed in Claim 1.

As understood by Applicants, Pavan is directed towards a distributed block-based programming model for control applications, wherein a user program specifies interconnections between a plurality of program blocks distributed across a plurality of

processing nodes (Abstract). Pavan discloses using multimedia information with Multiple-Input Multiple-Output (MIMO) control systems (Column 1, line 56 to Column 2, line 10). Paven discloses a method wherein a user program is received. This user program specifies interconnections between a plurality of program blocks distributed across a plurality of processing nodes, wherein the user program is translated into a system-level program having a program fragment for each of the processing nodes, wherein each program fragment comprises the program blocks located on the processing node and one or more system-level blocks for establishing connections between the processing node and a different processing node across a network (Column 2, lines 19-27; and Figure 4).

Applicants respectfully assert that to the extent Pavan discloses program blocks, root nodes, and the creation of program fragments with program blocks and children, Pavan does not teach or suggest a first storage unit for storing blocks of a root image, a second storage unit for storing a leaf image, nor a union block device which creates an application environment by merging the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit, as claimed in Claim 1.

Applicants respectfully assert that the blocks of a root image, as claimed in amended Claim 1 are not the program blocks as taught by Pavan. Applicants have amended Claim 1 to clarify that the blocks of a root image comprise sections of data, wherein a file of the root image comprises at least one block, as claimed in Claim 1.

Support for Applicants' amendment is found in Applicants' Specification, Paragraphs 0018-0020. As claimed in Amended Claim 1, these blocks make up a root image which comprises a computer program. Support for this amendment may be found in Paragraph 0017. This is completely different from the program blocks as taught by Pavan. As understood by Applicants, Pavan teaches that a program block is part of a block-based programming model, wherein a block is a high level program abstraction (Column 3, line 64 to Column 4, line 2). Further, these program blocks may be functions, objects implemented in an object-oriented programming language, or sensors, cameras and functions performed by physical devices (Column 3, line 64 to Column 4, line 18). The functional blocks of Pavan are not blocks comprising sections of data, as claimed in Claim 1.

Applicants respectfully assert that Pavan does not teach or suggest a root image or a leaf image, as claimed in Claim 1. A root image, as claimed in Claim 1, is not a root node, as taught by Pavan. The root block, node, or fragment, as taught by Pavan, controls the system operations and executes on the control node and controls the execution of the system-level program for a MIMO control system (Column 9, lines 64-67), as compared to a root image comprising a computer program, as claimed in amended Claim 1. Support for this amendment may be found in Applicants' Specification, Paragraph 0018.

Further, Applicants respectfully assert that a second storage unit for storing a leaf image, as claimed in Claim 1, is not the same thing as the process Pavan describes for the "Grow-Fragment" block 508. Pavan teaches methods for making program fragments for

each of the processing nodes that take into account all the components or program blocks that make up each processing node as well as all interconnecting lines between the processing nodes. Pavan describes a "child" as a program block that is connected to the current block that is being processing by the "Grow-Fragment" block. Where Pavan teaches a method for implementing a programming method for interconnecting program blocks or functions that may reside on several compute nodes, Applicants claim a second storage unit for storing a leaf image, the leaf image comprising new data blocks and changes to the blocks of the root image, as claimed in Claim 1. Applicants respectfully assert that Davidson does not remedy these deficiencies.

Lastly, the rejection appears to agree that Pavan does not teach or suggest "a union block device for interfacing between the compute node and the first and second storage units to distribute the application environment to the compute node, …wherein the union block device creates the application environment by merging the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit," as claimed in Claim 1. Applicants respectfully assert that Davidson does not remedy the this deficiency.

The rejection contends that Davidson describes a union block device. Applicants respectfully assert that the rejection is reading the management node 105 of Davidson, which manages or assists an administrator of an HPC system, on Applicants' claimed union block device that creates an application environment by merging the blocks of the

root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit, as claimed in Claim 1. Applicants respectfully disagree.

As understood by Applicants, Davidson discloses a method and apparatus for fault tolerance and recovery of high-performance computing (HPC) systems. Davidson teaches a method for monitoring currently running nodes in the HPC system, and when a fault occurs, shutting down the defaulting node and booting the host at a free node in the HPC system. Davidson further discloses the management node 105, referred to by the rejection, comprising at least one blade substantially dedicated to managing or assisting an administrator. Davidson further discusses the methods of linking the blades comprising the management node 105 with the rest of the HPC nodes through wires, buses, LANs, MANs, WANS, an Internet connection, or a combination of two or more such links. However, Applicants do not find any teaching by Davidson wherein the management node provides an application environment to a compute node by merging the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit, as claimed in Claim 1

Applicants respectfully assert that the combination of Pavan and Davidson does not teach or suggest a first storage unit for storing blocks of a root image of the compute node; and a second storage unit for storing a leaf image, the leaf image comprising new data blocks and changes to the blocks of the root image, nor a union block device for interfacing between the compute node and the first and second storage units to distribute the application environment to a compute node, wherein the union block device creates

the application environment by merging the blocks of the root image stored on the first stored unit with the blocks of the leaf image stored on the second storage unit, as claimed in Claim 1.

Therefore, Applicants respectfully assert that embodiments as recited by Claim 1 are not rendered obvious by the combination of Pavan and Davidson. Accordingly, Applicants respectfully assert that dependent Claims 2-16 are patentable by virtue of their dependency on an allowable base claim, as well as for their additional recited patentable features.

Claim 17:

Independent Claim 17 recites features similar to that of independent Claim 1 and is therefore patentable for at least the same or similar reasons as recited above. Accordingly, Applicants respectfully assert that dependent Claims 18-33 are patentable by virtue of their dependency on an allowable base claim, as well as for their additional recited patentable features.

For the above reasons, Applicants request reconsideration and withdrawal of the rejections under 35 U.S.C. §103.

CONCLUSION

In light of the above listed remarks, reconsideration of rejected Claims is requested. Based on the arguments presented above, it is respectfully submitted that Claims 1-33 overcome the rejections of record and, therefore, allowance of Claims 1-33 is earnestly solicited.

Please charge any additional fees that may be required to maintain pendency of the present application, or apply any credits to our PTO deposit account number: 50-4160.

Respectfully submitted,

MURABITO, HAO & BARNES LLP

Dated: October 8, 2009

/James P. Hao/
James P. Hao
Registration No. 36,398

MURABITO, HAO & BARNES LLP
Two North Market Street
Third Floor
San Jose, California 95113

(408) 938-9060 Voice
(408) 938-9069 Facsimile

I hereby certify that this correspondence is being electronically transmitted to the USPTO via EFS on the date shown below:
**October 8, 2009**
/Shannon Warren/
Shannon Warren

# EXHIBIT A-5

| *Notice of Allowability* | Application No. 11/709,477 | Applicant(s) KULKARNI ET AL. | |
| --- | --- | --- | --- |
| | Examiner EDWARD MARTELLO | Art Unit 2628 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to *the amendment received 11 July 2012*.
2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
3. ☒ The allowed claim(s) is/are *1-27*.
4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   a) ☐ All b) ☐ Some* c) ☐ None of the:
   1. ☐ Certified copies of the priority documents have been received.
   2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
   3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

   * Certified copies not received: _____.

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
**THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ A SUBSTITUTE OATH OR DECLARATION must be submitted. Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL PATENT APPLICATION (PTO-152) which gives reason(s) why the oath or declaration is deficient.
6. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.
   (a) ☐ including changes required by the Notice of Draftsperson's Patent Drawing Review ( PTO-948) attached
   1) ☐ hereto or 2) ☐ to Paper No./Mail Date _____.
   (b) ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____.

   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**
7. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☐ Notice of References Cited (PTO-892)
2. ☐ Notice of Draftperson's Patent Drawing Review (PTO-948)
3. ☒ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date 07/17/2012
4. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material
5. ☐ Notice of Informal Patent Application
6. ☐ Interview Summary (PTO-413), Paper No./Mail Date _____.
7. ☐ Examiner's Amendment/Comment
8. ☒ Examiner's Statement of Reasons for Allowance
9. ☐ Other _____.

/Edward Martello/
Primary Examiner, Art Unit 2628

## DETAILED ACTION

### *Response to Amendment*

1. This Office Action is responsive to the Applicant initiated interview conducted on 10 July 2012 and the amendment received 11 July 2012.

2. Claims 1, 2, 4, 7, 10, 12, 14, 16, 21 and 23-27 are amended, claims 5, 8, 9, 11, 13, 15, 17-20 and 22 are as previously presented and claims 3 and 6 are as originally presented.

3. In summary, claims 1-27 are pending in the application.

4. The Applicants' remarks and arguments with respect to the 35 U.S.C. § 112 rejection of claims 4, 5, 14, 16 and 17 are persuasive, thus, the 35 U.S.C. § 112 rejection of claims 4, 5, 14, 16 and 17 is hereby withdrawn.

### *Reasons for Allowance*

5. The following is the Examiner's statement for reasons for allowance: In response to the Applicant initiated interview conducted on 10 July 2012 and the amendment received 11 July 2012, the Examiner has determined that the amended claims have overcome all the art of record and that art deemed available in an updated search as shown in the record, thus claims 1-27 are in condition for allowance and all remaining rejections of the claims are hereby withdrawn.

6. With regard to claim 7, claiming a method for providing data to a plurality of compute nodes, comprising: storing blocks of a root image of said compute nodes on a first storage unit;

storing leaf images for respective compute nodes on respective second storage units, said leaf images including only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes; and caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory are a unique combination of features and are non-obvious over the art of record.

7. With regard to claim 19, claiming a method for indexing file systems for a plurality of compute nodes, comprising: storing blocks of a root image of Said compute nodes on a first storage unit; storing leaf images for respective compute nodes on respective second storage units, said leaf images comprising only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image, wherein said leaf images for respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes; merging the blocks of said root image with the blocks of respective leaf images stored on respective second storage units to create respective file systems for respective, compute nodes; receiving indexing results pertaining to said root image from one of said compute nodes; and providing said indexing results to the others of said compute nodes are a unique combination of features and are non-obvious over the art of record.

8. Claims 1 and 23, claiming a system and a computer readable storage medium, respectively, incorporate the methods of claim 7, thus, they are of the same features and scope as

claim 7 and contain a unique combination of features which are non-obvious over the art of record.

9. Claim 14, claiming a system incorporating the methods of claim 19, is also a unique combination of features and is non-obvious over the art of record.

10. Any comments considered necessary by applicant must be submitted no later than the payment of the issue fee and, to avoid processing delays, should preferably accompany the issue fee. Such submissions should be clearly labeled "Comments on Statement of Reasons for Allowance."

***Conclusion***

11. Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/Edward Martello/

Primary Examiner, Art Unit 2628

Doc code: IDS
Receipt date: 07/17/2012
Doc description: Information Disclosure Statement (IDS) Filed
PTO/SB/08a (01-10)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | 11709477 |
| | Filing Date | 2007-02-21 |
| | First Named Inventor | Kulkarni |
| | Art Unit | 2628 |
| | Examiner Name | Edward Martello |
| | Attorney Docket Number | 139537 |

| U.S.PATENTS | | | | | | Remove |
|---|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| | 1 | 5113523 | A | 1992-05-12 | Colley | |
| | 2 | 5127104 | A | 1992-06-30 | Dennis | |
| | 3 | 5764902 | A | 1998-06-09 | Rothrock | |
| | 4 | 5974547 | A | 1999-10-26 | Klimenko | |
| | 5 | 5999734 | A | 1999-12-07 | Willis | |
| | 6 | 6018747 | A | 2000-01-25 | Burns | |
| | 7 | 6195680 | B1 | 2001-02-27 | Goldszmidt | |
| | 8 | 6292941 | B1 | 2001-09-18 | Jollands | |


ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.M./

Receipt date: 07/17/2012

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | 11709477 |
| Filing Date | | 2007-02-21 |
| First Named Inventor | Kulkarni | |
| Art Unit | | 2628 |
| Examiner Name | Edward Martello | |
| Attorney Docket Number | | 139537 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 9 | 6442605 | B1 | 2002-08-27 | Rodriguez | |
| | 10 | 6597956 | B1 | 2003-07-22 | Aziz | |
| | 11 | 6606744 | B1 | 2003-08-12 | Mikurak | |
| | 12 | 6745192 | B1 | 2004-06-01 | Libenzi | |
| | 13 | 6779177 | B1 | 2004-08-17 | Bahrs | |
| | 14 | 6871219 | B2 | 2005-03-22 | Noordergraaf | |
| | 15 | 6938057 | B2 | 2005-08-30 | Gusler | |
| | 16 | 6986005 | B2 | 2006-01-10 | Vo | |
| | 17 | 6990513 | B2 | 2006-01-24 | Belfiore | |
| | 18 | 6990573 | B2 | 2006-01-24 | Cherian | |
| | 19 | 7127712 | B1 | 2006-10-24 | Noble | |

EFS Web 2.1.17 ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.M./

Receipt date: 07/17/2012

**INFORMATION DISCLOSURE STATEMENT BY APPLICANT**
( Not for submission under 37 CFR 1.99)

| | |
|---|---|
| Application Number | 11709477 |
| Filing Date | 2007-02-21 |
| First Named Inventor | Kulkarni |
| Art Unit | 2628 |
| Examiner Name | Edward Martello |
| Attorney Docket Number | 139537 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 20 | 7150015 | B2 | 2006-12-12 | Pace | |
| | 21 | 7155714 | B2 | 2006-12-26 | Makris | |
| | 22 | 7200715 | B2 | 2007-04-03 | Kleiman | |
| | 23 | 7246221 | B1 | 2007-07-17 | Soltis | |
| | 24 | 7246351 | B2 | 2007-07-17 | Bloch | |
| | 25 | 7263551 | B2 | 2007-08-28 | Belfiore | |
| | 26 | 7290258 | B2 | 2007-10-30 | Steeb | |
| | 27 | 7331047 | B2 | 2008-02-12 | Chu | |
| | 28 | 7334157 | B1 | 2008-02-19 | Graf | |
| | 29 | 7430610 | B2 | 2008-09-30 | Pace | |
| | 30 | 7454462 | B2 | 2008-11-18 | Belfiore | |

 ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.M./

Receipt date: 07/17/2012

## INFORMATION DISCLOSURE STATEMENT BY APPLICANT
( Not for submission under 37 CFR 1.99)

| | |
|---|---|
| Application Number | 11709477 |
| Filing Date | 2007-02-21 |
| First Named Inventor | Kulkarni |
| Art Unit | 2628 |
| Examiner Name | Edward Martello |
| Attorney Docket Number | 139537 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 31 | 7467293 | B2 | 2008-12-16 | Zhang | |
| | 32 | 7496739 | B1 | 2009-02-24 | Raghavan | |
| | 33 | 7499988 | B2 | 2009-03-03 | Keohane | |
| | 34 | 7536686 | B2 | 2009-05-19 | Tan | |
| | 35 | 7549055 | B2 | 2009-06-16 | Zimmer | |
| | 36 | 7590653 | B2 | 2009-09-15 | Sparks | |
| | 37 | 7668938 | B1 | 2010-02-23 | Phillips | |
| | 38 | 7685148 | B2 | 2010-03-23 | Engquist | |

If you wish to add additional U.S. Patent citation information please click the Add button. Add

### U.S.PATENT APPLICATION PUBLICATIONS

Remove

| Examiner Initial* | Cite No | Publication Number | Kind Code1 | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 20020016891 | A1 | 2002-02-07 | Noel | |

EFS Web 2.1.17

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.M./

Receipt date: 07/17/2012

**INFORMATION DISCLOSURE STATEMENT BY APPLICANT**
**( Not for submission under 37 CFR 1.99)**

| | |
|---|---|
| Application Number | 11709477 |
| Filing Date | 2007-02-21 |
| First Named Inventor | Kulkarni |
| Art Unit | 2628 |
| Examiner Name | Edward Martello |
| Attorney Docket Number | 139537 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 2 | 20020087813 | A1 | 2002-07-04 | Harris | |
| | 3 | 20020087846 | A1 | 2002-07-04 | Nickolls | |
| | 4 | 20030046511 | A1 | 2003-03-06 | Buch | |
| | 5 | 20030130832 | A1 | 2003-07-10 | Schulter | |
| | 6 | 20030233648 | A1 | 2003-12-18 | Earl | |
| | 7 | 20040015899 | A1 | 2004-01-22 | May | |
| | 8 | 20040078779 | A1 | 2004-04-22 | Dutt | |
| | 9 | 20040088473 | A1 | 2004-05-06 | Ogle | |
| | 10 | 20040199919 | A1 | 2004-10-07 | Tovinkere | |
| | 11 | 20050128319 | A1 | 2005-06-16 | Morino | |
| | 12 | 20060173993 | A1 | 2006-08-03 | Henseler | |



ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.M./

Receipt date: 07/17/2012

**INFORMATION DISCLOSURE STATEMENT BY APPLICANT**
**( Not for submission under 37 CFR 1.99)**

| | |
|---|---|
| Application Number | 11709477 |
| Filing Date | 2007-02-21 |
| First Named Inventor | Kulkarni |
| Art Unit | 2628 |
| Examiner Name | Edward Martello |
| Attorney Docket Number | 139537 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 13 | 20080229040 | A1 | 2008-09-18 | Honma | |

If you wish to add additional U.S. Published Application citation information please click the Add button. Add

**FOREIGN PATENT DOCUMENTS** Remove

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | | | | | | | ☐ |

If you wish to add additional Foreign Patent Document citation information please click the Add button Add

**NON-PATENT LITERATURE DOCUMENTS** Remove

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |
|---|---|---|---|
| | 1 | CALZAROSSA, M., and M. KUBÁT, "Processor Allocation in Parallel Systems," Proceedings of the IEEE International Conference on Computer Systems and Software Engineering (COMPEURO '91), Bologna, Italy, May 13–16, 1991, pp. 133–137. | ☐ |
| | 2 | CHEN, D., et al., "Exploiting High-Level Coherence Information to Optimize Distributed Shared State," Proceedings of the 9th ACM Symposium on Principles and Practice of Parallel Programming, San Diego, June 11–13, 2003, pp. 131–142. | ☐ |
| | 3 | COHEN, A., and M. WOODRING, "Win32 Multithreaded Programming," O'Reilly Online Catalog, Chapter 1, <http://www.oreilly.com/catalog/multithread/excerpt/ch01.html> [retrieved November 21, 2006], pp. 1–8. | ☐ |
| | 4 | COUTURIER, R., et al., "A Compiler for Parallel Unity Programs Using OpenMp," Proceedings of the International Conference on Parallel and Distributed Processing Techniques and Applications, Las Vegas, Nevada, June 28–July 1, 1999, pp. 1992–1998. | ☐ |
| | 5 | ISMAIL, I.M., and J.A. DAVIS, "Program-Based Static Allocation Policies for Highly Parallel Computers," Proceedings of the 1995 IEEE Fourteenth Annual International Phoenix Conference on Computers and Communications, Scottsdale, Arizona, March 28–31, 1995, pp. 61–68. | ☐ |


ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.M./

Receipt date: 07/17/2012

**INFORMATION DISCLOSURE STATEMENT BY APPLICANT**
( Not for submission under 37 CFR 1.99)

| | |
|---|---|
| Application Number | 11709477 |
| Filing Date | 2007-02-21 |
| First Named Inventor | Kulkarni |
| Art Unit | 2628 |
| Examiner Name | Edward Martello |
| Attorney Docket Number | 139537 |

| | | | |
|---|---|---|---|
| | 6 | KANDEMIR, M., et al., "Minimizing Data and Synchronization Costs in One-Way Communication," IEEE Transactions on Parallel and Distributed Systems 11(12):1232–1251, December 2000. | ☐ |
| | 7 | LI, K.-C., et al., "Design Issue of a Novel Toolkit for Parallel Application Performance Monitoring and Analysis in Cluster and Grid Environments," Proceedings of the 8th International Symposium on Parallel Architectures, Algorithms and Networks (ISPAN'05), Las Vegas, Nev., December 7–9, 2005, 6 pages. | ☐ |
| | 8 | NGUYEN, T.M., et al., "Branching Store File System," U.S. Patent Application No. 11/026,622, filed December 30, 2004. | ☐ |
| | 9 | OHTA, K., et al., "Improving Parallel Write by Node Level Request Scheduling," Proceedings of the 9th IEEE/ACM International Symposium on Cluster Computing and the Grid, Shanghai, May 18–21, 2009, pp. 196–203. | ☐ |
| | 10 | OpenMP Fortran Application Program Interface (Version 2.0), November 2000, <http://www.openmp.org/drupal/mp-documents/fspec20.pdf>, pp. 1–3 and 34–36. | ☐ |
| | 11 | OpenMP Fortran Application Program Interface (Version 2.0), November 2000, <http://www.openmp.org/drupal/mp-documents/fspec20.pdf>, pp. 1–3, 18–19, 25–27, 34–37, and 67. | ☐ |
| | 12 | "Sequent's NUMA-Q SMP™ Architecture," Sequent Computer Systems, Inc., 1997, <http://parallel.ru/ftp/computers/sequent/NUMA_SMP_REV.pdf>, pp. 1–18. | ☐ |
| | 13 | SIVATHANU, G., et al., "Ensuring Data Integrity in Storage: Techniques and Applications," Proceedings of the 2005 ACM Workshop on Storage Security and Survivability (StorageSS '05), Alexandria, Va., November 7–10, 2005, pp. 26–36. | ☐ |
| | 14 | ZHU, T., et al., "Scheduling Divisible Loads in the Dynamic Heterogeneous Grid Environment," Proceedings of the First International Conference on Scalable Information Systems, Hong Kong, May 29–June 1, 2006, 10 pages. | ☐ |

If you wish to add additional non-patent literature document citation information please click the Add button Add

**EXAMINER SIGNATURE**

| | | | |
|---|---|---|---|
| Examiner Signature | /Edward Martello/ | Date Considered | 07/18/2012 |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.M./

EFS Web 2.1.17

| Receipt date: 07/17/2012<br>**INFORMATION DISCLOSURE STATEMENT BY APPLICANT**<br>( **Not for submission under 37 CFR 1.99)** | Application Number | 11709477 |
|---|---|---|
| | Filing Date | 2007-02-21 |
| | First Named Inventor | Kulkarni |
| | Art Unit | 2628 |
| | Examiner Name | Edward Martello |
| | Attorney Docket Number | 139537 |

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.M./

Receipt date: 07/17/2012

| | | |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99**) | Application Number | 11709477 |
| | Filing Date | 2007-02-21 |
| | First Named Inventor | Kulkarni |
| | Art Unit | 2628 |
| | Examiner Name | Edward Martello |
| | Attorney Docket Number | 139537 |

**CERTIFICATION STATEMENT**

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

☐ That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

☐ See attached certification statement.

☒ The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☐ A certification statement is not submitted herewith.

**SIGNATURE**

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| | | | |
|---|---|---|---|
| Signature | /David P. Sheldon/ | Date (YYYY-MM-DD) | 2012-07-17 |
| Name/Print | David P. Sheldon | Registration Number | 62,494 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**



ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.M./

Receipt date: 07/17/2012

# Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /E.M./

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# BIB DATA SHEET

**CONFIRMATION NO. 4127**

| SERIAL NUMBER | FILING or 371(c) DATE | CLASS | GROUP ART UNIT | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 11/709,477 | 02/21/2007<br>RULE | 345 | 2628 | 139537 |

**APPLICANTS**

Pradip Kulkarni, Pune, INDIA;
Mukul Kumar, Pune, INDIA;
Adhir Potdar, Pune, INDIA;
Richard Au, Woodside, CA;
Tung Nguyen, Cupertino, CA;

** **CONTINUING DATA** *************************

This application is a CIP of 11/395,816 03/30/2006 PAT 7,721,282
which is a CIP of 11/026,622 12/30/2004 ABN

** **FOREIGN APPLICATIONS** *************************

** **IF REQUIRED, FOREIGN FILING LICENSE GRANTED** **
04/02/2007

| | | STATE OR COUNTRY | SHEETS DRAWINGS | TOTAL CLAIMS | INDEPENDENT CLAIMS |
|---|---|---|---|---|---|
| Foreign Priority claimed ☐ Yes ☑ No<br>35 USC 119(a-d) conditions met ☐ Yes ☐ No<br>Verified and Acknowledged /EDWARD MARTELLO/ Examiner's Signature | ☐ Met after Allowance<br>Initials | INDIA | 6 | 27 | 5 |

**ADDRESS**

CHRISTENSEN O'CONNOR JOHNSON KINDNESS PLLC
1420 FIFTH AVENUE
SUITE 2800
SEATTLE, WA 98101-2347
UNITED STATES

**TITLE**

Root image caching and indexing for block-level distributed application management

| FILING FEE RECEIVED | FEES: Authority has been given in Paper | |
|---|---|---|
| 1750 | No.____________ to charge/credit DEPOSIT ACCOUNT<br>No.____________ for following: | ☐ All Fees<br>☐ 1.16 Fees (Filing)<br>☐ 1.17 Fees (Processing Ext. of time)<br>☐ 1.18 Fees (Issue)<br>☐ Other __________<br>☐ Credit |

BIB (Rev. 05/07).

| *Issue Classification* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 11709477 | KULKARNI ET AL. |
| | **Examiner** | **Art Unit** |
| | EDWARD MARTELLO | 2628 |

| ORIGINAL | | INTERNATIONAL CLASSIFICATION | |
|---|---|---|---|
| CLASS | SUBCLASS | CLAIMED | NON-CLAIMED |
| 717 | 176 | G 0 6 F 9 / 445 (2006.01.01) | |

**CROSS REFERENCE(S)**

| CLASS | SUBCLASS (ONE SUBCLASS PER BLOCK) | | | | |
|---|---|---|---|---|---|
| | | | | | |

☒ Claims renumbered in the same order as presented by applicant ☐ CPA ☐ T.D. ☐ R.1.47

| Final | Original | Final | Original | Final | Original | Final | Original | Final | Original | Final | Original | Final | Original | Final | Original |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | | 17 | | | | | | | | | | | | |
| | 2 | | 18 | | | | | | | | | | | | |
| | 3 | | 19 | | | | | | | | | | | | |
| | 4 | | 20 | | | | | | | | | | | | |
| | 5 | | 21 | | | | | | | | | | | | |
| | 6 | | 22 | | | | | | | | | | | | |
| | 7 | | 23 | | | | | | | | | | | | |
| | 8 | | 24 | | | | | | | | | | | | |
| | 9 | | 25 | | | | | | | | | | | | |
| | 10 | | 26 | | | | | | | | | | | | |
| | 11 | | 27 | | | | | | | | | | | | |
| | 12 | | | | | | | | | | | | | | |
| | 13 | | | | | | | | | | | | | | |
| | 14 | | | | | | | | | | | | | | |
| | 15 | | | | | | | | | | | | | | |
| | 16 | | | | | | | | | | | | | | |

| | | | |
|---|---|---|---|
| NONE<br>(Assistant Examiner) | (Date) | **Total Claims Allowed:**<br>27 | |
| /EDWARD MARTELLO/<br>Primary Examiner.Art Unit 2628<br>(Primary Examiner) | 07/26/2012<br>(Date) | O.G. Print Claim(s)<br>7 & 19 | O.G. Print Figure<br>3A |

U.S. Patent and Trademark Office Part of Paper No. 20120726

EAST Search History

EAST Search History (Prior Art)

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| S3 | 1 | root WITH image SAME caching | US-PGPUB; USPAT; USOCR; EPO; JPO | ADJ | ON | 2009/12/16 08:50 |
| S4 | 60 | root WITH image SAME cach$3 | US-PGPUB; USPAT; USOCR; EPO; JPO | ADJ | ON | 2009/12/16 08:52 |
| S5 | 12 | ("5113523" \| "5127104" \| "5999734" \| "6018747" \| "6502238" \| "7200715" \| "7246351" \| "7263551" \| "7331047" \| "7467293" \| "7475274" \| "7496739").PN. | US-PGPUB; USPAT; USOCR; EPO; JPO | ADJ | ON | 2009/12/16 08:55 |
| S6 | 3 | ("6421777" \| "6751658" \| "20030126242").PN. | US-PGPUB; USPAT; USOCR; EPO; JPO | ADJ | ON | 2009/12/23 12:30 |
| S7 | 21 | ((base or kernel) WITH code) WITH image SAME cach$3 | US-PGPUB; USPAT; USOCR; EPO; JPO | ADJ | ON | 2009/12/23 15:43 |
| S8 | 2 | ("6502238" \| "7475274").PN. | US-PGPUB; USPAT; USOCR; EPO; JPO | ADJ | ON | 2009/12/23 16:11 |
| S9 | 10 | (US-20030126242-$ or US-20060179308-$ or US-20070061787-$ or US-20070198772-$).did. or (US-6751658-$ or US-6421777-$ or US-6101576-$ or US-6651245-$ or US-7475274-$ or US-6502238-$).did. | US-PGPUB; USPAT | ADJ | ON | 2009/12/23 16:39 |
| S10 | 8 | S9 AND cache | US-PGPUB; USPAT; USOCR; EPO; JPO | ADJ | ON | 2009/12/23 16:39 |
| S11 | 317 | 345/557.ccls. | US-PGPUB; USPAT; | ADJ | ON | 2009/12/24 11:14 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | USOCR; EPO; JPO | | | |
| S12 | 6 | ("20020083120" \| "20050131962" \| "5175852" \| "6502238" \| "7269664" \| "7475274").PN. | US-PGPUB; USPAT; USOCR; EPO; JPO | ADJ | ON | 2010/05/11 08:06 |
| S13 | 283 | (((root OR base OR kernel) WITH (software OR code OR binary)) SAME image) SAME2 cach$3 | US-PGPUB; USPAT; USOCR; EPO; JPO | ADJ | ON | 2010/05/11 08:26 |
| S14 | 22 | ("5999734" \| "7475274" \| "7496739" \| "5764902" \| "7263551" \| "7467293" \| "6195680" \| "5127104" \| "6990513" \| "7331047" \| "6779177" \| "7127712" \| "7150015" \| "6502238" \| "6606744" \| "5113523" \| "7246351" \| "6018747" \| "7200715" \| "6292941" \| "7155714" \| "7454462").PN. | US-PGPUB; USPAT; EPO | ADJ | ON | 2012/02/29 16:51 |
| S15 | 3 | (6721846\|7870106\|8001323).PN. | US-PGPUB; USPAT; EPO | ADJ | ON | 2012/03/08 11:19 |
| S16 | 11 | ("20030236927" \| "6751658" \| "20020083120" \| "6421777" \| "6502238" \| "7475274" \| "5175852" \| "20030126242" \| "20050131962" \| "6101576" \| "7269664").PN. | US-PGPUB; USPAT; EPO | ADJ | ON | 2012/07/09 15:29 |
| S17 | 30 | client node cach$3 | US-PGPUB; USPAT; EPO | ADJ | ON | 2012/07/16 11:49 |
| S18 | 2305 | 709/213.ccls. | US-PGPUB; USPAT; EPO | ADJ | ON | 2012/07/16 12:03 |
| S19 | 1022 | cache AND 709/213.ccls. | US-PGPUB; USPAT; EPO | ADJ | ON | 2012/07/16 12:04 |
| S20 | 195 | ((program WITH (data OR code)) SAME cache) AND 709/213.ccls. | US-PGPUB; USPAT; EPO | ADJ | ON | 2012/07/16 12:07 |
| S21 | 51 | ("20020016891" \| "20020087813" \| "20020087846" \| "20030046511" \| "20030130832" \| "20030233648" \| "20040015899" \| "20040078779" \| "20040088473" \| "20040199919" \| "20050128319" \| "20060173993" \| "20080229040" \| "5113523" \| "5127104" \| "5764902" \| "5974547" \| "5999734" \| "6018747" \| "6195680" \| "6292941" \| "6442605" \| "6597956" \| "6606744" \| "6745192" \| "6779177" \| "6871219" \| "6938057" \| "6986005" \| "6990513" \| | US-PGPUB; USPAT; EPO | ADJ | ON | 2012/07/18 20:10 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | "6990573" \| "7127712" \| "7150015" \| "7155714" \| "7200715" \| "7246221" \| "7246351" \| "7263551" \| "7290258" \| "7331047" \| "7334157" \| "7430610" \| "7454462" \| "7467293" \| "7496739" \| "7499988" \| "7536686" \| "7549055" \| "7590653" \| "7668938" \| "7685148").PN. | | | | |
| S22 | 854 | 717/176.ccls. | US-PGPUB; USPAT; EPO | ADJ | ON | 2012/07/26 15:47 |
| S23 | 199843 | ((provid&3 OR send$3 OR push$3 OR trans$7 OR updat$3) WITH (data OR code OR iamge OR applicat$3 OR (operat$3 system) OR OS)) AND comput$3 AND node AND (stor$3 OR sav$3) AND (root OR base) | US-PGPUB; USPAT; EPO | ADJ | ON | 2012/07/27 08:06 |

**EAST Search History (Interference)**

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| S24 | 208 | (((provid$3 OR send$3 OR push$3 OR trans$7 OR updat$3) WITH (data OR code OR iamge OR applicat$3 OR (operat$3 system) OR OS)) AND cache AND comput$3 AND node AND (stor$3 OR sav$3) AND (root OR base)).CLM. | US-PGPUB; USPAT; UPAD | ADJ | ON | 2012/07/27 08:20 |
| S25 | 14 | (((provid$3 OR send$3 OR push$3 OR trans$7 OR updat$3) WITH (data OR code OR iamge OR applicat$3 OR (operat$3 system) OR OS)) AND cache AND comput$3 AND node AND (first NEAR (stor$3 OR sav$3)) AND (root OR base)).CLM. | US-PGPUB; USPAT; UPAD | ADJ | ON | 2012/07/27 08:24 |
| S26 | 6 | (((provid$3 OR send$3 OR push$3 OR trans$7 OR updat$3) WITH (data OR code OR iamge OR applicat$3 OR (operat$3 system) OR OS)) AND cache AND comput$3 AND node AND (first NEAR (stor$3 OR sav$3)) AND (second NEAR (stor$3 OR sav$3)) AND (root OR base)).CLM. | US-PGPUB; USPAT; UPAD | ADJ | ON | 2012/07/27 08:25 |
| S27 | 1 | (((provid$3 OR send$3 OR push$3 OR trans$7 OR updat$3) WITH (data OR code OR iamge OR applicat$3 OR (operat$3 system) OR OS)) AND cache AND comput$3 AND node AND (first NEAR (stor$3 OR sav$3)) AND (leaf OR termin$3) AND (second NEAR (stor$3 OR sav$3)) AND (root OR base)).CLM. | US-PGPUB; USPAT; UPAD | ADJ | ON | 2012/07/27 08:27 |

**7/27/2012 8:32:55 AM**
**C:\Users\emartello\Documents\EAST\Workspaces\11709477_Root_Image_Caching.wsp**

| Search Notes | Application/Control No. 11709477 | Applicant(s)/Patent Under Reexamination KULKARNI ET AL. |
|---|---|---|
| | Examiner Edward Martello | Art Unit 2628 |

## SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| 345 | 557 | 10/26/2009 | /EM/ |
| 717 | 176 | 07/26/2012 | /EM/ |

## SEARCH NOTES

| Search Notes | Date | Examiner |
|---|---|---|
| eDAN Inventor Name Search | 10/26/2009 | /EM/ |
| See attached EAST Search History | 12/16/2009 | /EM/ |
| See attached EAST Search History | 12/23/2009 | /EM/ |
| See attached EAST Search History | 05/11/2010 | /EM/ |
| See attached EAST Search History | 02/29/2012 | /EM/ |
| See attached EAST Search History | 03/08/2012 | /EM/ |
| See attached EAST Search History | 07/09/2012 | /EM/ |
| See attached EAST Search History | 07/16/2012 | /EM/ |
| See attached EAST Search History | 07/18/2012 | /EM/ |
| See attached EAST Search History | 07/26/2012 | /EM/ |
| See attached EAST Search History | 07/27/2012 | /EM/ |

## INTERFERENCE SEARCH

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| All | All | 07/27/2012 | /EM/ |

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING or 371(c) DATE | GRP ART UNIT | FIL FEE REC'D | ATTY.DOCKET.NO | TOT CLAIMS | IND CLAIMS |
|---|---|---|---|---|---|---|
| 11/709,477 | 02/21/2007 | 2628 | 1750 | 139537 | 27 | 5 |

**CONFIRMATION NO. 4127**

**CORRECTED FILING RECEIPT**

*OC000000055618546*

52531
CHRISTENSEN O'CONNOR JOHNSON KINDNESS PLLC
1420 FIFTH AVENUE
SUITE 2800
SEATTLE, WA 98101-2347

Date Mailed: 07/30/2012

Receipt is acknowledged of this non-provisional patent application. The application will be taken up for examination in due course. Applicant will be notified as to the results of the examination. Any correspondence concerning the application must include the following identification information: the U.S. APPLICATION NUMBER, FILING DATE, NAME OF APPLICANT, and TITLE OF INVENTION. Fees transmitted by check or draft are subject to collection. Please verify the accuracy of the data presented on this receipt. **If an error is noted on this Filing Receipt, please submit a written request for a Filing Receipt Correction. Please provide a copy of this Filing Receipt with the changes noted thereon. If you received a "Notice to File Missing Parts" for this application, please submit any corrections to this Filing Receipt with your reply to the Notice. When the USPTO processes the reply to the Notice, the USPTO will generate another Filing Receipt incorporating the requested corrections**

**Applicant(s)**

Pradip Kulkarni, Pune, INDIA;
Mukul Kumar, Pune, INDIA;
Adhir Potdar, Pune, INDIA;
Richard Au, Woodside, CA;
Tung Nguyen, Cupertino, CA;

**Assignment For Published Patent Application**

Emendable Assets Limited Liability Company, Wilmington, DE

**Power of Attorney:** The patent practitioners associated with Customer Number 52531

**Domestic Priority data as claimed by applicant**

This application is a CIP of 11/395,816 03/30/2006 PAT 7721282
which is a CIP of 11/026,622 12/30/2004 ABN

**Foreign Applications** (You may be eligible to benefit from the **Patent Prosecution Highway** program at the USPTO. Please see http://www.uspto.gov for more information.)

**If Required, Foreign Filing License Granted:** 04/02/2007

The country code and number of your priority application, to be used for filing abroad under the Paris Convention, is **US 11/709,477**

**Projected Publication Date:** Request for Non-Publication Acknowledged

**Non-Publication Request:** Yes

**Early Publication Request:** No

**Title**

Root image caching and indexing for block-level distributed application management

**Preliminary Class**

345

## PROTECTING YOUR INVENTION OUTSIDE THE UNITED STATES

Since the rights granted by a U.S. patent extend only throughout the territory of the United States and have no effect in a foreign country, an inventor who wishes patent protection in another country must apply for a patent in a specific country or in regional patent offices. Applicants may wish to consider the filing of an international application under the Patent Cooperation Treaty (PCT). An international (PCT) application generally has the same effect as a regular national patent application in each PCT-member country. The PCT process **simplifies** the filing of patent applications on the same invention in member countries, but **does not result** in a grant of "an international patent" and does not eliminate the need of applicants to file additional documents and fees in countries where patent protection is desired.

Almost every country has its own patent law, and a person desiring a patent in a particular country must make an application for patent in that country in accordance with its particular laws. Since the laws of many countries differ in various respects from the patent law of the United States, applicants are advised to seek guidance from specific foreign countries to ensure that patent rights are not lost prematurely.

Applicants also are advised that in the case of inventions made in the United States, the Director of the USPTO must issue a license before applicants can apply for a patent in a foreign country. The filing of a U.S. patent application serves as a request for a foreign filing license. The application's filing receipt contains further information and guidance as to the status of applicant's license for foreign filing.

Applicants may wish to consult the USPTO booklet, "General Information Concerning Patents" (specifically, the section entitled "Treaties and Foreign Patents") for more information on timeframes and deadlines for filing foreign patent applications. The guide is available either by contacting the USPTO Contact Center at 800-786-9199, or it can be viewed on the USPTO website at http://www.uspto.gov/web/offices/pac/doc/general/index.html.

For information on preventing theft of your intellectual property (patents, trademarks and copyrights), you may wish to consult the U.S. Government website, http://www.stopfakes.gov. Part of a Department of Commerce initiative, this website includes self-help "toolkits" giving innovators guidance on how to protect intellectual property in specific countries such as China, Korea and Mexico. For questions regarding patent enforcement issues, applicants may call the U.S. Government hotline at 1-866-999-HALT (1-866-999-4158).

## LICENSE FOR FOREIGN FILING UNDER

## Title 35, United States Code, Section 184

## Title 37, Code of Federal Regulations, 5.11 & 5.15

**GRANTED**

The applicant has been granted a license under 35 U.S.C. 184, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" followed by a date appears on this form. Such licenses are issued in all applications where the conditions for issuance of a license have been met, regardless of whether or not a license may be required as

set forth in 37 CFR 5.15. The scope and limitations of this license are set forth in 37 CFR 5.15(a) unless an earlier license has been issued under 37 CFR 5.15(b). The license is subject to revocation upon written notification. The date indicated is the effective date of the license, unless an earlier license of similar scope has been granted under 37 CFR 5.13 or 5.14.

This license is to be retained by the licensee and may be used at any time on or after the effective date thereof unless it is revoked. This license is automatically transferred to any related applications(s) filed under 37 CFR 1.53(d). This license is not retroactive.

The grant of a license does not in any way lessen the responsibility of a licensee for the security of the subject matter as imposed by any Government contract or the provisions of existing laws relating to espionage and the national security or the export of technical data. Licensees should apprise themselves of current regulations especially with respect to certain countries, of other agencies, particularly the Office of Defense Trade Controls, Department of State (with respect to Arms, Munitions and Implements of War (22 CFR 121-128)); the Bureau of Industry and Security, Department of Commerce (15 CFR parts 730-774); the Office of Foreign AssetsControl, Department of Treasury (31 CFR Parts 500+) and the Department of Energy.

**NOT GRANTED**

No license under 35 U.S.C. 184 has been granted at this time, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" DOES NOT appear on this form. Applicant may still petition for a license under 37 CFR 5.12, if a license is desired before the expiration of 6 months from the filing date of the application. If 6 months has lapsed from the filing date of this application and the licensee has not received any indication of a secrecy order under 35 U.S.C. 181, the licensee may foreign file the application pursuant to 37 CFR 5.15(b).

---

**_SelectUSA_**

The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation and commercialization of new technologies. The USA offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to encourage, facilitate, and accelerate business investment. To learn more about why the USA is the best country in the world to develop technology, manufacture products, and grow your business, visit SelectUSA.gov.

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| Applicants: | P. Kulkarni et al. | Attorney Docket No.: | 139537 |
| Application No.: | 11/709477 | Art Unit: | 2628 / Confirmation No.: 4127 |
| Filed: | February 21, 2007 | Examiner: | E. Martello |
| Title: | ROOT IMAGE CACHING AND INDEXING FOR BLOCK-LEVEL DISTRIBUTED APPLICATION MANAGEMENT | | |

## REQUEST FOR CORRECTED FILING RECEIPT

Seattle, Washington 98101
July 23, 2012

TO THE COMMISSIONER FOR PATENTS:
ATTN: OFFICE OF INITIAL PATENT EXAMINATION
FILING RECEIPT CORRECTIONS

In reviewing the official Filing Receipt for the above-identified patent application, applicants' attorney noted that the listing of domestic priority is incomplete.

Applicants' attorney therefore respectfully requests that the Filing Receipt be revised to read as follows:

Domestic Priority data as claimed by applicant:

This application is a CIP of 11/395,816 03/30/2006 **PAT 7,721,282**
**which is a CIP of 11/026,622 12/30/2004 ABN**

Submitted herewith is a Supplemental Application Data Sheet setting forth the complete chain of priority. Attached hereto is page 1 of the Filing Receipt with the correction and changes marked.

Respectfully submitted,

CHRISTENSEN O'CONNOR
JOHNSON KINDNESS[PLLC]

**/David P. Sheldon/**

David P. Sheldon
Registration No. 62,494
Direct Dial No. 206.695.1611

DPS:cae



LAW OFFICES OF
CHRISTENSEN O'CONNOR JOHNSON KINDNESS[PLLC]
1420 Fifth Avenue
Suite 2800
Seattle, Washington 98101
206.682.8100

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING or 371(c) DATE | GRP ART UNIT | FIL FEE REC'D | ATTY.DOCKET.NO | TOT CLAIMS | IND CLAIMS |
|---|---|---|---|---|---|---|
| 11/709,477 | 02/21/2007 | 2628 | 1750 | ~~PNTA-P006.CIP-A~~ 39535 | 27 | 5 |

**CONFIRMATION NO. 4127**

**FILING RECEIPT**

41066
MURABITO, HAO & BARNES, LLP
TWO NORTH MARKET STREET, THIRD FLOOR
SAN JOSE, CA95113

Date Mailed: 04/02/2007

Receipt is acknowledged of this regular Patent Application. It will be considered in its order and you will be notified as to the results of the examination. Be sure to provide the U.S. APPLICATION NUMBER, FILING DATE, NAME OF APPLICANT, and TITLE OF INVENTION when inquiring about this application. Fees transmitted by check or draft are subject to collection. Please verify the accuracy of the data presented on this receipt. **If an error is noted on this Filing Receipt, please mail to the Commissioner for Patents P.O. Box 1450 Alexandria Va 22313-1450. Please provide a copy of this Filing Receipt with the changes noted thereon. If you received a "Notice to File Missing Parts" for this application, please submit any corrections to this Filing Receipt with your reply to the Notice. When the USPTO processes the reply to the Notice, the USPTO will generate another Filing Receipt incorporating the requested corrections (if appropriate).**

**Applicant(s)**

Pradip Kulkarni, Pune, INDIA;
Mukul Kumar, Pune, INDIA;
Adhir Potdar, ~~Maharashtra~~ Pune, INDIA;
Richard Au, Woodside, CA;
Tung Nguyen, Cupertino, CA;

**Assignment For Published Patent Application**

~~Penta Systems, Inc.~~ Emendable Assets Limited Liability Company

**Power of Attorney:** The patent practitioners associated with Customer Number ~~41066~~ 52531

**Domestic Priority data as claimed by applicant**

This application is a CIP of 11/395,816 03/30/2006 PAT 7,721,282
which is a CIP of 11/026,622 12/30/2004 ABN

**Foreign Applications**

**If Required, Foreign Filing License Granted:** 04/02/2007

The country code and number of your priority application, to be used for filing abroad under the Paris Convention, is **US11/709,477**

**Projected Publication Date:** Request for Non-Publication Acknowledged

**Non-Publication Request:** Yes

**Early Publication Request:** No

# Supplemental Application Data Sheet

## Application Information

| | |
|---|---|
| Application Number:: | 11/709,477 |
| Filing Date:: | 02/21/07 |
| Application Type:: | Regular |
| Subject Matter:: | Utility |
| Suggested Classification:: | 345/557 |
| Suggested Group Art Unit:: | 2628 |
| Title:: | Root Image Caching and Indexing for Block-Level Distributed Application Management |
| Attorney Docket Number:: | 137957 |
| Request For Early Publication?:: | No |
| Request For Non-Publication?:: | Yes |
| Suggested Drawing Figure:: | |
| Total Drawing Sheets:: | 6 |
| Small Entity?:: | No |
| Petition Included?:: | No |
| Secrecy Order in Parent Appl.?:: | No |

## Applicant Information 1

| | |
|---|---|
| Applicant Authority Type:: | Inventor |
| Primary Citizenship Country:: | India |
| Status:: | Full Capacity |
| Given Name:: | Pradip |
| Family Name:: | Kulkarni |
| City of Residence:: | Pune |
| Country of Residence:: | India |
| Street of Mailing Address:: | 3B/11, Visava Park, D. P. Road, Aundh |
| City of Mailing Address:: | Pune |
| Country of Mailing Address:: | India |
| Postal or Zip Code of Mailing Address:: | 411007 |

## Applicant Information 2

| | |
|---|---|
| Applicant Authority Type:: | Inventor |
| Primary Citizenship Country:: | India |
| Status:: | Full Capacity |

| | |
|---|---|
| Given Name:: | Mukul |
| Family Name:: | Kumar |
| City of Residence:: | Pune |
| Country of Residence:: | India |
| Street of Mailing Address:: | Flat No. 7, ~~Nont~~ Mont Vert Solitaire, S. No. 260/1, Aundh |
| City of Mailing Address:: | Pune |
| Country of Mailing Address:: | India |
| Postal or Zip Code of Mailing Address:: | 411007 |

**Applicant Information 3**

| | |
|---|---|
| Applicant Authority Type:: | Inventor |
| Primary Citizenship Country:: | India |
| Status:: | Full Capacity |
| Given Name:: | Adhir |
| Family Name:: | Potdar |
| City of Residence:: | ~~Maharahstra~~ Pune |
| Country of Residence:: | India |
| Street of Mailing Address:: | A1-21, Royal Orchard, Wireless Colony, D. P. Road, Aundh |
| City of Mailing Address:: | Pune |
| Country of Mailing Address:: | India |
| Postal or Zip Code of Mailing Address:: | 411007 |

**Applicant Information 4**

| | |
|---|---|
| Applicant Authority Type:: | Inventor |
| Primary Citizenship Country:: | US |
| Status:: | Full Capacity |
| Given Name:: | Richard |
| Family Name:: | Au |
| City of Residence:: | Woodside |
| State or Province of Residence:: | CA |
| Country of Residence:: | US |
| Street of Mailing Address:: | 389 Moore Road |
| City of Mailing Address:: | Woodside |
| State or Province of Mailing Address:: | CA |
| Country of Mailing Address:: | US |

Postal or Zip Code of Mailing Address:: 94062

**Applicant Information 5**

Applicant Authority Type:: Inventor
Primary Citizenship Country:: US
Status:: Full Capacity
Given Name:: Tung
Family Name:: Nguyen
City of Residence:: Cupertino
State or Province of Residence:: CA
Country of Residence:: US
Street of Mailing Address:: 22346 McClellan Road
City of Mailing Address:: Cupertino
State or Province of Mailing Address:: CA
Country of Mailing Address:: US
Postal or Zip Code of Mailing Address:: 95014

**Correspondence Information**

Correspondence Customer Number:: 52531

**Representative Information**

| | | |
|---|---|---|
| Representative Customer Number:: | 52531 | |

**Domestic Priority Information**

| Application:: | Continuity Type:: | Parent Application:: | Parent Filing Date:: |
|---|---|---|---|
| 11/709,477 | Continuation-in-part of | 11/395,816 | 03/30/06 |
| 11/395,816 | Continuation-in-part of | 11/026,622 | 12/30/04 |

**Assignment Information**

Assignee Name:: ~~Panta Systems, Inc.~~ Emendable Assets Limited Liability Company
Street of Mailing Address:: ~~20450 Stevens Creek Blvd~~ 2711 Centerville Road, Suite 400
City of Mailing Address:: ~~Cupertino~~ Wilmington
State or Province of Mailing Address:: ~~CA~~ DE
Country of Mailing Address:: US
Postal or Zip Code of Mailing Address:: ~~95014~~ 19808

DPS:cae/ctg

# Electronic Acknowledgement Receipt

| | |
|---|---|
| EFS ID: | 13319233 |
| Application Number: | 11709477 |
| International Application Number: | |
| Confirmation Number: | 4127 |
| Title of Invention: | Root image caching and indexing for block-level distributed application management |
| First Named Inventor/Applicant Name: | Pradip Kulkarni |
| Customer Number: | 52531 |
| Filer: | David Patrick Sheldon/Marzena Dixon |
| Filer Authorized By: | David Patrick Sheldon |
| Attorney Docket Number: | 139537 |
| Receipt Date: | 23-JUL-2012 |
| Filing Date: | 21-FEB-2007 |
| Time Stamp: | 19:12:55 |
| Application Type: | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Request for Corrected Filing Receipt | 39537_Request_for_Corrected_Filing_Receipt.pdf | 200036<br>[illegible] | no | 2 |

**Warnings:**

**Information:**

| | | | | | |
|---|---|---|---|---|---|
| 2 | Application Data Sheet | 39537_Supplemental_ADS.pdf | 62613<br>552ec07d87deea9612780ce5ccb98ad71a86edb9 | no | 3 |

**Warnings:**

**Information:**

This is not an USPTO supplied ADS fillable form

| | |
|---|---|
| **Total Files Size (in bytes):** | 262649 |

**This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.**

**New Applications Under 35 U.S.C. 111**
**If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.**

**National Stage of an International Application under 35 U.S.C. 371**
**If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.**

**New International Application Filed with the USPTO as a Receiving Office**
**If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.**

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 11/709,477 | 02/21/2007 | Pradip Kulkarni | 139537 | 4127 |

52531 7590 07/17/2012
CHRISTENSEN O'CONNOR JOHNSON KINDNESS PLLC
1420 FIFTH AVENUE
SUITE 2800
SEATTLE, WA 98101-2347

| EXAMINER | |
|---|---|
| MARTELLO, EDWARD | |
| ART UNIT | PAPER NUMBER |
| 2628 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 07/17/2012 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

efiling@cojk.com

PTOL-90A (Rev. 04/07)

| ***Applicant-Initiated Interview Summary*** | **Application No.**<br>11/709,477 | **Applicant(s)**<br>KULKARNI ET AL. | |
| --- | --- | --- | --- |
| | **Examiner**<br>EDWARD MARTELLO | **Art Unit**<br>2628 | |

All participants (applicant, applicant's representative, PTO personnel):

(1) *EDWARD MARTELLO*. (3)_____.

(2) *David P. Sheldon; 62,494*. (4)_____.

Date of Interview: *10 July 2012*.

Type: ☒ Telephonic ☐ Video Conference
☐ Personal [copy given to: ☐ applicant ☐ applicant's representative]

Exhibit shown or demonstration conducted: ☐ Yes ☒ No.
If Yes, brief description: _____.

Issues Discussed ☐101 ☒112 ☒102 ☒103 ☐Others
(For each of the checked box(es) above, please describe below the issue and detailed description of the discussion)

Claim(s) discussed: *1*.

Identification of prior art discussed: *Nguyen*.

Substance of Interview
(For each issue discussed, provide a detailed description and indicate if agreement was reached. Some topics may include: identification or clarification of a reference or a portion thereof, claim interpretation, proposed amendments, arguments of any applied references etc...)

*We discussed the Nguyen reference and how the chain of ownership and the chain of continuation in part of prior applications has the reference disqualified as a prior art reference under 102(e) and 103(c). The Section 112 rejection was discussed and the Examiner is open to withdrawal of the rejection pending review of the remarks received in the forthcoming amendment. No agreement was reached with respect to the claims* .

**Applicant recordation instructions:** The formal written reply to the last Office action must include the substance of the interview. (See MPEP section 713.04). If a reply to the last Office action has already been filed, applicant is given a non-extendable period of the longer of one month or thirty days from this interview date, or the mailing date of this interview summary form, whichever is later, to file a statement of the substance of the interview

**Examiner recordation instructions**: Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

☐ Attachment

/Edward Martello/
Primary Examiner, Art Unit 2628

## Summary of Record of Interview Requirements

**Manual of Patent Examining Procedure (MPEP), Section 713.04, Substance of Interview Must be Made of Record**
A complete written statement as to the substance of any face-to-face, video conference, or telephone interview with regard to an application must be made of record in the application whether or not an agreement with the examiner was reached at the interview.

**Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews**
Paragraph (b)

In every instance where reconsideration is requested in view of an interview with an examiner, a complete written statement of the reasons presented at the interview as warranting favorable action must be filed by the applicant. An interview does not remove the necessity for reply to Office action as specified in §§ 1.111, 1.135. (35 U.S.C. 132)

37 CFR §1.2 Business to be transacted in writing.
All business with the Patent or Trademark Office should be transacted in writing. The personal attendance of applicants or their attorneys or agents at the Patent and Trademark Office is unnecessary. The action of the Patent and Trademark Office will be based exclusively on the written record in the Office. No attention will be paid to any alleged oral promise, stipulation, or understanding in relation to which there is disagreement or doubt.

---

The action of the Patent and Trademark Office cannot be based exclusively on the written record in the Office if that record is itself incomplete through the failure to record the substance of interviews.

It is the responsibility of the applicant or the attorney or agent to make the substance of an interview of record in the application file, unless the examiner indicates he or she will do so. It is the examiner's responsibility to see that such a record is made and to correct material inaccuracies which bear directly on the question of patentability.

Examiners must complete an Interview Summary Form for each interview held where a matter of substance has been discussed during the interview by checking the appropriate boxes and filling in the blanks. Discussions regarding only procedural matters, directed solely to restriction requirements for which interview recordation is otherwise provided for in Section 812.01 of the Manual of Patent Examining Procedure, or pointing out typographical errors or unreadable script in Office actions or the like, are excluded from the interview recordation procedures below. Where the substance of an interview is completely recorded in an Examiners Amendment, no separate Interview Summary Record is required.

The Interview Summary Form shall be given an appropriate Paper No., placed in the right hand portion of the file, and listed on the "Contents" section of the file wrapper. In a personal interview, a duplicate of the Form is given to the applicant (or attorney or agent) at the conclusion of the interview. In the case of a telephone or video-conference interview, the copy is mailed to the applicant's correspondence address either with or prior to the next official communication. If additional correspondence from the examiner is not likely before an allowance or if other circumstances dictate, the Form should be mailed promptly after the interview rather than with the next official communication.

The Form provides for recordation of the following information:
- Application Number (Series Code and Serial Number)
- Name of applicant
- Name of examiner
- Date of interview
- Type of interview (telephonic, video-conference, or personal)
- Name of participant(s) (applicant, attorney or agent, examiner, other PTO personnel, etc.)
- An indication whether or not an exhibit was shown or a demonstration conducted
- An identification of the specific prior art discussed
- An indication whether an agreement was reached and if so, a description of the general nature of the agreement (may be by attachment of a copy of amendments or claims agreed as being allowable). Note: Agreement as to allowability is tentative and does not restrict further action by the examiner to the contrary.
- The signature of the examiner who conducted the interview (if Form is not an attachment to a signed Office action)

It is desirable that the examiner orally remind the applicant of his or her obligation to record the substance of the interview of each case. It should be noted, however, that the Interview Summary Form will not normally be considered a complete and proper recordation of the interview unless it includes, or is supplemented by the applicant or the examiner to include, all of the applicable items required below concerning the substance of the interview.

A complete and proper recordation of the substance of any interview should include at least the following applicable items:
1) A brief description of the nature of any exhibit shown or any demonstration conducted,
2) an identification of the claims discussed,
3) an identification of the specific prior art discussed,
4) an identification of the principal proposed amendments of a substantive nature discussed, unless these are already described on the Interview Summary Form completed by the Examiner,
5) a brief identification of the general thrust of the principal arguments presented to the examiner,
   (The identification of arguments need not be lengthy or elaborate. A verbatim or highly detailed description of the arguments is not required. The identification of the arguments is sufficient if the general nature or thrust of the principal arguments made to the examiner can be understood in the context of the application file. Of course, the applicant may desire to emphasize and fully describe those arguments which he or she feels were or might be persuasive to the examiner.)
6) a general indication of any other pertinent matters discussed, and
7) if appropriate, the general results or outcome of the interview unless already described in the Interview Summary Form completed by the examiner.

Examiners are expected to carefully review the applicant's record of the substance of an interview. If the record is not complete and accurate, the examiner will give the applicant an extendable one month time period to correct the record.

**Examiner to Check for Accuracy**

If the claims are allowable for other reasons of record, the examiner should send a letter setting forth the examiner's version of the statement attributed to him or her. If the record is complete and accurate, the examiner should place the indication, "Interview Record OK" on the paper recording the substance of the interview along with the date and the examiner's initials.

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (01-10)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99)** | | |
|---|---|---|
| | Application Number | 11709477 |
| | Filing Date | 2007-02-21 |
| | First Named Inventor | Kulkarni |
| | Art Unit | 2628 |
| | Examiner Name | Edward Martello |
| | Attorney Docket Number | 139537 |

| U.S.PATENTS | | | | | | Remove |
|---|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| | 1 | 5113523 | A | 1992-05-12 | Colley | |
| | 2 | 5127104 | A | 1992-06-30 | Dennis | |
| | 3 | 5764902 | A | 1998-06-09 | Rothrock | |
| | 4 | 5974547 | A | 1999-10-26 | Klimenko | |
| | 5 | 5999734 | A | 1999-12-07 | Willis | |
| | 6 | 6018747 | A | 2000-01-25 | Burns | |
| | 7 | 6195680 | B1 | 2001-02-27 | Goldszmidt | |
| | 8 | 6292941 | B1 | 2001-09-18 | Jollands | |

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | 11709477 |
| | Filing Date | 2007-02-21 |
| | First Named Inventor | Kulkarni |
| | Art Unit | 2628 |
| | Examiner Name | Edward Martello |
| | Attorney Docket Number | 139537 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 9 | 6442605 | B1 | 2002-08-27 | Rodriguez | |
| | 10 | 6597956 | B1 | 2003-07-22 | Aziz | |
| | 11 | 6606744 | B1 | 2003-08-12 | Mikurak | |
| | 12 | 6745192 | B1 | 2004-06-01 | Libenzi | |
| | 13 | 6779177 | B1 | 2004-08-17 | Bahrs | |
| | 14 | 6871219 | B2 | 2005-03-22 | Noordergraaf | |
| | 15 | 6938057 | B2 | 2005-08-30 | Gusler | |
| | 16 | 6986005 | B2 | 2006-01-10 | Vo | |
| | 17 | 6990513 | B2 | 2006-01-24 | Belfiore | |
| | 18 | 6990573 | B2 | 2006-01-24 | Cherian | |
| | 19 | 7127712 | B1 | 2006-10-24 | Noble | |

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | 11709477 |
| | Filing Date | 2007-02-21 |
| | First Named Inventor | Kulkarni |
| | Art Unit | 2628 |
| | Examiner Name | Edward Martello |
| | Attorney Docket Number | 139537 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 20 | 7150015 | B2 | 2006-12-12 | Pace | |
| | 21 | 7155714 | B2 | 2006-12-26 | Makris | |
| | 22 | 7200715 | B2 | 2007-04-03 | Kleiman | |
| | 23 | 7246221 | B1 | 2007-07-17 | Soltis | |
| | 24 | 7246351 | B2 | 2007-07-17 | Bloch | |
| | 25 | 7263551 | B2 | 2007-08-28 | Belfiore | |
| | 26 | 7290258 | B2 | 2007-10-30 | Steeb | |
| | 27 | 7331047 | B2 | 2008-02-12 | Chu | |
| | 28 | 7334157 | B1 | 2008-02-19 | Graf | |
| | 29 | 7430610 | B2 | 2008-09-30 | Pace | |
| | 30 | 7454462 | B2 | 2008-11-18 | Belfiore | |

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | 11709477 |
| | Filing Date | 2007-02-21 |
| | First Named Inventor | Kulkarni |
| | Art Unit | 2628 |
| | Examiner Name | Edward Martello |
| | Attorney Docket Number | 139537 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 31 | 7467293 | B2 | 2008-12-16 | Zhang | |
| | 32 | 7496739 | B1 | 2009-02-24 | Raghavan | |
| | 33 | 7499988 | B2 | 2009-03-03 | Keohane | |
| | 34 | 7536686 | B2 | 2009-05-19 | Tan | |
| | 35 | 7549055 | B2 | 2009-06-16 | Zimmer | |
| | 36 | 7590653 | B2 | 2009-09-15 | Sparks | |
| | 37 | 7668938 | B1 | 2010-02-23 | Phillips | |
| | 38 | 7685148 | B2 | 2010-03-23 | Engquist | |

If you wish to add additional U.S. Patent citation information please click the Add button. Add

**U.S.PATENT APPLICATION PUBLICATIONS** Remove

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 20020016891 | A1 | 2002-02-07 | Noel | |

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | 11709477 |
| | Filing Date | 2007-02-21 |
| | First Named Inventor | Kulkarni |
| | Art Unit | 2628 |
| | Examiner Name | Edward Martello |
| | Attorney Docket Number | 139537 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 2 | 20020087813 | A1 | 2002-07-04 | Harris | |
| | 3 | 20020087846 | A1 | 2002-07-04 | Nickolls | |
| | 4 | 20030046511 | A1 | 2003-03-06 | Buch | |
| | 5 | 20030130832 | A1 | 2003-07-10 | Schulter | |
| | 6 | 20030233648 | A1 | 2003-12-18 | Earl | |
| | 7 | 20040015899 | A1 | 2004-01-22 | May | |
| | 8 | 20040078779 | A1 | 2004-04-22 | Dutt | |
| | 9 | 20040088473 | A1 | 2004-05-06 | Ogle | |
| | 10 | 20040199919 | A1 | 2004-10-07 | Tovinkere | |
| | 11 | 20050128319 | A1 | 2005-06-16 | Morino | |
| | 12 | 20060173993 | A1 | 2006-08-03 | Henseler | |

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | 11709477 |
| | Filing Date | 2007-02-21 |
| | First Named Inventor | Kulkarni |
| | Art Unit | 2628 |
| | Examiner Name | Edward Martello |
| | Attorney Docket Number | 139537 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 13 | 20080229040 | A1 | 2008-09-18 | Honma | |

If you wish to add additional U.S. Published Application citation information please click the Add button. Add

**FOREIGN PATENT DOCUMENTS** Remove

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | | | | | | | ☐ |

If you wish to add additional Foreign Patent Document citation information please click the Add button Add

**NON-PATENT LITERATURE DOCUMENTS** Remove

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |
|---|---|---|---|
| | 1 | CALZAROSSA, M., and M. KUBÁT, "Processor Allocation in Parallel Systems," Proceedings of the IEEE International Conference on Computer Systems and Software Engineering (COMPEURO '91), Bologna, Italy, May 13–16, 1991, pp. 133–137. | ☐ |
| | 2 | CHEN, D., et al., "Exploiting High-Level Coherence Information to Optimize Distributed Shared State," Proceedings of the 9th ACM Symposium on Principles and Practice of Parallel Programming, San Diego, June 11–13, 2003, pp. 131–142. | ☐ |
| | 3 | COHEN, A., and M. WOODRING, "Win32 Multithreaded Programming," O'Reilly Online Catalog, Chapter 1, <http://www.oreilly.com/catalog/multithread/excerpt/ch01.html> [retrieved November 21, 2006], pp. 1–8. | ☐ |
| | 4 | COUTURIER, R., et al., "A Compiler for Parallel Unity Programs Using OpenMp," Proceedings of the International Conference on Parallel and Distributed Processing Techniques and Applications, Las Vegas, Nevada, June 28–July 1, 1999, pp. 1992–1998. | ☐ |
| | 5 | ISMAIL, I.M., and J.A. DAVIS, "Program-Based Static Allocation Policies for Highly Parallel Computers," Proceedings of the 1995 IEEE Fourteenth Annual International Phoenix Conference on Computers and Communications, Scottsdale, Arizona, March 28–31, 1995, pp. 61–68. | ☐ |

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | 11709477 |
| | Filing Date | 2007-02-21 |
| | First Named Inventor | Kulkarni |
| | Art Unit | 2628 |
| | Examiner Name | Edward Martello |
| | Attorney Docket Number | 139537 |

| | | | |
|---|---|---|---|
| | 6 | KANDEMIR, M., et al., "Minimizing Data and Synchronization Costs in One-Way Communication," IEEE Transactions on Parallel and Distributed Systems 11(12):1232–1251, December 2000. | ☐ |
| | 7 | LI, K.-C., et al., "Design Issue of a Novel Toolkit for Parallel Application Performance Monitoring and Analysis in Cluster and Grid Environments," Proceedings of the 8th International Symposium on Parallel Architectures, Algorithms and Networks (ISPAN'05), Las Vegas, Nev., December 7–9, 2005, 6 pages. | ☐ |
| | 8 | NGUYEN, T.M., et al., "Branching Store File System," U.S. Patent Application No. 11/026,622, filed December 30, 2004. | ☐ |
| | 9 | OHTA, K., et al., "Improving Parallel Write by Node Level Request Scheduling," Proceedings of the 9th IEEE/ACM International Symposium on Cluster Computing and the Grid, Shanghai, May 18–21, 2009, pp. 196–203. | ☐ |
| | 10 | OpenMP Fortran Application Program Interface (Version 2.0), November 2000, <http://www.openmp.org/drupal/mp-documents/fspec20.pdf>, pp. 1–3 and 34–36. | ☐ |
| | 11 | OpenMP Fortran Application Program Interface (Version 2.0), November 2000, <http://www.openmp.org/drupal/mp-documents/fspec20.pdf>, pp. 1–3, 18–19, 25–27, 34–37, and 67. | ☐ |
| | 12 | "Sequent's NUMA-Q SMP™ Architecture," Sequent Computer Systems, Inc., 1997, <http://parallel.ru/ftp/computers/sequent/NUMA_SMP_REV.pdf>, pp. 1–18. | ☐ |
| | 13 | SIVATHANU, G., et al., "Ensuring Data Integrity in Storage: Techniques and Applications," Proceedings of the 2005 ACM Workshop on Storage Security and Survivability (StorageSS '05), Alexandria, Va., November 7–10, 2005, pp. 26–36. | ☐ |
| | 14 | ZHU, T., et al., "Scheduling Divisible Loads in the Dynamic Heterogeneous Grid Environment," Proceedings of the First International Conference on Scalable Information Systems, Hong Kong, May 29–June 1, 2006, 10 pages. | ☐ |

If you wish to add additional non-patent literature document citation information please click the Add button Add

**EXAMINER SIGNATURE**

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | 11709477 |
| | Filing Date | 2007-02-21 |
| | First Named Inventor | Kulkarni |
| | Art Unit | 2628 |
| | Examiner Name | Edward Martello |
| | Attorney Docket Number | 139537 |

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | 11709477 |
| | Filing Date | 2007-02-21 |
| | First Named Inventor | Kulkarni |
| | Art Unit | 2628 |
| | Examiner Name | Edward Martello |
| | Attorney Docket Number | 139537 |

**CERTIFICATION STATEMENT**

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

☐ That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

☐ See attached certification statement.

☒ The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☐ A certification statement is not submitted herewith.

**SIGNATURE**

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /David P. Sheldon/ | Date (YYYY-MM-DD) | 2012-07-17 |
|---|---|---|---|
| Name/Print | David P. Sheldon | Registration Number | 62,494 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

# Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

| Electronic Patent Application Fee Transmittal | |
|---|---|
| **Application Number:** | 11709477 |
| **Filing Date:** | 21-Feb-2007 |
| **Title of Invention:** | Root image caching and indexing for block-level distributed application management |
| **First Named Inventor/Applicant Name:** | Pradip Kulkarni |
| **Filer:** | David Patrick Sheldon/Constance Edgar |
| **Attorney Docket Number:** | 139537 |
| Filed as Large Entity | |

**Utility under 35 USC 111(a) Filing Fees**

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| Submission- Information Disclosure Stmt | 1806 | 1 | 180 | 180 |
| | | **Total in USD ($)** | | **180** |

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 13276391 |
| **Application Number:** | 11709477 |
| **International Application Number:** | |
| **Confirmation Number:** | 4127 |
| **Title of Invention:** | Root image caching and indexing for block-level distributed application management |
| **First Named Inventor/Applicant Name:** | Pradip Kulkarni |
| **Customer Number:** | 52531 |
| **Filer:** | David Patrick Sheldon/Constance Edgar |
| **Filer Authorized By:** | David Patrick Sheldon |
| **Attorney Docket Number:** | 139537 |
| **Receipt Date:** | 17-JUL-2012 |
| **Filing Date:** | 21-FEB-2007 |
| **Time Stamp:** | 20:32:26 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $180 |
| RAM confirmation Number | 6570 |
| Deposit Account | 031740 |
| Authorized User | CHRISTENSEN, O'CONNOR, JOHNSON & KINDNESS |

The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows:

Charge any Additional Fees required under 37 C.F.R. Section 1.16 (National application filing, search, and examination fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.17 (Patent application and reexamination processing fees)

**File Listing:**

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Information Disclosure Statement (IDS) Form (SB08) | 39537_1st_Suppl_IDS.pdf | 614968<br>557e578cc5b3067099ae414cf46d6856f2f3 0779 | no | 10 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 2 | Non Patent Literature | 39537_Calzarossa.pdf | 239637<br>274f2c7e7658309b32694f6be62ae09571b 827a3 | no | 5 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 3 | Non Patent Literature | 39537_Chen.pdf | 1317671<br>63175493168a0ed30b3d14f7471716524 044a1 | no | 12 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 4 | Non Patent Literature | 39537_Cohen.pdf | 507911<br>fe9a2a3f4d07eea39e9442f3e1fd7b4154e4 0bd2 | no | 8 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 5 | Non Patent Literature | 39537_Couturier.pdf | 447680<br>6b8a745ca7278b85ec4529b85bb403801a9 d1078 | no | 8 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 6 | Non Patent Literature | 39537_Ismail.pdf | 584913<br>d67cbf0114b27faa735d347d635aee05f99a 4c16 | no | 8 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 7 | Non Patent Literature | 39537_Kandemir.pdf | 1815652<br>c6d5fddd5f075ad4bc25d1781609e5892d4 880cf | no | 20 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 8 | Non Patent Literature | 39537_Li.pdf | 485707<br>ab76f01005caa0de4d184bb07e503af1ab6 e02e | no | 6 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 9 | Non Patent Literature | 39537_Ohta.pdf | 666239<br>7814491257414144 22b3e8f91b16dd8a9d22e649 | no | 8 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 10 | Non Patent Literature | 39537_Sequents_NUMA-Q.pdf | 1274157<br>8cdbffc0383c09bce858a84f2c08d96438a1919 | no | 21 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 11 | Non Patent Literature | 39537_Sivathanu.pdf | 1216976<br>8caa4dc995554523 3cbd4642aad13ec0369d127d | no | 11 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 12 | Non Patent Literature | 39537_Zhu.pdf | 807932<br>2ecd6f0fa9a939197bf67c8d1e34cd3a31a3cf88 | no | 10 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 13 | Non Patent Literature | 39537_OpenMP.pdf | 292065<br>bf940657891f5 10344bee2af697f39941d639d5 | no | 6 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 14 | Non Patent Literature | 39537_OpenMP-2.pdf | 534605<br>99072b3306ebc28a61e72e67ef9b12cd794e8cd4 | no | 15 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 15 | Fee Worksheet (SB06) | fee-info.pdf | 30036<br>1d274cb49e7201e7b55ff93ec1435b182fc90495 | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| | | **Total Files Size (in bytes):** | 10836149 | | |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

New Applications Under 35 U.S.C. 111

If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

National Stage of an International Application under 35 U.S.C. 371

If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

New International Application Filed with the USPTO as a Receiving Office

If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Applicants: | P. Kulkarni et al. | Attorney Docket No.: 139537 |
| Application No.: | 11/709477 | Art Unit: 2628 / Confirmation No.: 4127 |
| Filed: | February 21, 2007 | Examiner: E. Martello |
| Title: | ROOT IMAGE CACHING AND INDEXING FOR BLOCK-LEVEL DISTRIBUTED APPLICATION MANAGEMENT | |

AMENDMENT AFTER NON-FINAL REJECTION

Seattle, Washington 98101

July 11, 2012

TO THE COMMISSIONER FOR PATENTS:

INTRODUCTORY COMMENTS

Please amend the above-identified application as follows:

**Amendments to the Specification** begin on page 2 of this paper.

**Amendments to the Claims** are reflected in the listing of the claims, which begins on page 10 of this paper.

**Remarks/Arguments** begin on page 17 of this paper.

LAW OFFICES OF
CHRISTENSEN O'CONNOR JOHNSON KINDNESS^PLLC
1420 Fifth Avenue
Suite 2800
Seattle, Washington 98101
206.682.8100

REMARKS

In the Office Action mailed March 12, 2012 (hereinafter "Office Action"), the arguments submitted with the previous response were deemed persuasive. Claims 4, 5, 14, 16, and 17 were rejected under 35 U.S.C. § 112, second paragraph, as allegedly being indefinite. Claims 19-27 were rejected under 35 U.S.C. § 102(e) as allegedly being anticipated by U.S. Patent No. 7,870,106, to Nguyen et al. (hereinafter "Nguyen"). Claims 14-18 were rejected under 35 U.S.C. § 103(a) as allegedly being unpatentable over Nguyen. Claims 1-13 were rejected under 35 U.S.C. § 103(a) as allegedly being unpatentable over Nguyen[1] in view of U.S. Patent No. 6,101,576, to Kobayashi et al. (hereinafter "Kobayashi"). Applicants respectfully traverse these rejections.

With this response, Claims 1, 2, 4, 7, 10, 12, 14, 16, 21, and 23-27 have been amended for clarity. Claims 1-27 remain pending in the present application. Applicants have carefully considered the issues raised in the Office Action, and respectfully request reconsideration and allowance of the pending claims in view of the remarks set forth below.

Claims 4, 5, 14, 16, and 17 Are Definite

The Office Action rejected Claims 4, 5, 14, 16, and 17 under 35 U.S.C. § 112, second paragraph, as allegedly being indefinite. Specifically, the Office Action alleged that the claimed "union block devices" have insufficient basis within the claims to define their character. Applicants respectfully traverse this rejection. Claims 4, 5, 14, 16, and 17 each recite "systems"

[1] The Office Action, on page 12, listed this rejection as being over U.S. Patent Application Publication No. 2003/0126242, which is not the same disclosure as U.S. Patent No. 7,870,106, to Nguyen et al. However, the Office Action proceeded to apparently refer to drawings and sections of Nguyen, and referred back to the discussion of Nguyen with respect to Claims 14-27. As such, applicants have treated this Section 103 rejection as being based on U.S. Patent No. 7,870,106.

LAW OFFICES OF
CHRISTENSEN O'CONNOR JOHNSON KINDNESS^PLLC
1420 Fifth Avenue
Suite 2800
Seattle, Washington 98101
206.682.8100

that comprise "union block devices." Such union block devices are disclosed in the application as originally filed, at least in paragraphs 27-29, and are recited in the claims in a definite manner.

Accordingly, applicants respectfully request withdrawal of the Section 112 rejections of Claims 4, 5, 14, 16, and 17.

The Section 102 Rejections Should Be Withdrawn Because Nguyen Does Not Anticipate Claims 19-27

The Office Action rejected Claims 19-27 under 35 U.S.C. § 102(e) as allegedly being anticipated by Nguyen. Applicants respectfully traverse this rejection.

Independent Claim 19 recites, *inter alia*, "receiving indexing results pertaining to said root image from one of said compute nodes; and providing said indexing results to the others of said compute nodes." Independent Claim 23 recites, *inter alia*, "indexing said root image portion; and providing the results of said indexing to a second compute node." The Office Action alleged that Nguyen discloses these features, but applicants respectfully disagree.

The cited portion of Nguyen states:

> The root file system 104 has a root metadata structure 205 and a root data structure 210. Entries in the root metadata structure 205 point to associated entries in the root data structure 210. The root data structure 210 comprises the base instance of the distributed application. Neither the root data structure 210 nor the root metadata structure 205 is modified by compute nodes. However, a system management node or the like may modify the root file system 104, such that changes to the distributed application are easily and rapidly deployed to compute nodes.

(Nguyen, Col. 5, lines 34-43.) Nothing in this passage relates to indexing a root image portion, or to receiving or providing indexing results. Indeed, indexing and indexing results are not discussed anywhere within Nguyen. Accordingly, applicants respectfully submit that Nguyen does not disclose each and every feature recited in independent Claims 19 and 23, and therefore fails to anticipate Claims 19 and 23.

LAW OFFICES OF
CHRISTENSEN O'CONNOR JOHNSON KINDNESS[PLLC]
1420 Fifth Avenue
Suite 2800
Seattle, Washington 98101
206.682.8100

Claims 20-22 depend from Claim 19. Claims 24-27 depend from Claim 23. Applicants respectfully submit that Nguyen fails to anticipate Claims 20-22 and 24-27 for at least the reasons discussed above with respect to Claims 19 and 23, as well as for additional reasons.

Accordingly, applicants respectfully request withdrawal of the Section 102 rejections of Claims 19-27.

The Section 103 Rejections Should Be Withdrawn Because Nguyen Is Not Valid Prior Art Under Section 103

The Office Action rejected Claims 14-18 under 35 U.S.C. § 103(a) as allegedly being unpatentable over Nguyen, and rejected Claims 1-13 under 35 U.S.C. § 103(a) as allegedly being unpatentable over Nguyen in view of Kobayashi. Applicants respectfully traverse these rejections.

Nguyen was patented on January 11, 2011, and was not published before being issued. As this date is after the date of filing of the present application, Nguyen does not qualify as prior art under Section 102(a) or Section 102(b). Accordingly, Nguyen could only qualify as prior art under Section 102(e)(2).

At the time of filing of the present application, both the present application and Nguyen were owned by or under obligation of assignment to Panta Systems, Inc. As such, applicants respectfully submit that, pursuant to Section 103(c), Nguyen is not valid prior art with respect to the present application.

Since each of the Section 103 rejection relies at least in part on Nguyen, applicants respectfully submit that the Section 103 rejections were made in error. Applicants respectfully request withdrawal of the Section 103 rejections of Claims 1-18.

No Disclaimers or Disavowals

Although the present communication may include alterations to the application or claims, or characterizations of claim scope or referenced art, applicants are not conceding in this application that previously pending claims are not patentable over the cited references. Rather, any alterations or characterizations are being made to facilitate expeditious prosecution of this application. Applicants reserve the right to pursue at a later date any previously pending or other broader or narrower claims that capture any subject matter supported by the present disclosure, including subject matter found to be specifically disclaimed herein or by any prior prosecution. Accordingly, reviewers of this or any parent, child or related prosecution history shall not reasonably infer that applicants have made any disclaimers or disavowals of any subject matter supported by the present application.

CONCLUSION

In view of the foregoing amendments and remarks, applicants respectfully submit that Claims 1-27 are in condition for allowance over the patents and publications of record, and respectfully request reconsideration and allowance of the same. The Examiner is invited to contact the undersigned attorney at the number provided below to resolve any issues that may arise in order to advance prosecution of this application.

Respectfully submitted,

CHRISTENSEN O'CONNOR
JOHNSON KINDNESS^PLLC

David P. Sheldon
Registration No. 62,494
Direct Dial No. 206.695.1611

DPS:lal

LAW OFFICES OF
CHRISTENSEN O'CONNOR JOHNSON KINDNESS^PLLC
1420 Fifth Avenue
Suite 2800
Seattle, Washington 98101
206.682.8100



59537AM.DOC

# Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 11709477 |
| **Filing Date:** | 21-Feb-2007 |
| **Title of Invention:** | Root image caching and indexing for block-level distributed application management |
| **First Named Inventor/Applicant Name:** | Pradip Kulkarni |
| **Filer:** | David Patrick Sheldon/Lori Lewis |
| **Attorney Docket Number:** | 139537 |

Filed as Large Entity

## Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |
| Extension - 1 month with $0 paid | 1251 | 1 | 150 | 150 |

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| | **Total in USD ($)** | | | **150** |

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 13230706 |
| **Application Number:** | 11709477 |
| **International Application Number:** | |
| **Confirmation Number:** | 4127 |
| **Title of Invention:** | Root image caching and indexing for block-level distributed application management |
| **First Named Inventor/Applicant Name:** | Pradip Kulkarni |
| **Customer Number:** | 52531 |
| **Filer:** | David Patrick Sheldon/Lori Lewis |
| **Filer Authorized By:** | David Patrick Sheldon |
| **Attorney Docket Number:** | 139537 |
| **Receipt Date:** | 11-JUL-2012 |
| **Filing Date:** | 21-FEB-2007 |
| **Time Stamp:** | 19:32:19 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $150 |
| RAM confirmation Number | 8513 |
| Deposit Account | 031740 |
| Authorized User | CHRISTENSEN, O'CONNOR, JOHNSON & KINDNESS |

The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows:

Charge any Additional Fees required under 37 C.F.R. Section 1.16 (National application filing, search, and examination fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.17 (Patent application and reexamination processing fees)

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | | 39537_Amendment_After_Non Final_Rejection_07-11-2012.pdf | 4439252<br>e0dfd9afe1e2ab7cd30081a7fd68e538fc690b46 | yes | 20 |

**Multipart Description/PDF files in .zip description**

| Document Description | Start | End |
|---|---|---|
| Amendment/Req. Reconsideration-After Non-Final Reject | 1 | 1 |
| Specification | 2 | 9 |
| Claims | 10 | 15 |
| Applicant Arguments/Remarks Made in an Amendment | 16 | 20 |

**Warnings:**

**Information:**

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 2 | Fee Worksheet (SB06) | fee-info.pdf | 29760<br>9241784496f52afc6ee5ae3049f73f4761853cf6 | no | 2 |

**Warnings:**

**Information:**

| | |
|---|---|
| **Total Files Size (in bytes):** | 4469012 |

**This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.**

**<u>New Applications Under 35 U.S.C. 111</u>**
**If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.**

**<u>National Stage of an International Application under 35 U.S.C. 371</u>**
**If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.**

**<u>New International Application Filed with the USPTO as a Receiving Office</u>**
**If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.**

PTO/SB/06 (07-06)
Approved for use through 1/31/2007. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# PATENT APPLICATION FEE DETERMINATION RECORD
Substitute for Form PTO-875

Application or Docket Number: 11/709,477
Filing Date: 02/21/2007
☐ To be Mailed

## APPLICATION AS FILED – PART I

| FOR | NUMBER FILED (Column 1) | NUMBER EXTRA (Column 2) | SMALL ENTITY ☐ RATE ($) | SMALL ENTITY FEE ($) | OR | OTHER THAN SMALL ENTITY RATE ($) | OTHER THAN SMALL ENTITY FEE ($) |
|---|---|---|---|---|---|---|---|
| ☐ BASIC FEE (37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | | | N/A | |
| ☐ SEARCH FEE (37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | | | N/A | |
| ☐ EXAMINATION FEE (37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | | | N/A | |
| TOTAL CLAIMS (37 CFR 1.16(i)) | minus 20 = | * | X $ = | | OR | X $ = | |
| INDEPENDENT CLAIMS (37 CFR 1.16(h)) | minus 3 = | * | X $ = | | | X $ = | |
| ☐ APPLICATION SIZE FEE (37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $250 ($125 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | | | | |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | | | | |
| | | | TOTAL | | | TOTAL | |

* If the difference in column 1 is less than zero, enter "0" in column 2.

## APPLICATION AS AMENDED – PART II

| AMENDMENT 07/11/2012 | CLAIMS REMAINING AFTER AMENDMENT (Column 1) | | HIGHEST NUMBER PREVIOUSLY PAID FOR (Column 2) | PRESENT EXTRA (Column 3) | SMALL ENTITY RATE ($) | SMALL ENTITY ADDITIONAL FEE ($) | OR | OTHER THAN SMALL ENTITY RATE ($) | OTHER THAN SMALL ENTITY ADDITIONAL FEE ($) |
|---|---|---|---|---|---|---|---|---|---|
| Total (37 CFR 1.16(i)) | * 27 | Minus | ** 27 | = 0 | X $ = | | OR | X $60= | 0 |
| Independent (37 CFR 1.16(h)) | * 5 | Minus | ***5 | = 0 | X $ = | | OR | X $250= | 0 |
| ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | | | | |
| ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | | OR | | |
| | | | | | TOTAL ADD'L FEE | | OR | TOTAL ADD'L FEE | 0 |

| AMENDMENT | CLAIMS REMAINING AFTER AMENDMENT (Column 1) | | HIGHEST NUMBER PREVIOUSLY PAID FOR (Column 2) | PRESENT EXTRA (Column 3) | SMALL ENTITY RATE ($) | SMALL ENTITY ADDITIONAL FEE ($) | OR | OTHER THAN SMALL ENTITY RATE ($) | OTHER THAN SMALL ENTITY ADDITIONAL FEE ($) |
|---|---|---|---|---|---|---|---|---|---|
| Total (37 CFR 1.16(i)) | * | Minus | ** | = | X $ = | | OR | X $ = | |
| Independent (37 CFR 1.16(h)) | * | Minus | *** | = | X $ = | | OR | X $ = | |
| ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | | | | |
| ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | | OR | | |
| | | | | | TOTAL ADD'L FEE | | OR | TOTAL ADD'L FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

Legal Instrument Examiner:
/LINDA HUMES/

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

AMENDMENTS TO THE SPECIFICATION

Please amend paragraph [0001] as follows:

[0001] The present Application for Patent is a continuation-in-part of ~~Patent Serial~~ Application No. 11/395,816, entitled "BLOCK-LEVEL I/O SUBSYSTEM FOR DISTRIBUTED APPLICATION ENVIRONMENT ~~MANGEMENT~~ MANAGEMENT," filed March 30, 2006, ~~pending and~~ now U.S. Patent No. 7,721,282, assigned to the assignee hereof and hereby expressly incorporated by reference herein.

Please amend paragraph [0002] as follows:

[0002] The present Application for Patent is related to the following co-pending U.S. Patent Application:.

"VIRUS SCANNING FOR BLOCK-LEVEL DISTRIBUTED APPLICATION MANAGEMENT," by Kulkarni et [[al]] al., ~~having Attorney Docket No. PNTA-P006.CON.B, filed concurrently herewith~~ filed February 28, 2007, now U.S. Patent No. 8,065,737, assigned to the assignee hereof[[,]] and expressly incorporated by reference herein.

Please delete paragraph [0003] and the preceding heading.

Please amend paragraph [0012] as follows:

[0012] Thus, embodiments of the present ~~invention~~ disclosure provide an operating system-independent system and method for distributing an application environment to a compute node. By utilizing a root-leaf system of application environment storage, embodiments of the present ~~invention~~ disclosure allow creation of boot images on the fly without significantly diminishing bring-up time. This is due to the fact that creating a new boot image does not

LAW OFFICES OF
CHRISTENSEN O'CONNOR JOHNSON KINDNESS[PLLC]
1420 Fifth Avenue
Suite 2800
Seattle, Washington 98101
206.682.8100

require copying the contents of the root image. Rather it involves registering a new UBD with the system, which occurs very quickly. Bring up time, and access time in general, can be further improved by caching commonly accessed the portions of the root image. Moreover, updating the boot image for the entire cluster simply involves updating the root image. Additionally, because of the commonality of the root image and the fact that its contents are not directly changed, certain operations performed on the root image (e.g., indexing) only need to be performed once by one compute node. Thereafter, the results of that operation can be shared with the other compute nodes in the cluster, thus saving the other compute nodes valuable time and resources.

Please amend paragraphs [0014]-[0017] as follows:

**[0014]** FIG. 2 is a diagram of a system for root image caching and indexing in a block-level distributed application environment, in accordance with various embodiments of the present ~~invention~~ disclosure.

**[0015]** FIGS. 3A-3B are flowcharts illustrating a process for root image caching and indexing in a block-level distributed application environment, in accordance with various embodiments of the present ~~invention~~ disclosure.

**[0016]** FIG. 4 illustrates a flowchart for a process for updating the cache based on a read request, in accordance with an embodiment of the present ~~invention~~ disclosure.

**[0017]** FIG. 5 illustrates a flowchart for a process for indexing a root image, in accordance with various embodiments of the present ~~invention~~ disclosure.

Please amend paragraphs [0018]-[0019] as follows:

**[0018]** Reference will now be made in detail to ~~the preferred~~ various embodiments of the ~~invention~~ disclosure, examples of which are illustrated in the accompanying drawings. While

the ~~invention~~ disclosure will be described in conjunction with the ~~preferred~~ various embodiments, it will be understood that they are not intended to limit the ~~invention~~ scope of the claims to these embodiments. On the contrary, the ~~invention~~ disclosure is intended to cover alternatives, modifications and equivalents, which may be included within the spirit and scope of the ~~invention~~ disclosure as defined by the claims. Furthermore, in the detailed description of the present ~~invention~~ disclosure, numerous specific details are set forth in order to provide a thorough understanding of the present ~~invention~~ disclosure. However, it will be obvious to one of ordinary skill in the art that the present ~~invention~~ disclosure may be practiced without these specific details. In other instances, ~~well known~~ well-known methods, procedures, components, and circuits have not been described in detail so as not to unnecessarily obscure aspects of the present ~~invention~~ disclosure.

[0019] Some portions of the detailed descriptions that follow are presented in terms of procedures, logic blocks, processing, and other symbolic representations of operations on data bits within a computer or digital system memory. These descriptions and representations are the means used by those skilled in the data processing arts to most effectively convey the substance of their work to others skilled in the art. A procedure, logic block, process, etc., is herein, and generally, conceived to be a self-consistent sequence of steps or instructions leading to a desired result. The steps are those requiring physical manipulations of physical quantities. Usually, though not necessarily, these physical manipulations take the form of electrical or magnetic signals capable of being stored, transferred, combined, compared, and otherwise manipulated in a computer system or similar electronic computing device. For reasons of convenience, and with reference to common usage, these signals are referred to as bits, values, elements, symbols, characters, terms, numbers, or the like with reference to the present ~~invention~~ disclosure.

Please amend paragraph [0024] as follows:

[0024] FIG. 2 is a diagram of a system 200 for root image caching and indexing in a block-level distributed application environment, in accordance with various embodiments of the present ~~invention~~ disclosure. In one embodiment, system 200 is implemented in a multi-computer system, such as an HPC cluster. In one embodiment, the application environment includes an operating system. In other embodiments, the application environment may contain other applications. System 200 has a number of compute nodes 220a-n coupled to first storage unit 240 and a corresponding second storage unit 250a-n though a corresponding union block device (UBD) 230a-n. To the compute nodes 220a-n, it appears that they have access to their own version of a distributed application environment. However, a separate and complete boot image is not created and stored for each compute node 220a-n.

Please amend paragraph [0031] as follows:

[0031] An embodiment of the present ~~invention~~ disclosure provides for caching of portions of the root image. Because several compute nodes in a cluster may often access the same data (e.g., same drivers, same library files, etc.) on the root image, tremendous speed improvements can be realized by caching such data in cache 260. For example, by current standards, it is common for a storage disk to achieve a data transfer rate around 76 MB/s, whereas cache memory can achieve speeds up to and greater than 800 MB/s. In one embodiment, the cache may be contained within a single storage appliance, along with the first storage unit 240 and the second storage units 250a-n.

LAW OFFICES OF
CHRISTENSEN O'CONNOR JOHNSON KINDNESS[PLLC]
1420 Fifth Avenue
Suite 2800
Seattle, Washington 98101
206.682.8100

Please amend paragraph [0034] as follows:

[0034] An embodiment of the present ~~invention~~ disclosure provides for indexing the root image. From the standpoint of seek time, it is beneficial for each compute node to have access to an index of its file system. In a traditional clustered computing situation, each compute node would independently index its file system. To the extent that each compute node in a cluster has similar operating environments to the others, indexing performed on common data is therefore redundant.

Please amend paragraph [0036] as follows:

[0036] FIGS. 3A-3B are flowcharts illustrating a process 300 for root image caching and indexing in a block-level distributed application environment, in accordance with various embodiments of the present ~~invention~~ disclosure. Although specific operations are disclosed in process 300, such operations are exemplary. Process 300 may not include all of the operations illustrated by FIGS. 3A-3B. Also, process 300 may include various other operations and/or variations of the operations shown by FIGS. 3A-3B. Likewise, the sequence of the operations of process 300 can be modified. Steps of process 300 may be stored as instructions on a computer readable medium and executed on a computer processor.

Please amend paragraph [0044] as follows:

[0044] FIG. 4 illustrates a flowchart for a process 345 for updating the cache based on a read request, in accordance with an embodiment of the present ~~invention~~ disclosure. [[Is]] It should be appreciated that the steps illustrated in FIG. 4 are exemplary and the updating performed in block 345 of process 300 may be achieved in many other ways as well. Process 345 may not include all of the operations illustrated by FIG. 4. Also, process 345 may include various other

operations and/or variations of the operations shown by FIG. 4. Likewise, the sequence of the operations of process 345 can be modified. Steps of process 345 may be stored as instructions on a computer readable medium and executed on a computer processor.

Please amend paragraphs [0049]-[0054] as follows:

**[0049]** FIG. 5 illustrates a flowchart for a process 500 for indexing a root image, in accordance with various embodiments of the present ~~invention~~ disclosure. Although specific operations are disclosed in process 500, such operations are exemplary. Process 500 may not include all of the operations illustrated by FIG. 5. Also, process 500 may include various other operations and/or variations of the operations shown by FIG. 5. Likewise, the sequence of the operations of process 500 can be modified. Steps of process 500 may be stored as instructions on a computer readable medium and executed on a computer processor.

**[0050]** Step 510 involves receiving data blocks of a file system at a compute node. The data blocks include a root image portion in the leaf image portion. As described above, the leaf image portion includes additional data blocks not previously contained in the root image portion and also changes made by the compute node to the blocks of the root image. Thus, the file system actually seen by the compute node is a product of ~~urging~~ merging the root image portion in the leaf image portion together at the block level.

**[0051]** Step 520 involves the compute node indexing the root image portion of its file system. In such a case, the compute node is to some extent ~~agonizing~~ agnostic to the fact that its file system is divided between a root image portion and a leaf image portion. At step 540, the compute node provides the indexing results of the root image portion to another compute node. It is appreciated that this may be achieved a number of ways. For example, the first compute node may simply provide the indexing results to the second compute node directly.

LAW OFFICES OF
CHRISTENSEN O'CONNOR JOHNSON KINDNESS^PLLC
1420 Fifth Avenue
Suite 2800
Seattle, Washington 98101
206.682.8100

Alternatively, the first compute node may store the indexing results on a shared storage unit that is accessible by the second compute node (step 530).

[0052] Thereafter, the compute node may complete its indexing of its file system by indexing the leaf image portion of the file system (step 550). Further down the road, the benefits of indexing the root image separately from the leaf image are realized when the compute node requires that its file system be re-indexed. At step 560, the compute node re-indexes its file system by re-indexing its corresponding leaf image portion with the previous indexing results of the root portion.

[[In]]

[0053] Thus, by operating at the block level, embodiments of the present ~~invention~~ disclosure provide file system and operating system independent systems and methods for distributing an application environment to a compute node. By utilizing a branching store system of application environment distribution, embodiments of the present ~~invention~~ disclosure allow creation of boot images on the fly without significantly diminishing bring-up time. This is due to the fact that creating a new boot image does not require copying the contents of the root image, but rather it involves registering a new UBD with the system, which occurs very quickly. Bring up time, and access time in general, can be further improved by caching commonly accessed the portions of the root image. Moreover, updating the boot image for the entire cluster simply involves updating the root image.

[0054] Embodiments of the present ~~invention~~ disclosure also allow for scalability and redundancy. For example, a server containing the root image may only have the resources to supply the root image to 100 compute nodes. Thus, in order to implement a 200-compute node system, two servers, each containing a copy of the root image, are used. This scalability provided by embodiments also lends itself to dynamic scaling. In other words, the number of

LAW OFFICES OF
CHRISTENSEN O'CONNOR JOHNSON KINDNESS^PLLC
1420 Fifth Avenue
Suite 2800
Seattle, Washington 98101
206.682.8100

root images required for a specific configuration can change based on the I/O workload, and new root images can be created on the fly accordingly. Moreover, additional servers containing the root image may be added into the system to provide redundancy and increase reliability. For example, and with reference to FIG. 2, cache 261, first storage unit 241, and second storage units 251a-n provide failover/redundancy security for system 200. As an added security measure, some of the root nodes may be located remotely from each other (e.g., half located in a main office and half in a satellite office). In addition, it is possible to copy the contents of one or more leaf nodes into a non-UBD (regular block device) copy (e.g., for use as an isolated backup).

Please amend paragraph [0056] as follows:

**[0056]** The previous description of the disclosed embodiments is provided to enable any person skilled in the art to make or use the present ~~invention~~ disclosure. Various modifications to these embodiments will be readily apparent to those skilled in the art, and the generic principles defined herein may be applied to other embodiments without departing from the spirit or scope of the ~~invention~~ disclosure. Thus, the present ~~invention~~ disclosure is not intended to be limited to the embodiments shown herein but is to be accorded the widest scope consistent with the principles and novel features disclosed herein.

LAW OFFICES OF
CHRISTENSEN O'CONNOR JOHNSON KINDNESS^PLLC
1420 Fifth Avenue
Suite 2800
Seattle, Washington 98101
206.682.8100

AMENDMENTS TO THE CLAIMS

1. (Currently amended) A system for providing data to a plurality of compute nodes, the system comprising:

a first storage unit ~~for storing~~ configured to store blocks of a root image of said compute nodes;

a plurality of second storage units ~~for storing~~ configured to store leaf images of respective compute nodes, said leaf images ~~comprising~~ including only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of said root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes; and

a cache ~~for caching~~ configured to cache blocks of said root image previously accessed by at least one of said compute nodes.

2. (Currently amended) The system as recited in Claim 1 wherein said cache is ~~configurable~~ configured to store [[the]] X most recently accessed blocks of said root image, and wherein ~~further~~ X represents a cache threshold value.

3. (Original) The system as recited in Claim 1 wherein said first storage unit, said second storage units, and said cache are contained within a single storage appliance.

4. (Currently amended) The system as recited in Claim 1 further comprising:

a plurality of union block devices ~~for interfacing~~ configured to interface between respective compute nodes and said first storage unit, respective second storage units, and said cache to distribute application environments to the compute nodes, wherein said union block

LAW OFFICES OF
CHRISTENSEN O'CONNOR JOHNSON KINDNESS^PLLC
1420 Fifth Avenue
Suite 2800
Seattle, Washington 98101
206.682.8100

devices ~~create~~ are configured to create said application environments by merging the blocks of said root image with the blocks of respective leaf images.

5. (Previously presented) The system as recited in Claim 4 wherein said union block devices comprise low-level drivers for interfacing between the file systems of respective compute nodes and said first storage unit, respective second storage units, and said cache.

6. (Original) The system as recited in Claim 1 wherein said first storage unit is read-only.

7. (Currently amended) A method for providing data to a plurality of compute nodes, comprising:

storing blocks of a root image of said compute nodes on a first storage unit;

storing leaf images for respective compute nodes on respective second storage units, said leaf images ~~comprising~~ including only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes; and

caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory.

8. (Previously presented) The method as recited in Claim 7 further comprising:

receiving a read request from at least one of said compute nodes, wherein a first portion of the data requested is currently stored in said cache memory; and

providing said first portion of said data to said at least one of said compute nodes from said cache memory.

9. (Previously presented) The method as recited in Claim 8 further comprising:

updating said cache memory based on said read request.

10. (Currently amended) The method as recited in Claim 9 wherein a second portion of the data requested is not currently stored in said cache memory and said updating comprises:

caching said second portion in said cache memory; and

removing the least recently accessed data from said cache memory if the amount of data [[is]] <u>in</u> said cache memory is above a threshold value.

11. (Previously presented) The method as recited in Claim 7 further comprising:

merging the blocks of said root image with the blocks of respective leaf images to create cohesive respective application environments.

12. (Currently amended) The method as recited in Claim 11 wherein said merging occurs at an operational level between ~~the respective~~ file systems of the <u>respective</u> compute nodes and said first storage unit, respective second storage units, and said cache memory.

13. (Previously presented) The method as recited in Claim 7 wherein said first storage unit is read-only.

14. (Currently amended) A system for indexing file systems for a plurality of compute nodes, <u>the system</u> comprising:

a first storage unit ~~for storing~~ <u>configured to store</u> blocks of a root image of said compute nodes;

a plurality of second storage units ~~for storing~~ <u>configured to store</u> leaf images of respective compute nodes, said leaf images comprising only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of said root

LAW OFFICES OF
CHRISTENSEN O'CONNOR JOHNSON KINDNESS[PLLC]
1420 Fifth Avenue
Suite 2800
Seattle, Washington 98101
206.682.8100

image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes; and

a plurality of union block devices corresponding to said compute nodes, said union block devices ~~for interfacing~~ configured to interface between said compute nodes and said first and second storage units to distribute said file systems to said compute nodes, wherein said union block devices are configured to create said file systems by merging the blocks of said root image stored on the first storage unit with the blocks of respective leaf images stored on respective second storage units, and wherein further at least one of said compute nodes is ~~configurable~~ configured to index said root image and provide the indexing results to another of said compute nodes.

15. (Previously presented) The system as recited in Claim 14 wherein said first storage unit and said second storage units are contained within a single storage appliance.

16. (Currently amended) The system as recited in Claim 14 further comprising:

a plurality of union block devices ~~for interfacing~~ configured to interface between respective compute nodes and said first storage unit and respective second storage units, said union block devices ~~operable~~ configured to distribute application environments to the compute nodes, wherein said union block devices are configured to create said application environments by merging the blocks of said root image with the blocks of respective leaf images.

17. (Previously presented) The system as recited in Claim 16 wherein said union block devices comprise low-level drivers for interfacing between the file systems of respective compute nodes and said first storage unit, respective second storage units, and said cache.

18. (Previously presented) The system as recited in Claim 14 wherein said first storage unit is read-only.

19. (Previously presented) A method for indexing file systems for a plurality of compute nodes, comprising:

storing blocks of a root image of said compute nodes on a first storage unit;

storing leaf images for respective compute nodes on respective second storage units, said leaf images comprising only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image, wherein said leaf images for respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes;

merging the blocks of said root image with the blocks of respective leaf images stored on respective second storage units to create respective file systems for respective compute nodes;

receiving indexing results pertaining to said root image from one of said compute nodes; and

providing said indexing results to the others of said compute nodes.

20. (Previously presented) The method as recited in Claim 19 further comprising:

storing said indexing results on a shared storage unit.

21. (Currently amended) The method as recited in Claim 19 wherein said merging occurs at an operational level between [[the]] respective file systems of the compute nodes and said first storage unit and respective second storage units.

22. (Previously presented) The method as recited in Claim 19 wherein said first storage unit is read-only.

23. (Currently amended) A ~~non-transitory computer readable media comprising computer-executable~~ computer-readable storage medium having instructions stored ~~therein~~ thereon that, ~~the computer-executable instructions comprising~~ in response to execution by at least one computing device, cause the at least one computing device to:

~~instructions to~~ receive data blocks of a file system, said data blocks comprising a root image portion and leaf image portion, said leaf image portion comprising only additional data blocks not previously contained in said root image portion and changes made by said first compute node to the blocks of said root image, wherein said leaf image portion does not include blocks of said root image that are unchanged by said first compute node, wherein said file system is the result of merging said root image portion and said leaf image portion together at the block-level;

~~instructions to~~ index said root image portion; and

~~instructions to~~ provide the results of said indexing to a second compute node, wherein said logic encoded in the one or more tangible media comprise computer executable instructions executed by the first compute node.

24. (Currently amended) The ~~non-transitory computer readable media~~ computer-readable storage medium of Claim 23, wherein the instructions further ~~comprising instructions~~ cause the at least one computing device to store said results of said indexing on a shared storage unit accessible by said second compute node.

25. (Currently amended) The ~~non-transitory computer readable media~~ computer-readable storage medium of Claim 23, wherein the instructions further ~~comprising instructions~~ cause the at least one computing device to index said leaf image portion.

26. (Currently amended) The ~~non-transitory computer readable media~~ computer-readable storage medium of Claim 25, wherein the instructions further ~~comprising instructions~~ cause the at least one computing device to re-index said file system by re-indexing said leaf image portion and merging the results of said re-indexing of said leaf image portion with said results of said indexing of said root image portion.

27. (Currently amended) The ~~non-transitory computer readable media~~ computer-readable storage medium of Claim 23 wherein said root image portion is read-only.

LAW OFFICES OF
CHRISTENSEN O'CONNOR JOHNSON KINDNESS[PLLC]
1420 Fifth Avenue
Suite 2800
Seattle, Washington 98101
206.682.8100

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 11/709,477 | 02/21/2007 | Pradip Kulkarni | PNTA-P006.CIP.A |

**CONFIRMATION NO. 4127**

**POA ACCEPTANCE LETTER**

52531
CHRISTENSEN O'CONNOR JOHNSON KINDNESS PLLC
1420 FIFTH AVENUE
SUITE 2800
SEATTLE, WA 98101-2347

*OC000000054795033*

Date Mailed: 06/14/2012

## NOTICE OF ACCEPTANCE OF POWER OF ATTORNEY

This is in response to the Power of Attorney filed 06/07/2012.

The Power of Attorney in this application is accepted. Correspondence in this application will be mailed to the above address as provided by 37 CFR 1.33.

/agizaw/

Office of Data Management, Application Assistance Unit (571) 272-4000, or (571) 272-4200, or 1-888-786-0101

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 11/709,477 | 02/21/2007 | Pradip Kulkarni | PNTA-P006.CIP.A |

**CONFIRMATION NO. 4127**

**POWER OF ATTORNEY NOTICE**

*OC000000054794984*

70848
PANTA c/o MURABITO HAO & BARNES LLP
Two Market Street
3rd Floor
San Jose, CA 95113

Date Mailed: 06/14/2012

## NOTICE REGARDING CHANGE OF POWER OF ATTORNEY

This is in response to the Power of Attorney filed 06/07/2012.

- The Power of Attorney to you in this application has been revoked by the assignee who has intervened as provided by 37 CFR 3.71. Future correspondence will be mailed to the new address of record(37 CFR 1.33).

/agizaw/

---

Office of Data Management, Application Assistance Unit (571) 272-4000, or (571) 272-4200, or 1-888-786-0101

PTO/SB/80 (11-08)
Approved for use through 11/30/2011. OMB 0651-0035
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# POWER OF ATTORNEY TO PROSECUTE APPLICATIONS BEFORE THE USPTO

I hereby revoke all previous powers of attorney given in the application identified in the attached statement under 37 CFR 3.73(b)

I hereby appoint:

[x] Practitioners associated with the Customer Number: **52531**

OR

[ ] Practitioner(s) named below (if more than ten patent practitioners are to be named, then a customer number must be used):

| Name | Registration Number | Name | Registration Number |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

as attorney(s) or agent(s) to represent the undersigned before the United States Patent and Trademark Office (USPTO) in connection with any and all patent applications assigned only to the undersigned according to the USPTO assignment records or assignment documents attached to this form in accordance with 37 CFR 3.73(b).

Please change the correspondence address for the application identified in the attached statement under 37 CFR 3.73(b) to:

[x] The address associated with Customer Number: **52531**

OR

| | | | | | |
|---|---|---|---|---|---|
| [ ] Firm or Individual Name | | | | | |
| Address | | | | | |
| City | | State | | Zip | |
| Country | | Telephone | | Email | |

Assignee Name and Address:

Emendable Assets Limited Liability Company
2711 Centerville Rd
Suite 400
Wilmington, Delaware U.S.A.
19808

**A copy of this form, together with a statement under 37 CFR 3.73(b) (Form PTO/SB/96 or equivalent) is required to be filed in each application in which this form is used. The statement under 37 CFR 3.73(b) may be completed by one of the practitioners appointed in this form if the appointed practitioner is authorized to act on behalf of the assignee, and must identify the application in which this Power of Attorney is to be filed.**

**SIGNATURE of Assignee of Record**

The individual whose signature and title is supplied below is authorized to act on behalf of the assignee

| | | | |
|---|---|---|---|
| Signature | [signature] | Date | 5/31/2012 |
| Name | Peter Kwon | Telephone | |
| Title | Authorized Person for Emendable Assets Limited Liability Company | | |

This collection of information is required by 37 CFR 1.31, 1.32 and 1.33. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 3 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

DECLARATION REGARDING AUTHORITY TO SIGN
ON BEHALF OF A LEGAL ENTITY
37 C.F.R. 3.73(b)(2)(i)

I, Peter Kwon (whose title is supplied below), hereby declare that I am authorized to sign documents on behalf of Emendable Assets Limited Liability Company

Peter Kwon
Authorized Person for Emendable Assets Limited Liability Company

5/31/2012
Date

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Applicants: | P. Kulkarni et al. | OLD Attorney Docket No.: PNTA-P006.CIP.A<br>**NEW** Attorney Docket No.: 139537 |
| Application No.: | 11/709,477 | Art Unit: 2628 / Confirmation No.: 4127 |
| Filed: | February 21, 2007 | Examiner: E. Martello |
| Title: | ROOT IMAGE CACHING AND INDEXING FOR BLOCK-LEVEL DISTRIBUTED APPLICATION MANAGEMENT | |

**STATEMENT OF OWNERSHIP UNDER 37 C.F.R. § 3.73(b)**

June 7, 2012

TO THE COMMISSIONER FOR PATENTS:

Emendable Assets Limited Liability Company, a limited liability company, certifies that it is the assignee of the entire right, title, and interest in the above-identified patent application by a chain of title from the inventors of the above-identified patent application to the current assignee as shown below:

1. From: Pradip Kulkarni, Mukul Kumar, Adhir Potdar, Richard Au, and Tung M. Nguyen
   To: Panta Systems, Inc.

   The document was recorded in the U.S. Patent and Trademark Office at Reel 018975, Frame 0285.

2. From: Panta Systems, Inc.
   To: Venture Lending & Leasing IV, Inc.

   The document was recorded in the U.S. Patent and Trademark Office at Reel 028324, Frame 0627.

3. From: Venture Lending & Leasing IV, Inc.
   To: Emendable Assets Limited Liability Company

   The document was recorded in the U.S. Patent and Trademark Office at Reel 028321, Frame 0563.

LAW OFFICES OF
CHRISTENSEN O'CONNOR JOHNSON KINDNESS[PLLC]
1420 Fifth Avenue
Suite 2800
Seattle, Washington 98101
206.682.8100

The undersigned is an attorney of record and is authorized to act on behalf of the assignee.

Respectfully submitted,

**/Kevan L. Morgan/**

Kevan L. Morgan
Attorney of Record
Registration No. 42,015

KLM:cae



LAW OFFICES OF
CHRISTENSEN O'CONNOR JOHNSON KINDNESS[PLLC]
1420 Fifth Avenue
Suite 2800
Seattle, Washington 98101
206.682.8100

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 12964904 |
| **Application Number:** | 11709477 |
| **International Application Number:** | |
| **Confirmation Number:** | 4127 |
| **Title of Invention:** | Root image caching and indexing for block-level distributed application management |
| **First Named Inventor/Applicant Name:** | Pradip Kulkarni |
| **Customer Number:** | 70848 |
| **Filer:** | Kevan L Morgan/Constance Edgar |
| **Filer Authorized By:** | Kevan L Morgan |
| **Attorney Docket Number:** | PNTA-P006.CIP.A |
| **Receipt Date:** | 07-JUN-2012 |
| **Filing Date:** | 21-FEB-2007 |
| **Time Stamp:** | 21:32:41 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | | 39537_Rev_POA.pdf | 938863<br>edfb597874c75d4cbe8594f776598e8ba28df8ec | yes | 4 |

| Multipart Description/PDF files in .zip description | | |
|---|---|---|
| **Document Description** | **Start** | **End** |
| Power of Attorney | 1 | 2 |
| Assignee showing of ownership per 37 CFR 3.73(b). | 3 | 4 |

**Warnings:**

**Information:**

| | |
|---|---|
| **Total Files Size (in bytes):** | 938863 |

**This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.**

**New Applications Under 35 U.S.C. 111**
**If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.**

**National Stage of an International Application under 35 U.S.C. 371**
**If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.**

**New International Application Filed with the USPTO as a Receiving Office**
**If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.**

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 11/709,477 | 02/21/2007 | Pradip Kulkarni | PNTA-P006.CIP.A | 4127 |

70848 7590 03/12/2012
PANTA c/o MURABITO HAO & BARNES LLP
Two Market Street
3rd Floor
San Jose, CA 95113

| EXAMINER | |
|---|---|
| MARTELLO, EDWARD | |
| **ART UNIT** | **PAPER NUMBER** |
| 2628 | |
| **MAIL DATE** | **DELIVERY MODE** |
| 03/12/2012 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

| Office Action Summary | Application No. | Applicant(s) |
|---|---|---|
| | 11/709,477 | KULKARNI ET AL. |
| | Examiner | Art Unit |
| | EDWARD MARTELLO | 2628 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE 3 MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on *31 August 2010*.

2a)☐ This action is **FINAL**. 2b)☒ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

5)☒ Claim(s) *1-27* is/are pending in the application.

5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6)☐ Claim(s) _____ is/are allowed.

7)☒ Claim(s) *1-27* is/are rejected.

8)☐ Claim(s) _____ is/are objected to.

9)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

10)☐ The specification is objected to by the Examiner.

11)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.

Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

12)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

13)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

a)☐ All b)☐ Some * c)☐ None of:

1.☐ Certified copies of the priority documents have been received.

2.☐ Certified copies of the priority documents have been received in Application No. _____.

3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

* See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)

2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3) ☐ Information Disclosure Statement(s) (PTO/SB/08) Paper No(s)/Mail Date _____.

4) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____.

5) ☐ Notice of Informal Patent Application

6) ☐ Other: _____.

## DETAILED ACTION

### *Continued Examination Under 37 CFR 1.114*

1. A request for continued examination under 37 CFR 1.114, including the fee set forth in 37 CFR 1.17(e), was filed in this application after final rejection. Since this application is eligible for continued examination under 37 CFR 1.114, and the fee set forth in 37 CFR 1.17(e) has been timely paid, the finality of the previous Office action has been withdrawn pursuant to 37 CFR 1.114. Applicant's submission filed on 25 August 2010 has been entered.

### *Response to Amendment*

2. Claims 1, 5 and 7-27 are amended and claims 2-4 and 6 are as originally presented.

3. In summary, claims 1-27 are pending in the application.

4. The amendment of claims 5, 8-13, 15-18, 20-22 and 24-27 has cured the basis for the objection to the claims, thus, the objection to claims 5, 8-13, 15-18, 20-22 and 24-27 is hereby withdrawn.

5. The amendment of claims 23-27 has cured the basis for the 35 U.S.C. § 101 rejection of the claims, thus, the 35 U.S.C. § 101 rejection of claims 23-27 is hereby withdrawn.

6. The amendment of Paragraph [0022] of the specification is accepted and entered into the record, thus, the objection to Paragraph [0022] of the specification is hereby withdrawn.

7. The Applicants' argument with respect to the objection to the specification due the lack of antecedent basis for the union block devices is persuasive with respect to this feature, thus, the objection to the specification is hereby withdrawn.

### *Claim Rejections - 35 USC § 112*

The following is a quotation of the second paragraph of 35 U.S.C. 112:

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

8. Claims 4, 5, 14, 16 and 17 are rejected under 35 U.S.C. 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention. Claims 4, 5, 14, 16 and 17 all incorporate features called "union block devices" with insufficient basis within the claims to define their character. Union block devices are described in paragraph [0024] and in paragraphs [0027]-[0028]. Paragraph 27 states that they may be low level drivers and that the file system resides on the server side of system 200, but as they are shown in figure 2, they appear to be standalone devices and not part of the compute nodes. The functionality described in paragraphs [0027]-[0028] requires a processor that is not part of the "union block devices" as shown in figure 2, thus they must be part of their respective compute nodes which they would be if they were a low-level driver as now presented in claims 5 and 17. Paragraph [0028] claims that the "union block devices" may create new leaf images on a second storage unit when their respective compute nodes make changes to their instantiation of the application environment and they do this without knowledge of the file system as claimed in the last sentence in paragraph [0027]. The Examiner would like to know how a "union block devices" can create files on a disk that are associated with files on

another disk, the main disk 260 which is managed with a file system on the server or compute node side of the overall environment, and **not have any knowledge of the file system**. Each of the compute nodes 220a-220n are typified as being able to be running different operating systems and the server, if there is one in a particular configuration, could be running yet another operating system. For example, these nodes and server could be running a combination of operating systems that could include a mixed environment of file systems such as NTFS, FAT32, and a UNIX (4.4BSD and descendants) file systems and it would be most interesting to be informed as to how the UDB's know where on a disk to find a particular set of clusters or even down to disk sectors to modify the contents of them and possibly have to request additional clusters for an update without knowing anything about the operating system file system on the nodes or the server. These UBD's are "effectively low-level drivers that operate as an interface…." according to the specification and are made equal to drivers in claims 5 and 17. There is insufficient information provided in the claims and the specification as to the where/ how the functionality of this UBD joining device or device driver is accomplished in the broadly defined embodiments covered in the specification and as such, the claimed subject matter does not meet the requirements of UCS 112 second paragraph in that it does not enable one of ordinary skill in the art at the time of the invention to make and use the invention.

***Prior Art Claim Rejections***

9. A new ground of rejection based upon Nguyen et al.; U. S. Patent 7,870,106 B1, follows.

***Claim Rejections - 35 USC § 102***

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (e) the invention was described in (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for purposes of this subsection of an application filed in the United States only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language.

10. Claims 19-27 are rejected under 35 U.S.C. 102(e) as being anticipated by Nguyen et al. (U. S. Patent 7,870,106 B1, hereafter '106).

11. Regarding claim 19 (Currently Amended), Nguyen teaches a method for indexing file systems for a plurality of compute nodes ('106; fig. 1), comprising: storing blocks of a root image of said compute nodes on a first storage unit ('106; fig. 1, element 104; col. 3, ln. 63-67); storing leaf images for respective compute nodes on respective second storage units ('106; fig. 1, elements 105a, 105b, 105n; col. 4, ln. 3-10), said leaf images comprising <u>only</u> additional data blocks not previously contained in said root image ('106; col. 4, ln. 35-37; updates to the base image) and changes made by respective compute nodes to the blocks of the root image ('106; col. 4, ln. 4-10, col. 4, ln. 12-14; changes are made on a block by block basis), wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes ('106; col. 4, ln. 33-35; only changes are stored in the leaf nodes; the base nodes is not changed by the compute nodes; col. 3, ln. 65-67); merging the blocks of said root image with the blocks of respective leaf images stored on respective second storage

units to create respective file systems for respective compute nodes ('106; fig. 3; col 5, ln. 23 through col. 6, ln. 2); receiving indexing results pertaining to said root image from one of said compute nodes ('106; col. 5, ln. 34-43); and providing said indexing results to the others of said compute nodes ('106; col. 5, ln. 34-43).

12. In regard to claim 20 (Currently Amended), Nguyen teaches the method as recited in claim 19 and further teaches the method as further comprising: storing said indexing results on a shared storage unit ('106; fig. 8, col. 8, ln. 66 through col. 9, ln. 8; storage controller or server).

13. Regarding claim 21 (Currently Amended), Nguyen teaches the method as recited in claim 19 and further teaches wherein said merging occurs at an operational level between the respective file systems of the compute nodes and said first storage unit and respective second storage units ('106; fig. 3; col 5, ln. 23 through col. 6, ln. 2).

14. In regard to claim 22 (Currently Amended), Nguyen teaches the method as recited in claim 19 and further teaches wherein said first storage unit is read-only ('106; col. 4, ln. 54-55).

15. Regarding claim 23 (Currently Amended), Nguyen teaches a non-transitory computer readable media comprising computer-executable instructions stored therein ('106; col. 7, ln. 25-28), the computer-executable instructions comprising: instructions to receive data blocks of a file system ('106; fig. 1), said data blocks comprising a root image portion ('106; fig. 1, element 104; col. 3, ln. 63-67) and leaf image portion ('106; fig. 1, elements 105a, 105b, 105n; col. 4, ln. 3-

10), said leaf image portion comprising only additional data blocks not previously contained in said root image portion ('106; col. 4, ln. 35-37; updates to the base image) and changes made by said first compute node to the blocks of said root image ('106; col. 4, ln. 4-10, col. 4, ln. 12-14; changes are made on a block by block basis), wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute node ('106; col. 4, ln. 33-35; only changes are stored in the leaf nodes; the base nodes is not changed by the compute nodes; col. 3, ln. 65-67), wherein said file system is the result of merging said root image portion and said leaf image portion together at the block-level ('106; fig. 3; col 5, ln. 23 through col. 6, ln. 2; col. 4, ln. 12-14; changes are made on a block by block basis); instructions to index said root image portion ('106; col. 5, ln. 34-43); and instructions to provide the results of said indexing to a second compute node ('106; col. 5, ln. 34-43), wherein said logic encoded in the one or more tangible media comprise computer executable instructions executed by the first compute node ('106; col. 7, ln. 25-55).

16. In regard to claim 24 (Currently Amended), Nguyen teaches the non-transitory computer readable media of claim 23, and further teaches the media as further comprising instructions to store said results of said indexing on a shared storage unit accessible by said second compute node ('106; fig. 4; col. 6, ln. 3-24).

17. Regarding claim 25 (Currently Amended), Nguyen teaches the non-transitory computer readable media of claim 23, and further teaches the media as further comprising instructions to index said leaf image portion ('106; col. 5, ln. 34-43).

18. In regard to claim 26 (Currently Amended), Nguyen teaches the non-transitory computer readable media of claim 25, and further teaches the media as further comprising instructions to re-index said file system by re-indexing said leaf image portion ('106; col. 8, ln. 50-61) and merging the results of said re-indexing of said leaf image portion with said results of said indexing of said root image portion ('106; fig. 3; col 5, ln. 23 through col. 6, ln. 2).

19. Regarding claim 27 (Currently Amended), Nguyen teaches the non-transitory computer readable media of claim 23 and further teaches wherein said root image portion is read-only ('106; col. 4, ln. 54-55).

***Claim Rejections - 35 USC § 103***

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

The factual inquiries set forth in *Graham* v. *John Deere Co.*, 383 U.S. 1, 148 USPQ 459 (1966), that are applied for establishing a background for determining obviousness under 35 U.S.C. 103(a) are summarized as follows:

1. Determining the scope and contents of the prior art.
2. Ascertaining the differences between the prior art and the claims at issue.
3. Resolving the level of ordinary skill in the pertinent art.
4. Considering objective evidence present in the application indicating obviousness or nonobviousness.

20. Claims 14-18 are rejected under 35 U.S.C. 103(a) as being unpatentable over Nguyen et al. (U. S. Patent 7,870,106 B1, hereafter '106) as applied to claims 19-27 above.

21. In regard to claim 14 (Currently Amended), Nguyen teaches a system for indexing file systems for a plurality of compute nodes ('106; fig. 1), comprising: a first storage unit for storing blocks of a root image of said compute nodes ('106; fig. 1, element 104; col. 3, ln. 63-67); a plurality of second storage units for storing leaf images of respective compute nodes ('106; fig. 1, elements 105a, 105b, 105n; col. 4, ln. 3-10), said leaf images comprising only additional data blocks not previously contained in said root image ('106; col. 4, ln. 35-37; updates to the base image) and changes made by respective compute nodes to the blocks of said root image ('106; col. 4, ln. 4-10, col. 4, ln. 12-14; changes are made on a block by block basis), wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes ('106; col. 4, ln. 33-35; only changes are stored in the leaf nodes; the base nodes is not changed by the compute nodes; col. 3, ln. 65-67); and a plurality of union block devices ('106; fig. 1, element 110, filter with ports or paths to each compute node; col. 4, ln. 18-29, essentially one or more low-level driver(s) of the instant application that service each node; fig. 4, element 110, col. 6, ln. 25-26, there is a copy of filter 110 at each compute node - a plurality union block devices) corresponding to said compute nodes ('106; fig. 2, col. 38-48; fig. 4, element 110, col. 6, ln. 25-26), said union block devices ('106; fig. 1, element 110, filter with ports or paths to each compute node; col. 4, ln. 18-29, essentially one or more low-level driver(s) of the instant application that service each node; fig. 4, element 110, col. 6, ln. 25-26, there is a copy of filter 110 at each compute node - a plurality union block devices) for interfacing between

said compute nodes and said first and second storage units to distribute said file systems to said compute nodes ('106; fig. 2, col. 38-48; fig. 4, element 110, col. 6, ln. 25-26), wherein said union block devices ('106; fig. 1, element 110, filter with ports or paths to each compute node; col. 4, ln. 18-29, essentially one or more low-level driver(s) of the instant application that service each node; fig. 4, element 110, col. 6, ln. 25-26, there is a copy of filter 110 at each compute node - a plurality union block devices) create said file systems by merging the blocks of said root image stored on the first storage unit with the blocks of respective leaf images stored on respective second storage unit ('106; fig. 3; col 5, ln. 23 through col. 6, ln. 2), and wherein further at least one of said compute nodes is configurable to index said root image and provide the indexing results to another of said compute nodes ('106; col. 5, ln. 34-43).

22. While Nguyen does not explicitly teach union block devices, the filter element 110 of Nguyen is equivalent to the concept of a plurality of union block devices and an embodiment described at fig. 4, element 110, col. 6, ln. 25-26, has a copy of filter 110 at each compute node yielding a plurality union block devices performing the function of a low-level driver as described in the instant application and in the Applicants' remarks provided with the RCE.

23. It would have been obvious to one of ordinary skill in the art at the time of the invention to have comprehended that the plurality of union block devices of the instant application are equivalent to the filter teachings of Nguyen.

24. Regarding claim 15 (Currently Amended), Nguyen teaches the system as recited in claim 14 and further teaches wherein said first storage unit and said second storage units are contained

within a single storage appliance ('106; fig. 1, element 102; col. 10, ln. 18, comprises a physical storage device).

25. In regard to claim 16 (Currently Amended), Nguyen teaches the system as recited in Claim 14 and further teaches the system as further comprising: a plurality of union block devices for interfacing between respective compute nodes and said first storage unit and respective second storage units ('106; fig. 1, element 110, filter with ports or paths to each compute node; col. 4, ln. 18-29, essentially one or more low-level driver(s) of the instant application that service each node; fig. 4, element 110, col. 6, ln. 25-26, there is a copy of filter 110 at each compute node - a plurality union block devices), said union block devices ('106; fig. 1, element 110, filter with ports or paths to each compute node; col. 4, ln. 18-29, essentially one or more low-level driver(s) of the instant application that service each node; fig. 4, element 110, col. 6, ln. 25-26, there is a copy of filter 110 at each compute node - a plurality union block devices) operable to distribute application environments to the compute nodes, wherein said union block devices create said application environments by merging the blocks of said root image with the blocks of respective leaf images ('106; fig. 3; col 5, ln. 23 through col. 6, ln. 2).

26. Regarding claim 17 (Currently Amended), Nguyen teaches the system as recited in claim 16 and further teaches wherein said union block devices comprise low-level drivers for interfacing between the file systems of respective compute nodes and said first storage unit, respective second storage units, and said cache ('106; fig. 1, element 110, filter with ports or paths to each compute node; col. 4, ln. 18-29, essentially one or more low-level driver(s) of the

instant application that service each node; fig. 4, element 110, col. 6, ln. 25-26, there is a copy of filter 110 at each compute node - a plurality union block devices).

27. In regard to claim 18 (Currently Amended), Nguyen teaches the system as recited in claim 14 and further teaches wherein said first storage unit is read-only ('106; col. 4, ln. 54-55).

28. Claims 1-13 are rejected under 35 U.S.C. 103(a) as being unpatentable over Nguyen (U. S. Patent Application Publication 2003/0126242 A1, hereafter '106) as applied to claims 14-27 above and in view of Kobayashi et al. (U. S. Patent 6,101,576, already of record, hereafter '576).

29. Regarding claim 1 (Currently Amended), Nguyen teaches a system for providing data to a plurality of compute nodes ('106; fig. 1) comprising: a first storage unit for storing blocks of a root image of said compute nodes ('106; fig. 1, element 104; col. 3, ln. 63-67); a plurality of second storage units for storing leaf images of respective compute nodes ('106; fig. 1, elements 105a, 105b, 105n; col. 4, ln. 3-10), said leaf images comprising only additional data blocks not previously contained in said root image ('106; col. 4, ln. 35-37; updates to the base image) and changes made by respective compute nodes to the blocks of said root image ('106; col. 4, ln. 4-10, col. 4, ln. 12-14; changes are made on a block by block basis), wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes ('106; col. 4, ln. 33-35; only changes are stored in the leaf nodes; the base nodes is not changed by the compute nodes; col. 3, ln. 65-67); and does not explicitly teach

a cache for caching blocks of said root image previously accessed by at least one of said compute nodes.

30. Nguyen does teach caching blocks of said root image previously accessed by at least one of said compute nodes ('106; col. 9, ln. 45-61); caching of modified blocks is provided).

31. Kobayashi, solving the same problem of caching frequently accessed data sets, however, explicitly teaches physical caches ('576; fig. 12, memory caches as elements 11a, 11b and a disk cache as element 14b; col. 5, ln. 47-51) for the benefit of increasing the speed of data transfers from the host to client in data streaming or transfer operations as frequently accessed data is kept in high speed memory and not constantly retrieved from slower disk sources.

32. It would have been obvious to one of ordinary skill in the art at the time of the invention to have combined the detailed image/data cache teachings of Kobayashi with the server/client image assess and remotely stored boot/OS system teachings of Nguyen for the benefit of increasing the speed of data transfers from the host to client in data streaming or transfer operations as frequently accessed data is kept in high speed memory and not constantly retrieved from slower disk sources.

33. In regard to claim 2 (Original), Kobayashi further teaches wherein said cache is configurable to store the X most recently accessed blocks of said root image, and wherein further X represents a cache threshold value ('576; col. 2, ln. 37 through col. 3, ln. 9).

34. Regarding claim 3 (Original), Nguyen and Kobayashi teach the system as recited in claim 1 and Kobayashi further teaches wherein said first storage unit, said second storage units, and said cache are contained within a single storage appliance ('106; fig. 1).

35. In regard to claim 4 (Original), Nguyen and Kobayashi teach the system as recited in claim 1 and they further teach a plurality of union block devices for interfacing between respective compute nodes and said first storage unit ('106; fig. 1, element 110, filter with ports or paths to each compute node; col. 4, ln. 18-29, essentially one or more low-level driver(s) of the instant application that service each node; fig. 4, element 110, col. 6, ln. 25-26, there is a copy of filter 110 at each compute node - a plurality union block devices), respective second storage units, and said cache ('576; fig. 12, memory caches as elements 11a, 11b and a disk cache as element 14b; col. 5, ln. 47-51) to distribute application environments to the compute nodes ('106; fig. 1, element 110, filter with ports or paths to each compute node; col. 4, ln. 18-29, essentially one or more low-level driver(s) of the instant application that service each node; fig. 4, element 110, col. 6, ln. 25-26, there is a copy of filter 110 at each compute node - a plurality union block devices), wherein said union block devices create said application environments by merging the blocks of said root image with the blocks of respective leaf images ('106; fig. 3; col 5, ln. 23 through col. 6, ln. 2).

36. Regarding claim 5 (Currently Amended), Nguyen and Kobayashi teach the system as recited in claim 4 and Nguyen further teaches wherein said union block devices comprise low-level drivers for interfacing between the file systems of respective compute nodes and said first

storage unit, respective second storage units, and said cache ('106; fig. 1, element 110, filter with ports or paths to each compute node; col. 4, ln. 18-29, essentially one or more low-level driver(s) of the instant application that service each node; fig. 4, element 110, col. 6, ln. 25-26, there is a copy of filter 110 at each compute node - a plurality union block devices).

37. In regard to claim 6 (Original), Nguyen and Kobayashi teach the system as recited in claim 1 and Nguyen further teaches wherein said first storage unit is read-only ('106; col. 4, ln. 54-55).

38. Regarding claim 7 (Currently Amended), Nguyen teaches a method for providing data to a plurality of compute nodes ('106; fig. 1), comprising: storing blocks of a root image of said compute nodes on a first storage unit ('106; fig. 1, element 104; col. 3, ln. 63-67); storing leaf images for respective compute nodes on respective second storage units ('106; fig. 1, elements 105a, 105b, 105n; col. 4, ln. 3-10), said leaf images comprising <u>only</u> additional data blocks not previously contained in said root image ('106; col. 4, ln. 35-37; updates to the base image) and changes made by respective compute nodes to the blocks of the root image ('106; col. 4, ln. 4-10, col. 4, ln. 12-14; changes are made on a block by block basis), wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes ('106; col. 4, ln. 33-35; only changes are stored in the leaf nodes; the base nodes is not changed by the compute nodes; col. 3, ln. 65-67); and does not explicitly teach caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory.

39. Nguyen does teach caching blocks of said root image previously accessed by at least one of said compute nodes ('106; col. 9, ln. 45-61); caching of modified blocks is provided).

40. Kobayashi, solving the same problem of caching frequently accessed data sets, however, explicitly teaches physical caches ('576; fig. 12, memory caches as elements 11a, 11b and a disk cache as element 14b; col. 5, ln. 47-51) for the benefit of increasing the speed of data transfers from the host to client in data streaming or transfer operations as frequently accessed data is kept in high speed memory and not constantly retrieved from slower disk sources.

41. It would have been obvious to one of ordinary skill in the art at the time of the invention to have combined the detailed image/data cache teachings of Kobayashi with the server/client image assess and remotely stored boot/OS system teachings of Nguyen for the benefit of increasing the speed of data transfers from the host to client in data streaming or transfer operations as frequently accessed data is kept in high speed memory and not constantly retrieved from slower disk sources.

42. In regard to claim 8 (Currently Amended), Nguyen and Kobayashi teach the method as recited in claim 7 and they further teach the method as further comprising: receiving a read request from at least one of said compute nodes ('106; col. 9, ln. 45-61), wherein a first portion of the data requested is currently stored in said cache memory; and providing said first portion of said data to said at least one of said compute nodes from said cache memory ('576; fig. 12, memory caches as elements 11a, 11b and a disk cache as element 14b; col. 5, ln. 47-51).

43. Regarding claim 9 (Currently Amended), Nguyen and Kobayashi teach the method as recited in claim 8 and Nguyen further teaches the method as further comprising: updating said cache memory based on said read request ('106; col. 9, ln. 45-61).

44. In regard to claim 10 (Currently Amended), Nguyen and Kobayashi teach the method as recited in claim 9 and Kobayashi further teaches wherein a second portion of the data requested is not currently stored in said cache memory and said updating comprises: caching said second portion in said cache memory; and removing the least recently accessed data from said cache memory if the amount of data is said cache ('576; col. 12, ln. 59-65, LRU algorithm).

45. Regarding claim 11 (Currently Amended), Nguyen and Kobayashi teach the method as recited in claim 7 and Nguyen further teaches the method as further comprising: merging the blocks of said root image with the blocks of respective leaf images to create cohesive respective application environments ('106; fig. 3; col 5, ln. 23 through col. 6, ln. 2).

46. In regard to claim 12 (Currently Amended), Nguyen and Kobayashi teach the method as recited in claim 11 and Nguyen further teaches wherein said merging occurs at an operational level between the respective file systems of the compute nodes and said first storage unit, respective second storage units, and said cache memory ('106; fig. 3; col 5, ln. 23 through col. 6, ln. 2).

47. Regarding claim 13 (Currently Amended), Nguyen and Kobayashi teach the method as recited in claim 7 and Nguyen further teaches wherein said first storage unit is read-only ('106; col. 4, ln. 54-55).

***Response to Arguments***

48. Applicant's arguments with respect to claims 1-27 have been considered but are moot because the arguments do not apply to any of the reference being used in the current rejection.

***Conclusion***

Any inquiry concerning this communication or earlier communications from the examiner should be directed to Edward Martello whose telephone number is (571) 270-1883. The examiner can normally be reached on M-F 7:30-5:00 EST.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Xiao Wu can be reached on (571) 272-7761. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/Edward Martello/

Primary Examiner, Art Unit 2628

| Notice of References Cited | Application/Control No. 11/709,477 | Applicant(s)/Patent Under Reexamination KULKARNI ET AL. | |
|---|---|---|---|
| | Examiner EDWARD MARTELLO | Art Unit 2628 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| * | A | US-7,870,106 B1 | 01-2011 | Nguyen et al. | 707/694 |
| | B | US- | | | |
| | C | US- | | | |
| | D | US- | | | |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

| *Index of Claims* | Application/Control No. 11709477 | Applicant(s)/Patent Under Reexamination KULKARNI ET AL. |
|---|---|---|
| | Examiner Edward Martello | Art Unit 2628 |

| ✓ | Rejected | - | Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

☐ Claims renumbered in the same order as presented by applicant ☐ CPA ☐ T.D. ☐ R.1.47

| CLAIM | | DATE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 12/23/2009 | 05/11/2010 | 03/08/2012 | | | | | | |
| | 1 | ✓ | ✓ | ✓ | | | | | | |
| | 2 | ✓ | ✓ | ✓ | | | | | | |
| | 3 | ✓ | ✓ | ✓ | | | | | | |
| | 4 | ✓ | ✓ | ✓ | | | | | | |
| | 5 | ✓ | ✓ | ✓ | | | | | | |
| | 6 | ✓ | ✓ | ✓ | | | | | | |
| | 7 | ✓ | ✓ | ✓ | | | | | | |
| | 8 | ✓ | ✓ | ✓ | | | | | | |
| | 9 | ✓ | ✓ | ✓ | | | | | | |
| | 10 | ✓ | ✓ | ✓ | | | | | | |
| | 11 | ✓ | ✓ | ✓ | | | | | | |
| | 12 | ✓ | ✓ | ✓ | | | | | | |
| | 13 | ✓ | ✓ | ✓ | | | | | | |
| | 14 | ✓ | ✓ | ✓ | | | | | | |
| | 15 | ✓ | ✓ | ✓ | | | | | | |
| | 16 | ✓ | ✓ | ✓ | | | | | | |
| | 17 | ✓ | ✓ | ✓ | | | | | | |
| | 18 | ✓ | ✓ | ✓ | | | | | | |
| | 19 | ✓ | ✓ | ✓ | | | | | | |
| | 20 | ✓ | ✓ | ✓ | | | | | | |
| | 21 | ✓ | ✓ | ✓ | | | | | | |
| | 22 | ✓ | ✓ | ✓ | | | | | | |
| | 23 | ✓ | ✓ | ✓ | | | | | | |
| | 24 | ✓ | ✓ | ✓ | | | | | | |
| | 25 | ✓ | ✓ | ✓ | | | | | | |
| | 26 | ✓ | ✓ | ✓ | | | | | | |
| | 27 | ✓ | ✓ | ✓ | | | | | | |

**EAST Search History**

**EAST Search History (Prior Art)**

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| S3 | 1 | root WITH image SAME caching | US-PGPUB; USPAT; USOCR; EPO; JPO | ADJ | ON | 2009/12/16 08:50 |
| S4 | 60 | root WITH image SAME cach$3 | US-PGPUB; USPAT; USOCR; EPO; JPO | ADJ | ON | 2009/12/16 08:52 |
| S5 | 12 | ("5113523" \| "5127104" \| "5999734" \| "6018747" \| "6502238" \| "7200715" \| "7246351" \| "7263551" \| "7331047" \| "7467293" \| "7475274" \| "7496739").PN. | US-PGPUB; USPAT; USOCR; EPO; JPO | ADJ | ON | 2009/12/16 08:55 |
| S6 | 3 | ("6421777" \| "6751658" \| "20030126242").PN. | US-PGPUB; USPAT; USOCR; EPO; JPO | ADJ | ON | 2009/12/23 12:30 |
| S7 | 21 | ((base or kernel) WITH code) WITH image SAME cach$3 | US-PGPUB; USPAT; USOCR; EPO; JPO | ADJ | ON | 2009/12/23 15:43 |
| S8 | 2 | ("6502238" \| "7475274").PN. | US-PGPUB; USPAT; USOCR; EPO; JPO | ADJ | ON | 2009/12/23 16:11 |
| S9 | 10 | (US-20030126242-$ or US-20060179308-$ or US-20070061787-$ or US-20070198772-$).did. or (US-6751658-$ or US-6421777-$ or US-6101576-$ or US-6651245-$ or US-7475274-$ or US-6502238-$).did. | US-PGPUB; USPAT | ADJ | ON | 2009/12/23 16:39 |
| S10 | 8 | S9 AND cache | US-PGPUB; USPAT; USOCR; EPO; JPO | ADJ | ON | 2009/12/23 16:39 |
| S11 | 317 | 345/557.ccls. | US-PGPUB; USPAT; | ADJ | ON | 2009/12/24 11:14 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | USOCR; EPO; JPO | | | |
| S12 | 6 | ("20020083120" \| "20050131962" \| "5175852" \| "6502238" \| "7269664" \| "7475274").PN. | US-PGPUB; USPAT; USOCR; EPO; JPO | ADJ | ON | 2010/05/11 08:06 |
| S13 | 283 | (((root OR base OR kernel) WITH (software OR code OR binary)) SAME image) SAME2 cach$3 | US-PGPUB; USPAT; USOCR; EPO; JPO | ADJ | ON | 2010/05/11 08:26 |
| S14 | 22 | ("5999734" \| "7475274" \| "7496739" \| "5764902" \| "7263551" \| "7467293" \| "6195680" \| "5127104" \| "6990513" \| "7331047" \| "6779177" \| "7127712" \| "7150015" \| "6502238" \| "6606744" \| "5113523" \| "7246351" \| "6018747" \| "7200715" \| "6292941" \| "7155714" \| "7454462").PN. | US-PGPUB; USPAT; EPO | ADJ | ON | 2012/02/29 16:51 |
| S15 | 3 | (6721846\|7870106\|8001323).PN. | US-PGPUB; USPAT; EPO | ADJ | ON | 2012/03/08 11:19 |

**EAST Search History (Interference)**

<This search history is empty>

**3/8/2012 5:32:18 PM**
**C:\ Users\ emartello\ Documents\ EAST\ Workspaces\ 11709477_Root_Image_Caching.wsp**

| Search Notes | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 11709477 | KULKARNI ET AL. |
| | **Examiner** | **Art Unit** |
| | Edward Martello | 2628 |

## SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| 345 | 557 | 10/26/2009 | /EM/ |

## SEARCH NOTES

| Search Notes | Date | Examiner |
|---|---|---|
| eDAN Inventor Name Search | 10/26/2009 | /EM/ |
| See attached EAST Search History | 12/16/2009 | /EM/ |
| See attached EAST Search History | 12/23/2009 | /EM/ |
| See attached EAST Search History | 05/11/2010 | /EM/ |
| See attached EAST Search History | 02/29/2012 | /EM/ |
| See attached EAST Search History | 03/08/2012 | /EM/ |

## INTERFERENCE SEARCH

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| | | | |

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| Applicant | : Kulkarni, et al. | Confirmation | : 4127 |
| Serial No. | : 11/709,477 | Examiner | : Martello, Edward |
| Filing Date | : 02/21/2007 | Art Unit | : 2628 |

Attorney Docket No. : PNTA-P006.CIP.A

---

For: ROOT IMAGE CACHING AND INDEXING FOR BLOCK-LEVEL DISTRIBUTED APPLICATION MANAGEMENT

AMENDMENT AND RESPONSE TO FINAL OFFICE ACTION AND REQUEST FOR CONTINUED EXAMINATION (RCE)

Commissioner for Patents & Trademarks
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Sir:

In response to the FINAL Office Action mailed August 27, 2010, please consider the following amendments and remarks in the above captioned patent application.

**Amendments to the Specification** begin on Page 2 of this paper.

**Amendments to the Claims** begin on Page 3 of this paper.

**Remarks** begin on Page 9 of this paper.

Amendments to the Specification:

Please replace Paragraph 0022 with the following:

**[0022]** With reference to FIG. 1, an example system for implementing embodiments includes a general purpose computing system environment, such as compute node 100. In its most basic configuration, compute node 100 typically includes at least one processing unit 102 and memory 104. Depending on the exact configuration and type of compute node, memory 104 may be volatile (such as RAM), non-volatile (such as ROM, flash memory, etc.) or some combination of the two. This most basic configuration is illustrated in Figure 1 by dashed line 106 [[105]]. Additionally, compute node 100 may also have additional features/functionality. For example, compute node 100 may also include additional storage (removable and/or non-removable) including, but not limited to, magnetic or optical disks or tape. Such additional storage is illustrated in FIG. 1 by removable storage 108 and non-removable storage 110. Computer storage media includes volatile and nonvolatile, removable and non-removable media implemented in any method or technology for storage of information such as computer readable instructions, data structures, program modules or other data. Memory 104, removable storage 108 and nonremovable storage 110 are all examples of computer storage media. Computer storage media includes, but is not limited to, RAM, ROM, EEPROM, flash memory or other memory technology, CD-ROM, digital versatile disks (DVD) or other optical storage, magnetic cassettes, magnetic tape, magnetic disk storage or other magnetic storage devices, or any other medium which can be used to store the desired information and which can be accessed by compute node 100. Any such computer storage media may be part of compute node 100.

Amendments to the Claims:

1. (Currently amended) A system for providing data to a plurality of compute nodes comprising:

a first storage unit for storing blocks of a root image of said compute nodes;

a plurality of second storage units for storing leaf images of respective compute nodes, said leaf images comprising only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of said root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes; and

a cache for caching blocks of said root image previously accessed by at least one of said compute nodes.

2. (Original) The system as recited in Claim 1 wherein said cache is configurable to store the X most recently accessed blocks of said root image, and wherein further X represents a cache threshold value.

3. (Original) The system as recited in Claim 1 wherein said first storage unit, said second storage units, and said cache are contained within a single storage appliance.

4. (Original) The system as recited in Claim 1 further comprising:

a plurality of union block devices for interfacing between respective compute nodes and said first storage unit, respective second storage units, and said cache to distribute application environments to the compute nodes, wherein said union block devices create said application environments by merging the blocks of said root image with the blocks of respective leaf images.

5. (Currently amended) The system as recited in Claim 4[[0]] wherein said union block devices comprise low-level drivers for interfacing between the file systems of

respective compute nodes and said first storage unit, respective second storage units, and said cache.

6. (Original) The system as recited in Claim 1 wherein said first storage unit is read-only.

7. (Currently amended) A method for providing data to a plurality of compute nodes, comprising:

storing blocks of a root image of said compute nodes on a first storage unit;

storing leaf images for respective compute nodes on respective second storage units, said leaf images comprising only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes; and

caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory.

8. (Currently amended) The method as recited in Claim 7[[0]] further comprising:

receiving a read request from at least one of said compute nodes, wherein a first portion of the data requested is currently stored in said cache memory; and

providing said first portion of said data to said at least one of said compute nodes from said cache memory.

9. (Currently amended) The method as recited in Claim 8[[0]] further comprising:

updating said cache memory based on said read request.

10. (Currently amended) The method as recited in Claim 9[[0]] wherein a second portion of the data requested is not currently stored in said cache memory and said updating comprises:

caching said second portion in said cache memory; and

removing the least recently accessed data from said cache memory if the amount of data is said cache memory is above a threshold value.

11. (Currently amended) The method as recited in Claim 7[[0]] further comprising:

merging the blocks of said root image with the blocks of respective leaf images to create cohesive respective application environments.

12. (Currently amended) The method as recited in Claim 11[[0]] wherein said merging occurs at an operational level between the respective file systems of the compute nodes and said first storage unit, respective second storage units, and said cache memory.

13. (Currently amended) The method as recited in Claim 7[[0]] wherein said first storage unit is read-only.

14. (Currently amended) A system for indexing file systems for a plurality of compute nodes, comprising:

a first storage unit for storing blocks of a root image of said compute nodes;

a plurality of second storage units for storing leaf images of respective compute nodes, said leaf images comprising only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of said root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes; and

a plurality of union block devices corresponding to said compute nodes, said union block devices for interfacing between said compute nodes and said first and second storage units to distribute said file systems to said compute nodes, wherein said union block devices create said file systems by merging the blocks of said root image stored on the first storage unit with the blocks of respective leaf images stored on respective second storage units, and wherein further at least one of said compute nodes is configurable to index said root image and provide the indexing results to another of said compute nodes.

15. (Currently amended) The system as recited in Claim 14[[0]] wherein said first storage unit and said second storage units are contained within a single storage appliance.

16. (Currently amended) The system as recited in Claim 14[[0]] further comprising:

a plurality of union block devices for interfacing between respective compute nodes and said first storage unit and respective second storage units, said union block devices operable to distribute application environments to the compute nodes, wherein said union block devices create said application environments by merging the blocks of said root image with the blocks of respective leaf images.

17. (Currently amended) The system as recited in Claim 16[[0]] wherein said union block devices comprise low-level drivers for interfacing between the file systems of respective compute nodes and said first storage unit, respective second storage units, and said cache.

18. (Currently amended) The system as recited in Claim 14[[0]] wherein said first storage unit is read-only.

19. (Currently amended) A method for indexing file systems for a plurality of compute nodes, comprising:

storing blocks of a root image of said compute nodes on a first storage unit;

storing leaf images for respective compute nodes on respective second storage units, said leaf images comprising only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image, wherein said leaf images for respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes;

merging the blocks of said root image with the blocks of respective leaf images stored on respective second storage units to create respective file systems for respective compute nodes;

receiving indexing results pertaining to said root image from one of said compute nodes; and

providing said indexing results to the others of said compute nodes.

20. (Currently amended) The method as recited in Claim 19[[0]] further comprising:

storing said indexing results on a shared storage unit.

21. (Currently amended) The method as recited in Claim 19[[0]] wherein said merging occurs at an operational level between the respective file systems of the compute nodes and said first storage unit and respective second storage units.

22. (Currently amended) The method as recited in Claim 19[[0]] wherein said first storage unit is read-only.

23. (Currently amended) A non-transitory computer readable media comprising computer-executable instructions stored therein, the computer-executable instructions comprising Logic encoded in one or more tangible media for execution by a first compute node, and when executed said logic operable to:

instructions to receive data blocks of a file system, said data blocks comprising a root image portion and leaf image portion, said leaf image portion comprising only additional data blocks not previously contained in said root image portion and changes made by said first compute node to the blocks of said root image, wherein said leaf image portion does not include blocks of said root image that are unchanged by said first compute node, wherein said file system is the result of merging said root image portion and said leaf image portion together at the block-level;

instructions to index said root image portion; and

instructions to provide the results of said indexing to a second compute node, wherein said logic encoded in the one or more tangible media comprise computer executable instructions executed by the first compute node.

24. (Currently amended) The non-transitory computer readable media of ~~The logic as recited in~~ Claim 23[[0]], further comprising instructions to store ~~wherein said providing further comprises: storing~~ said results of said indexing on a shared storage unit accessible by said second compute node.

25. (Currently amended) The non-transitory computer readable media of ~~The logic as recited in~~ Claim 23[[0]], further comprising instructions to ~~wherein said logic is further operable to:~~ index said leaf image portion.

26. (Currently amended) The non-transitory computer readable media of ~~The logic as recited in Claim~~ 25[[0]], further comprising instructions to ~~wherein said logic is further operable to:~~ re-index said file system by re-indexing said leaf image portion and merging the results of said re-indexing of said leaf image portion with said results of said indexing of said root image portion.

27. (Currently amended) The non-transitory computer readable media of ~~The logic as recited in~~ Claim 23[[0]] wherein said root image portion is read-only.

## REMARKS

Claims 1-27 are pending. Claims 5, 8-18, 20-22, and 23-27 are amended. No new matter has been added as a result of these amendments.

## Claim Objections

Claims 5, 8-13, 15-18, 20-22, and 24-27 are objected to because of typographical errors. Claims 5, 8-13, 15-18, 20-22, and 24-27 have been amended as appropriate.

## Objection to the Specification

Paragraph 22 of the Specification is objected to as it calls out "dashed line 105," while the dashed line in Figure 1 is labeled "106." Paragraph 22 of the Specification has been amended as appropriate.

The Specification is further objected to as failing to provide proper antecedent basis for the claimed subject matter. In particular, the rejection contends that Claims 4, 5, 14, 16, and 17 all allegedly incorporate features called "union block devices" with insufficient basis within the claims to define their character. Applicants respectfully disagree. Applicants respectfully assert that Figure 2 illustrates an exemplary block-level distributed application environment that can contain both physical and virtual elements (Paragraph 26). As illustrated in Figure 2 and discussed in Paragraphs 12 and 22-29, a "union block device" is a driver implemented by and for each respective compute node. As such each union block device driver provides an interface between the first and second storage devices and the file system of its compute node, providing the compute

node with an instantiation of the application environment by accessing the compute node's leaf image containing portions of the application environment that the compute node has changed as well as locating portions of the application environment that have not been changed by the compute node (Paragraphs 27-28). In one exemplary embodiment, the portions that have not been changed by the compute node can be found in the root image (Paragraph 28). Applicants respectfully assert that one skilled in the art would understand the nature and function of such a union block device driver, as described in Paragraphs 12 and 22-29. Applicants respectfully assert that drivers serving as interfaces between operating system file systems for a computer system and associated storage devices are well known in the art. Further, one skilled in the art would understand how a driver may serve as an interface between storage devices and a file system of a computer system.

As understood by Applicants, the rejection contends that Figure 2 illustrates a union block device implemented as a stand-alone "device" that would need its own separate processor. Applicants respectfully disagree. As discussed above, Applicants respectfully assert that Figure 2 illustrates an exemplary block-level distributed application environment that can contain <u>both physical and virtual elements</u> (Paragraph 26). As illustrated in Figure 2 and discussed in Paragraphs 12 and 22-29, a "union block device" is therefore a driver implemented by and for a particular compute node. In other words, union block devices are not "devices" as understood by the rejection, requiring their own separate processor to run the driver. Rather, union block devices are drivers implemented on and for each compute node.

As understood by Applicants, the rejection further questions how a union block device can create a new leaf image on a respective second storage union when the respective compute node makes changes to its instantiation of the application environment. Applicants respectfully assert that the Specification describes that the union block device is a driver that serves to interface between an OS file system in a compute node and the first storage unit and its respective second storage unit (Figure 2; Paragraphs 24-30). Applicants respectfully assert that Paragraphs 28 and 29 state that when the instantiation of the application environment has been changed the union block device will do one of two things: create a new leaf image (thereby replacing the obsolete leaf image) or by modifying the existing leaf image. As the union block device is a driver serving as an interface between the first and second storage devices and the file system of the compute node, Applicants respectfully assert that one skilled in the art would understand how a low-level driver may create or modify a leaf image comprising blocks of data stored in the second storage unit.

Claim Rejections – 35 U.S.C. §101

Claims 23-27 are rejected under 35 U.S.C. 101 because the claimed invention is allegedly directed to non-statutory subject matter. Applicants have amended Claims 24-27 as appropriate. Applicants respectfully request reconsideration and withdrawal of the rejections under 35 U.S.C. §101.

Claim Rejections – 35 U.S.C. §112

Claims 4, 5, 14, 16, and 17 are rejected under 35 U.S.C. 112, second paragraph, as being allegedly indefinite for failing to particularly point out and distinctly claim the subject matter which the application regards as the invention. In particular, and as discussed above, the rejection alleges that the above claims all incorporate "union block devices" with insufficient basis within the claims to define their character. Applicants respectfully disagree. For at least the same or similar reason as discussed above, Applicants respectfully assert that the union block device, as claimed in Claims 4, 5, 14, 16, and 17 would be understood by one skilled in the art to be low-level drivers that are implemented by and for the compute nodes to serve as an interface between the storage units and the file system of each respective compute node. Applicants respectfully assert that one skilled in the art would understand that a union block device is implemented by and for a compute node, rather than existing as a separate "device" requiring a separate processor. Further, Applicants respectfully assert that one skilled in the art would understand that the union block device as a driver serving as an interface between the first and second storage devices and the file system of the compute node, can create or modify a leaf image comprising blocks of data stored in the second storage unit as an instantiation of an operating system is changed by the compute node. Accordingly, Applicants respectfully request reconsideration and withdrawal of the rejections under 35 U.S.C. §112.

Claim Rejections – 35 U.S.C. §102

Claims 14-27 are rejected under 35 U.S.C. 102(b) as being allegedly anticipated by Chang (US 2003/0126242), hereinafter "Chang."

As is well established, anticipation requires the presence of a single prior art reference to disclose each and every element of the claimed invention, arranged as in the claim. There must be no difference between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention. Scripps Clinic & Research Found. v. Genentech Inc., 18 USPQ 2d 1001, 1010 (Fed. Cir. 1991).

Applicants contend that Chang fails to teach all of the claimed elements of Independent Claims 14, 19, and 23.

Claim 14:

Amended Claim 14 recites in part:

> a plurality of second storage units for storing leaf images of respective compute nodes, said leaf images comprising only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of said root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes; and
>
> a plurality of union block devices corresponding to said compute nodes, said union block devices for interfacing between said compute nodes and said first and second storage units to distribute said file systems to said compute nodes, wherein said union block devices create said file systems by merging the blocks of said root image stored on the first storage unit with the blocks of respective leaf images stored on respective second storage units, and wherein further at least one of said compute nodes is configurable to index said root image and provide the indexing results to another of said compute nodes (emphasis added).

Applicants respectfully assert that Chang does not teach or suggest "leaf images comprising only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of said root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes," as claimed in Claim 14.

As understood by Applicants, the rejection is reading the client image copy 74, 76, 78 of Chang on Applicants' claimed "leaf image," as claimed in Claim 14. Applicants respectfully disagree.

As understood by Applicants, Chang discloses a client image copy that is created using a snapshot of a base boot image with a virtual copy or reverse snapshot of the base image stored for each client device, wherein each client image copy includes both a base boot image and information specific to the client (Abstract). In particular, Chang teaches that each client image copy includes both common operating system (OS) and application blocks for storing the base boot image, and client-specific blocks for storing information specific to the particular client device (Paragraph 0012; and Figures 1 and 2). Chang discloses in Figure 2 that each client image copy includes common OS and application blocks 80 containing the reverse snapshot of the base image as well as client specific blocks 82 for storing client specific files (Paragraphs 0030-0034).

To the extent that Chang discloses client image copies that include client-specific blocks for storing information specific to the particular client device, Chang also

discloses that the client image copies also include physically common operating system (OS) and application blocks for storing the base boot image (Paragraph 0012; and Figures 1 and 2). In other words, where Applicants' claim "leaf images comprising only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of said root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes," as claimed in Claim 14, Chang discloses client image copies that comprise common OS and Application blocks and client specific blocks. Applicants respectfully assert that the client image copy of Chang is not a leaf image, as claimed in Claim 14, because the client image copy of Chang includes blocks of the root image that are unchanged by a compute node (e.g., the common OS and application blocks for storing the base boot image).

Therefore, Applicants respectfully assert that embodiments as recited by Claim 14 are not rendered anticipated by Chang. Accordingly, Applicants respectfully assert that dependent Claims 15-18 are patentable by virtue of their dependency on an allowable base claim, as well as for their additional recited patentable features.

Claim 19:

Independent Claim 19 recites features similar to that of independent Claim 14 and is therefore patentable for at least the same or similar reasons as recited above. Accordingly, Applicants respectfully assert that dependent Claims 20-22 are patentable

by virtue of their dependency on an allowable base claim, as well as for their additional recited patentable features.

Claim 23:

Independent Claim 23 recites features similar to that of independent Claim 14 and is therefore patentable for at least the same or similar reasons as recited above. Accordingly, Applicants respectfully assert that dependent Claims 24-27 are patentable by virtue of their dependency on an allowable base claim, as well as for their additional recited patentable features.

For the above reasons, Applicants request reconsideration and withdrawal of the rejections under 35 U.S.C. §102.

## Claim Rejections – 35 U.S.C. §103

Claims 1-13 are rejected under 35 U.S.C. 103(a) as being allegedly unpatentable over Chang, in view of Kobayashi et al. (US 6,101,576), hereinafter "Kobayashi." Applicants respectfully assert that Claims 1-13 are patentable over the cited combination in view of the following.

Applicants respectfully point out that the Examiner has the burden of establishing a prima facie case of obviousness. To establish a prima facie case of obviousness, three basic criteria must be met. First, there must be some suggestion or motivation, either in

the references themselves or in the knowledge generally available to one of ordinary skill in the art, to modify the reference or to combine reference teachings. Second, there must be a reasonable expectation of success. Finally, the prior art reference (or references when combined) must teach or suggest all the claim features. The teaching or suggestion to make the claimed combination and the reasonable expectation of success must both be found in the prior art, and not based on Applicant's disclosure. In re Vaeck, 947 F.2d 488, 20 USPQ2d 1438 (Fed. Cir. 1991). See MPEP 2100-126. Specifically, "all words in a claim must be considered when judging the patentability of that claim against the prior art." *In re Wilson*, 424 F.2d., 1382 (CCPA 1970).

Moreover, in response to the recent U.S. Supreme Court decision in *KSR Int'l Co. v. Teleflex, Inc.* (U.S. 2007), new guidelines were set forth for examining obviousness under 35 U.S.C. 103. The U.S. Supreme Court reaffirmed the *Graham* factors and, while not totally rejecting the "teachings, suggestion, or motivation" test, the Court appears to now require higher scrutiny on the part of the U.S. Patent & Trademark Office. In accordance with the recently submitted guidelines, it is "now necessary to identify the reason" why a person of ordinary skill in the art would have combined the elements of cited references, or at least describe the pertinence of the elements set forth in the cited disclosure, in the manner presently claimed.

Applicants respectfully assert the combination of Chang and Kobayashi fails to teach or suggest all the claimed elements of Claims 1-13 in view of the following rationale.

Claim 1:

Amended Claim 1 recites in part:

> a plurality of second storage units for storing leaf images of respective compute nodes, said leaf images comprising only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of said root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes (emphasis added).

Applicants respectfully assert the combination of Chang and Kobayashi does not teach or suggest "leaf images comprising only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of said root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes," as claimed in Claim 1.

For at least the same or similar reasons as recited above with regards to Claim 14, Applicants respectfully assert that Chang does not teach or suggest leaf images comprising only changes made by respective compute nodes to the blocks of said root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes, as claimed in Claim 1. Applicants respectfully assert the deficiencies of Chang are not remedied by Kobayashi.

Therefore, Applicants respectfully assert that Claim 1 is not rendered obvious by the combination of Chang and Kobayashi. Accordingly, Applicants respectfully assert

that dependent Claims 2-6 are patentable by virtue of their dependency on an allowable base claim, as well as for their additional recited patentable features.

Claim 7:

Independent Claim 7 recites features similar to that of independent Claim 1 and is therefore patentable for at least the same or similar reasons as recited above. Accordingly, Applicants respectfully assert that dependent Claims 8-13 are patentable by virtue of their dependency on an allowable base claim, as well as for their additional recited patentable features.

For the above reasons, Applicants request reconsideration and withdrawal of the rejections under 35 U.S.C. §103.

CONCLUSION

In light of the above listed remarks, reconsideration of rejected Claims is requested. Based on the arguments presented above, it is respectfully submitted that Claims 1-27 overcome the rejections of record and, therefore, allowance of Claims 1-27 is earnestly solicited.

Please charge any additional fees that may be required to maintain pendency of the present application, or apply any credits to our PTO deposit account number: 50-4160.

Respectfully submitted,

MURABITO, HAO & BARNES LLP

Dated: ____08/31________, 2010

/Jeffrey A. Lehman/
Jeffrey A. Lehman
Registration No. 65,494

MURABITO, HAO & BARNES LLP
Two North Market Street
Third Floor
San Jose, California 95113

(408) 938-9060 Voice
(408) 938-9069 Facsimile

I hereby certify that this correspondence is being electronically transmitted to the USPTO via EFS on the date shown below:
**August 31, 2010**
_/Shannon Warren/________
Shannon Warren

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | ISSUE DATE | PATENT NO. | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 11/709,477 | 12/11/2012 | 8332844 | 139537 | 4127 |

52531 7590 11/21/2012

CHRISTENSEN O'CONNOR JOHNSON KINDNESS PLLC
1420 FIFTH AVENUE
SUITE 2800
SEATTLE, WA 98101-2347

# ISSUE NOTIFICATION

The projected patent number and issue date are specified above.

**Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)**
(application filed on or after May 29, 2000)

The Patent Term Adjustment is 1193 day(s). Any patent to issue from the above-identified application will include an indication of the adjustment on the front page.

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) WEB site (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Application Assistance Unit (AAU) of the Office of Data Management (ODM) at (571)-272-4200.

APPLICANT(s) (Please see PAIR WEB site http://pair.uspto.gov for additional applicants):

Pradip Kulkarni, Pune, INDIA;
Mukul Kumar, Pune, INDIA;
Adhir Potdar, Pune, INDIA;
Richard Au, Woodside, CA;
Tung Nguyen, Cupertino, CA;

The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation, and commercialization of new technologies. The USA offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to encourage and facilitate business investment. To learn more about why the USA is the best country in the world to develop technology, manufacture products, and grow your business, visit SelectUSA.gov.

IR103 (Rev. 10/09)

# PART B - FEE(S) TRANSMITTAL

**Complete and send this form, together with applicable fee(s), to: Mail** **Mail Stop ISSUE FEE**
**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, Virginia 22313-1450**
**or Fax (571)-273-2885**

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

52531 7590 08/06/2012
CHRISTENSEN O'CONNOR JOHNSON KINDNESS PLLC
1420 FIFTH AVENUE
SUITE 2800
SEATTLE, WA 98101-2347

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**

I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

(Depositor's name)
(Signature)
(Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 11/709,477 | 02/21/2007 | Pradip Kulkarni | 139537 | 4127 |

TITLE OF INVENTION: ROOT IMAGE CACHING AND INDEXING FOR BLOCK-LEVEL DISTRIBUTED APPLICATION MANAGEMENT

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | NO | ~~$1740~~ $1770 | $0 | $0 | ~~$1740~~ $1770 | 11/06/2012 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| MARTELLO, EDWARD | 2628 | 345-557000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).
☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.
☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list
(1) the names of up to 3 registered patent attorneys or agents OR, alternatively,
(2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 CHRISTENSEN O'CONNOR JOHNSON KINDNESS PLLC
2
3

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE: Emendable Assets Limited Liability Company

(B) RESIDENCE: (CITY and STATE OR COUNTRY): Wilmington, Delaware

Please check the appropriate assignee category or categories (will not be printed on the patent): ☐ Individual ☒ Corporation or other private group entity ☐ Government

4a. The following fee(s) are submitted:
☒ Issue Fee
☐ Publication Fee (No small entity discount permitted)
☐ Advance Order - # of Copies ____________

4b. Payment of Fee(s): (**Please first reapply any previously paid issue fee shown above**)
☐ A check is enclosed.
☒ Payment by credit card. XXXXXXXXXXXXXXX
☒ The Director is hereby authorized to charge XXXXXXXXXX, any deficiency, or credit any overpayment, to Deposit Account Number 03-1740 XXXXXXXXXXXXXXXXXXXX

5. **Change in Entity Status** (from status indicated above)
☐ a. Applicant claims SMALL ENTITY status. See 37 CFR 1.27.
☐ b. Applicant is no longer claiming SMALL ENTITY status. See 37 CFR 1.27(g)(2).

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

Authorized Signature /David P. Sheldon/ Date November 6, 2012

Typed or printed name David P. Sheldon Registration No. 62,494

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| Applicants: | P. Kulkarni et al. | Attorney Docket No.: | 139537 |
| Application No.: | 11/709477 | Art Unit: | 2628 / Confirmation No.: 4127 |
| Filed: | February 21, 2007 | Examiner: | E. Martello |
| Title: | ROOT IMAGE CACHING AND INDEXING FOR BLOCK-LEVEL DISTRIBUTED APPLICATION MANAGEMENT | | |

COMMENTS ON STATEMENT OF REASONS FOR ALLOWANCE

Seattle, Washington 98101

November 6, 2012

TO THE COMMISSIONER FOR PATENTS:

Applicants thank the Examiner for the issuance of the Notice of Allowance mailed August 6, 2012, in the above-identified application. Applicants agree that the claims are allowable and note that there are reasons for allowance not explicitly stated by the Examiner. For example, applicants do not accede to Examiner's characterization of the cited references, and further note that none of the cited art teaches the claimed invention as a whole. The application also includes allowed claims containing subject matter that is not repeated by the Examiner in the Statement of Reasons for Allowance. The subject matter of these claims provides additional basis for allowance of the application.

Further, applicants disagree with the characterization of the claims provided in the Notice of Allowance. In particular, the Notice of Allowance stated that Claim 23 incorporates the method of Claim 7. Applicants respectfully disagree. For example, Claim 7 includes recitations related to caching blocks of a root image. Claim 23 does not include such a recitation. Hence, applicants respectfully submit that Claim 23 does not incorporate the method of Claim 7.

The Notice of Allowance also stated that Claim 1 incorporates the method of Claim 7, and that Claim 14 incorporates the method of Claim 19. To the extent that the Notice of Allowance alleged that Claim 1 includes all of the limitations of Claim 7, and that Claim 14



LAW OFFICES OF
CHRISTENSEN O'CONNOR JOHNSON KINDNESS^PLLC
1420 Fifth Avenue
Suite 2800
Seattle, Washington 98101
206.682.8100

includes all of the limitations of Claim 19, applicants respectfully disagree. The claim language is not identical and should therefore not be considered to have identical scope.

Finally, the Notice of Allowance stated that "In response to the Applicant initiated interview conducted on 10 July 2012 and the amendment received 11 July 2012, the Examiner has determined that the amended claims have overcome all the art of record[.]" (Notice of Allowance, page 2.) To the extent that this comment implies that the amendments submitted on 11 July 2012, were necessary to overcome the art of record, applicants respectfully disagree. The amendments submitted on 11 July 2012, were directed to matters of form and to improve the clarity of the claims, and were not required to overcome the art of record.

Respectfully submitted,

CHRISTENSEN O'CONNOR
JOHNSON KINDNESS[PLLC]

/David P. Sheldon/

David P. Sheldon
Registration No. 62,494
Direct Dial No. 206.695.1611

DPS:dps



LAW OFFICES OF
CHRISTENSEN O'CONNOR JOHNSON KINDNESS[PLLC]
1420 Fifth Avenue
Suite 2800
Seattle, Washington 98101
206.682.8100

# Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 11709477 |
| **Filing Date:** | 21-Feb-2007 |
| **Title of Invention:** | ROOT IMAGE CACHING AND INDEXING FOR BLOCK-LEVEL DISTRIBUTED APPLICATION MANAGEMENT |
| **First Named Inventor/Applicant Name:** | Pradip Kulkarni |
| **Filer:** | David Patrick Sheldon/Janet Berdine |
| **Attorney Docket Number:** | 139537 |

Filed as Large Entity

## Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| Utility Appl issue fee | 1501 | 1 | 1770 | 1770 |
| **Extension-of-Time:** | | | | |

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| Miscellaneous: | | | | |
| | | Total in USD ($) | | 1770 |

# Electronic Acknowledgement Receipt

| | |
|---|---|
| EFS ID: | 14165823 |
| Application Number: | 11709477 |
| International Application Number: | |
| Confirmation Number: | 4127 |
| Title of Invention: | ROOT IMAGE CACHING AND INDEXING FOR BLOCK-LEVEL DISTRIBUTED APPLICATION MANAGEMENT |
| First Named Inventor/Applicant Name: | Pradip Kulkarni |
| Customer Number: | 52531 |
| Filer: | David Patrick Sheldon/Janet Berdine |
| Filer Authorized By: | David Patrick Sheldon |
| Attorney Docket Number: | 139537 |
| Receipt Date: | 06-NOV-2012 |
| Filing Date: | 21-FEB-2007 |
| Time Stamp: | 20:20:28 |
| Application Type: | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $1770 |
| RAM confirmation Number | 18943 |
| Deposit Account | 031740 |
| Authorized User | CHRISTENSEN, O'CONNOR, JOHNSON & KINDNESS |

The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows:

Charge any Additional Fees required under 37 C.F.R. Section 1.16 (National application filing, search, and examination fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.17 (Patent application and reexamination processing fees)

**File Listing:**

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Issue Fee Payment (PTO-85B) | 39537_Issue_Fee_Transmittal.pdf | 1125041<br>44fb612b2b07eac35c4c27080aab91b72c73c07f | no | 1 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 2 | Post Allowance Communication - Incoming | 39537_Comments_on_Reasons_for_Allowance.pdf | 19226<br>[illegible] | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 3 | Fee Worksheet (SB06) | fee-info.pdf | 30378<br>[illegible] | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| | | **Total Files Size (in bytes):** | 1174645 | | |

**This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.**

**New Applications Under 35 U.S.C. 111**
**If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.**

**National Stage of an International Application under 35 U.S.C. 371**
**If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.**

**New International Application Filed with the USPTO as a Receiving Office**
**If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.**

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| Applicants: | P. Kulkarni et al. | Attorney Docket No.: 139537 | |
| Application No.: | 11/709477 | Art Unit: 2628 / Confirmation No.: 4127 | |
| Filed: | February 21, 2007 | Examiner: E. Martello | |
| Title: | ROOT IMAGE CACHING AND INDEXING FOR BLOCK-LEVEL DISTRIBUTED APPLICATION MANAGEMENT | | |

STATEMENT OF SUBSTANCE OF INTERVIEW

Seattle, Washington 98101

August 17, 2012

TO THE COMMISSIONER FOR PATENTS:

Applicants thank Examiner Martello for his time during a telephone interview with the undersigned attorney on July 10, 2012. Applicants presented reasoning regarding the position that Claims 4, 5, 14, 16, and 17 were definite. Applicants also argued that the Nguyen reference does not anticipate Claims 19-27, and is not valid prior art under Section 103. Though the Examiner stated that the arguments would be considered upon submission of a formal response, no agreement was reached with regard to patentability.

Respectfully submitted,

CHRISTENSEN O'CONNOR
JOHNSON KINDNESS[PLLC]

David P. Sheldon
Registration No. 62,494
Direct Dial No. 206.695.1611

DPS:lal

LAW OFFICES OF
CHRISTENSEN O'CONNOR JOHNSON KINDNESS[PLLC]
1420 Fifth Avenue
Suite 2800
Seattle, Washington 98101
206.682.8100

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 13527905 |
| **Application Number:** | 11709477 |
| **International Application Number:** | |
| **Confirmation Number:** | 4127 |
| **Title of Invention:** | ROOT IMAGE CACHING AND INDEXING FOR BLOCK-LEVEL DISTRIBUTED APPLICATION MANAGEMENT |
| **First Named Inventor/Applicant Name:** | Pradip Kulkarni |
| **Customer Number:** | 52531 |
| **Filer:** | David Patrick Sheldon/Lori Lewis |
| **Filer Authorized By:** | David Patrick Sheldon |
| **Attorney Docket Number:** | 139537 |
| **Receipt Date:** | 17-AUG-2012 |
| **Filing Date:** | 21-FEB-2007 |
| **Time Stamp:** | 17:48:39 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Applicant summary of interview with examiner | 39537_Statement_of_Substance_of_Interview.pdf | 196520<br>[illegible] | no | 1 |

**Warnings:**

**Information:**

| Total Files Size (in bytes): | 196520 |
|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

New Applications Under 35 U.S.C. 111
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

National Stage of an International Application under 35 U.S.C. 371
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

New International Application Filed with the USPTO as a Receiving Office
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

52531 7590 08/06/2012
CHRISTENSEN O'CONNOR JOHNSON KINDNESS PLLC
1420 FIFTH AVENUE
SUITE 2800
SEATTLE, WA 98101-2347

| EXAMINER | |
|---|---|
| MARTELLO, EDWARD | |
| ART UNIT | PAPER NUMBER |
| 2628 | |

DATE MAILED: 08/06/2012

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 11/709,477 | 02/21/2007 | Pradip Kulkarni | 139537 | 4127 |

TITLE OF INVENTION: ROOT IMAGE CACHING AND INDEXING FOR BLOCK-LEVEL DISTRIBUTED APPLICATION MANAGEMENT

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | NO | $1740 | $0 | $0 | $1740 | 11/06/2012 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED. THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED. SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the SMALL ENTITY status shown above.

If the SMALL ENTITY is shown as YES, verify your current SMALL ENTITY status:

A. If the status is the same, pay the TOTAL FEE(S) DUE shown above.

B. If the status above is to be removed, check box 5b on Part B - Fee(s) Transmittal and pay the PUBLICATION FEE (if required) and twice the amount of the ISSUE FEE shown above, or

If the SMALL ENTITY is shown as NO:

A. Pay TOTAL FEE(S) DUE shown above, or

B. If applicant claimed SMALL ENTITY status before, or is now claiming SMALL ENTITY status, check box 5a on Part B - Fee(s) Transmittal and pay the PUBLICATION FEE (if required) and 1/2 the ISSUE FEE shown above.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**



PTOL-85 (Rev. 02/11)

# PART B - FEE(S) TRANSMITTAL

**Complete and send this form, together with applicable fee(s), to: Mail** **Mail Stop ISSUE FEE**
**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, Virginia 22313-1450**
**or Fax (571)-273-2885**

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

52531 7590 08/06/2012
CHRISTENSEN O'CONNOR JOHNSON KINDNESS PLLC
1420 FIFTH AVENUE
SUITE 2800
SEATTLE, WA 98101-2347

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**

I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

(Depositor's name)
(Signature)
(Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 11/709,477 | 02/21/2007 | Pradip Kulkarni | 139537 | 4127 |

TITLE OF INVENTION: ROOT IMAGE CACHING AND INDEXING FOR BLOCK-LEVEL DISTRIBUTED APPLICATION MANAGEMENT

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | NO | $1740 | $0 | $0 | $1740 | 11/06/2012 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| MARTELLO, EDWARD | 2628 | 345-557000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).
   - ❑ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.
   - ❑ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list
   (1) the names of up to 3 registered patent attorneys or agents OR, alternatively,
   (2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.
   1 ____________
   2 ____________
   3 ____________

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE

(B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) : ❑ Individual ❑ Corporation or other private group entity ❑ Government

4a. The following fee(s) are submitted:
- ❑ Issue Fee
- ❑ Publication Fee (No small entity discount permitted)
- ❑ Advance Order - # of Copies ____________

4b. Payment of Fee(s): **(Please first reapply any previously paid issue fee shown above)**
- ❑ A check is enclosed.
- ❑ Payment by credit card. Form PTO-2038 is attached.
- ❑ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment, to Deposit Account Number ____________ (enclose an extra copy of this form).

5. **Change in Entity Status** (from status indicated above)
- ❑ a. Applicant claims SMALL ENTITY status. See 37 CFR 1.27.
- ❑ b. Applicant is no longer claiming SMALL ENTITY status. See 37 CFR 1.27(g)(2).

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

Authorized Signature ____________ Date ____________

Typed or printed name ____________ Registration No. ____________

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 11/709,477 | 02/21/2007 | Pradip Kulkarni | 139537 | 4127 |

52531 7590 08/06/2012
CHRISTENSEN O'CONNOR JOHNSON KINDNESS PLLC
1420 FIFTH AVENUE
SUITE 2800
SEATTLE, WA 98101-2347

| EXAMINER | |
|---|---|
| MARTELLO, EDWARD | |
| ART UNIT | PAPER NUMBER |
| 2628 | |

DATE MAILED: 08/06/2012

**Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)**
(application filed on or after May 29, 2000)

The Patent Term Adjustment to date is 1009 day(s). If the issue fee is paid on the date that is three months after the mailing date of this notice and the patent issues on the Tuesday before the date that is 28 weeks (six and a half months) after the mailing date of this notice, the Patent Term Adjustment will be 1009 day(s).

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) WEB site (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

| *Notice of Allowability* | Application No. 11/709,477 | Applicant(s) KULKARNI ET AL. | |
|---|---|---|---|
| | Examiner EDWARD MARTELLO | Art Unit 2628 | |

***-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--***

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to *the amendment received 11 July 2012*.
2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on ____; the restriction requirement and election have been incorporated into this action.
3. ☒ The allowed claim(s) is/are *1-27*.
4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   a) ☐ All b) ☐ Some* c) ☐ None of the:
   1. ☐ Certified copies of the priority documents have been received.
   2. ☐ Certified copies of the priority documents have been received in Application No. ____.
   3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

   * Certified copies not received: ____.

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
**THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ A SUBSTITUTE OATH OR DECLARATION must be submitted. Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL PATENT APPLICATION (PTO-152) which gives reason(s) why the oath or declaration is deficient.
6. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.
   (a) ☐ including changes required by the Notice of Draftsperson's Patent Drawing Review ( PTO-948) attached
   1) ☐ hereto or 2) ☐ to Paper No./Mail Date ____.
   (b) ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date ____.

   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**
7. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☐ Notice of References Cited (PTO-892)
2. ☐ Notice of Draftperson's Patent Drawing Review (PTO-948)
3. ☒ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date 07/17/2012
4. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material
5. ☐ Notice of Informal Patent Application
6. ☐ Interview Summary (PTO-413), Paper No./Mail Date ____.
7. ☐ Examiner's Amendment/Comment
8. ☒ Examiner's Statement of Reasons for Allowance
9. ☐ Other ____.

/Edward Martello/
Primary Examiner, Art Unit 2628

## DETAILED ACTION

### *Response to Amendment*

1. This Office Action is responsive to the Applicant initiated interview conducted on 10 July 2012 and the amendment received 11 July 2012.

2. Claims 1, 2, 4, 7, 10, 12, 14, 16, 21 and 23-27 are amended, claims 5, 8, 9, 11, 13, 15, 17-20 and 22 are as previously presented and claims 3 and 6 are as originally presented.

3. In summary, claims 1-27 are pending in the application.

4. The Applicants' remarks and arguments with respect to the 35 U.S.C. § 112 rejection of claims 4, 5, 14, 16 and 17 are persuasive, thus, the 35 U.S.C. § 112 rejection of claims 4, 5, 14, 16 and 17 is hereby withdrawn.

### *Reasons for Allowance*

5. The following is the Examiner's statement for reasons for allowance: In response to the Applicant initiated interview conducted on 10 July 2012 and the amendment received 11 July 2012, the Examiner has determined that the amended claims have overcome all the art of record and that art deemed available in an updated search as shown in the record, thus claims 1-27 are in condition for allowance and all remaining rejections of the claims are hereby withdrawn.

6. With regard to claim 7, claiming a method for providing data to a plurality of compute nodes, comprising: storing blocks of a root image of said compute nodes on a first storage unit;

storing leaf images for respective compute nodes on respective second storage units, said leaf images including only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes; and caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory are a unique combination of features and are non-obvious over the art of record.

7. With regard to claim 19, claiming a method for indexing file systems for a plurality of compute nodes, comprising: storing blocks of a root image of Said compute nodes on a first storage unit; storing leaf images for respective compute nodes on respective second storage units, said leaf images comprising only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image, wherein said leaf images for respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes; merging the blocks of said root image with the blocks of respective leaf images stored on respective second storage units to create respective file systems for respective, compute nodes; receiving indexing results pertaining to said root image from one of said compute nodes; and providing said indexing results to the others of said compute nodes are a unique combination of features and are non-obvious over the art of record.

8. Claims 1 and 23, claiming a system and a computer readable storage medium, respectively, incorporate the methods of claim 7, thus, they are of the same features and scope as

claim 7 and contain a unique combination of features which are non-obvious over the art of record.

9. Claim 14, claiming a system incorporating the methods of claim 19, is also a unique combination of features and is non-obvious over the art of record.

10. Any comments considered necessary by applicant must be submitted no later than the payment of the issue fee and, to avoid processing delays, should preferably accompany the issue fee. Such submissions should be clearly labeled "Comments on Statement of Reasons for Allowance."

***Conclusion***

11. Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/Edward Martello/

Primary Examiner, Art Unit 2628

# EXHIBIT A-6

US008407722B2

(12) **United States Patent**
**Tuttle et al.**

(10) **Patent No.: US 8,407,722 B2**
(45) **Date of Patent: Mar. 26, 2013**

(54) **ASYNCHRONOUS MESSAGING USING A NODE SPECIALIZATION ARCHITECTURE IN THE DYNAMIC ROUTING NETWORK**

(75) Inventors: **Timothy Tuttle**, San Francisco, CA (US); **Karl E. Rumelhart**, Palo Alto, CA (US)

(73) Assignee: **Shaw Parsing L.L.C.**, Las Vegas, NV (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1127 days.

(21) Appl. No.: **11/396,251**

(22) Filed: **Mar. 30, 2006**

(65) **Prior Publication Data**

US 2007/0239822 A1 Oct. 11, 2007

**Related U.S. Application Data**

(63) Continuation of application No. 10/105,018, filed on Mar. 21, 2002, now Pat. No. 7,051,070, which is a continuation-in-part of application No. 10/017,182, filed on Dec. 14, 2001, now Pat. No. 7,043,525.

(Continued)

(51) **Int. Cl.**
***G06F 3/00*** (2006.01)
***G06F 15/16*** (2006.01)

(52) **U.S. Cl.** ........................................ **719/316**; 709/206

(58) **Field of Classification Search** .................. 709/203, 709/219; 719/309
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,230,048 A * 7/1993 Moy ................................ 707/1
5,535,335 A 7/1996 Cox et al.
5,692,193 A 11/1997 Jagannathan et al.
5,699,523 A 12/1997 Li et al.
5,706,516 A 1/1998 Chang et al.
5,732,219 A 3/1998 Blumer et al.
5,754,939 A 5/1998 Herz et al.

(Continued)

FOREIGN PATENT DOCUMENTS

EP 0 733 983 A2 9/1996
EP 0 749 081 A1 12/1996

(Continued)

OTHER PUBLICATIONS

Franklin et al., "Dissemination-Based Information Systems," IEEE Data Engineering Bulletin, vol. 19, No. 3, Sep. 1996, 9 pages.

(Continued)

*Primary Examiner* — Andy Ho
*Assistant Examiner* — Tuan Dao
(74) *Attorney, Agent, or Firm* — Sterne, Kessler, Goldstein & Fox P.L.L.C.

(57) **ABSTRACT**

A network routes update messages containing updates to properties of live objects from input sources to clients having the objects. When the clients receive live objects, the clients identify the object IDs associated with the objects and register the object IDs with the routing network. The routing network is adapted to selectively send update messages to nodes in the network and the nodes forward the messages to the clients. One implementation uses a hierarchy of registries to indicate which nodes and clients receive which update messages. Another implementation assigns update messages to one or more of N categories and nodes to one or more of M types, and the gateways maintain mapping between categories and types. To ensure that clients receive all of the update messages for which they register, the clients connect to client proxies that in turn connect to at least one node of each type.

**37 Claims, 12 Drawing Sheets**



**Related U.S. Application Data**

(60) Provisional application No. 60/256,613, filed on Dec. 18, 2000, provisional application No. 60/276,847, filed on Mar. 16, 2001, provisional application No. 60/278,303, filed on Mar. 21, 2001, provisional application No. 60/279,608, filed on Mar. 28, 2001, provisional application No. 60/280,627, filed on Mar. 29, 2001.

(56) **References Cited**

U.S. PATENT DOCUMENTS


5,822,543 A 10/1998 Dunn et al.
5,845,324 A 12/1998 White et al.
5,878,420 A 3/1999 de la Salle
5,886,643 A 3/1999 Diebboll et al.
5,919,247 A 7/1999 Van Hoff et al.
5,933,429 A 8/1999 Bubenik et al.
5,938,733 A 8/1999 Heimsoth et al.
5,964,839 A 10/1999 Johnson et al.
5,974,457 A 10/1999 Waclawsky et al.
6,018,619 A 1/2000 Allard et al.
6,029,175 A 2/2000 Chow et al.
6,052,447 A 4/2000 Golden et al.
6,055,493 A 4/2000 Ries et al.
6,091,724 A * 7/2000 Chandra et al. .............. 370/390
6,094,681 A 7/2000 Shaffer et al.
6,112,240 A 8/2000 Pogue et al.
6,138,158 A 10/2000 Boyle et al.
6,173,406 B1 1/2001 Wang et al.
6,233,600 B1 5/2001 Salas et al.
6,240,451 B1 5/2001 Campbell et al.
6,253,167 B1 6/2001 Matsuda et al.
6,256,747 B1 7/2001 Inohara et al.
6,292,835 B1 9/2001 Huang et al.
6,308,209 B1 10/2001 Lecheler
6,314,459 B1 * 11/2001 Freeman ...................... 709/220
6,324,587 B1 * 11/2001 Trenbeath et al. ........... 719/310
6,363,421 B2 3/2002 Barker et al.
6,366,926 B1 * 4/2002 Pohlmann et al. ......... 707/104.1
6,405,245 B1 6/2002 Burson et al.
6,408,282 B1 6/2002 Buist
6,418,448 B1 7/2002 Sarkar
6,418,467 B1 7/2002 Schweitzer et al.
6,446,257 B1 9/2002 Pradhan et al.
6,449,638 B1 9/2002 Wecker et al.
6,460,036 B1 10/2002 Herz
6,484,143 B1 11/2002 Swildens et al.
6,502,131 B1 12/2002 Vaid et al.
6,510,323 B1 * 1/2003 Stocker et al. ............... 455/466
6,539,427 B1 3/2003 Natarajan et al.
6,553,413 B1 4/2003 Leighton et al.
6,560,611 B1 5/2003 Nine et al.
6,567,411 B2 5/2003 Dahlen
6,577,328 B2 6/2003 Matsuda et al.
6,606,596 B1 8/2003 Zirngibl et al.
6,606,643 B1 8/2003 Emens et al.
6,609,138 B1 8/2003 Merriam
6,654,804 B1 11/2003 Fleming
6,658,652 B1 12/2003 Alexander et al.
6,687,729 B1 2/2004 Sievert et al.
6,691,165 B1 2/2004 Bruck et al.
6,725,446 B1 4/2004 Hahn et al.
6,728,747 B1 4/2004 Jenkins et al.
6,751,663 B1 6/2004 Farrell et al.
6,760,324 B1 7/2004 Scott et al.
6,769,009 B1 7/2004 Reisman
6,789,115 B1 9/2004 Singer et al.
6,792,458 B1 9/2004 Muret et al.
6,829,642 B1 12/2004 Giroir et al.
6,832,222 B1 12/2004 Zimowski
6,836,886 B2 12/2004 Turke et al.
6,871,346 B1 3/2005 Kumbalimutt et al.
6,918,084 B1 7/2005 Slaughter et al.
6,970,924 B1 11/2005 Chu et al.
7,020,082 B2 3/2006 Bhagavath et al.
7,043,525 B2 5/2006 Tuttle et al.
7,051,070 B2 5/2006 Tuttle et al.
7,107,326 B1 9/2006 Fijolek et al.
7,127,720 B2 10/2006 Cano et al.
7,139,844 B2 11/2006 Smith et al.
7,159,034 B1 1/2007 Rai
7,207,043 B2 4/2007 Blythe et al.
7,209,959 B1 * 4/2007 Campbell et al. ............ 709/219
7,249,197 B1 7/2007 Roestenburg et al.
7,263,547 B2 8/2007 Kloba et al.
7,277,917 B2 10/2007 Tuttle et al.
7,293,074 B1 * 11/2007 Jellinek et al. ................ 709/218
7,350,213 B2 3/2008 Deutesfeld et al.
7,412,518 B1 8/2008 Duigou et al.
7,426,721 B1 9/2008 Saulpaugh et al.
7,430,610 B2 9/2008 Pace et al.
7,516,177 B2 4/2009 Knapp et al.
7,565,359 B2 7/2009 Nazem et al.
2001/0012299 A1 8/2001 Dahlen
2001/0047426 A1 11/2001 Hunter
2002/0010757 A1 1/2002 Granik et al.
2002/0013852 A1 1/2002 Janik
2002/0024536 A1 2/2002 Kahan et al.
2002/0056004 A1 5/2002 Smith et al.
2002/0073165 A1 6/2002 McNulty et al.
2002/0078251 A1 6/2002 Lewis
2002/0087630 A1 * 7/2002 Wu .............................. 709/203
2002/0095399 A1 7/2002 Devine et al.
2002/0120717 A1 * 8/2002 Giotta ......................... 709/219
2002/0165977 A1 * 11/2002 Novaes ........................ 709/238
2003/0026254 A1 2/2003 Sim
2003/0041110 A1 2/2003 Wenocur et al.
2003/0120817 A1 6/2003 Ott et al.
2003/0140111 A1 7/2003 Pace et al.
2004/0139433 A1 7/2004 Blythe et al.
2004/0148606 A1 7/2004 Hosoe
2004/0199926 A1 10/2004 Gilgen et al.
2004/0215493 A1 10/2004 Koppes et al.
2005/0027815 A1 2/2005 Christodoulou et al.
2005/0033841 A1 2/2005 McCarthy et al.
2005/0125557 A1 6/2005 Vasudevan et al.
2005/0278726 A1 12/2005 Cano et al.
2006/0031282 A1 2/2006 Tuttle et al.
2006/0031283 A1 2/2006 Tuttle et al.
2006/0041681 A1 2/2006 Rumelhart
2006/0075279 A1 4/2006 Cameros et al.
2006/0117318 A1 6/2006 Rumelhart et al.
2006/0265488 A1 11/2006 Tuttle et al.
2007/0033293 A1 2/2007 Rumelhart
2007/0050519 A1 3/2007 Cano et al.
2007/0061811 A1 3/2007 Rumelhart et al.
2009/0077173 A1 3/2009 Lowery et al.


FOREIGN PATENT DOCUMENTS


EP 0 889 421 A1 1/1999
WO WO 97/16796 A1 5/1997
WO WO 01/63837 A2 8/2001
WO WO 2005/046184 A1 5/2005


OTHER PUBLICATIONS


Nagami et al., "Toshiba's Flow Attribute Notification Protocol (FANP) Specification," Apr. 1997, RFC 2129, Internet RFC/STD/FYI/BCP Archives [online], [retrieved on May 16, 2002]. Retrived from the Internet: <landfield.com/rfcs/rfc2129.html>, 16 pages.

Strom et al., "Gryphon: An Information Flow Based Approach to Message Brokering," International Symposium on Software Reliability Engineering '98, 1998, 2 pages.

Sturman et al., "Reflection in the Gryphon Message Brokering System," Reflection Workshop of the 13.sup.th ACM Conference on Object Oriented Program Systems, Languages and Applications (OOPSLA '98), 1998, 5 pages.

International DOI Foundation, "Introduction to the Digital Object Identifier," [online]. Apr. 1998 [retrieved on May 16, 2002]. Retrieved from the Internet: <doi.org/introduction.html.>, 4 pages.

Aksoy et al., "Research in Data Broadcast and Dissemination", Proc. 1st Int'l Conf. on Advanced Multimedia Content Processing, Osaka University, Osaka, Japan, Nov. 1998.

Banavar et al., "An Efficient Multicast Protocol for Content-Based Publish-Subscribe Systems," Proc. of the 19th International Conference on Distributed Computing Systems, 1999, 9 pages.
Banavar et al., "Information Flow Based Event Distribution Middleware," Proceedings of the 1999 ICDCS Workshop on Electronic Commerce and Web-Based Applications, 1999, 8 pages.
Aguilera et al., "Matching Events in a Content-based Subscription System," Eighteenth ACM Symposium on Principles of Distributed Computing (PODC '99), Atlanta, GA, May 4-6, 1999, 9 pages.
Banavar et al., "A Case for Message Oriented Middleware," Distributed Computing, 13.sup.th International Symposium, Bratislava, Slavak Republic, Sep. 27-29, 1999, 18 pages.
Aguilera et al., "Efficient Atomic Broadcast Using Deterministic Merge," Symposium on Principles of Distributed Computing, 2000, 10 pages.
Opyrchal et al., "Exploiting IP Multicast in Content-Based Publish-Subscribe Systems," Proceedings of the IFIP/ACM International Conference on Distributed Systems Platforms (Middleware 2000), Apr. 2000, 23 pages.
Caplin Systems Ltd., White Paper "Real Time Text Protocol (RTTP)," Version 1.1, Sep. 2000, 11 pages.
Reuters, "Reuters Market Data Systems and the Trading Solutions Architecture," Version 1.0, Jan. 12, 2001, 51 pages.
Ramamrithan et al., "Dissemination of Dynamic Data on the Internet," [online]. Powerpoint Presentation, Spring 2001, [retrieved on Feb. 6, 2002], 5 pages. Retrieved from the Internet <.cs.umbc.edu/courses/graduate/CMSC691T/spring.sub.—2001/rlist/amit.ppt>.
ComputerLetter, vol. 17, No. 23, Jul. 16, 2001, pp. 1-8.
ComputerLetter, vol. 17, No. 31, Sep. 24, 2001, pp. 1-6.
ComputerLetter, vol. 17, No. 35, Nov. 5, 2001, pp. 1-6.
Tuttle et al., "Upstream Delivery of Information in a Digital Network", U.S. Appl. No. 09/901,582, filed Jul. 9, 2001.
"Repackaging the Net", ComputerLetter, vol. 17, No. 35, Nov. 5, 2001, pp. 1-5.
"Reckoning with IP", ComputerLetter, vol. 17, No. 37, Nov. 19, 2001, pp. 1-6.
"Persistence Counts", ComputerLetter, vol. 17, No. 23, Jul. 16, 2001, pp. 1, 5-7.
Zhao et al.; "A Workflow-centric Study of Organizational Knowledge Distribution;" Proceedings of the 33rd Hawaii International Conference on System Sciences; 2000; pp. 1-10; IEEE.
Gribble, et al.; "The Ninja Architecture for Robust Internet-scale Systems and Services;" Computer Networks; 2001; pp. 473-497; vol. 35; Elsevier Science B.V.
Carmona, David; "Programming the Thread Pool in the .NET Framework"; 'Online' Jun. 2002, pp. 1-17, XP002357234; retrieved on Dec. 1, 2005 from the Internet: URL:http://msdn.microsoft.com/library/default.asp?url=/library/en-us/dndotnet/hmtl/progthrepool.asp>, pp. 1-17.
Welsh, Matthew D.; "An Architecture for Highly Concurrent, Well-Conditioned Internet Services"; URL: http://www.eecs.harvard.edu/{mdw/papers/mdw-phdthesis/pdf>, 2005, pp. 48-54, 101, and 113-114.
Written Opinion of the International Searching Authority for International Application No. PCT/US2005/029162, recorded Jan. 17, 2006, 7 pages.
Written Opinion of the International Searching Authority for International Application No. PCT/US2005/029021, recorded Dec. 14, 2005, 10 pages.
Written Opinion of the International Searching Authority for International Application No. PCT/US2005/029158, recorded Jan. 25, 2006, 7 pages.
Non-Final Office Action dated Oct. 26, 2009, U.S. Appl. No. 11/205,263, Rumelhart et al., filed Aug. 15, 2005.
Final Office Action dated Nov. 24, 2009, U.S. Appl. No. 11/205,237, Rumelhart et al., filed Aug. 15, 2005.
Non-Final Office Action dated May 3, 2005, 8 pages in U.S. Appl. No. 10/017,182, Tuttle et al., filed Dec. 14, 2001.
Notice of Allowance dated Jan. 3, 2006, U.S. Appl. No. 10/105,018, Tuttle et al., filed Mar. 21, 2002.
Notice of Allowance dated Jul. 5, 2006, U.S. Appl. No. 10/105,018, Tuttle et al., filed Mar. 21, 2002.
Non-Final Office Action dated Aug. 9, 2005, U.S. Appl. No. 10/213,269, Cano et al., filed Aug. 5, 2002.
Final Office Action dated Jan. 26, 2006, U.S. Appl. No. 10/213,269, Cano et al., filed Aug. 5, 2002.
Notice of Allowance dated Jun. 6, 2006, U.S. Appl. No. 10/213,269, Cano et al., filed Aug. 5, 2002.
Non-Final Office Action dated Feb. 3, 2009, U.S. Appl. No. 11/205,233, Rumelhart et al., filed Aug. 15, 2005.
Non-Final Office Action dated Aug. 6, 2009, U.S. Appl. No. 11/205,233, Rumelhart et al., filed Aug. 15, 2005.
Non-Final Office Action dated Apr. 22, 2008, U.S. Appl. No. 11/205,237, Cameros et al., filed Aug. 15, 2005.
Non-Final Office Action dated Apr. 29, 2009, U.S. Appl. No. 11/205,237, Cameros et al., filed Aug. 15, 2005.
Final Office Action dated Nov. 25, 2008, U.S. Appl. No. 11/205,237, Cameros et al., filed Aug. 15, 2005.
Notice of Allowance dated May 22, 2007, U.S. Appl. No. 11/347,802, Tuttle et al., filed Feb. 3, 2006.
Non-Final Office Action dated Jan. 26, 2007, U.S. Appl. No. 11/347,802, Tuttle et al., filed Feb. 3, 2006.
Non-Final Office Action dated Mar. 6, 2009, U.S. Appl. No. 11/515,233, Rumelhart et al., filed Aug. 31, 2006.
Final Office Action dated Oct. 7, 2009, U.S. Appl. No. 11/515,233, Rumelhart et al., filed Aug. 31, 2006.
Non-Final Office Action dated Jan. 7, 2010, U.S. Appl. No. 11/205,233, Rumelhart et al., filed Aug. 15, 2005.
Non-Final Office Action dated Feb. 22, 2010, U.S. Appl. No. 11/515,233, Rumelhart et al., filed Aug. 31, 2006.
Final Office Action dated Mar. 23, 2010, U.S. Appl. No. 11/205,263, Rumelhart et al., filed Aug. 15, 2005.
U.S. Appl. No. 13/617,168, Tuttle et al., "Asynchronous Messaging Using A Node Specialization Architecture in the Dynamic Routing Network," filed Sep. 14, 2012.
Non-Final Rejection mailed Aug. 9, 2005 for U.S. Appl. No. 10/213,269, filed Aug. 5, 2002; 11 pages.
Final Rejection mailed Jan. 26, 2006 for U.S. Appl. No. 10/213,269, filed Aug. 5, 2002; 8 pages.
Notice of Allowance mailed Jun. 6, 2006 for U.S. Appl. No. 10/213,269, filed Aug. 5, 2002; 4 pages.
Non-Final Rejection mailed Aug. 26, 2010 for U.S. Appl. No. 11/515,366, filed Aug. 31, 2006; 16 pages.
Final Rejection mailed Feb. 17, 2011 for U.S. Appl. No. 11/515,366, filed Aug. 31, 2006; 30 pages.
Notice of Allowance mailed Nov. 10, 2005 for U.S. Appl. No. 10/017,182, filed Dec. 14, 2001; 6 pages.

* cited by examiner


Dynamic Content Provider
116
117
110
100
Information Provider
108
Dynamic Content Routing Network
125
124
Server
118
112
Client
120
122
114

Fig. 1

Case 3:25-cv-02885-L-BN Document 167 Filed 08/28/26 Page 251 of 1002 PageID 5408






Fig. 2


Input Source
210A
Input Source
210B
Input Source
210C
Routing Network
110
Client
312A
Client
312B
Client
312C
Client
312D
Client
312E
Client
312F
Client
312G
Client
312H
114

Fig. 3

Case 3:25-cv-02885-L-BN Document 167 Filed 08/28/26 Page 253 of 1002 PageID 5410






Fig. 4




Fig. 5


Parse Page and Identify Object IDs
610
Connect to Routing Network
612
Register Object IDs With Network
614
New Page Loaded ?
616
Yes
Terminate
618
No
Message Received from Network ?
No
618
Yes
Extract Data
620
Update Identified Object

Fig. 6



710A
Information Provider
710B
Dynamic Content Provider
710C
710D
Global Load Balancer 716
Cluster Load Balancer 720A
Cluster Load Balancer
Cluster Load Balancer
724A
Gateway
Gateway
Gateway
Gateway
734A
730a
732A Node
732A Node
Node
Node
Node
Node
726A
App Server
App Server
App Server
728A
110
Cluster Load Balancer 722A
Cluster Load Balancer
Cluster Load Balancer
714A
714B
714C
Global Load Balancer 718
Client
Client
Client
Client
Client
Client
712A
712B
712C
712D
712E
712F


Fig. 7


Receive Message
810
Extract IDs
820
Look up Registered Nodes
830
Transmit Message to Registered Nodes if any
840
Look up Registered Clients
850
Transmit Message to Registered Clients
860

Fig. 8


726
726
Node of Type 1
732
Node of Type 2
732
740
Client Proxy
712
712
Client 1
Client 2
110

Fig. 9


Receive Message
1010
Identify Message Category
1020
Look Up Nodes of the Message Category
1030
Transmit Message to Identified Nodes
1040
Determine Clients Registered for the Message and Client Proxies Connected to the Clients
1050
Transmit Message to Client Proxy
1060
Transmit Message to Registered Clients
1070

Fig. 10


726
Node of Type 1
726
Node of Type 2
740
Client Proxy
736
712
Client 1
712
Client 2
110

Fig. 11


726
Node of Type 1
726
Node of Type 2
726
Node of Type 3
712
Client 1
712
Client 1
110

Fig. 12

# ASYNCHRONOUS MESSAGING USING A NODE SPECIALIZATION ARCHITECTURE IN THE DYNAMIC ROUTING NETWORK

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 10/105,018 filed Mar. 21, 2002 (now U.S. Pat. No. 7,051,070), which is a continuation-in-part of U.S. application Ser. No. 10/017,182 filed Dec. 14, 2001 now U.S. Pat. No. 7,043,525, which claims the benefit of U.S. Provisional Application No. 60/256,613, filed Dec. 18, 2000, U.S. Provisional Application No. 60/276,847, filed Mar. 16, 2001, U.S. Provisional Application No. 60/278,303, filed Mar. 21, 2001, U.S. Provisional Application No. 60/279,608, filed Mar. 28, 2001, and U.S. Provisional Application No. 60/280,627, filed Mar. 29, 2001, all of which are hereby incorporated by reference herein.

## BACKGROUND

1. Field of the Invention

This invention pertains in general to transferring information through digital networks and in particular to transferring information for remotely updating content at client devices through the digital networks.

2. Background Art

The Internet is a digital network of computers. An individual computer on the Internet is typically identified by an internet protocol (IP) address. A computer on the Internet sends a packet of information to another computer by routing the packet to a logical port at the destination computer's IP address. The destination computer interprets the packet according to one of several possible protocols determined by the port to which the packet was sent.

The World Wide Web (the "Web") is a collection of technology and content available on the Internet that allows the content to be routed from server computers to particular destination computers. The Web includes a large number of web pages residing on many different servers. Web pages contain one or more files, or references to one or more files, specifying instructions for presenting the web page and content, such as text, images, applets, video, and/or audio.

Web pages use a variety of definitional and programming languages to control how information is presented. The most fundamental of these is the Hypertext Markup Language (HTML). HTML uses a system of "tags" to specify how content should be displayed. Recent advances in HTML introduce "style sheets" which help separate content information from display information. HTML has also been modified and extended to provide new capabilities. For example, Extensible Markup Language (XML) adds semantic content to web pages. In addition, Dynamic HTML (DHTML) adds some dynamic content to web pages.

A web page may also include one or more programs for controlling how the web page is displayed. For example, JAVA® applets and JAVASCRIPT® scripts may be used to control the display of a web page. In addition, DHTML uses scripts to control the dynamic content. Thus, a web page designer can use applets and scripts to produce animation effects or modify the display based on user interaction. For example, the designer can write a script that changes the color of a piece of text when a user clicks on a button.

Devices that display/execute web pages are often called "client devices" or simply "clients." Client devices include personal computers, web-enabled set-top boxes and televisions, cellular telephones, personal digital assistants and other handheld devices, and special-purpose web-browsing appliances. Client devices typically employ a program called a "web browser" for interpreting the HTML or other display instructions in the web page and displaying the content accordingly. Most web browsers include special functionality, such as a Java Virtual Machine, for executing JAVA® applets and/or other applets or scripts embedded in the web pages.

A client device specifies a web page or other document on the web using a Uniform Resource Locator (URL). A URL has the form "service://server/path/file." Here "service" refers to the protocol to be used, such as the file transfer protocol (FTP) or the hypertext transport protocol (HTTP). "Server" is the IP address of the server containing the page, and "path/file" specifies the particular web page on the server.

The Web suffers from a substantial limitation with respect to dynamically updating content in a web page at a client device. The Web's only mode of operation is for a client device to first request a page from a server and then for the server to send the requested page to the client device. Once the server delivers the page to the client, it typically terminates its connection to the client, and does not retain any information about the client or the page that was sent. For this reason, servers are typically "stateless." As a result, client devices drive and control the flow of information around the Web. While client-side control is appropriate in some situations, it does not permit efficient updating of data at the client devices. For example, if a web page contains information that may change, such as the score of a baseball game or a stock quote, the server has no way to inform the client devices that are viewing the page of the change. Instead, the client devices must ask the server for the updated information. However, the client devices do not know when the information on the web page has changed, and thus do not know to ask for the update.

There are some simple web programming techniques that attempt to update content on client device-side web pages. One approach that web designers use is to rely on the client devices to periodically re-request web pages. This updating can be performed as the result of user action (such as pressing the "refresh" button) or can be automated to occur on a particular schedule (such as by using the HTML Meta Refresh tag to cause the client device to request the page every 'X' seconds). Although this technique provides client devices with more up-to-date information, it is very wasteful of resources. In particular, the web server must resend the page even if nothing has changed, and, even when something has changed, it must resend the entire web page rather than just the updated information, which may be only a very small part of the page. Further, attempting to reduce unnecessary requests by decreasing the request rate results in decreasing the currency of the data. This is an unalterable trade off in a client-driven approach.

The performance of automatic refreshing can be improved somewhat by putting information that may change in a separate frame from information that is less likely to change, and only refreshing the separate frame. A few web designers even write custom JAVA applets to limit refreshing to individual components on a page, such as the score of a soccer game. A willingness to go to such effort illustrates the serious drain of resources caused by frequent refreshing. Nevertheless, even custom JAVA applets are not a meaningful attack on this problem. Custom applets require a large separate development effort for each item on each page that might need to be updated. More importantly, most custom applets still update content based upon client-driven requests, although it is possible to design an applet that accepts "pushed" messages. This

solution is not scalable to provide updated information for large numbers of client devices and for large numbers of web pages.

Therefore, there is a need in the art for an efficient way to provide dynamic content to a web page at a client device.

## DISCLOSURE OF THE INVENTION

The above need is met by a dynamic content routing network that routes messages containing data for updating properties of live objects to clients displaying web pages or other representations of data containing the live objects. The web server that initially provides the web pages to the clients does not need to track which clients are currently displaying the live objects. Instead, the information provider or a dynamic content provider (generically referred to as an "input source") that provided the live object simply sends an update message to the routing network. This routing utilizes bandwidth efficiently because the update messages are provided to the clients only when the live objects change.

The routing network is adapted to selectively send messages to the nodes in the network. In one embodiment, a hierarchy of registrations is used. Each gateway in the routing network maintains the mappings between the live: objects and the nodes that have registered for the live objects. Each node in the routing network, in turn, maintains the mappings between the live objects and the clients that display them. An input source provides a message to a gateway in each cluster in the routing network. Each gateway forwards to each node only messages that reference the objects for which it has registered. Each node forwards to each client only messages that reference the objects for which it has registered. Adding node functionality to the gateway and client functionality to the node advantageously allows the routing network to decide which nodes should receive an update message. As a result, messages are sent to only nodes that have registered for the messages. Furthermore, each node receives all the messages that the clients connected to that node are interested in.

In another embodiment, all messages from an input source are assigned to one or more of N categories. Also, the nodes are assigned to one or more of M types, and mappings are created between message categories and node types. Each gateway keeps track of these mappings. When a gateway receives messages from input sources, the gateway identifies the categories of the messages and routes the messages to the nodes of the types to which the categories are mapped. To ensure that clients have access to the messages they need, clients are allowed to communicate with nodes of several types using client proxies connected between the clients and the nodes. There are at least two ways to implement the client proxy embodiment. The implementations differ primarily in where the client registration information is stored. In the first implementation, client registration information is stored at the nodes, and the client proxy merely passes messages among the clients and nodes. When a node directs a message to the client, the node passes the message to the client proxy along with a pointer to the client socket. When the client proxy receives the message, it simply pushes it to the client socket.

In the second implementation of the client proxy embodiment, the client proxy stores client registration information. In this embodiment, each node stores the object IDs registered by client proxies connected to the node. The client proxy registers with the nodes for all objects for which it needs to receive updates. The nodes receive the messages from the input sources, determine which client proxies have registered for the messages, and send the messages to the appropriate client proxies. The client proxies, in turn, transmit the messages to the clients that have registered for the messages.

The features and advantages described in this summary and the following detailed description are not all-inclusive, and particularly, many additional features and advantages will be apparent to one of ordinary skill in the art in view of the drawings, specification, and claims hereof.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a high-level block diagram illustrating an environment containing a dynamic content routing network;

FIG. **2** is an interaction diagram illustrating interactions among a server, information provider, dynamic content provider, client, and routing network to update a property of a live object on a web page;

FIG. **3** is a high-level diagram graphically indicating the many-to-many mapping performed by the routing network;

FIG. **4** illustrates two different web pages containing sports scores;

FIG. **5** is a block diagram illustrating an input source and the tools available to it for generating the update messages;

FIG. **6** is a flow chart illustrating the steps performed by an embodiment of an activation module;

FIG. **7** is a block diagram illustrating a lower-level view of the routing network according to an embodiment of the present invention;

FIG. **8** is a flow chart illustrating steps performed by a gateway and a node in a cluster to perform object-based routing of a message received from an input source in an embodiment using a hierarchy of registries;

FIG. **9** is a block diagram illustrating a high-level view of the routing network in an embodiment adapted to use message categories, node types, and client proxies;

FIG. **10** is a flow chart illustrating steps performed by a gateway, a node that stores client registration information, and a pass-through client proxy to perform object-based routing of a message received from an input source;

FIG. **11** is a block diagram illustrating a high-level view of the routing network for an embodiment in which the client proxy stores the client registration information; and

FIG. **12** is a block diagram illustrating a high-level view of the routing network for an embodiment in which the nodes adopt client proxy functionality.

The figures depict an embodiment of the present invention for purposes of illustration only. One skilled in the art will readily recognize from the following description that alternative embodiments of the structures and methods illustrated herein may be employed without departing from the principles of the invention described herein.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIG. **1** is a high-level block diagram illustrating an environment **100** containing a dynamic content routing network **110** (hereafter referred to as the "routing network"). The environment **100** also contains a server **112** in communication with a client **114**, an information provider **108**, and a dynamic content provider **116**. Although a typical environment **100** will have hundreds of servers **112** and information providers **108**, thousands (or even millions) of clients **114**, and multiple dynamic content providers **116**, FIG. **1** illustrates only one of each of these entities in order to enhance the clarity of this description.

The server **112**, client **114**, information provider **108**, dynamic content provider **116**, and routing network **110** are

preferably in communication via conventional communications links **117** such as those comprising the Internet. The communications links **117** include known wired communications media, such as dedicated or shared data, cable television or telephone lines, and/or known wireless communications media, such as communications over the cellular telephone network using protocols such as the global system for mobile communications (GSM), code division multiple access (CDMA), time division multiple access (TDMA), etc.

In one embodiment, the entities may each be in communication with one or more Internet Service Providers (ISPs) (not shown) that provide each entity with access to other computers on the Internet. In addition, the server **112**, client **114**, information provider **108**, dynamic content provider **116**, and routing network **110** are preferably each identified by at least one Internet Protocol (IP) address such as "66.35.209.224." The IP address may also have one or more domain names associated with it, such as "bangnetworks.com." Alternative embodiments of the present invention may use alternative addressing schemes and/or naming conventions instead of, or in addition to, those described herein. For example, embodiments wherein one or more of the clients are cellular telephones or other portable devices may rely on different addressing schemes.

Preferably, the information provider **108** provides web pages or other representations of data to the server **112**. The web pages contain one or more "live objects," which are designated to be real-time dynamically-updateable objects. Each live object is identified by an object identifier, or object ID. Preferably, the server **112** provides the web pages **118** to multiple clients **114**. The clients **114** contact the routing network **110** and register for update messages for the object IDs on the web page. The routing network **110**, in turn, preferably maintains a registry indicating which clients have registered for which object IDs.

The information provider **108** and/or dynamic content provider **116** send update messages to the routing network **110**. These messages can be sent any time the information provider **108** or dynamic content provider **116** wants to update a property of a live object. Each update message preferably identifies a live object and contains data for updating a property of the identified live object. The routing network **110** accesses the registry and determines which clients have registered for the identified object. Then, the routing network **110** routes the update message to the appropriate clients. Upon receipt of an update message, the clients **114** update the specified property of the live object.

The routing network **110** provides an efficient one-to-many mapping of objects to clients (and by inference of information, a many-to-many mapping of information providers **108**/dynamic content providers **116** to clients) through object-based routing. Messages provided by the information provider **108** and/or dynamic content provider **116** to the routing network **110** are not routed to the clients **114** based entirely on a specified destination; more specifically, they are not routed based on the IP address of the client, as in conventional IP routing schemes. Instead, the messages are routed based on the live objects referenced by the message.

The mapping and object-based routing provided by the routing network **110** allow the information provider **108** and dynamic content provider **116** to update properties of live objects at a dynamically changing cross-section of clients in real-time, without requiring the information provider or dynamic content provider to track the clients or web pages being viewed by the clients. The clients **114**, in turn, do not need to have any a priori knowledge of object IDs—they "discover" which IDs they should register when they receives the web pages **118** from the server **112**.

Object-based routing also allows information providers **108** to dynamically update content on web pages without requiring the clients **114** to re-request the content, and without requiring the information providers **108** or servers **112** to maintain connections with the clients. In this manner, significantly more clients can receive updated content from a given information provider **108** than would be possible utilizing conventional client-side request-driven transmission control protocol/Internet Protocol (TCP/IP) connections between the clients and the server **112**.

Turning now to the individual entities illustrated in FIG. **1**, the server **112** is preferably a conventional computer system configured to act as a web server and serves web pages **118** and other data representations to clients **114**. The web pages **118** provided by the server **112** are associated with one or more information providers **108**.

An information provider **108** is an entity providing one or more web pages **118**, information contained in web pages, and/or other representations of data served by the server **112**. The information provider **108** preferably has a conventional computer system coupled to the Internet. In one embodiment, the server **112** is directly controlled by the information provider **108** (e.g., the server is physically located at the information provider and/or is dedicated to serving only the information provider's web pages). In this embodiment, the server **112** and information provider **108** can be treated as the same entity. In an alternative embodiment, the server **112** serves web pages from multiple information providers.

As is known in the art, the web pages **118** and other content on the server **112** are specified by uniform resource locators (URLs) having the form "service://server/path/web page." Typically, web pages **118** are obtained via the hypertext transport protocol (HTTP) and thus an exemplary URL for retrieving the web page "b1.html" from the web server having the domain name "www.bangnetworks.com" is "http://www.bangnetworks.com/news/b1.html."

As used herein, a "web page" is a block of data available from the server **112**. In the simplest case, a web page is a file written in the hypertext markup language (HTML). The web page may also contain or refer to one or more other blocks of data, such as other files, text, images, applets, video, and/or audio. In addition, the web page may contain instructions for presenting the web page and its content, such as HTML tags and style sheets. The instructions may also be in the Extensible Markup Language (XML), which is related to HTML and adds semantic content to web pages or the Dynamic HTML (DHTML), which adds some dynamic content to web pages. Additionally, the instructions may take the form of one or more programs such as JAVA® applets and JAVASCRIPT® and/or DHTML scripts.

As used herein, the phrase "web page" also refers to other representations of data served by the server **112** regardless of whether these data representations include characteristics of conventional web pages. These data representations include, for example, application programs and data intended for the web browser **120** or other application programs residing at the clients **114** or elsewhere, such as spreadsheet or textual (e.g., word processing) data, etc.

In a preferred embodiment, objects at the client, such as web pages and elements of web pages, can be designated as "live" by the information provider **108**. Properties of a live object can be dynamically updated in real-time at the client **114** by the information provider **108** or another entity acting on behalf of the information provider. As used herein, an "object" is any datum or data at the client **114** that can be

individually identified or accessed. Examples of objects include elements of web pages such as text characters and strings, images, frames, tables, audio, video, applets, scripts, HTML, XML, and other code forming the web page, variables and other information used by applets, scripts and/or code, URLs embedded in the web page, etc. Application and operating system constructs are also objects. For example, cells of spreadsheets, text in word processor documents, and title bars and messages displayed by the operating system or applications are objects. Preferably, multiple objects can be grouped together into a single, logical object. Thus, an object can be defined at any desired or useful level of granularity.

Since content on a web page is conceptualized and organized by "object," the present invention essentially abstracts web pages and web page content, and other modules and/or functionality at the client **114**, away from the HTML code or other conventional representation. This abstraction allows the information provider **108** to update a property of an object without concern for the location, display format, or other specifics of how the data is being represented at the client **114**.

Live objects have associated "properties" which include any modifiable data related to the object or referenced with respect to the object. The information provider **108** typically, but not necessarily, provides initial settings for the properties of live objects provided to the client **114**. The properties may or may not affect the visual representation of the object in the web page or other data representation. A property may affect an internal aspect of the object and, thus, a change to the property may not have any direct effect on a web page containing the object. For example, the property may affect whether particular aspects of the object are modifiable, how the object responds to user input or other stimuli, etc. Additionally, a property may also have a direct effect on how the object is displayed at the client **114**. For example, the property may affect the content, color, typeface, size, formatting, or other attribute of text, images, or other data displayed by the object. Other properties may occupy parts of the spectrum between having no effect on the visible representation of the object and having a direct effect on the visible representation of the object. For example, a web page showing scores of football games may include a list of games and the current scores of the games as of the time the server **112** serves the web page. The list of games, subset of games to be displayed, and the scores of the games can be designated as live objects (or properties of a single live object) and updated as necessary or desired.

A property can also preferably include instantiating an instance of the object or invoking functionality of the object. For example, a property of a browser window object may include functionality for instantiating another browser window. This function can be invoked as a logical change to a property of the object. The second browser window can be referenced through the original browser window (i.e., object) or designated as a new live object.

An information provider **108** or other entity preferably updates a live object at a client **114** via an update message. In general, an update message identifies the live object and, if necessary, the property of the live object, and contains data for updating the property. In one embodiment, the data may be the actual value for the property or executable code for causing the object's property to be updated. For example, the data may be a simple numerical or textual value, e.g., "4," to which the property should be set, and/or the data may be JAVASCRIPT® code or a call to a JAVASCRIPT® function at the client that effects the desired change to the property of the object.



The update message preferably implicitly or explicitly identifies a handler at the client **114** for use in updating the live object's property. In one embodiment, the client **114** utilizes a default handler when the message implicitly specifies the handler (e.g. when the message does not identify a specific handler). In one embodiment, if the update message specifies the actual value for the property, a default handler generates JAVASCRIPT® code for changing the property to the specified value. If the data in the update message are JAVASCRIPT® code, the default handler does not perform any processing of the code. In either case, the default handlers preferably use LiveConnect to execute the JAVASCRIPT® code in a Java Virtual Machine (JVM) **122** at the client **114** and thereby update the property of the live object.

For certain objects and/or data types, the default handlers are not appropriate. In these cases, the message preferably explicitly identifies a handler for performing the update. For example, the message may explicitly specify a function to call on the data or the message may explicitly identify the environment in which the data should be executed. For example, the data in the update message may include code for execution by a software "plug-in" such as MACROMEDIA FLASH® and the message may explicitly identify FLASH as the handler.

The information provider **108** preferably designates an object as "live" by including a unique identifier for the object, the object ID, in the web page or other data representation provided to the client **114**. In one embodiment, the information provider **108** encodes the object ID in an object's corresponding HTML "ID" attribute using the following HTML expression:

ID="elementIdentifier,"

where "elementIdentifier" is the object ID and is preferably a string. The string can encode any information desired by the information provider **108** or other entity establishing the object ID and in one embodiment is a simple textual and/or numeric identifier. In one embodiment, the information provider **108** begins the object ID with a predefined token, such as "Bang$," in order to distinguish live objects from other objects that happen to have defined ID attributes. For example, an object can have the object ID "Bang$elementIdentifier."

In the preferred embodiment, each information provider **108** optionally encodes a unique information provider ID in its object IDs in order to prevent naming collisions between the object IDs of different information providers. In one embodiment, the information provider ID is a textual and/or numeric identifier. The information provider **108** may specify the information provider ID and the object ID as part of a hierarchical namespace. For example, in one embodiment objects are named as follows: "$namespace1$[namespace2$ . . . $namespaceN$]objectId," where "$namespace1" is the information provider ID and the "$" operates as the name separator and defines additional optional levels of a namespace hierarchy. One embodiment of the system **100** supports typical directory services functionality. For example, two dollar sign characters appearing together, "$$," refers to the top level of the namespace hierarchy.

Thus, the object ID for a live object is preferably formed from a combination of the predefined token, the information provider ID namespace, and a value assigned by the information provider **108**. For example, the object ID for a live object representing the real time price of a stock having the symbol "BANG" might be: "Bang$$informationProviderID-$equities$realtime$bang." In this example, "Bang$" is the predefined token that signifies a live object, "$informationProviderID" is the ID identifying the information provider,

"$equities$realtime$" defines levels of a namespace hierarchy, and "bang" identifies the specific object.

In some embodiments and situations, the object ID utilizes relative names. For example, an information provider **108** referring to its own object IDs is implicitly in its own namespace. Accordingly, the information provider **108** does not need to include the information Provider ID in the object IDs it utilizes internally. In one embodiment, the information provider ID is not explicitly encoded into the object ID. Instead, the information provider ID is encoded elsewhere in the web page in order to provide scope to the page's object IDs.

In one embodiment, the object ID identifies a point (i.e., a node in a tree) in a Document Object Model (DOM) representation of a web page or other document at the client **114**. The DOM is a platform- and language-neutral interface that represents a document as a hierarchy of objects. The DOM also provides an interface that allows programs and scripts to dynamically access and update properties of the objects. Object properties can be inherited by descendent objects.

In this embodiment, the client **114** preferably executes an update message in the context of the specified point in the DOM representation. The update may specify a change to a property of the object at the identified point. The update also may specify a change to a parent or descendent of the object at the identified point. In each case, the update is executed relative to the specified point in the DOM representation. In one embodiment, points in the DOM representation specify how to update properties of live objects located at those points. Thus, the same update may be interpreted differently depending upon the identified live object's location in the DOM representation.

For example, assume there is an object in the DOM representation identified as "window.document.frame[3].ObjectID." Also assume that the object has an "innerText" property located at "window.document.frame[3].ObjectID.innerText" that specifies the text displayed by the object. An update message can change the text displayed by the object by specifying "ObjectID" and the new value for the innerText property.

An advantage of utilizing object IDs to specify objects is that the information provider **108** or other entity providing the update message can access and change properties of objects without knowing the object's actual location in the DOM representation. Indeed, the object may be in different locations in different DOM representations and/or in multiple locations in the same DOM representation. In any of these cases, the update message will change the specified properties of all of the objects having the given object ID.

Depending upon the particular embodiment of the environment **100**, the information provider **108** and/or the dynamic content provider **116** provides update messages to the routing network **110**. The dynamic content provider **116** is preferably a conventional computer system operated by an entity that provides real-time information, such as stock prices and/or sports scores. In one embodiment, the information provider **108** receives updated properties for the live objects from the dynamic content provider **116** or another source (or generates the updated properties internally). Then, the information provider **108** sends an update message specifying the object ID and the change to the object property to the routing network **110**. In this embodiment, the dynamic content provider **116** may be absent from the environment **100**.

In another embodiment, the dynamic content provider **116** provides the object IDs for live objects to one or more information providers **108** and the information providers **108** distribute the live objects to the clients **114**. Then, the dynamic content provider **116** sends messages specifying the changes to the properties of the live objects to the routing network **110**. For example, the dynamic content provider **116** distributes an object ID associated with the score of a particular baseball game to the information providers **108**. Then, the dynamic content provider **116** sends a message specifying the object ID and an update to a property of the object that controls the displayed score of the particular baseball game to the routing network **110**. These two embodiments are not mutually exclusive and, therefore, some updates may be provided to the routing network **110** by the information provider **108** while others are provided by the dynamic content provider **116**.



The client **114** is a device that retrieves web pages **118** and/or other information from the server **112**. In one embodiment, the client **114** is a conventional personal computer used by a person to access information on the Internet. In alternative embodiments, the client **114** is a different consumer electronic device having Internet connectivity, such as an Internet-enabled television, a cellular telephone, a personal digital assistant (PDA), a web browsing appliance, etc. The client **114** preferably, but not necessarily, has an associated display device.

The client **114** preferably executes a web browser **120**, such as MICROSOFT INTERNET EXPLORER®, for retrieving web pages and displaying them on the display device. In embodiments where the client receives data representations from the server **112** other than conventional web pages, the web browser **120** does not necessarily share similarities with conventional web browsers. Preferably, the web browser **120** contains a JVM **122** for executing JAVA® applets and/or scripts. The web browser **120** also preferably contains Dynamic HTML capabilities, such as support for JAVASCRIPT® (or another scripting language, such as VBScript) and the Document Object Model (DOM), and enables communications between JAVA® and the scripting languages. In one embodiment, the web browser **120** supports the LiveConnect standard for enabling communication between JAVA® applets and scripts written in the supported scripting languages. The web browser **120** can also be extended through software plug-ins such as MACROMEDIA FLASH®, REAL NETWORKS REALPLAYER®, and/or APPLE QUICKTIME®. In alternative embodiments, the functionality of the JVM **122** and/or other aspects of the web browser **120** are provided by one or more other functional units within the client **114**. The term "module" is used herein to refer to software computer program code and/or any hardware or circuitry utilized to provide the functionality attributed to the module. The web browser **120** and JVM **122** are examples of modules in the client **114**.

In some embodiments, the client **114** does not necessarily have a display device, web browser **120** and/or other components associated with a typical consumer device. The client **114**, for example, may be a dedicated purpose device having certain aspects of web connectivity such as an embedded HTTP client in a web-enabled appliance or in a controller for an automobile, audio-visual equipment, or some other device.

A web page **118** provided from the server **112** to the client **114** preferably includes instructions for enabling the live objects on the web page. The instructions cause the client **114** to automatically and transparently (i.e., without user interaction) contact the routing network **110** and download an activation module **124** for activating the live objects. In one embodiment, the instructions comprise a URL specifying the location of the activation module **124** at the routing network **110**. In an alternative embodiment, the client **114** obtains the activation module **124** from the server **112** or another source.

The activation module **124** preferably contains JAVA® instructions for execution by the JVM **122**. However, alternative embodiments of the module **124** may encode the instructions in the web page **118** and/or the activation module **124** using different languages and/or techniques. For example, the instructions and/or activation module **124** can be embedded in the web browser **120** or operating system, either as native code or as plug-ins. In these alternative embodiments, the web browser **120** does not have to download the activation module **124** from an external source.

The activation module **124** preferably registers object IDs from the web page **118** downloaded by the client **114** with the routing network **110** and updates the live objects in response to update messages received from the network. The routing network **110** records the registrations in the registry **125**. The client's registrations preferably remain in effect as long as the client is displaying the associated web page **118**, although other embodiments of the system **100** may use different criteria for determining when to terminate the client's registrations.

FIG. **2** is an interaction diagram illustrating interactions among the server **112**, information provider **108**/dynamic content provider **116** (generically referred to as an "input source **210**"), client **114**, and the routing network **110** to update a property of a live object. Initially, the client **114** sends **212** a web page request to the server **112**. In response, the server **112** provides **214** to the client **114** the web page containing or otherwise identifying the one or more live objects. Instructions encoded in the web page preferably cause the client **114** to transparently request **216** the activation module **124** from the routing network **110**. In response, the routing network **110** sends **218** the activation module **124**. The client **114** executes **220** the activation module **124**, which identifies the object IDs of the live objects at the client and registers **222** the object IDs with the routing network **110**. The routing network **110** updates **223** its registry to identify the object IDs for which the client **114** has registered.

At some point, the input source **210** sends **224** an update message to the routing network **110** in order to change a property of a live object at the client **114**. In one embodiment, the message from the input source **210** to the routing network **110** contains only a single object ID and an update to a property of the identified object. In another embodiment, the message contains multiple object IDs and the corresponding property updates. In this latter embodiment, the message may have an associated "Batch ID" that identifies the message as having multiple object IDs and updates. Preferably, the information provider **108** can include a batch ID in a web page **118** in the same manner as including an object ID. Likewise, the client **114** can preferably register for a batch ID with the routing network **110** in the same manner as an object ID. In fact, the batch ID can be the same as the object ID so that the client **114** registers for both batch and non-batch messages by registering one ID. Alternatively, separate procedures can be established for registering batch messages. The client **114** preferably processes the component messages of a batch as if each message were delivered separately.

The routing network **110**, in turn, routes **226** the message to each client **114** that has registered for the specified object ID, preferably by utilizing standard Internet communications protocols, such as IP addresses, etc. The activation module **124** at the client **114** processes the message and updates **228** the property of the identified live object. If live objects having the same object ID appear in multiple locations at the client **114** (e.g., at multiple locations on a web page being displayed at the client), the activation module **124** preferably updates each of the live objects having the specified ID. As a result, the routing network **110** allows live objects at the client **114** to be dynamically updated. Preferably, this routing and updating happens quickly enough to be considered "real-time" for the purposes of the input source **210**.



This update process, indicated within the dashed box **230** in FIG. **2**, can repeat an indefinite number of times and is fully asynchronous as to the information provider **210** and client **114**. For example, the input source **210** may send regular update messages to the routing network **110** as the score of a sporting event changes or a stock price fluctuates, but may stop sending update messages once the sporting event ends or stock market closes. When the client **114** ends the display of a web page containing the live object, or otherwise no longer desires to receive update messages, the client preferably closes **232** the connection with the routing network **110**. The routing network **110**, in turn, updates **234** the registry **125** to remove the client's object registrations. In another embodiment, the client **114** sends messages to the routing network **110** that selectively register and/or de-register the client from one or more objects yet leaves the connection open in order to receive update messages pertaining to other objects.

FIG. **3** is a high-level diagram graphically indicating the many-to-many mapping performed by the routing network **110**. Multiple input sources (labeled **210**A-C) send update messages to the routing network **110**. Each update message preferably specifies at least one object ID and an update to a property of the identified object. The routing network **110**, in turn, selectively routes the update messages to the clients **114** that have registered for the given object ID from the given input source **210**. In FIG. **3**, assume for example that clients **312**A and **312**B have registered for a given object ID while the other clients have not registered for the object ID. Accordingly, the routing network **110** routes the update message to clients **3 12**A and **312**B, but does not route the message to clients **312**C-**312**H.

FIG. **4** illustrates an example of the capabilities of the dynamic content routing network **110**. FIG. **4** illustrates two different web pages **410**, **412** containing sports scores. Although the web pages are formatted differently, each page contains the same scores for two professional football games and two professional baseball games. Web page **410** contains all four games under the heading "Local Sports Scores" while web page **412** contains the baseball games under the heading "Baseball Scores" and the football games under the heading "Football Scores."

There are various ways to internally represent the games and scores in the web pages using live objects. In one embodiment, a "game" object is defined having properties for the two teams involved in the game and the score associated with each team. The game object is placed at a selected position in the web page and the properties of the object cause the information about the game to be displayed on the page. In another embodiment, "team" and "score" objects are defined, with the team object having a property defining the name of a team and the score object having a property defining a score. In this second embodiment, the team and score objects are placed at selected locations on the page so that the proper teams and scores are aligned when the page is rendered. In yet another embodiment, an object is defined having properties for the name of one team and a score associated with that team. Then, pairs of the objects are placed in the page in the proper alignment to indicate the games and scores. In another embodiment, an object is defined having properties specifying names of two teams and a separate object is defined having properties specifying two scores. In this last embodiment, the two objects are placed in the page so that the names

of the teams align with the associated scores. Obviously, additional variations of these representations are possible.

Assume for the example of FIG. **4** that the names of teams in a game are specified by a "names" object having properties for the two team names and the scores in the game are specified by a "scores" object having properties for two scores. In web page **410**, a names object **414** having properties set to identify the "SF 49ers" and the "STL Rams" is located directly under the "Local Sports Scores" heading. A scores object **416** having a property set to identify the score of the game as "42" to "7" is directly to the right of the names object **414**. In web page **412**, the properties of the second names object **418** identify the same game using slightly different terminology: "SF" and "STL." However, this names object **418** is aligned with the same scores object **416** as is utilized in web page **410**.

Thus, the same scores object **416** is utilized in different positions in each web page **410**, **412**. In order to update the score of the San Francisco 49ers vs. St. Louis Rams football game on both web pages, the input source **210** simply sends an update message to the routing network **110** specifying the object ID for the scores object **416** and the update to the score property. The routing network **110** routes the update message to the appropriate clients **114**, and the clients update the appropriate score regardless of the particular page layout.

The input source **210**, i.e., the information provider **108** and/or dynamic content provider **116** can use a variety of tools to generate the update messages. FIG. **5** is a block diagram illustrating an input source **210** and the tools available to it for generating the update messages. Other tools can be utilized in addition to or instead of the ones described herein.

Preferably, the tools allow the input source **210** to access an application programming interface (API) provided by the routing network **110** for accepting messages. In one embodiment, the messages sent by the input source **210** are in the same format as utilized by the activation module **124** at the client **114**. In an alternative embodiment, the messages provided to the routing network **110** are in a different format and the routing network translates the messages into the format utilized by the activation module **124**.

In one embodiment, the input source **210** utilizes a data pump module **510** to access the API. The data pump module **510** reads an extensible markup language (XML) file containing one or more object IDs and the new values for the identified objects at regular intervals and automatically generates API calls that send messages representing changes to object properties to the routing network **110**. In another embodiment, the data pump module **510** is event-driven and reads the XML file in response to a change in the file or some other occurrence.

In another embodiment, the input source **210** utilizes a director console module **512** to access the API. Preferably, the director console module **512** presents an administrator with a graphical interface displaying the contents of the web page **118**. For example, the administrator may use the director console **512** to edit textual data, images, and/or any objects or properties of objects on the web page. After editing, the administrator uses a "send update" button or similar technique to cause the director console module **512** to send messages for the changed objects and properties to the routing network **110** via the API.

In another embodiment, the information provider **108** and dynamic content provider **116** work together as the input source **210** by using a content management system module **514** to access the API. Preferably, the content management system module **514** resides at the information provider **108** and receives object property updates from the dynamic content provider **116**. The content management system module **514** preferably updates the properties of the live objects in the web page **118** stored at the server **112** and also sends messages for the changed properties to the routing network **110**. In this manner, the web page **118** at the server **112** and the web page displayed at the client **114** are updated almost simultaneously. In one embodiment, the dynamic content provider **116** sends the update messages to the routing network **110** instead of to the information provider **108**. Embodiments of the system **100** can also utilize any combination of the content management techniques described herein.

For example, the tools described above can generate a message having the following code for updating the text displayed by a score object to "2":

```
LiveObject score=new LiveObject("Bang$homeScoreID");
score.setProperty("innerText", "2").
```

This code sets the innerText property of the object having object ID "Bang$homeScoreID" to "2." The tools use the API to pass this message to the routing network **110**.

Turning now to the actions performed at the client **114**, FIG. **6** is a flow chart illustrating the steps performed by an embodiment of the activation module **124**. Those of skill in the art will recognize that different embodiments may perform the steps of FIG. **6** in different orders. The activation module **124** generally performs three functions: register object IDs with the routing network **110**, handle messages received by the client **114** from the network in order to update the properties of live objects, and control communications between the client and the network.

In order to register object IDs, the activation module **124** preferably parses **610** the web page **118** received from the server **112** and identifies the object IDs of the live objects. In an alternative embodiment, the activation module **124** identifies only a subset of the object IDs, such as the IDs of only live objects that are currently being displayed by the web browser **120**. Alternatively, a list of object IDs may be pre-encoded in the web page in addition to the objects themselves, thereby enabling easy identification by the activation module **124**. In yet another embodiment, a user of the client **114** selects the object IDs to register.

The activation module **124** preferably opens **612** a connection between the client **114** and the routing network **110**. The activation module **124** can open **612** this connection before or after the activation module receives and/or parses the web page **118**. In some cases, the client **114** is located behind a firewall that puts a restriction on the types of connection requests the client can make. A firewall might, for example, block all non-HTTP traffic. For this reason, the activation module **124** preferably wraps the connection request in an HTTP header in order to get the request to the routing network **110** through the firewall.

The activation module **124** uses the connection between the client **114** and routing network **110** to register **614** the object IDs by communicating to the routing network **116** a vector (e.g., a list or array) containing the identified object IDs. In order to accomplish this task through the firewall, the activation module **124** preferably puts the vector into a string, referred to as "object data," and then preferably creates an HTTP message to communicate the object data to the routing network **110**. A schematic example is as follows:

```
POST/HTTP/1.\r\n
Content-Length: <length of object data>\r\n
\r\n
<object data>
```

where <object data> is the object ID list. When the routing network **110** receives such an HTTP request, it extracts the object data and updates the registry **125** to indicate that the client **114** has registered for the identified objects.

If the web browser **120** loads **616** a new page, or otherwise terminates display of the objects on the initial page, the activation module **124** associated with the initial web page preferably terminates **618** the client's connection with the routing network **110**. Those of skill in the art will recognize that this termination **618** can occur asynchronously with the other steps illustrated in FIG. **6**. Thus, the location of steps **616** and **618** represents only one possible place in the sequence of steps where the termination may occur.

If the connection is not terminated, the activation module **124** preferably waits until it receives **618** a message from the routing network **110** specifying an object ID and an update to a property of the identified object. In one embodiment, this message is received as HTTP data. Upon receipt of the message, the activation module **124** preferably extracts **620** the object ID and update from the HTTP data. Then, the activation module **124** updates **622** the property of the identified object, or causes the object to be updated, as specified by the message.

The sequence of receiving messages **618**, extracting data **620**, and updating objects **622** is preferably repeated until a new page is loaded **616** or the connection with the routing network **110** is otherwise terminated. Although not shown in FIG. **6**, in certain circumstances, such as when a user action with respect to the web page **118** activates a new live object, the activation module **124** may register new object IDs with the routing network **110** without first downloading and parsing a new page. In one embodiment, if the newly-loaded page contains live objects, then the process of downloading the activation module **124** and updating the objects as described by FIG. **6** is repeated. In an alternative embodiment, the activation module **124** remains active at the client **114** and, therefore, the client does not re-download the activation module from the routing network **110**. Instead, the already-present activation module **124** performs the live-enabling process on the new page.

FIG. **7** is a block diagram illustrating a lower-level view of the routing network **110** according to one embodiment of the present invention. FIG. **7** illustrates multiple input sources (labeled **710**A-D) representative of sources providing messages to the routing network **110**, such as an information provider **710**A and a dynamic content provider **710**B. FIG. **7** also illustrates multiple clients (labeled **712**A-F) representative of the many clients in communication with the routing network **110** at any given instant.

Internally, the routing network **110** is preferably divided into one or more clusters **714**. In FIG. **7**, the routing network **110** has three clusters **714**A, **714**B, **714**C, although the number of clusters can vary depending upon the processing needs of the network. An input-side global load balancer **716** preferably routes messages from the input sources **710** to the clusters **714**. Similarly, a client-side global load balancer **718** preferably routes connection requests from the clients **712** to the clusters **714**. The load balancers **716**, **718** are designed to ensure that load is distributed among the clusters **714** according to a predetermined heuristic. For example, the load may be distributed evenly among the clusters **714** or a more powerful cluster may be distributed a majority of the load. In one embodiment, one load balancer performs the functions of the input-side **716** and client-side **718** load balancers and utilizes conventional Domain Name System-(DNS-) based load balancing.

Each cluster **714**, of which cluster **714**A is representative, preferably contains an input-side cluster load balancer **720**A and a client-side cluster load balancer **722**A. The cluster load balancers **720**A, **722**A function similarly to the corresponding global load balancers **716**, **718** in that the input-side cluster load balancer **720**A balances and routes incoming messages among one or more gateways **724**A and the client-side cluster load balancer **722**A balances and routes incoming connection requests among one or more nodes **726**A and application servers **728**A. The gateways **724**A are connected to the nodes **726**A. In one embodiment every gateway **724**A is connected to every node **726**A and in another embodiment certain gateways are connected to only certain nodes.

Preferably, the routing network **110** utilizes conventional single-processor computer systems executing the Linux operating system (OS). Preferably, each component of the routing network **110** is implemented by a separate, dedicated computer system in order to enable the separate optimization of the components. The input/output (I/O) functionality of the OS is preferably enhanced through the use of a non-blocking OS package such as NBIO available from the University of California, Berkeley, Calif. Based on the assumption that connections with the nodes **728** are long-lived, the OS is preferably configured to not allocate resources toward monitoring idle connections. Instead, the well-known/dev/poll patch is preferably applied to the OS in order to provide advanced socket polling capabilities.

Those skilled in the art will recognize that there are many ways to use the functionality of the routing network **110** to route update messages to clients **710**. For example, in one embodiment, every message is distributed to every node **726**. In another embodiment, the routing network **110** selectively sends messages to the nodes **726** in the routing network **110**. Selectively sending messages to the nodes in the routing network presents at least the two difficulties. First, for a given message, a decision needs to be made as to which nodes should receive it. Second, a client must receive all messages in which it is interested. There are at least two approaches meeting these difficulties. The first approach uses a hierarchy of registries at the gateways and nodes to respectively keep track which messages to send to the nodes and clients. The second approach assigns messages to one or more categories, assigns nodes to one or more types, and maintains mappings between categories and types. This latter approach also uses client proxies to allow clients **712** to communicate with multiple nodes of different types.

FIG. **7** illustrates the embodiment using the hierarchy of registries. A node **726** registers with each gateway **724** in all of the clusters and indicates which messages it needs and the clients do the same with the nodes. Each gateway **724** preferably maintains a registry **734** containing the object IDs registered by the nodes **726** connected to the gateway **724**. In one embodiment, the gateway registry **734** associates each object ID with a linked list containing one entry for each node **726** that has registered for that object ID. In another embodiment, the gateway registry **734** is a hash table containing the object ID registered by the nodes **726** connected to the gateway **724**. A node **726** preferably maintains a node registry **732** containing the object IDs registered by clients **712** connected to the node. The gateways **724** in each cluster **714** receive the messages from the input sources **710** and direct the messages to the appropriate node or nodes **726**. The nodes **726** preferably transmit messages received from the gateways **724** to the clients **712** that have registered in the object IDs identified by the messages.

In one embodiment, the node registry **732** associates each object ID with a linked list containing one entry for each

client **712** that has registered for that object ID. In another embodiment, the node registry **732** is a hash table containing the object ID registered by the clients **712** connected to the nodes **726**. Each entry in the linked list or hash table preferably contains a pointer to a socket representing the connection to the corresponding client **712**. As is known in the art, the pointer to the socket, typically called a "file descriptor," represents an address to which the node can write in order to send the message to the corresponding client. Gateways **724** can also use file descriptors in this manner to store node addresses. Alternative embodiments of the present invention utilize other data structures in addition to, or instead of, the hash table and linked list, and/or may utilize different data within the data structures.

Preferably, the node **726** adds an entry to its registry **732** every time a client **712** registers an interest in an object and deletes the corresponding entry from the registry when the client **712** disconnects from the node or otherwise indicates that it is no longer interested in a particular object. If the node **726** determines that the client **712** registered for an object ID that was not previously registered on that node, the node preferably registers that object ID with the gateways **724** to which it is connected. Similarly, if the node **726** determines that the client **712** deregistered an object ID for which it was the last interested client, the node **726** deregisters that object ID with the gateways **724** to which it is connected. The gateways **724** update their registries **734** in response to the communication from the node **726**.

In alternative embodiments of the present invention, when the client **712** disconnects from the node **726** or otherwise indicates that it is no longer interested in a particular object, the node **726** waits for a period of time or until some event occurs before deregistering the object ID with the gateway **724**. For example, the node **726** could wait until it receives a message associated with that object ID to do the deregistration. Alternatively, the wait time can be fixed, random, or based on the frequency of registrations for that object ID, or registrations for the same input source **710** as the object being deregistered. This latter approach keeps the object IDs from more frequently used input sources **710** registered for a longer period of time. This waiting advantageously reduces the number of registration changes required between nodes and gateways in cases where it is likely that another client will soon register for the same object ID.

Since a gateway **724** does not control the rate at which it receives messages from input sources **710**, it is possible for the gateway to receive messages faster than it can process them (i.e., send the messages to the nodes). Therefore, each gateway **724** preferably maintains a queue **730** of messages that have been received but not yet processed in order to avoid losing messages. In one embodiment, the gateway **724** drops messages if the queue **730** becomes too long. In another embodiment, the gateway **724** utilizes priorities assigned to certain messages or input sources to determine which messages to drop.

The application server **728** within each node **714** preferably serves the activation module **124** to the clients **712** in response to client requests. In addition, the application server **728** serves any other modules that may be required or desired to support the environment **100**. In an alternative embodiment of the routing network, a single application server **728** fulfills all of the client requests. This application server **728** may be within a certain cluster **714** or independent of the clusters. However, this single-application-server embodiment is less desirable because it lacks redundancy.

FIG. **8** is a flow chart illustrating steps performed by a gateway **724** and a node **726** in a cluster **714** to perform object-based routing of a message received from an input source **710** in the embodiment using a hierarchy of registries. Initially, the gateway **724** receives **810** the message from the input source **710**. The gateway **724** extracts **820** the object ID from the message. The gateway **724** examines its registry **734** to determine the nodes **726** that have registered in the object ID. The gateway **724** transmits **840** the message to each of the registered nodes **726**. Each node **726** that receives the message uses its registry **732** to determine **850** which clients **712** have registered for the message. Each node **726** then forwards **860** the message to the registered clients **712**.

Adding node functionality to the gateway and client functionality to the node advantageously allows the routing network **110** to solve the difficulties identified above. For example, it allows the routing network **110** to decide which nodes should receive an updated message. As a result, messages are sent to only nodes that have registered for the message. Further, no matter which node a client connects to, that node will receive all messages that the client wants. One skilled in the art would understand that while the present invention allows registration at both a gateway level and node level, registration could be extended to any number of levels.

In the second approach for meeting the difficulties described above, all messages in the routing network **110** are assigned to one or more of N categories, and all of the nodes are assigned to one or more of M types. Mappings are created that specify which categories of messages are forwarded to which types of nodes. The mappings allow control over the amount of traffic processed by the nodes.

FIG. **9** is a block diagram illustrating a high-level view of the routing network **110** of FIG. **7** in an embodiment adapted to use the approach having message categories and node types. Although FIG. **9** illustrates only two node types—nodes of type **1 726** and nodes of type **2 726**—for purposes of simplicity, this embodiment of the network **110** can have any number of node types. FIG. **9** also illustrates a client proxy **740** for reasons described below. However, an embodiment of the present invention using message categories and node types does not necessarily utilize a client proxy **740**.

There are many different possible mappings between message categories and node types. In the simple case, there is one-to-one mapping between message categories and node types. For example, if the message is of category **1**, it is forwarded to the nodes of type **1**. In more complicated mappings, messages of one category are mapped to nodes of multiple types. For example, messages of category **1** are mapped to nodes of types **1**, **2**, and **3**, whereas messages of category **2** are mapped to nodes of types **2**, **3** and **4**. In short, any possible mapping of message categories to node types is possible and the number of message categories, N, does not have to be the same as the number of node types, M.

There are multiple ways to assign the messages into categories. One way is to assign all messages from a given input source **710** into a certain category. Another way is to explicitly specify the category in the object ID for the message. Yet another way is to utilize a hashing function or lookup table to partition messages into categories based on object IDs or other values. For example, in one embodiment a hash function is applied to the object ID to generate an integer between **1** and N, and this integer is the message category.

Nodes are preferably assigned to types based on information stored in the gateways **724**. In one embodiment, each gateway **724** holds a lookup table or other data structure that specifies the types to which each node is assigned. The lookup table also preferably stores the mappings between message categories and node types. When a gateway **724** receives a message from an input source, the gateway preferably deter-

mines the category of the message using one of the techniques described above. Then, the gateway **724** determines the node type (or types) to which the message category maps, and determines which nodes are of the given type. The gateway **724** routes the message to the appropriate nodes.

In one embodiment, the gateway **724** uses a combination of multiple techniques to determine the message categories, node types, and/or mappings. For example, a lookup table can be used to encode a priori knowledge about categories, types, and/or mappings and a hash table can be used to route messages for which there is no a priori knowledge. Continuing this example, assume that certain messages are assigned to a given category based on a table lookup, while other messages are assigned to categories based on a hashing function. In this example, the gateway **724** looks up the object ID (or other information, such as an input source ID) of an arriving message in a lookup table to determine if it has a specified category. If the object ID is stored in the lookup table, the gateway **724** determines the mappings for the category and routes the messages to the nodes of the appropriate types. If the object ID is not stored in the lookup table, the gateway **724** utilizes a hash function on the object ID (or other information) to determine the message category.

Message categorization advantageously allows the routing network **110** to decide which nodes get which messages. However, message categorization does not ensure that clients **712** have access to the messages they need. Assume a client **712** connects to a node of type **1** and the client **712** wants to receive messages of category **3**. If there is a simple one-to-one mapping of message categories to node types, nodes of type **1** will never receive messages of category **3**, and neither will the client **712**. To ensure that clients have access to the messages they need, the embodiment shown in FIG. **9** uses client proxies to allow clients **712** to communicate with multiple nodes of different types. As shown in FIG. **9**, the clients **712** connect to a client proxy **740** instead of the nodes **726**. Each client proxy **740** is connected to at least one node of each type. For example, as shown in FIG. **9**, the client proxy **740** connects to a node of type **1** **726** and a node of type **2** **726**.

There are at least two ways to implement the embodiment that uses client proxies to ensure that clients connect to multiple nodes of different types. The implementations vary primarily in where the client registration information is stored. In the first variation, client registration information is stored at the nodes, and the client proxy is adapted to simply pass update messages and registration information among the clients and nodes. In the second variation, the client proxy **740** is responsible for keeping track of client registrations.

FIG. **9** illustrates the variation where the nodes store the client registration information, and the client proxy **740** is adapted to pass messages and registration information among the clients and nodes. When a client sends registration information to the client proxy **740**, the client proxy passes it to the appropriate node or nodes. In one embodiment, the client proxy **740** sends client registration information to at least one node of every type, and the nodes ignore irrelevant registration information (e.g., registrations for messages of categories not handled by the node). In another embodiment, the client proxy **740** itself analyzes the registrations, and passes only registrations relevant for a given node type to a node of that type. In a third embodiment, the client contains functionality for determining which node types handle which registration requests, and the client tells the proxy **740** to which node types to pass the registration information.

The client proxy **740** preferably stores an identifier of its connection to each client **712**, such as a pointer to the socket for the client connection, and sends this identifier to the nodes along with the registration information. Each node **726**, in turn, maintains a registry **732** storing the relevant registration information it receives from the client proxy **740**. Preferably, at most one node of each type will contain registration information for a given client for messages of a category mapped to the node type. In addition, a node preferably does not store registration information for messages of categories not mapped to its node type.



The registry **732** for each node **726** preferably indicates the object IDs registered by the clients, the client proxy **740** to which the client is connected (e.g., a pointer to the socket at the node to which the client proxy is connected), and the identifier indicating the client's connection to the client proxy (e.g., the pointer to the socket at the client proxy to which the client is connected). When the node **726** receives an update message, it uses the registry to identify the clients to which it should forward the message, the client proxies to which the clients are connected, and the specific connections between the client proxies and the clients. The node routes the update message to the identified client proxies and includes the identifier (e.g., the pointer to the client socket) telling the client proxy where to send the update message. When the client proxy **740** receives the update message, it uses the identifier to send the message to the client or clients.

In one embodiment, the node registry **732** contains, for each object ID, a list with one entry for each client registered for that ID. Each entry contains a (name of client proxy, name of client) pair where each "name" is a socket identifier or some other information for identifying how to route the message to the named entity. In another embodiment, the registry **732** is adapted to more efficiently handle the case where multiple clients at a given client proxy are registered for the same object ID by placing a list of clients registered for the object ID in each entry. Thus, each entry in the list for a given object ID contains a (name of client proxy, list of names of clients on that proxy) pair. When a message having a particular object ID arrives at the node, the node walks down the corresponding entries in the registry for that ID, pushing one copy of the message to each listed client proxy. Along with the message, the node includes the list of clients on that proxy (e.g., a list of pointers to sockets for the clients) who have registered for the object ID. When the client proxy receives the message and the list, it simply pushes a copy of the message to each client.

The approach using the pass-through client proxy **740** described above is advantageous because it reduces memory loads because the client proxy stores only minimal state, and each node has a restricted list of object IDs for which it is responsible. It also expedites message routing because the client proxy does very little processing to forward a message. Plus, this approach separates different potential stress points in the network into different components, allowing the network to be tuned to provide good performance. In particular, the nodes handle a large amount of data and store a large amount of state, but do not have to hold open a large number of connections. The client proxies do not store a large amount of data or state, but hold open a large number of connections to the clients. In different embodiments, the ratios of nodes to client proxies can be varied to match the network to its requirements.

In the second variation of client proxies, the client proxy **740** stores client registration information. FIG. **11** illustrates a high-level diagram of the routing network **110** in which the client proxy **740** stores the client registration information. In this embodiment, the node registry **732** stores the object IDs registered by client proxies **740** connected to the node. Each client proxy **740** preferably maintains a client proxy registry

736 containing the object IDs registered by clients 712 connected to the client proxy 740. The client proxy 740 registers with the nodes for all objects for which it needs to receive updates. Thus, this variation is similar to the hierarchical registry embodiment described above.

An alternative to maintaining a separate client proxy as described above is to have the nodes themselves provide the client proxy functionality. In this alternative, clients connect to a node of a first type. When a client registers for messages of a category not handled by the node, the node passes the registration to a node of the appropriate type along with an identifier of the client connection. In this case, the node connected to the client adopts the functionality of the pass-through client proxy. The node can also adopt the functionality of the client proxy that stores client registration information, thereby creating a hierarchy of registrations among the nodes themselves.

FIG. **12** is a high-level block diagram of the routing network **110** of the embodiment in which the nodes themselves adopt client proxy functionality. There are at least two ways to implement this embodiment. In one implementation there is a preferred node type, such as node of type **3**, that always serves as a client proxy. This node type may be designated to handle the most common categories of messages. As a result, the client proxy functionality would be utilized very rarely. As shown in FIG. **12**, client **1 712** and client **2 712** are connected to the node of type **3 726**, which in turn is connected to a node of type **1 726** and a node of type **2 726**.

In another implementation, instead of having one preferred node type that always serves as a client proxy, each node type can serve as a node and as a client proxy. For example, when a client **712** connects to a node **726**, it passes the node all of the object IDs the client wishes to register. For object IDs of message categories handled by that node, the node stores the registrations in its registry. For object IDs of messages in other categories, the node acts as a client proxy and passes the registration requests to nodes of the appropriate types. This implementation can be made more efficient by providing functionality in the activation module for identifying the most common categories of messages sought by the client, and causing the client to connect to a node of a type that receives those categories of messages.

An alternative to connecting clients **712** to nodes **726** using a client proxy **740** is having a client **712** maintain multiple connections to the routing network **110**. This can be accomplished, for example, by attaching message-categorization functionality to the activation module **124**. The activation module **124** preferably determines which categories of messages it needs and to which nodes types it should connect. The activation module **124** then makes a connection to one node of each relevant type and registers the appropriate object IDs with the appropriate nodes.

An alternative to using client proxies is to allow clients to register for only categories of messages handled by one type of node. For example, if each node type handles messages from only one input source, each client **712** can be required to register for messages from only one input source. This can be done, for example, by configuring the load balancer **718** to ensure that clients registering for messages from one input source connect to a node of the type that receives messages from that input source.

FIG. **10** is a flow chart illustrating steps performed by a gateway **724**, a node **726** that stores client registration information, and a pass-through client proxy **740** to perform object-based routing of a message received from an input source **710**. Initially, the gateway **724** receives **1010** the message from an input source **710**. The gateway **724** determines **1020** to which category the message belongs using one or more of the techniques described above. After the gateway **724** has determined to which category the message belongs, the gateway **724** identifies **1030** node types to which the message category is mapped and routes **1040** the message to the nodes of those types. Each node **726** that receives the message extracts **1050** the object ID from the message. Each node **726** examines its registry **732** to determine which clients have registered for the message, the client proxies to which the clients are connected, and the connections between the client proxies and the clients. Each node **726** then forwards **1060** the message to the identified client proxies **740** along with the identifiers for the client connections (e.g., the client socket or a list of client sockets). When a client proxy **740** receives the message from a node **726**, it pushes **1070** the message to the identified client socket or sockets.

The above description is included to illustrate the operation of the preferred embodiments and is not meant to limit the scope of the invention. The scope of the invention is to be limited only by the following claims. From the above discussion, many variations will be apparent to one skilled in the relevant art that would yet be encompassed by the spirit and scope of the invention. For example, the invention may be implemented using a tangible computer-readable medium having stored thereon computer-executable instructions.

The invention claimed is:

**1**. A method comprising:

receiving, using a processing device, an update message from an input source, the update message identifying a live object and containing data for updating a property of the live object;

identifying a category of the update message based on the input source;

determining a node having a node type to which the update message is to be routed based on a mapping of categories of update messages to node types, the mapping controlling an amount of update message traffic through nodes of a routing network;

routing, using the processing device, the update message to the node having the determined node type;

causing the node, through the update message, to determine a client, different from the input source, that has registered for updates of the live object;

causing the node to route the update message from the node to the client; and

causing the client to process the update message and to update the property of the lire object.

**2**. The method of claim **1**, further comprising:

causing the node to extract an object identifier (ID) from the update message, to establish a connection with the client, and to determine if the client has registered for updates of the live object based on the object ID.

**3**. The method of claim **2**, further comprising:

causing the node to determine at least one client proxy with which the client communicates;

causing the node to route the update message to the client proxy; and

causing the client proxy to route the update message to the client to determine the connection.

**4**. The method of claim **3**, further comprising causing the node to maintain client registration information concerning the client connection.

**5**. The method of claim **3**, further comprising causing the node to maintain client registration information concerning the client connection at the client proxy.

**6**. The method of claim **1**, wherein the property of the live object has a direct effect on a visual representation of the live

object in a data representation, has an effect on an internal aspect of the live object and has no effect on the visual representation of the live object in the data representation, or has a direct effect on one aspect of the visual representation of the live object in the data representation and has no effect on other aspect of the visual representation of the live object in the data representation.

**7**. A routing network comprising:

a gateway device configured to:

receive an update message from an input source, the update message identifying a live object and containing data for updating a property of the live object,

identify a category of the update message based on the input source;

determine a node having a node type to which the update message is to be routed based on a mapping of a categories of update messages to node types, the mapping controlling an amount of update message traffic through nodes of a routing network; and route the update message; and

the node configured to:

receive the update message from the gateway device, wherein the node is configured to be mapped to the node type,

determine a client, different from the input source, that has registered for updates of the live object, and

route the update message from the node to the client, wherein the client is adapted to process the update message and to update the property of the live object.

**8**. The routing network of claim **7**, wherein the node is configured to extract an object identifier (ID) from the update message and to determine a connection to the client to route the data to the client.

**9**. The routing network of claim **8**, wherein the node is configured to determine the connection by determining at least one client proxy with which the client communicates and to route the update message to the client proxy.

**10**. The routing network of claim **9**, wherein client registration information concerning the client connection is configured to be maintained at the node.

**11**. The routing network of claim **9**, wherein client registration information concerning the client connection is configured to be maintained at the client proxy.

**12**. The routing network of claim **7**, wherein:

the gateway device is configured to route the update message to the node adapted to receive messages of more than one message category, and

the node is configured to determine a connection with at least one client proxy with which the client communicates and to route the data to the client proxy.

**13**. The routing network of claim **7**, wherein the node type is configured to identify the node that receives the update message from the gateway device.

**14**. A method comprising:

providing, using a processing device of an input source, a data representation to a client device, different from the input source, coupled to a routing network, wherein the data representation includes at least one live object recognizable by the client device, and causing the client device to respond to the live object of the data representation by determining an object identifier (ID) of the live object and to register for updates of the live object with the routing network, such that registering the client device with the routing network provides client connection information to a node in the routing network; and

sending, using the processing device of the input source, an update message to the routing network, wherein the update message identifies the live object and contains update data that updates a property of the live object,

wherein a gateway device at the routing network is configured to identify a category of the update message based on the input source, to determine a node type to which the identified category maps, and to route the update message to the node, having the node type, at the routing network,

wherein the node is configured to identify the client device as a registered device and to route the update message to the client device, and

wherein the client device processes the update message upon receipt to update the property of the live object at the client device.

**15**. The method of claim **14**, wherein providing the data representation to the client device includes providing the live object that causes the client device to register with a client proxy of the routing network.

**16**. The method of claim **14**, wherein providing the data representation to the client device includes providing the live object that causes the client device to register with the node of the routing network.

**17**. The method of claim **14**, wherein providing the data representation to the client device includes providing an activation module that is executed by the client device and that registers the live object with the routing network.

**18**. The method of claim **17**, wherein providing the activation module includes providing the activation module that is configured to determine a node type that handles registration and that causes the client device to register with the node corresponding to the node type.

**19**. The method of claim **17**, wherein providing the activation module includes providing the activation module that is configured to determine a message category of the data representation and that causes the client device to register with a node having a node type corresponding to the message category.

**20**. An apparatus comprising:

an input source device configured to provide a data representation to a client device, different from the input source, coupled to a routing network, wherein the data representation includes at least one live object that is recognizable by the client device, and that causes the client device to determine an object identifier (ID) of the live object to register for updates of the bye object with the routing network, such that registering the client device with the routing network provides client connection information to the routing network,

wherein the input source device is configured to route an update message to the routing network, wherein the update message identifies the live object and contains update data for updating a property of the live object,

wherein a gateway device at the network is configured to identify a category of the update message based on the input source, to determine a node type to which the identified category maps, and to route the update message to a node of the node type at the routing network,

wherein the node is configured to identify the client device as a registered device and route the update message containing the update data to the client device, and

wherein the client device is configured to process the update message upon receipt to update the property of the bye object at the client device.

**21**. The apparatus of claim **20**, wherein the live object of the data representation is configured to cause the client device to register with a client proxy of the routing network.

**22**. The apparatus of claim **20**, wherein the live object of the data representation is configured to cause the client device to register with the node of the routing network.

**23**. The apparatus of claim **20**, wherein the received data representation includes an activation module that is configured to be executed by the client device and adapted to register the live object with the routing network.

**24**. The apparatus of claim **23**, wherein the activation module is configured to determine a node type for handling registration and to cause the client device to register with the node of the node type.

**25**. The apparatus of claim **23**, wherein the activation module determines a message category of the data representation and causes the client device to register with the node having a node type corresponding to the message category.

**26**. An article of manufacture including a computer-readable storage medium having instructions stored thereon, execution of which by a computing device causes the computing device to perform operations comprising:

providing, using a processing device of an input source, a data representation to a client device, different from the input source, coupled to a routing network, wherein the data representation includes at least one live object that is recognizable by the client device, and that causes the client device to respond to the live object by determining an object identifier (ID) of the live object to register for updates of the live object with the routing network, such that registering the client device with the routing network provides client connection information to the routing network; and

sending, using the processing device of the input source, an update message to the routing network, wherein the update message identifies the live object and contains update data for updating a property of the live object,

wherein a gateway device at the routing network is configured to identify a category of the update message based on the input source, to determine a node type to which the identified category maps, and to route the update message to a node of the node type at the routing network,

wherein the node is configured to identify the client device as a registered device and to route the update message to the client device, and

wherein the client device is configured to process the update message upon receipt to update the property of the live object at the client device.

**27**. The article of manufacture of claim **26**, wherein the live object of the data representation causes the client device to register with a client proxy of the routing network.

**28**. The article of manufacture of claim **26**, wherein the live object of the data representation causes the client device to register with the node of the routing network.

**29**. The article of manufacture of claim **26**, wherein the received data representation includes an activation module executed by the client device and adapted to register the live object with the routing network.

**30**. The article of manufacture of claim **29**, wherein the activation module determines a node type that handles registration and causes the client device to register with the node of the node type.

**31**. The article of manufacture of claim **29**, wherein the activation module determines a message category of the data representation and causes the client device to register with the node having a node type corresponding to the message category.

**32**. A non-transitory computer readable storage medium having instructions stored thereon, the instructions comprising:

instructions for providing a data representation to a client device coupled to a routing network, wherein the data representation includes at least one live object recognizable by the client device, and wherein the client device is configured to respond to the live object of the data representation by determining an object identifier (ID) of the live object to register for updates of the live object with the routing network, such that registering the client device with the routing, network provides client connection information to the routing network; and

instructions for providing, using a processing device of an input source, different from the client device, an update message to the routing network, wherein the update message identifies the live object and contains update data for updating a property of the live object,

wherein a gateway device at the routing network is configured to identify a category of the update message based on the input source, to determine a node type to which the identified category maps, and to route the update message to a node of the node type at the routing network,

wherein the node is configured to identify the client device as a registered device and to route the update message containing the update data to the client device, and

wherein the client device is configured to process the update message upon receipt to update the property of the live object at the client device.

**33**. The non-transitory computer readable storage medium of claim **32**, wherein the live object of the data representation causes the client device to register with a client proxy of the routing network.

**34**. The non-transitory computer readable storage medium of claim **32**, wherein the live object of the data representation causes the client device to register with the node of the routing network.

**35**. The non-transitory computer readable storage medium of claim **32**, wherein the data representation includes an activation module that is executed by the client device and that is adapted to register the live object with the routing network.

**36**. The non-transitory computer readable storage medium of claim **35**, wherein the activation module determines a node type for handling registration and causes the client device to register with the node of the node type.

**37**. The non-transitory computer readable storage medium of claim **35**, wherein the activation module determines a message category of the data representation and causes the client device to register with the node having the node type corresponding to the message category.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION



PATENT NO. : 8,407,722 B2
APPLICATION NO. : 11/396251
DATED : March 26, 2013
INVENTOR(S) : Tuttle et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On Title Page 2, Item (56), under "OTHER PUBLICATIONS", in Column 2, Line 3, delete "Retrived" and insert -- Retrieved --, therefor.

On Title Page 3, Item (56), under "OTHER PUBLICATIONS", in Column 1, Line 12, delete "Slavak Republic," and insert -- Slovak Republic, --, therefor.

On Title Page 3, Item (56), under "OTHER PUBLICATIONS", in Column 1, Line 48, delete "library/default.asp?url=/library/en-us/dndotnet/hmtl/progthrepool." and insert -- library/default.asp?url=/library/en-us/dndotnet/html/progthrepool. --, therefor.

In the Specifications

In Column 3, Line 24, delete "live: objects" and insert -- live objects --, therefor.

In Column 12, Line 7, delete "provider 210" and insert -- provider 108 --, therefor.

In Column 14, Line 57, delete "network 116" and insert -- network 110--, therefor.

In the Claims

In Column 22, Line 47, in Claim 1, delete "of the lire" and insert -- of the live --, therefor.

In Column 24, Line 45, in Claim 20, delete "of the bye" and insert -- of the live --, therefor.

In Column 24, Line 64, in Claim 20, delete "bye object" and insert -- live object --, therefor.

In Column 26, Line 17, in Claim 32, delete "routing, network" and insert -- routing network --, therefor.

Signed and Sealed this
Thirteenth Day of May, 2014

Michelle K. Lee

Michelle K. Lee
*Deputy Director of the United States Patent and Trademark Office*

US008407722C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (12886th)

# United States Patent

**Tuttle et al.**

(10) **Number: US 8,407,722 C1**

(45) **Certificate Issued: Apr. 4, 2025**

(54) **ASYNCHRONOUS MESSAGING USING A NODE SPECIALIZATION ARCHITECTURE IN THE DYNAMIC ROUTING NETWORK**

(75) Inventors: **Timothy Tuttle**, San Francisco, CA (US); **Karl E. Rumelhart**, Palo Alto, CA (US)

(73) Assignee: **INTELLECTUAL VENTURES I LLC**

**Reexamination Request:**
No. 90/019,662, Sep. 16, 2024

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **8,407,722** |
| Issued: | **Mar. 26, 2013** |
| Appl. No.: | **11/396,251** |
| Filed: | **Mar. 30, 2006** |

Certificate of Correction issued May 13, 2014

**Related U.S. Application Data**

(63) Continuation of application No. 10/105,018, filed on Mar. 21, 2002, now Pat. No. 7,051,070, which is a continuation-in-part of application No. 10/017,182, filed on Dec. 14, 2001, now Pat. No. 7,043,525.

(60) Provisional application No. 60/278,303, filed on Mar. 21, 2001, provisional application No. 60/280,627, filed on Mar. 29, 2001, provisional application No. 60/279,608, filed on Mar. 28, 2001, provisional application No. 60/276,847, filed on Mar. 16, 2001, provisional application No. 60/256,613, filed on Dec. 18, 2000.

(51) **Int. Cl.**

| | |
|---|---|
| ***G06F 3/00*** | (2006.01) |
| ***G06F 15/16*** | (2006.01) |
| ***H04L 45/302*** | (2022.01) |
| ***H04L 67/55*** | (2022.01) |
| ***H04L 67/63*** | (2022.01) |
| *H04L 67/1001* | (2022.01) |
| *H04L 67/1008* | (2022.01) |
| *H04L 67/1014* | (2022.01) |
| *H04L 67/1029* | (2022.01) |

(52) **U.S. Cl.**
CPC ............ ***H04L 67/55*** (2022.05); ***H04L 45/306*** (2013.01); ***H04L 67/63*** (2022.05); *H04L 67/1001* (2022.05); *H04L 67/1008* (2013.01); *H04L 67/1014* (2013.01); *H04L 67/1029* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/019,662, please refer to the USPTO's Patent Electronic System.

*Primary Examiner* — Woo H Choi

(57) **ABSTRACT**

A network routes update messages containing updates to properties of live objects from input sources to clients having the objects. When the clients receive live objects, the clients identify the object IDs associated with the objects and register the object IDs with the routing network. The routing network is adapted to selectively send update messages to nodes in the network and the nodes forward the messages to the clients. One implementation uses a hierarchy of registries to indicate which nodes and clients receive which update messages. Another implementation assigns update messages to one or more of N categories and nodes to one or more of M types, and the gateways maintain mapping between categories and types. To ensure that clients receive all of the update messages for which they register, the clients connect to client proxies that in turn connect to at least one node of each type.



# EX PARTE REEXAMINATION CERTIFICATE

NO AMENDMENTS HAVE BEEN MADE TO THE PATENT

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

The patentability of claims **1**, **6-7**, **14-17**, **20-23**, **26-29** and **32-35** is confirmed.

Claims **2-5**, **8-13**, **18-19**, **24-25**, **30-31** and **36-37** were not reexamined.

* * * * *

# EXHIBIT A-7

**Amendment Under 37 C.F.R. § 1.116**
**Expedited Procedure – Art Unit 2194**

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re application of: | Confirmation No.: 1129 |
| TUTTLE *et al.* | Art Unit: 2194 |
| Appl. No.: 11/396,251 | Examiner: DAO, TUAN C. |
| Filed: March 30, 2006 | Atty. Docket: 2222.775000E |
| For: **Asynchronous Messaging Using a Node Specialization Architecture in the Dynamic Routing Network** | |

## Reply Under 37 C.F.R. § 1.116

***Mail Stop AF***

Commissioner for Patents
PO Box 1450
Alexandria, VA 22313-1450

Sir:

In reply to the Final Office Action dated **December 30, 2011,** ("Office Action"), Applicants submit the following Amendment and Remarks.

**Status of the Claims** is reflected in the listing of claims which begins on page **2** of this paper.

**Remarks and Arguments** begin on page **16** of this paper.

It is not believed that extensions of time or fees for net addition of claims are required beyond those that may otherwise be provided for in documents accompanying this paper. However, if additional extensions of time are necessary to prevent abandonment of this application, then such extensions of time are hereby petitioned under 37 C.F.R. § 1.136(a), and any fees required therefor (including fees for net addition of claims) are hereby authorized to be charged to our Deposit Account No. 19-0036.

### *Status of the Claims*

This listing of claims will replace all prior versions, and listings, of claims in the application.

1-25. (Cancelled)

26. (Previously Presented) A method comprising:

receiving, using a processing device, an update message from an input source, the update message identifying a live object and containing data for updating a property of the live object;

identifying a category of the update message based on the input source;

determining a node having a node type to which the update message is to be routed based on a mapping of categories of update messages to node types, the mapping controlling an amount of update message traffic through nodes of a routing network;

routing, using the processing device, the update message to the node having the determined node type;

causing the node, through the update message, to determine a client, different from the input source, that has registered for updates of the live object;

causing the node to route the update message from the node to the client; and

causing the client to process the update message and to update the property of the live object.

27. (Cancelled)

28. (Previously Presented) The method of claim 26, further comprising:

causing the node to extract an object ID from the update message, to establish a connection with the client, and to determine if the client has registered for updates of the live object based on the object ID.

29. (Previously Presented) The method of claim 28, further comprising:

causing the node to determine at least one client proxy with which the client communicates;

causing the node to route the update message to the client proxy; and

causing the client proxy to route the update message to the client to determine the connection.

30. (Previously Presented) The method of claim 29, further comprising causing the node to maintain client registration information concerning the client connection.

31. (Previously Presented) The method of claim 29, further comprising causing the node to maintain client registration information concerning the client connection at the client proxy.

32. (Cancelled)

33. (Previously Presented) A routing network comprising:

a gateway device configured to:

receive an update message from an input source, the update message identifying a live object and containing data for updating a property of the live object,

identify a category of the update message based on the input source;

determine a node having a node type to which the update message is to be routed based on a mapping of a categories of update messages to node types, the mapping controlling an amount of update message traffic through nodes of a routing network; and

route the update message; and

the node configured to:

receive the update message from the gateway device, wherein the node is configured to be mapped to the node type,

determine a client, different from the input source, that has registered for updates of the live object, and

route the update message from the node to the client, wherein the client is adapted to process the update message and to update the property of the live object.

34. (Previously Presented) The routing network of claim 33, wherein the node is configured to extract an object ID from the update message and to determine a connection to the client to route the data to the client.

35. (Previously Presented) The routing network of claim 34, wherein the node is configured to determine the connection by determining at least one client proxy with which the client communicates and to route the update message to the client proxy.

36. (Previously Presented) The routing network of claim 35, wherein client registration information concerning the client connection is configured to be maintained at the node.

37. (Previously Presented) The routing network of claim 35, wherein client registration information concerning the client connection is configured to be maintained at the client proxy.

38. (Previously Presented) The routing network of claim 33, wherein:

the gateway device is configured to route the update message to the node adapted to receive messages of more than one message category, and

the node is configured to determine a connection with at least one client proxy with which the client communicates and to route the data to the client proxy.

39. (Previously Presented) A method comprising:

providing, using a processing device of an input source, a data representation to a client device, different from the input source, coupled to a routing network, wherein the data representation includes at least one live object recognizable by the client device, and causing the client device to respond to the live object of the data representation by

determining an object ID of the live object and to register for updates of the live object with the routing network, such that registering the client device with the routing network provides client connection information to a node in the routing network; and

sending, using the processing device of the input source, an update message to the routing network, wherein the update message identifies the live object and contains update data that updates a property of the live object,

wherein a gateway device at the routing network is configured to identify a category of the update message based on the input source, to determine a node type to which the identified category maps, and to route the update message to the node, having the node type, at the routing network,

wherein the node is configured to identify the client device as a registered device and to route the update message to the client device, and

wherein the client device processes the update message upon receipt to update the property of the live object at the client device.

40. (Previously Presented) The method of claim 39, wherein providing the data representation to the client device includes providing the live object that causes the client device to register with a client proxy of the routing network.

41. (Previously Presented) The method of claim 39, wherein providing the data representation to the client device includes providing the live object that causes the client device to register with the node of the routing network.

42. (Previously Presented) The method of claim 39, wherein providing the data representation to the client device includes providing an activation module that is executed by the client device and that registers the live object with the routing network.

43. (Previously Presented) The method of claim 42, wherein providing the activation module includes providing the activation module that is configured to determine a node type that handles registration and that causes the client device to register with the node corresponding to the node type.

44. (Previously Presented) The method of claim 42, wherein providing the activation module includes providing the activation module that is configured to determine a message category of the data representation and that causes the client device to register with a node having a node type corresponding to the message category.

45. (Previously Presented) An apparatus comprising:

an input source device configured to provide a data representation to a client device, different from the input source, coupled to a routing network, wherein the data representation includes at least one live object that is recognizable by the client device, and that causes the client device to determine an object ID of the live object to register for updates of the live object with the routing network, such that registering the client device with the routing network provides client connection information to the routing network,

wherein the input source device is configured to route an update message to the routing network, wherein the update message identifies the live object and contains update data for updating a property of the live object,

wherein a gateway device at the network is configured to identify a category of the update message based on the input source, to determine a node type to which the identified category maps, and to route the update message to a node of the node type at the routing network,

wherein the node is configured to identify the client device as a registered device and route the update message containing the update data to the client device, and

wherein the client device is configured to process the update message upon receipt to update the property of the live object at the client device.

46. (Previously Presented) The apparatus of claim 45, wherein the live object of the data representation is configured to cause the client device to register with a client proxy of the routing network.

47. (Previously Presented) The apparatus of claim 45, wherein the live object of the data representation is configured to cause the client device to register with the node of the routing network.

48. (Previously Presented) The apparatus of claim 45, wherein the received data representation includes an activation module that is configured to be executed by the client device and adapted to register the live object with the routing network.

49. (Previously Presented) The apparatus of claim 48, wherein the activation module is configured to determine a node type for handling registration and to cause the client device to register with the node of the node type.

50. (Previously Presented) The apparatus of claim 48, wherein the activation module determines a message category of the data representation and causes the client device to register with the node having a node type corresponding to the message category.

51. (Previously Presented) An article of manufacture including a computer-readable storage medium having instructions stored thereon, execution of which by a computing device causes the computing device to perform operations comprising:

providing, using a processing device of an input source, a data representation to a client device, different from the input source, coupled to a routing network, wherein the data representation includes at least one live object that is recognizable by the client device, and that causes the client device to respond to the live object by determining an object ID of the live object to register for updates of the live object with the routing network, such that registering the client device with the routing network provides client connection information to the routing network; and

sending, using the processing device of the input source, an update message to the routing network, wherein the update message identifies the live object and contains update data for updating a property of the live object,

wherein a gateway device at the routing network is configured to identify a category of the update message based on the input source, to determine a node type to which the identified category maps, and to route the update message to a node of the node type at the routing network,

wherein the node is configured to identify the client device as a registered device and to route the update message to the client device, and

wherein the client device is configured to process the update message upon receipt to update the property of the live object at the client device.

52. (Previously Presented) The article of manufacture of claim 51, wherein the live object of the data representation causes the client device to register with a client proxy of the routing network.

53. (Previously Presented) The article of manufacture of claim 51, wherein the live object of the data representation causes the client device to register with the node of the routing network.

54. (Previously Presented) The article of manufacture of claim 51, wherein the received data representation includes an activation module executed by the client device and adapted to register the live object with the routing network.

55. (Previously Presented) The article of manufacture of claim 54, wherein the activation module determines a node type that handles registration and causes the client device to register with the node of the node type.

56. (Previously Presented) The article of manufacture of claim 54, wherein the activation module determines a message category of the data representation and causes the client device to register with the node having a node type corresponding to the message category.

57. (Previously Presented) A non-transitory computer readable storage medium having instructions stored thereon, the instructions comprising:

instructions for providing a data representation to a client device coupled to a routing network, wherein the data representation includes at least one live object recognizable by the client device, and wherein the client device is configured to respond to the live object of the data representation by determining an object ID of the live object to register for updates of the live object with the routing network, such that registering the client device with the routing network provides client connection information to the routing network; and

instructions for providing, using a processing device of an input source, different from the client device, an update message to the routing network, wherein the update message identifies the live object and contains update data for updating a property of the live object,

wherein a gateway device at the routing network is configured to identify a category of the update message based on the input source, to determine a node type to which the identified category maps, and to route the update message to a node of the node type at the routing network,

wherein the node is configured to identify the client device as a registered device and to route the update message containing the update data to the client device, and

wherein the client device is configured to process the update message upon receipt to update the property of the live object at the client device.

58. (Previously Presented) The non-transitory computer readable storage medium of claim 57, wherein the live object of the data representation causes the client device to register with a client proxy of the routing network.

59. (Previously Presented) The non-transitory computer readable storage medium of claim 57, wherein the live object of the data representation causes the client device to register with the node of the routing network.

60. (Previously Presented) The non-transitory computer readable storage medium of claim 57, wherein the data representation includes an activation module that is executed by the client device and that is adapted to register the live object with the routing network.

61. (Previously Presented) The non-transitory computer readable storage medium of claim 60, wherein the activation module determines a node type for handling registration and causes the client device to register with the node of the node type.

62. (Previously Presented) The non-transitory computer readable storage medium of claim 60, wherein the activation module determines a message category of the data representation and causes the client device to register with the node having the node type corresponding to the message category.

63. (Previously Presented) A method comprising:

providing a live object to a client device;

sending, using a processing device of an input source, different from the client device, an update message to a routing network identifying the live object and containing update data to update the live object at the client device,

wherein in response to determining that the client device is registered to receive update data for the live object, causing a category of the update message to be identified based on the input source, a node type associated with the category be determined, and the update message be routed from the gateway device to a node having the node type at the routing network, and causing the node to route the update message to the client device.

64. (Previously Presented) An apparatus comprising:

an input source arranged to provide a live object to a client device, different from the input source; and

the input source arranged to provide an update message to a routing network identifying the live object and containing update data for updating the live object,

wherein the routing network is configured to identify a category of the update message based on the input source, determine a node type associated with the category, and to route the update message from a gateway device at the routing network to a node having the node type at the routing network, and wherein the node is configured to route the update message to the client device if the client device is registered to receive the update data for the live object.

65. (Cancelled)

66. (Previously Presented) A non-transitory computer readable storage medium having instructions stored thereon, the instructions comprising:

instructions for providing a live object to a client device; and

instructions for providing an update message from an input source, different from the client device, to a routing network identifying the live object and containing update data for updating the live object at the client device,

wherein a category of the update message is identified based on the input source, a node type associated with the category is determined, and the update message is routed from a gateway device at the routing network to a node having the node type at the

routing network, wherein the update message is routed from the node to the client device in response to a determination that the client device is registered to receive the update data for the live object.

67. (Previously Presented) The routing network of claim 33, wherein the node type is configured to identify the node that receives the update message from the gateway device.

68. (Previously Presented) The method of claim 26, wherein the property of the live object has a direct effect on a visual representation of the live object in a data representation, has an effect on an internal aspect of the live object and has no effect on the visual representation of the live object in the data representation, or has a direct effect on one aspect of the visual representation of the live object in the data representation and has no effect on other aspect of the visual representation of the live object in the data representation.

## *Remarks*

Reconsideration of this Application is respectfully requested.

Claims 26, 28-31, 33-64, and 66-68 are pending in the application, with claims 26, 33, 39, 45, 51, 57, 63, 64, and 66 being the independent claims. No claim amendments are sought.

Based on the following remarks, Applicants respectfully request that the Examiner reconsider all outstanding rejections and that they be withdrawn.

***Rejections under 35 U.S.C. § 103***

**Claims 26, 28, 33, 34, 39, 42-45, 48-51, 54-57, 60-62, 67, and 68**

Claims 26, 28, 33, 34, 39, 42-45, 48-51, 54-57, 60-62, 67, and 68 were rejected under 35 U.S.C. § 103(a) as allegedly being unpatentable over U.S. Patent No 6,091,724 to Chandra et al. ("Chandra") in view of U.S. Patent No. 6,510,323 to Stocker et al. ("Stocker") and further in view of U.S. Patent No. 6,324,578 to Trenbeath et al. ("Trenbeath"). Applicants respectfully traverse this rejection.

Independent claims 26, 33, 39, 45, 51, and 57 recite features that distinguish over the applied references. For example, claim 26 recites, *inter alia*, (emphasis added):

> ***identifying a category of the update message based on the input source.***

Independent claim 33 recites similar distinguishing features, using its respective language. Further, independent claim 39recites, *inter alia*, (emphasis added):

> wherein a gateway device at the routing network is configured to ***identify a category of the update message based on the input source***, to determine a node type to which the identified category maps, and to route the update

> message to the node, having the node type, at the routing network.

Independent claims 45, 51, and 57 recite similar distinguishing features, using their respective language.

These features are neither disclosed nor suggested by the applied references.

The Examiner, for example, on page 3 of the Office Action relies on columns 1:25-35 and 5:45-65 of Chandra (in view of paragraphs 103 and 105 of the specification of instant application) to allegedly show the above-noted distinguishing features of independent claims 26, 33, 39, 45, 51, and 57. Applicants respectfully disagree.

Chandra discloses a method for "routing messages within a network using the data content of the message." (Chandra, Title.) When discussing the background art, Chandra discloses that (emphasis added):

> One example of a system that includes such a network environment is a publish/subscribe system. In publish/subscribe systems, publishers post messages and ***subscribers independently specify categories of events in which they are interested.*** The system takes the posted messages and includes in each message header the destination information of those subscribers indicating interest in the particular message. The system then uses the destination information in the message to forward the message through the network to the appropriate subscribers.
>
> (Chandra, 1:26-35.)

This section of Chandra, relied on by the Examiner, merely discloses that subscribers can specify categories of event in which they are interested. This is not the same as "identify a category of the update message <u>based on the input source</u>," as recited in claims 26, 33, 39, 45, 51, and 57, using their respective language.

Chandra further discusses the content based subscription, where "one or more of the clients can specify a subscription. Each subscription provides a set of conditions indicating the types of messages those clients are interested in receiving." (Chandra, 5:45-48.) Chandra discloses that (emphasis added):

> Consider an example in which messages are related to the stock market. In such an example, a subscription may have the following three fields (or attributes): stock issue, stock price and stock value. The client specifies values for these fields, e.g., IBM, 100, 200, and then, these fields are used to determine if the client is interested in a particular message. ***If the data content of the message matches the specified values of the subscription, then the message is delivered to the one or more subscribers (or clients) of that subscription.*** It will be apparent to those skilled in the art that the use of three fields in the subscription is only one example. Subscriptions may include any number of desired fields and tests may include relationships other than equality. Further, the stock market scenario is only one example. Messages and subscriptions can be used for any type of data or events.
>
> (Chandra, 5:53-67.)

This section of Chandra, relied on by the Examiner, discloses that if the ***data content of the message*** matches the specified values of the subscription, then the message is delivered to the one or more subscribers (or clients) of that subscription. This is not the same as "identify a category of the update message based on the input source." as recited in claims 26, 33, 39, 45, 51, and 57, using their respective language.

The Examiner, for example, on page 3 of the Office Action, relies on the above sections of Chandra to allegedly show "identifying each category based on the category/topic of the message content." By this statement, the Examiner appears to agree that Chandra teaches identifying categories **based on category/topic of the message content**. In contrast, claims 26, 33, 39, 45, 51, and 57 recite, *inter* alia,

"identify a category of the update message based on the input source," using their respective language.

The Office Action, for example, on pages 4 and 5, states, which Applicants do not acquiesce to, that Stocker teaches "GIMR 300 determining a message control node 210 to send a general information message 220 to MSS 110," "if the cell serving mobile station in part of the served area 195, the step 430 is entered," "determining if the served area ... associated with the MS 100," "routing the update message to the node having determined node type," and "sending general message invocation ... to determined message control nod." However, the Office Action does not use Stocker to disclose, nor does it teach or suggest, at least the above-noted distinguishing features of claims 26, 33, 39, 45, 51, and 57. Therefore, Stocker does not cure the deficiencies of Chandra.

Further, the Office Action, for example, on page 5, states, which Applicants do not acquiesce to, that Trenbeath teaches "subscribed clients C, D, E receives [sic] update data, attached data object in update messages from a publishing client A." However, the Office Action does not use Trenbeath to disclose, nor does it teach or suggest, at least the above-noted distinguishing features of claims 26, 33, 39, 45, 51, and 57. Therefore, Trenbeath does not cure the deficiencies of Chandra and Stocker. Thus, the combination of Chandra, Stocker, and Trenbeath does not render the claims obvious.

Applicants therefore respectfully request the reconsideration and withdrawal of the rejection of claims 26, 33, 39, 45, 51, and 57 under 35 U.S.C. § 103(a). Accordingly, at least based on their respective dependencies to claims 26, 33, 39, 45, 51, and 57,

claims 28, 34, 42-44, 48-50, 54-56, 60-62, 67, and 68 should be found allowable over the applied references, as well as for their additional distinguishing features.

**Claims 29-31 and 35-38**

Claims 29-31 and 35-38 were rejected under 35 U.S.C. § 103(a) as allegedly being unpatentable over Chandra in view of Stocker, further in view of Trenbeath, and in further view of U.S. Patent No. 7,209,959 to Campbell et al. ("Campbell"). Applicants respectfully traverse this rejection.

Dependent claims 29-31 and 35-38 are allowable at least because they recite all of the features of independent claims 26 and 33, from which they depend. As discussed above, Chandra, Stocker, and Trenbeath, taken alone or in combination, fail to disclose all of the features of claims 26 and 33.

Further, the Office Action, on pages 30-34, states, which Applicants do not acquiesce to, that Campbell teaches "causing the node to determine at least one client proxy with which the client communicates; causing the node to route to the client proxy; and causing the client proxy to rout the data to the client to determine the connection," "client information is extracted and replaced with predetermined substitute information at server proxy which is considered as a client proxy," and "wherein the node is configured to determine a connection by determining at least one client proxy with which the registered client communicates and to route the data to the client proxy." However, the Office Action does not use Campbell to disclose, nor does it teach or suggest, at least the above-noted distinguishing features of claims 26 and 33. Therefore, Campbell does not cure the deficiencies of Chandra, Stocker, and Trenbeath.

Accordingly, at least based on their respective dependencies to claims 26 and 33, claims 29-31 and 35-38 should be found allowable over the applied references, as well as for their additional distinguishing features.

**Claims 40, 41, 46, 47, 52, 53, 58, and 59**

Claims 40, 41, 46, 47, 52, 53, 58, and 59 were rejected under 35 U.S.C. § 103(a) as allegedly being unpatentable over Chandra in view of Stocker, further in view of Trenbeath, and in further view of U.S. Patent No. 6,314,459 to Freeman ("Freeman"). Applicants respectfully traverse this rejection.

Dependent claims 40, 41, 46, 47, 52, 53, 58, and 59 are allowable at least because they recite all of the features of independent claims 39, 45, 51, and 57, from which they depend. As discussed above, Chandra, Stocker, and Trenbeath, taken alone or in combination, fail to disclose all of the features of claims 39, 45, 51, and 57.

Further, the Office Action, on pages 35-38, states, which Applicants do not acquiesce to, that Freeman teaches "wherein providing the data representation to the client device includes providing the live object that causes the client device to register with a client proxy of the routing network," "wherein providing the data representation to the client device includes providing the live object that causes the client device to register with the node of the routing network," "wherein the live object of the data representation is configured to cause the client device to register with a client proxy of the routing network," and "wherein the live object of the data representation is configured to cause the client device to register with the node of the routing network." However, the Office Action does not use Freeman to disclose, nor does it teach or

suggest, at least the above-noted distinguishing features of claims 39, 45, 51, and 57. Therefore, Freeman does not cure the deficiencies of Chandra, Stocker, and Trenbeath.

Accordingly, at least based on their respective dependencies to claims 39, 45, 51, and 57, claims 40, 41, 46, 47, 52, 53, 58, and 59 should be found allowable over the applied references, as well as for their additional distinguishing features.

**Claims 63, 64, and 66**

Claims 63, 64, and 66 were rejected under 35 U.S.C. § 103(a) as allegedly being unpatentable over Chandra in view of Stocker. Applicants respectfully traverse this rejection.

Independent claims 63, 64, and 66 recite features that distinguish over the applied references. For example, independent claim 63recites, *inter alia*, (emphasis added):

> wherein in response to determining that the client device is registered to receive update data for the live object, ***causing a category of the update message to be identified <u>based on the input source</u>***, a node type associated with the category be determined, and the update message be routed from the gateway device to a node having the node type at the routing network, and causing the node to route the update message to the client device.

Further, independent claim 64 recites, *inter alia*, (emphasis added):

> wherein the routing network is configured to ***identify a category of the update message <u>based on the input source</u>***, determine a node type associated with the category, and to route the update message from a gateway device at the routing network to a node having the node type at the routing network, and wherein the node is configured to route the update message to the client device if the client device is registered to receive the update data for the live object.

Also, independent claim 66 recites, *inter alia*, (emphasis added):

> wherein ***a category of the update message is identified <u>based on the input source</u>***, a node type associated with the category is determined, and the update message is routed from a gateway device at the routing network to a node having the node type at the routing network, wherein the update message is routed from the node to the client device in response to a determination that the client device is registered to receive the update data for the live object.

As discussed above with respect to independent claims 26, 33, 39, 45, 51, and 57, Chandra and Stocker, taken alone or in combination, fail to disclose the above-noted distinguishing features of claims 63, 64, and 66. Applicants therefore respectfully request the reconsideration and withdrawal of the rejection of claims 63, 64, and 66 under 35 U.S.C. § 103(a).

## *Conclusion*

All of the stated grounds of rejection have been properly traversed, accommodated, or rendered moot. Applicants therefore respectfully request that the Examiner reconsider all presently outstanding rejections and that they be withdrawn. Applicants believe that a full and complete reply has been made to the outstanding Office Action and, as such, the present application is in condition for allowance. If the Examiner believes, for any reason, that personal communication will expedite prosecution of this application, the Examiner is invited to telephone the undersigned at the number provided.

Prompt and favorable consideration of this Amendment and Reply is respectfully requested.

Respectfully submitted,

STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

Glenn J. Perry
Attorney for Applicants
Registration No. 28,458

Date: 9 Feb. 2012

1100 New York Avenue, N.W.
Washington, D.C. 20005-3934
(202) 371-2600

1465715_1.DOCX

# EXHIBIT A-8

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re application of: | Confirmation No.: 1129 |
| TUTTLE *et al.* | Art Unit: 2194 |
| Appl. No.: 11/396,251 | Examiner: DAO, TUAN C. |
| Filed: March 30, 2006 | Atty. Docket: 2222.775000E |
| For: **Asynchronous Messaging Using a Node Specialization Architecture in the Dynamic Routing Network** | |

## Brief on Appeal Under 37 C.F.R. § 41.37

***Mail Stop Appeal Brief - Patents***

Commissioner for Patents
PO Box 1450
Alexandria, VA 22313-1450

Sir:

A Notice of Appeal from the Final Office Action, dated December 30, 2011, was filed March 28, 2012, along with a Pre Appeal Conference Request and Arguments. The Pre Appeal Brief Conference Decision was mailed May 1, 2012. Appellants hereby file one copy of this Appeal Brief, together with the required fee set forth in 37 C.F.R. § 41.20(b)(2).

It is not believed that extensions of time are required beyond those that may otherwise be provided for in documents accompanying this paper. However, if additional extensions of time are necessary to prevent abandonment of this application, then such extensions of time are hereby petitioned under 37 C.F.R. § 1.136(a), and any fees required therefor (including fees for net addition of claims) are hereby authorized to be charged to our Deposit Account No. 19-0036.

## Table of Contents


I. Real Party In Interest (37 C.F.R. § 41.37(c)(1)(i)) ..... 3
II. Related Appeals and Interferences (37 C.F.R. § 41.37(c)(1)(ii)) ..... 4
III. Summary of Claimed Subject Matter (37 C.F.R. § 41.37(c)(1)(iii)) ..... 5
- A. Independent Claim 26 ..... 5
- B. Independent Claim 33 ..... 6
- C. Independent Claim 39 ..... 7
- D. Independent Claim 45 ..... 8
- E. Independent Claim 51 ..... 9
- F. Independent Claim 57 ..... 10
- G. Independent Claim 63 ..... 11
- H. Independent Claim 64 ..... 11
- I. Independent Claim 66 ..... 12

IV. Argument (37 C.F.R. § 41.37(c)(1)(iv)) ..... 13
- A. The Office committed reversible errors as the references lack at least the claimed identifying based on input source and rather Chandra teaches using a category/topic of message content ..... 13
- B. Chandra, Stocker, and Trenbeath do not teach or suggest at least identifying a category of the update message based on the input source as respectively recited in claims 26, 33, 39, 45, 51, and 57 ..... 13
- C. Campbell does not cure the deficiencies of Chandra, Stocker, and Trenbeath ..... 19
- D. Freeman does not cure the deficiencies of Chandra, Stocker, and Trenbeath21
- E. Chandra and Stocker do not teach or suggest at least the claimed category of an updated message is identified based on the input source as respectively recited in claims 63, 64, and 66 ..... 22
- F. Conclusion ..... 24

V. Claims Appendix (37 C.F.R. § 41.37(c)(i)(v)) ..... 25

***I. Real Party In Interest (37 C.F.R. § 41.37(c)(1)(i))***

The real party in interest in this appeal is the Shaw Parsing LLC, having its principal place of business at 2215-B Renaissance Drive, Suite 5, Las Vegas, Nevada, 89119. An Assignment assigning all right, title, and interest in and to the patent application from the inventors to Bang Networks, Inc. was recorded in the Assignment Branch of the United States Patent and Trademark Office on June 21, 2007, at reel 019462, frame 0914. An Assignment assigning all right, title, and interest in and to the patent application from the Bang Networks, Inc. to Shaw Parsing LLC was recorded in the Assignment Branch of the United States Patent and Trademark Office on June 21, 2007, at reel 019462, frame 0936.

***II. Related Appeals and Interferences (37 C.F.R. § 41.37(c)(1)(ii))***

To the best of the knowledge of Appellants, Appellants' legal representative, and Appellants' assignee, there are no other appeals, interferences, or judicial proceedings which are related to, directly affect, or are directly affected by or have a bearing on a decision by the Board of Patent Appeals and Interferences ("the Board") in the pending appeal.

Appellants will comply with 37 C.F.R. § 41.8(a) and will notify the Board of any change during the proceeding, within 20 days of the change, in (1) the real party-in-interest, and (2) each judicial or administrative proceeding that could affect, or be affected by, the Board proceeding.

### *III. Summary of Claimed Subject Matter (37 C.F.R. § 41.37(c)(1)(iii))*

A concise explanation of the subject matter recited in the independent claims on appeal (i.e., claims 26, 33, 39, 45, 51, 57, 63, 64, and 66) is provided below. The explanation refers to the specification by page and line number and to the drawings by reference characters. Reference is made to example supporting embodiments disclosed in the specification, although it is understood that the claims should not be limited to the specific embodiments to which reference is made.

#### *A. Independent Claim 26*

| *Claim Element* | *Example Support* |
|---|---|
| A method comprising: | FIGs. 7, 8, and 10 |
| receiving, using a processing device, an update message from an input source, the update message identifying a live object and containing data for updating a property of the live object; | FIG. 7, element 724A; FIG. 8, element 810; FIG. 10, element 1010; page 6, lines 2-10; page 38, lines 10-11; page 46, line 20 – page 47, line 1 |
| ***identifying a category of the update message based on the input source*;** | FIG. 7, element 724A; FIG. 10, element 1020; page 39, lines 3-7; page 40, lines 3-18; page 47, lines 2-3<br><br>[emphasis added for at least one distinguishing feature of the claim] |
| determining a node having a node type to which the update message is to be routed based on a mapping of categories of update messages to node types, the mapping controlling an amount of update message traffic through nodes of a routing network; | FIG. 7, elements 724A and 726A; FIG. 10, element 1030; page 39, lines 3-7; page 47, lines 3-5 |
| routing, using the processing device, the update message to the node having the determined node type; | FIG. 7, elements 724A and 726A; FIG. 10, element 1040; page 47, lines 3-5 |
| causing the node, through the update message, to determine a client, different from the input source, that has registered for updates of the live object; | FIG. 7, elements 724A, 726A, 712; FIG. 8, element 850; FIG. 10, element 1050; page 38, lines 14-16; page 47, lines 5-9 |
| causing the node to route the update | FIG. 7, elements 724A, 726A, 712; FIG. 8, |

| | |
|---|---|
| message from the node to the client; and | element 860; FIG. 10, elements 1060 and 1070; page 38, lines 14-16; page 47, lines 9-12 |
| causing the client to process the update message and to update the property of the live object. | page 16, line 18 – page 17, line 5 |

### *B. Independent Claim 33*

| *Claim Element* | *Example Support* |
|---|---|
| A routing network comprising: | FIG. 3, element 110 |
| a gateway device configured to: | FIG. 7, element 724A |
| receive an update message from an input source, the update message identifying a live object and containing data for updating a property of the live object, | FIG. 7, element 724A; FIG. 8, element 810; FIG. 10, element 1010; page 6, lines 2-10; page 38, lines 10-11; page 46, line 20 – page 47, line 1 |
| ***identify a category of the update message based on the input source;*** | FIG. 7, element 724A; FIG. 10, element 1020; page 39, lines 3-7; page 40, lines 3-18; page 47, lines 2-3<br><br>[emphasis added for at least one distinguishing feature of the claim] |
| determine a node having a node type to which the update message is to be routed based on a mapping of a categories of update messages to node types, the mapping controlling an amount of update message traffic through nodes of a routing network; and | FIG. 7, element 724A; FIG. 10, element 1030; page 39, lines 3-7; page 47, lines 3-5 |
| route the update message; and | FIG. 7, element 724A; FIG. 10, element 1040; page 47, lines 3-5 |
| the node configured to: | FIG. 7, element 726A |
| receive the update message from the gateway device, wherein the node is configured to be mapped to the node type, | FIG. 7, elements 724A and 726A; FIG. 10, element 1040; page 39, lines 3-7; page 47, lines 3-5 |
| determine a client, different from the input source, that has registered for updates of the live object, and | FIG. 7, elements 724A, 726A, 712; FIG. 8, element 850; FIG. 10, element 1050; page 38, lines 14-16; page 47, lines 5-9 |
| route the update message from the node to the client, wherein the client is adapted to process the update message and to update the property of the live object. | FIG. 7, elements 724A, 726A, 712; FIG. 8, element 860; FIG. 10, elements 1060 and 1070; page 16, line 18 – page 17, line 5; page 38, lines 14-16; page 47, lines 9-12 |

### C. *Independent Claim 39*

| ***Claim Element*** | ***Example Support*** |
|---|---|
| A method comprising: | FIGs. 7, 8, and 10 |
| providing, using a processing device of an input source, a data representation to a client device, different from the input source, coupled to a routing network, wherein the data representation includes at least one live object recognizable by the client device, and causing the client device to respond to the live object of the data representation by determining an object ID of the live object and to register for updates of the live object with the routing network, such that registering the client device with the routing network provides client connection information to a node in the routing network; and | FIG. 3, element 210; FIG. 7, element 710; page 11, lines 3-19 |
| sending, using the processing device of the input source, an update message to the routing network, wherein the update message identifies the live object and contains update data that updates a property of the live object, | FIG. 3, element 210; FIG. 7, element 710; FIG. 8, element 810; FIG. 10, element 1010; page 6, lines 2-10; page 38, lines 10-11; page 46, line 20 – page 47, line 1 |
| wherein a gateway device at the routing network is configured to ***identify a category of the update message based on the input source***, to determine a node type to which the identified category maps, and to route the update message to the node, having the node type, at the routing network, | FIG. 7, element 724A; FIG. 8, element 810; FIG. 10, elements 1010, 1020, and 1030; page 6, lines 2-10; page 38, lines 10-11; page 39, lines 3-7; page 40, lines 3-18; page 46, line 20 – page 47, lines 1-5<br><br>[emphasis added for at least one distinguishing feature of the claim] |
| wherein the node is configured to identify the client device as a registered device and to route the update message to the client device, and | FIG. 7, elements 724A, 726A, 712; FIG. 8, elements 850 and 860; FIG. 10, elements 1050, 1060, and 1070; page 38, lines 14-16; page 47, lines 5-12 |
| wherein the client device processes the update message upon receipt to update the property of the live object at the client device. | page 16, line 18 – page 17, line 5 |

### *D. Independent Claim 45*

| *Claim Element* | *Example Support* |
|---|---|
| An apparatus comprising: | FIGs. 3 and 7 |
| an input source device configured to provide a data representation to a client device, different from the input source, coupled to a routing network, wherein the data representation includes at least one live object that is recognizable by the client device, and that causes the client device to determine an object ID of the live object to register for updates of the live object with the routing network, such that registering the client device with the routing network provides client connection information to the routing network, | FIG. 3, element 210; FIG. 7, element 710; page 11, lines 3-19 |
| wherein the input source device is configured to route an update message to the routing network, wherein the update message identifies the live object and contains update data for updating a property of the live object, | FIG. 3, element 210; FIG. 7, element 710; FIG. 8, element 810; FIG. 10, element 1010; page 6, lines 2-10; page 38, lines 10-11; page 46, line 20 – page 47, line 1 |
| wherein a gateway device at the network is configured to ***identify a category of the update message based on the input source***, to determine a node type to which the identified category maps, and to route the update message to a node of the node type at the routing network, | FIG. 7, element 724A; FIG. 8, element 810; FIG. 10, elements 1010, 1020, and 1030; page 6, lines 2-10; page 38, lines 10-11; page 39, lines 3-7; page 40, lines 3-18; page 46, line 20 – page 47, lines 1-5<br><br>[emphasis added for at least one distinguishing feature of the claim] |
| wherein the node is configured to identify the client device as a registered device and route the update message containing the update data to the client device, and | FIG. 7, elements 724A, 726A, 712; FIG. 8, elements 850 and 860; FIG. 10, elements 1050, 1060, and 1070; page 38, lines 14-16; page 47, lines 5-12 |
| wherein the client device is configured to process the update message upon receipt to update the property of the live object at the client device. | page 16, line 18 – page 17, line 5 |

### *E. Independent Claim 51*

| *Claim Element* | *Example Support* |
|---|---|
| An article of manufacture including a computer-readable storage medium having instructions stored thereon, execution of which by a computing device causes the computing device to perform operations comprising: | FIGs. 7, 8, and 10; page 12, line 20 – page 13, line 11; page 20, line 14-18; page 21, line 13 – page 22, line 15 |
| providing, using a processing device of an input source, a data representation to a client device, different from the input source, coupled to a routing network, wherein the data representation includes at least one live object that is recognizable by the client device, and that causes the client device to respond to the live object by determining an object ID of the live object to register for updates of the live object with the routing network, such that registering the client device with the routing network provides client connection information to the routing network; and | FIG. 3, element 210; FIG. 7, element 710; page 11, lines 3-19 |
| sending, using the processing device of the input source, an update message to the routing network, wherein the update message identifies the live object and contains update data for updating a property of the live object, | FIG. 3, element 210; FIG. 7, element 710; FIG. 8, element 810; FIG. 10, element 1010; page 6, lines 2-10; page 38, lines 10-11; page 46, line 20 – page 47, line 1 |
| wherein a gateway device at the routing network is configured to ***identify a category of the update message based on the input source,*** to determine a node type to which the identified category maps, and to route the update message to a node of the node type at the routing network, | FIG. 7, element 724A; FIG. 8, element 810; FIG. 10, elements 1010, 1020, and 1030; page 6, lines 2-10; page 38, lines 10-11; page 39, lines 3-7; page 40, lines 3-18; page 46, line 20 – page 47, lines 1-5<br><br>[emphasis added for at least one distinguishing feature of the claim] |
| wherein the node is configured to identify the client device as a registered device and to route the update message to the client device, and | FIG. 7, elements 724A, 726A, 712; FIG. 8, elements 850 and 860; FIG. 10, elements 1050, 1060, and 1070; page 38, lines 14-16; page 47, lines 5-12 |
| wherein the client device is configured to process the update message upon receipt to update the property of the live object at the client device. | page 16, line 18 – page 17, line 5 |

### F. *Independent Claim 57*

| *Claim Element* | *Example Support* |
|---|---|
| A non-transitory computer readable storage medium having instructions stored thereon, the instructions comprising: | FIGs. 7, 8, and 10; page 12, line 20 – page 13, line 11; page 20, line 14-18; page 21, line 13 – page 22, line 15 |
| instructions for providing a data representation to a client device coupled to a routing network, wherein the data representation includes at least one live object recognizable by the client device, and wherein the client device is configured to respond to the live object of the data representation by determining an object ID of the live object to register for updates of the live object with the routing network, such that registering the client device with the routing network provides client connection information to the routing network; and | FIG. 3, element 210; FIG. 7, element 710; page 11, lines 3-19 |
| instructions for providing, using a processing device of an input source, different from the client device, an update message to the routing network, wherein the update message identifies the live object and contains update data for updating a property of the live object, | FIG. 3, element 210; FIG. 7, element 710; FIG. 8, element 810; FIG. 10, element 1010; page 6, lines 2-10; page 38, lines 10-11; page 46, line 20 – page 47, line 1 |
| wherein a gateway device at the routing network is configured to ***identify a category of the update message based on the input source***, to determine a node type to which the identified category maps, and to route the update message to a node of the node type at the routing network, | FIG. 7, element 724A; FIG. 8, element 810; FIG. 10, elements 1010, 1020, and 1030; page 6, lines 2-10; page 38, lines 10-11; page 39, lines 3-7; page 40, lines 3-18; page 46, line 20 – page 47, lines 1-5<br><br>[emphasis added for at least one distinguishing feature of the claim] |
| wherein the node is configured to identify the client device as a registered device and to route the update message containing the update data to the client device, and | FIG. 7, elements 724A, 726A, 712; FIG. 8, elements 850 and 860; FIG. 10, elements 1050, 1060, and 1070; page 38, lines 14-16; page 47, lines 5-12 |
| wherein the client device is configured to process the update message upon receipt to update the property of the live object at the client device. | page 16, line 18 – page 17, line 5 |

### G. *Independent Claim 63*

| ***Claim Element*** | ***Example Support*** |
|---|---|
| A method comprising: | FIGs. 7, 8, and 10 |
| providing a live object to a client device; | page 11, lines 3-19 |
| sending, using a processing device of an input source, different from the client device, an update message to a routing network identifying the live object and containing update data to update the live object at the client device, | FIG. 3, element 210; FIG. 7, element 710; FIG. 8, element 810; FIG. 10, element 1010; page 6, lines 2-10; page 38, lines 10-11; page 46, line 20 – page 47, line 1 |
| wherein in response to determining that the client device is registered to receive update data for the live object, causing ***a category of the update message to be identified based on the input source***, a node type associated with the category be determined, and the update message be routed from the gateway device to a node having the node type at the routing network, and causing the node to route the update message to the client device. | FIG. 7, elements 724A, 726A, 712; FIG. 8, element 810, 850, and 860; FIG. 10, elements 1010, 1020, 1030, 1050, 1060, and 1070; page 6, lines 2-10; page 38, lines 10-16; page 39, lines 3-7; page 40, lines 3-18; page 46, line 20 – page 47, lines 1-12<br><br>[emphasis added for at least one distinguishing feature of the claim] |

### H. *Independent Claim 64*

| ***Claim Element*** | ***Example Support*** |
|---|---|
| An apparatus comprising: | FIGs. 3 and 7 |
| an input source arranged to provide a live object to a client device, different from the input source; and | FIG. 3, element 210; FIG. 7, element 710; page 11, lines 3-19 |
| the input source arranged to provide an update message to a routing network identifying the live object and containing update data for updating the live object, | FIG. 3, element 210; FIG. 7, element 710; FIG. 8, element 810; FIG. 10, element 1010; page 6, lines 2-10; page 38, lines 10-11; page 46, line 20 – page 47, line 1 |
| wherein the routing network is configured to ***identify a category of the update message based on the input source,*** determine a node type associated with the category, and to route the update message from a gateway device at the routing network to a node having the node type at the routing network, and wherein the node is configured to route the update message to the client device if the client device is registered to receive | FIG. 7, elements 724A, 726A, 712; FIG. 8, element 810, 850, and 860; FIG. 10, elements 1010, 1020, 1030, 1050, 1060, and 1070; page 6, lines 2-10; page 38, lines 10-16; page 39, lines 3-7; page 40, lines 3-18; page 46, line 20 – page 47, lines 1-12<br><br>[emphasis added for at least one distinguishing feature of the claim] |

| | |
|---|---|
| the update data for the live object. | |

### *I. Independent Claim 66*

| ***Claim Element*** | ***Example Support*** |
|---|---|
| A non-transitory computer readable storage medium having instructions stored thereon, the instructions comprising: | FIGs. 7, 8, and 10; page 12, line 20 – page 13, line 11; page 20, line 14-18; page 21, line 13 – page 22, line 15 |
| instructions for providing a live object to a client device; and | page 11, lines 3-19 |
| instructions for providing an update message from an input source, different from the client device, to a routing network identifying the live object and containing update data for updating the live object at the client device, | FIG. 3, element 210; FIG. 7, element 710; FIG. 8, element 810; FIG. 10, element 1010; page 6, lines 2-10; page 38, lines 10-11; page 46, line 20 – page 47, line 1 |
| wherein ***a category of the update message is identified based on the input source***, a node type associated with the category is determined, and the update message is routed from a gateway device at the routing network to a node having the node type at the routing network, wherein the update message is routed from the node to the client device in response to a determination that the client device is registered to receive the update data for the live object. | FIG. 7, elements 724A, 726A, 712; FIG. 8, element 810, 850, and 860; FIG. 10, elements 1010, 1020, 1030, 1050, 1060, and 1070; page 6, lines 2-10; page 38, lines 10-16; page 39, lines 3-7; page 40, lines 3-18; page 46, line 20 – page 47, lines 1-12<br><br>[emphasis added for at least one distinguishing feature of the claim] |

## *IV. Argument (37 C.F.R. § 41.37(c)(1)(iv))*

### ***A. The Office committed reversible errors as the references lack at least the claimed identifying based on input source and rather Chandra teaches using a category/topic of message content***

Appellants demonstrate Chandra, Stocker, Trenbeath, Campbell and Freeman do not teach or suggest at least the claimed identifying a category of the update message based on the input source ***or*** an updated message is identified based on the input source. Rather, the reference relied upon by the Office, Chandra, merely teaches using a category/topic of message content. Thus, as the claims are allowable over the references, the Office should be reversed and the claims passed to issue.

### ***B. Chandra, Stocker, and Trenbeath do not teach or suggest at least identifying a category of the update message based on the input source as respectively recited in claims 26, 33, 39, 45, 51, and 57***

The Examiner maintained the rejection of claims 26, 28, 33, 34, 39, 42-45, 48-51, 54-57, 60-62, 67, and 68 under 35 U.S.C. § 103(a) as allegedly being unpatentable over Chandra in view of Stocker, and further in view of Trenbeath. (Final Office Action mailed December 30, 2011 ("Final Office Action"), pp. 2-30; Advisory Action mailed February 28, 2012 ("Advisory Action"), pp. 2.)

Independent claims 26, 33, 39, 45, 51, and 57 recite a combination of features not taught or suggested by the applied references.

For example, independent claim 26 recites, *inter alia*, (emphasis added):

> ***identifying a category of the update message <u>based on the input source</u>.***

Independent claim 33 recites similar distinguishing features, using its respective language. Further, independent claim 39 recites, *inter alia*, (emphasis added):

> wherein a gateway device at the routing network is configured to ***identify a category of the update message <u>based on the input source</u>***, to determine a node type to which the identified category maps, and to route the update message to the node, having the node type, at the routing network.

Independent claims 45, 51, and 57 recite similar distinguishing features, using their respective language.

The combination of Chandra, Stocker, and Trenbeath does not teach or suggest at least the above-noted distinguishing features, and the Examiner's rejection based on 35 U.S.C. § 103(a) is therefore improper as being legally and factually deficient.

The Examiner relies on Chandra for this claim feature. (Final Office Action, p. 3 citing Chandra 1:25-35 and 5:45-65 (in view of paragraphs 103 and 105 of the specification of instant application).) Appellants disagree. Rather than teaching or suggesting at least "identify a category of the update message ***based on the input source,***" as respectfully recited in claims, Chandra teaches identifying categories ***based on category/topic of the message content***.

Chandra discloses a method for "routing messages within a network using the data content of the message." (Chandra, Title.) When discussing the background art, Chandra discloses that (emphasis added):

> One example of a system that includes such a network environment is a publish/subscribe system. In publish/subscribe systems, publishers post messages and ***subscribers independently specify categories of events in which they are interested.*** The

> system takes the posted messages and includes in each message header the destination information of those subscribers indicating interest in the particular message. The system then uses the destination information in the message to forward the message through the network to the appropriate subscribers.
>
> (Chandra, 1:26-35.)

Chandra also discusses the content based subscription, where "one or more of the clients can specify a subscription. Each subscription provides a set of conditions indicating the types of messages those clients are interested in receiving." (Chandra, 5:45-48.) Chandra further discloses that:

> Consider an example in which messages are related to the stock market. In such an example, a subscription may have the following three fields (or attributes): stock issue, stock price and stock value. The client specifies values for these fields, e.g., IBM, 100, 200, and then, these fields are used to determine if the client is interested in a particular message. ***If the data content of the message matches the specified values of the subscription, then the message is delivered to the one or more subscribers (or clients) of that subscription.*** It will be apparent to those skilled in the art that the use of three fields in the subscription is only one example. Subscriptions may include any number of desired fields and tests may include relationships other than equality. Further, the stock market scenario is only one example. Messages and subscriptions can be used for any type of data or events.
>
> (Chandra, 5:53-67; emphasis added.)

These sections of Chandra, relied on by the Examiner, merely disclose that subscribers can specify categories of events in which they are interested and if the ***data content of the message*** matches the specified values of the subscription, then the message is delivered to the one or more subscribers (or clients) of that subscription. This is not the same as "identif[ying] a category of the update message ***based on the input source,***" as recited in claims 26, 33, 39, 45, 51, and 57, using their respective language.

The Examiner also states:

> Chandra column 1:25-35; column 5:45-65 discloses "publisher post messages and subscribers independently specify categories or [sic] event [sic] in which they are interested" and :if the data content of the message matches the specified value of the subscription, then the message is delivered [to] the one or more subscribers (or clients)" → ***identifying each category based on the category/topic of the message content***);

(Final Office Action, p. 3; emphasis added.) This proves the Examiner agrees that Chandra teaches identifying categories ***based on category/topic of the message content***. In contrast, claims 26, 33, 39, 45, 51, and 57 recite, *inter* alia, "identify a category of the update message ***based on the input source***," using their respective language.

Appellant rebutted the Examiner stating:

> The Examiner, for example, on page 3 of the Office Action, relies on the above sections of Chandra [Chandra, 1:25-35 and 5:45-65] to allegedly show "identifying each category based on the category/topic of the message content." By this statement, the Examiner appears to agree that Chandra teaches identifying categories **based on category/topic of the message content**. In contrast, claims 26, 33, 39, 45, 51, and 57 recite, *inter* alia, "identify a category of the update message based on the input source," using their respective language.
>
> (Reply under 37 C.F.R. 1.116 filed February 9, 2012 ("After Final Response"), pp. 18-19)

The Examiner then responded:

> More specifically, in Chandra, a publish/subscriber system and publisher is equivalent as input source and a specific publisher publishes/posts messages related to "sport", "weather", and "stocks". A particular subscriber selects category "stocks" (which he/she is interested" [sic] is equivalent identifying a category "stocks" of update messages based on available categories ("sport", "weather", and "stock") of the publisher/input source. Put another way, if said specific publisher only

> publishes/posts messages related to "sports", "weather", "celebrities", then the particular subscriber cannot identify the category "stocks" (which he/she is interested) and should subscribes [sic] for another publisher based on available categories of the another publisher. Accordingly, Chandra indeed fully discloses identifying a category of the update message based [sic] a plurality of available categories of the input source.
>
> (Advisory Action, p. 2.) Appellants respectfully disagree.

First, the Examiner states that "if said specific publisher only publishes/posts messages related to 'sports', 'weather', 'celebrities', then the ***particular subscriber cannot identify the category 'stocks' (which he/she is interested)***." (Advisory Action, p. 2, emphasis added.) Appellants respectfully disagree. Chandra specifically discloses that subscriptions are based on the ***type of messages those clients are interested*** in receiving (Chandra, 5:46-48.) Therefore, following the Examiner's example, if the particular subscriber is interested in "stocks" type of messages, Chandra discloses that the particular subscriber will subscribe to "stocks" type of messages no matter what a specific publisher publishes. Therefore, the Examiner's statement that "particular subscriber ***cannot identify*** the category 'stocks' (which he/she is interested)" because the specific publisher only publishes/posts messages related to "sports," "weather," and "celebrities" (Advisory Action, p. 2, emphasis added) is not correct.

Second, the Examiner states that "if said specific publisher only publishes/posts messages related to 'sports', 'weather', 'celebrities', then the particular subscriber cannot identify the category 'stocks' (which he/she is interested) and ***should subscribes [sic] for another publisher based on available categories of the another publisher***." (Advisory Action, p. 2, emphasis added.) Appellants respectfully disagree. Chandra specifically states

that "[e]ach subscription provides a set of conditions indicating the ***type of messages those clients are interested*** in receiving." (Chandra, 5:46-48, emphasis added.) Therefore, Chandra discloses that subscriptions are based on ***type of messages*** that clients are interested in, and not based on available categories of ***another publisher***, as the Examiner suggests.

Moreover, following the Examiner's example, if a particular subscriber selects a category of "stocks", the particular subscriber is subscribed to "stocks" type of messages. Chandra determines whether a data content of a message matches the specified values of the subscription (such as "stock"), then the message is delivered to the particular subscriber. Chandra does not identify messages based on the publisher, which the Examiner analogizes as input source of independent claims, to which Applicants do not concede.

Therefore, Chandra, the only reference relied upon by the Examiner, does not teach or suggest "identifying a category of the update message based on the input source" ***or*** "an updated message is identified based on the input source," as respectively claimed in claims 26, 33, 39, 45, 51, and 57, but rather Chandra teaches identifying categories based on category/topic of the message content. The Examiner does not rely on Stocker, Trenbeath, Campbell, and Freeman to disclose at least this distinguishing feature, nor do these references teach or suggest at least the above noted distinguishing feature.

With regards to Stocker, the Examiner alleges Stocker teaches "GIMR 300 determining a message control node 210 to send a general information message 220 to MSS 110," "if the cell serving mobile station in part of the served area 195, the step 430 is entered," "determining if the served area ... associated with the MS 100," "routing the update message to the node having determined node type," and "sending general message

invocation .... to determined message control nod." (Final Office Action, pp. 4-5.) However, the Examiner does not use Stocker to disclose, nor does it teach or suggest, at least the above-noted distinguishing features of claims 26, 33, 39, 45, 51, and 57. Therefore, Stocker does not cure the deficiencies of Chandra.

With regards to Trenbeath, the Examiner alleges Trenbeath teaches "subscribed clients C, D, E receives [sic] update data, attached data object in update messages from a publishing client A." (Final Office Action, p. 5.) However, the Examiner does not use Trenbeath to disclose, nor does it teach or suggest, at least the above-noted distinguishing features of claims 26, 33, 39, 45, 51, and 57. Therefore, Trenbeath does not cure the deficiencies of Chandra and Stocker.

Thus, as neither Stocker nor Trenbeath cures the deficiencies of Chandra, the applied references cannot be used to establish a prima facie case of obviousness.

Accordingly, Appellants respectfully request reconsideration and withdrawal of the rejection of independent claims 26, 33, 39, 45, 51, and 57, and they be found allowable over the applied references. Also, dependent claims 28, 34, 42-44, 48-50, 54-56, 60-62, 67, and 68 are allowable for at least the same reasons as independent claims 26, 33, 39, 45, 51, and 57 are allowable, and further for their own respective features.

### *C. Campbell does not cure the deficiencies of Chandra, Stocker, and Trenbeath*

The Examiner rejected claims 29-31 and 35-38 under 35 U.S.C. § 103(a) as allegedly being unpatentable over Chandra in view of Stocker, further in view of Trenbeath, and in further view of Campbell.

Dependent claims 29-31 and 35-38 are allowable at least because they recite all of the features of independent claims 26 and 33, from which they depend. As discussed above, the combination of Chandra, Stocker, and Trenbeath fails to disclose all of the features of claims 26 and 33.

The Examiner alleges Campbell teaches "causing the node to determine at least one client proxy with which the client communicates; causing the node to route to the client proxy; and causing the client proxy to rout the data to the client to determine the connection," "client information is extracted and replaced with predetermined substitute information at server proxy which is considered as a client proxy," and "wherein the node is configured to determine a connection by determining at least one client proxy with which the registered client communicates and to route the data to the client proxy." (Final Office Action, pp. 30-34). Appellants disagree. However, the Examiner does not use Campbell to disclose, nor does it teach or suggest, at least the above-noted distinguishing features of claims 26 and 33. Therefore, as Campbell does not cure the deficiencies of Chandra, Stocker, and Trenbeath, the applied references cannot be used to establish a prima facie case of obviousness for claims 26 and 33.

Accordingly, at least based on their respective dependency to claim 26 and 33, claims 29-31 and 35-38 should be found allowable over the applied references, as well as for their additional distinguishing features.

### *D. Freeman does not cure the deficiencies of Chandra, Stocker, and Trenbeath*

The Examiner rejected claims 40, 41, 46, 47, 52, 53, 58, and 59 under 35 U.S.C. § 103(a) as allegedly being unpatentable over Chandra in view of Stocker, further in view of Trenbeath, and in further view of Freeman.

Dependent claims 40, 41, 46, 47, 52, 53, 58, and 59 are allowable at least because they recite all of the features of independent claims 39, 45, 51, and 57, from which they depend. As discussed above, the combination of Chandra, Stocker, and Trenbeath fails to disclose all of the features of claims 39, 45, 51, and 57.

The Examiner alleges Freeman teaches "wherein providing the data representation to the client device includes providing the live object that causes the client device to register with a client proxy of the routing network," "wherein providing the data representation to the client device includes providing the live object that causes the client device to register with the node of the routing network," "wherein the live object of the data representation is configured to cause the client device to register with a client proxy of the routing network," and "wherein the live object of the data representation is configured to cause the client device to register with the node of the routing network." (Final Office Action, on pages 35-38.) Appellants disagree. However, the Examiner does not use Freeman to disclose, nor does it teach or suggest, at least the above-noted distinguishing features of claims 39, 45, 51, and 57. Therefore, as Freeman does not cure the deficiencies of Chandra, Stocker, and Trenbeath, the applied references cannot be used to establish a prima facie case of obviousness for claims 39, 45, 51, and 57.

Accordingly, at least based on their respective dependency to claim 39, 45, 51, and 57, claims 40, 41, 46, 47, 52, 53, 58, and 59 should be found allowable over the applied references, as well as for their additional distinguishing features.

*E.* ***Chandra and Stocker do not teach or suggest at least the claimed category of an updated message is identified based on the input source as respectively recited in claims 63, 64, and 66***

The Examiner maintained the rejections of claims 63, 64, and 66 under 35 U.S.C. § 103(a) as allegedly being unpatentable over Chandra in view of Stocker. (Final Office Action, pp. 38-44; Advisory p, 2.)

Independent claims 63, 64, and 66 recite features that distinguish over the applied references. For example, independent claim 63 recites, *inter alia*, (emphasis added):

> wherein in response to determining that the client device is registered to receive update data for the live object, ***causing a category of the update message to be identified <u>based on the input source</u>***, a node type associated with the category be determined, and the update message be routed from the gateway device to a node having the node type at the routing network, and causing the node to route the update message to the client device.

Further, independent claim 64 recites, *inter alia*, (emphasis added):

> wherein the routing network is configured to ***identify a category of the update message <u>based on the input source</u>***, determine a node type associated with the category, and to route the update message from a gateway device at the routing network to a node having the node type at the routing network, and wherein the node is configured to route the update message to the client device if the client device is registered to receive the update data for the live object.

Also, independent claim 66 recites, *inter alia*, (emphasis added):

> wherein ***a category of the update message is identified based on the input source***, a node type associated with the category is determined, and the update message is routed from a gateway device at the routing network to a node having the node type at the routing network, wherein the update message is routed from the node to the client device in response to a determination that the client device is registered to receive the update data for the live object.

The Examiner again relies on Chandra to allegedly teach the above-noted distinguishing features. (Final Office Action, pp. 38-44.) Appellant disagrees for reasons similar to those discussed above. While these claims recite different distinguishing features, i.e., an updated message is identified based on the input source, the reference relied upon by the Office, Chandra, merely teaches using a category/topic of message content. Thus, for similar reasons as discussed above with respect to independent claims 26, 33, 39, 45, 51, and 57, Chandra and Stocker, taken alone or in combination, fail to disclose at least the above-noted distinguishing features of claims 63, 64, and 66. Applicants therefore respectfully request the reconsideration and withdrawal of the rejection of claims 63, 64, and 66 under 35 U.S.C. § 103(a).

### *F. Conclusion*

Therefore, as the Office has failed to show the applied references teach at least the claimed identifying a category of the update message based on the input source *or* an updated message is identified based on the input source, Appellants respectfully request that the Board reverse the Office's final rejection of claims 26, 28-31, 33-64, and 66-68, and remand this application for allowance of claims 26, 28-31, 33-64, and 66-68.

Respectfully submitted,

STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

Jason D. Eisenberg
Attorney for Appellants
Registration No. 43,447

Date: 5/31/12

1100 New York Avenue, N.W.
Washington, D.C. 20005-3934
(202) 371-2600
1532103_2.docx

## V. *Claims Appendix (37 C.F.R. § 41.37(c)(i)(v))*

1-25. (Cancelled)

26. A method comprising:

receiving, using a processing device, an update message from an input source, the update message identifying a live object and containing data for updating a property of the live object;

identifying a category of the update message based on the input source;

determining a node having a node type to which the update message is to be routed based on a mapping of categories of update messages to node types, the mapping controlling an amount of update message traffic through nodes of a routing network;

routing, using the processing device, the update message to the node having the determined node type;

causing the node, through the update message, to determine a client, different from the input source, that has registered for updates of the live object;

causing the node to route the update message from the node to the client; and

causing the client to process the update message and to update the property of the live object.

27. (Cancelled)

28. The method of claim 26, further comprising:

causing the node to extract an object ID from the update message, to establish a connection with the client, and to determine if the client has registered for updates of the live object based on the object ID.

29. The method of claim 28, further comprising:

causing the node to determine at least one client proxy with which the client communicates;

causing the node to route the update message to the client proxy; and

causing the client proxy to route the update message to the client to determine the connection.

30. The method of claim 29, further comprising causing the node to maintain client registration information concerning the client connection.

31. The method of claim 29, further comprising causing the node to maintain client registration information concerning the client connection at the client proxy.

32. (Cancelled)

33. A routing network comprising:

a gateway device configured to:

receive an update message from an input source, the update message identifying a live object and containing data for updating a property of the live object,

identify a category of the update message based on the input source;

determine a node having a node type to which the update message is to be routed based on a mapping of a categories of update messages to node types, the mapping controlling an amount of update message traffic through nodes of a routing network; and

route the update message; and

the node configured to:

receive the update message from the gateway device, wherein the node is configured to be mapped to the node type,

determine a client, different from the input source, that has registered for updates of the live object, and

route the update message from the node to the client, wherein the client is adapted to process the update message and to update the property of the live object.

34. The routing network of claim 33, wherein the node is configured to extract an object ID from the update message and to determine a connection to the client to route the data to the client.

35. The routing network of claim 34, wherein the node is configured to determine the connection by determining at least one client proxy with which the client communicates and to route the update message to the client proxy.

36. The routing network of claim 35, wherein client registration information concerning the client connection is configured to be maintained at the node.

37. The routing network of claim 35, wherein client registration information concerning the client connection is configured to be maintained at the client proxy.

38. The routing network of claim 33, wherein:

the gateway device is configured to route the update message to the node adapted to receive messages of more than one message category, and

the node is configured to determine a connection with at least one client proxy with which the client communicates and to route the data to the client proxy.

39. A method comprising:

providing, using a processing device of an input source, a data representation to a client device, different from the input source, coupled to a routing network, wherein the data representation includes at least one live object recognizable by the client device, and causing the client device to respond to the live object of the data representation by determining an object ID of the live object and to register for updates of the live object with the routing network, such that registering the client device with the routing network provides client connection information to a node in the routing network; and

sending, using the processing device of the input source, an update message to the routing network, wherein the update message identifies the live object and contains update data that updates a property of the live object,

wherein a gateway device at the routing network is configured to identify a category of the update message based on the input source, to determine a node type to which the

identified category maps, and to route the update message to the node, having the node type, at the routing network,

wherein the node is configured to identify the client device as a registered device and to route the update message to the client device, and

wherein the client device processes the update message upon receipt to update the property of the live object at the client device.

40. The method of claim 39, wherein providing the data representation to the client device includes providing the live object that causes the client device to register with a client proxy of the routing network.

41. The method of claim 39, wherein providing the data representation to the client device includes providing the live object that causes the client device to register with the node of the routing network.

42. The method of claim 39, wherein providing the data representation to the client device includes providing an activation module that is executed by the client device and that registers the live object with the routing network.

43. The method of claim 42, wherein providing the activation module includes providing the activation module that is configured to determine a node type that handles registration and that causes the client device to register with the node corresponding to the node type.

44. The method of claim 42, wherein providing the activation module includes providing the activation module that is configured to determine a message category of the data representation and that causes the client device to register with a node having a node type corresponding to the message category.

45. An apparatus comprising:

an input source device configured to provide a data representation to a client device, different from the input source, coupled to a routing network, wherein the data

representation includes at least one live object that is recognizable by the client device, and that causes the client device to determine an object ID of the live object to register for updates of the live object with the routing network, such that registering the client device with the routing network provides client connection information to the routing network,

wherein the input source device is configured to route an update message to the routing network, wherein the update message identifies the live object and contains update data for updating a property of the live object,

wherein a gateway device at the network is configured to identify a category of the update message based on the input source, to determine a node type to which the identified category maps, and to route the update message to a node of the node type at the routing network,

wherein the node is configured to identify the client device as a registered device and route the update message containing the update data to the client device, and

wherein the client device is configured to process the update message upon receipt to update the property of the live object at the client device.

46. The apparatus of claim 45, wherein the live object of the data representation is configured to cause the client device to register with a client proxy of the routing network.

47. The apparatus of claim 45, wherein the live object of the data representation is configured to cause the client device to register with the node of the routing network.

48. The apparatus of claim 45, wherein the received data representation includes an activation module that is configured to be executed by the client device and adapted to register the live object with the routing network.

49. The apparatus of claim 48, wherein the activation module is configured to determine a node type for handling registration and to cause the client device to register with the node of the node type.

50. The apparatus of claim 48, wherein the activation module determines a message category of the data representation and causes the client device to register with the node having a node type corresponding to the message category.

51. An article of manufacture including a computer-readable storage medium having instructions stored thereon, execution of which by a computing device causes the computing device to perform operations comprising:

providing, using a processing device of an input source, a data representation to a client device, different from the input source, coupled to a routing network, wherein the data representation includes at least one live object that is recognizable by the client device, and that causes the client device to respond to the live object by determining an object ID of the live object to register for updates of the live object with the routing network, such that registering the client device with the routing network provides client connection information to the routing network; and

sending, using the processing device of the input source, an update message to the routing network, wherein the update message identifies the live object and contains update data for updating a property of the live object,

wherein a gateway device at the routing network is configured to identify a category of the update message based on the input source, to determine a node type to which the identified category maps, and to route the update message to a node of the node type at the routing network,

wherein the node is configured to identify the client device as a registered device and to route the update message to the client device, and

wherein the client device is configured to process the update message upon receipt to update the property of the live object at the client device.

52. The article of manufacture of claim 51, wherein the live object of the data representation causes the client device to register with a client proxy of the routing network.

53. The article of manufacture of claim 51, wherein the live object of the data representation causes the client device to register with the node of the routing network.

54. The article of manufacture of claim 51, wherein the received data representation includes an activation module executed by the client device and adapted to register the live object with the routing network.

55. The article of manufacture of claim 54, wherein the activation module determines a node type that handles registration and causes the client device to register with the node of the node type.

56. The article of manufacture of claim 54, wherein the activation module determines a message category of the data representation and causes the client device to register with the node having a node type corresponding to the message category.

57. A non-transitory computer readable storage medium having instructions stored thereon, the instructions comprising:

instructions for providing a data representation to a client device coupled to a routing network, wherein the data representation includes at least one live object recognizable by the client device, and wherein the client device is configured to respond to the live object of the data representation by determining an object ID of the live object to register for updates of the live object with the routing network, such that registering the client device with the routing network provides client connection information to the routing network; and

instructions for providing, using a processing device of an input source, different from the client device, an update message to the routing network, wherein the update message identifies the live object and contains update data for updating a property of the live object,

wherein a gateway device at the routing network is configured to identify a category of the update message based on the input source, to determine a node type to which the identified category maps, and to route the update message to a node of the node type at the routing network,

wherein the node is configured to identify the client device as a registered device and to route the update message containing the update data to the client device, and

wherein the client device is configured to process the update message upon receipt to update the property of the live object at the client device.

58. The non-transitory computer readable storage medium of claim 57, wherein the live object of the data representation causes the client device to register with a client proxy of the routing network.

59. The non-transitory computer readable storage medium of claim 57, wherein the live object of the data representation causes the client device to register with the node of the routing network.

60. The non-transitory computer readable storage medium of claim 57, wherein the data representation includes an activation module that is executed by the client device and that is adapted to register the live object with the routing network.

61. The non-transitory computer readable storage medium of claim 60, wherein the activation module determines a node type for handling registration and causes the client device to register with the node of the node type.

62. The non-transitory computer readable storage medium of claim 60, wherein the activation module determines a message category of the data representation and causes the client device to register with the node having the node type corresponding to the message category.

63. A method comprising:

providing a live object to a client device;

sending, using a processing device of an input source, different from the client device, an update message to a routing network identifying the live object and containing update data to update the live object at the client device,

wherein in response to determining that the client device is registered to receive update data for the live object, causing a category of the update message to be

identified based on the input source, a node type associated with the category be determined, and the update message be routed from the gateway device to a node having the node type at the routing network, and causing the node to route the update message to the client device.

64. An apparatus comprising:

an input source arranged to provide a live object to a client device, different from the input source; and

the input source arranged to provide an update message to a routing network identifying the live object and containing update data for updating the live object,

wherein the routing network is configured to identify a category of the update message based on the input source, determine a node type associated with the category, and to route the update message from a gateway device at the routing network to a node having the node type at the routing network, and wherein the node is configured to route the update message to the client device if the client device is registered to receive the update data for the live object.

65. (Cancelled)

66. A non-transitory computer readable storage medium having instructions stored thereon, the instructions comprising:

instructions for providing a live object to a client device; and

instructions for providing an update message from an input source, different from the client device, to a routing network identifying the live object and containing update data for updating the live object at the client device,

wherein a category of the update message is identified based on the input source, a node type associated with the category is determined, and the update message is routed from a gateway device at the routing network to a node having the node type at the routing network, wherein the update message is routed from the node to the client device in response to a determination that the client device is registered to receive the update data for the live object.

67. The routing network of claim 33, wherein the node type is configured to identify the node that receives the update message from the gateway device.

68. The method of claim 26, wherein the property of the live object has a direct effect on a visual representation of the live object in a data representation, has an effect on an internal aspect of the live object and has no effect on the visual representation of the live object in the data representation, or has a direct effect on one aspect of the visual representation of the live object in the data representation and has no effect on other aspect of the visual representation of the live object in the data representation.

# EXHIBIT A-9

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re application of: | Confirmation No.: 1129 |
| Tuttle *et al.* | Art Unit: 2194 |
| Appl. No.: 11/396,251 | Examiner: DAO, TUAN C. |
| Filed: March 30, 2006 | Atty. Docket: 2222.775000E |
| For: **Asynchronous Messaging Using a Node Specialization Architecture in the Dynamic Routing Network** | |

## Amendment and Reply Under 37 C.F.R. § 1.111

***Mail Stop Amendment***

Commissioner for Patents
PO Box 1450
Alexandria, VA 22313-1450

Sir:

In reply to the Non-Final Office Action dated January 19, 2010, Applicants submit the following Amendment and Remarks.

It is not believed that extensions of time or fees for net addition of claims are required beyond those that may otherwise be provided for in documents accompanying this paper. However, if additional extensions of time are necessary to prevent abandonment of this application, then such extensions of time are hereby petitioned under 37 C.F.R. § 1.136(a), and any fees required therefor (including fees for net addition of claims) are hereby authorized to be charged to our Deposit Account No. 19-0036.

## *Amendments to the Claims*

This listing of claims will replace all prior versions, and listings, of claims in the application.

1-25. (canceled)

26. (Currently Amended) A method ~~for providing dynamic content over a network, the method~~ comprising:

receiving, using a processing device, an update message ~~from an input source, the update message~~ identifying a live object and containing data for updating a property of the live object;

~~identifying, using the processing device, a category of the update message;~~

identifying, using the processing device, a mapping of [[the]] a category of the update message to a node type; and

routing, using the processing device, the update message to a node having the ~~mapped~~ node type, [[; and]]

causing the node, through the update message, to determine ~~determining, using the processing device,~~ a client that has registered for updates of the live object and ~~routing~~ causing the node to route the data from the node to the client, and

~~wherein~~ causing the client ~~is adapted~~ to process ~~the update~~ the data and to update the property of the live object.

27. (Cancelled)

28. (Currently Amended) The method of claim 26, ~~wherein~~ further comprising causing the node ~~determining a client comprises extracting~~ to extract an object ID from the update message and ~~determining~~ to establish a connection to the client to determine the client that has registered for updates of the live object.

29. (Currently Amended) The method of claim 28, ~~wherein determining a connection comprises determining~~ further comprising causing the node to determine at

least one client proxy with which the client communicates, [[and]] ~~routing~~ to route the data to the client proxy, and ~~then routing~~ to route the data from the client proxy to the client to determine the connection.

30. (Currently Amended) The method of claim 29, ~~wherein~~ further comprising causing the node to maintain client registration information concerning the client connection. ~~is maintained at the node.~~

31. (Currently Amended) The method of claim 29, further comprising causing the node to maintain ~~wherein~~ client registration information concerning the client connection ~~is maintained~~ at the client proxy.

32. (Currently Amended) The method of claim 28, wherein:

the routing the update message comprises routing the update message to a proxy node comprising a second node ~~that is adapted to receive~~ receiving messages of more than one message category, [[;]] and

further comprising causing the node ~~determining a connection comprises determining~~ to determine at least one corresponding node having a corresponding node type ~~that is~~ mapped to the message category, with which the registered client communicates, and ~~routing~~ to route the data to the corresponding node to determine the connection.

33. (Currently Amended) A routing network ~~for enabling dynamic updating of a property of a live object at a client coupled to the network, the routing network~~ comprising:

a gateway device ~~that receives~~ configured to:

receive~~, using a processing device,~~ an update message ~~from an input source, the update message~~ identifying a live object and containing data for updating a property of the live object, ~~wherein the gateway identifies a category of the update message, identifies~~

identify a mapping of [[the]] a category of the update message to a node type, and routes

route the update message; and in accordance with the identified mapping; and

routing means for determining a node device configured to:

receive the update message from the gateway device, wherein the node device is configured to be mapped to the node type,

determine, using the processing device, a client that has registered for updates of the live object, and routing

route the data from [[a]] the node device that has received the routed update message to the registered client, wherein the registered client is adapted to process the data and to update the property of the live object.

34. (Currently Amended) The routing network of claim 33, wherein the routing means node device is configured to extract extracts an object ID from the update message and to determine determines a connection to the registered client for routing to route the data to the registered client.

35. (Currently Amended) The routing network of claim 34, wherein the routing means node device is configured to determine determines a connection by determining at least one client proxy with which the registered client communicates[[,]] and then routing to route the data to the client proxy.

36. (Currently Amended) The routing network of claim 35, wherein client registration information concerning the client connection is configured to be maintained at the node device.

37. (Currently Amended) The routing network of claim 35, wherein client registration information concerning the client connection is configured to be maintained at the client proxy.

38. (Currently Amended) The routing network of claim 33, wherein:

the gateway device is configured to ~~routs~~ route the update message by routing the update message to a proxy node comprising a second node ~~that is~~ adapted to receive messages of more than one message category, [[;]] and

~~the routing means~~ the node device is configured to determine ~~determines~~ at least one corresponding node that has a corresponding node type mapped to the message category and with which the registered client communicates[[,]] and ~~then routing~~ to route the data to the corresponding node.

39. (Currently Amended) A ~~computer~~ method ~~for providing dynamic content over a network, the method~~ comprising:

providing, using a processing device, a data representation to a client device coupled to [[the]] a network, wherein the data representation includes at least one live object ~~that is~~ recognized by the client device, and ~~wherein~~ causing the client device ~~responds~~ to respond to the live object of the data representation by determining an object ID of the live object and to register for updates of the live object with a routing network, such that registering the client device with the ~~routing~~ network provides client connection information to the routing network; [[and]]

sending, using the processing device, an update message to the ~~routing~~ network, wherein the update message identifies the live object and contains update data that updates a property of the live object, such that a gateway device at the ~~routing~~ network ~~has sufficient information~~ is configured to identify the client device as a registered device and to send a routed message containing the update data from the gateway device to a node;

causing the node to send the routed message to the client device; ~~, such that~~ and

causing the client device ~~processes~~ to process the routed message upon receipt to update the property of the live object at the client device.

40. (Currently Amended) The method of claim 39, wherein providing the data representation to the client device includes providing a [[the]] live object ~~of the data representation~~ that causes the client device to register with a client proxy of the network.

41. (Currently Amended) The method of claim 39, wherein providing the data representation to the client device includes providing a [[the]] live object ~~of the data representation~~ that causes the client device to register with a node of the network.

42. (Currently Amended) The method of claim 39, wherein providing the data representation to the client device including providing ~~the received data representation includes~~ an activation module that is executed by the client device and ~~is adapted to register~~ that registers the live object with the ~~routing~~ network.

43. (Currently Amended) The method of claim 42, wherein providing the activation module includes providing an activation module that is configured to determine ~~determines~~ a node type that handles registration and that causes the client device to register with a node ~~of the determined registration~~ corresponding to the node type.

44. (Currently Amended) The method of claim 42, wherein providing the activation module ~~determines~~ includes providing an activation module that is configured to determine a message category of the data representation and that causes the client device to register with a node having a node type corresponding to the message category.

45. (Currently Amended) An apparatus ~~for providing dynamic content over a network, the apparatus~~ comprising:

a content provider device configured to provide ~~that provides, using a processing device,~~ a data representation to a client device coupled to the network, wherein the data representation includes at least one live object that is recognized by the client device, and that causes ~~wherein~~ the client device to determine ~~responds to the live object of the data representation by determining~~ an object ID of the live object to register for updates of the live object with ~~a routing~~ the network, such that registering the client device with the ~~routing~~ network provides client connection information to the ~~routing~~ network; and

an information provider device ~~that sends, using the processing device,~~ configured to send an update message to the ~~routing~~ network, wherein the update

message identifies the live object and contains update data ~~that updates~~ for updating a property of the live object, such that a gateway device at the routing network ~~has sufficient information~~ is configured to identify the client device as a registered device and to send a routed message from the gateway device to a node,

wherein the node is configured to send the routed message containing the update data to the client device, ~~such that~~ and

wherein the client device is configured to process ~~processes~~ the routed message upon receipt to update the property of the live object at the client device.

46. (Currently Amended) The apparatus of claim 45, wherein the live object of the data representation is configured to cause ~~causes~~ the client device to register with a client proxy of the network.

47. (Currently Amended) The apparatus of claim 45, wherein the live object of the data representation is configured to cause ~~causes~~ the client device to register with a node of the network.

48. (Currently Amended) The apparatus of claim 45, wherein the received data representation includes an activation module that is configured to be executed by the client device and [[is]] adapted to register the live object with the routing network.

49. (Currently Amended) The apparatus of claim 48, wherein the activation module is configured to determine ~~determines~~ a node type ~~that handles~~ for handling registration and to cause ~~causes~~ the client device to register with a node of the ~~determined registration~~ node type.

50. (Previously Presented) The apparatus of claim 48, wherein the activation module determines a message category of the data representation and causes the client device to register with a node having a node type corresponding to the message category.

51. (Currently Amended) [[A]] An article of manufacture including a ~~tangible~~ computer-readable medium having ~~stored thereon computer-executable~~ instructions ~~for providing dynamic content over a network~~ stored thereon, an execution of which by a computing device causes the computing device to perform operations ~~that, if executed by a computing device, cause the computing device to perform a method~~ comprising:

providing, using a processing device, a data representation to a client device coupled to [[the]] a network, wherein the data representation includes at least one live object that is recognized by the client device, and ~~wherein~~ that causes the client device ~~responds~~ to respond to the live object ~~of the data representation~~ by determining an object ID of the live object to register for updates of the live object with ~~a routing~~ the network, such that registering the client device with the ~~routing~~ network provides client connection information to the ~~routing~~ network; and

sending, using the processing device, an update message to the ~~routing~~ network, wherein the update message identifies the live object and contains update data ~~that updates~~ for updating a property of the live object, such that a gateway device at the ~~routing~~ network ~~has sufficient information~~ is configured to identify the client device as a registered device and to send a routed message containing the update data from the gateway device to a node, wherein the node sends the routed message to the client device, and ~~such that~~ wherein the client device ~~processes~~ is configured to process the routed message upon receipt to update the property of the live object at the client device.

52. (Currently Amended) The ~~computer-readable medium~~ article of manufacture of claim 51, wherein the live object of the data representation causes the client device to register with a client proxy of the network.

53. (Currently Amended) The ~~computer-readable medium~~ article of manufacture of claim 51, wherein the live object of the data representation causes the client device to register with a node of the network.

54. (Currently Amended) The ~~computer-readable medium~~ article of manufacture of claim 51, wherein the received data representation includes an activation module ~~that is~~

executed by the client device and [[is]] adapted to register the live object with the routing network.

55. (Currently Amended) The computer-readable medium article of manufacture of claim 54, wherein the activation module determines a node type that handles registration and causes the client device to register with a node of the determined registration node type.

56. (Currently Amended) The computer-readable medium article of manufacture of claim 54, wherein the activation module determines a message category of the data representation and causes the client device to register with a node having a node type corresponding to the message category.

57. (Currently Amended) A device for providing dynamic content over a network, the device comprising:

logic configured to provide, using a processing device, a data representation to a client device coupled to the network, wherein the data representation includes at least one live object that is recognized by the client device, and wherein the client device responds is configured to respond to the live object of the data representation by determining an object ID of the live object to register for updates of the live object with a routing network, such that registering the client device with the routing network provides client connection information to the routing network; and

logic configured to provide, using [[the]] a processing device, an update message to the routing network, wherein the update message identifies the live object and contains update data that updates for updating a property of the live object, such that a gateway device at the routing network has sufficient information is configured to identify the client device as a registered device and to send a routed message from the gateway device to a node, wherein the node is configured to send the routed message containing the update data to the client device, such that and wherein the client device processes is configured to process the routed message upon receipt to update the property of the live object at the client device.

58. (Previously Presented) The device of claim 57, wherein the live object of the data representation causes the client device to register with a client proxy of the network.

59. (Previously Presented) The device of claim 57, wherein the live object of the data representation causes the client device to register with a node of the network.

60. (Currently Amended) The device of claim 57, wherein the ~~received~~ data representation includes an activation module that is executed by the client device and that is adapted to register the live object with the ~~routing~~ network.

61. (Currently Amended) The device of claim 60, wherein the activation module determines a node type ~~that handles~~ for handling registration and causes the client device to register with a node of the ~~determined registration~~ node type.

62. (Previously Presented) The device of claim 60, wherein the activation module determines a message category of the data representation and causes the client device to register with a node having a node type corresponding to the message category.

63. (Currently Amended) A method comprising:

providing~~, using a processing device,~~ a live object to a client device;

sending~~, using the processing device,~~ an update message to a ~~routing~~ network~~, the update message~~ identifying the live object and containing update data to update the live object at the client device; and

in response to determining that [[if]] the client device is registered to receive update data for the ~~identified~~ live object, sending a routed message containing the update data ~~, using the processing device,~~ from a gateway device at the ~~routing~~ network to a node, wherein the node sends the routed message to the client device. ~~a routed message containing the update data to the client device.~~

64. (Currently Amended) An apparatus ~~that provides dynamic content, the apparatus~~ comprising:

a content provider arranged to provide a live object to a client device; and

an information provider arranged to provide an update message to a ~~routing~~ network~~, the update message~~ identifying the live object and containing update data ~~to update~~ <u>for updating</u> the live object,

wherein the ~~routing~~ network ~~is arranged to send~~ <u>is configured to send</u> a routed message containing the update data <u>from a gateway device at the network to a node, and wherein the node is configured to send the routed message</u> to the client device if the client device is registered to receive <u>the</u> update data for the ~~identified~~ live object.

65. (Currently Amended) A tangible computer-readable ~~storage~~ medium having ~~stored thereon computer-executable~~ instructions ~~for providing dynamic content over a network~~ <u>stored thereon</u>, ~~that if executed by a computing device, cause the computing device to perform a method~~ <u>the instructions</u> comprising:

<u>instructions to provide</u> ~~providing~~, using a processing device, a live object to a client <u>device</u>;

<u>instructions to send</u> ~~sending~~, using the processing device, an update message to a ~~routing~~ network~~, the update message~~ identifying the live object and containing update data ~~to update~~ <u>for updating</u> the live object; and

~~if the client device is registered to receive update data for the identified live object, sending~~ <u>instructions to cause</u>, using the processing device <u>and in response to determining that the client device is registered to receive update data for the live object</u>, ~~from the routing network~~ a routed message <u>to be sent from a gateway device at the network to a node, wherein the node is configured to send the routed message</u> containing the update data to the client device.

66. (Currently Amended) A device ~~for providing dynamic content, the device~~ comprising:

logic configured to provide a live object to a client <u>device</u>;

logic configured to provide an update message to a ~~routing~~ network~~, the update message~~ identifying the live object and containing update data ~~to update~~ for updating the live object at the client device; and

logic configured to send a routed message containing the update data from a gateway device at the network to a node, wherein the node is configured to send the routed message to the client device in response to determining that [[if]] the client device is registered to receive the update data for the ~~identified~~ live object.

67. (New) The routing network of claim 33, wherein the node type is configured to identify the node that receives the update message from the gateway device.

## *Remarks*

Reconsideration of this Application is respectfully requested.

Upon entry of the foregoing amendment, claims 26 and 28-67 are pending in the application, with claims 26, 33, 39, 45, 51, 57, and 63-66 being the independent claims. Claim 27 is sought to be cancelled, and claims 1-25 were previously cancelled, without prejudice to or disclaimer of the subject matter therein. Claims 26, 28, 29-49, 51-57, 60, 61, and 63-66 are sought to be amended. New claim 67 is sought to be added. Applicants reserve the right to prosecute similar or broader claims, with respect to any cancelled and amended claims, in the future. These changes are believed to introduce no new matter, and their entry is respectfully requested.

Based on the above amendment and the following remarks, Applicants respectfully request that the Examiner reconsider all outstanding rejections and that they be withdrawn.

### *Statement of Substance of Examiner Interview*

Applicants respectfully thank the Examiner for extending the courtesy of a telephone interview on March 5, 2010, with Applicants' representatives Jason Eisenberg and William Ladd. In the interview, Applicants' representatives discussed why the claims distinguished over the applied references. No final agreement was reached.

### *Rejection under 35 U.S.C. § 101*

At page 2 of the Office Action, the Examiner rejected claims 57-62, 64, and 66 under 35 U.S.C. § 101 as allegedly being directed to non-statutory subject matter. Applicants respectfully traverse this rejection.

Without acquiescing to the propriety of the rejection, claims 57, 64, and 66 have been clarified and recite statutory subject matter. For example, claims 57, 64, and 66 recite, *inter alia*, a "client device," and claim 57 recites, *inter alia*, a "processing device."

Accordingly, Applicants respectfully request that the Examiner reconsider and withdraw the 35 U.S.C. § 101 rejection of claims 57, 64, and 66 and pass these claims to allowance. Additionally, claims 58-62 depend from claim 57, so the revisions and comments directed to claim 57 apply equally to claims 58-62.

***Rejection under 35 U.S.C. § 102***

At page 4 of the Office Action, the Examiner rejected claims 26-28, 33-34, 39, 42-45, 48-51, 54-57, and 60-66 under 35 U.S.C. § 102(e) as being allegedly anticipated by U.S. Patent Number 6,324,587 to Trenbeath *et al.* ("Trenbeath"). Applicants respectfully traverse this rejection.

**Claim 26**

The applied references do not support a 35 U.S.C. § 102(e) rejection of claim 26. For example, claim 26 recites, *inter alia*, "identifying, using the processing device, a ***mapping of a category of the update message to a node type***; and ***routing, using the processing device, the update message to a node having the node type***" (emphasis added).

At page 5 of the Office Action the Examiner states, to which Applicants do not acquiesce, that Trenbeath teaches "identifying, using the processing device, a mapping of the category to a node type" because "blocks 402, 406, and 410 [of FIG. 14 are] associated with blocks 404, 408, and 412 respectively." Applicants respectfully disagree.

In Trenbeath, "FIG. 14 . . . illustrate[s] the high-level steps taken by a subscription client in processing messages received from a publication client and high level events . . . [i]f an update message is detected at step 406, the subscription client will process the update message at step 408." (Trenbeath, col. 25, lines 16-36 and FIG. 14.)

However, Trenbeath does not disclose at least that the "subscription message" in Trenbeath is ***routed to*** the "high-level steps" in Trenbeath, as recited in claim 26. Rather, in Trenbeath, "an update message is sent to each subscription client." (Trenbeath, col. 25, lines 6 and 7.)

Also, the "client" in Trenbeath ("publication client" or "subscription client") does not disclose the "node type," as recited by claim 26, because, for example, Trenbeath does not teach at least a ***mapping of a category of the update message to*** a type of "client."

Thus, Trenbeath does not disclose at least "identifying, using the processing device, a mapping of a category of the update message to a node type; and routing, using

the processing device, the update message to a node having the node type," as recited by claim 26 (emphasis added). Rather, Trenbeath merely describes "message[s] detected" and "high-level steps" taken. (Trenbeath, col. 25, lines 16-36 and FIG. 14.)

Thus, for at least this reason, Trenbeath does not support a 35 U.S.C. § 102(e) rejection of claim 26.

**Claims 33, 39, 45, 51, 57, and 63-66**

Without acquiescing to the propriety of the rejection, claims 33, 39, 45, 51, 57, and 63-66 have been clarified to state features not disclosed by the applied references. For example, claim 33 recites, *inter alia*, "a ***gateway device*** configured to . . . route the update message . . . a ***node device*** configured to . . . ***receive*** the update message ***from the gateway device*** . . . and route the data ***from the node device to the client***," claims 39, 45, 51, and 57 recite, *inter alia*, "send a routed message containing the update data ***from the gateway device to a node . . . the node . . . send[s] the routed message . . . to the client device***," claim 65 recites, *inter alia*, "instructions to cause . . . ***a routed message to be sent from a gateway device at the network to a node, wherein the node is configured to send the routed message containing the update data to the client device***," and claims 63, 64, and 66 recite, *inter alia*, "send[ing] a routed message . . . ***from a gateway device at the network to a node, wherein the node . . . send[s] the routed message to the client device***" (emphasis added).

In Trenbeath, "the publication client would be software running on a personal computer operated by the grandparents and each family would operate subscription client software on computers in their home . . . [a] subscription client would submit, through email, the modified family information file to the publication client which would replace the previous copy of the file . . . [n]ext, the publication client would distribute the modified family information file to each of the subscription clients, again over email." (Trenbeath, col. 3, lines 13-25.)

Trenbeath states that ". . . the subscription client creates a subscription folder and sends a request message to the publication client in order to receive all the data objects for the subscription folder . . . [t]hese data objects are sent using update messages that contain the data objects as attachments . . . [a]t this point, the subscription folder is

current with the publication folder and will receive update messages as the state of the folder changes." (Trenbeath, col. 3, lines 39-46.)

Thus, Trenbeath does not disclose at least "a ***gateway device*** configured to . . . route the update message . . . a ***node device*** configured to . . . ***receive*** the update message ***from the gateway device*** . . . and route the data ***from the node device to the client***," as recited by claim 33, at least "send a routed message containing the update data ***from the gateway device to a node . . . the node . . . send[s] the routed message . . . to the client device***," as recited by claims 39, 45, 51, and 57, "instructions to cause . . . ***a routed message to be sent from a gateway device at the network to a node, wherein the node is configured to send the routed message containing the update data to the client device***," as recited by claim 65, or at least "send[ing] a routed message . . . ***from a gateway device at the network to a node, wherein the node . . . send[s] the routed message to the client device***," as recited by claims 63, 64, and 66. Rather, in Trenbeath, "the subscription client . . . receive[s] all the data objects" from "the publication client." (Trenbeath, col. 3, lines 39-46.)

Accordingly, Applicants respectfully request that the Examiner reconsider and withdraw the 35 U.S.C. § 102(e) rejection of claims 26, 33, 39, 45, 51, 57, and 63-66 and pass these claims to allowance. Additionally, at least based on their respective dependencies to claims 26, 33, 39, 45, 51, and 57, Applicants respectfully request allowance of claims 28, 34, 42-44, 48-50, 54-56, 60-62, as well as for their additional distinguishing features.

Without acquiescing to the propriety of the rejection, Applicants have cancelled claim 27, rendering the 35 U.S.C. § 102(e) rejection of claim 27 moot.

### *Rejections under 35 U.S.C. § 103*

#### Claims 29-32 and 35-38

At page 14 of the Office Action, the Examiner rejected claims 29-32 and 35-38 under 35 U.S.C. § 103(a) as being allegedly unpatentable over Trenbeath in view of U.S. Patent Number 7,209,959 to Campbell *et al.* ("Campbell"). Applicants respectfully traverse this rejection.

Claims 29-32 and 35-38 depend from claims 26 and 33, respectively. At page 15 of the Office Action the Examiner states that Campbell teaches "determining a connection comprises determining at least one client proxy with which the client communicates and routing the data to the client proxy, and then routing the data from the client proxy to the client." However, the Examiner does not use Campbell to teach at least the above noted distinguishing features of claims 26 and 33. Therefore, the applied references cannot be used to establish a prima facie case of obviousness for claims 26 and 33.

Accordingly, at least based on their respective dependencies to claims 26 and 33, Applicants respectfully request allowance of claims 29-32 and 35-38, as well as for their additional distinguishing features.

**Claims 40, 41, 46, 47, 52, 53, 58, and 59**

At page 17 of the Office Action, the Examiner rejected claims 40-41, 46-47, 52-53, and 58-59 under 35 U.S.C. § 103(a) as being allegedly unpatentable over Trenbeath in view of U.S. Patent Number 6,314,459 to Freeman ("Freeman"). Applicants respectfully traverse this rejection.

Claims 40, 41, 46, 47, 52, 53, 58, and 59 depend from claims 39, 45, 51, and 57, respectively. At page 18 of the Office Action the Examiner states, to which Applicants do not acquiesce, that Freeman teaches "wherein the live object of the data representation causes the client device to register with a client proxy of the network." However, the Examiner does not use Freeman to teach, nor does Freeman teach, at least the above noted distinguishing features of claims 39, 45, 51, and 57. Thus, Freeman cannot be used to cure the deficiencies of Trenbeath. Therefore, the applied references cannot be used to establish a prima facie case of obviousness for claims 39, 45, 51, and 57.

Accordingly, at least based on their respective dependencies to claims 39, 45, 51, and 57, Applicants respectfully request allowance of claims 40, 41, 46, 47, 52, 53, 58, and 59, as well as for their additional distinguishing features.

*New Claim 67*

New claim 67 depends from claim 33 and includes all features therein. Thus, at least based on its dependency to claim 33, Applicants respectfully request allowance of new claim 67, as well as for its additional distinguishing features.

## Conclusion

All of the stated grounds of rejection have been properly traversed, accommodated, or rendered moot. Applicants therefore respectfully request that the Examiner reconsider all presently outstanding rejections and that they be withdrawn. Applicants believe that a full and complete reply has been made to the outstanding Office Action. If the Examiner believes, for any reason, that personal communication will expedite prosecution of this application, the Examiner is invited to telephone the undersigned at the number provided.

Prompt and favorable consideration of this Amendment and Reply is respectfully requested.

Respectfully submitted,

STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

Glenn J. Perry
Attorney for Applicants
Registration No. 28,458

Date: 19 April 2010

1100 New York Avenue, N.W.
Washington, D.C. 20005-3934
(202) 371-2600

1073863_1.DOC

# EXHIBIT A-10

| Office Action Summary | Application No. | Applicant(s) |
|---|---|---|
| | 11/396,251 | TUTTLE ET AL. |
| | Examiner | Art Unit |
| | TUAN DAO | 2194 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE 3 MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on *26-66*.

2a)☐ This action is **FINAL**. 2b)☒ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) *26-66* is/are pending in the application.

4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) *26-66* is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.

Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

a)☐ All b)☐ Some * c)☐ None of:

1.☐ Certified copies of the priority documents have been received.

2.☐ Certified copies of the priority documents have been received in Application No. _____.

3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

* See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)

2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3) ☒ Information Disclosure Statement(s) (PTO/SB/08) Paper No(s)/Mail Date *01/08/2010 and 10/24/2009*.

4) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____ .

5) ☐ Notice of Informal Patent Application

6) ☐ Other: _____ .

## DETAILED ACTION

1. This communication is responsive to Amendment filed 10/03/2009.

2. Claims 26-66 have been examined.

### *Response to Amendment*

3. In the instant amendment, claims 26-62 have been amended. Claims 63-66 have been added.

- The objection to the specification is withdrawn in view of Applicant's amendments.
- The 35 USC §101 rejection over claims 33-38 and 51-56 is withdrawn in view of Applicant's amendments.

### *Claim Rejections - 35 USC § 101*

7. 35 U.S.C. 101 reads as follows:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

8. Claims 57-62, 64 and 66 are rejected under 35 U.S.C 101 because the claimed invention is directed to non-statutory subject matter.

9. Claim 57 is rejected under 35 U.S.C. 101 because the claimed invention is directed to non-statutory subject matter. Although the preamble of the claim recites *"A device,"* the body of the claim does not positively recite any elements of hardware. The body of the claim recites *'logic configured to provide.'* In light of the specification, the aforementioned logic is implemented in software (see e.g., paragraphs 0047, 0050 and 0062), which is non-statutory

subject matter. Therefore, the nature of the subject matter claimed may reasonably be construed as non-tangible embodiments.

Claims 58-62 have the same rejection.

10. Claim 64 is rejected under 35 U.S.C. 101 because the claimed invention is directed to non-statutory subject matter. Although the preamble of the claim recites "An apparatus" the body of the claim does not positively recite any elements of hardware. The rejected claims are directed to an apparatus which appears to be software per se. More specifically, in light of the specification (see e.g., paragraphs 0050 and 0062), the claimed apparatus is merely software which is non-statutory subject matter.

11. Claim 66 is not directed to eligible subject matter in view of **In re Comiskey**, 499 F.3d 1365 (Fed. Cir. 2007). Although the preamble of the claim recites "a device" the body of the claim does not positively recite any elements of hardware. The claim merely recites "logic configured to provide …" and "logic configured to send …" and does not positively recite any element of hardware or machine (e.g., a computer). Therefore, the nature of the subject matter claimed may reasonably be construed as non-tangible embodiments. See **In Re Bilski**, 88 USPQ2d 1385; see also **Diamond v. Diehr**, 450 U.S. 175, 184 (1981); **Parker v. Flook**, 473 U.S. 584, 588 n.9 (1978); **Gottschalk v. Benson**, 409 U.S. 63, 70 (1972); **Cochrane v. Deener**, 94 U.S. 780, 787-88 (1976)); The mere recitation of the machine in the preamble with an absence of a machine in the body of the claim fails to make the claim statutory under 35 USC 101.

***Claim Rejections - 35 USC § 102***

12. The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the basis for the rejections under this section made in this Office action:

A person shall be entitled to a patent unless –

(e) the invention was described in (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for purposes of this subsection of an application filed in the United States only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language.

13. Claims 26-28, 33-34, 39, 42-45, 48-51, 54-57 and 60-66 are rejected under 35 U.S.C. 102(e) as being anticipated by Trenbeath et al. (US 6,324,587, hereinafter "Trenbeath").

As per claim 26, Trenbeath discloses a method for providing dynamic content over a network, the method comprising:

receiving, using a processing device, an update message from an input source (FIG. 4; column 3: 40-50 and column 9: 20-35: an update message sent from subscription clients to publishing clients), the update message identifying a live object (FIG. 8; column 13: 40-65 – column 14:1-20: PublicationID) and containing data for updating a property of the live object (FIG. 4-5 and 13; column 3:45-50; column 9: 20-35; column 20: 15-45: update message updating/modifying/deleting data object);

identifying, using the processing device, a category of the update message (FIG. 7 and 14; column 25: types of an update message: block 404 message for updating subscription

list/client, block 408 message for updating content/data, block 412, message for updating/synchronizing state/data, …);

identifying, using the processing device, a mapping of the category to a node type (FIG. 7 and 14; column 13: 5-40 and column 25: blocks 402, 406 and 410 associated with blocks 404, 408 and 412 respectively);

routing, using the processing device, the update message to a node having the mapped node type (FIG. 14; column 25: depending on the condition, the message will be routed to block 404, 408 or 412);

and determining, using the processing device, a client that has registered for updates of the live object and routing the data to the client (FIG. 8; column 3:30-50, column 13 and 14: the client subscribes/registers topics and they are determined based on Subscription Client ID 213, Permissions 215, Subscriber Status 216, Flags 217,), wherein the client is adapted to process the update data and update the property of the live object (FIG. 5; column 9-10: subscribed clients C, D, E receives update data, attached data object in update messages from a publishing client A).

As per claim 27, Trenbeath discloses the method of claim 26, wherein determining a client and routing the data to the client are performed at the node (FIG. 6-7: columns 12-13).

As per claim 28, Trenbeath discloses the method of claim 26, wherein determining a client comprises extracting an object ID from the update message (FIG. 8; column 13: 40-65 – column 14:1-20) and determining a connection to the client (FIG. 8; column 13: 40-65 – column 14: 1-20: Store and Transport protocol).

As per claim 33, Trenbeath discloses a routing network for enabling dynamic updating of a property of a live object at a client coupled to the network, the routing network comprising:

a gateway that receives, using a processing device, an update message from an input source (FIG. 4; column 3: 40-50 and column 9: 20-35: an update message sent from subscription clients to publishing clients), the update message identifying a live object (FIG. 8; column 13: 40-65 – column 14:1-20: PublicationID) and containing data for updating a property of the live object (FIG. 4-5 and 13; column 3:45-50; column 9: 20-35; column 20: 15-45: update message updating/modifying/deleting data object), wherein the gateway identifies a category of the update message (FIG. 7 and 14; column 25: types of an update message: block 404 message for updating subscription list/client, block 408 message for updating content/data, block 412, message for updating/synchronizing state/data, …), identifies a mapping of the category to a node type (FIG. 7 and 14; column 13: 5-40 and column 25: blocks 402, 406 and 410 associated with blocks 404, 408 and 412 respectively), and routes the update message in accordance with the identified mapping (FIG. 14; column 25: depending on the condition, the message will be routed to block 404, 408 or 412); and

routing means for determining, using the processing device, a client that has registered for updates of the live object and routing the data from a node that has received the routed update message to the registered client (FIG. 8; column 3:30-50, column 13 and 14: the client subscribes/registers topics and they are determined based on Subscription Client ID 213, Permissions 215, Subscriber Status 216, Flags 217,), wherein the registered client is adapted to process the data and update the property of the live object (FIG. 5; column 9-10: subscribed

clients C, D, E receives update data, attached data object in update messages from a publishing client A).

As per claim 34, it is a routing network claim, which recite(s) the same limitations as those of claims 28, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 34.

As per claim 39, Trenbeath discloses a computer method for providing dynamic content over a network, the method comprising:

providing, using a processing device, a data representation to a client device coupled to the network (FIG. 4; column 3: 40-50 and column 9: 20-35: an update message sent from subscription clients to publishing clients), wherein the data representation includes at least one live object that is recognized by the client device (FIG. 8; column 13: 40-65 – column 14:1-20: PublicationID 208), and wherein the client responds to the live object of the data representation by determining an object ID of the live object (FIG. 8B, Publication ID 208 registered with Subscription Client ID 213) to register for updates of the live object with a routing network (FIG. 5E, column 3: 30-50 subscribed clients C, D, E receives update data, attached data object in update messages from a publishing client A,), such that registering the client with the routing network provides client connection information to the routing network (FIG. 8B, Permissions 215 of subscribed clients; Subscriber Status 216 including active, pending); and

sending, using the processing device, an update message to the routing network, wherein the update message identifies the live object (FIG. 8; column 13: 40-65 – column 14:1-20: PublicationID) and contains update data that updates a property of the live object (FIG. 4-5 and 13; column 3:45-50; column 9: 20-35; column 20: 15-45: update message updating/modifying/deleting data object) such that the routing network has sufficient information (FIG. 8; column 3:30-50, column 13 and 14: the client subscribes/registers topics and they are determined based on Subscription Client ID 213, Permissions 215, Subscriber Status 216, Flags 217) to identify the client device as a registered device and send a routed message containing the update data to the client device, such that the client device processes the routed message upon receipt to update the property of the live object at the client device (FIG. 5; column 9-10: subscribed clients C, D, E receives update data, attached data object in update messages from a publishing client A).

As per claim 42, Trenbeath discloses the method of claim 39, wherein the received data representation includes an activation module that is executed by the client device (FIG. 4, 14; column 9-10; column 25: 15-25: software located in both publication client and subscription client) and is adapted to register the live object with the routing network (FIG. 8; column 3:30-50, column 13 and 14: the client subscribes/registers topics and they are determined based on Subscription Client ID 213, Permissions 215, Subscriber Status 216, Flags 217,).

As per claim 43, Trenbeath discloses the method of claim 42, wherein the activation module determines a node type that handles registration and causes the client device to register

with a node of the determined registration node type (FIG. 6 and 8; column 3:30-50, column 13 and 14: the client subscribes/registers topics and they are determined based on Subscription Client ID 213, Permissions 215, Subscriber Status 216, Flags 217,).

As per claim 44, Trenbeath discloses the method of claim 42, wherein the activation module determines a message category of the data representation and causes the client device to register with a node having a node type corresponding to the message category (FIG. 6 and 8; column 3:30-50, column 13 and 14: the client subscribes/registers topics and they are determined based on Subscription Client ID 213, Permissions 215, Subscriber Status 216, Flags 217, message categories updating/deleting/modifying).

As per claim 45, Trenbeath discloses an apparatus for providing dynamic content over a network, the apparatus comprising:

a content provider that provides, using a processing device, a data representation to a client device coupled to the network (FIG. 4; column 3: 40-50 and column 9: 20-35: an update message sent from subscription clients to publishing clients), wherein the data representation includes at least one live object that is recognized by the client device (FIG. 8; column 13: 40-65 – column 14:1-20: PublicationID 208), and wherein the client responds to the live object of the data representation by determining an object ID of the live object (FIG. 8B, Publication ID 208 registered with Subscription Client ID 213) to register for updates of the live object with a routing network (FIG. 5E, column 3: 30-50 subscribed clients C, D, E receives update data, attached data object in update messages from a publishing client A,), such that registering the

client with the routing network provides client connection information to the routing network (FIG. 8B, Permissions 215 of subscribed clients; Subscriber Status 216 including active, pending);

an information provider that sends, using the processing device, an update message to the routing network, wherein the update message identifies the live object (FIG. 8; column 13: 40-65 – column 14:1-20: PublicationID) and contains update data that updates a property of the live object (FIG. 4-5 and 13; column 3:45-50; column 9: 20-35; column 20: 15-45: update message updating/modifying/deleting data object) such that the routing network has sufficient information (FIG. 8; column 3:30-50, column 13 and 14: the client subscribes/registers topics and they are determined based on Subscription Client ID 213, Permissions 215, Subscriber Status 216, Flags 217) to identify the client device as a registered device and send a routed message containing the update data to the client device, such that the client device processes the routed message upon receipt to update the property of the live object at the client device (FIG. 5; column 9-10: subscribed clients C, D, E receives update data, attached data object in update messages from a publishing client A).

As per claim 48, it is an apparatus claim, which recite(s) the same limitations as those of claims 42, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 48.

As per claim 49, it is an apparatus claim, which recite(s) the same limitations as those of claims 43, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 49.

As per claim 50, it is an apparatus claim, which recite(s) the same limitations as those of claims 44, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 50.

As per claim 51, it is a computer readable medium claim, which recite(s) the same limitations as those of claims 39, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 51.

As per claim 54, it is a computer readable medium claim, which recite(s) the same limitations as those of claims 42, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 54.

As per claim 55, it is a computer readable medium claim, which recite(s) the same limitations as those of claims 43, wherein all claimed limitations have been addressed and/or set

forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 55.

As per claim 56, it is a computer readable medium claim, which recite(s) the same limitations as those of claims 44, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 56.

As per claim 57, it is a device claim, which recite(s) the same limitations as those of claims 39, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 57.

As per claim 60, it is a device claim, which recite(s) the same limitations as those of claims 42, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 60.

As per claim 61, it is a device claim, which recite(s) the same limitations as those of claims 43, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 61.

As per claim 62, it is a device claim, which recite(s) the same limitations as those of claims 44, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 62.

As per claim 63, Trenbeath discloses a method comprising:

providing, using a processing device, a live object to a client device (FIG. 4; column 3: 40-50 and column 9: 20-35: an update message sent from subscription clients to publishing clients);

sending, using the processing device, an update message to a routing network (FIG. 4-6; column 3: 40-50 and column 9: 20-35), the update message identifying the live object (FIG. 8; column 13: 40-65 – column 14:1-20: PublicationID) and containing update data to update the live object (FIG. 4-5 and 13; column 3:45-50; column 9: 20-35; column 20: 15-45: update message updating/modifying/deleting data object); and

if the client device is registered to receive update data for the identified live object (FIG. 8; column 3:30-50, column 13 and 14: the client subscribes/registers topics and they are determined based on Subscription Client ID 213, Permissions 215, Subscriber Status 216, Flags 217), sending, using the processing device, from the routing network a routed message containing the update data to the client device (FIG. 5; column 9-10: subscribed clients C, D, E receives update data, attached data object in update messages from a publishing client A.).

As per claim 64, it is an apparatus claim, which recite(s) the same limitations as those of claims 63, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 64.

As per claim 65, it is a computer readable medium claim, which recite(s) the same limitations as those of claims 63, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 65.

As per claim 66, it is a device claim, which recite(s) the same limitations as those of claims 63, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 66.

***Claim Rejections - 35 USC § 103***

14. The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

15. Claims 29-32 and 35-38 are rejected under 35 U.S.C. 103(a) as being unpatentable over Trenbeath in view of Campbell et al. (US 7,209,959, hereinafter "Campbell").

As per claim 29, Trenbeath does not explicitly disclose determining a connection comprises determining at least one client proxy with which the client communicates and routing the data to the client proxy, and then routing the data from the client proxy to the client.

However, in analogous art, Campbell further discloses determining a connection comprises determining at least one client proxy with which the client communicates and routing the data to the client proxy, and then routing the data from the client proxy to the client (column 2: 8-20).

It would have been obvious to a person having ordinary skill in the art at the time the invention was made to combine the proxy server of Campbell into Trenbeath's teaching because it would provide for the purpose of hiding the client from the web server (column 2: 8-20: a proxy server is considered as a client server).

As per claim 30, Trenbeath discloses the method of claim 29, wherein client registration information concerning the client connection is maintained at the node (FIG. 8B; column 14:1-20).

As per claim 31, Trenbeath does not explicitly disclose wherein client registration information concerning the client connection is maintained at the client proxy.

However, in analogous art, Campbell further discloses wherein client registration information concerning the client connection is maintained at the client proxy (column 2: 8-20:

client information is extracted and replaced with predetermined substitute information at server proxy which is considered as a client proxy).

It would have been obvious to a person having ordinary skill in the art at the time the invention was made to combine the proxy server of Campbell into Trenbeath's teaching because it would provide for the purpose of hiding the client from the web server (column 2: 8-20).

As per claim 32, Trenbeath discloses wherein:

comprising a node that is adapted to receive messages of more than one message category (FIG. 7; column 12: 50-65 – column 13: 1-3: different Data Objects);

and determining a connection comprises determining at least one corresponding node having a node type that is mapped to the message category, with which the registered client communicates, and routing the data to the corresponding node (FIG. 6-8; column 3: 30-50 and column 12-14).

Trenbeath does not explicitly disclose routing the update message comprises routing the update message to a proxy node.

However, in analogous art, Campbell further discloses routing the update message comprises routing the update message to a proxy node (column 2: 8-20: proxy server is considered as a proxy node).

It would have been obvious to a person having ordinary skill in the art at the time the invention was made to combine the proxy server of Campbell into Trenbeath's teaching because it would provide for the purpose of hiding the client from the web server (column 2: 8-20).

As per claim 35, it is a routing network claim, which recite(s) the same limitations as those of claims 29, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 35.

As per claim 36, it is a routing network claim, which recite(s) the same limitations as those of claims 30, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 36.

As per claim 37, it is a routing network claim, which recite(s) the same limitations as those of claims 31, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 37.

As per claim 38, it is a routing network claim, which recite(s) the same limitations as those of claims 32, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 38.

16. Claims 40-41, 46-47, 52-53 and 58-59 are rejected under 35 U.S.C. 103(a) as being unpatentable over Trenbeath in view of Freeman et al. (US 6,314,459 hereinafter "Freeman").

As per claim 40, Trenbeath does not explicitly disclose wherein the live object of the data representation causes the client device to register with a client proxy of the network.

However, in analogous art, Freeman further discloses wherein the live object of the data representation causes the client device to register with a client proxy of the network (FIG. 7; column 4: 5-35).

It would have been obvious to a person having ordinary skill in the art at the time the invention was made to combine the registry 124 supporting client/server proxy of Freeman into Trenbeath's teaching because it would provide for the purpose of enabling automatic configuration of a network in order to share resource or services (column 2: 5-15).

As per claim 41, Trenbeath does not explicitly disclose wherein the live object of the data representation causes the client device to register with a node of the network.

However, in analogous art, Freeman further discloses wherein the live object of the data representation causes the client device to register with a node of the network (FIG. 7; column 4: 5-35: node 102 and 104 containing registry 124 and 126 respectively).

It would have been obvious to a person having ordinary skill in the art at the time the invention was made to combine the registry 124 supporting client/server proxy of Freeman into Trenbeath's teaching because it would provide for the purpose of enabling automatic configuration of a network in order to share resource or services (column 2: 5-15).

As per claim 46, it is an apparatus claim, which recite(s) the same limitations as those of claims 40, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 46.

As per claim 47, it is an apparatus claim, which recite(s) the same limitations as those of claims 41, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 47.

As per claim 52, it is a computer readable medium claim, which recite(s) the same limitations as those of claims 40, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 52.

As per claim 53, it is a computer readable medium claim, which recite(s) the same limitations as those of claims 41, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 53.

As per claim 58, it is a device claim, which recite(s) the same limitations as those of claims 40, wherein all claimed limitations have been addressed and/or set forth above. Therefore,

as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 58.

As per claim 59, it is a device claim, which recite(s) the same limitations as those of claims 41, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 59.

***Response to Arguments***

17. Applicant's arguments, see Remarks (page 16-17), filed 10/23/2009, with respect to the rejection(s) of claim(s) 39-42, 45-50, 51-56 and 57-62 under 35 U.S.C 102 (e) and claim(s) 26-38 and 43-44 under 35 U.S.C 103(a) have been fully considered and are persuasive. Therefore, the rejection has been withdrawn. However, upon further consideration, a new ground(s) of rejection is made in view of the new references (please refer to section 3 and 4 above for further details).

***Conclusion***

18. Any inquiry concerning this communication should be directed to examiner Tuan Dao, whose telephone/fax numbers are (571) 270 3387 and (571) 270 4387, respectively. The examiner can normally be reached on every Monday-Thursday and the second Friday of the bi-week from 7:30AM to 5:00PM.

19. If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Hyung Sough, can be reached at (571) 272 6799.

The fax phone number for the organization where this application or proceeding is assigned is (571) 273 8300.

Any inquiry of a general nature of relating to the status of this application or proceeding should be directed to the TC 2100 Group receptionist whose telephone number is (571) 272 2100.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

/T. D./

Examiner, Art Unit 2194

/Hyung S. Sough/
Supervisory Patent Examiner, Art Unit 2194
01/15/10

# EXHIBIT A-11

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 11/396,251 | 03/30/2006 | Timothy Tuttle | 2222.775000E | 1129 |

26111 7590 06/17/2010
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
1100 NEW YORK AVENUE, N.W.
WASHINGTON, DC 20005

| EXAMINER | |
|---|---|
| DAO, TUAN C. | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2194 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 06/17/2010 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

| *Office Action Summary* | Application No. | Applicant(s) |
|---|---|---|
| | 11/396,251 | TUTTLE ET AL. |
| | Examiner | Art Unit |
| | TUAN DAO | 2194 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE *3* MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on *19 April 2010*.

2a)☒ This action is **FINAL**. 2b)☐ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) *26 and 28-67* is/are pending in the application.

4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) *26 and 28-67* is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.

Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

a)☐ All b)☐ Some * c)☐ None of:

1.☐ Certified copies of the priority documents have been received.

2.☐ Certified copies of the priority documents have been received in Application No. _____.

3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

* See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☐ Notice of References Cited (PTO-892)
2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3) ☒ Information Disclosure Statement(s) (PTO/SB/08) Paper No(s)/Mail Date *04/19/2010*.
4) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____.
5) ☐ Notice of Informal Patent Application
6) ☐ Other: _____.

## DETAILED ACTION

1. This communication is responsive to Amendment filed 04/19/2010.

2. Claims 26 and 28-67 have been examined.

### *Response to Amendment*

3. In the instant amendment, claims 26 and 28-66 have been amended. Claim 67 has been newly added.

- The 35 USC §101 rejection over claims 57-62, 64, and 66 is withdrawn in view of Applicant's amendments.

### *Information Disclosure Statement*

4. As required by M.P.E.P. 609, the applicant's submissions of the Information Disclosure Statement dated 04/19/2010 is acknowledged by the examiner and the cited references have been considered in the examination of the claims now pending.

### *Claim Objections*

5. Claims 45-50 are objected to because of the following informalities:

As per claims 45 and 48, "the routing network" (lines 9 and 3, respectively) is not previous addressed.

Appropriate correction is required.

### *Claim Rejections - 35 USC § 101*

6. 35 U.S.C. 101 reads as follows:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

7. Claim 65 is rejected under 35 U.S.C. 101 because the claimed invention is directed to non-statutory subject matter.

8. As per claim 65, it fails to place the invention squarely within one statutory class of invention by declaring "a tangible computer-readable medium" including data storage and transmission media. As such, the claim is drawn to a form of energy. Energy is not one of the four categories of invention and therefore this claim(s) is/are not statutory. Energy is not a series of steps or acts and thus is not a process. Energy is not a physical article or object and as such is not a machine or manufacture. Energy is not a combination of substances and therefore not a composition of matter.

### *Claim Rejections - 35 USC § 102*

9. The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the basis for the rejections under this section made in this Office action:

> (e) the invention was described in (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for purposes of this subsection of an application filed in the United States only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language.

10. Claims 26, 28, 33-34, 39, 42-45, 48-51, 54-57 and 60-67 are rejected under 35 U.S.C. 102(e) as being anticipated by Trenbeath et al. (US 6,324,587, hereinafter "Trenbeath").

As per claim 26, Trenbeath discloses a method comprising:

receiving, using a processing device (FIG. 3B: a server device/publishing client in FIG. 4/publishing/subsribting client in FIG. 5E), an update message identifying a live object and containing data for updating a property of the live object (FIG. 8; column 13: 40-65 – column 14:1-20: PublicationID) and containing data for updating a property of the live object (FIG. 4-5 and 13; column 3:45-50; column 9: 20-35; column 20: 15-45: update message updating/modifying/deleting data object);

identifying, using the processing device, a mapping of a category of the update message to a node type (FIG.14, decision node 402 New Subscription Message? Yes ➔ mapping to node for processing new subscription message; decision node 406 "Update Message? Yes ➔ mapping to node for processing update message; decision node 410 Syncstate Message? Yes ➔ mapping to node for processing syncstate message);

and routing, using the processing device, the update message to a node having the node type (FIG.14, decision node 408 ➔ FIG.16, decision nodes 442-444-462, wherein each type of the update messages has associated node types create, modify, delete for creating, modifying, and deleting),

causing the node, through the update message, to determine a client that has registered for updates of the live object (FIG. 5D-E; column 10: 30-55: determining a list of subscription clients)

and causing the node to route the data from the node to the client (FIG. 5E; column 10: 40-55: the revised object data sent from the publication folder to the subscription folder located in subscription client),

and causing the client to process the data and to update the property of the live object (FIG. 5E; column 10: 40-55: the object in the subscription folder located on the subscription client is updated).

As per claim 28, Trenbeath discloses the method of claim 26, further comprising causing the node to extract an object ID from the update message (FIG. 8; column 13: 40-65 – column 14:1-20) and to establish a connection to the client to determine the client that has registered for updates of the live object (FIG. 8; column 13: 40-65 – column 14: 1-20: Store and Transport protocol).

As per claim 33, Trenbeath discloses a routing network comprising:

a gateway device (FIG. 3B: a server device/publishing client in FIG. 4/publishing/subsribting client in FIG. 5E) configured to:

receive an update message (FIG. 4; column 3: 40-50 and column 9: 20-35: an update message sent from subscription clients to publishing clients)

identifying a live object (FIG. 8; column 13: 40-65 – column 14:1-20: PublicationID)

and containing data for updating a property of the live object (FIG. 4-5 and 13; column 3:45-50; column 9: 20-35; column 20: 15-45: update message updating/modifying/deleting data object),

identify a mapping of a category of the update message to a node type (FIG.14, decision node 402 New Subscription Message? Yes ➔ mapping to node for processing new subscription message; decision node 406 "Update Message? Yes ➔ mapping to node for processing update message; decision node 410 Syncstate Message? Yes ➔ mapping to node for processing syncstate message),

and route the update message (FIG. 5C: message is routed from client E to client A; FIG. 14; column 25: depending on the condition, the message will be routed to block 404, 408 or 412);

and a node device (FIG. 2 and 3; column 7 and 8: client and/or server) configured to:

receive the update message from the gateway device, wherein the node device is configured to be mapped to the node type (FIG.14, decision node 408 ➔ FIG.16, decision nodes 442-444-462, wherein each type of the update messages has associated node types create, modify, delete for creating, modifying, and deleting),

determine a client that has registered for updates of the live object (FIG. 5D-E; column 10: 30-55: determining a list of subscription clients),

and route the data from the node device to the client (FIG. 5E; column 10: 40-55: the revised object data sent from the publication folder to the subscription folder located in subscription client),

wherein the client is adapted to process the data and to update the property of the live object (FIG. 5E; column 10: 40-55: the object in the subscription folder located on the subscription client is updated).

As per claim 34, it is a routing network claim, which recite(s) the same limitations as those of claims 28, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 34.

As per claim 67, Trenbeath discloses the routing network of claim 33, wherein the node type is configured to identify the node that receives the update message from the gateway device (FIG. 6 and 8; column 3:30-50, column 13 and 14: the client subscribes/registers topics and they are determined based on Subscription Client ID 213, Permissions 215, Subscriber Status 216, Flags 217; FIG.14, decision node 402 New Subscription Message? Yes ➔ mapping to node for processing new subscription message; decision node 406 "Update Message? Yes ➔ mapping to node for processing update message; decision node 410 Syncstate Message? Yes ➔ mapping to node for processing syncstate message).

As per claim 39, Trenbeath discloses a method comprising:

providing, using a processing device (FIG. 3B: a server device/publishing client in FIG. 4/publishing/subsribting client in FIG. 5E), a data representation to a client device coupled to a network (FIG. 4; column 3: 40-50 and column 9: 20-35: an update message sent from subscription clients to publishing clients), wherein the data representation includes at least one live object recognized by the client device (FIG. 8B, Publication ID 208 registered with Subscription Client ID 213), and causing the client device to respond to the live object of the data representation by determining an object ID of the live object (FIG. 8B, Publication ID 208

registered with Subscription Client ID 213) and to register for updates of the live object with a routing network (FIG. 5E, column 3: 30-50 subscribed clients C, D, E receives update data, attached data object in update messages from a publishing client A,), such that registering the client device with the network provides client connection information to the routing network (FIG. 8B, Permissions 215 of subscribed clients; Subscriber Status 216 including active, pending);

sending, using the processing device, an update message to the network, wherein the update message identifies the live object (FIG. 8; column 13: 40-65 – column 14:1-20: PublicationID)

and contains update data that updates a property of the live object (FIG. 4-5 and 13; column 3:45-50; column 9: 20-35; column 20: 15-45: update message updating/modifying/deleting data object),

such that a gateway device at the network (FIG. 3B: a server device/publishing client in FIG. 4/publishing/subsribting client in FIG. 5E)

is configured to identify the client device as a registered device (FIG. 5D-E; column 10: 15-55: determining a publication client)

and to send a routed message containing the update data from the gateway device to a node (FIG.14, decision node 408 ➔ FIG.16, decision nodes 442-444-462, wherein each type of the update messages has associated node types create, modify, delete for creating, modifying, and deleting);

causing the node to send the routed message to the client device (FIG. 5E; column 10: 40-55: the revised object data sent from the publication folder to the subscription folder located in subscription client);

and causing the client device to process the routed message upon receipt to update the property of the live object at the client device (FIG. 5E; column 10: 40-55: the object in the subscription folder located on the subscription client is updated).

As per claim 42, Trenbeath discloses the method of claim 39, wherein providing the data representation to the client device including providing an activation module that is executed by the client device (FIG. 4, 14; column 9-10; column 25: 15-25: software located in both publication client and subscription client) and that registers the live object with the network (FIG. 8; column 3:30-50, column 13 and 14: the client subscribes/registers topics and they are determined based on Subscription Client ID 213, Permissions 215, Subscriber Status 216, Flags 217).

As per claim 43, Trenbeath discloses the method of claim 42, wherein providing the activation module includes providing an activation module that is configured to determine determines a node type that handles registration and that causes the client device to register with a node corresponding to the node type (FIG. 6 and 8; column 3:30-50, column 13 and 14: the client subscribes/registers topics and they are determined based on Subscription Client ID 213, Permissions 215, Subscriber Status 216, Flags 217).

As per claim 44, Trenbeath discloses the method of claim 42, wherein providing the activation module includes providing an activation module that is configured to determine a message category of the data representation and that causes the client device to register with a node having a node type corresponding to the message category (FIG. 6 and 8; column 3:30-50, column 13 and 14: the client subscribes/registers topics and they are determined based on Subscription Client ID 213, Permissions 215, Subscriber Status 216, Flags 217, message categories updating/deleting/modifying).

As per claim 45, Trenbeath discloses an apparatus comprising:

a content provider device configured to provide a data representation to a client device coupled to the network (FIG. 4; column 3: 40-50 and column 9: 20-35: an update message sent from subscription clients to publishing clients), wherein the data representation includes at least one live object that is recognized by the client device (FIG. 8B, Publication ID 208 registered with Subscription Client ID 213), and that causes the client device to determine an object ID of the live object (FIG. 8B, Publication ID 208 registered with Subscription Client ID 213) to register for updates of the live object with the network (FIG. 5E, column 3: 30-50 subscribed clients C, D, E receives update data, attached data object in update messages from a publishing client A,), such that registering the client device with the network provides client connection information to the network (FIG. 8B, Permissions 215 of subscribed clients; Subscriber Status 216 including active, pending);

and an information provider device configured to send an update message to the network, wherein the update message identifies the live object (FIG. 8; column 13: 40-65 – column 14:1-20: PublicationID)

and contains update data-for updating a property of the live object (FIG. 4-5 and 13; column 3:45-50; column 9: 20-35; column 20: 15-45: update message updating/modifying/deleting data object),

such that a gateway device at the routing network (FIG. 3B: a server device/publishing client in FIG. 4/publishing/subsribting client in FIG. 5E) is configured to identify the client device as a registered device (FIG. 5D-E; column 10: 15-55: determining a publication client)

and to send a routed message from the gateway device to a node (FIG.14, decision node 408 → FIG.16, decision nodes 442-444-462, wherein each type of the update messages has associated node types create, modify, delete for creating, modifying, and deleting),

wherein the node is configured to send the routed message containing the update data to the client device (FIG. 5E; column 10: 40-55: the revised object data sent from the publication folder to the subscription folder located in subscription client),

and wherein the client device is configured to process processes the routed message upon receipt to update the property of the live object at the client device (FIG. 5E; column 10: 40-55: the object in the subscription folder located on the subscription client is updated).

As per claim 48, Trenbeath discloses the apparatus of claim 45, wherein the received data representation includes an activation module that is configured to be executed by the client device (FIG. 4, 14; column 9-10; column 25: 15-25: software located in both publication client

and subscription client) and adapted to register the live object with the routing network (FIG. 8; column 3:30-50, column 13 and 14: the client subscribes/registers topics and they are determined based on Subscription Client ID 213, Permissions 215, Subscriber Status 216, Flags 217).

As per claim 49, Trenbeath discloses the apparatus of claim 48, wherein the activation module is configured to determine a node type for handling registration and to cause the client device to register with a node of the node type (FIG. 6 and 8; column 3:30-50, column 13 and 14: the client subscribes/registers topics and they are determined based on Subscription Client ID 213, Permissions 215, Subscriber Status 216, Flags 217).

As per claim 50, it is an apparatus claim, which recite(s) the same limitations as those of claims 44, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 50.

As per claim 51, Trenbeath discloses an article of manufacture including a computer-readable medium having instructions stored thereon, an execution of which by a computing device causes the computing device to perform operations (FIG. 2) comprising:

providing, using a processing device (FIG. 3B: a server device/publishing client in FIG. 4/publishing/subsribting client in FIG. 5E), a data representation to a client device coupled to a network (FIG. 4; column 3: 40-50 and column 9: 20-35: an update message sent from subscription clients to publishing clients), wherein the data representation includes at least one

live object that is recognized by the client device (FIG. 8; column 13: 40-65 – column 14:1-20: PublicationID 208), and that causes the client device to respond to the live object by determining an object ID of the live object (FIG. 8B, Publication ID 208 registered with Subscription Client ID 213) to register for updates of the live object with the network (FIG. 5E, column 3: 30-50 subscribed clients C, D, E receives update data, attached data object in update messages from a publishing client A,), such that registering the client device with the network provides client connection information to the network (FIG. 8B, Permissions 215 of subscribed clients; Subscriber Status 216 including active, pending);

and sending, using the processing device, an update message to the network, wherein the update message identifies the live object (FIG. 8; column 13: 40-65 – column 14:1-20: PublicationID)

and contains update data for updating a property of the live object (FIG. 4-5 and 13; column 3:45-50; column 9: 20-35; column 20: 15-45: update message updating/modifying/deleting data object),

such that a gateway device at the network (FIG. 3B: a server device/publishing client in FIG. 4/publishing/subsribting client in FIG. 5E)

is configured to identify the client device as a registered device (FIG. 5D-E; column 10: 15-55: determining a publication client)

and to send a routed message containing the update data from the gateway device to a node (FIG.14, decision node 408 ➔ FIG.16, decision nodes 442-444-462, wherein each type of the update messages has associated node types create, modify, delete for creating, modifying, and deleting),

wherein the node sends the routed message to the client device (FIG. 5E; column 10: 40-55: the revised object data sent from the publication folder to the subscription folder located in subscription client),

and wherein the client device is configured to process the routed message upon receipt to update the property of the live object at the client device (FIG. 5E; column 10: 40-55: the object in the subscription folder located on the subscription client is updated).

As per claim 54, it is an article of manufacture claim, which recite(s) the same limitations as those of claims 48, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 54.

As per claim 55, it is an article of manufacture claim, which recite(s) the same limitations as those of claims 49, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 55.

As per claim 56, it is an article of manufacture claim, which recite(s) the same limitations as those of claims 50, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 56.

As per claim 57, it is a device claim, which recite(s) the same limitations as those of claims 39, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 57.

As per claim 60, it is a device claim, which recite(s) the same limitations as those of claims 48, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 60.

As per claim 61, it is a device claim, which recite(s) the same limitations as those of claims 49, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 61.

As per claim 62, it is a device claim, which recite(s) the same limitations as those of claims 50, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 62.

As per claim 63, Trenbeath discloses a method comprising:

Providing a live object to a client device (FIG. 4; column 3: 40-50 and column 9: 20-35: an update message sent from subscription clients to publishing clients);

Sending an update message to a network (FIG. 4-6; column 3: 40-50 and column 9: 20-35) identifying the live object (FIG. 8; column 13: 40-65 – column 14:1-20: PublicationID) and containing update data to update the live object at the client device (FIG. 4-5 and 13; column 3:45-50; column 9: 20-35; column 20: 15-45: update message updating/modifying/deleting data object);

And in response to determining that the client device is registered to receive update data for the live object (FIG. 8; column 3:30-50, column 13 and 14: the client subscribes/registers topics and they are determined based on Subscription Client ID 213, Permissions 215, Subscriber Status 216, Flags 217),

sending a routed message containing the update data from a gateway device at the network to a node (FIG.14, decision node 408 → FIG.16, decision nodes 442-444-462, wherein each type of the update messages has associated node types create, modify, delete for creating, modifying, and deleting),

wherein the node sends the routed message to the client device (FIG. 5E; column 10: 40-55: the revised object data sent from the publication folder to the subscription folder located in subscription client).

As per claim 64, Trenbeath discloses an apparatus comprising:

a content provider arranged to provide a live object to a client device (FIG. 4; column 3: 40-50 and column 9: 20-35: an update message sent from subscription clients to publishing clients);

and an information provider arranged to provide an update message to a network (FIG. 4-6; column 3: 40-50 and column 9: 20-35)

identifying the live object (FIG. 8; column 13: 40-65 – column 14:1-20: PublicationID) and containing update data for updating the live object (FIG. 4-5 and 13; column 3:45-50; column 9: 20-35; column 20: 15-45: update message updating/modifying/deleting data object),

wherein the network is configured to send a routed message containing the update data from a gateway device at the network to a node (FIG.14, decision node 408 ➔ FIG.16, decision nodes 442-444-462, wherein each type of the update messages has associated node types create, modify, delete for creating, modifying, and deleting),

and wherein the node is configured to send the routed message to the client device (FIG. 5E; column 10: 40-55: the revised object data sent from the publication folder to the subscription folder located in subscription client)

if the client device is registered to receive the update data for the live object (FIG. 8; column 3:30-50, column 13 and 14: the client subscribes/registers topics and they are determined based on Subscription Client ID 213, Permissions 215, Subscriber Status 216, Flags 217).

As per claim 65, Trenbeath discloses a tangible computer-readable medium having instructions stored thereon (FIG. 2), the instructions comprising:

instructions to provide, using a processing device, a live object to a client device (FIG. 4; column 3: 40-50 and column 9: 20-35: an update message sent from subscription clients to publishing clients);

instructions to send, using the processing device, an update message to a network-(FIG. 4-6; column 3: 40-50 and column 9: 20-35)

identifying the live object (FIG. 8; column 13: 40-65 – column 14:1-20: PublicationID)

and containing update data for updating the live object (FIG. 4-5 and 13; column 3:45-50; column 9: 20-35; column 20: 15-45: update message updating/modifying/deleting data object);

and instructions to cause, using the processing device and in response to determining that the client device is registered to receive update data for the live object (FIG. 8; column 3:30-50, column 13 and 14: the client subscribes/registers topics and they are determined based on Subscription Client ID 213, Permissions 215, Subscriber Status 216, Flags 217),

a routed message to be sent from a gateway device at the network to a node (FIG.14, decision node 408 ➔ FIG.16, decision nodes 442-444-462, wherein each type of the update messages has associated node types create, modify, delete for creating, modifying, and deleting),

wherein the node is configured to send the routed message containing the update data to the client device (FIG. 5E; column 10: 40-55: the revised object data sent from the publication folder to the subscription folder located in subscription client).

As per claim 66, it is a device claim, which recite(s) the same limitations as those of claims 63, wherein all claimed limitations have been addressed and/or set forth above. Therefore,

as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 66.

***Claim Rejections - 35 USC § 103***

11. The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

12. Claims 29-32 and 35-38 are rejected under 35 U.S.C. 103(a) as being unpatentable over Trenbeath in view of Campbell et al. (US 7,209,959, hereinafter "Campbell").

As per claim 29, Trenbeath does not explicitly disclose further comprising causing the node to determine at least one client proxy with which the client communicates, and to route the data to the client proxy, and to route the data from the client proxy to the client to determine the connection.

However, Campbell further discloses further comprising causing the node to determine at least one client proxy with which the client communicates, and to route the data to the client proxy, and to route the data from the client proxy to the client to determine the connection (column 2: 8-20).

It would have been obvious to a person having ordinary skill in the art at the time the invention was made to combine the proxy server of Campbell into Trenbeath's teaching because

it would provide for the purpose of hiding the client from the web server (Campbell, column 2: 8-20: a proxy server is considered as a client server).

As per claim 30, Trenbeath discloses further comprising causing the node to maintain client registration information concerning the client connection (FIG. 8B; column 14:1-20).

As per claim 31, Trenbeath does not explicitly disclose comprising causing the node to maintain client registration information concerning the client connection at the client proxy.

However, Campbell further discloses comprising causing the node to maintain client registration information concerning the client connection at the client proxy (column 2: 8-20: client information is extracted and replaced with predetermined substitute information at server proxy which is considered as a client proxy).

It would have been obvious to a person having ordinary skill in the art at the time the invention was made to combine the proxy server of Campbell into Trenbeath's teaching because it would provide for the purpose of hiding the client from the web server (Campbell, column 2: 8-20).

As per claim 32, Trenbeath discloses wherein:

the routing the update message comprises routing the update message to a proxy node comprising a second node receiving messages of more than one message category (FIG. 7; column 12: 50-65 – column 13: 1-3: different Data Objects),

and further comprising causing the node to determine at least one corresponding node having a corresponding node type mapped to the message category, with which the registered client communicates (FIG. 6-8; column 3: 30-50 and column 12-14).

Trenbeath does not explicitly disclose to route the data to the corresponding node to determine the connection.

However, Campbell further discloses to route the data to the corresponding node to determine the connection (column 2: 8-20: proxy server is considered as a proxy node).

It would have been obvious to a person having ordinary skill in the art at the time the invention was made to combine the proxy server of Campbell into Trenbeath's teaching because it would provide for the purpose of hiding the client from the web server (Campbell, column 2: 8-20).

As per claim 35, it is a routing network claim, which recite(s) the same limitations as those of claims 29, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 35.

As per claim 36, Trenbeath discloses wherein the node device is configured to determine a connection by determining at least one client proxy with which the registered client communicates and to route the data to the client proxy (FIG. 8B; column 14:1-20).

As per claim 37, Trenbeath does not disclose wherein client registration information concerning the client connection is configured to be maintained at the client proxy.

However, Campbell further discloses wherein client registration information concerning the client connection is configured to be maintained at the client proxy (column 2: 8-20: client information is extracted and replaced with predetermined substitute information at server proxy which is considered as a client proxy).

It would have been obvious to a person having ordinary skill in the art at the time the invention was made to combine the proxy server of Campbell into Trenbeath's teaching because it would provide for the purpose of hiding the client from the web server (Campbell, column 2: 8-20).

As per claim 38, Trenbeath discloses wherein:

the gateway device is configured to route the update message by routing the update message to a proxy node comprising a second node adapted to receive messages of more than one message category (FIG. 7; column 12: 50-65 – column 13: 1-3: different Data Objects),

and the node device is configured to determine at least one corresponding node that has a corresponding node type mapped to the message category and with which the registered client communicates (FIG. 6-8; column 3: 30-50 and column 12-14).

Trenbeath does not explicitly disclose to route the data to the corresponding node.

However, Campbell further discloses to route the data to the corresponding node (column 2: 8-20: proxy server is considered as a proxy node).

It would have been obvious to a person having ordinary skill in the art at the time the invention was made to combine the proxy server of Campbell into Trenbeath's teaching because it would provide for the purpose of hiding the client from the web server (Campbell, column 2: 8-20).

13. Claims 40-41, 46-47, 52-53 and 58-59 are rejected under 35 U.S.C. 103(a) as being unpatentable over Trenbeath in view of Freeman et al. (US 6,314,459 hereinafter "Freeman").

As per claim 40, Trenbeath does not explicitly disclose wherein providing the data representation to the client device includes providing a live object that causes the client device to register with a client proxy of the network.

However, Freeman further discloses wherein providing the data representation to the client device includes providing a live object that causes the client device to register with a client proxy of the network (FIG. 7; column 4: 5-35).

It would have been obvious to a person having ordinary skill in the art at the time the invention was made to combine the registry 124 supporting client/server proxy of Freeman into Trenbeath's teaching because it would provide for the purpose of enabling automatic configuration of a network in order to share resource or services (Freeman, column 2: 5-15).

As per claim 41, Trenbeath does not explicitly disclose wherein providing the data representation to the client device includes providing a live object that causes the client device to register with a node of the network.

However, Freeman further discloses wherein providing the data representation to the client device includes providing a live object that causes the client device to register with a node of the network (FIG. 7; column 4: 5-35: node 102 and 104 containing registry 124 and 126 respectively).

It would have been obvious to a person having ordinary skill in the art at the time the invention was made to combine the registry 124 supporting client/server proxy of Freeman into Trenbeath's teaching because it would provide for the purpose of enabling automatic configuration of a network in order to share resource or services (Freeman, column 2: 5-15).

As per claim 46, Trenbeath does not explicitly disclose wherein the live object of the data representation is configured to cause the client device to register with a client proxy of the network.

However, Campbell further discloses wherein the live object of the data representation is configured to cause the client device to register with a client proxy of the network (FIG. 7; column 4: 5-35).

It would have been obvious to a person having ordinary skill in the art at the time the invention was made to combine the registry 124 supporting client/server proxy of Freeman into Trenbeath's teaching because it would provide for the purpose of enabling automatic configuration of a network in order to share resource or services (Freeman, column 2: 5-15).

As per claim 47, Trenbeath does not explicitly disclose wherein the live object of the data representation is configured to cause the client device to register with a node of the network.

However, Campbell further discloses wherein the live object of the data representation is configured to cause the client device to register with a node of the network (FIG. 7; column 4: 5-35: node 102 and 104 containing registry 124 and 126 respectively).

It would have been obvious to a person having ordinary skill in the art at the time the invention was made to combine the registry 124 supporting client/server proxy of Freeman into Trenbeath's teaching because it would provide for the purpose of enabling automatic configuration of a network in order to share resource or services (Freeman, column 2: 5-15).

As per claim 52, it is an article of manufacture claim, which recite(s) the same limitations as those of claims 46, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 52.

As per claim 53, it is an article of manufacture claim, which recite(s) the same limitations as those of claims 47, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 53.

As per claim 58, it is a device claim, which recite(s) the same limitations as those of claims 46, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 58.

As per claim 59, it is a device claim, which recite(s) the same limitations as those of claims 47, wherein all claimed limitations have been addressed and/or set forth above. Therefore, as the reference teaches all of the limitations of the above claim(s), it also teaches all of the limitations of claims 59.

***Response to Arguments***

14. Applicants' arguments have been considered but are moot in view of the new ground(s) of rejection. Applicants' amendment necessitated the new ground(s) of rejection presented in this Office action.

15. Applicant's arguments filed on 04/19/2010 have been fully considered but they are not persuasive for the following reasons:

1) Limitation at issue " identifying, using the processing device, a mapping of a category of the update message to a node type; and routing, using the processing device, the update message to a node having the node type" (Remarks, page 14).

a) Applicants argue "Trenbeath does not teach at least a mapping of a category of the update message to a type of 'client'."

As an initial matter, in response to applicant's argument that the references fail to show certain features of applicant's invention, it is noted that the features upon which applicant relies (i.e., "…at least a mapping of a category of the update message to a type of "client."" – see

Remarks, page 14) are not recited in the rejected claim(s). Although the claims are interpreted in light of the specification, limitations from the specification are not read into the claims. See In re Van Geuns, 988 F.2d 1181, 26 USPQ2d 1057 (Fed. Cir. 1993).

In further, examiner notes that in the specification, Applicants defined a node can be a Document Object Model (DOM) tree node (paragraph 0058) or a cluster node (paragraph 0109).

Accordingly, the plain language of the claims "identifying, using the processing device, a mapping of a category of the update message to a node type; and routing, using the processing device, the update message to a node having the node type" does not exclude a branching/decision tree node, which is used by a processing device to map and forward/branch/route a message for further processing.

Therefore, Trenbeath fully teaches identifying, using the processing device, a mapping of a category of the update message to a node type;" (FIG.14, decision node 402 New Subscription Message? Yes à mapping to node for processing new subscription message; decision node 406 "Update Message? Yes à mapping to node for processing update message; decision node 410 Syncstate Message? Yes à mapping to node for processing syncstate message).

b)Applicants argue "Trenbeath does not disclose at least that the "subscription message" in Trenbeath is routed to the "high-level steps" in Trenbeath, as recited in claim 26." (Remarks, page 14)

Examiner respectfully disagrees. Trenbeath explicitly teaches routing, using the processing device, the update message to a node having the node type (FIG.14, decision node

408 à FIG.16, decision nodes 442-444-462, wherein each type of the update messages has associated node types create, modify, delete for creating, modifying, and deleting).

Therefore, Trenbeath fully teaches identifying, using the processing device, a mapping of a category of the update message to a node type; (FIG.14, decision node 402 New Subscription Message? Yes ➔ mapping to node for processing new subscription message; decision node 406 "Update Message? Yes ➔ mapping to node for processing update message; decision node 410 Syncstate Message? Yes ➔ mapping to node for processing syncstate message) and

routing, using the processing device, the update message to a node having the node type (FIG.14, decision node 408 à FIG.16, decision nodes 442-444-462, wherein each type of the update messages has associated node types create, modify, delete for creating, modifying, and deleting).

2) Limitation at issue "a gateway configured to... route the update message.., a node device configured to... receive the update message from the gateway device.., and route the data from the node device to the client," claims 39, 45, 51, and 57 recite, inter alia, "send a routed message containing the update data from the gateway device to a node.., the node.., send[s] the routed message.., to the client device," claim 65 recites, inter alia, "instructions to cause.., a routed message to be sent from a gateway device at the network to a node, wherein the node is configured to send the routed message containing the update data to the client device," and claims 63, 64, and 66 recite, inter alia, "send[ing] a routed message.., from a gateway: device at

the network to a node, wherein the node.., send[s] the routed message to the client device" (Remarks, page 15).

Examiner notes that Applicant's amendment necessitated the new ground(s) of rejection presented in this Office action set forth in details above.

c) Claims 29-32 and 35-38 (Remarks, page 16) are also rejected based on virtue of their dependencies on the rejected base claim 26 and 33.

d) Claims 40-41, 46-47, 52-53, and 58-59 (Remarks, page 17) are also rejected based on virtue of their dependencies on the rejected base claim 39, 45, 51, and 57.

In conclusion, examiner respectfully maintains ground of rejection over claims 26 and 28-65.

***Conclusion***

16. Applicants' amendment necessitated the new ground(s) of rejection presented in this Office action. Accordingly, **THIS ACTION IS MADE FINAL.** See MPEP § 706.07(a). Applicant is reminded of the extension of time policy as set forth in 37 CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE MONTHS from the mailing date of this action. In the event a first reply is filed within TWO MONTHS of the mailing date of this final action and the advisory action is not mailed until after the end of the THREE-MONTH shortened statutory period, then the shortened statutory period

will expire on the date the advisory action is mailed, and any extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of the advisory action. In no event, however, will the statutory period for reply expire later than SIX MONTHS from the date of this final action.

17. Any inquiry concerning this communication should be directed to examiner Tuan Dao, whose telephone/fax numbers are (571) 270 3387 and (571) 270 4387, respectively. The examiner can normally be reached on every Monday-Thursday and the second Friday of the bi-week from 7:30AM to 5:00PM.

18. If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Hyung Sough, can be reached at (571) 272 6799.

The fax phone number for the organization where this application or proceeding is assigned is (571) 273 8300.

Any inquiry of a general nature of relating to the status of this application or proceeding should be directed to the TC 2100 Group receptionist whose telephone number is (571) 272 2100. I

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR

system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

/Tuan C. Dao/

Examiner, Art Unit 2194

/Hyung S. Sough/
Supervisory Patent Examiner, Art Unit 2194
June 16, 2010

# EXHIBIT A-12

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re application of: | Confirmation No.: 1129 |
| TUTTLE *et al.* | Art Unit: 2194 |
| Appl. No.: 11/396,251 | Examiner: DAO, TUAN C. |
| Filed: March 30, 2006 | Atty. Docket: 2222.775000E |
| For: **Asynchronous Messaging Using a Node Specialization Architecture in the Dynamic Routing Network** | |

# Amendment and Reply Under 37 C.F.R. § 1.116

***Mail Stop AF***

Commissioner for Patents
PO Box 1450
Alexandria, VA 22313-1450

Sir:

In reply to the Office Action dated June 17, 2010, Applicants submit the following Amendment and Remarks.

Amendments to the Claims are reflected in the listing of claims which begins on page **3** of this paper.

Remarks and Arguments begin on page **12** of this paper.

It is not believed that extensions of time or fees for net addition of claims are required beyond those that may otherwise be provided for in documents accompanying this paper. However, if additional extensions of time are necessary to prevent abandonment of this application, then such extensions of time are hereby petitioned under 37 C.F.R. § 1.136(a), and any fees required therefore (including fees for net addition of claims) are hereby authorized to be charged to our Deposit Account No. 19-0036.

## *Amendments to the Claims*

This listing of claims will replace all prior versions, and listings, of claims in the application.

1-25. (Cancelled)

26. (Currently Amended) A method comprising:

receiving, using a processing device, an update message identifying a live object and containing data for updating a property of the live object;

determining a node having a node type to which the update message is to be routed based on ~~identifying, using the processing device,~~ a mapping of ~~a category~~ categories of ~~the~~ update messages to [[a]] node types, the mapping controlling an amount of update message traffic through nodes of a routing network; and

routing, using the processing device, the update message to [[a]] the node having the determined node type,

causing the node, through the update message, to determine a client that has registered for updates of the live object;

causing the node to route the data from the node to the client, and

causing the client to process the data and to update the property of the live object.

27. (Cancelled)

28. (Currently Amended) The method of claim 26, further comprising:

causing the node to extract an object ID from the update message, [[and]] to establish a connection [[to]] with the client, and to determine if the client [[that]] has registered for updates of the live object based on the object ID.

29. (Currently Amended) The method of claim 28, further comprising:

causing the node to determine at least one client proxy with which the client communicates;[[, to ]]

routing[[e]] the data to the client proxy[[,]]; and

<u>routing</u> ~~to route~~ the data from the client proxy to the client to determine the connection.

30. (Previously Presented) The method of claim 29, further comprising causing the node to maintain client registration information concerning the client connection.

31. (Previously Presented) The method of claim 29, further comprising causing the node to maintain client registration information concerning the client connection at the client proxy.

32. (Currently Amended) The method of claim 28, wherein:

the routing the update message comprises routing the update message to a <u>gateway device</u> ~~proxy node comprising a second node~~ receiving message of more than one message category, and

further comprising causing the <u>gateway device</u> ~~node~~ to determine <u>the node having the node type to which the update message is to be routed based on</u> ~~at least one corresponding node having a corresponding~~ <u>the mapping of categories to</u> node type<u>s</u> ~~mapped to the message category~~, with which the registered client communicates, and to route the data to the ~~corresponding~~ node to determine the <u>client</u> connection.

33. (Currently Amended) A routing network comprising:

a gateway device configured to:

receive an update message identifying a live object and containing data for updating a property of the live object,

<u>determine a node having a node type to which the update message is to be routed based on</u> ~~identify~~ a mapping of a ~~category~~ <u>categories</u> of the update message<u>s</u> to [[a]] node type<u>s</u>, <u>the mapping controlling an amount of update message traffic through nodes of a routing network;</u> and

route the update message; and

[[a]] <u>the</u> node ~~device~~ configured to:

receive the update message from the gateway device, wherein the node ~~device~~ is configured to be mapped to the node type,

determine a client that has registered for updates of the live object, and

route the data from the node ~~device~~ to the client, wherein the client is adapted to process the data and to update the property of the live object.

34. (Currently Amended) The routing network of claim 33, wherein the node ~~device~~ is configured to extract an object ID from the update message and to determine a connection to the client to route the data to the client.

35. (Currently Amended) The routing network of claim 34, wherein the node ~~device~~ is configured to determine a connection by determining at least one client proxy with which the registered client communicates and to route the data to the client proxy.

36. (Currently Amended) The routing network of claim 35, wherein client registration information concerning the client connection is configured to be maintained at the node ~~device~~.

37. (Previously Presented) The routing network of claim 35, wherein client registration information concerning the client connection is configured to be maintained at the client proxy.

38. (Currently Amended) The routing network of claim 33, wherein:

the gateway device is configured to route the update message to the node ~~by routing the update message to a proxy node comprising a second node~~ adapted to receive messages of more than one message category, and

the node ~~device~~ is configured to determine ~~at least one corresponding node that has a corresponding node type mapped to the message category and with which the registered client communicates and to route the data to the corresponding node~~ a connection with ~~by determining~~ at least one client proxy with which the registered client communicates and to route the data to the client proxy.

39. (Currently Amended) A method comprising:

providing, using a processing device, a data representation to a client device coupled to a routing network, wherein the data representation includes at least one live object ~~recognized~~ recognizable by the client device, and causing the client device to respond to the live object of the data representation by determining an object ID of the live object and to register for updates of the live object with [[a]] the routing network, such that registering the client device with the routing network provides client connection information to a node in the routing network; and

sending, using the processing device, an update message to the routing network, wherein the update message identifies the live object and contains update data that updates a property of the live object, such that a gateway device at the routing network is configured ~~to identify the client device as a registered device and~~ to route the update ~~send a routed~~ message ~~containing the update data~~ from the gateway device to [[a]] the node at the routing network and the node is configured to identify the client device as a registered device,[[;]]

wherein ~~causing~~ the node ~~to sends~~ routes the ~~routed~~ update message to the client device, and [[; and ]]

wherein ~~causing~~ the client device [[to]] processes the update ~~routed~~ message upon receipt to update the property of the live object at the client device.

40. (Currently Amended) The method of claim 39, wherein providing the data representation to the client device includes providing [[a]] the live object that causes the client device to register with a client proxy of the routing network.

41. (Currently Amended) The method of claim 39, wherein providing the data representation to the client device includes providing [[a]] the live object that causes the client device to register with [[a]] the node of the routing network.

42. (Currently Amended) The method of claim 39, wherein providing the data representation to the client device including providing an activation module that is executed by the client device and that registers the live object with the routing network.

43. (Currently Amended) The method of claim 42, wherein providing the activation module includes providing [[an]] the activation module that is configured to determine a node type that handles registration and that causes the client device to register with [[a]] the node corresponding to the node type.

44. (Currently Amended) The method of claim 42, wherein providing the activation module includes providing [[an]] the activation module that is configured to determine a message category of the data representation and that causes the client device to register with a node having a node type corresponding to the message category.

45. (Currently Amended) An apparatus comprising:

an input source ~~content provider~~ device configured to provide a data representation to a client device coupled to [[the]] a routing network, wherein the data representation includes at least one live object that is ~~recognized~~ recognizable by the client device, and that causes the client device to determine an object ID of the live object to register for updates of the live object with the routing network, such that registering the client device with the routing network provides client connection information to the routing network; and

an input source ~~information provider~~ device configured to route ~~send~~ an update message to the routing network, wherein the update message identifies the live object and contains update data for updating a property of the live object, such that a gateway device at the network is configured ~~to identify the client device as a registered device and~~ to route ~~send a routed~~ the update message from the gateway device to a node at the routing network,

wherein the node is configured to identify the client device as a registered device and route ~~send~~ the ~~routed~~ update message containing the update data to the client device, and

wherein the client device is configured to process the ~~routed~~ update message upon receipt to update the property of the live object at the client device.

46. (Currently Amended) The apparatus of claim 45, wherein the live object of the data representation is configured to cause the client device to register with a client proxy of the routing network.

47. (Currently Amended) The apparatus of claim 45, wherein the live object of the data representation is configured to cause the client device to register with [[a]] the node of the routing network.

48. (Previously Presented) The apparatus of claim 45, wherein the received data representation includes an activation module that is configured to be executed by the client device and adapted to register the live object with the routing network.

49. (Currently Amended) The apparatus of claim 48, wherein the activation module is configured to determine a node type for handling registration and to cause the client device to register with [[a]] the node of the node type.

50. (Previously Presented) The apparatus of claim 48, wherein the activation module determines a message category of the data representation and causes the client device to register with [[a]] the node having a node type corresponding to the message category.

51. (Currently Amended) An article of manufacture including a computer-readable medium having instructions stored thereon, [[an]] execution of which by a computing device causes the computing device to perform operations comprising:

providing, using a processing device, a data representation to a client device coupled to a routing network, wherein the data representation includes at least one live object that is ~~recognized~~ recognizable by the client device, and that causes the client device to respond to the live object by determining an object ID of the live object to

register for updates of the live object with the routing network, such that registering the client device with the routing network provides client connection information to the routing network; and

sending, using the processing device, an update message to the routing network, wherein the update message identifies the live object and contains update data for updating a property of the live object, such that a gateway device at the routing network is configured ~~to identify the client device as a registered device and~~ to route ~~send~~ an update ~~routed~~ message ~~containing the update data~~ from the gateway device at the routing network to a node at the routing network, wherein the node is configured to identify the client device as a registered device and to route ~~sends~~ the update ~~routed~~ message to the client device, and wherein the client device is configured to process the update ~~routed~~ message upon receipt to update the property of the live object at the client device.

52. (Currently Amended) The article of manufacture of claim 51, wherein the live object of the data representation causes the client device to register with a client proxy of the routing network.

53. (Currently Amended) The article of manufacture of claim 51, wherein the live object of the data representation causes the client device to register with [[a]] the node of the routing network.

54. (Currently Amended) The article of manufacture of claim 51, wherein the received data representation includes an activation module executed by the client device and adapted to register the live object with the routing network.

55. (Currently Amended) The article of manufacture of claim 54, wherein the activation module determines a node type that handles registration and causes the client device to register with [[a]] the node of the node type.

56. (Currently Amended) The article of manufacture of claim 54, wherein the activation module determines a message category of the data representation and causes

the client device to register with [[a]] the node having a node type corresponding to the message category.

57. (Currently Amended) A device comprising:

logic configured to provide a data representation to a client device coupled to [[the]] a routing network, wherein the data representation includes at least one live object ~~recognized~~ recognizable by the client device, and wherein the client device is configured to respond to the live object of the data representation by determining an object ID of the live object to register for updates of the live object with [[a]] the routing network, such that registering the client device with the routing network provides client connection information to the routing network; and

logic configured to provide, using a processing device, an update message to the routing network, wherein the update message identifies the live object and contains update data for updating a property of the live object, such that a gateway device at the routing network is configured ~~to identify the client device as a registered device and~~ to route ~~send~~ the update ~~a routed~~ message from the gateway device to a node at the routing network, wherein the node is configured to identify the client device as a registered device and to route ~~send~~ the update ~~routed~~ message containing the update data to the client device, and wherein the client device is configured to process the update ~~routed~~ message upon receipt to update the property of the live object at the client device.

58. (Currently Amended) The device of claim 57, wherein the live object of the data representation causes the client device to register with a client proxy of the routing network.

59. (Currently Amended) The device of claim 57, wherein the live object of the data representation causes the client device to register with [[a]] the node of the routing network.

60. (Currently Amended) The device of claim 57, wherein the data representation includes an activation module that is executed by the client device and that is adapted to register the live object with the routing network.

61. (Currently Amended) The device of claim 60, wherein the activation module determines a node type for handling registration and causes the client device to register with [[a]] the node of the node type.

62. (Currently Amended) The device of claim 60, wherein the activation module determines a message category of the data representation and causes the client device to register with [[a]] the node having [[a]] the node type corresponding to the message category.

63. (Currently Amended) A method comprising:

providing a live object to a client device;

sending an update message to a routing network identifying the live object and containing update data to update the live object at the client device~~; and~~

wherein in response to determining that the client device is registered to receive update data for the live object, the update message is routed from ~~sending a routed message containing the update data from~~ a gateway device at the routing network to a node at the routing network, wherein the node routes ~~sends~~ the update ~~routed~~ message to the client device.

64. (Currently Amended) An apparatus comprising:

an input source ~~a content provider~~ arranged to provide a live object to a client device; and

the input source ~~an information provider~~ arranged to provide an update message to a routing network identifying the live object and containing update data for updating the live object,

wherein the routing network is configured to ~~send~~ route the update message from ~~a routed message containing the update data from~~ a gateway device at the routing

network to a node at the routing network, and wherein the node is configured to route the update ~~send the routed~~ message to the client device if the client device is registered to receive the update data for the live object.

65. (Cancelled)

66. (Currently Amended) A device comprising:

logic configured to provide a live object to a client device;

logic configured to provide an update message to a routing network identifying the live object and containing update data for updating the live object at the client device~~;~~ ~~and~~

wherein ~~logic configured to send~~ the update ~~a routed~~ message ~~containing the update data~~ is routed from a gateway device at the routing network to a node at the routing network, wherein the node is configured to route ~~send~~ the update ~~routed~~ message to the client device in response to determining that the client device is registered to receive the update data for the live object.

67. (Previously Presented) The routing network of claim 33, wherein the node type is configured to identify the node that receives the update message from the gateway device.

## *Remarks*

Reconsideration of this Application is respectfully requested.

Upon entry of the foregoing amendment, claims 26, 28-64 and 66-67 are pending in the application, with claims 26, 33, 39, 45, 51, 57, 63-64, 66 being the independent claims. Claim 65 is sought to be cancelled without prejudice to or disclaimer of the subject matter therein. These changes are believed to introduce no new matter, and their entry is respectfully requested.

Based on the above amendment and the following remarks, Applicants respectfully request that the Examiner reconsider all outstanding objections and rejections and that they be withdrawn.

***Rejections under 35 U.S.C. § 101***

Claim 65 was rejected under 35 U.S.C. § 101 as the claimed invention is allegedly directed to non statutory subject matter. Applicants respectfully traverse this rejection.

Without acquiescing the propriety of the rejection, Applicants have cancelled claim 65. Applicants, therefore, respectfully request that the Examiner withdraws the rejection under 35 U.S.C. 101.

***Rejections under 35 U.S.C. § 102***

Claims 26, 28, 33-34, 39, 42-45, 48-51, 54-57, 60-64, 66-67 were rejected under 35 U.S.C. § 102(e) as allegedly being anticipated by U.S. Pat. No. 6,324,587 to Trenbeath et al. ("Trenbeath"). Applicants respectfully traverse this rejection.

**Claims 26, 28 and 33-34**

Without acquiescing to the propriety of the rejection, Applicants have amended claims 26 and 33.

Claim 26 recites, *inter alia,*

> determining a node having a node type to which the update message is to be routed based on a mapping of categories of update messages to node types, **the mapping controlling an amount of update message traffic through nodes of a routing network;**

[emphasis added]

Claim 33 recites a similar feature.

Trenbeath at least does not disclose or suggest mapping a category of the update message to a node type to control the amount of message traffic to a node in a routing network, as set forth in independent claims 26 and 33. In Trenbeath, Figure 14 describes the high level internal steps that the subscription client takes in processing messages from the publication client. (Trenbeath, Col. 25, ln 16-21). After the subscription client receives the message, those high level steps include the subscription client determining whether the message is a new subscription message (Trenbeath, Figure 14, step 402), an update message (Trenbeath, Figure 14, step 406), a syncstate message (Trenbeath, Figure 14, step 410), a data object submission event (Trenbeath, Figure 14, step 414) or a subscription client status event (Trenbeath, Figure 14, step 418). After the subscription client determines the type of a message, the subscription client process the message in accordance with the message type in steps 404, 408, 412, 416, and 420. The processing is internal to the subscription client. (Trenbeath, Col. 25, ln 16-19).

Claims 26 and 33 describe that the update messages is routed to "a node having a certain node type to which the update message is to be routed based on a mapping of

categories of update messages to node types." The mapping of categories controls "an amount of update message traffic through nodes of a routing network." Therefore, Trenbeath does not anticipate these claims under 35 U.S.C. 102(e) as it fails to teach all elements of claims 26 and 33.

Claims 28 and 34 respectively depend from the independent claims 26 and 33. As Trenbeath fails to anticipate of claims 26 and 33, Trenbeath fails to anticipate the corresponding dependent claims. Therefore, Applicants request reconsideration and withdrawal of the rejection of claims 26, 28 and 33-34 under 35 U.S.C. 102(e).

**Claims 39,43-45, 48-51, 54-57, 60-64, and 66-67**

Without acquiescing to the propriety of the rejection, applicant has amended claims 39, 45, 51, 57, and 63.

Claim 39, recties, *inter alia,*

> sending, using the processing device, an update message to the routing network, wherein the update message identifies the live object and contains update data that updates a property of the live object, such that a **gateway device at the routing network is configured to route the update message from the gateway device to the node at the routing network and the node is configured to identify the client device as a registered device**,

[emphasis added]

Claims 45, 51, 57, 63-64, and 66 were modified to recite a similar feature.

Trenbeath at least does not disclose or suggest sending a message to a routing network which includes a configurable gateway device that routes messages to a node or a node that is configured to identify a client device, as set forth in independent claims 39, 45, 51, 57, 63-64, and 66. Trenbeath discloses a publication client and a subscription client that use a routing network to send communicate messages that include a data

object (Trenbeath, Abstract; Fig. 2, Fig 3A). In Trenbeath the routing network's only functionality is to route a message from the publication client to the subscription client and *vise versa*. In fact, Trenbeath discloses that "[T]he invention is entirely client-based in that a particular server is not required for performing the replication. The server is only used for communication between the clients . . . typically . . . using a standard protocol such as the Internet message protocol . . . that is widely implemented today." (Trenbeath, Col. 2 ln 65-68; Col 3. 1-4).

A routing network is a feature of independent claims 39, 45, 51, 57, 63-64 and 66. The routing network that receives an update message contains elements such as a gateway and a node. The function of the gateway is to route update messages to a node. (Specification, paragraph 14). The function of the node is to identify a client device that has registered to receive a message update and route the update message to the client device. (Specification, paragraph 14). Therefore, Trenbeath does not establish anticipation under 35 U.S.C. 102(e) as it fails to establish all elements of claims 39, 45, 51, 57, 63, 64 and 66.

Claims 43, 44, 48-50, 54-56, 60-62 and 67 depend from the independent claims 39, 45, 51, 57, 63-64 and 66. As Trenbeath fails to establish anticipation of claims 39, 45, 51, 57, 63-64 and 66, Trenbeath also fails to establish anticipation of the corresponding dependent claims. Therefore, Applicants request reconsideration and withdrawal of the rejection of claims 43, 44, 48-50, 54-56, 60-62 and 67 under 35 U.S.C. 102(e).

Accordingly, the Office Action fails to establish anticipation of claims 26, 28, 33, 34, 39, 42-45, 48-51, 54-57, 60-64 and 66-67 over Trenbeath. Applicants therefore

respectfully request the reconsideration and withdrawal of the rejection of claims 26, 28, 33, 34, 39, 42-45, 48-51, 54-57, 60-64 and 66-67 under 35 U.S.C. § 102(e).

***Rejections under 35 U.S.C. § 103***

**Claims 29-32 and 35-38**

Claims 29-32 and 35-38 were rejected under 35 U.S.C. § 103(a) as allegedly being unpatentable over U.S. Pat. No. 6,324,587 to Trenbeath et al. ("Trenbeath") in view of U.S. Pat. No. 7,209,959 to Campbell et al. ("Campbell"). Applicants respectfully traverse this rejection.

Claims 29-32 and 35-38 depend from claims 26 and 33, respectively. At page 15 of the Office Action the Examiner states that Campbell teaches "determining a connection comprises determining at least one client proxy with which the client communicates and routing the data to the client proxy, and then routing the data from the client proxy to the client." However, the Examiner does not use Campbell to teach at least the above noted distinguishing features of claims 26 and 33. Therefore, the applied references cannot be used to establish a prima facie case of obviousness for claims 26 and 33.

Accordingly, at least based on their respective dependencies to claims 26 and 33 as well as for their additional distinguishing features Applicants respectfully request allowance of claims 29-32 and 35-38.

**Claims 40, 41, 46, 47, 52, 53, 58, and 59**

Claims 40-41, 46-47, 52-53 and 58-59 were rejected under 35 U.S.C. § 103(a) as allegedly being unpatentable over U.S. Pat. No. 6,324,587 to Trenbeath et al.

("Trenbeath") in view of U.S. Pat. No. 6,314,459 to Freeman ("Freeman"). Applicants respectfully traverse this rejection.

Claims 40, 41, 46, 47, 52, 53, 58, and 59 depend from claims 39, 45, 51, and 57, respectively. At page 18 of the Office Action the Examiner states, to which Applicants do not acquiesce, that Freeman teaches "wherein the live object of the data representation causes the client device to register with a client proxy of the network." However, the Examiner does not use Freeman to teach, nor does Freeman teach, at least the above noted distinguishing features of claims 39, 45, 51, and 57. Thus, Freeman does not cure the deficiencies of Trenbeath. Therefore, the applied references do not establish a prima facie case of obviousness for claims 39, 45, 51, and 57.

Accordingly, at least based on their respective dependencies to claims 39, 45, 51, and 57 as well as for their additional distinguishing features, Applicants respectfully request allowance of claims 40, 41, 46, 47, 52, 53, 58, and 59.

## *Conclusion*

All of the stated grounds of objection and rejection have been properly traversed, accommodated, or rendered moot. Applicants therefore respectfully request that the Examiner reconsider all presently outstanding objections and rejections and that they be withdrawn. Applicants believe that a full and complete reply has been made to the outstanding Office Action and, as such, the present application is in condition for allowance. If the Examiner believes, for any reason, that personal communication will expedite prosecution of this application, the Examiner is invited to telephone the undersigned at the number provided.

Prompt and favorable consideration of this Amendment and Reply is respectfully requested.

Respectfully submitted,

STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

Glenn J. Perry
Attorney for Applicants
Registration No. 28,458

Date: 16 Aug. 2010

1100 New York Avenue, N.W.
Washington, D.C. 20005-3934
(202) 371-2600
1130491_1.DOC

# EXHIBIT A-13

**Amendment Under 37 C.F.R. § 1.116**
**Expedited Procedure – Art Unit 2194**

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of:
TUTTLE *et al.*
Appl. No.: 11/396,251
Filed: March 30, 2006
For: **Asynchronous Messaging Using a Node Specialization Architecture in the Dynamic Routing Network**

Confirmation No.: 1129
Art Unit: 2194
Examiner: DAO, TUAN C.
Atty. Docket: 2222.775000E

## Reply Under 37 C.F.R. § 1.116

***Mail Stop AF***

Commissioner for Patents
PO Box 1450
Alexandria, VA 22313-1450

Sir:

In reply to the Final Office Action dated **December 30, 2011,** ("Office Action"), Applicants submit the following Amendment and Remarks.

**Status of the Claims** is reflected in the listing of claims which begins on page **2** of this paper.

**Remarks and Arguments** begin on page **16** of this paper.

It is not believed that extensions of time or fees for net addition of claims are required beyond those that may otherwise be provided for in documents accompanying this paper. However, if additional extensions of time are necessary to prevent abandonment of this application, then such extensions of time are hereby petitioned under 37 C.F.R. § 1.136(a), and any fees required therefor (including fees for net addition of claims) are hereby authorized to be charged to our Deposit Account No. 19-0036.

***Status of the Claims***

This listing of claims will replace all prior versions, and listings, of claims in the application.

1-25. (Cancelled)

26. (Previously Presented) A method comprising:

receiving, using a processing device, an update message from an input source, the update message identifying a live object and containing data for updating a property of the live object;

identifying a category of the update message based on the input source;

determining a node having a node type to which the update message is to be routed based on a mapping of categories of update messages to node types, the mapping controlling an amount of update message traffic through nodes of a routing network;

routing, using the processing device, the update message to the node having the determined node type;

causing the node, through the update message, to determine a client, different from the input source, that has registered for updates of the live object;

causing the node to route the update message from the node to the client; and

causing the client to process the update message and to update the property of the live object.

27. (Cancelled)

28. (Previously Presented) The method of claim 26, further comprising:

causing the node to extract an object ID from the update message, to establish a connection with the client, and to determine if the client has registered for updates of the live object based on the object ID.

29. (Previously Presented) The method of claim 28, further comprising:

causing the node to determine at least one client proxy with which the client communicates;

causing the node to route the update message to the client proxy; and

causing the client proxy to route the update message to the client to determine the connection.

30. (Previously Presented) The method of claim 29, further comprising causing the node to maintain client registration information concerning the client connection.

31. (Previously Presented) The method of claim 29, further comprising causing the node to maintain client registration information concerning the client connection at the client proxy.

32. (Cancelled)

33. (Previously Presented) A routing network comprising:

a gateway device configured to:

receive an update message from an input source, the update message identifying a live object and containing data for updating a property of the live object,

identify a category of the update message based on the input source;

determine a node having a node type to which the update message is to be routed based on a mapping of a categories of update messages to node types, the mapping controlling an amount of update message traffic through nodes of a routing network; and

route the update message; and

the node configured to:

receive the update message from the gateway device, wherein the node is configured to be mapped to the node type,

determine a client, different from the input source, that has registered for updates of the live object, and

route the update message from the node to the client, wherein the client is adapted to process the update message and to update the property of the live object.

34. (Previously Presented) The routing network of claim 33, wherein the node is configured to extract an object ID from the update message and to determine a connection to the client to route the data to the client.

35. (Previously Presented) The routing network of claim 34, wherein the node is configured to determine the connection by determining at least one client proxy with which the client communicates and to route the update message to the client proxy.

36. (Previously Presented) The routing network of claim 35, wherein client registration information concerning the client connection is configured to be maintained at the node.

37. (Previously Presented) The routing network of claim 35, wherein client registration information concerning the client connection is configured to be maintained at the client proxy.

38. (Previously Presented) The routing network of claim 33, wherein:

the gateway device is configured to route the update message to the node adapted to receive messages of more than one message category, and

the node is configured to determine a connection with at least one client proxy with which the client communicates and to route the data to the client proxy.

39. (Previously Presented) A method comprising:

providing, using a processing device of an input source, a data representation to a client device, different from the input source, coupled to a routing network, wherein the data representation includes at least one live object recognizable by the client device, and causing the client device to respond to the live object of the data representation by

determining an object ID of the live object and to register for updates of the live object with the routing network, such that registering the client device with the routing network provides client connection information to a node in the routing network; and

sending, using the processing device of the input source, an update message to the routing network, wherein the update message identifies the live object and contains update data that updates a property of the live object,

wherein a gateway device at the routing network is configured to identify a category of the update message based on the input source, to determine a node type to which the identified category maps, and to route the update message to the node, having the node type, at the routing network,

wherein the node is configured to identify the client device as a registered device and to route the update message to the client device, and

wherein the client device processes the update message upon receipt to update the property of the live object at the client device.

40. (Previously Presented) The method of claim 39, wherein providing the data representation to the client device includes providing the live object that causes the client device to register with a client proxy of the routing network.

41. (Previously Presented) The method of claim 39, wherein providing the data representation to the client device includes providing the live object that causes the client device to register with the node of the routing network.

42. (Previously Presented) The method of claim 39, wherein providing the data representation to the client device includes providing an activation module that is executed by the client device and that registers the live object with the routing network.

43. (Previously Presented) The method of claim 42, wherein providing the activation module includes providing the activation module that is configured to determine a node type that handles registration and that causes the client device to register with the node corresponding to the node type.

44. (Previously Presented) The method of claim 42, wherein providing the activation module includes providing the activation module that is configured to determine a message category of the data representation and that causes the client device to register with a node having a node type corresponding to the message category.

45. (Previously Presented) An apparatus comprising:

an input source device configured to provide a data representation to a client device, different from the input source, coupled to a routing network, wherein the data representation includes at least one live object that is recognizable by the client device, and that causes the client device to determine an object ID of the live object to register for updates of the live object with the routing network, such that registering the client device with the routing network provides client connection information to the routing network,

wherein the input source device is configured to route an update message to the routing network, wherein the update message identifies the live object and contains update data for updating a property of the live object,

wherein a gateway device at the network is configured to identify a category of the update message based on the input source, to determine a node type to which the identified category maps, and to route the update message to a node of the node type at the routing network,

wherein the node is configured to identify the client device as a registered device and route the update message containing the update data to the client device, and

wherein the client device is configured to process the update message upon receipt to update the property of the live object at the client device.

46. (Previously Presented) The apparatus of claim 45, wherein the live object of the data representation is configured to cause the client device to register with a client proxy of the routing network.

47. (Previously Presented) The apparatus of claim 45, wherein the live object of the data representation is configured to cause the client device to register with the node of the routing network.

48. (Previously Presented) The apparatus of claim 45, wherein the received data representation includes an activation module that is configured to be executed by the client device and adapted to register the live object with the routing network.

49. (Previously Presented) The apparatus of claim 48, wherein the activation module is configured to determine a node type for handling registration and to cause the client device to register with the node of the node type.

50. (Previously Presented) The apparatus of claim 48, wherein the activation module determines a message category of the data representation and causes the client device to register with the node having a node type corresponding to the message category.

51. (Previously Presented) An article of manufacture including a computer-readable storage medium having instructions stored thereon, execution of which by a computing device causes the computing device to perform operations comprising:

providing, using a processing device of an input source, a data representation to a client device, different from the input source, coupled to a routing network, wherein the data representation includes at least one live object that is recognizable by the client device, and that causes the client device to respond to the live object by determining an object ID of the live object to register for updates of the live object with the routing network, such that registering the client device with the routing network provides client connection information to the routing network; and

sending, using the processing device of the input source, an update message to the routing network, wherein the update message identifies the live object and contains update data for updating a property of the live object,

wherein a gateway device at the routing network is configured to identify a category of the update message based on the input source, to determine a node type to which the identified category maps, and to route the update message to a node of the node type at the routing network,

wherein the node is configured to identify the client device as a registered device and to route the update message to the client device, and

wherein the client device is configured to process the update message upon receipt to update the property of the live object at the client device.

52. (Previously Presented) The article of manufacture of claim 51, wherein the live object of the data representation causes the client device to register with a client proxy of the routing network.

53. (Previously Presented) The article of manufacture of claim 51, wherein the live object of the data representation causes the client device to register with the node of the routing network.

54. (Previously Presented) The article of manufacture of claim 51, wherein the received data representation includes an activation module executed by the client device and adapted to register the live object with the routing network.

55. (Previously Presented) The article of manufacture of claim 54, wherein the activation module determines a node type that handles registration and causes the client device to register with the node of the node type.

56. (Previously Presented) The article of manufacture of claim 54, wherein the activation module determines a message category of the data representation and causes the client device to register with the node having a node type corresponding to the message category.

57. (Previously Presented) A non-transitory computer readable storage medium having instructions stored thereon, the instructions comprising:

instructions for providing a data representation to a client device coupled to a routing network, wherein the data representation includes at least one live object recognizable by the client device, and wherein the client device is configured to respond to the live object of the data representation by determining an object ID of the live object to register for updates of the live object with the routing network, such that registering the client device with the routing network provides client connection information to the routing network; and

instructions for providing, using a processing device of an input source, different from the client device, an update message to the routing network, wherein the update message identifies the live object and contains update data for updating a property of the live object,

wherein a gateway device at the routing network is configured to identify a category of the update message based on the input source, to determine a node type to which the identified category maps, and to route the update message to a node of the node type at the routing network,

wherein the node is configured to identify the client device as a registered device and to route the update message containing the update data to the client device, and

wherein the client device is configured to process the update message upon receipt to update the property of the live object at the client device.

58. (Previously Presented) The non-transitory computer readable storage medium of claim 57, wherein the live object of the data representation causes the client device to register with a client proxy of the routing network.

59. (Previously Presented) The non-transitory computer readable storage medium of claim 57, wherein the live object of the data representation causes the client device to register with the node of the routing network.

60. (Previously Presented) The non-transitory computer readable storage medium of claim 57, wherein the data representation includes an activation module that is executed by the client device and that is adapted to register the live object with the routing network.

61. (Previously Presented) The non-transitory computer readable storage medium of claim 60, wherein the activation module determines a node type for handling registration and causes the client device to register with the node of the node type.

62. (Previously Presented) The non-transitory computer readable storage medium of claim 60, wherein the activation module determines a message category of the data representation and causes the client device to register with the node having the node type corresponding to the message category.

63. (Previously Presented) A method comprising:

providing a live object to a client device;

sending, using a processing device of an input source, different from the client device, an update message to a routing network identifying the live object and containing update data to update the live object at the client device,

wherein in response to determining that the client device is registered to receive update data for the live object, causing a category of the update message to be identified based on the input source, a node type associated with the category be determined, and the update message be routed from the gateway device to a node having the node type at the routing network, and causing the node to route the update message to the client device.

64. (Previously Presented) An apparatus comprising:

an input source arranged to provide a live object to a client device, different from the input source; and

the input source arranged to provide an update message to a routing network identifying the live object and containing update data for updating the live object.

wherein the routing network is configured to identify a category of the update message based on the input source, determine a node type associated with the category, and to route the update message from a gateway device at the routing network to a node having the node type at the routing network, and wherein the node is configured to route the update message to the client device if the client device is registered to receive the update data for the live object.

65. (Cancelled)

66. (Previously Presented) A non-transitory computer readable storage medium having instructions stored thereon, the instructions comprising:

instructions for providing a live object to a client device; and

instructions for providing an update message from an input source, different from the client device, to a routing network identifying the live object and containing update data for updating the live object at the client device,

wherein a category of the update message is identified based on the input source, a node type associated with the category is determined, and the update message is routed from a gateway device at the routing network to a node having the node type at the

routing network, wherein the update message is routed from the node to the client device in response to a determination that the client device is registered to receive the update data for the live object.

67. (Previously Presented) The routing network of claim 33, wherein the node type is configured to identify the node that receives the update message from the gateway device.

68. (Previously Presented) The method of claim 26, wherein the property of the live object has a direct effect on a visual representation of the live object in a data representation, has an effect on an internal aspect of the live object and has no effect on the visual representation of the live object in the data representation, or has a direct effect on one aspect of the visual representation of the live object in the data representation and has no effect on other aspect of the visual representation of the live object in the data representation.

## *Remarks*

Reconsideration of this Application is respectfully requested.

Claims 26, 28-31, 33-64, and 66-68 are pending in the application, with claims 26, 33, 39, 45, 51, 57, 63, 64, and 66 being the independent claims. No claim amendments are sought.

Based on the following remarks, Applicants respectfully request that the Examiner reconsider all outstanding rejections and that they be withdrawn.

### *Rejections under 35 U.S.C. § 103*

**Claims 26, 28, 33, 34, 39, 42-45, 48-51, 54-57, 60-62, 67, and 68**

Claims 26, 28, 33, 34, 39, 42-45, 48-51, 54-57, 60-62, 67, and 68 were rejected under 35 U.S.C. § 103(a) as allegedly being unpatentable over U.S. Patent No 6,091,724 to Chandra et al. ("Chandra") in view of U.S. Patent No. 6,510,323 to Stocker et al. ("Stocker") and further in view of U.S. Patent No. 6,324,578 to Trenbeath et al. ("Trenbeath"). Applicants respectfully traverse this rejection.

Independent claims 26, 33, 39, 45, 51, and 57 recite features that distinguish over the applied references. For example, claim 26 recites, *inter alia*, (emphasis added):

> ***identifying a category of the update message <u>based on the input source</u>***.

Independent claim 33 recites similar distinguishing features, using its respective language. Further, independent claim 39recites, *inter alia*, (emphasis added):

> wherein a gateway device at the routing network is configured to ***identify a category of the update message <u>based on the input source</u>***, to determine a node type to which the identified category maps, and to route the update

Atty. Dkt. No. 2222.775000E

> message to the node, having the node type, at the routing network.

Independent claims 45, 51, and 57 recite similar distinguishing features, using their respective language.

These features are neither disclosed nor suggested by the applied references.

The Examiner, for example, on page 3 of the Office Action relies on columns 1:25-35 and 5:45-65 of Chandra (in view of paragraphs 103 and 105 of the specification of instant application) to allegedly show the above-noted distinguishing features of independent claims 26, 33, 39, 45, 51, and 57. Applicants respectfully disagree.

Chandra discloses a method for "routing messages within a network using the data content of the message." (Chandra, Title.) When discussing the background art, Chandra discloses that (emphasis added):

> One example of a system that includes such a network environment is a publish/subscribe system. In publish/subscribe systems, publishers post messages and ***subscribers independently specify categories of events in which they are interested.*** The system takes the posted messages and includes in each message header the destination information of those subscribers indicating interest in the particular message. The system then uses the destination information in the message to forward the message through the network to the appropriate subscribers.
>
> (Chandra, 1:26-35.)

This section of Chandra, relied on by the Examiner, merely discloses that subscribers can specify categories of event in which they are interested. This is not the same as "identify a category of the update message based on the input source," as recited in claims 26, 33, 39, 45, 51, and 57, using their respective language.

Chandra further discusses the content based subscription, where "one or more of the clients can specify a subscription. Each subscription provides a set of conditions indicating the types of messages those clients are interested in receiving." (Chandra, 5:45-48.) Chandra discloses that (emphasis added):

> Consider an example in which messages are related to the stock market. In such an example, a subscription may have the following three fields (or attributes): stock issue, stock price and stock value. The client specifies values for these fields, e.g., IBM, 100, 200, and then, these fields are used to determine if the client is interested in a particular message. ***If the data content of the message matches the specified values of the subscription, then the message is delivered to the one or more subscribers (or clients) of that subscription.*** It will be apparent to those skilled in the art that the use of three fields in the subscription is only one example. Subscriptions may include any number of desired fields and tests may include relationships other than equality. Further, the stock market scenario is only one example. Messages and subscriptions can be used for any type of data or events.
>
> (Chandra, 5:53-67.)

This section of Chandra, relied on by the Examiner, discloses that if the ***data content of the message*** matches the specified values of the subscription, then the message is delivered to the one or more subscribers (or clients) of that subscription. This is not the same as "identify a category of the update message based on the input source." as recited in claims 26, 33, 39, 45, 51, and 57, using their respective language.

The Examiner, for example, on page 3 of the Office Action, relies on the above sections of Chandra to allegedly show "identifying each category based on the category/topic of the message content." By this statement, the Examiner appears to agree that Chandra teaches identifying categories **based on category/topic of the message content**. In contrast, claims 26, 33, 39, 45, 51, and 57 recite, *inter* alia,

"identify a category of the update message based on the input source," using their respective language.

The Office Action, for example, on pages 4 and 5, states, which Applicants do not acquiesce to, that Stocker teaches "GIMR 300 determining a message control node 210 to send a general information message 220 to MSS 110," "if the cell serving mobile station in part of the served area 195, the step 430 is entered," "determining if the served area … associated with the MS 100," "routing the update message to the node having determined node type," and "sending general message invocation … to determined message control nod." However, the Office Action does not use Stocker to disclose, nor does it teach or suggest, at least the above-noted distinguishing features of claims 26, 33, 39, 45, 51, and 57. Therefore, Stocker does not cure the deficiencies of Chandra.

Further, the Office Action, for example, on page 5, states, which Applicants do not acquiesce to, that Trenbeath teaches "subscribed clients C, D, E receives [sic] update data, attached data object in update messages from a publishing client A." However, the Office Action does not use Trenbeath to disclose, nor does it teach or suggest, at least the above-noted distinguishing features of claims 26, 33, 39, 45, 51, and 57. Therefore, Trenbeath does not cure the deficiencies of Chandra and Stocker. Thus, the combination of Chandra, Stocker, and Trenbeath does not render the claims obvious.

Applicants therefore respectfully request the reconsideration and withdrawal of the rejection of claims 26, 33, 39, 45, 51, and 57 under 35 U.S.C. § 103(a). Accordingly, at least based on their respective dependencies to claims 26, 33, 39, 45, 51, and 57,

claims 28, 34, 42-44, 48-50, 54-56, 60-62, 67, and 68 should be found allowable over the applied references, as well as for their additional distinguishing features.

<u>**Claims 29-31 and 35-38**</u>

Claims 29-31 and 35-38 were rejected under 35 U.S.C. § 103(a) as allegedly being unpatentable over Chandra in view of Stocker, further in view of Trenbeath, and in further view of U.S. Patent No. 7,209,959 to Campbell et al. ("Campbell"). Applicants respectfully traverse this rejection.

Dependent claims 29-31 and 35-38 are allowable at least because they recite all of the features of independent claims 26 and 33, from which they depend. As discussed above, Chandra, Stocker, and Trenbeath, taken alone or in combination, fail to disclose all of the features of claims 26 and 33.

Further, the Office Action, on pages 30-34, states, which Applicants do not acquiesce to, that Campbell teaches "causing the node to determine at least one client proxy with which the client communicates; causing the node to route to the client proxy; and causing the client proxy to rout the data to the client to determine the connection," "client information is extracted and replaced with predetermined substitute information at server proxy which is considered as a client proxy," and "wherein the node is configured to determine a connection by determining at least one client proxy with which the registered client communicates and to route the data to the client proxy." However, the Office Action does not use Campbell to disclose, nor does it teach or suggest, at least the above-noted distinguishing features of claims 26 and 33. Therefore, Campbell does not cure the deficiencies of Chandra, Stocker, and Trenbeath.

Accordingly, at least based on their respective dependencies to claims 26 and 33, claims 29-31 and 35-38 should be found allowable over the applied references, as well as for their additional distinguishing features.

**Claims 40, 41, 46, 47, 52, 53, 58, and 59**

Claims 40, 41, 46, 47, 52, 53, 58, and 59 were rejected under 35 U.S.C. § 103(a) as allegedly being unpatentable over Chandra in view of Stocker, further in view of Trenbeath, and in further view of U.S. Patent No. 6,314,459 to Freeman ("Freeman"). Applicants respectfully traverse this rejection.

Dependent claims 40, 41, 46, 47, 52, 53, 58, and 59 are allowable at least because they recite all of the features of independent claims 39, 45, 51, and 57, from which they depend. As discussed above, Chandra, Stocker, and Trenbeath, taken alone or in combination, fail to disclose all of the features of claims 39, 45, 51, and 57.

Further, the Office Action, on pages 35-38, states, which Applicants do not acquiesce to, that Freeman teaches "wherein providing the data representation to the client device includes providing the live object that causes the client device to register with a client proxy of the routing network," "wherein providing the data representation to the client device includes providing the live object that causes the client device to register with the node of the routing network," "wherein the live object of the data representation is configured to cause the client device to register with a client proxy of the routing network," and "wherein the live object of the data representation is configured to cause the client device to register with the node of the routing network," However, the Office Action does not use Freeman to disclose, nor does it teach or

suggest, at least the above-noted distinguishing features of claims 39, 45, 51, and 57. Therefore, Freeman does not cure the deficiencies of Chandra, Stocker, and Trenbeath.

Accordingly, at least based on their respective dependencies to claims 39, 45, 51, and 57, claims 40, 41, 46, 47, 52, 53, 58, and 59 should be found allowable over the applied references, as well as for their additional distinguishing features.

**Claims 63, 64, and 66**

Claims 63, 64, and 66 were rejected under 35 U.S.C. § 103(a) as allegedly being unpatentable over Chandra in view of Stocker. Applicants respectfully traverse this rejection.

Independent claims 63, 64, and 66 recite features that distinguish over the applied references. For example, independent claim 63recites, *inter alia*, (emphasis added):

> wherein in response to determining that the client device is registered to receive update data for the live object, ***causing a category of the update message to be identified based on the input source***, a node type associated with the category be determined, and the update message be routed from the gateway device to a node having the node type at the routing network, and causing the node to route the update message to the client device.

Further, independent claim 64 recites, *inter alia*, (emphasis added):

> wherein the routing network is configured to ***identify a category of the update message based on the input source***, determine a node type associated with the category, and to route the update message from a gateway device at the routing network to a node having the node type at the routing network, and wherein the node is configured to route the update message to the client device if the client device is registered to receive the update data for the live object.

Also, independent claim 66 recites, *inter alia*, (emphasis added):

> wherein ***a category of the update message is identified*** ***based on the input source***, a node type associated with the category is determined, and the update message is routed from a gateway device at the routing network to a node having the node type at the routing network, wherein the update message is routed from the node to the client device in response to a determination that the client device is registered to receive the update data for the live object.

As discussed above with respect to independent claims 26, 33, 39, 45, 51, and 57, Chandra and Stocker, taken alone or in combination, fail to disclose the above-noted distinguishing features of claims 63, 64, and 66. Applicants therefore respectfully request the reconsideration and withdrawal of the rejection of claims 63, 64, and 66 under 35 U.S.C. § 103(a).

## *Conclusion*

All of the stated grounds of rejection have been properly traversed, accommodated, or rendered moot. Applicants therefore respectfully request that the Examiner reconsider all presently outstanding rejections and that they be withdrawn. Applicants believe that a full and complete reply has been made to the outstanding Office Action and, as such, the present application is in condition for allowance. If the Examiner believes, for any reason, that personal communication will expedite prosecution of this application, the Examiner is invited to telephone the undersigned at the number provided.

Prompt and favorable consideration of this Amendment and Reply is respectfully requested.

Respectfully submitted,

STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

Glenn J. Perry
Attorney for Applicants
Registration No. 28,458

Date: 9 Feb. 2012

1100 New York Avenue, N.W.
Washington, D.C. 20005-3934
(202) 371-2600

1465715_1.DOCX

# EXHIBIT A-14

US007257582B2

(12) **United States Patent**
**Rothschild**

(10) **Patent No.: US 7,257,582 B2**
(45) **Date of Patent: Aug. 14, 2007**

(54) **LOAD BALANCING WITH SHARED DATA**

(75) Inventor: **Michael Rothschild**, Ramot Hashavim (IL)

(73) Assignee: **Corigin Ltd**, Or-Yehuda (IL)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 912 days.

(21) Appl. No.: **10/375,893**

(22) Filed: **Feb. 27, 2003**

(65) **Prior Publication Data**

US 2003/0177161 A1 Sep. 18, 2003

**Related U.S. Application Data**

(60) Provisional application No. 60/363,853, filed on Mar. 13, 2002.

(51) **Int. Cl.**
*G06F 17/30* (2006.01)

(52) **U.S. Cl.** .................................... **707/10**; 707/104.1

(58) **Field of Classification Search** ............. 707/1-10, 707/100-104.1, 200-206; 718/105; 719/316; 703/23; 705/35; 711/147.3, 133

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,357,632 A * 10/1994 Pian et al. .................. 718/105
5,603,028 A * 2/1997 Kitsuregawa et al. ....... 718/105
5,835,755 A * 11/1998 Stellwagen, Jr. ............... 707/3
5,926,833 A * 7/1999 Rasoulian et al. .......... 711/147
6,061,067 A * 5/2000 Silva et al. ................ 345/619
6,275,867 B1 * 8/2001 Bendert et al. ............ 719/316

* cited by examiner

*Primary Examiner*—Yicun Wu
(74) *Attorney, Agent, or Firm*—Andrew Wilford

(57) **ABSTRACT**

The input of a computer executable process, is logically subdivided, without reading, into a plurality of partitions which are distributed to a plurality of processors in which respective subtasks including the reading of those partitions, are carried out. The method allows distribution of processing of a large amount of data to a plurality of processors cooperating in a way that the load imposed on each processor is proportional to its capacity to do the work.

**14 Claims, 4 Drawing Sheets**




Configuration File
0
Input 1
Input 2
Input 3
. . .
Input n-1
Input n
1
2
3
4
5
6
9
10
Initiating System
Equivalent Process
101
102
103
104
105
Split
Sub Task
Wait
Merge
303
Output 3
Output 4
304
20
Helping System 1
Sub Task
201
30
Helping System 2
Sub Task
202
Control File
7
Output 1
301
Output 2
302

Fig. 1



Configuration File
0
Input 1
Input 2
Input 3
. . .
Input n-1
Input n
1
2
3
4
5
6
9
10
Initiating System
Equivalent Process
101
102
Split
103
Sub Task
104
Wait
Terminate
106
20
Helping System 1
Sub Task
201
Control File
7
30
Helping System 2
Sub Task
202
Output 1
Output 2
Ouput 3
. . .
Ouput n-1
Ouput n
401
402
403
404
405
406


*Fig. 2*



Configuration File
0
Input 1
Input 2
Input 3
. . .
Input n-1
Input n
1
2
3
4
5
6
9
10
Initiating System
Equivalent Process
Split
Sub Task
Wait
Terminate
101
102
103
104
106
20
Helping System 1
Sub Task
201
30
Helping System 2
Sub Task
202
Control File
7
Output File
408


Fig. 3


Control File
Input 1
Input 2
Input 3
Input 4
Input 5
Input 6
0
Sub Task 1
Sub Task 2
Output 1
Output 2
Merge
Output 3

Fig. 4

# LOAD BALANCING WITH SHARED DATA

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a nonprovisional application corresponding to Ser. No. 60/363,853 filed 13 Mar. 2002.

## FIELD OF THE INVENTION

This invention relates to the field of sharing data and workload between possibly heterogeneous computer systems.

More specifically, it deals with a way to split the performance of a given task among a plurality of processing units which can all access, directly or indirectly, the input data and the devices on which the output data is to be stored.

Sort applications, statistical analysis batch applications and report writing applications and database queries are examples of applications that can readily enjoy this invention.

## BACKGROUND OF THE INVENTION

With the constant improvement in telecommunication technology and the increasing tendency to consolidate computing resources, many computer sites contain a plurality of computers.

The load imposed on the various computers in these sites is normally the result of the activities directed specifically to these computers and the fact that one of them is especially loaded while others are relatively idle does not affect the way work is distributed between them. As a result, in contemporary environments, much can be gained by the parallelization of some processes and their distributed execution across all available computing resources in a way that both speeds the execution of the whole process and balances the load the various computers are subjected to.

Recent developments introduced the concepts of Storage Area Networks (SAN) and Network Attached Storage (NAS) devices to enable efficient usage of storage resources. These technologies increase the symmetry of storage access in a multiple computer environment, increasing the benefits that can be expected from such a parallelization.

## OBJECTS OF THE INVENTION

The principal object of the present invention is to enable the decomposition of a certain type of linear processes that currently use a single computer, into equivalent parallel processes that can efficiently use any number of potentially heterogeneous computers, taking the available capacity of each of these computers into account while optimizing execution.

A more general object is to improve processing efficiency of certain processes.

It is also an object to obtain better processor utilization.

## SUMMARY OF THE INVENTION

These objects and others which may become apparent hereinafter are achieved in a method which distributes the load of a process that normally reads an input file sequentially and processes its records one by one between a plurality of potentially heterogeneous processors through the logical partition of the input and the activation of a plurality of sub tasks in said plurality of processors, each said sub task processing the partitions defined by said logical partition in a first come first serve basis.



The method of effecting a computer-executable process according to the invention thus comprises the steps of:

(a) automatically determining file allocation and logically subdividing records of the input file into a plurality of partitions;

(b) distributing the partitions to a plurality of processors and activating respective subtasks of the computer-executable process in each of the processors, each subtask reading and processing the partitions on a first come first serve basis; and

(c) generating at least one output reflecting the processing of the subtasks.

The automatic determination of file allocation and logical subdivision of records of said input file into said plurality of partitions in step (a) and the distribution of said partitions in step (b) can be carried out with at least one processor and the processors used can include mutually heterogeneous processors.

Each of the subtasks can produce a subtask output and the subtask outputs can be merged to produce the output of step (c). The output in step (c) can, however, be a succession of outputs from the subtasks in a one to one correspondence with the records of the input file. Alternatively, the output in step (c) can be an accumulation of output records from the subtasks in an arbitrary order.

The input file can reside on a directly attached storage or on a storage area network (SAN) or on a network attached storage (NAS)and can be derived therefrom. The computer-executable process can be a sort process, a statistical analysis process, a report creating process or a database query or a combination thereof. Without limitation thereto, the one processor can be part of a mainframe computer and the plurality of processors can be processors of at least one other computer or the plurality of processors can all be parts of a single multiprocessor. The one processor can thus also reside on a machine which is not a mainframe.

## BRIEF DESCRIPTION OF THE DRAWING

The above and other objects, features, and advantages will become more readily apparent from the following description, reference being made to the accompanying drawing in which:

FIG. **1** is a block diagram describing how a system according to the invention works;

FIG. **2** is a block diagram which describes the way the system works when the output file can be shared with no write coordination mechanism;

FIG. **3** is a block diagram which describes the way the system works when the output file can be shared with a write coordination mechanism; and

FIG. **4** is a diagram which illustrates the application of the invention to a sort process.

## SPECIFIC DESCRIPTION

FIG. **1** contains a top-level description of the invention and its workings. In the initiating system **10**, the invocation of a process has been replaced by an invocation of a logically equivalent Process **101** that is based on the current invention, capable of delegating at least some of the load to the available helping systems. In this figure, only two such helping systems are depicted—helping system **1** and helping system **2**—but in general, any positive number of such systems can be used.

The Equivalent Process **101** accepts the same input, or input with the same semantics, as the original Process. If the original Process is a sort Process then, in most cases, it is told by this input, what the file to be sorted is and what parts of the records in this file constitute the key according to which it is to be sorted. In this case the input also specifies the data types of the various parts of the key. If the original Process is one of statistical analysis then the various statistics and the data for these statistics are specified by this input. If the original Process is a report generator then the definition of the various reports and the data files they should be extracted from are parts of this input.

The various parts of the Equivalent Process **101** are depicted here as consecutive steps in one procedure but alternative embodiments could replace them by dependent tasks controlled by a job scheduler. In this case, the wait step **104** would be replaced by a dependency of the Merge step **105** on the completion of Sub Task **103**, Sub Task **201** and Sub Task **202**. More generally, the Merge step would have been instructed to start only after all the Sub Task steps have completed.

The first step of the Equivalent Process **101** is the Split step **102**. This step combines the information contained in the parameters supplied to the Equivalent Process **101** as a whole (in the sort case, these parameters include the name of the file to be sorted **9** and the keys to be used), with the information contained in the configuration file **0** which includes the names of the servers available to perform this task and with information from the operating system about the size and location of the input file or files **9**, to create the control file **4** specifying a logical partition of the input.

Input files **9** are, thus, logically partitioned into n logical partitions where n is a number the split step **102** has decided upon. In FIG. **1**, these logical partitions are numbered as 1 to 6.

A logical partition in this context is a well-defined part of the input or output. A very simple way to define a partition, which in many cases is the most efficient, would be to define the partitions as consecutive ranges on the input or output, ranging from one relative byte address to another relative byte address or from one relative track address to another.

Of course, as we normally process full records, the partition boundaries or the way they are interpreted should take this fact into account. For example, if the beginning of a range falls within a record, this record can be said to belong to the previous range. Other partition definitions can be used with no impact on the rest of the embodiment.

Note that the number of input partitions is not necessarily the number of helping systems. Normally, the number of logical input partitions will largely exceed the number of helping systems.

Note that the logical partition does not rely on actual reading of the file. The actual reading of the file is reserved to the subtasks which read the partitions allocated to them. A splitting function may be allocating offset 0 to offset 100000 to a first partition, offset 100001 to 200000 to the second partition, offset 200001 to 300000 to the third partition and 300001 to the end of the file to a fourth partition.

The split step **102** could rely on additional information that could also be contained in the configuration file **0**. It could, for example, take into account the power of each available server and the current load of this server.

When the split step terminates, the various Sub Tasks (in this case: **103**, **202**,**203**) can be activated. This activation can be initiated by the split step **102** itself or by an external scheduler. Each Sub Task finds the subdivision of the input in the control file **4**. Each such Sub Task then repeatedly tries to allocate for itself and then process, an input partition that has not been allocated yet. In the embodiment described in FIG. **1**, the output of the various Sub Tasks has to be further processed to create an output that is equivalent to the one expected from the original process. This is why each Sub Task creates its output on dedicated output files. In this case, Sub Task **201** creates Output**1** (**301**), Sub Task **202** creates Output**2** (**302**) and Sub Task **103** creates Output**3** (**303**).

Reading, processing and writing, are not necessarily straight forward since all the input and output files are shared by the potentially heterogeneous systems and while the Sub Task itself is also performed in these potentially heterogeneous systems, the results should look as if they have all been created by the Initiating System **10**.

This is why the various Sub Tasks may have to use heterogeneous read and write functionality to read and write their corresponding Input Partitions (see my commonly owned copending application Ser. No. 10/209,673 filed 31 Jul. 2002, which is hereby incorporated in its entirety by reference).

This is also why, if the original Process is a sort Process, depending on the type of the input key, parts of the key's data may or may not be converted from the Initiating System's representation to an equivalent representation on the Helping Systems and then, after being sorted, converted back to the Initiating System's representation.

If, continuing with the sort example, the Initiating System **10** is an IBM mainframe and the Helping Systems **20** and **30** are HP-UX machines then character strings should not be converted from EBCDIC to ASCII since the order we want to create is the EBCDIC order. In this case, binary numbers should not be converted either since their representation is the same on both systems but the mainframe's floating point numbers should be, converted to HP-UX floating point numbers and back and packed decimal numbers should be converted to and from some HP-UX appropriate representation like, depending on the precision, short, long or long long binary numbers or even character strings.

Once all the Sub Tasks have terminated, the Merge Step **105** can be initiated. To initiate the Merge Step **105** at the appropriate time, the Wait Step **104** can be used, as depicted in this figure, to periodically verify the Control file **4** and detect the completion of all sub tasks and then schedule the Merge Step **105**. Another alternative for the timely activation of the Merge Step would be to use some existing scheduler, as already mentioned.

Note that although the Merge Step **105** is depicted as running on the Initiating System **10**, this should not necessarily be the case.

It can be the task of the Split Step **102** to decide where the Merge Step **105** should run or the processor that was the fastest in processing the last input partition it processed can be automatically selected for this purpose.

The Merge Step **105**, as the Sub Tasks preceding it, may have to use the heterogeneous read and write functionality and the appropriate type conversions of parts of the data. What the Merge step **105** does is, of course, to merge the outputs of the various Sub Tasks into the result output file or files, represented in this figure by Output **4**. Once the Merge Step **105** has completed, the whole Equivalent Process **101** is complete. The Merge step **105** only needs to be performed in cases where there are more than one Sub Task. Otherwise it is not needed.

If the original Process is a sort Process then there are some additional cases, beyond the simple sort of an input file for

the creation of an output file where the same technology)can be used to at least some extent.

A typical case is when the sort to be replaced uses exits like the input and output exits supported by all conventional IBM mainframe sort utilities, termed, in this environment E15 and E35.

Such exits could be handled in any of the following ways or a combination thereof:

Provide equivalent exit routines in all the relevant Helping System. This requires some work and is not always possible but when implemented, it is the most efficient solution. Note that the input exit only needs to be implemented where Sub Tasks are performing and the output exit only needs to be implemented where the Merge Process or the only Sub Task is being performed.

Use communication, either over telecommunication lines, or through the disk controller, to communicate between an exit running on one system and a Sub Task or Merge Process running on another. This alternative is not as efficient as the other ones, but it could be the only available one.

Run the Merge Process on the Initiating System **10** just to avoid the need to perform the output exit elsewhere.

Run on the initiating System **10** Pre Sort and Post Sort conversion steps with the sole purpose of running the exits.

FIG. **2** depicts an embodiment that can improve performance in some very special cases.

The special cases where this embodiment would be preferable are those where there is a one to one correspondence between the input records and the output records, the size of the output generated for a given input partition can be predicted and there is no harm in placing the output records in the same order as their corresponding input records appeared in the input file.

In such cases, output partitions are logically allocated on an output file in a one to one correspondence with the input partitions and the Sub Tasks write the output resulting from processing a specific input partition to the corresponding output partition. The Merge step can then be obviated.

In the specific example of FIG. **2**, the output created from processing input**1** **1** is placed in output**1** **401**, the output created for input**2** **2** is placed on output**2** **402** etc.

The Terminate step **106** is only there to signal the termination of the equivalent processes. In an environment where process scheduling is performed by a scheduler, this step can be obviated.

In this embodiment, as well as in that of FIG. **1**, there is a simple way to reduce the risk of failure resulting from one of the systems becoming inoperative.

All that is needed is some mechanism to detect the failure of a system (based, for example, on some heart beat mechanism) and return the partitions for which the failing system was responsible to the general pool where the remaining systems will then take care of them.

FIG. **3** depicts yet another special embodiment that is preferable in applications where the output created by the various Sub Tasks is small when compared to their input, where the order of the resulting records is immaterial and where a mechanism exists for simultaneous writes on a single file.

Note that in the embodiment of FIG. **2** there where simultaneous write operations directed at the same file as well but since the various parts of the output file were preallocated and no two Sub Tasks wrote to the same logical partition of the output, there was no need for a special mechanism to coordinate these simultaneous writes. This is not the case in this figure. Here, the output records are written to the output file **408** at an arbitrary order and there is no prior knowledge of their quantity and size. Therefore, the write operations must be coordinated and it is the assumption of this embodiment that they are.

A special case where such an embodiment might be interesting is that of a query that selects rows from a database table without requiring any special ordering of the output. In this case, there might be a process that first scans the index to detect interesting row identifiers and puts them on the input file **9** that serves as an input for the whole process depicted in this figure. Both this input file **9** and the output file **408** can be virtual. The input file may be a memory resident list and the output file may be the screen of a terminal.

FIG. **4** describes a sort process. In the example depicted in FIG. **4**, two subtasks—Sub Task **1** and Sub Task **2**, are invoked to perform a sort.

The input file **0** is (logically) partitioned into six partitions.

Sub Task **2** is, for some reason, faster than Sub Task **1** (it may be running on a faster processor or on one on which the current load is lower). This is why Sub Task **2** manages to do a larger part of the job.

First, Sub Task **2** updates the control file to take responsibility of Input **1**.

Then Sub Task **1** starts processing Input **1**. While this is happening, Sub Task **2** takes responsibility (using the control file) for Input **2** and starts processing it.

While Sub Task **1** processes Input **2**, Sub Task **2** finishes the processing of Input **1**, takes responsibility for Input **3** and processes it, then it takes responsibility for Input **4** and starts processing it.

While Sub Task **2** processes Input **4**, Sub Task **1** finishes processing Input **2**, takes responsibility for Input **5** and starts processing it.

While Sub Task **1** processes Input **5**, Sub Task **2** finishes processing Input **4**, takes responsibility for Input **6**, and processes it.

When both Sub Tasks terminate the processing of their last input partition they put the sorted output on their respective output files.

Then the merge step is initiated and merges the two output files into one merged output file.

I claim:

**1**. A method of effecting on a preexisting input file a computer-executable process comprised of a plurality of subtasks, the method comprising the steps of:

(a) automatically determining file allocation and logically subdividing records of said input file into a plurality of partitions;

(b) distributing descriptions of all of said partitions to each of a plurality of subtask processors

c) simultaneously executing at least a respective one of the subtasks of the computer-executable process in each of at least some of said processors on a respective one of the partitions with each subtask reading and processing the respective partition so as to process the respective partition and produce respective subtask output and;

d) thereafter repeating step (c) in at least some of the subtask processors each with another unprocessed partition on a first-come/first-served basis; and

(e) generating at least one output combining all of the subtask outputs and reflecting the processing of all of said subtasks.

**2**. The method defined in claim **1** wherein the automatic determination of file allocation and logical subdivision of records of said input file into said plurality of partitions in

step (a) and the distribution of the description of all of said partitions in step (b) is carried out with at least one further processor in addition to the subtask processors.

**3**. The method defined in claim **1**, further comprising the step of merging said subtask outputs in step (e).

**4**. The method defined in claim **1** wherein the output in step (e) is a succession of outputs from said subtasks in a one-to-one correspondence with said records of said input file.

**5**. The method defined in claim **1** wherein the output in step (e) is an accumulation of output records from said subtasks in an arbitrary order.

**6**. The method defined in claim **1** wherein said input file resides on a storage area network and is derived therefrom.

**7**. The method defined in claim **1** wherein said input file resides on a network-attached storage and is derived therefrom.

**8**. The method defined in claim **1** wherein said computer-executable process is a sort process.

**9**. The method defined in claim **1** wherein said computer-executable process is a statistical analysis process.

**10**. The method defined in claim **1** wherein said computer-executable process is a report-creating process.

**11**. The method defined in claim **1** wherein said computer-executable process includes a database query.

**12**. The method defined in claim **2** wherein said one processor is part of a mainframe computer and the other processors are processors of at least one other computer.

**13**. The method defined in claim **1** wherein said plurality of processors are all parts of a single multiprocessor.

**14**. The method defined in claim **1** wherein the automatic determination of file allocation and logical subdivision of records of said input file into said plurality of partitions in step (a) and the distribution of the descriptions of all of said partitions in step (b) is carried out with at least one processor, and said one processor and said plurality of processors are all parts of a single multiprocessor not including said one processor.

* * * * *

# EXHIBIT A-15

Remarks:

This amendment is submitted in an earnest effort to advance this case to issue without delay.

The claims have been amended to clarify their language and defined the invention with somewhat greater particularity over the art.

The primary difference between the instant invention and the processes disclosed in US 5,603,028 of Kitsuregawa and 5,357,632 of Pian is that these systems rely on a special control process that uses load information to distribute the load between processors that share the load. With the instant invention as defined in the claims there is no such special process. The prior art's load information is not created with the process of the instant invention. Instead, the load sharing is done as a byproduct of the fact that the load-sharing process take parts of the load on a first-come/first-served basis.

A comparison would be to a road intersection where, according to the prior art, there is a traffic light that determines who can go when. The instant invention is more like such an intersection with a four-way stop so that the individual drivers determine who can go and when.

This is a major improvement since in addition to eliminating the control process it also eliminates the need to

collect and maintain load information, which it is very difficult to do and almost impossible to define so as to anticipate all possible processors that might execute the subtasks.

The amended claims, refer to a distribution of a description of the work to be done. The sharing process can use such a description to distribute the load without a special load process.

For these reasons the instant invention is clearly allowable over the cited art. Notice to that effect is earnestly solicited.

If only minor problems that could be corrected by means of a telephone conference stand in the way of allowance of this case, the examiner is invited to call the undersigned to make the necessary corrections.

Respectfully submitted,
K.F. Ross P.C.

by: Andrew Wilford, 26,597
Attorney for Applicant

02 March 2007
5676 Riverdale Avenue Box 900
Bronx, NY 10471-0900
Cust. No.: 535
Tel: 718 884-6600
Fax: 718 601-1099

Enclosure: None.

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/375,893 | 02/27/2003 | Michael Rothschild | 22469 | 6365 |

535 7590 12/08/2006

THE FIRM OF KARL F ROSS
5676 RIVERDALE AVENUE
PO BOX 900
RIVERDALE (BRONX), NY 10471-0900

| EXAMINER | |
|---|---|
| WU, YICUN | |
| **ART UNIT** | **PAPER NUMBER** |
| 2165 | |

DATE MAILED: 12/08/2006

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

| Office Action Summary | Application No. | Applicant(s) |
|---|---|---|
| | 10/375,893 | ROTHSCHILD, MICHAEL |
| | Examiner | Art Unit |
| | Yicun Wu | 2165 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE 3 MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on *27 February 2003*.

2a)☐ This action is **FINAL**. 2b)☒ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) *1-14* is/are pending in the application.

4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) *1-14* is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☒ The drawing(s) filed on *27 February 2003* is/are: a)☒ accepted or b)☐ objected to by the Examiner.

Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

a)☐ All b)☐ Some * c)☐ None of:

1.☐ Certified copies of the priority documents have been received.

2.☐ Certified copies of the priority documents have been received in Application No. _____.

3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

* See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)
2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3) ☐ Information Disclosure Statement(s) (PTO/SB/08) Paper No(s)/Mail Date _____.
4) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____.
5) ☐ Notice of Informal Patent Application
6) ☐ Other: _____.

Ylen
Patent Examiner
Technology Center 2100

## III. DETAILED ACTION

1. Claims 1-14 are presented for examination.

### *Claim Rejections - 35 USC § 103*

2. The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

3. Claims 1-5 are rejected under 35 U.S.C. 103(a) as being unpatentable over Kitsuregawa et al. (U.S. Patent 5,603,028) in view of Pian (U.S. Patent 5,357,632).

As to Claim 1, Kitsuregawa et al discloses a method of effecting a computer-executable process comprising the steps of:

(a) automatically determining file allocation (i.e. a plurality of data. Col. 3, lines 61-65) and logically subdividing records (i.e. a total Nx number of data. Col. 4, lines 55-60) of the input file (Col. 4, lines 55-60) into a plurality of partitions (Col. 4, lines 55-60);

(b) distributing (i.e. transferred. Col. 4, lines 55-60 and abstract) the partitions to a plurality (i.e. second group. Col. 4, lines 55-60) and activating respective subtasks of the computer-executable process in each of the processors (Col. 4, lines 55-60), each subtask reading and processing the partitions on a first come first serve basis (Col. 4, lines 55-60); and

(c) generating at least one output (i.e. output. Col. 5, lines 11-22) reflecting the processing of the subtasks (Col. 5, lines 11-22 and Col. 4, lines 55-60).

Kitsuregawa et al does not explicitly teach a plurality of processors.

Pian teaches a plurality of processors (i.e. a plurality of control processors. Col. 1, lines 49-67 and fig. 1).

Therefore, it would have been obvious to a person having ordinary skill in the art at the time the invention was made to have modified Kitsuregawa et al to include a plurality of processors.

It would have been obvious to a person having ordinary skill in the art at the time the invention was made to have modified Kitsuregawa et al by the teaching of Pian to include a plurality of processors with the motivation to more improve distributed data flow signal network as taught by Pian (column 1, line 50-55).

As to Claim 2, Kitsuregawa et al as modified teaches a method wherein

the automatic determination of file allocation and logical subdivision of records of the input file into the plurality of partitions in step (a) and the distribution of the partitions in step (b) is carried out with at least one processor (i.e. a first group of N memories. Kitsuregawa et al Col. 4, lines 49-55 and col. 2, lines 27-30) in addition to the subtask processors formulation (i.e. a second group of N memories. Kitsuregawa et al Col. 4, lines 49-55).

As to Claim 3, the teachings of Kitsuregawa et al as modified has been discussed above,

Kitsuregawa et al does not explicitly teach merging the subtask outputs to produce the output of step (c).

Pian teaches merging the subtask outputs to produce the output of step (c). (i.e. joins. Col. 10, lines 1-14).

Therefore, it would have been obvious to a person having ordinary skill in the art at the time the invention was made to have modified Kitsuregawa et al to include merging the subtask outputs to produce the output of step (c).

It would have been obvious to a person having ordinary skill in the art at the time the invention was made to have modified Kitsuregawa et al by the teaching of Pian to include merging the subtask outputs to produce the output of step (c) with the motivation to more improve distributed data flow signal network as taught by Pian (column 1, line 50-55).

As to Claim 4, Kitsuregawa et al as modified teaches a method wherein

the output in step (c) is a succession of outputs from the subtasks in a one to one orrespondence with the records of the input file (Kitsuregawa et al Col. 4, lines 49-60).

As to Claim 5, Kitsuregawa et al as modified teaches a method wherein

the output in step (c) is an accumulation of output records from the subtasks in an arbitrary order (Kitsuregawa et al Col. 4, lines 49-60).

As to Claim 6, Kitsuregawa et al as modified teaches a method wherein

the input file resides on a storage area network and is derived therefrom (fig. 3).

As to Claim 7, Kitsuregawa et al as modified teaches a method wherein

the input file resides on a network attached storage and is derived therefrom (fig. 3).

As to Claim 8, Kitsuregawa et al as modified teaches a method wherein the

computer-executable process is a sort process (a sort process is considered intended use) .

As to Claim 9, Kitsuregawa et al as modified teaches a method wherein

the computer-executable process is a statistical analysis process (statistical analysis process is considered intended use).

As to Claim 10, Kitsuregawa et al as modified teaches a method wherein

the computer-executable process is a report creating process (report creating process is considered intended use).

As to Claim 11, Kitsuregawa et al as modified teaches a method wherein

the computer-executable process includes a database query (database query is considered intended use).

As to Claim 12, Kitsuregawa et al as modified teaches a method wherein

the one processor is part of a mainframe computer (a mainframe computer is considered intended use) and the plurality of processors are processors of at least one other computer (i.e. a plurality of control processors. Pian Col. 1, lines 49-67).

As to Claim 13, Kitsuregawa et al as modified teaches a method wherein

the plurality of processors are all parts of a single multiprocessor (Pian Col. 1, lines 49-67 and fig. 1).

As to Claim 14, Kitsuregawa et al as modified teaches a method wherein

the automatic determination of file allocation and logical subdivision of records of the input file into the plurality of partitions in step (a) and the distribution of the partitions in step (b) is carried out with at least one processor (Kitsuregawa et al Col. 4, lines 49-60), and

the one processor and the plurality of processors are all parts of a single multiprocessor (Pian Col. 1, lines 49-67 and fig. 1).

***<u>Points of contact</u>***

4. Any inquiry concerning this communication or earlier communications from the examiner should be directed to Yicun Wu whose telephone number is 571-272-4087. The examiner can normally be reached on 8:00 am to 4:30 pm, Monday -Friday.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Jeffrey Gaffin can be reached on 571-272-4146. The fax phone numbers for the organization where this application or proceeding is assigned are 571-273-8300.

Any inquiry of a general nature or relating to the status of this application or proceeding should be directed to the receptionist whose telephone number is 571-272-2100.

Yicun Wu
Patent Examiner
Technology Center 2100

December 5, 2006

# EXHIBIT A-16

## CLAIM AMENDMENTS

1. (currently amended) A method of effecting on a preexisting input file a computer-executable process comprised of a plurality of subtasks, the method comprising the steps of:

(a) automatically determining file allocation and logically subdividing records of said input file into a plurality of partitions;

(b) distributing descriptions of all of said partitions to each of a plurality of subtask processors ~~and activating~~

(c) simultaneously executing at least a respective one of the subtasks of the computer-executable process in each of at least some of said processors on a respective one of the partitions with [[,]] each subtask reading and processing [[said]] the respective partition [[s]] so as to process the respective partition and produce respective subtask output and;

(d) thereafter repeating step (c) in at least some of the subtask processors each with another unprocessed partition on a first-come/first-served basis; and

[[(c)]] (e) generating at least one output combining all of the subtask outputs and reflecting the processing of all of said subtasks.

2. (currently amended) The method defined in claim 1 wherein the automatic determination of file allocation and logical subdivision of records of said input file into said plurality of

partitions in step (a) and the distribution of the description of all of said partitions in step (b) is carried out with at least one further processor in addition to the subtask processors ~~formulation~~.

3. (currently amended) The method defined in claim 1 ~~wherein each of said subtasks produces a subtask output, said method,~~ further comprising the step of merging said subtask outputs ~~to produce the output of step (c)~~ in step (e).

4. (currently amended) The method defined in claim 1 wherein the output in step [[(c)]] (e) is a succession of outputs from said subtasks in a one-to-one correspondence with said records of said input file.

5. (currently amended) The method defined in claim 1 wherein the output in step [[(c)]] (e) is an accumulation of output records from said subtasks in an arbitrary order.

6. (original) The method defined in claim 1 wherein said input file resides on a storage area network and is derived therefrom.

7. (currently amended) The method defined in claim 1 wherein said input file resides on a network-attached storage and is derived therefrom.

8. (original) The method defined in claim 1 wherein said computer-executable process is a sort process.

9. (original) The method defined in claim 1 wherein said computer-executable process is a statistical analysis process.

10. (currently amended) The method defined in claim 1 wherein said computer-executable process is a report-creating process.

11. (original) The method defined in claim 1 wherein said computer-executable process includes a database query.

12. (currently amended) The method defined in claim [[1]] 2 wherein said one processor is part of a mainframe computer and ~~said plurality of~~ the other processors are processors of at least one other computer.

13. (original) The method defined in claim 1 wherein said plurality of processors are all parts of a single multiprocessor.

14. (currently amended) The method defined in claim 1 wherein the automatic determination of file allocation and logical subdivision of records of said input file into said plurality of

partitions in step (a) and the distribution of the descriptions of all of said partitions in step (b) is carried out with at least one processor, and said one processor and said plurality of processors are all parts of a single multiprocessor not including said one processor.

# EXHIBIT A-17

US007712080B2

(12) **United States Patent**
**Pan et al.**

(10) **Patent No.: US 7,712,080 B2**
(45) **Date of Patent: May 4, 2010**

(54) **SYSTEMS AND METHODS FOR PARALLEL DISTRIBUTED PROGRAMMING**

(75) Inventors: **Lei Pan**, Irvine, CA (US); **Lubomir R. Bic**, Irvine, CA (US); **Michael B. Dillencourt**, Irvine, CA (US)

(73) Assignee: **The Regents of the University of California**, Oakland, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1013 days.

(21) Appl. No.: **10/850,842**

(22) Filed: **May 21, 2004**

(65) **Prior Publication Data**

US 2005/0039159 A1 Feb. 17, 2005

**Related U.S. Application Data**

(60) Provisional application No. 60/472,612, filed on May 21, 2003.

(51) **Int. Cl.**
***G06F 9/44*** (2006.01)
***G06F 9/45*** (2006.01)
***G06F 15/00*** (2006.01)

(52) **U.S. Cl.** ....................... **717/119**; 717/107; 717/108; 717/149; 712/10; 712/23; 712/32

(58) **Field of Classification Search** ....................... None
See application file for complete search history.

(56) **References Cited**

OTHER PUBLICATIONS

Pan et al., Distributed Parallel Computing using Navigatinal programming: Orchestrating Computations Around Data, , IASTED PDCS 2002, pp. 1-6.*

Pan et al., Mobile Agents—The Right Vehicle for Distributed Sequential Computing, Springer-Verlag Berlin Jeidelberg 2002, pp. 575-584.*

Fukuda et al., Messengers: Distributed Programming Using Mobile Agents, Transactions of the SDPS, Dec. 2001, vol .5, No. 4, pp. 95-112.*

Stanislaw Chrobot, Sharing Varaibles in Distributed Memory, Fundamenta Infomaticae 44 (2000) 63-81, IOS Press, pp. 63-81.*

Suzuki et al., Self-Migrating Threads for Multi-Agent Applications, publication data: 1999, published by 1st IEEE computer socitiey international workshop, pp. 1-8.*

Fukuda t al., Messages versus Messengers in Distributed Programming, published by Hournal of Parallel and Distributed Computing vol. 57, Issue 2 May 1999, pp. 1-8.*

Lei Pan, et al., *Distributed Sequential Computing* (pp. 223-239), Applied Parallel and Distributed Computing (Advances in Computation: Theory and Practice, vol. 16), (Y. Pan and L.T. Yang, Eds.), Nova Science Publishers, Inc., New York, 2004.

Lei Pan, et al., *Facilitating Agent Navigation Using DSM—High Level Designs* (11 pages), The 7th Int'l Conf. on Integrated Design & Process Technology (IDPT03), Austin, Texas, Dec. 2003.

(Continued)

*Primary Examiner*—Tuan Q Dam
*Assistant Examiner*—Zheng Wei
(74) *Attorney, Agent, or Firm*—Orrick, Herrington & Sutcliffe LLP

(57) **ABSTRACT**

The present invention relates generally to computer programming, and more particularly to systems and methods for parallel distributed programming. Generally, a parallel distributed program is configured to operate across multiple processors and multiple memories. In one aspect of the invention, a parallel distributed program includes a distributed shared variable located across the multiple memories and distributed programs capable of operating across multiple processors.

**18 Claims, 8 Drawing Sheets**



OTHER PUBLICATIONS

Lei Pan et al., *From Distributed Sequential Computing to Distributed Parallel Computing* (8 pages), The 5th Workshop on High Performance Scientific and Engineering Computing with Applications (HPSECA-03, in conjunction with ICPP-03), Kaohsiung, Taiwan, Oct. 2003.

Lei Pan et al., *NavP Versus SPMD: Two Views of Distributed Computation* (8 pages), Int'l. Conf. on Parallel and Distributed Computing and Systems (PDCS 2003), Marina del Rey, CA, Nov. 2003.

Lei Pan et al., *Distributed Computing Using Navigational Programming* (37 pages), International Journal of Parallel Programming (IJPP), vol. 32, No. 1, pp. 1-37, Feb. 2004, 2004 Plenum Publishing Corporation.

Lei Pan, "*Navigational Programming*", Abstract of the Dissertation, University of California, Irvine (2005), pp. xvii-xx.

* cited by examiner

Fig. 1(a)
(Prior Art)




Fig. 1(b)
(Prior Art)



Fig. 2



Fig. 3(a)




Fig. 3(b)



Fig. 4(a)




Fig. 4(b)



Fig. 5(a)




Fig. 5(b)



Fig. 6


100
Messenger Control Block (MCB)
200
Agent Variables
300
Offset Vector
400
Messenger Heap

Fig. 7


500
Explicit Navigation
600
Compile-Time Strong Mobility
700
DSM
800
Physical

Fig. 8


1000
Implicit Agent Navigation
1100
Navigation Protocol
Mobile Agent System
1150
1200
DSM
1300
Physical Network

# SYSTEMS AND METHODS FOR PARALLEL DISTRIBUTED PROGRAMMING

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims priority to U.S. Application No. 60/472,612 filed on May 21, 2003, which is incorporated herein by reference.

## FIELD OF THE INVENTION

The present invention relates generally to computer programming, and more particularly to systems and methods for parallel distributed programming.

## BACKGROUND OF THE INVENTION

Developing a software application for a system with a single processor and a single memory can be straight forward. When viewing the source code for such an application, the source code is often very similar to its original algorithm that describes the computable operations needed to be executed, and thus is generally not too burdensome to follow or analyze given the original algorithm. On the other hand, a software application for operation on multiple processors that uses multiple memory areas may be more complex. Such applications are often referred to as "parallel distributed programs," and there are generally two approaches to developing such programs.

One approach to developing a parallel distributed program is often referred to as "message passing" ("MP"), which is illustrated in FIG. **1***a*. With this approach, the system is programmed as multiple tasks or threads, X and Y, that operate or execute on multiple processors, Processors **1** and **2**, and handle data residing in multiple memories (not shown). The tasks or threads, X and Y, communicate and cooperate with each other by sending and receiving "messages". This approach allows for the different tasks and threads to operate in parallel and communicate with each other when necessary, which may result in an efficient and high-performing system. However, the source code for such a system may be burdensome to develop because programming the multiple tasks and threads and having them send and receive messages to each other may dramatically change the code structure and data structure of the original algorithm, and hence may be complicated, tedious, and error-prone. The code structure and data structure of the MP-based programs may lose much of their original characteristics. The abilities to preserve these original characteristics are referred to as algorithmic integrity and data structure integrity. MP programs typically do not preserve algorithmic integrity and data structure integrity.

Another approach is often referred to as "distributed shared memory" ("DSM"), which is illustrated in FIG. **1***b*. In this approach, a memory space, which may span across multiple memories indifferent processors, Processors **1** and **2**, is dedicated for multiple threads or tasks to access, i.e., it is a globally accessible memory space built on distributed memories. Thus, a thread, X, on one processor, Processor **1**, can access data in a memory on another processor, Processor **2**, without having to establish another thread. Developing parallel distributed programs using this approach is often easier than using the MP approach, because DSM alleviates the need for major changes in code structure and data structure. However, this approach is generally not as efficient, because it may require a transfer of large amounts of data from the memory on the other processor, Processor **2**, to the processor having thread X, Processor **1** and thus may not satisfy the need for high performance parallel computing.



Accordingly, improved systems and methods for parallel distributed programming are desirable.

## SUMMARY OF THE INVENTION

The present invention is generally directed to parallel distributed programs. Generally, a parallel distributed program is configured to operate across multiple processors/nodes and multiple memories. In one aspect of the invention, a parallel distributed program includes at least one distributed shared variable located across the multiple memories and one or more distributed programs configured to operate across multiple processors.

In another aspect of the invention, the one or more distributed programs include one or more self-migrating threads configured to migrate from one processor to another.

Other systems, methods, features and advantages of the invention will be or will become apparent to one with skill in the art upon examination of the following figures and detailed description. It is intended that all such additional systems, methods, features and advantages be included within this description, be within the scope of the invention, and be protected by the accompanying claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

A description of the present invention will be rendered by reference to specific embodiments thereof, which are illustrated in the accompanying drawings. It should be noted that the components in the figures are not necessarily to scale, emphasis instead being placed upon illustrating the principles of the invention. Moreover, in the figures, like reference numerals designate corresponding parts throughout the different views. However, like parts do not always have like reference numerals. Moreover, all illustrations are intended to convey concepts, where relative sizes, shapes and other detailed attributes may be illustrated schematically rather than literally or precisely.

FIG. **1***a* is an illustration of the prior art operation of message passing.

FIG. **1***b* is an illustration of the prior art operation of distributed share memory.

FIG. **2** is an illustration of the operation of a self-migrating thread in accordance with a preferred embodiment of the present invention.

FIGS. **3**(*a*)-(*b*) is an illustration of one approach to transform a DSC program to a DPC program in accordance with a preferred embodiment of the present invention.

FIGS. **4**(*a*)-(*b*) is an illustration of another approach to transform a DSC program to a DPC program in accordance with a preferred embodiment of the present invention.

FIGS. **5**(*a*)-(*b*) is an illustration of another approach to transform a DSC program to a DPC program in accordance with a preferred embodiment of the present invention.

FIG. **6** is an illustration of a Messenger in accordance with a preferred embodiment of the present invention.

FIG. **7** is an illustration of an explicit-navigation mobile agent system in accordance with a preferred embodiment of the present invention.

FIG. **8** is an illustration of an implicit navigation mobile agent system in accordance with a preferred embodiment of the present invention.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

Methods and systems for developing sequential or parallel applications, such as high performance numerical computing, bioinformatics, database, transaction-based, and Internet applications, on distributed memory systems, shared memory systems, and systems that incorporate both distributed and shared memory systems, will now be described. Some examples of the systems are multi-processor supercomputers, clusters, networks of workstations ("NOW"), the Grid, and the Internet.

An approach to developing sequential or parallel applications in accordance with a preferred embodiment of the present invention, referred to as "navigational programming," includes the programming and use of self-migrating threads or tasks, which are threads or tasks that can migrate from one processor to another. These self-migrating threads or tasks may be in the form of mobile agents with strong mobility. The approach is illustrated in FIG. **2**. These self-migrating threads may be programmed explicitly, e.g., with "migration statements" or implicitly, e.g., driven by data distribution. With this approach, a thread, M, may perform its computations on one processor, Processor **1**, and if the thread M needs to access memory belonging to another processor, e.g., Processor **2**, it may suspend its computations, migrate, or move, to the other processor, Processor **2**, and then resume its computations.

The source code to handle the explicit migration of threads may be in the form of the hop( ) command. The hop( ) commands may be used as annotations in conventional programming languages such as C.

In one aspect of navigational programming, a distributed shared variable ("DSV") may be used. DSVs and self-migration make shared variable programming possible beyond shared memory that provides single-address memory space. A DSV is logically a single variable that includes several variables that may be physically distributed across multiple memories. An example of a DSV is a global array. A global array, A[.], may include x+1 members, i.e., A[0] to A[x]. These members may be variables that are physically distributed across memories of multiple processors, e.g., members A[0] to A[x/2] may be located in the memory of Processor **1** and A[(x/2)+1] to A[x] may be located in the memory of Processor **2**. In accordance with navigational programming, a self-migrating thread may access all the entries within the DSV. For example, if thread M is located in Processor **1** and needed to access members A[(x/2)+1] to A[x], thread M would migrate to Processor **2**.

Another aspect of navigational programming is distributed sequential computing ("DSC"), which is computing using a single locus of computation over distributed data, possibly stored in a DSV. A self-migrating thread may be utilized to perform DSC. For example, for an algorithm that performs computations on a DSV, e.g., A[.], if the algorithm operates on Processor **1** and needs to access data on Processor **2**, a single thread, M, can migrate to Processor **2** to access the data in the memory of Processor **2** and then continue the computations.

DSC allows a programmer to develop threads that efficiently access multiple memories spanning across multiple processors without having to implement the complicated, tedious, time consuming, and error-prone low-level tasks of message handling in distributed programming. Further, it maintains the original code structure and data structure, i.e., it preserves algorithmic integrity and data structure integrity, in the resulting source code. Moreover, the programmer may follow the principle of pivot-computes, which is defined as the principle under which a computation takes place on the node that owns the large-sized data. Thus, if the data is distributed over a plurality of nodes, e.g., multiple memory areas associated with separate processors, wherein the distribution is disproportionate, e.g., a large portion of the data resides in one area and a smaller portion resides in a separate area, the computation will take place on the node with the larger portion of data, i.e., the pivot node, instead of having the larger portion of data moved, which may affect performance. If the programmer follows the principle of pivot-computes, as an MP programmer usually would, then an application utilizing DSC may be as efficient and scalable as an application utilizing the MP approach.

To illustrate this feature, consider a program that sets each member of an array, A[i], to the value of the previous member, and then increments that member by one, wherein i is the number of members of A[.]. For a single processor, single memory system, the pseudo-code may be implemented as follows:

```
(1) for i = 2 to x
(2) A[i] = A[i-1] + 1
(3) end for
```

This program will (1) count from 2 to x, i.e., the number of members of array A, and (2) assign each member i the value of the previous member, i−1, and increment that member by 1. These three code lines may be viewed as a code building block, which may be represented by the following notation $B_T(D)$, where B represents the block of code, T represents the type of computation performed by the block of code (T is for in the above code), and D represents the data that the block of code B operates on (D is the loop index i and the array A[.] in the above code). The block may include any type of basic programming constructs, such as a loop, an if statement, a multi-way conditional statement, or a sequence of assignments. In the above code, A[.] resides in a single memory area.

In parallel distributed computing, the array A[.] is distributed, e.g., the array A[.] spans across multiple memory areas on different processors, P**1** and P**2**, where the first half of the array, A[1 to x/2] is on one processor, P**1**, and the other half the array, A[(x/2)+1 to x] is on the other processor, P**2**. A code block required to handle distributed data may be referred to as distributed code building blocks ("DBlocks"). DBlocks cannot be directly taken as implementations in non-shared-memory environments. The essence of implementing distributed memory programs is turning DBlocks into non-DBlocks, defined as "DBlock resolution."

If the prior art Message Passing approach is used to "resolve" the DBlock, then the pseudo-code may be written as follows:

```
(1)  if μ == P1
(2)       for i = 2 to x/2
(3)            A[i] = A[i − 1] + 1
(4)       end for
(5)       t = A[x/2]
(6)       Send (t, P2)
(7)  else if μ == P2
(8)       Recv (t, P1)
(9)       A[1] = t + 1
(10)      for i = 2 to x/2
```

-continued

```
(11)            A[i] = A[i − 1] + 1
(12)        end for
(13)    end if
```

This program may run on both processors, and it will (1) check to see if the current processor, μ, on which the task is running, is P**1**. If it is, then the program will (2) count from 2 to half of the array x/2, which is the portion of the array A[.] in the memory of P**1**, and (3) assign each member i the value of the previous member, i−1, and increment that member by 1. Then, the program will (5) assign a variable t to the value of the last member of the array A in the memory of P**1**, x/2. Subsequently, (6) the program will send a message to P**2** that will include the value of t. (7) if the current processor, μ, on which the task is running, is P**2**, then the program will (8) receive a message from P**1** containing the value of the last member of the array A[.] on P**1** via value t and (9) assign the first member of the array A[.] on P**2** to the value in t+1. Then, the program will (10) count from 2 to half of the array x/2, which is the portion of array A[.] in the memory of P**2** and (11) assign each member i the value of the previous member, i−1, and increment that member by 1.

Compare the operation of the pseudo-code using the prior art MP technique with the operation of the pseudo-code using navigational programming, as follows:

```
(1)  for i = 2 to x
(2)      t = A[i − 1]
(3)      if i == x/2 + 1
(4)          hop (P2)
(5)      A[i] = t + 1
(6)  end for
```

In this program, the task will (1) count from 2 to x, and for each count, the task will (2) assign the value of the member of the previous count i−1 to the variable t. This variable t is referred to as "agent variable," and is accessible by its owner thread from anywhere. (3) If the count reaches one more than half of the array A, then that means the task needs to access the other half of the array A[.] in P**2**. Thus, the task will (4) "hop" or migrate to P**2** and continue its computation. If not, then the task will continue its computation on P**1**, and (5) assign the value of the previous member and increment it by one. Compared to the implementation done using MP, the DSC program preserves the original code structure (i.e., it does not break the loop into two or more blocks) and the original data structure (i.e., it maintains the global indexing of the array A[.]). DBlock resolution using navigational programming thus preserves the DBlock's code structure and data structure, and the implementation follows the principle of pivot-computes (the pivot node is P**1** for the first half of the loop, and P**2** for the second).

Another aspect of navigational programming is distributed parallel computing ("DPC"), which is computing using multiple concurrent DSC programs. With this aspect, original code structure and data structure may be preserved by virtue of using DSC programs. The "intersection" between each composing DSC program and the resulting DPC program may be minimal because it may consist of only local synchronizations, which minimizes the code "pollution" among all the composing DSC programs. The composing DSC programs are said to be "orthogonal" to the DPC program, and thus parallel distributed programming using DSC self-migrating threads exhibits "composition orthogonality." Furthermore, a DPC application targeted to multi-processor environments may be utilized on a uni-processor and operates as a multi-threaded application. Since the memory location information is only used in the hop( ) commands used as annotations in the code to indicate migration, ignoring these commands would result in a multi-threaded program that runs on a uni-processor without further changing its code structure and data structure. In contrast, in a program developed using MP, the memory location information is used not only in the Send( ) and Recv( ) commands, but also in restructuring code structure and data structure, therefore such program would look awkward and become unnecessarily difficult to maintain for uni-processors.



To illustrate the feature of DPC, consider a sequential program that performs block-fashion matrix multiplication as follows:

```
(1)  for i = 0 to p − 1
(2)      for j = 0 to p − 1
(3)          C_ij = A_i B_j
(4)      end for
(5)  end for
```

In a distributed environment, we may use a processor to post-fetch the computed C sub-matrix and pre-fetch the next pair of A and B sub-matrices. The DSC program that performs the computation may be written as follows:

```
(1)    for i = 0 to p − 1
(2)        for j = 0 to p − 1
(2.1)          inject (WR (i, j))
(2.2)          waitEvent (IO_b(i,j))
(3)            C_ij = A_i B_j
(3.1)          hop (!μ)
(4)        end for
(5)    end for
```

In the program, WR( ) is a separate DSC program that performs fetching. It is "injected," or spawned, by the computing thread, and it hops to the other node to perform fetching, after which it "signals" an event to indicate that the fetching is done. The computing thread will (2.2) wait for the event to make sure that the data is correctly post- and pre-fetched, (3) compute the sub-matrix multiplication, and (3.1) hop to the other node to perform the computation for the next loop. The DSC program WR( ) may be written as follows:

```
(1)  WR(int i, int j)
(2)      hop(!μ)
(3)      write (C_i''j'')
(4)      read (A_i', B_j')
(5)      signalEvent (IO_b(i',j'))
(6)  end
```

The computing DSC program and the fetching DSC program together make a DPC program. The two DSC threads of the DPC program run concurrently to perform parallel or pipelined computing. In this particular example, the computations and the fetching are pipelined.

If the prior art Message Passing approach is used, then the pseudo-code may be written as follows:

```
if μ == P1
    for i = 0 to p−1
        for j = 0 to p−1
            if(i*p+j)%2 == 0
                Send("f", (i, j), P2)
                Cij = Ai Bj
            else
                Send("c", (i, j), P2)
                write(Ci'j')
                read(Ai', Bj')
                end if
                Recv(sync, P2)
            end for
        end for
        Send ("stop", (0, 0), P2)
else if μ == P2
    while (1)
        Recv (s, (i, j), P1)
        if s == "f"
            write(Ci'j')
                read(Ai', Bj')
            else if s == "c"
                Cij = Ai Bj
            else if s == "stop"
                exit
            end if
            Send(sync, P1)
        end while
end if
```

In the MP implementation, the code for the two different tasks, namely multiplication and fetching, is tangled, polluting each other. In contrast, the two DSC programs in the navigational programming approach are composed into a DPC program with only local events or injections as the intersection between the two. This demonstrates the composition othogonality of the navigational programming.

In yet another aspect of the invention, transformations are provided to convert a DSC application into a DPC application utilizing multiple DSC threads running sequentially or concurrently, thus utilizing parallelization and pipeline opportunities in the sequential computation. To illustrate different approaches for transformation, FIGS. **3**(*a*), **4**(*a*), and **5**(*a*) depict sequential computations running in a two-dimensional space with spatial s and temporal t dimensions. These computations may be executing in loops, which means they could continue to spread along both dimensions (only two nodes are shown in FIGS. **3**(*a*), **4**(*a*), and **5**(*a*)). Each box in the figures represents a computation. A box marked with R means the computation represented by the box produces intermediate result that will be required by the following computation on the next node, whereas a box marked with NR means the computation on the next node is independent of the computation represented by the box.

One approach for transformation is illustrated in FIGS. **3**(*a*) and **3**(*b*). In this approach the computation on the next node is scheduled as soon as the dependency condition allows it. That is, since in the DSC the computation on the next node only depends on the intermediate result from part of the computation on the current node, as shown in FIG. **3**(*a*), the thread can clone itself as soon as the computation of R is done, and have the clone hop to the next node carrying the intermediate result and continue the computation at the same time when it continues the computation of NR on the current node, as shown in FIG. **3**(*b*). A special case is when R=Ø in which case the computations on the two nodes are completely independent of each other and can be performed in parallel.

Another approach for transformation is depicted in FIGS. **4**(*a*) and (*b*). This approach explores pipeline opportunity. The computation of R**1** on the next node only depends on the intermediate result from the computation of R**1** on the current node, as shown in FIG. **4**(*a*). The thread is split into two. The first thread would, after performing R**1** on the current node, hop to the next node carrying the intermediate result and continue the computation of R**1** there. The second thread will be transformed using the first transformation, as shown in FIG. **3**(*b*), or using the second transformation recursively (i.e., to split R**2** further). The two threads will be synchronized on the next node. That is, upon finishing its computation, the first thread will signal an event to allow the second thread to move on to its computation on the next node.

Another approach is illustrated in FIGS. **5**(*a*) and (*b*). This approach illustrates parallel reduction. The computations on the two nodes each compute a partial result which is added to or multiplied by the total result, as shown in FIG. **5**(*a*). If these computations do not depend on each other, they can be performed in parallel, and the total result can be collected by a separate DSC thread, as shown in FIG. **5**(*b*).

Navigational programming may be facilitated by mobile agent systems. Self-migrating threads may be in the form of mobile agents. Such a mobile agent has the ability to halt its execution, encapsulate the values of its variables, move to another node, restore the state, and continue executing. This ability is often referred to as strong mobility.

There may be several ways of building mobile agent systems. One way is to build directly on top of message passing. An example of such a system is MESSENGERS, in which applications are developed as collections of mobile agents, which may be referred to as Messengers. In MESSENGERS, three levels of networks are used. The lowest level is the physical network (e.g., a LAN or WAN), which constitutes the underlying computational processing elements. Superimposed on the physical layer is the daemon network, where each daemon is a server process that receives, executes, and dispatches Messengers. The logical network is an application-specific computation network created on top of the daemon network. Messengers may be injected by a program, which is part of the MESSENGERS system, or by another Messenger into any of the daemon nodes, and they may start creating new logical nodes and links on the current or any other daemons. Based on application need, multiple logical nodes can be created on one physical node.

A "MESSENGERS daemon" executes compiled Messengers. A daemon and all Messengers running on it share one process, and the Messengers are linked to the process dynamically. Messengers are allowed to call C functions, grouped in a user library which is also dynamically linked to the process. There are four tasks for a daemon. First, to accept signals, such as UNIX signals, to inject Messengers. These signals are sent by the program minject or another messenger. Second, to respond to requests, such as "search node" and "complete link," from other Messengers. Third, to add incoming Messengers to a ready list. And fourth, to execute Messengers. In addition, a daemon also provides a function, the calling of which would result in the autonomous caller Messenger being sent to a destination daemon. Socket-level message passing is used by a daemon or a Messenger to communicate with remote daemons.

The structure of a Messenger is depicted in FIG. **6**. A Messenger may include a small Messenger control block ("MCB") **100**, which stores data such as "pointer to next function," library name, and Messenger size. The Messenger may further include agent variables **200**, a vector of offsets **300** used to access memory in a Messenger heap used for dynamic arrays, and the heap itself **400**.

There are two types of variables in MESSENGERS: agent variables and node variables. An agent variable is private to a particular Messenger and travels with that Messenger as it migrates through the logical network. A node variable is stationary and is accessible by all Messengers currently at the logical node to which the variable belongs. Hence agent variables can be used to carry data between nodes, while node variables can be used for inter-agent communication.

A Messenger's programmer may tell it to migrate using the navigational statements, such as hop( ). A destination node's logical address or a logical link between the source and the destination nodes can be used as the argument for the statements. When a Messenger hops, it takes the data in its agent variables with it to wherever it migrates.

A Messenger can spawn another Messenger using a statement, such as inject( ). Synchronization among Messengers uses "events," and statements, such as signalEvent( ) and waitEvent( ). Since no remote data accessing is allowed, the events are local and so is synchronization. A Messenger's execution is not preempted between any two navigational statements. A Messenger must explicitly relinquish control to other Messengers using statements such as hop( ). We call this feature non-preemptive scheduling.

The Messenger compiler lies at the heart of the system. Messengers code, with strong mobility, is translated into stationary code communicating using message passing with sockets. The translated stationary code (in C) is then further compiled into machine native code for execution. Strong mobility in MESSENGERS means that computation migrates in the network in the form of a program counter. The actual mechanism for handling program counters can be seen from a simple example. The basic idea is to break a MESSENGERS program into smaller functions (in C) at navigational or other context-switching statements, and use the "pointer to next function" as an artificial program counter. Consider the following code:

```
(1) S1
(2) hop( )
(3) S2
```

This code shows two statements **S1** and **S2** separated by a context-switching statement hop( ). This code is compiled by the MESSENGERS compiler into two functions, each takes a pointer to an MCB **100** as its argument, shown in the following code:

```
(1) f1 (mcb)                          (1) f2 (mcb)
(2)     S1                            (2)     S2
(3)     mcb --> next_func = 2         (3) end
(4)     .../* code for hop ( ) */
(5) end
```

In this program, f**1**( ) uses a "pointer to next function" to point to function f**2**( ), which is executed after migration. Line (4) in the program represents code that calls the daemon function mentioned earlier, and by calling this function the Messenger autonomously sends itself to a destination daemon.

One feature of the MESSENGERS system is that it allows code to either be loaded from a shared disk or, in a non-shared file system, be sent across the network at most once, irrespective of how many times the locus of computation moves across the network. This feature is the key to efficient agent migration.

The overhead of mobile agent navigation in MESSENGERS may be relatively small due to the following reasons. First, since a Messenger is compiled into smaller functions at navigational statements, it is not necessary to save the function stack but only the pointer to next function. Second, the extra information associated with a Messenger's status (i.e., MCB **100**) is small. Third, no marshalling and unmarshalling of the agent variables is needed. Fourth, a Messenger runs in the same memory space of a daemon, which is why adding or removing it from the ready list takes only a few instructions to update some pointers in the list, instead of doing memory copying. The navigation of Messengers is almost as fast as sending TCP messages using a C program.

In another aspect of navigational programming, an explicit-navigation mobile agent system may be built on top of a DSM. A DSM system may be used to serve as communication media for the globally accessible data, or in other words, agent variables. FIG. **7** depicts the functional components of such a system and the dependencies. A DSM **700** may be built on top of a physical network of machines **800**. The mobile agent system **600**, which may include a compiler and a daemon system, may be built on the DSM **700**. An application may be implemented to include explicit agent navigation **500** that uses the mobile agent system **600**. The advantages of such a DSM based explicit-navigation system include: 1) It prevents false sharing; 2) Agent migration is faster using DSM; 3) DSM memory consistency protocols can help to reuse the agent variables when the owner agent visits the same node multiple times; 4) Daemon programming on DSM is dramatically simpler than using socket level message passing programming.

In another aspect of navigational programming, an implicit-navigation mobile agent system may be based on a DSM. In this system, a mechanism is included that decides for the agent when and where to migrate, and how the migration is achieved. FIG. **8** depicts a functional design of an implicit-navigation agent system. A DSM **1200** may be built on top of a physical network of machines **1300**. The design further includes a navigation protocol **1100**, which decides when a Messenger migrates and the destination. These protocols **1100** may be designed to follow the principle of pivot-computes. The other component is a mobile agent system **1150** that is able to support run-time strong mobility, i.e., a Messenger should be able to migrate at run-time anywhere in the program without any user direction. An application may be implemented to include implicit agent navigation **1000** that uses the mobile agent system **1150** and navigation protocol **1100**. The run-time strong mobility may be used in conjunction with the logical program counter, i.e., the "next function pointer" in MESSENGERS. This may result in more efficient agent navigation combining both the programmer's knowledge of the application and the run-time system's capability in dynamic situations.

In the foregoing specification, the invention has been described with reference to specific embodiments thereof. It will, however, be evident that various modifications and changes may be made thereto without departing from the broader spirit and scope of the invention. For example, the reader is to understand that the specific ordering and combination of process actions shown in the process flow diagrams described herein is merely illustrative, and the invention can be performed using different or additional process actions or a different combination or ordering of process actions. The

specification and drawings are, accordingly, to be regarded in an illustrative rather than restrictive sense.

What is claimed is:

**1**. A method of developing a distributed parallel computing program, comprising steps of:

establishing at least one distributed shared variable, wherein the at least one distributed shared variable is a single variable that includes several variables that may be physically distributed across multiple memories;

developing at least one distributed sequential computing program to access the at least one distributed shared variable; and

transforming the at least one distributed sequential computing program into at least one distributed parallel computing program by spawning at least one child distributed sequential computing program from the at least one distributed sequential computing program when at least one intermediate condition occurs within the at least one distributed sequential computing program, wherein the at least one distributed parallel computing program concurrently uses the at least one distributed sequential computing program and the at least one spawned child distributed sequential computing program to perform parallel processing and/or operations, wherein the at least one intermediate condition comprising one intermediate result that will be required by the at least one spawned child distributed sequential computing program to continue computation.

**2**. The method of claim **1**, wherein each of the at least one distributed sequential computing program includes at least one self-migrating thread, capable of migrating among at least one processor and capable of accessing the at least one distributed shared variable.

**3**. The method of claim **1**, wherein the at least one distributed shared variable is configured to be located among a plurality of memories.

**4**. The method of claim **1**, wherein the distributed parallel computing program is configured to operate across multiple processors.

**5**. The method of claim **1**, wherein the distributed parallel computing program is configured to operate using multiple threads.

**6**. The method of claim **1**, wherein the distributed parallel computing program is configured to operate across multiple nodes.

**7**. The method of claim **1**, further comprising the step of configuring the at least one distributed sequential computing program to include at least one mobile agent.

**8**. The method of claim **7**, wherein the at least one mobile agent is implemented using self-migrating threads.

**9**. A distributed parallel computing system, having at least one memory area and at least one processor, comprising:

at least one distributed shared variable capable of loading into the at least one memory area, wherein the at least one distributed shared variable is a single variable that includes several variables that may be physically loaded into the at least one memory area; and

at least one distributed sequential computing program, configured to operate in the at least one processor, configured to access the at least one distributed shared variable, and configured to transform into at least one distributed parallel computing program by spawning at least one child distributed sequential computing system program when at least one intermediate condition occurs within the at least one distributed sequential program, wherein the at least one distributed parallel computing program concurrently uses the at least one distributed sequential computing program and the at least one spawned child distributed sequential computing program to perform parallel processing and/or operations, wherein the at least one intermediate condition comprising one intermediate result that will be required by the at least one spawned child distributed sequential computing program to continue computation.

**10**. The system of claim **9**, wherein the at least one distributed sequential computing program comprises at least one mobile agent.

**11**. The system of claim **10**, wherein the at least one mobile agent is implemented using self-migrating threads.

**12**. The system of claim **10**, wherein the at least one mobile agent is an explicit-navigation mobile agent.

**13**. The system of claim **10**, wherein the at least one mobile agent is an implicit-navigation mobile agent.

**14**. The system of claim **10**, wherein the at least one mobile agent is configured to move from one processor to another processor.

**15**. The system of claim **10**, wherein the at least one mobile agent operates within a distributed shared memory system.

**16**. The system of claim **9**, wherein the at least one processor is located across a physical network.

**17**. The method of claim **1**, wherein the distributed parallel computing program is configured to operate across a distributed shared memory system.

**18**. The method of claim **9**, wherein the distributed parallel computing program is configured to operate across a distributed shared memory system.

* * * * *

# EXHIBIT A-18

| **Office Action Summary** | Application No. | Applicant(s) | |
|---|---|---|---|
| | 10/850,842 | PAN ET AL. | |
| | **Examiner** | **Art Unit** | |
| | ZHENG WEI | 2192 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE 3 MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on *18 April 2008*.

2a)☒ This action is **FINAL**. 2b)☐ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) *1-6,9,10 and 15-22* is/are pending in the application.

4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) *1-6,9,10 and 15-22* is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☒ The drawing(s) filed on *21 May 2004* is/are: a)☒ accepted or b)☐ objected to by the Examiner.

Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

a)☐ All b)☐ Some * c)☐ None of:

1.☐ Certified copies of the priority documents have been received.

2.☐ Certified copies of the priority documents have been received in Application No. _____.

3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

* See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)
2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3) ☐ Information Disclosure Statement(s) (PTO/SB/08) Paper No(s)/Mail Date _____.
4) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____.
5) ☐ Notice of Informal Patent Application
6) ☐ Other: _____.

## DETAILED ACTION

### *Remarks*

1. This office action is in response to the amendment filed on 04/18/2008.

2. Claims 7, 8, 11-14 and 23-25 have been canceled.

3. Claims 1-3, 9, 10, and 15-22 have been amended.

4. The objection to claim 1-10 is withdrawn in view of Applicants' amendment

5. Claims 1-6, 9-10, and 15-22 remain pending and have been examined.

### *Response to Arguments*

6. Applicants' arguments filed on 04/18/2008, in particular on pages 6-7, have been fully considered but they are not persuasive. For example:

- At page 7, the Applicants argue that Fukuda does not teaching performing the step of message-passing in Messengers. However, Fukuda also discloses the spawn operation in message-passing method is comparable to the "create" operation in Messengers (see for example, page 5, right column, second paragraph, "Specifically, our create is comparable to a spawn operation in PVM while a hop is similar to a send/receive operation" [emphasis added]). Moreover, Fukuda discloses the "create" operation to create new logical nodes and/or lines (see for example, Figure 1 and related text) and further transforming code by spawning a child program (see for example, page 4, right column, last paragraph, "This also causes a replica of the messenger to be

created..." [emphasis added]). Furthermore, Suzuki (with co-author Fukuda) also discloses detailed implementation of using Threads to migrate program to other nodes (code execution) (see for example, p.2, section 2.2 Principles of Operations, figure 2. Network objects defined in C++ and related text). Therefore, Pan and Suzuki's reference combines with Fukuda do disclose said limitation as the Applicants argued.

### *Claim Rejections - 35 USC § 103*

7. The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

(a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

8. Claims 1-6 and 9-10, and 15-22 are rejected under 35 U.S.C. 102(a) as being unpatentable over Pan (Pan et al., Distributed Sequential Computing Using Mobile Code: Moving Computation to Data) in view of Suzuki (Suzuki et al., "Self-Migrating Threads for multi-Agent applications", is made of record.) further in view of Fukuda (Fukuda et al., Message versus Messengers in Distributed Programming).

Claim 1:

Pan discloses a method/system of developing a distributed application, comprising steps of:

- establishing one or more distributed shared variables (see for example, p.77, right column, second paragraph, "distributed sequential computing"; also see "The data is distributed in essence…the code follows the data (an agent-based approach)"); and
- developing one or more distributed sequential computing programs to access the one or more distributed shared variables (see for example, p.77, right column, first paragraph, "distributing the sequential algorithm", "re-programming") and
- transforming the one or more distributed sequential computing programs into one or more distributed parallel programs (see for example, p.79 section "Sequential matrix multiplication implemented using MESSENGERS; also see Figure 2 Matrix decomposition, Figure 3, Logical network used for matrix multiplication and related text)

but does not explicitly disclose the distributed application is a parallel distributed application and transforming by spawning. However, Suzuki in the same analogous art of distributed computing, discloses a same parallel distributed approach using self-migrating threads that autonomously navigate over networks and resume their native -mode executions at each destination (see for example, p.1, right column, third paragraph, "These threads can behave as autonomous light-weight agents roaming over and changing their synthetic world") and also discloses coding multi-Agent Applications with Self-migrating Threads (see for example, p.3, section 2.3 Coding Multi-Agent Application with Self-Migrating

Threads"). Therefore, it would have been obvious to one having ordinary skill in the art at the time the invention was made to combine Pan's sequential computing algorithm with Suzuki's detail programming implementation for multi-agent applications with self migrating threads in a parallel distributed system. One would have been motivated to do so to improve performance sequential computation as disclosed by Pan (see for example, p.77, ABSTRACT, "Sequential computations can benefit from a distributed environment consisting of a network of workstations through the use of a mobile agent system.").

Fukuda discloses transforming/migrating the program by spawning a child program (replica of the Messenger to be created) (see for example, page 4, right column, last paragraph, "This also causes a replica of the messenger to be created..."; also see, page 3, left column, third paragraph, "Messenger programs" and related text). Therefore, it would have been obvious to one having ordinary skill in the art at the time the invention was made to combine Pan, Suzuki and Fukuda, because they all disclose the same MESSENGER system.

Claim 2:

Suzuki further discloses wherein each of the one or more distributed sequential computing programs includes one or more self-migrating threads, capable of migrating among one or more processors and capable of accessing the one or more distributed shared variables (see for example, p.3, section 2.3 Coding Multi-Agent Application with Self-Migrating Threads").

Claim 3:

Suzuki further discloses wherein the one or more distributed shared variables are configured to be located among a plurality of memories (see for example, p.2, section 2.1 Computational Network and Objects, "daemon node information").

Claim 4:

Suzuki further discloses wherein the parallel distributed application is configured to operate across multiple processors (see for example, p.3, right column, second paragraph "Thread Navigation" The thread propagates along links and/or jumps directly to nodes")

Claim 5:

Suzuki further discloses wherein the parallel distributed application is configured to operate using multiple threads (see for example, p.1, right column third paragraph "threads")").

Claim 6:

Suzuki further discloses wherein the parallel distributed application is configured to operate across multiple nodes (see for example, Figure 1. Computational network, Logical Network, nodes).

Claim 9:

Pan also discloses the method comprising the step of configuring the one or more distributed sequential programs to include one or more mobile agents (see for example, p.77, right column, forth paragraph "Moreover, the agent doing the computation can send out additional agents to other machines to pre-fetch data needed for subsequent computation")).

Claim 10:

Pan further discloses wherein the one or more mobile agents are implemented using self-migrating threads (see for example, p.78, right column, third paragraph, "self-migrating computations")

Claims 15-17 and 20-22:

Claims 15-17 and 20-22 are system version for performing the claimed method as in claims 1-6, 9 and 10 addressed above, wherein all claimed limitation functions have been addressed and/or set forth above. Thus, they also would have been obvious.

Claims 18 and 19:

Pan further discloses wherein the one or more mobile agents are explicit-navigation/implicit-navigation mobile agents (see for example, p.78, right column second paragraph "the programs are carried by agents as they navigate through space"; also see p.77, forth paragraph, "Moreover, the agent doing the computation can send out additional agents to other machines to pre-fetch data needed for subsequent computation")

### *Conclusion*

9. The prior art made of record and not relied upon is considered pertinent to applicant's disclosure.

Applicant's arguments with respect to claims rejection have been considered but are not persuasive, Accordingly, **THIS ACTION IS MADE FINAL**. See MPEP § 706.07(a). Applicant is reminded of the extension of time policy as set forth in 37 CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE MONTHS from the mailing date of this action. In the event a first reply is filed within TWO MONTHS of the mailing date of this final action and the advisory action is not mailed until after the end of the THREE-MONTH shortened statutory period, then the shortened statutory period will expire on the date the advisory action is mailed, and any extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of the advisory action. In no event, however, will

the statutory period for reply expire later than SIX MONTHS from the mailing date of this final action.

10. Any inquiry concerning this communication or earlier communications from the examiner should be directed to Zheng Wei whose telephone number is (571) 270-1059 and Fax number is (571) 270-2059. The examiner can normally be reached on Monday-Thursday 8:00-15:00.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Tuan Q. Dam can be reached on (571) 272-3695. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Any inquiry of a general nature of relating to the status of this application or proceeding should be directed to the TC 2100 Group receptionist whose telephone number is 571- 272-1000.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/Z. W./

Examiner, Art Unit 2192

/Tuan Q. Dam/

Supervisory Patent Examiner, Art Unit 2192

# EXHIBIT A-19

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| Appl. No. | : | 10/850,842 | Confirmation No. 9744 |
| Applicant | : | Pan et al. | |
| Filing Date | : | May 21, 2004 | |
| Title | : | SYSTEMS AND METHODS FOR PARALLEL DISTRIBUTED PROGRAMMING | |
| Group Art Unit | : | 2192 | |
| Examiner | : | Zheng Wei | |
| Docket No. | : | 703538.4044 | |

# AMENDMENT

**Mail Stop Amendment**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

This paper is filed in response to the Office Action mailed on July 22, 2008.

A listing of the claims begins on page 2.

The remarks begin on page 5.

# Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 10850842 |
| **Filing Date:** | 21-May-2004 |
| **Title of Invention:** | Systems and methods for parallel distributed programming |
| **First Named Inventor/Applicant Name:** | Lei Pan |
| **Filer:** | Kenneth Steven Roberts/Mary L. Smith |
| **Attorney Docket Number:** | 703538.4044 |

Filed as Large Entity

## Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |
| Extension - 3 months with $0 paid | 1253 | 1 | 1110 | 1110 |

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| Request for continued examination | 1801 | 1 | 810 | 810 |
| | **Total in USD ($)** | | | **1920** |

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 4651757 |
| **Application Number:** | 10850842 |
| **International Application Number:** | |
| **Confirmation Number:** | 9744 |
| **Title of Invention:** | Systems and methods for parallel distributed programming |
| **First Named Inventor/Applicant Name:** | Lei Pan |
| **Customer Number:** | 34313 |
| **Filer:** | Kenneth Steven Roberts/Mary L. Smith |
| **Filer Authorized By:** | Kenneth Steven Roberts |
| **Attorney Docket Number:** | 703538.4044 |
| **Receipt Date:** | 21-JAN-2009 |
| **Filing Date:** | 21-MAY-2004 |
| **Time Stamp:** | 17:58:37 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Deposit Account |
| Payment was successfully received in RAM | $1920 |
| RAM confirmation Number | 4150 |
| Deposit Account | 150665 |
| Authorized User | |

The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows:

Charge any Additional Fees required under 37 C.F.R. Section 1.16 (National application filing, search, and examination fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.17 (Patent application and reexamination processing fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.19 (Document supply fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.21 (Miscellaneous fees and charges)

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | | 703538_4044.pdf | 252932<br>da3bfb124a25536017a1b8a592e968fef6a8fb08 | yes | 9 |

**Multipart Description/PDF files in .zip description**

| Document Description | Start | End |
|---|---|---|
| Request for Continued Examination (RCE) | 1 | 2 |
| Amendment Submitted/Entered with Filing of CPA/RCE | 3 | 9 |

**Warnings:**

**Information:**

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 2 | Fee Worksheet (PTO-06) | fee-info.pdf | 31644<br>5f1723b04953e7c590463f07da284127bdde481bf | no | 2 |

**Warnings:**

**Information:**

**Total Files Size (in bytes):** 284576

**This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.**

**<u>New Applications Under 35 U.S.C. 111</u>**
**If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.**

**<u>National Stage of an International Application under 35 U.S.C. 371</u>**
**If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.**

**<u>New International Application Filed with the USPTO as a Receiving Office</u>**
**If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.**

Listing of the claims:

1. (Previously presented) A method of developing a parallel distributed application, comprising steps of:

establishing at least one distributed shared variable;

developing at least one distributed sequential computing program to access the at least one distributed shared variable; and

transforming the at least one distributed sequential computing program into at least one distributed parallel program by spawning at least one child distributed sequential computing program from the at least one distributed sequential program when at least one intermediate condition occurs within the at least one distributed sequential program.

2. (Previously presented) The method of claim 1, wherein each of the at least one distributed sequential computing program includes at least one self-migrating thread, capable of migrating among at least one processor and capable of accessing the at least one distributed shared variable.

3. (Previously presented) The method of claim 1, wherein the at least one distributed shared variable is configured to be located among a plurality of memories.

4. (Original) The method of claim 1, wherein the parallel distributed application is configured to operate across multiple processors.

5. (Original) The method of claim 1, wherein the parallel distributed application is configured to operate using multiple threads.

6. (Original) The method of claim 1, wherein the parallel distributed application is configured to operate across multiple nodes.

7. – 8. (Cancelled)

9. (Previously presented) The method of claim 1, further comprising the step of configuring the at least one distributed sequential program to include at least one mobile agent.

10. (Previously presented) The method of claim 9, wherein the at least one mobile agent is implemented using self-migrating threads.

11. – 14. (Cancelled)

15. (Previously presented) A distributed parallel computing system, having at least one memory area and at least one processor, comprising:

at least one distributed shared variable capable of loading into the at least one memory area; and

at least one distributed sequential computing system, configured to operate in the at least one processor, configured to access the at least one distributed shared variable, and configured to transform into at least one distributed parallel computing system by spawning at least one child distributed sequential computing system when at least one intermediate condition occurs within the at least one distributed sequential system.

16. (Previously presented) The system of claim 15, wherein the at least one distributed sequential computing system comprises at least one mobile agent.

17. (Previously presented) The system of claim 16, wherein the at least one mobile agent is implemented using self-migrating threads.

18. (Previously presented) The system of claim 16, wherein the at least one mobile agent is an explicit-navigation mobile agent.

19. (Previously presented) The system of claim 16, wherein the at least one mobile agent is an implicit-navigation mobile agent.

20. (Previously presented) The system of claim 16, wherein the at least one mobile agent is configured to move from one processor to another processor.

21. (Previously presented) The system of claim 16, wherein the at least one mobile agent operates within a distributed shared memory system.

22. (Previously presented) The system of claim 15, wherein the at least one processor is located across a physical network.

23. – 25. (Cancelled)

## REMARKS

Claims 1-6, 9-10, and 15-22 are pending in the application. In the office action dated July 22, 2008, the Examiner rejected claims 1-6, 9-10, and 15-22 under 35 U.S.C. § 103(a) as being unpatentable over Pan et al ("Distributed Sequential Computing Using Mobile Code: Moving Computation to Data," hereinafter "Pan") in view of Suzuki et al. ("Self-Migrating Threads for Multi-Agent Applications" hereinafter "Suzuki"), and further in view of Fukuda et al. ("Message Versus Messengers in Distributed Programming," hereinafter "Fukuda"). Pending independent claims 1 and 15, and there respective dependent claims, however, are patentably distinguished over the cited references because claims 1 and 15 claim *parallel* distributed operations, which are not disclosed or suggested by Pan, Fukuda, nor Suzuki references either alone or in combination.

The Examiner concedes that Pan does not disclose the distributed application is a parallel distributed application. The Examiner then asserts that Suzuki discloses the "same parallel distributed approach using self-migrating threads that autonomously navigate over networks and resume their native-mode executions at each destination" and cites page 1, right column, third paragraph of Pan in support of this contention. The Examiner's assertion makes clear that Suzuki discloses a computing paradigm comprising a set of autonomous self-migrating threads that operates in a sequential sense and <u>not</u> in the parallel sense as claimed by Applicants. Notably, in order for a thread to recommence, i.e., resume, it must have been terminated prior to migration. Suzuki simply does not disclose a system that can handle multiple threads concurrently. Moreover, Suzuki explicitly discloses that the *hop()* function used in creating self-migrating threads carries out the following steps in the course of execution: network

navigation (via link/node), context switch, and *termination*. Suzuki, p.3 ("As shown above, . . . "). One of ordinary skill in the art would readily recognize this to describes a sequential operation.

Nothing in Suzuki discloses a parallel system. One of ordinary skill in the art would readily recognize that parallel processing enables many calculations to be carried out simultaneously, i.e., without terminating and resuming thread processes. Due to the wholesale absence of an express limitation of independent claim 1, Suzuki is incapable of curing the deficiency of Pan and thus the combination of Pan, Suzuki and Fukuda can not establish a prima facie case of obviousness..

Thus, for at least the reasons given above, Applicants submit that independent claim 1 is in condition for allowance, and respectfully request that the rejection of claim 1 be withdrawn. Independent claim 15 is also patentable for at least the same reasons given above for claim 1.

The remaining claims depend from either claim 1 or 15, and are therefore also patentable for at least the reasons given for claim 1.

## CONCLUSION

In view of the foregoing, Applicants respectfully submit that claims 1-6, 9-10, and 15-22 are in condition for allowance. Prompt and favorable action on the merits of the claims is earnestly solicited. Should the Examiner have any questions or comments, the Examiner is invited to call the undersigned at (949) 567-6700.

The Commissioner is authorized to charge any fee that may be required in connection with this Amendment to deposit account no. 15-0665.

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

Dated: January 21, 2009

By: [signature]
Kenneth S. Roberts
Reg. No. 38,358

4 Park Plaza, Suite 1600
Irvine, CA 92614-2558
Tel. 949-567-6700
Fax: 949-567-6710

# EXHIBIT A-20

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| Appl. No. | : | 10/850,842 | Confirmation No. 9744 |
| Applicant | : | Pan et al. | |
| Filing Date | : | May 21, 2004 | |
| Title | : | SYSTEMS AND METHODS FOR PARALLEL DISTRIBUTED PROGRAMMING | |
| Group Art Unit | : | 2192 | |
| Examiner | : | Zheng Wei | |
| Docket No. | : | 703538.4044 | |

# AMENDMENT

**Mail Stop Amendment**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

This paper is filed in response to the Office Action mailed on April 2, 2009.

Please amend the subject application as follows.

Amendment to the claims appear in a listing of the claims beginning on page 2.

The remarks begin on page 5.

# Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 10850842 |
| **Filing Date:** | 21-May-2004 |
| **Title of Invention:** | Systems and methods for parallel distributed programming |
| **First Named Inventor/Applicant Name:** | Lei Pan |
| **Filer:** | Kenneth Steven Roberts/Mary L. Smith |
| **Attorney Docket Number:** | 703538.4044 |

Filed as Large Entity

## Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |
| Extension - 2 months with $0 paid | 1252 | 1 | 490 | 490 |

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| | | **Total in USD ($)** | | **490** |

# Electronic Acknowledgement Receipt

| | |
|---|---|
| EFS ID: | 6001331 |
| Application Number: | 10850842 |
| International Application Number: | |
| Confirmation Number: | 9744 |
| Title of Invention: | Systems and methods for parallel distributed programming |
| First Named Inventor/Applicant Name: | Lei Pan |
| Customer Number: | 34313 |
| Filer: | Kenneth Steven Roberts/Mary L. Smith |
| Filer Authorized By: | Kenneth Steven Roberts |
| Attorney Docket Number: | 703538.4044 |
| Receipt Date: | 02-SEP-2009 |
| Filing Date: | 21-MAY-2004 |
| Time Stamp: | 14:26:59 |
| Application Type: | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Deposit Account |
| Payment was successfully received in RAM | $490 |
| RAM confirmation Number | 587 |
| Deposit Account | 150665 |
| Authorized User | |

The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows:

Charge any Additional Fees required under 37 C.F.R. Section 1.16 (National application filing, search, and examination fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.17 (Patent application and reexamination processing fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.19 (Document supply fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.21 (Miscellaneous fees and charges)

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Amendment/Req. Reconsideration-After Non-Final Reject | 703538_4044amend.pdf | 80821<br>c21490d835e62c6790604b6383f78f1a7ccbf eab6 | no | 9 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 2 | Fee Worksheet (PTO-875) | fee-info.pdf | 29993<br>52bd7c2b1db4fcfc2e4d0a229650c044db2 db22f | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| | | **Total Files Size (in bytes):** | 110814 | | |

**This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.**

**<u>New Applications Under 35 U.S.C. 111</u>**
**If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.**

**<u>National Stage of an International Application under 35 U.S.C. 371</u>**
**If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.**

**<u>New International Application Filed with the USPTO as a Receiving Office</u>**
**If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.**

Listing of the claims:

1. (Currently amended) A method of developing a ~~parallel~~ distributed parallel ~~application~~ computing program, comprising steps of:

establishing at least one distributed shared variable;

developing at least one distributed sequential computing program to access the at least one distributed shared variable; and

transforming the at least one distributed sequential computing program into at least one distributed parallel computing program by spawning at least one child distributed sequential computing program from the at least one distributed sequential computing program when at least one intermediate condition occurs within the at least one distributed sequential computing program, wherein the at least one distributed parallel computing program concurrently uses the at least one distributed sequential computing program and the at least one child distributed sequential computing program to perform parallel processing and/or operations.

2. (Previously presented) The method of claim 1, wherein each of the at least one distributed sequential computing program includes at least one self-migrating thread, capable of migrating among at least one processor and capable of accessing the at least one distributed shared variable.

3. (Previously presented) The method of claim 1, wherein the at least one distributed shared variable is configured to be located among a plurality of memories.

4. (Currently amended) The method of claim 1, wherein the ~~parallel~~ distributed parallel ~~application~~ computing program is configured to operate across multiple processors.

5. (Currently amended) The method of claim 1, wherein the ~~parallel~~ distributed <u>parallel</u> ~~application~~ <u>computing program</u> is configured to operate using multiple threads.

6. (Currently amended) The method of claim 1, wherein the ~~parallel~~ distributed <u>parallel</u> ~~application~~ <u>computing program</u> is configured to operate across multiple nodes.

7. – 8. (Cancelled)

9. (Currently amended) The method of claim 1, further comprising the step of configuring the at least one distributed sequential <u>computing</u> program to include at least one mobile agent.

10. (Previously presented) The method of claim 9, wherein the at least one mobile agent is implemented using self-migrating threads.

11. – 14. (Cancelled)

15. (Currently Amended) A distributed parallel computing system, having at least one memory area and at least one processor, comprising:

at least one distributed shared variable capable of loading into the at least one memory area; and

at least one distributed sequential computing ~~system~~ <u>program</u>, configured to operate in the at least one processor, configured to access the at least one distributed shared variable, and configured to transform into at least one distributed parallel computing ~~system~~ <u>program</u> by spawning at least one child distributed sequential computing ~~system~~ <u>program</u> when at least one intermediate condition occurs within the at least one distributed sequential ~~system~~ <u>program, wherein the at least one distributed parallel computing program concurrently uses the at least one distributed sequential</u>

computing program and the at least one child distributed sequential computing program to perform parallel processing and/or operations.

16. (Currently amended) The system of claim 15, wherein the at least one distributed sequential computing ~~system~~ program comprises at least one mobile agent.

17. (Previously presented) The system of claim 16, wherein the at least one mobile agent is implemented using self-migrating threads.

18. (Previously presented) The system of claim 16, wherein the at least one mobile agent is an explicit-navigation mobile agent.

19. (Previously presented) The system of claim 16, wherein the at least one mobile agent is an implicit-navigation mobile agent.

20. (Previously presented) The system of claim 16, wherein the at least one mobile agent is configured to move from one processor to another processor.

21. (Previously presented) The system of claim 16, wherein the at least one mobile agent operates within a distributed shared memory system.

22. (Previously presented) The system of claim 15, wherein the at least one processor is located across a physical network.

23. – 25. (Cancelled)

26. (New) The method of claim 1, wherein the distributed parallel computing program is configured to operate across a distributed shared memory system.

27. (New) The method of claim 15, wherein the distributed parallel computing program is configured to operate across a distributed shared memory system.

REMARKS

Claims 1-6, 9-10, 15-22 and 26-27 are pending in the application. Claims 26 and 27 are newly amended. In the office action mailed April 2, 2009, the Examiner rejected claims 1-6, 9-10, and 15-22 under 35 U.S.C. § 103(a) as being unpatentable over Pan et al ("Distributed Sequential Computing Using Mobile Code: Moving Computation to Data," hereinafter "Pan") in view of Suzuki et al. ("Self-Migrating Threads for Multi-Agent Applications" hereinafter "Suzuki"), and further in view of Fukuda et al. ("Message Versus Messengers in Distributed Programming," hereinafter "Fukuda").

Neither Pan, Suzuki or Fukuda, alone or in combination, teach or suggest the claimed invention as claimed in independent claims 1 and 15. Specifically, the combination of Pan, Suzuki and Fukuda fails to teach or suggest

> transforming the at least one distributed sequential computing program into at least one distributed parallel computing program by spawning at least one child distributed sequential computing program from the at least one distributed sequential computing program when at least one intermediate condition occurs within the at least one distributed sequential computing program, wherein the at least one distributed parallel computing program concurrently uses the at least one distributed sequential computing program and the at least one child distributed sequential computing program to perform parallel processing and/or operations

as claimed in claim; or

at least one distributed sequential computing program, configured to operate in the at least one processor, configured to access the at least one distributed shared variable, and configured to transform into at least one distributed parallel computing program by spawning at least one child distributed sequential computing program when at least one intermediate condition occurs within the at least one distributed sequential program, wherein the at least one distributed parallel computing program concurrently uses the at least one distributed sequential computing program and the at least one child distributed sequential computing program to perform processing and/or operations

as claimed in claim 15. Pan, Suzuki and Fukuda simply do not teach or suggest transforming a distributed sequential computing (DSC) program into a distributed parallel computing program (DPC) program or a DSC program configured to transform into a DPC program wherein the DPC concurrently uses the DSC and child DSC to perform parallel and/or pipeline processing. Although Pan may describe the concept of DSC programs, which is computing using a single locus of computation over distributed data (Application [0024]), Pan does not disclose or suggest transforming the DSC into a DPC by spawning a child DSC or a DSC configured to transform into a DPC by spawning a child DSC. Similarly, Suzuki describes the use of a collection of self-migrating threads. Although, as Applicants acknowledge at paragraph 0024 of the application, a self-migrating thread may be utilized to perform DSC, a description of the use of a collection of self-migrating threads does not disclose or suggest transforming a DSC into a DPC by spawning a child DSC or a DSC configured to transform into a DPC

by spawning a child DSC.

As Pan notes at page 78, column 1, "Our implementations use MESSENGERS, a system for agent-based distributed computing developed in Information and Computer Science at the University of California, Irvine ([1, 5])." Reference 5 in Pan is Fukada. Thus the combined teaching of Pan and Fukuda is effectively Pan, i.e., distributed sequential computing using MESSENGERS. Moreover, in light of Pan's discussion of implementation of DSCs using MESSENGERS, the fact that Fukuda describes replication does not teach or suggest transforming a DSC into a DPC by spawning a child DSC or a DSC configured to transform into a DPC by spawning a child DSC wherein the DPC concurrently uses the DSC and child DSC to perform parallel processing and/or operations, but rather only suggests to one skilled in the art the replication of a MESSENGER within an individual DSC program. Thus, Fukuda does not cure the deficiency of Pan and Suzuki noted above, and, as a result, Pan, Suzuki and Fukuda can not establish a prima facie case of obviousness. Accordingly, Applicants submit that independent claims 1 and 15, and claims 2-6, 9-10 and 16-22 by virtue of their dependence on claims 1 and 15, meet the requirements for patentability under 35 USC 103, and respectfully request that the rejections of such claims be withdrawn.

## CONCLUSION

In view of the foregoing, Applicants respectfully submit that claims 1-6, 9-10, and 15-22 are in condition for allowance. Prompt and favorable action on the merits of the

claims is earnestly solicited. Should the Examiner have any questions or comments, the Examiner is invited to call the undersigned at (949) 567-6700.

The Commissioner is authorized to charge any fee that may be required in connection with this Amendment to deposit account no. 15-0665.

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

Dated: September 2, 2009

By: /Kenneth S. Roberts/
Kenneth S. Roberts
Reg. No. 38,358

4 Park Plaza, Suite 1600
Irvine, CA 92614-2558
Tel. 949-567-6700
Fax: 949-567-6710

# EXHIBIT A-21

| Notice of Allowability | Application No. 10/850,842 | Applicant(s) PAN ET AL. |
|---|---|---|
| | Examiner ZHENG WEI | Art Unit 2192 |

***-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--***

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to *09/02/2009*.

2. ☒ The allowed claim(s) is/are *1-6,9,10,15-22,26 and 27 (re-numbered as 1-18)*.

3. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   a) ☐ All b) ☐ Some* c) ☐ None of the:
   1. ☐ Certified copies of the priority documents have been received.
   2. ☐ Certified copies of the priority documents have been received in Application No. ____.
   3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

   * Certified copies not received: ____.

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
**THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

4. ☐ A SUBSTITUTE OATH OR DECLARATION must be submitted. Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL PATENT APPLICATION (PTO-152) which gives reason(s) why the oath or declaration is deficient.

5. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.
   (a) ☐ including changes required by the Notice of Draftsperson's Patent Drawing Review ( PTO-948) attached
   1) ☐ hereto or 2) ☐ to Paper No./Mail Date ____.
   (b) ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date ____.

   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☐ Notice of References Cited (PTO-892)
2. ☐ Notice of Draftperson's Patent Drawing Review (PTO-948)
3. ☐ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date ____
4. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material
5. ☐ Notice of Informal Patent Application
6. ☒ Interview Summary (PTO-413), Paper No./Mail Date *20091202* .
7. ☒ Examiner's Amendment/Comment
8. ☒ Examiner's Statement of Reasons for Allowance
9. ☐ Other ____.

/Tuan Q. Dam/
Supervisory Patent Examiner, Art Unit 2192

## DETAILED ACTION

### *Remarks*

1. This office action is in response to the amendment filed on 9/02/2009.

2. Claims 1, 4-6, 9, 15 and 16 have been amended.

3. Claims 26 and 27 have been added.

4. Claims 1-6, 9, 10, 15-22, 26 and 27 remain pending and have been examined

## EXAMINER'S AMENDMENT

5. An examiner's amendment to the record appears below. Should the changes and/or additions be unacceptable to applicant, an amendment may be filed as provided by 37 CFR 1.312. To ensure consideration of such an amendment, it MUST be submitted no later than the payment of the issue fee.

6. Authorization for this examiner's amendment was given in a telephone interview and further email communication with Kenneth S. Roberts(Reg# 38,358) on 12/02/2009 to obviate any potential 35 U.S.C. § 112 issues, and to put the claims in condition for allowance.

7. Applicant's proposed amendment is received via email and accepted by examiner.

8. Claims 1 and 15 are now being further amended based on the received applicant's proposed amendment.

9. The application has been amended as follows:

**IN THE CLAIMS**

**Please amend claims 1 and 15 as follows:**

1. (Currently amended) A method of developing a distributed parallel computing program, comprising steps of:

establishing at least one distributed shared variable, wherein the at least one distributed shared variable is a single variable that includes several variables that may be physically distributed across multiple memories;

developing at least one distributed sequential computing program to access the at least one distributed shared variable; and

transforming the at least one distributed sequential computing program into at least one distributed parallel computing program by spawning at least one child distributed sequential computing program from the at least one distributed sequential computing program when at least one intermediate condition occurs within the at least one distributed sequential computing program, wherein the at least one distributed parallel computing program concurrently uses the at least one distributed sequential computing program and the at least one spawned child distributed sequential computing program to perform parallel processing and/or operations, wherein the at least one intermediate condition comprising one intermediate result that will be required by the at least one spawned child distributed sequential computing program to continue computation.

15. (Currently amended) A distributed parallel computing system, having at least one memory area and at least one processor, comprising:

at least one distributed shared variable capable of loading into the at least one memory area, wherein the at least one distributed shared variable is a single variable that includes several variables that may be physically loaded into the at least one memory area; and

at least one distributed sequential computing program, configured to operate in the at least one processor, configured to access the at least one distributed shared variable, and configured to transform into at least one distributed parallel computing program by spawning at least one child distributed sequential computing system program when at least one intermediate condition occurs within the at least one distributed sequential program, wherein the at least one distributed parallel computing program concurrently uses the at least one distributed sequential computing program and the at least one spawned child distributed sequential computing program to perform parallel processing and/or operations, wherein the at least one intermediate condition comprising one intermediate result that will be required by the at least one spawned child distributed sequential computing program to continue computation.

**--END OF AMENDMENT--**

### *Allowable Subject Matter*

10. **Claims 1-6, 9, 10, 15-22, 26 and 27 are allowed** (re-numbered as claims 1-18). As the Applicants pointed out under REMAKRS section, page number 5-7, neither Pan, Suzuki, Fukuda, alone or in combination, teach or suggest the claimed invention as claimed in independent claims 1 and 15. Specifically, the combination of Pan, Suzuki and Fukuda fails to teach or suggest the feature about "establishing at least one distributed shared variable, wherein the at least one distributed shared variable is a single variable that includes several variables that may be physically distributed across multiple memories; developing at least one distributed sequential computing program to access the at least one distributed shared variable; and transforming the at least one distributed sequential computing program into at least one distributed parallel computing program by spawning at least one child distributed sequential computing program from the at least one distributed sequential computing program when at least one intermediate condition occurs within the at least one distributed sequential computing program, wherein the at least one distributed parallel computing program concurrently uses the at least one distributed sequential computing program and the at least one spawned child distributed sequential computing program to perform parallel processing and/or operations, wherein the at least one intermediate condition comprising one intermediate result that will be required by the at least one spawned child distributed sequential computing program to continue computation" as further clarified by the Examiner's Amendment above, and in as such manners as recited in the independent

claims 1 and 15, thus Claims 1, 15 and each of the dependent claims are allowable for at least the same reasons.

11. Any comments considered necessary by applicant must be submitted no later than the payment of the issue fee and, to avoid processing delays, should preferably accompany the issue fee. Such submissions should be clearly labeled "Comments on Statement of Reasons for Allowance."

## ***Conclusion***

Any inquiry concerning this communication or earlier communications from the examiner should be directed to Zheng Wei whose telephone number is (571) 270-1059 and Fax number is (571) 270-02059. The examiner can normally be reached on Monday-Thursday 8:00-15:00.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Tuan Q. Dam can be reached on (571) 272-3695. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/Z. W./
Examiner, Art Unit 2192

/Tuan Q. Dam/
Supervisory Patent Examiner, Art Unit 2192

# EXHIBIT A-22

US011032000B2

(12) **United States Patent**
**Howard**

(10) **Patent No.: US 11,032,000 B2**
(45) **Date of Patent: Jun. 8, 2021**

(54) **COMMUNICATIONS IN A WIRELESS NETWORK**

(71) Applicant: **Intellectual Ventures II LLC**, Wilmington, DE (US)

(72) Inventor: **Paul Howard**, Bristol (GB)

(73) Assignee: **Intellectual Ventures II LLC**, Wilmington, DE (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/682,854**

(22) Filed: **Nov. 13, 2019**

(65) **Prior Publication Data**

US 2020/0083952 A1 Mar. 12, 2020

**Related U.S. Application Data**

(63) Continuation of application No. 14/458,693, filed on Aug. 13, 2014, which is a continuation of application (Continued)

(51) **Int. Cl.**

| | |
|---|---|
| ***H04B 7/26*** | (2006.01) |
| ***H04W 72/04*** | (2009.01) |
| ***H04W 52/14*** | (2009.01) |
| ***H04J 3/16*** | (2006.01) |
| ***H04L 5/00*** | (2006.01) |
| *H04W 52/54* | (2009.01) |

(52) **U.S. Cl.**
CPC .......... ***H04B 7/2643*** (2013.01); ***H04J 3/1694*** (2013.01); ***H04L 5/0053*** (2013.01); ***H04W 52/146*** (2013.01); ***H04W 72/042*** (2013.01); ***H04W 72/0406*** (2013.01); ***H04W 72/0446*** (2013.01); *H04W 52/54* (2013.01)

(58) **Field of Classification Search**
CPC .... H04B 7/2643; H04J 3/1694; H04L 5/0053; H04W 52/146; H04W 72/0406; H04W 72/042; H04W 72/0446
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,056,109 A 10/1991 Gilhousen et al.
5,265,119 A 11/1993 Gilhousen et al.
(Continued)

FOREIGN PATENT DOCUMENTS

DE 10201270 A1 8/2002
EP 1467582 A1 10/2004
(Continued)

OTHER PUBLICATIONS

"3 UMTS Interfaces," UMTS Protocols and Protocol Testing, pp. 9-14, located at <http://www.tek.com/Measurement/App.sub. --Notes/2F_sub. —14251 /eng/in!- erfaces.pdf>.
(Continued)

*Primary Examiner* — Ronald B Abelson
(74) *Attorney, Agent, or Firm* — Volpe Koenig

(57) **ABSTRACT**

A user equipment (UE) may, in a time interval that it is not sending information over a physical uplink shared channel, send an uplink physical signal based on received resource allocation information. The uplink physical signal may be used to determine channel conditions by a base station. The UE may receive, on a downlink control channel, control information. The control information may be based on the determined channel conditions.

**24 Claims, 5 Drawing Sheets**



**Related U.S. Application Data**

No. 13/176,298, filed on Jul. 5, 2011, now Pat. No. 8,811,356, which is a continuation of application No. 11/646,692, filed on Dec. 27, 2006, now Pat. No. 8,009,639.


(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,485,486 | A | 1/1996 | Gilhousen et al. | |
| 6,061,784 | A | 5/2000 | Tarsky et al. | |
| 6,567,459 | B1 | 5/2003 | Hakkinen et al. | |
| 6,611,509 | B1 | 8/2003 | Hayashi et al. | |
| 6,754,505 | B1 | 6/2004 | Baker et al. | |
| 6,978,151 | B2 | 12/2005 | Choi et al. | |
| 7,120,134 | B2 | 10/2006 | Tiedemann, Jr. et al. | |
| 7,180,902 | B1 | 2/2007 | Raaf et al. | |
| 7,215,657 | B2 | 5/2007 | Toshimitsu et al. | |
| 8,009,639 | B2 | 8/2011 | Howard | |
| 8,072,916 | B2 | 12/2011 | Dateki | |
| 2001/0012276 | A1 | 8/2001 | Tsunehara et al. | |
| 2001/0026543 | A1 | 10/2001 | Hwang et al. | |
| 2001/0048711 | A1 | 12/2001 | Sun et al. | |
| 2002/0061005 | A1 | 5/2002 | Lee et al. | |
| 2002/0075891 | A1 | 6/2002 | Souissi | |
| 2002/0077151 | A1* | 6/2002 | Matthews | H04Q 7/20 |
| 2002/0085522 | A1 | 7/2002 | Huber | |
| 2002/0094834 | A1 | 7/2002 | Baker et al. | |
| 2002/0105929 | A1 | 8/2002 | Chen et al. | |
| 2002/0114311 | A1 | 8/2002 | Mazur et al. | |
| 2002/0119798 | A1 | 8/2002 | Hamabe | |
| 2002/0136193 | A1 | 9/2002 | Chang et al. | |
| 2002/0150058 | A1 | 10/2002 | Kim et al. | |
| 2002/0168993 | A1 | 11/2002 | Choi et al. | |
| 2002/0172208 | A1* | 11/2002 | Malkamaki | H04L 12/28 |
| 2002/0196766 | A1 | 12/2002 | Hwang et al. | |
| 2003/0022683 | A1 | 1/2003 | Beckmann et al. | |
| 2003/0054850 | A1 | 3/2003 | Masseroni et al. | |
| 2003/0069020 | A1 | 4/2003 | Speight | |
| 2004/0022213 | A1* | 2/2004 | Choi | H04Q 7/00 |
| 2004/0152473 | A1 | 8/2004 | Kuwano et al. | |
| 2004/0170132 | A1* | 9/2004 | Shin | H04L 5/14 |
| 2004/0203419 | A1 | 10/2004 | Crocker et al. | |
| 2005/0002360 | A1 | 1/2005 | Lamontagne et al. | |
| 2005/0013287 | A1 | 1/2005 | Wallentin et al. | |
| 2005/0022098 | A1 | 1/2005 | Vayanos et al. | |
| 2005/0058103 | A1* | 3/2005 | Jeong | H04H 7/216 |
| 2005/0222948 | A1 | 10/2005 | Sato et al. | |
| 2006/0093026 | A1 | 5/2006 | Montojo et al. | |
| 2006/0211417 | A1 | 9/2006 | Pedlar | |
| 2006/0221809 | A1 | 10/2006 | Malladi et al. | |
| 2007/0058595 | A1* | 3/2007 | Classon | H04B 7/212 |
| 2007/0173256 | A1 | 7/2007 | Laroia et al. | |
| 2007/0177656 | A1 | 8/2007 | Maruta et al. | |
| 2007/0265017 | A1 | 11/2007 | Ishii et al. | |
| 2008/0090528 | A1 | 4/2008 | Malladi | |
| 2008/0144600 | A1* | 6/2008 | Anderson | H04J 3/06 |
| 2009/0262711 | A1 | 10/2009 | Ahn et al. | |

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| EP | 1615384 | A1 | 1/2006 | |
| EP | 1681780 | A1 | 7/2006 | |
| JP | 11261544 | A2 | 9/1999 | |
| JP | 2006197318 | A2 | 7/2006 | |
| JP | 2005-346319 | * | 9/2006 | H04L 12/56 |
| WO | 2005083897 | A1 | 9/2005 | |
| WO | 2006015984 | A1 | 2/2006 | |
| WO | 2006019263 | A2 | 2/2006 | |
| WO | 2006063138 | A2 | 6/2006 | |

OTHER PUBLICATIONS

"3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Feasibility Study for Evolved UTRA and UTRAN (Release 7)," (Mar. 2006). 3GPP:Valbonne, France, TS 25.912 v0.0.4:1-13.

"3rd Generation Partnership Project; Technical Specification Group Services and System Aspects; 3GPP System Architecture Evolution: Report on Technical Options and Conclusions (Release 7)," (Jul. 2005). 3GPP:Valbonne, France, TA 23.882 v03.0:1-13.

"3rd Generation Partnership Project; Technical Specification Group Services and System Aspects; General UMTS Architecture (3G TS23.101 version 3.0.1 )," (Apr. 1999). 3GPP:Valbonne, France, TS 23.101 v3.0.1 :1-13.

3rd Generation Partnership Project; Technical Specification Group Services and System Aspects; Multimedia Broadcast/Multicast Service (MBMS); Architecture and Functional Description (Release 6); 3GPP: Valbonne, France; 3GPP TS 23.246 v.6.4.0 (Sep. 2004).

"UMTS Protocols and Protocol Testing," Tektronix, The International Engineering Consortium, pp. 1-45, located at <http://www.rfpeople.com/docs/umts.pdf>.

3RD Generation Partnership Project. "Technical Specification Group Radio Access Network; Radio Resource Control (RRC); Protocol Specification (Release 7)," 3GPP TS 25.331 V7.3.0, Dec. 2006.

Final Rejection issued by USPTO, dated Nov. 19, 2009 for U.S. Appl. No. 11/646,692.

Final Rejection, U.S. Appl. No. 13/176,298, dated Nov. 6, 2013.

Shadialy, Z. "Tutorial: Medium Access Control (MAC) in 3G/UMTS Protocol Stack," located at <http://www.3g4g.co.uklTutoriai/ZG/zg_sub.—mac.html> visited on Jun. 20, 2007. (9 pages).

International Engineering Consortium. "Universal Mobile Telecommunications System (UMTS) Protocols and Protocol Testing," located at <http://www.iec.org/online/tutorials/umts/topic02.html> visited on Jun. 20, 2007. (7 pages).

International Preliminary Report on Patentability dated Jun. 30, 2009 from PCT Application No. PCT/EP2007l064483.

Non-Final Rejection issued by USPTO, dated May 14, 2009 for U.S. Appl. No. 11/646,692.

Non-Final Rejection issued by USPTO, dated May 28, 2010 for U.S. Appl. No. 11/646,692.

Non-Final Rejection, U.S. Appl. No. 13/176,298, dated Jul. 24, 2013.

Non-Final Rejection, U.S. Appl. No. 13/176,298, dated Apr. 10, 2013.

Notice of Allowance issued by USPTO, dated Feb. 2, 2011 for U.S. Appl. No. 11/646,692.

Notice of Allowance issued by USPTO, dated May 17, 2011 for U.S. Appl. No. 11/646,692.

Notice of Allowance, U.S. Appl. No. 13/176,298, dated Apr. 15, 2014.

Office Action, Japanese Patent Application No. 2009-543459, dated Dec. 18, 2012.

Final Rejection, U.S. Appl. No. 14/458,693, dated May 10, 2016.

Final Rejection, U.S. Appl. No. 14/458,693, dated Mar. 21, 2017.

Final Rejection, U.S. Appl. No. 14/458,693, dated May 17, 2018.

Non-Final Rejection, U.S. Appl. No. 14/458,693, dated Dec. 30, 2015.

Non-Final Rejection, U.S. Appl. No. 14/458,693, dated Dec. 2, 2016.

Non-Final Rejection, U.S. Appl. No. 14/458,693, dated Oct. 23, 2017.

Notice of Allowance, U.S. Appl. No. 14/458,693, dated Nov. 16, 2015.

Advisory Action, U.S. Appl. No. 14/458,693, dated Aug. 25, 2016.

Miscellaneous Communication to Applicant, U.S. Appl. No. 14/458,693, dated May 20, 2016.

Examiner's Answer to Appeal Brief, U.S. Appl. No. 14/458,693, dated Nov. 23, 2018.

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Evolved Universal Terrestrial Radio Access (E-UTRA) and Evolved Universal Terrestrial Radio Access Network (E-UTRAN); Overall description; Stage 2 (Release 8)," 3GPP TS 36.300 V0.3.1 (Nov. 2006).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Physical Channels and Modulation (Release 8)," 3GPP TS 36.211 V0.2.1 (Nov. 2006).

(56) **References Cited**

OTHER PUBLICATIONS

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Physical layer procedures (Release 8)," 3GPP TS 36.213 V0.1.0 (Oct. 2006).
Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Multiplexing and channel coding (Release 8)," 3GPP TS 36.212 V02.1 (Nov. 2006).

* cited by examiner


UE
110
Uu
Node-B
Node-B
Node-B
112
Iub
RRM
114
RNC
118
Iu
SGSN
120
GGSN
122
CN
116
External network
124
UE domain
Radio access network (RAN) domain
Core network (CN) domain

FIG. 1

Case 3:25-cv-02885-L-BN Document 167 Filed 08/28/26 Page 550 of 1002 PageID 5707






FIG. 2


310
312
314
316
Frame #0
PLCCH
Frame #1
PLCCH
Frame #2
PLCCH
Frame #3
PLCCH
UL Beacon
Frame #0
PLCCH
Frame #1
Frame #2
Frame #3
PLCCH
UL Beacon
PLCCH
UL Beacon
PLCCH
UL Beacon
DL
UL
Basestation
302
Terminal
304
Terminal
306
Terminal
308

FIG. 3


GSM connected mode
Establish RR connection
Release RR connection
GSM: handover
UTRA: inter-RAT handover
GPRS packet transfer mode
Initiation of temporary block flow
Release of temporary block flow
Cell reselection
GPRS packet idle mode[1]
Camping on a GSM/GPRS cell[1]
UTRA RRC connected mode
CELL_PCH
Out of service
In service
CELL_FACH
Out of service
In service
404
CELL_ACTIVE
406
URA_PCH
Out of service
In service
CELL_DCH
Establish RRC connection
Release RRC connection
Establish RRC connection
Release RRC connection
Camping on a UTRAN cell[1]
Idle mode

FIG. 4


500
Processor
504
Memory
508
Storage devices
510
Media drive
512
Media
518
Storage unit
I/F
Storage unit
520
522
Bus
502
Communications
I/F
Channel
524
528

FIG. 5

# COMMUNICATIONS IN A WIRELESS NETWORK

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 14/458,693, filed Aug. 13, 2014, which is a continuation of U.S. patent application Ser. No. 13/176,298, filed Jul. 5, 2011, which issued as U.S. Pat. No. 8,811,356 on Aug. 19, 2014, which is a continuation of U.S. patent application Ser. No. 11/646,692, filed Dec. 27, 2006, which issued as U.S. Pat. No. 8,009,639 on Aug. 30, 2011, which are all incorporated by reference as if fully set forth.

## BACKGROUND OF THE INVENTION

Time division-code division multiple access (TD-CDMA) is an air interface technology that combines the benefits of the three elemental concepts in a universal mobile telecommunication system (UMTS): time division multiple access (TDMA); code division multiple access (CDMA); and time division duplex (TDD). TDD, in particular, uses the same radio channel for both uplink and downlink communications, and discriminates between signals by separating the transmissions in time. One of the benefits obtained by operating both links on the same frequency is the ability to exploit channel reciprocity.

Channel reciprocity gives equipment the ability to derive information about uplink channel conditions from downlink channel conditions based upon signals received by the user equipment (UE). Pathloss is one example of channel information that can be obtained from channel reciprocity. Knowledge of the uplink pathloss enables open-loop power control to be employed for uplink transmissions. For example, uplink power control is important for the operation of the CDMA element of TD-CDMA as it counteracts the near-far effect that would otherwise be encountered if all UEs transmitted at a fixed power regardless of the uplink pathloss.

The open-loop uplink power control feature provides a significant advantage when coupled with a multiple access data transmission system that is used for packet-based communication and/or shared channels. When access to a limited number of uplink channels is shared between a large population of terminals it is imperative that access to the channels can be switched between terminals with minimal latency. A data terminal that can derive information needed to access uplink channels from the downlink transmissions (beacon signals) has a significant advantage over a terminal that relies on the (lengthy) configuration of a dedicated channel in order to establish a feedback channel.

However, channel reciprocity cannot always be guaranteed. For example TDD transmissions may not be permitted in certain frequency spectrum allocations; this is a regulatory issue and may be used to protect other wireless equipment in the same or adjacent frequency bands. In these situations the correlation between uplink and downlink channels is lost because the channels are transported on carrier frequencies that are separated in frequency by an amount that is greater than the coherence bandwidth of the channel (usually, only a few MHz separation is sufficient to cause the uplink and downlink fading profiles to be independent).

In high speed mobile applications, the time delay between downlink and uplink transmissions may exceed the coherence time of the channel. The maximum time delay that can



be tolerated is a function of the mobile speed and the RF carrier frequency used, with the coherence time reducing with increasing speed and RF carrier frequency. Also, the use of multiple transmit and/or receive antennas at the network and/or the mobile terminal can introduce unintentional decorrelation between the uplink and downlink channels.

If the TD-CDMA air interface is to be used in applications where the correlation between the uplink and downlink path loss is not guaranteed, then it would be advantageous to find a substitute for channel reciprocity.

## BRIEF SUMMARY OF THE INVENTION

Although it is desirable to support air interfaces where the pathloss is not reciprocal, known conventional methods do not deal directly with the evolution or adaptation of an air interface that uses channel reciprocity to deliver key features and advantages where channel reciprocity is not guaranteed. The adaptation provided in embodiments of the invention introduces a new technique for uplink channel control that uses a feedback scheme as a substitute for the absence of channel reciprocity, with minimal impact on the ability of the air interface to support uplink shared channels.

Embodiments of the present invention enable active feedback control between a base station and user equipment (UE). In particular, the operation of a system designed for TDD, or unpaired operation, is expanded to operate in FDD, or paired, mode. For example, an uplink beacon function (for power control) and a modified random access process substitute for the information lost due to the lack of channel reciprocity in paired operation. Embodiments of the invention allow a terminal to transmit the uplink physical channel control signal (UL_Beacon) independently from the uplink physical channel. Therefore, the implementation of closed loop feedback may operate in the absence of an uplink physical channel. In one embodiment, a UE allocates a time slot for a beacon signal separated from the time slots for data in a frame. A second time slot is allocated within the frame for the base station to transmit a control signal in response to the beacon signal. The control signal instructs the UE to adjust a transmission parameter.

A UL_Beacon signal may be combined with a physical layer common control channel (PLCCH) to form a feedback system. A dedicated timeslot groups all of the UL_Beacon signals from multiple UEs in a specific uplink timeslot. By grouping the UL_Beacon signals together, embodiments obtain separation between the UL_Beacon signals and the standard uplink physical channels. Additionally, in a synchronous system embodiments of the invention detect and cancel the UL_Beacon signals from other cell sites (intercell interference). The PLCCH carries feedback information to the UEs that are transmitting UL_Beacon signals. The PLCCH can share a timeslot with other physical channels by exploiting the CDMA aspect of the system.

In other embodiments, the number of supported UEs can be increased by fractionating the use of the UL_Beacon and PLCCH across a multiframe period. Fractionation may also prevent timeslot blocking where half duplex UEs have a long UL/DL switching time. Additionally, support for half duplex terminals is implicit due to the nature of the TDMA frame structure. The system may manage the allocation of resource across the population of terminals such that the full capacity of the base station can be utilized even when only half-duplex terminals are deployed. In embodiments of the invention, full-duplex terminals can be still be supported along with half duplex UEs.

Moreover, in other embodiments, a radio resource control (RRC) connected state covers the subset of terminals that are in cell forward access channel (Cell_FACH), which are also transmitting UL_Beacon and receiving PLCCH, thus creating an active control feedback channel. Management of the UEs that are in Cell_Active state may remove users that are less active, and may add users that are newly active while retaining users that may have on-going data transfer requirements.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** illustrates a cellular communication system according to embodiments of the invention;

FIG. **2** illustrates a timeslot arrangement for uplink and downlink messages supporting the UL_Beacon and its corresponding PLCCH within a TD-CDMA frame structure modified to support FDD according to embodiments of the invention;

FIG. **3** illustrates fractionation in different frames at the base station according to embodiments of the invention;

FIG. **4** illustrates UTRA RRC connected modes according to embodiments of the invention;

FIG. **5** illustrates a computer system that may be employed to implement embodiments of the invention.

## DETAILED DESCRIPTION OF THE INVENTION

FIG. **1** illustrates an example of a cellular communication system according to embodiments of the invention. The network includes a user equipment (UE) domain, a radio access network (RAN) domain, and a core network domain. The UE domain includes user equipment **110** that communicate with at least one base station **112** in the RAN domain via a wireless interface. The RAN domain may also include a network controller (RNC) **118** (e.g., radio network controller), such as that used in UMTS systems. Alternatively, such functionality may be distributed between the Node Bs and an access gateway (AGW) (not shown) or other controller in the core network. FIG. **1** also illustrates an optional radio resource manager (RRM) **114**. The RRM may perform functions otherwise performed by the Node Bs or an AGW in some embodiments.

The core network (CN) **116** includes, in this example, a serving GPRS support node (SGSN) **120**, and a gateway GPRS support node (GGSN) **122**. The core network is coupled to an external network **124**. The SGSN **120** is responsible for session control, including keeping track of the location of the UEs. The GGSN **122** concentrates and tunnels user data within the core network **116** to the ultimate destination (e.g., an Internet service provider) in the external network **124**. Further details may be found in the 3GPP UMTS technical specifications, such as TS23.246 v6.4.0 "3rd Generation Partnership Project; Technical Specification Group Services and System Aspects; Multimedia Broadcast/Multicast Service (MBMS); Architecture and Functional Description (Release 6)," published by the 3GPP Support Office, 650 Route des Lucioles—Sophia Antipolis, Valbonne—FRANCE, which are incorporated by reference herein.

Further details regarding exemplary communications systems that may implement embodiments of the invention may be found in 3GPP UMTS technical specifications, such as TR 882, "3GPP System Architecture Evolution: Report on Technical Options and Conclusions"; TR 25.912, "Feasibility Study for Evolved UTRA and UTRAN"; TS 23.101, "General Universal Mobile Telecommunications System (UMTS) Architecture," all of which are incorporated by reference herein.

TDD to FDD Evolution

A system designed for operation in Time Division Duplex (TDD) mode has base stations and terminals that transmit and receive at orthogonal points in time. In normal operation terminals are in receive mode when the base station is transmitting, and base stations are in receive mode when terminals are transmitting. In conventional TDD implementations, neither base stations nor the terminals are able to transmit and receive at the same points in time because the same frequency is used for uplink and downlink communication.

Such a system can be adjusted to operate in Frequency Division Duplex (FDD) mode, where the uplink and downlink communications occur on different frequencies. According to embodiments of the invention, to make full and efficient use of the frequency spectrum resources, the base stations are adapted to transmit and receive at the same time. This is possible since the uplink and downlink communications now occur on different frequencies. The terminals, however, retain the restriction of transmitting and receiving at orthogonal points in time to retain the simplicity of not having to transmit and receive at the same time (e.g., no duplexer required). The full use of the frequency spectrum is then obtained by allocating the resource across a plurality of terminals.

Additional measures may be needed if there are aspects of the air interface that rely on the channel reciprocity that can be assumed for TDD systems. In the case of TD-CDMA, modifications may be made for the correct operation of uplink power control and rate adaptation. This can be achieved by defining an uplink physical control channel used for estimating the uplink channel conditions and a downlink channel used to feed back control information to the terminal. These channels may not need an associated data physical channel to be operational.

Modifications may be made to the random access channel. This may be achieved by introducing an additional indicator step at the start of any physical random access. A new uplink physical channel carries the random access indicators. A new downlink physical channel carries the response to received uplink indicators.

Uplink Physical Channel Control Signal

When pathloss reciprocity is not available, the combination of an uplink physical channel control signal with a downlink feedback channel may be used to keep the terminal informed of the condition of the uplink channel. The uplink physical control signal is referred to herein as an "Uplink Beacon" (UL_Beacon).

In general, a system that supports shared channels may also support shared access to a large number of terminals. To extract the maximum benefit from the resulting trunking gain, shared channels can be quickly and efficiently reallocated between the population of UEs. To obtain rapid access to the uplink shared channels, terminals can transmit at the correct power with their first transmission so that latency can be kept to a minimum.

According to embodiments of the invention, the RNC or other controller (e.g., other controller having its functionality in the core network) allocates resources so that the physical channel control signal is separate from the uplink (shared) physical channel. Thus, terminals are able to transmit an UL_Beacon independently of their access to the uplink shared channel. The system may implement a closed loop control system, in which the base station detects the

received power and/or other channel information from the UL_Beacon, and sends controlling commands back to each terminal to keep the terminal informed of the channel conditions observed at the base station.

In certain embodiments, the closed loop control system is simply based on the UL_Beacon power received at the base station. The base station may send power control commands on a shared downlink channel to each terminal based on the power received from the UL_Beacon signal. Each power control command may, for example, indicate whether terminal power should be increased or decreased by a predetermined amount. This downlink channel is referred to as the "Physical Layer Control Channel" (PLCCH). The capacity of the PLCCH may be matched to the number of bits required in the feedback field and the number of UL_Beacon signals that can be simultaneously supported. That is, each UL_Beacon may correspond to one bit of the PLLCH. All terminals transmitting UL_Beacon signals may receive this channel and extract the relevant feedback field.

It is possible to extend the complexity of the control loop by sending control commands based on other aspects of the UL_Beacon signal as received by the base station, such as time-of-arrival, and channel impulse response. The amount of resource that is required for the feedback channel increases with the size (in bits) of the feedback information to each UE.

For example, for air interface technologies with a TDMA element, it is possible to adapt the TDMA frame structure to provide separation between the UL_Beacon and the normal physical channels by dedicating at least one uplink time slot per frame (or at least one time slot per multi-frame) to carrying UL_Beacon signals.

By placing UL_Beacon signals in a dedicated timeslot, a dedicated detection scheme can be applied which may include performance enhancing features such as intra-cell cancelling (for alleviating the effects of cross-correlation interference between UL_Beacon signals transmitted by multiple terminals in the same cell), or inter-cell cancelling (for reducing the interference from neighboring cells in the case where the UL_Beacon timeslots are time synchronized). Cross-interference between UL_Beacon and normal uplink bursts is avoided by the separation obtained from the use of separate time slots.

Those skilled in the art will recognize that there are a large number of possibilities for the arrangement of a UL_Beacon and its associated PLCCH within the frame structure according to embodiments of the invention. More than one UL_Beacon and PLCCH per frame could be supported if the feedback update rate is required to be faster than the frame rate (at the expense of system capacity). For system applications that can tolerate a slower feedback rate, embodiments may fractionate the use of the UL_Beacon timeslot (and the associated PLCCH).

When fractionation is employed, the RNC or other controller may allocate the UL_Beacon timeslot in a given frame to a group of terminals depending on the current fractionation phase, thus increasing the number of terminals that can be supported with active physical channel feedback control. The maximum fractionation cycle length may be determined by the feedback update rate that the system requires in order to meet its performance targets.

FIG. **2** illustrates an example of a timeslot arrangement supporting the UL_Beacon and its corresponding PLCCH within a TD-CDMA frame structure modified to support FDD. In this example, the PLCCH **212** shares a timeslot with another downlink shared channel. This is possible since normal downlink physical channels are used to transmit the PLCCH. The downlink frame also comprises a downlink beacon timeslot **206**, an access control timeslot **208**, and normal traffic carrying timeslots **210**. The uplink frame comprises a UL_Beacon control timeslot **216**, an access control timeslot **218**, and normal traffic carrying timeslots **214**.

FIG. **3** illustrates an example where fractionation is employed. The UL_Beacon and PLCCH timeslots are active in every frame at the base station **302**. However, terminal **304**, terminal **306**, and terminal **308** have been assigned a different fractionation phase. FIG. **3** illustrates the case where the fractionation phase is 3. For example, the fractionation phase of terminal **304** occurs in frame #**0 310**, the fractionation phase of terminal **306** occurs in frame #**1 312**, and the fractionation phase of terminal **308** occurs in frame #**2 314**. Since the fractionation phase is 3, the phase for terminal **304** occurs again in frame #**3 316**.

Half Duplex Terminals

Embodiments of the invention enable terminals to operate in half duplex or full duplex mode. In a half duplex system, base stations and terminals do not transmit and receive simultaneously. When such a system is evolved to operate in paired spectrum, it becomes inefficient if base stations retain their half duplex operation. It is not necessarily inefficient for the terminals to do so, however, since half duplex operation may have some advantages in the design and implementation of the terminal.

Nonetheless, there are some points that should be considered. For example, a single terminal may not be able to access all transmit and all receive slots. Therefore, the system may have to manage resources across the population of terminals to ensure all the available resources at the base station are efficiently utilized. To prevent blocking of timeslots, half duplex terminals may be operated with a fractionation cycle of greater than one. In particular, this may also apply for the case where there are more than one UL_Beacon timeslot per, frame. There is a time delay for half duplex terminals to switch between transmit and receive functions. In some cases this delay exceeds the guard period inserted between consecutive timeslots. In the half duplex terminal case, the terminal is unable to transmit and receive on adjacent timeslots. This will affect the locations of the UL_Beacon, PLCCH, and other common channels. Accordingly, the timeslot arrangement may be adjusted when the system is configured.

Terminal Management

Embodiments of this invention separate uplink control from the uplink physical traffic. This allows the control feedback to operate even when the terminal does not have data to send, with the consequence that uplink shared channels can be used with maximum efficiency.

To use shared channels efficiently, a relatively large user base may be needed. At the same time, the network resources required to support the control feedback channels for these terminals need to be minimized. In general, the number of users that can be supported with active control feedback channels is smaller than the typical number of users per cell. Therefore, the terminals in this active state may be managed.

In UMTS terminology, embodiments of the invention provide a new Universal Terrestrial Radio Access-Radio Resource Control-Connected (UTRA RRC-Control) sub-state into the system. UTRA systems already support the idea of different RRC-Connected states (see, TS25.331 Radio Resource Control (RRC) Protocol Specification, which is incorporated herein by reference), e.g., CELL_DCH, CELL_FACH etc. This sub-state is referred to as the

CELL_ACTIVE state. FIG. **4** illustrates this sub-state in context with other UTRA RRC-connected states. A UE in a Cell_Active sub-state transmits the physical channel control part of the uplink physical channel only, and nothing else (i.e., no data).

As shown in FIG. **4**, CELL_ACTIVE sub-state is a sub-state of CELL_FACH state **404**. In general, UEs in CELL_FACH state have an RRC connection, but they may not be actively transferring data. Out of the population of UEs in CELL_FACH state **404**, a smaller number of UEs, determined by the network to be the most-active UEs, are supported in a CELL_ACTIVE state **406**. In this state, the UEs transmit the physical channel control signal and listen to the associated feedback channel from the network. Because the UE is aware of the uplink pathloss conditions from the feedback channel, it can have instant access to the uplink shared channels, and the resource allocator (controller) in the network can treat the UE accordingly.

The rules governing which UEs are maintained in CELL_ACTIVE state are decided by the network (e.g., through the RNC) and may be based on factors such as the volume of data transfer required by the UE, the data transfer rate required by a UE, the frequency of short bursts of data transfer, the total number of UEs in CELL_FACH state, the time since the last data transfer, the UE power saving requirements, etc.

Note that UEs in CELL_ACTIVE state have their transmitters active, therefore it is necessary for these UEs to monitor the status of the downlink and automatically come out of CELL_ACTIVE state if the downlink is deemed to be out-of-synchronization (for example, very high downlink errors or low received signal strength). This feature prevents UEs continuing to transmit in a state where the feedback channel may be unreliable and thus causing interference.

While the invention has been described in terms of particular embodiments and illustrative figures, those of ordinary skill in the art will recognize that the invention is not limited to the embodiments or figures described. Although embodiments of the present invention are described, in some instances, using UMTS terminology, those skilled in the art will recognize that such terms are also used in a generic sense herein, and that the present invention is not limited to such systems.

Those skilled in the art will recognize that the operations of the various embodiments may be implemented using hardware, software, firmware, or combinations thereof, as appropriate. For example, some processes can be carried out using processors or other digital circuitry under the control of software, firmware, or hard-wired logic. (The term "logic" herein refers to fixed hardware, programmable logic and/or an appropriate combination thereof, as would be recognized by one skilled in the art to carry out the recited functions.) Software and firmware can be stored on computer-readable media. Some other processes can be implemented using analog circuitry, as is well known to one of ordinary skill in the art. Additionally, memory or other storage, as well as communication components, may be employed in embodiments of the invention.

FIG. **5** illustrates a typical computing system **500** that may be employed to implement processing functionality in embodiments of the invention. Computing systems of this type may be used in the radio controllers, the base stations, and the UEs, for example. Those skilled in the relevant art will also recognize how to implement the invention using other computer systems or architectures. Computing system **500** may represent, for example, a desktop, laptop, or notebook computer, hand-held computing device (PDA, cell phone, palmtop, etc.), mainframe, server, client, or any other type of special or general purpose computing device as may be desirable or appropriate for a given application or environment. Computing system **500** can include one or more processors, such as a processor **504**. Processor **504** can be implemented using a general or special purpose processing engine such as, for example, a microprocessor, microcontroller or other control logic. In this example, processor **504** is connected to a bus **502** or other communications medium.

Computing system **500** can also include a main memory **508**, such as random access memory (RAM) or other dynamic memory, for storing information and instructions to be executed by processor **504**. Main memory **508** also may be used for storing temporary variables or other intermediate information during execution of instructions to be executed by processor **504**. Computing system **500** may likewise include a read only memory ("ROM") or other static storage device coupled to bus **502** for storing static information and instructions for processor **504**.

The computing system **500** may also include information storage system **510**, which may include, for example, a media drive **512** and a removable storage interface **520**. The media drive **512** may include a drive or other mechanism to support fixed or removable storage media, such as a hard disk drive, a floppy disk drive, a magnetic tape drive, an optical disk drive, a CD or DVD drive (R, or RW), or other removable or fixed media drive. Storage media **518**, may include, for example, a hard disk, floppy disk, magnetic tape, optical disk, CD or DVD, or other fixed or removable medium that is read by and written to by media drive **512**. As these examples illustrate, the storage media **518** may include a computer-readable storage medium having stored therein particular computer software or data.

In alternative embodiments, information storage system **510** may include other similar components for allowing computer programs or other instructions or data to be loaded into computing system **500**. Such components may include, for example, a removable storage unit **522** and an interface **520**, such as a program cartridge and cartridge interface, a removable memory (for example, a flash memory or other removable memory module) and memory slot, and other removable storage units **522** and interfaces **520** that allow software and data to be transferred from the removable storage unit **522** to computing system **500**.

Computing system **500** can also include a communications interface **524**. Communications interface **524** can be used to allow software and data to be transferred between computing system **500** and external devices. Examples of communications interface **524** can include a modem, a network interface (such as an Ethernet or other NIC card), a communications port (such as for example, a USB port), a PCMCIA slot and card, etc. Software and data transferred via communications interface **524** are in the form of signals which can be electronic, electromagnetic, optical or other signals capable of being received by communications interface **524**. These signals are provided to communications interface **524** via a channel **528**. This channel **528** may carry signals and may be implemented using a wireless medium, wire or cable, fiber optics, or other communications medium. Some examples of a channel include a phone line, a cellular phone link, an RF link, a network interface, a local or wide area network, and other communications channels.

In this document, the terms "computer program product," "computer-readable medium" and the like may be used generally to refer to media such as, for example, memory **508**, storage device **518**, or storage unit **522**. These and other forms of computer-readable media may store one or more

instructions for use by processor **504**, to cause the processor to perform specified operations. Such instructions, generally referred to as "computer program code" (which may be grouped in the form of computer programs or other groupings), when executed, enable the computing system **500** to perform functions of embodiments of the present invention. Note that the code may directly cause the processor to perform specified operations, be compiled to do so, and/or be combined with other software, hardware, and/or firmware elements (e.g., libraries for performing standard functions) to do so.

In an embodiment where the elements are implemented using software, the software may be stored in a computer-readable medium and loaded into computing system **500** using, for example, removable storage drive **522**, drive **512** or communications interface **524**. The control logic (in this example, software instructions or computer program code), when executed by the processor **504**, causes the processor **504** to perform the functions of the invention as described herein.

It will be appreciated that, for clarity purposes, the above description has described embodiments of the invention with reference to different functional units and processors. However, it will be apparent that any suitable distribution of functionality between different functional units, processors or domains may be used without detracting from the invention. For example, functionality illustrated to be performed by separate processors or controllers may be performed by the same processor or controller. Hence, references to specific functional units are only to be seen as references to suitable means for providing the described functionality, rather than indicative of a strict logical or physical structure or organization.

Although the present invention has been described in connection with some embodiments, it is not intended to be limited to the specific form set forth herein. Rather, the scope of the present invention is limited only by the claims Additionally, although a feature may appear to be described in connection with particular embodiments, one skilled in the art would recognize that various features of the described embodiments may be combined in accordance with the invention.

Furthermore, although individually listed, a plurality of means, elements or method steps may be implemented by, for example, a single unit or processor. Additionally, although individual features may be included in different claims, these may possibly be advantageously combined, and the inclusion in different claims does not imply that a combination of features is not feasible and/or advantageous. Also, the inclusion of a feature in one category of claims does not imply a limitation to this category, but rather the feature may be equally applicable to other claim categories, as appropriate.

What is claimed is:

**1**. A user equipment (UE) comprising:

a receiver and a processor are configured to receive resource allocation information associated with an uplink physical signal, wherein the uplink physical signal and a physical uplink shared channel have different resources;

a transmitter and the processor are configured to send, over the physical uplink shared channel, data in assigned time intervals;

the transmitter and the processor are further configured, in a time interval that it is not sending information over the physical uplink shared channel, to send the uplink physical signal based on the received resource allocation information, wherein the uplink physical signal is used to determine channel conditions by a base station and in the same time interval that the uplink physical signal is sent, a plurality of UEs transmit uplink physical signals in the same time interval; and

the receiver and the processor are further configured to receive, on a physical control channel, control information, wherein the control information is based on the determined channel conditions, wherein physical control channels are transmitted in a same time slot with other physical channels in a plurality of predetermined time slots in a downlink frame, wherein other time slots of the downlink frame do not include a physical control channel, wherein a number of bits sent over the physical control channel is based on a number of fields of control information to be sent to the UE.

**2**. The UE of claim **1**, wherein the receiver and the processor are further configured to receive data on a physical downlink shared channel.

**3**. The UE of claim **2**, wherein the physical control channel and the physical downlink shared channel are time multiplexed.

**4**. The UE of claim **1**, wherein the receiver and the processor are further configured to receive, on the physical control channel, power control information.

**5**. The UE of claim **4**, wherein the physical control channel includes power control information for a plurality of UEs using different bits.

**6**. The UE of claim **1**, wherein in the time interval that the uplink physical signal is sent by the UE, a plurality of UEs each transmit on respective uplink physical control channels in the time interval.

**7**. A network device comprising:

a transmitter and a processor are configured to transmit resource allocation information associated with an uplink physical signal, wherein the uplink physical signal and a physical uplink shared channel have different resources;

a receiver and the processor are further configured to receive, over the physical uplink shared channel, data in assigned time intervals;

the receiver and the processor are further configured, in a time interval that it is not receiving information over the physical uplink shared channel, to receive the uplink physical signal based on the transmitted resource allocation information, wherein the uplink physical signal is used to determine channel conditions by the network device and in the same time interval that the uplink physical signal is sent, a plurality of UEs transmit uplink physical signals in the same time interval; and

the transmitter and the processor are further configured to transmit, on a physical control channel, control information, wherein the control information is based on the determined channel conditions, wherein physical control channels are transmitted in a same time slot with other physical channels in a plurality of predetermined time slots in a downlink frame, wherein other time slots of the downlink frame do not include a physical control channel, wherein a number of bits sent over the physical control channel is based on a number of fields of control information to be sent to the UE.

**8**. The network device of claim **7**, wherein the transmitter and the processor are further configured to transmit data on a physical downlink shared channel.

**9**. The network device of claim **8**, wherein the physical control channel and the physical downlink shared channel are time multiplexed.

**10**. The network device of claim **7**, wherein the transmitter and the processor are further configured to transmit, on the physical control channel, power control information.

**11**. The network device of claim **10**, wherein the physical control channel includes power control information for a plurality of UEs using different bits.

**12**. The network device of claim **7**, wherein in the time interval that the uplink physical signal is received by the network device, signals are received on other uplink physical control channels in the time interval from a plurality of UEs.

**13**. A method performed by user equipment (UE), the method comprising:

receiving resource allocation information associated with an uplink physical signal, wherein the uplink physical signal and a physical uplink shared channel have different resources;

sending, over the physical uplink shared channel, data in assigned time intervals;

sending, in a time interval that it is not sending information over the physical uplink shared channel, the uplink physical signal based on the received resource allocation information, wherein the uplink physical signal is used to determine channel conditions by a base station and in the same time interval that the uplink physical signal is sent, a plurality of UEs transmit uplink physical signals in the same time interval; and

receiving, on a physical control channel, control information, wherein the control information is based on the determined channel conditions, wherein physical control channels are transmitted in a same time slot with other physical channels in a plurality of predetermined time slots in a downlink frame, wherein other time slots of the downlink frame do not include a physical control channel, wherein a number of bits sent over the physical control channel is based on a number of fields of control information to be sent to the UE.

**14**. The method of claim **13** further comprising receiving data on a physical downlink shared channel.

**15**. The method of claim **14**, wherein the physical control channel and the physical downlink shared channel are time multiplexed.

**16**. The method of claim **13** further comprising receiving, on the physical control channel, power control information.

**17**. The method of claim **16**, wherein the physical control channel includes power control information for a plurality of UEs using different bits.

**18**. The method of claim **13**, wherein in the time interval that the uplink physical signal is sent by the UE, a plurality of UEs each transmit on respective uplink physical control channels in the time interval.

**19**. A method performed by a network device, the method comprising:

transmitting resource allocation information associated with an uplink physical signal, wherein the uplink physical signal and a physical uplink shared channel have different resources;

receiving, over the physical uplink shared channel, data in assigned time intervals;

receiving, in a time interval that it is not receiving information over the physical uplink shared channel, the uplink physical signal based on the transmitted resource allocation information, wherein the uplink physical signal is used to determine channel conditions by the network device in the same time interval that the uplink physical signal is sent, a plurality of UEs transmit uplink physical signals in the same time interval; and

transmitting, on a physical control channel, control information, wherein the control information is based on the determined channel conditions, wherein physical control channels are transmitted in a same time slot with other physical channels in a plurality of predetermined time slots in a downlink frame, wherein other time slots of the downlink frame do not include a physical control channel, wherein a number of bits sent over the physical control channel is based on a number of fields of control information to be sent to the UE.

**20**. The method of claim **19** further comprising transmitting data on a physical downlink shared channel.

**21**. The method of claim **20**, wherein the physical control channel and the physical downlink shared channel are time multiplexed.

**22**. The method of claim **19** further comprising transmitting, on the physical control channel, power control information.

**23**. The method of claim **22**, wherein the physical control channel includes power control information for a plurality of UEs using different bits.

**24**. The method of claim **19**, wherein in the time interval that the uplink physical signal is received by the network device, signals are received on other uplink physical control channels in the time interval from a plurality of UEs.

* * * * *

# EXHIBIT A-23

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

AMERICAN AIRLINES, INC.,

and

SOUTHWEST AIRLINES, CO.,

Petitioners,

v.

INTELLECTUAL VENTURES II LLC,

Patent Owner

Case No. IPR2026-00043
U.S. Patent No. 7,721,282

**PATENT OWNER'S PRELIMINARY RESPONSE**

## TABLE OF CONTENTS


I. INTRODUCTION ........................................................................ 1

II. THE SPECIFICATION OF THE '282 PATENT ........................................ 4

III. THE FILE HISTORY OF THE '282 PATENT .......................................... 7

IV. THE CLAIMS OF THE '282 PATENT ................................................ 10

V. CLAIM CONSTRUCTION ............................................................ 11

VI. REFERENCES RELIED ON IN THE PETITION ....................................... 15

A. Birse (EX1005) ..................................................................... 15

B. Declaration of Erez Zadok (EX1003) ............................................ 18

1. Example 1: The expert report collapses claim-defined "leaf image" functionality into Birse's "modified by the user" shadow volumes without addressing the node-specific requirement ........................... 20

2. Example 2: The expert report "creates" disclosure by importing claim language into Birse and labeling it as prior-art fact .......................... 21

3. Example 3: The expert report converts Birse's user-preference overlay into "block merging" without technical explanation ........... 23

4. Example 4: The expert report supplies the "persistent mapping" limitation through generalized inevitability reasoning, not Birse's disclosure ............................................................................ 24

5. The expert declaration should be afforded little weight under *Xerox* 26

VII. PETITIONER HAS NOT MET ITS BURDEN TO ESTABLISH OBVIOUSNESS UNDER 35 U.S.C §103 .................................................... 26

A. The Petition Fails To Explain How Birse Discloses A Union Block Device That Comprises A Low-Level Driver For Interfacing Between The First And Second Storage Units And The File System Of The Compute Node ............................................................................ 26

1. The Petition's Birse mapping proves redirection to server-side storage, not interfacing between two storage units and the compute node's file system ........................................................................ 27

2. Petitioner never identifies, in Birse, the claim-required "first storage unit" and "second storage unit" that the low-level driver interfaces with on the compute node side of the file system ............................29

3. The Petition is defective because it fails to map Birse to Element [1.6]............................................................................................30

B. The Petition Fails To Explain How Birse's User Specific "Shadow" Copies Are the Claimed Node-Specific "Leaf Images"....................31

1. According To Petitioner Southwest, the '282 Patent's "leaf image" is compute-node- specific and captures node specific block deltas......31

2. Birse's "shadow" volumes are, by contrast, user specific and intended to roam across clients ...........................................................32

3. The Petition's mapping improperly collapses user roaming overlays into node-specific leaf images ...................................................33

4. Petitioners' Expert Confirms the Deficiency in the Petition's Attempted Mapping Of Birse To The Claimed "Leaf Images" ........34

C. Petitioner's Inconsistent Identification of the Claimed "Application Environment" Undermines Its Ground 1 Mapping...........................35

1. The intrinsic record ties "application environment" to a specific claim-required output created by block-level root/leaf merging ......37

2. The Petition maps "application environment" one way for the "distributing" limitation, then a different way for the "creates … by merging" limitation .........................................................................38

3. The expert declaration compounds the inconsistency by equating the "application environment" with stored operating system volumes while defining "merging" as preference merging with a "system environment" ...........................................................................39

4. These inconsistencies are dispositive because Petitioner never identifies a single, claim-matching "application environment" in Birse that is both distributed and created by the recited merging operation ................................................................................40

D. Petitioner fails to explain why Birse's "merging user preferences" is the claimed "merging blocks" of a root image and a leaf image .......41

1. "User preferences" are not "blocks of a leaf image," and Petitioner does not bridge that gap........42

2. Birse's "dynamic merge" can be accomplished at a semantic or user-profile level, not a block-image level........43

3. The Petition's own discussion shows redirection or selection, not "merging blocks … to create the application environment"........43

4. The Board should reject Petitioner's conclusory equivalence between "preference merge" and "block merge" ........44

E. The Additional Grounds All Depend On The Deficient Mapping Of Birse To The Independent Claims In Ground 1 ........45

1. Ground 2 (Birse + Ballew): Ballew Adds Only HPC or Grid Context and Does Not Address the Deficiencies In Ground 1 With Respect To The Independent Claims ........45

2. Ground 3 (Birse + Wu): Wu Is Offered Only for a "Block Modification Log," and the Petition Concedes the Key Architecture Still Depends on Birse ........46

3. Ground 4 (Birse + Kleinschnitz): Kleinschnitz Is Offered Only for Snapshot Collapsing and Partitioning, Not for the Missing Birse Elements ........47

4. Grounds 2–4 Do Not Independently Establish Unpatentability ........48

VIII. CONCLUSION........49

**PATENT OWNER'S EXHIBIT LIST**

| | |
|---|---|
| EX2001 | *American Airlines, Inc. and v. Intellectual Ventures II LLC*, IPR2025-00785 and IPR2025-00786, Paper 11 (PTAB August 29, 2025) (declining to exercise discretion to deny IPRs). |
| EX2002 | *American Airlines, Inc. and v. Intellectual Ventures II LLC*, IPR2025-00782 and IPR2025-00931, Paper 12 (PTAB September 19, 2025) (declining to exercise discretion to deny IPRs). |
| EX2003 | *American Airlines, Inc. and v. Intellectual Ventures II LLC*, IPR2025-00987 and IPR2025-01055, Paper 9 (declining to exercise discretion to deny IPRs). |
| EX2004 | Defendant Southwest Airline Co.'s Preliminary Invalidity Contentions |
| EX2005 | "What's inside IV's patent portfolio?" by Kent Richardson and Erik Oliver |
| EX2006 | *American Airlines, Inc. and v. Intellectual Ventures II LLC*, IPR2025-01055, Paper 11 (PTAB November 21, 2025) (denying institution of IPR) |
| EX2007 | Abstract of Title For U.S. Patent No. 7,721,282 |
| EX2008 | Defendant Southwest Airline Co.'s Opening Claim Construction Brief For U.S. Patent Nos. 7,721,282, 8,332,844, 7,949,785, And 8,407,722 in Case No. 7:24-cv-00277, Doc. #76 (WD Tx). |
| EX2009 | Defendant American Airlines, Inc.'s Supplemental Rule 4-2 Disclosures in Case No. 4:24-cv-00980. |

# I. INTRODUCTION

Petitioner seeks inter partes review of claims 1 through 30 of U.S. Patent No. 7,721,282 (the '282 Patent), asserting four obviousness grounds under 35 U.S.C. § 103 based primarily on Birse (EX1005), with Ballew (EX1006), Wu (EX1007), and Kleinschnitz (EX1008) cited only in combination for select dependent limitations. Petition, 1–4. The Petition should be denied because Petitioner has not carried its institution-stage burden to show a reasonable likelihood of prevailing on any challenged claim.

At the core of every ground is the same premise: that Birse allegedly discloses the independent-claim architecture of the '282 patent. However, the Petition fails to demonstrate that several limitations of the independent claims are met by Birse. For example, the Petition fails to demonstrate that Birse discloses a union block device comprising "a low-level driver for interfacing between the first and second storage units *and the file system of the compute node*," as required by independent claim 1.

In addition, Petitioner Southwest is advancing inconsistent claim constructions here and in the district court with respect to the term "leaf images" in independent claims 1 and 15 of the '282 Patent. Petitioners' expert in these proceedings interpreted the claims according to their "ordinary and customary meaning." EX1003, ¶213. By contrast, in the district court, Petitioner Southwest *opposes* interpreting "leaf images" according to its *plain meaning* and asserts that "a

'leaf image' is *a node-specific image of the application environment operating at the block level below the file system*." Ex. 2008, 12 (emphasis in original). The Petition fails to demonstrate that Birse discloses a *node-specific* leaf image, as required by Petitioner Southwest's district court claim construction.

The inconsistent claim construction positions of Petitioners do not end with Southwest's construction of "leaf image." While Petitioners' expert in these proceedings was able to interpret the claims according to their "ordinary and customary meaning" (EX1003, ¶21), Petitioner American contends in the district court that the phrases "appropriate persistent mapping" (in independent claims 1 and 15), "the modifying" (in claim 15) and "at an operational level" (in claim 26) are all indefinite. EX2009, 4-5. As Director Squires explained in *Tesla, Inc. v. Intellectual Ventures II LLC*, IPR2025-00340, Paper 18 (November 5, 2025) (informative), absent a sufficient explanation why inconsistent claim construction positions are warranted, a petitioner cannot argue that a claim is indefinite in the district court and at the same time maintain that the same claim should be interpreted according to its plain and ordinary meaning in IPR proceedings. Here, the Petitioners fail to even acknowledge their existence of inconsistent claim construction positions, yet alone explain why inconsistent claim construction positions are warranted. As explained below, this deficiency provides an independent basis for denial of institution due to

the Petition's failure to satisfy its burden to explain how the challenged claims are to be construed under 37 CFR42.104(b)(3).

The Petition's allegations that Birse discloses the "application environment" recited in the independent claims of the '282 Patent are also defective. With respect to that limitation, the mappings in the Petition are inconsistent and rely on shifting identifications of key claim concepts and conclusory expert assertions instead of record evidence. For example, Petitioner inconsistently characterizes the “application environment” in Birse, alternately treating it as a stored operating-system copy distributed from a server and as a “dynamically merged system environment” based on user preferences, without reconciling those positions or mapping either of the to the claimed cohesive, block-merged image. Petition, 18, 26, 47–53; EX1001, 6:10–16; EX1003, ¶¶217, 255–266. And Petitioner does not establish the claim-required interface topology for the “low-level driver,” instead pointing to Birse’s generic statement that requests are “redirected at a lower level of the operating system,” which is not the same as a driver that interfaces between two image storage units and the compute node’s file system as claimed.

Because Grounds 2 through 4 expressly build on the same defective Birse mapping to the independent claims and cite the additional references only for discrete dependent-claim features, those grounds do not cure the Petition’s threshold failures. Petition, 74–86. For these reasons, and as set forth below, the Petition does

not meet the statutory standard for institution, and the Board should deny institution of this *inter partes* review.

## II. THE SPECIFICATION OF THE ‘282 PATENT

The ’282 Patent addresses the problem of deploying and maintaining application environments (including operating-system boot images) across multi-node computing systems such as clustered or high-performance computing environments, where pre-creating and storing a separate full boot image for each compute node can increase bring-up time and waste storage. EX1001, 2:3–12. To reduce deployment friction while still allowing node-specific customization, the patent describes distributing an "application environment" using a shared "root image" and per-node "leaf images," with a "filter" (implemented as a union block device) operating between the compute nodes and the file system to merge node-specific changes into a cohesive environment for a given node. *Id*., 2:3–5 and 6:10–16.

Architecturally, the system includes a first storage unit that stores blocks of a root image (for example, an operating system) and second storage units that store leaf images comprising new data blocks and changes to blocks of the root image. *Id*., 4:12–22. Each compute node has a corresponding leaf image that captures the changes made by that node to its instance of the application environment, including

blocks unique to that compute node. *Id.*, 4:17–35. The union block device is implemented as a low-level driver below the file system that "creates the application environment" by merging blocks from the root image with blocks from the leaf image. *Id.*, 7:24–33. The specification emphasizes the practical effect of this approach: the resulting environment provides the compute node with "one cohesive image rather than a base image plus its additions, deletions, and modifications." *Id.*, 6:10–16.

Figure 1 of the '282 Patent (reproduced below with colored annotations added) illustrates a system "for distributing an application environment to one or more compute nodes." *Id.*, 3:62-64. "System 100 has a number of compute nodes 120*a-n* [green boxes] coupled to first storage unit and a corresponding second storage unit 150*a-n* [red boxes] though a corresponding union block device (UBD) 130*a-n* [blue boxes]." *Id.*, 4:3-6. System 100 also "has a first storage unit 140 [purple box] for storing blocks of a root image of an application environment. The root image contains data initially common to the compute nodes 120*a-n*." *Id.*, 4:11-13.




"[E]ach compute node 120*a-n* has a corresponding second storage unit 150*a-n* for storing a leaf image. ... [A] leaf image will describe the changes made by the respective compute node 120*a-n* to its instance of the application environment. Thus, when a compute node (e.g., node 120*a*) makes changes involving the root image, modifications are made to that compute node's leaf image (e.g., leaf image stored on second storage device 150*a*)." *Id.*, 4:17-31.

"A compute node 120*a-n* mounts its instantiation of the application environment via its respective UBD 130*a-n*. The UBDs 130*a-n* are effectively low-level drivers that operate as an interface between the first and second storage devices and the file system of each compute node 120*a-n*." *Id.*, 4:41-45. In one embodiment, *the file system "reside[s] on each of the compute nodes 120a-n*," and the "*low-level driver* determin[es] which data blocks are needed for the compute node's instance of the application environment and *deliver[s] the application environment* to the

compute [node] *via the compute node's file system*." *Id.*, 4:46-47 and 6:18-22 (emphasis added).

Operationally, the patent focuses on recording node-specific modifications in the leaf image in response to the compute node's use of the environment, enabling the system to avoid storing a full duplicated boot image per node while still permitting node-specific changes and customization. *Id.*, 4:17–35. The patent also describes workflows in which accumulated leaf-image changes can be reconciled and used to update or form new root images, supporting systematic lifecycle management of distributed environments while preserving a cohesive, locally available application environment for a given node. *Id.*, 6:10–16.

## III. THE FILE HISTORY OF THE '282 PATENT

The '282 Patent matured from U.S. Patent Appl. 11/395,816 filed March 30, 2006 (the Application). EX1002. As filed, claim 1 of the Application recited as follows:

> 1. A system for distributing an application environment to a compute node comprising:
>
> a first storage unit for storing blocks of a root image of the compute node;
>
> a second storage unit for storing a leaf image, the leaf image comprising new data blocks and changes to the blocks of the root image; and
>
> a union block device for interfacing between the compute node and the first and second storage units to distribute the application environment to the compute node, wherein the union block device creates the application environment by merging the blocks of the root image stored on the first

> storage unit with the blocks of the leaf image stored on the second storage unit. *Id*., 22.

In the first Office Action, the Examiner rejected all of the claims as obvious in view of U.S. Patent No. 6,502,238 (Pavan) in view of U.S. Patent No. 7,475,274 (Davidson). *Id*., 65-81. In response, the Applicant amended claim 1 as follows:

> 1. (Currently amended) A system for distributing an application environment ~~to a compute node~~ comprising:
>
> a compute node comprising a computer system;
>
> a first storage unit for storing blocks of a root image of the compute node, wherein the first storage unit comprises a first non-volatile memory, wherein the root image comprises a computer program, wherein the blocks comprise sections of data, and wherein a file of the root image comprises at least one block;
>
> a second storage unit for storing a leaf image, the leaf image comprising new data blocks and changes to the blocks of the root image, wherein the second storage unit comprises a second non-volatile memory; and
>
> a union block device for interfacing between the compute node and the first and second storage units to distribute the application environment to the compute node, wherein the union block device comprises a driver, wherein the union block device creates the application environment by merging the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit. *Id*., 90.

In the accompanying remarks, the Applicant argued, *inter alia*, that "Pavan does not teach or suggest ... a union block device *for interfacing between the compute node and the first and second storage units* to distribute the application environment to the compute node." *Id*., 98 (emphasis added).

The Examiner next had a telephone interview with the Applicant during which the Applicant agreed to the addition of the following language new language at the end of claim 1:

> the union block device comprises a low-level driver for <u>*interfacing between the first and second storage units and the file system of the compute node*</u>; and the union block device, upon receiving a write request from the compute node for a sector X, creates an appropriate persistent mapping for sector X. *Id*., 112 (emphasis added).

Significantly, while the amended claim language previously presented to the Examiner in response to the first Office Action had only recited "a union block device for interfacing between the compute node and the first and second storage units," the new claim language that the Examiner added during the interview required that the union block device comprise a low-level driver "for interfacing between the first and second storage units <u>*and the file system of the compute node*</u>." *Id*., 90 and 112. Contemporaneously with the addition of this new claim language, the Examiner allowed the Application. *Id*., 111-114.

The file history demonstrates that a union block device broadly described as simply "interfacing between the compute node and the first and second storage units" was insufficient from the Examiner's perspective to distinguish claim 1 from the prior art. Rather, as a condition to allowing the Application, the Examiner required that the language of claim 1 go further and specify a union block device for

"interfacing between the first and second storage units *and the file system of the compute node*."

## IV. THE CLAIMS OF THE '282 PATENT

Claim 1 of the '282 Patent is representative, and recites in pertinent part:

> 1. A system for distributing an application environment comprising:
> *a compute node* comprising a computer system;
> a first storage unit for storing blocks of a root image of the compute node ...;
> a second storage unit for storing a leaf image, the leaf image comprising new data blocks and changes to the blocks of the root image, ... ; and
> a union block device ... the union block device comprises a low-level driver *for interfacing between the first and second storage units and the file system of the compute node*; ...
> EX1001, 7:12-38 (emphasis added)

Thus, claim 1 recites "a second storage unit for storing a leaf image ... comprising new data blocks and changes to the blocks of the root image." *Id,* 21-24. As discussed in the next section, Petitioner Southwest contends in the district court that a "leaf image" in the context of claim 1 of the '282 Patent is "a *node-specific image* of the application environment operating at the block level below the file system." EX2008, 10-12. The Petition fails to explain how the prior art, as relied on the Petition (i.e., Birse) meets Southwest's district court construction of "leaf image."

Claim 1 also recites a union block device for "interfacing between the first and second storage units *and the file system of the compute node*." EX1001, 7:25-38.

By way of example, this claim limitation corresponds to the disclosure in the specification where *the file system "reside[s] on each of the compute nodes 120a-n*," and the "*low-level driver* determin[es] which data blocks are needed for the compute node's instance of the application environment and *deliver[s] the application environment* to the compute [node] *via the compute node's file system*." EX1001, 4:46-47 and 6:18-22 (emphasis added). As explained more fully below, the Petition fails to explain how Birse discloses a union block device for "interfacing between the first and second storage units *and the file system of the compute node*," as claimed.

## V. CLAIM CONSTRUCTION

### A. "Leaf Image" (Claims 1 and 15)

The Petitioner Southwest is advancing inconsistent claim constructions with respect to the term "leaf images" in independent claims 1 and 15 of the '282 Patent. The Petition contends "that the challenged claims are obvious under any reasonable interpretation under the *Phillips* standard," and that, as a result "the Board need not resolve any express constructions." Petition, 11-12. In keeping with that approach, Petitioner's expert in these proceedings interpreted the claims according to their "ordinary and customary meaning." EX1003, ¶213. By contrast, in the district court, Petitioner Southwest *opposes* interpreting "leaf images" according to its *plain meaning* and asserts that "a 'leaf image' is *a node-specific image of the application*

<u>*environment operating at the block level below the file system*</u>." EX2008, 12 (emphasis in original). For example, Petitioner Southwest argues as follows with respect to the construction of "leaf image" in the '282 Patent:

> ... system claim 1 recites "a second storage unit for storing a leaf image, the leaf image comprising new data blocks and changes to the blocks of the root image," and method claim 15 requires "storing a leaf image comprising new data blocks and changes to the blocks of the root image" and "merging the blocks of the root image with the blocks of the leaf image" to "create the application environment" delivered "to the compute node." Thus, the claims specify (i) the operative unit is *blocks* (not files), and (ii) each leaf image is <u>*node-specific*</u> ("respective … compute nodes"; "respective leaf images"; "cohesive respective application environments"). ... The Court should therefore adopt Southwest's construction: a "leaf image" is <u>*a node-specific image of the application environment operating at the block level below the file system*</u>. Id., 11-12 (emphasis in original).

Yet, here the Petition does not argue that a "leaf image" must be "<u>*node-specific image*</u> of the application environment," nor explain how Birse discloses a "leaf image" that is a "<u>*node-specific image*</u> of the application environment." As the Director recently ruled in *Revvo Technologies, Inc. v. Cerebrum Sensor Technologies, Inc.*, IPR2025-00632, Paper 20 (Squires November 3, 2025) (precedential), a petitioner seeking to take inconsistent claim constructions positions is required to explain why it takes different claim construction positions in the petition and in district court. *See also*, *Cambridge Mobile Telematics, Inc. v. Sfara, Inc.*, IPR2024-00952, Paper 12 at 8 (PTAB Dec. 13, 2024) (informative). Here, the Petition fails to even acknowledge the existence of inconsistent claim construction

positions, yet alone explain why inconsistent claim construction positions are warranted.

Petitioners' strategy is clear. In the district court, Southwest is advancing a narrow claim construction requiring that a leaf image be "*a node-specific image of the application environment*" in an attempt to avoid infringement, while relying on a broader claim construction of the term in these proceedings in an attempt to invalidate the patent. That is the epitome of "inconsistent positions" and warrants denial of institution.

In any event, the Petition's decision (at 11) to rest on the assertion that the art meets the claims "under any reasonable interpretation under the *Phillips* standard" has a concrete consequence: Petitioner must prevail under all constructions that Petitioners' deem reasonable including those that Petitioner Southwest is advancing in the district court. Put differently, if there are multiple reasonable interpretations of "leaf image," Petitioners fail to carry their burden if the asserted prior art does not satisfy even one of those reasonable interpretations.

### B. "Appropriate Persistent Mappings" (Claims 1 and 15), "The Modifying" (Claim 15) And "At An Operational Level" (Claim 26)

The inconsistent claim construction positions of Petitioners do not end with Southwest's construction of "leaf image." While Petitioner's expert in these proceedings was able to interpret the claims according to their "ordinary and customary meaning" (EX1003, ¶21), Petitioner American contends in the district

court that the phrases "appropriate persistent mapping" (in independent claims 1 and 15), "the modifying" (in claim 15) and "at an operational level" (in claim 26) are all indefinite. EX2009, 4-5. As Director Squires explain in *Tesla, Inc. v. Intellectual Ventures II LLC*, IPR2025-00340, Paper 18 (November 5, 2025) (informative), absent a sufficient explanation why inconsistent claim construction positions are warranted, a petitioner cannot not argue that a claim is indefinite in the district court and at the same time maintain that the same claim should be interpreted according to its plain and ordinary meaning in IPR proceedings. Here, the Petitioners fail to even acknowledge their existence of inconsistent claim construction positions, yet alone explain why inconsistent claim construction positions are warranted.

Petitioners bear the burden of explaining how the challenged claims are to be construed. 37 CFR 42.104(b)(3). The Petitioners here failed to meet that burden because they have advanced inconsistent claim constructions without providing a sufficient explanation why inconsistent claim constructions are warranted. *Revvo Technologies, Inc. v. Cerebrum Sensor Technologies, Inc.*, IPR2025-00632, Paper 20 (November 3, 2025) (precedential) (finding that, where a Petitioner advances different claim constructions across two forums, "the Board erred when it determined that Petitioner complied with Rule 42.104(b)(3) by proposing Patent Owner's district court constructions"); *see also*, the following decisions cited in *Revvo*, *10X Genomics, Inc. v. President & Fellows of Harvard College*, IPR2023-

01299, Paper 15 at 13 (PTAB Mar. 7, 2024) and *Orthopediatrics Corp. v. K2M, Inc.*, IPR2018-01546, Paper 10 at 11 (PTAB Feb. 14, 2019) (both denying institution for failing to comply with Rule 42.104(b)(3) where a petitioner, without explanation, proposed different claim constructions before the Board and in district court).

## VI. REFERENCES RELIED ON IN THE PETITION

### A. Birse (EX1005)

Birse describes a network computer ("NC") system in which one or more NC clients obtain operating system ("OS") functionality from an NC server over a network. Birse explains that an NC server "may provide access to a copy of the operating system to an NC client in response to a boot request," and it depicts NC systems coupled via a network (including via the Internet). EX1005, 4:31–40; EX1005, 14:8–9. Birse's stated objective includes preserving user customizations so that *a user's desktop preferences and other customized setting*s can be supplied when the user logs in, *enabling the user to log in to different NC clients while having the same user experience*. As Birse explains:

> ... the NC system may preserve user customizations, such as preferences, by maintaining individual, user, storage areas. When an NC client boots from the network and accesses a stored copy of the operating system from an NC server, the user's preferences are dynamically merged with the system environment provided to the NC client. Advantageously, since, the user's desktop preferences and other customized settings are all preserved from session to session and supplied to the NC client as it boots from the network, *the user may login to any NC client on the network and have the same user experience*. *Id.*, 2:62–3:3 and 9:2–10 (emphasis added).

Birse further explains that, upon termination of a session, preferences and other *user data* reflecting changes made during the session may be copied to a *user-specific storage location* on the server, and then retrieved and supplied to the NC client at the user's next login, whether from the same NC client or a different NC client. As Birse explains:

> According to one embodiment, the user environment management process 182 tracks and maintains the persistent *user data* 186 to insure that changes the user has made during the current session will be persistent at the next login. For example, upon termination of a user session, preferences, desktop items, and various other information representing changes made by the user during the user session are copies to a *user-specific storage* location on the NC server 170. Subsequently, at the user's next login, from the same or different NC client, the user environment management process 182 will retrieve the data from the corresponding *user-specific storage location* and return it to the NC client thereby allowing the user to login to any NC client of the NC system 100 and have the same user experience. *Id*., 6:35–48 (emphasis added).

Birse also describes a copy-on-write "shadow" storage scheme that preserves a baseline OS image while capturing changes separately. In Birse, baseline OS content remains in "system volumes," and modifications made during operation are diverted into corresponding "shadow" storage so the baseline need not be overwritten; Birse then uses mapping constructs (including one-to-one block mapping and band mapping tables) to associate baseline blocks with modified counterparts for purposes of servicing accesses and preserving user customizations. *Id*., 5:13–14, 7:35–53, 10:63–65, 11:6–17, 11:49–52 and 15:33–37.

In the district court, Petitioner Southwest argues that a "leaf image" in the '282 Patent must be "*a node-specific image* of the application environment," i.e., the *same* leaf image is applied for a given node *regardless of the user logged into the node*. The architecture of Birse is materially different because, in Birse, the so-called leaf images (mapped to, e.g. shadow image 695) are "*user-specific images*" rather than "*node-specific images*," which means that a *different* leaf image is applied to a given node *depending on the user logged into the node*. The fact that Birse's so-called leaf images are *user-specific* -- as opposed to node-specific -- is what enables a user in Birse to "login to *any NC client* on the network and have the same user experience. Petition, 35 (mapping leaf image to, e.g., shadow image 695); EX1005, 2:62–3:3 and 9:2–10 (emphasis added).

Thus, according to the claim construction position advanced by Petitioner Southwest in the district court, the ’282 Patent is directed to distributing *a compute node's* "application environment" by having a union block device create a cohesive image through block-level merging of a shared "root image" with a *compute-node-specific* "leaf image" stored on a second storage unit corresponding to that compute node. *Id.*, 4:12–22 and 7:24–33. The specification explains that the system "merg[es] the blocks of the root image with the blocks of the leaf image to create the application environment," and that the resulting application environment "will appear to the compute node as one cohesive image rather than a base image plus its additions,

deletions, and modifications." *Id*., 6:10–16. Thus, whereas Birse frames "shadow" storage as a mechanism for preserving and roaming user-driven changes and preferences alongside baseline system volumes, Petitioner Southwest argues in the district court that the ’282 Patent's "leaf image" is expressly tied to *the compute node* and is part of a distribution mechanism in which the union block device affirmatively "creates" the delivered application environment by merging root-image and leaf-image blocks into what appears to the node as a single cohesive image. EX2008, 11-12; *see also*, EX1001, 4:17–22 and 6:10–16.

**B. Declaration of Erez Zadok (EX1003)**

Petitioners submit the Declaration of Dr. Erez Zadok (EX1003) as their purported technical evidence to support the Petition's obviousness theories and to supply a POSITA's perspective on how the cited prior art allegedly meets each challenged limitation. However, based on the written record, it appears that Petitioners kept their own expert in the dark with respect to the claim construction positions that Petitioners intended to advance in the district court. Petitioners' expert executed his declaration on Friday, October 10, 2025, based on his understanding that "the terms appearing in the patent claims should be interpreted according to their 'ordinary and customary meaning.'" EX1003, ¶¶213, 415. On the following Tuesday, October 14, 2025, Petitioner Southwest filed its Opening Claim Construction Brief in the district court (EX2008), where Southwest *opposed* interpreting "leaf images"

according to its *plain meaning* and asserted that "a 'leaf image' is *a node-specific image of the application environment ....*" EX2008, 12 (emphasis in original).

Petitioner Southwest's claim construction position in the district court was not developed overnight, and it would be quite surprising if Petitioner Southwest only initially conceived of its "*node-specific*" district court claim construction for "leaf image" during the intervening four days between the execution of the Expert Declaration in these proceedings on October 10, 2025 and the filing by Southwest of its Opening Claim Construction Brief in the district court on October 14, 2025. Yet, in the "Materials Considered" section of the Expert Declaration, there is no evidence that Petitioners' Expert considered any materials that would have informed him of the "*node-specific*" claim construction for "leaf image" that Petitioner Southwest intended to advance in the district court. EX1003, ¶30. Perhaps more importantly, regardless of whether Petitioners' Expert was actually informed that Petitioner Southwest intended to advance a "*node-specific*" claim construction for "leaf image" in the district court, it is beyond dispute that the Expert Declaration fails to analyze whether Birse discloses a 'leaf image' that is *a node-specific image of the application environment ....*," as Petitioner Southwest maintains in the district court.

In a proper petition, an expert declaration should explain the technology, interpret the prior art, and provide reasoned, technically grounded analysis that is

tethered to what the references actually disclose. Here, however, Petitioners use the declaration for an improper purpose: not to illuminate technical facts, but to rehabilitate weaknesses in the Petition by importing claim language into the prior art, relabeling Birse components with bracketed claim terms, and offering conclusory "operates the same way" assertions or generalized "must be present" logic in place of a limitation-specific showing. That is the type of expert "gap filling" and litigation-brief testimony the Board has held should be afforded little weight under *Xerox Corp. v. Bytemark, Inc.*, IPR2022-00624, Paper 9 at 15–17 (PTAB Aug. 24, 2022) (precedential), and it sets the stage for the concrete examples below demonstrating why Zadok's declaration cannot be credited as sufficient to carry Petitioners' institution burden.

**1. Example 1: The expert report collapses claim-defined "leaf image" functionality into Birse's "modified by the user" shadow volumes without addressing the node-specific requirement**

The ’282 patent describes a root image shared across compute nodes and a leaf image "unique to that compute node" that stores "changes made by a compute node to the root image." EX1001, 1:62–67. The Petition and the Expert Declaration attempt to map Birse's <u>*user-specific*</u> shadow volumes to the "leaf image" by emphasizing that Birse's shadow volume contains portions of the OS "modified by

the user." Petition, 44–45; EX1003, ¶¶252–253, citing EX1005, 5:13–14; EX1005, 11:49–52.

The Expert Report fills the resulting conceptual gap through characterization. It states that Birse "operates the same way," then equates the root image to "system volumes" and the leaf image to "shadow volumes," even though Birse's shadow volumes are described in user-centric terms and used to preserve user-specific changes and preferences. EX1003, ¶¶253, 256–259; Petition, 18, 47–48. The Expert Declaration never explains how Birse's user-modification and user-experience portability framework meets the compute-node-specific leaf image architecture that Southwest asserts is required by the claim language. EX2008, 11-12, *see also*, EX1001, 1:62–67; EX1005, 9:2–10. Instead, the Expert Declaration treats the existence of any CoW shadow mechanism as sufficient, which again is a gap-filling conclusion rather than a limitation-specific showing. EX1003, ¶¶252–257; Petition, 44–45 and 47–48.

### 2. Example 2: The expert report "creates" disclosure by importing claim language into Birse and labeling it as prior-art fact

Claim 1 recites that "the union block device creates the application environment by merging the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit." EX1001, 7:24–33; 6:8–16 (Step 330, "merging the blocks … to create the application environment,"

which appears as "one cohesive image"). The Petition's mapping hinges on the 'assertion in the Expert Report that Birse "operates the same way," and it cites EX1003 as the basis for treating Birse's block device drivers as "union block devices" that "create" and "merge" images. Petition, 47–48; EX1003, ¶¶255–257.

But the Expert Declaration does not actually identify a disclosure in Birse that a driver "creates the application environment" by "merging blocks" of two images in the sense required by the ’282 Patent. Instead, the Expert Declaration supplies the missing step by rewriting Birse in claim language and then treating that rewrite as evidence. For example, it states that Birse’s block device drivers "(i.e., 'union block devices') 'are configured to create said application environments by merging the blocks of said root image,'… 'with the blocks of respective leaf images."’ EX1003, ¶256. That quoted formulation mirrors the claim requirement, not Birse’s actual disclosure, and it is presented as though it were Birse’s own teaching. Petition, 47–48 (adopting the same, *ipse dixit*, “operates the same way” conclusion and citing EX1003, ¶¶255–56).

This is impermissible gap filling. The critical question is not whether a declarant can restate the claim using Birse’s nouns, but whether Birse actually teaches the claim-required creation of an “application environment” by block-level merging of a root image and a leaf image into a cohesive image. EX1001, 6:8–16; EX1001, 7:24–33. The Expert Declaration does not supply that evidence. It supplies

only an assertion that Birse "operates the same way," which is the precise kind of ipse dixit *Xerox* holds should be afforded little weight. *Xerox*, IPR2022-00624, Paper 9 at 15–17.

#### 3. Example 3: The expert report converts Birse's user-preference overlay into "block merging" without technical explanation

The Petition relies heavily on Birse's "preferences … dynamically merged with the system environment" language to support "merging" and "application environment." Petition, 18, 47–48, quoting EX1005, 9:2–10 and 14:61–67. That Birse passage is about preserving a consistent user experience and dynamically applying user preferences, not about creating a cohesive root-plus-leaf block image as required by the '282 Patent. EX1001, 6:8–16 (cohesive image) and 7:24–33 (union block device creates the application environment by merging blocks).

The Expert Declaration fills the resulting analytical gap by treating Birse's preference behavior as if it were the claimed block-level merge. It quotes Birse's preference and user-experience statements, including that users may log in to any client and have the same experience, and then simply concludes that this corresponds to the claimed creation of the application environment through root/leaf block merging. EX1003, ¶¶258–259, quoting EX1005, 9:2–10; EX1003, ¶257 (recasting the preference write example as "merging … to create the application environment

(dynamically merged system environment)"); Petition, 47–48 (adopting the same "dynamically merged system environment" label).

That conclusion is not supported by a reasoned technical explanation of how "preferences dynamically merged" equates to "merging the blocks of the root image" with "the blocks of the leaf image" to create a cohesive image. EX1001, 6:8–16 and 7:24–33. It is instead a relabeling exercise that attempts to bridge an evidentiary gap through mere assertion. Under *Xerox*, such conclusory equivalence testimony is entitled to little weight. *Xerox*, IPR2022-00624, Paper 9 at 15–17.

#### 4. Example 4: The expert report supplies the "persistent mapping" limitation through generalized inevitability reasoning, not Birse's disclosure

Claim 1 requires that, "upon receiving a write request … for a sector X," the union block device "creates an appropriate persistent mapping for sector X." EX1001, 5:1–11 and 7:24–33. The Petition's mapping of this limitation relies on the expert report for the key "persistent mapping" step. Petition, 52, citing EX1003, ¶264. Yet the Expert declaration at ¶264 does not cite Birse for "creating an appropriate persistent mapping for sector X" upon receiving a write request. Instead, it advances a generalized inevitability argument, asserting that "any" storage system that maintains OS images and snapshots "must persistently preserve" blocks and that "there must be a mapping of the original vs. modified blocks" or such systems would be "non-functional and useless." EX1003, ¶264.

That is classic gap filling. The claim does not merely require that data that is stored must be data that is stored, which is a truism. It requires that the union block device, upon receiving a write request for a particular sector X, creates an appropriate persistent mapping for that sector. EX1001, 5:1–11. The reasoning in the Expert declaration does not establish that Birse performs that claim-required act. It merely asserts that some form of mapping must exist in snapshot systems as a matter of general logic, and then treats that generalization as proof that Birse meets the limitation. EX1003, ¶264; Petition, 52.

The Expert Declaration later cites Birse's redirection of writes into a shadow volume and references mapping concepts such as "one-to-one block mapping" and tables mapping bands, but it again leaps from those disclosures to the specific claim requirement that the union block device "creates an appropriate persistent mapping for sector X," without establishing that Birse's mechanism matches either the timing or the function of the claimed mapping creation triggered by the write request for sector X. EX1003, ¶¶266–269, citing EX1005, 7:35–53, 10:63–65, 11:6–17 and 15:33–37); Petition, 52–53 (adopting the same theory and again citing EX1003, ¶¶265–66). Under *Xerox*, expert testimony that replaces a missing, claim-specific showing with generalized "must be present" logic is entitled to little weight. *Xerox*, IPR2022-00624, Paper 9 at 15–17.

#### 5. The expert declaration should be afforded little weight under *Xerox*

These examples demonstrate a repeating pattern. When the Petition's mapping requires proof of a claim-specific mechanism, the Expert Declaration supplies it through labels, conclusory "operates the same way" statements, and generalized inevitability reasoning rather than through a reasoned technical explanation tied to Birse's actual disclosures. Petition, 47–48 and 52–53; EX1003, ¶¶256, 264. Under *Xerox*, that kind of testimony should be afforded little weight and should not be credited to carry Petitioner's burden at institution. *Xerox*, IPR2022-00624, Paper 9 at 15–17.

## VII. PETITIONER HAS NOT MET ITS BURDEN TO ESTABLISH OBVIOUSNESS UNDER 35 U.S.C §103

In Ground 1, the Petition alleges that independent claims 1 and 15 of the '282 Patent are obvious over Birse alone. As explained below, Ground 1 is deficient because the Petition has failed to explain how all of the elements of independent claims 1 and 15 of the '282 Patent are met by Birse.

### A. The Petition Fails To Explain How Birse Discloses A Union Block Device That Comprises A Low-Level Driver For Interfacing Between The First And Second Storage Units And The File System Of The Compute Node

Claim 1 recites a union block device for "interfacing between the first and second storage units <u>*and the file system of the compute node*</u>." By way of example,

this claim limitation corresponds to the disclosure in the specification where *the file system "reside[s] on each of the compute nodes 120a-n*," and the "*low-level driver* determin[es] which data blocks are needed for the compute node's instance of the application environment and *deliver[s] the application environment* to the compute [node] *via the compute node's file system*." EX1001, 4:46-47 and 6:18-22 (emphasis added). Moreover, as explained in Section III above, the file history demonstrates that a union block device broadly described as simply "interfacing between the compute node and the first and second storage units" was insufficient from the Examiner's perspective to distinguish claim 1 from the prior art. Rather, as a condition to allowing the Application, the Examiner required that the language of claim 1 go further and specify a union block device for "interfacing between the first and second storage units *and the file system of the compute node*." EX1002, 90 and 112.

### 1. The Petition's Birse mapping proves redirection to server-side storage, not interfacing between two storage units and the compute node's file system

The Petition identifies the limitation in claim 1 requiring that "the union block comprises a low-level driver for interfacing between the first and second storage units *and the file system of the compute node*," as Element [1.6], and devotes three sentences to explaining how this element is met by Birse. The totality of the Petition's analysis for this claim element is as follows:

> As described above, Birse teaches the use of a block device ***driver*** that "keep[s] track of which portions of the operating system … have been modified by the user" and *redirects file system read and write requests between the system volumes and shadow volumes as appropriate*. Ex.1005, 12:11-15. See FIG. 1 of Birse:
>
> 
> 
> FIG. 1
>
> The "block device driver 154 appears to the file system 152 [of NC client 150] to be a standard hard drive device driver." *Id.*, 7:35–38. Additionally, Birse specifies that the file system and block device driver operates "as if the contents of the system volumes 160 are, in fact, contained on a local hard drive and the file systems read and write requests are redirected at a ***lower level*** of the operating system." *Id.*, 7:27-31. Ex.1003, ¶¶261-63.

Petition, 50-51 (emphasis added).

The Petition's analysis of Element [1.6] fails to explain how Birse's block device 154 comprises "a low-level driver for interfacing between the first and second storage units *and the file system of the compute node*," as required by the claim language. Among other deficiencies, the Petition fails to explain how the use of Birse's block device 154 to *redirect* file system read and write requests equates with "*interfacing* between the first and second storage units *and the file system of the compute node*," as claimed. *Redirecting* file system read and write requests is an operation that *avoids* interaction with the compute node's file system by routing

communications around it -- which is exactly the opposite of what the claim requires. Rather, claim 1 requires, *inter alia*, that the union block device performs *interfacing* between the first and second storage units *and the file system of the compute node*." At the very least, "*interfacing*" requires *communicating with the file system* of the compute node as opposed to *routing communications around the file system* of the compute node as set forth in the Petition's mapping of Element [1.6].

Claim 1 requires a low-level driver "for interfacing between the first and second storage units and the file system of the compute node." EX1001, 7:29-33. Petitioner's mapping does not do the necessary architectural work to satisfy that limitation. Instead, Petitioner simply equates the claimed "interfacing" with Birse's statement that the file system's requests are "redirected at a lower level." Petition, 50-51; EX1005, 7:27-31.

#### 2. Petitioner never identifies, in Birse, the claim-required "first storage unit" and "second storage unit" that the low-level driver interfaces with on the compute node side of the file system

The Petition's three-sentence analysis of Element [1.6] also fails to explain how Birse's redirection layer actually interfaces with two storage units in a root-image and leaf-image architecture and delivers their merged result to the compute node's file system as explicitly required. EX1001, 7:22-33. Put differently, Petitioner relies on the fact that Birse has a block device driver, but it never shows

that Birse's block device driver is structurally positioned and functionally configured as the claimed "union block device" that sits *between* the compute node's file system and the first and second storage units that store the root and leaf images. EX1001, 7:22-33; Petition, 50-51.

### 3. The Petition is defective because it fails to map Birse to Element [1.6]

At institution, Petitioner must demonstrate a reasonable likelihood of prevailing with a coherent, claim-specific mapping. Here, Petitioners' three-sentence analysis with respect to Element [1.6] supports only the proposition that Birse uses a block device driver to make remote system volumes appear local by redirecting read and write requests at a lower level of the operating system. Petition, 50-51; EX1005, 7:27-31 and 7:35-38. Petitioners do not explain how that redirection architecture satisfies the specific claim requirement that the union block device comprises a low-level driver for interfacing between the first and second storage units and the file system of the compute node. EX1001, 7:22-33. Because the Petition never establishes that required topology in Birse, Ground 1 fails to carry Petitioner's burden for at least element [1.6], and institution should be denied on that basis.

### B. The Petition Fails To Explain How Birse's User Specific "Shadow" Copies Are the Claimed Node-Specific "Leaf Images"

The Petition maps Birse's "shadow" volumes/image to the claimed "leaf images" in independent claims 1 and 15. Petition, 47-48 and 52-53. That mapping fails because the challenged claims, as interpreted by Southwest in the district court and read in light of the specification, require a leaf image that is *a node-specific image of the application environment,*" meaning that the leaf image stores *node-specific* block deltas against a shared root image. EX2008, 10-12; EX1005, 2:62–3:3 and 9:2–10. By contrast, Birse's "shadow" volume or image construct is expressly *user-specific* and is designed to preserve and roam user preferences across different NC clients (compute nodes). EX1005, 2:62–3:3, 6:35–48 and 9:2–10.

#### 1. According To Petitioner Southwest, the '282 Patent's "leaf image" is compute-node- specific and captures node specific block deltas

As Southwest argued in the district court, the '282 Patent describes a root and leaf architecture in which a shared root image provides a baseline, while changes are captured in a leaf image that is *unique to the compute node*. Ex.2008, 10-12. Thus, according to Petitioner Southwest, the claimed leaf image, is not merely any repository of modifications. It is the node's own block level delta image for that node's particular instantiation of the application environment.

### 2. Birse's "shadow" volumes are, by contrast, user specific and intended to roam across clients

Birse is centered on preserving user customizations and delivering a consistent user experience regardless of which NC client the user logs into. Birse teaches preserving "user customizations, such as preferences," by maintaining "individual, user, storage areas," so that the user may login "to any NC client on the network" and have the same user experience. EX1005, 2:59 to 3:3.

Birse's user environment management process likewise stores and retrieves user information from a user specific storage location on the server at session termination, and later retrieves that same user specific data at the next login, whether from the same or a different NC client. *Id.*, 6:35-48.

Birse also characterizes its shadow image in user centric terms, stating that the shadow image preferably contains only portions of the shared operating system image that have been modified by the user. *Id.,* 12:59-61. Birse similarly describes the shadowing function in terms of user preferences, using "if a user modifies a preference" as an exemplar. *Id.,* 14:49-53 and 14:61-67.

In short, Birse's shadow architecture is designed to preserve and roam user-level personalization, not to create and maintain a node-specific delta image tied to a particular compute node's instance of an application environment.

### 3. The Petition's mapping improperly collapses user roaming overlays into node-specific leaf images

The Petition maps Birse's shadow volumes to the claimed leaf images by relying on Birse's statement that a user's preferences are dynamically merged with the system environment provided to the NC client. Petition, 47-48, citing EX1005, 9:2 to 9:5 and, 14:61 to 14:67; and EX1003, ¶¶ 255-256). The Petition likewise relies on Birse's redirection of writes into the user's shadow volume on the NC server and then labels that user shadow volume as the claimed leaf image. Petition, 52-53, citing EX1005, 7:35-53, 10:63-65 and 11:6-17; and EX1003, ¶¶ 265-266).

That mapping does not satisfy the claim requirement as Southwest argued in the district court. Ex.2008, 10-12. As Southwest argued in the district court, the '282 Patent's leaf image is unique to the individual compute node, meaning that it captures changes made by the respective compute node to its instance of the application environment regardless of which user is logged into the node. *Id*. Birse, by contrast, is expressly engineered to do the opposite: make it so that a user can login to any NC client and receive the same user experience because the modifications being preserved are user specific and are retrieved at login *regardless of which client (compute node) is being used by the user*. EX1005, 2:59-3:3 and 6:35-48.

Petitioners never explain why a user roaming preference overlay, which Birse defines in terms of individual user storage areas and cross client portability, should

be treated as a compute-node-specific leaf image that stores node specific block deltas to a node's instance of the application environment. Petition, 47-48 and 52-53. This conceptual mismatch is not mere semantics. It is a technical incompatibility between Birse's user portability feature, and the *node-specific* delta images that Southwest argues are required by the claims of the '282 Patent. Ex.2008, 10-12.

#### 4. Petitioners' Expert Confirms the Deficiency in the Petition's Attempted Mapping Of Birse To The Claimed "Leaf Images"

The deficiency in the mapping of Birse to the claimed "leaf image" is also visible in the Petition's reliance on Dr. Zadok. Dr. Zadok quotes Birse's disclosure that user preferences are dynamically merged with the system environment and that the user may login to any client and have the same user experience. EX1003, ¶¶258–259, quoting EX1005, 9:2–10. Yet, for the "leaf image" mapping, Petitioners and their expert treat the shadow volumes (which store user-preferences) as the leaf images that the union block device merges with the root image blocks. Petition, 47–48; EX1003, ¶¶255–257. Neither Petitioners nor their expert explain how a user-roaming preference system constitutes a compute-node-specific leaf image that "describe[s] the changes made by the respective compute node" to its instance of the application environment, as argued by Southwest in the district court. This failure to reconcile the user-centric "shadow" concept with the node-centric "leaf image" requirement advanced by Southwest in the district court, is an independent reason

Ground 1 fails to establish a reasonable likelihood of prevailing.

### C. Petitioner's Inconsistent Identification of the Claimed "Application Environment" Undermines Its Ground 1 Mapping

Ground 1 also fails because Petitioner never maintains a consistent, claim-faithful identification of what the challenged claims call "the application environment." The '282 Patent uses that term to describe a specific, claim-required output: a cohesive image presented to a compute node that is created by a union block device through block-level merging of a shared root image and a leaf image. EX1001, 2:3–5; EX1001, 6:10–16; EX1001, 7:24–33. Petitioner's mapping to Birse does not track that construct. Instead, Petitioner alternates between two materially different concepts, treating the "application environment" as a stored operating system that reflects "a standard useable state" for Elements [1.0]/[15.0], while recasting the "application environment" as a "dynamically merged system environment" that includes user preferences for Elements [1.5]/[15.4]. Petition, 26-27, 47-48.

Starting with Elements [1.0]/[15.0], the Petition's mapping of the independent claims begins by mapping the "application environment" to the "stored copy of the system" *used to boot* an NC client. There, the Petition (at 26-27) states:

> Birse discloses a system and method for distributing *an application environment* (from NC server 170) to a plurality of compute nodes (NC clients 150, 812, 814, 816, 822, 824, 826): "…[T]he NC clients [150] *boot over the network by accessing a stored copy of the*

> *operating system* from the NC server [170]. NC server." Ex.1005, 4:56-60. (emphasis added).

Birse explains that the "stored copy of the system" *used to boot* an NC client corresponds to an operating system in "a *standard*, useable state":

> The NC system environment and the net-booting process described herein are intended to provide the needed reliability. ... [F]or administrative and maintenance purposes, preferably only the NC server 320 has a copy of the *master read-only operating system image* and NC clients boot according to the net-booting process described below. *Since rebooting an NC client restores the NC client to a standard, useable state*, it is impossible for a user without proper access privileges to make an NC client unbootable. Consequently, this NC system architecture and net-booting approach greatly simplifies NC client administration and provides a high level of reliability for the NC clients. EX1005, 9:32-50 (emphasis added).

However, in connection with Elements [1.5]/[15.4], the Petition pivots from mapping the "application environment" to "a *standard*, useable state," to mapping the "application environment" to a customized environment that includes "the *user's preferences*." Petition, 47-48.

The expert declaration repeats and compounds the same slippage by equating the "application environment" with "stored operating system volumes" (standard, useable state) in one portion of the analysis while defining the same "application environment" as including the user-preference overlay onto a "system environment" in another portion. EX1003, ¶¶182, 217, 256–257.

These internal inconsistencies are not semantic quibbles. Because the claims require that the union block device "creates the application environment by

merging" root-image and leaf-image blocks via a low-level driver beneath the file system, Petitioner must identify a single Birse counterpart that is both the distributed environment and the merged, created output. EX1001, 7:24–33. Petitioner does not do so. As a result, Ground 1 rests on shifting constructions and fails to provide the coherent, evidence-based, element-by-element showing required to demonstrate a reasonable likelihood of prevailing.

#### 1. The intrinsic record ties "application environment" to a specific claim-required output created by block-level root/leaf merging

The challenged claims do not use "application environment" as a free-floating label. Claim 1 requires a "union block device" that "creates the application environment by merging the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit," and further requires that the union block device "comprises a low-level driver" interfacing between the storage units and the file system. EX1001, 7:24-33. The specification reinforces that "creating the application environment" is accomplished by "merging the blocks of the root image with the blocks of the leaf image," and that the resulting "application environment" will "appear to the compute node as one cohesive image rather than a base image plus its additions, deletions, and modifications." EX1001, 6:10-16. The specification also describes the compute node's "own unique and cohesive instance of the application environment." EX1001, 2:3-5. In short, claim 1

consistently defines the "application environment" as the cohesive, merged (root+leaf) image presented to the node by the union block device, not merely an operating system in the abstract.

#### 2. The Petition maps "application environment" one way for the "distributing" limitation, then a different way for the "creates … by merging" limitation

In Ground 1, the Petition's mapping of Elements [1.0]/[15.0] identifies the "application environment" in Birse as the "operating system made available from the server at boot, which Birse explains is the "standard" operating system. For example, Petitioners argue that Birse distributes an "application environment" because "the NC clients [150] boot over the network by accessing a stored copy of the operating system from the NC server [170]." Petition, 26. Dr. Zadok's declaration adopts the same framing, concluding: "In sum, Birse discloses a system … for distributing an application environment [Birse using stored operating system volumes]." EX1003, ¶217. Under this mapping, the "application environment" is the stored "standard" operating system obtained from the server during net boot. EX1005, 9:32-50.

But, when Petitioner reaches the substantive "creates … by merging" limitations in Elements [1.5]/[15.4], Petitioners pivot and now label the same claimed "application environment" as "the application environment (dynamically merged system environment)." Petition, 47-48. In that same discussion, the Petition

relies on Birse's statement that: "When an NC client boots from the network and accesses a stored copy of the operating system from an NC server, the user's preferences are dynamically merged with the system environment provided to the NC client." Petition, 48, quoting EX1005, 2:62-65. That "dynamic merging" statement concerns preferences or customizations being overlaid onto a "standard" system environment.

Accordingly, the Petition uses "application environment" as a moving target. For Elements [1.0]/[15.0], it is the "standard" stored operating system stored on the server. For Elements [1.5]/[15.4], it becomes a "dynamically merged system environment" associated with user preferences.

#### 3. The expert declaration compounds the inconsistency by equating the "application environment" with stored operating system volumes while defining "merging" as preference merging with a "system environment"

The Expert Declaration mirrors the Petition's internal inconsistency. It characterizes the "application environment" for Elements [1.0]/[15.0] as "stored operating system volumes." EX1003, ¶217. Then, in addressing Elements [1.5]/[15.4], the declaration asserts that Birse's "union block devices" are "configured to create said application environments by merging the blocks of said root image … with the blocks of respective leaf images," and immediately describes the resulting "application environment" as the "dynamically merged system environment."

EX1003, ¶¶256-257. That is the same slippage. "Application environment" is treated as the "standard" stored operating system volumes in one part of the mapping, yet the "created" environment is described as a "dynamically merged system environment" grounded in preference overlay language in another part of the mapping. EX1003, ¶¶182, 217 and 257.

#### 4. These inconsistencies are dispositive because Petitioner never identifies a single, claim-matching "application environment" in Birse that is both distributed and created by the recited merging operation

Claim 1's structure requires Petitioner to identify one consistent mapping for "application environment." The same "application environment" that is being "distributed" must also be what the union block device "creates … by merging" root-image and leaf-image blocks, via a low-level driver beneath the file system. The claims' description of that creation step is explicit. Merging root and leaf blocks yields an output that "will appear … as one cohesive image." EX1001, 6:10-16. Petitioner's mapping does not keep those concepts constant.

Nor are the two mappings in any way reconcilable. If the Petition's mapping of "application environment" in Elements [1.0]/ [15.0] controls, meaning that the "application environment" is the "standard" operating system copy accessed from the server, Petitioner does not (and could not possibly) explain how that "standard" operating system copy is something the union block device "creates … by merging"

root and leaf image blocks into a cohesive image, as the claims require. The Petition never reconciles its competing identifications. Instead, it proceeds as though "application environment" can refer to whichever "environment" is convenient for the particular limitation being mapped. Because Petitioner does not consistently identify a single Birse counterpart that satisfies both sides of that required relationship, Ground 1 fails to meet Petitioner's institution burden.

### D. Petitioner fails to explain why Birse's "merging user preferences" is the claimed "merging blocks" of a root image and a leaf image

Independent claim 1 requires that "the union block device creates the application environment by merging the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit." EX1001, 7:44–46. This is a storage-architecture limitation. It ties (i) blocks of two images (a root image and a leaf image) to (ii) two storage units, and (iii) requires a union block device that "creates" the application environment by merging those blocks. EX1001, 7:31–49.

Petitioner's reliance on Birse's statement that "the user's preferences are dynamically merged with the system environment provided to the NC client" does not satisfy that burden because Petitioner never explains, at the required level of technical and claim-specific detail, how a preference-level merge is the same

operation as the claimed block-level merge of two images across two storage units. Petition, 48; EX1005, 3:13–16; EX1001, 7:44–46.

#### 1. "User preferences" are not "blocks of a leaf image," and Petitioner does not bridge that gap

Birse's cited passage is directed to preserving a user's desktop experience by combining "preferences" with a "system environment." EX1005, 3:13–16. That sentence does not identify a root image, does not identify a leaf image, and critically does not identify any act of merging blocks stored in two different storage units. EX1005, 3:13–16.

The claim, by contrast, is explicit. It is the merging of blocks of a root image with blocks of a leaf image that "creates the application environment." EX1001, 7:44–46. Petitioner's mapping treats Birse's high-level statement about preferences as if it necessarily describes the claimed block-level image merge, but the Petition does not explain why or how "preferences" correspond to "blocks of the leaf image," much less how those "preference" blocks are stored on the "second storage unit" and merged with "root image" blocks from the "first storage unit" to "create" the application environment as required. Petition, 48; EX1005, 3:13–16; EX1001, 7:44–46.

**2. Birse's "dynamic merge" can be accomplished at a semantic or user-profile level, not a block-image level**

Even taking Birse at face value, "dynamically merged" in Birse describes a functional result, meaning user customizations are some how applied so the user experiences the same environment across clients. EX1005, 3:13–16. That result can be achieved through many mechanisms, for example copying or applying configuration data at login or session initialization, without any need to merge the blocks of two images stored on two storage units.

Because the claims require a specific mechanism, namely block merging of root-image blocks and leaf-image blocks, Petitioner must do more than quote Birse's functional statement. Petition, 48; EX1005, 3:13–16; EX1001, 7:44–46. Petitioner must articulate why Birse's "dynamic merge" is, in fact, the claimed block-level merge performed by a union block device between two storage units. EX1001, 7:44–46. The Petition never supplies that missing explanation. Petition, 48–49.

**3. The Petition's own discussion shows redirection or selection, not "merging blocks … to create the application environment"**

The Petition's mapping elsewhere emphasizes that Birse's block device driver decides whether a requested portion "has been modified" and then directs reads to the system volumes or the shadow volume. Petition, 49–51; EX1005, 11:39–41, 11:55–12:10. That is request-routing or copy-on-write overlay behavior. Petition,

49–51; EX1005, 11:39–41, 11:55–12:10. It is not, without considerable further explanation, the same thing as a union block device that "creates the application environment by merging" blocks of a root image with blocks of a leaf image. EX1001, 7:44–46.

Put differently, the Petition appears to treat "the user's preferences are dynamically merged with the system environment" as a synonym for the claim's "merging blocks" requirement, but it never explains what exact blocks are being merged in Birse, where Birse stores the root-image blocks and leaf-image blocks on respective first and second storage units, and how that merge "creates the application environment," as opposed to merely resolving individual read and write requests during operation. Petition, 48–51; EX1005, 3:13–16, 11:39–41 and 11:55–12:10; EX1001, 7:44–46.

#### 4. The Board should reject Petitioner's conclusory equivalence between "preference merge" and "block merge"

Because the Petition's obviousness case depends on establishing that Birse meets the specific limitation of "merging the blocks of the root image … with the blocks of the leaf image …," Petitioner must provide a coherent, technically grounded mapping that ties Birse's disclosure to that claim language. EX1001, 7:44–46. The Petition instead relies on an unelaborated functional statement about user preferences and treats it as dispositive of the claimed block-level image merge.

Petition, 48; EX1005, 3:13–16. That is insufficient to meet Petitioner's burden, particularly where the claim requires a specific storage, image, and block mechanism rather than merely the general outcome of "user customization." EX1001, 7:44–46.

### E. The Additional Grounds All Depend On The Deficient Mapping Of Birse To The Independent Claims In Ground 1

Grounds 2 through 4 do not present alternative mappings for the core limitations of independent claims 1 and 15. Instead, Petitioners repeatedly premise each additional ground on the assertion that "Birse meets all elements of independent Claims 1 and 15," and then cite the secondary references only for collateral, claim-specific add-ons (HPC or grid context, a modification log, or partitioning and snapshot merging). Petition, 76, 77, 82 and 85. Accordingly, since the Petition fails to establish that Birse teaches the requirements of independent claims 1 and 15 discussed above, the additional grounds necessarily fail as well.

#### 1. Ground 2 (Birse + Ballew): Ballew Adds Only HPC or Grid Context and Does Not Address the Deficiencies In Ground 1 With Respect To The Independent Claims

In Ground 2, Petitioners expressly rely on their Ground 1 contention that Birse already satisfies all limitations of claims 1 and 15. Petition, 76-77. Ballew is then introduced only for the dependent limitations requiring that the compute node

"comprises a server" and that the system or method "operates in a high performance computing cluster" or "grid computing cluster." Petition, 76-79.

The Petition's motivation-to-combine discussion confirms this narrow role. Petitioners state that Ballew "discloses providing an execution environment generally to nodes in an HPC system," while "Birse offers details on OS storage and distribution," and therefore the operating system of Ballew's execution environment would be distributed "using Birse's shadow volumes." Petition, 75-76. That explanation does not purport to supply any missing elements identified in Ground 1. It assumes Birse already satisfied all of the elements of the independent claims. Critically, Ballew is not cited to resolve the specific deficiencies that undermine Ground 1. Because Ballew is not used to cure any of the asserted shortcomings of Birse, Ground 2 rises or falls with Ground 1.

#### 2. Ground 3 (Birse + Wu): Wu Is Offered Only for a "Block Modification Log," and the Petition Concedes the Key Architecture Still Depends on Birse

Ground 3 makes the dependency on Birse even more explicit. Petitioners state, "To the extent Birse does not explicitly disclose a block modification log, Wu discloses a block modification log," and then conclude that "Birse as combined with Wu meets Claims 8 and 24." Petition, 82. That is the only purported contribution Wu makes.

Wu is not cited to address any of the deficiencies of the Petition in mapping the independent claims to Birse in Ground 1, as discussed above. Petitioners do not rely on Wu to define or consistently identify an "application environment," to show a union block device that creates that environment by merging blocks of a root image and a leaf image, to establish a leaf image, or to satisfy the claim-required low-level driver topology. Instead, the Petition's Ground 3 mapping again assumes Birse supplies the complete independent-claim framework and uses Wu only as an add-on for the "block modification log" limitation. Petition, 81-82. Because Wu is not offered to cure the deficiencies with respect to mapping Birse to the independent claims, Ground 3 fails for the same reasons as Ground 1.

**3. Ground 4 (Birse + Kleinschnitz): Kleinschnitz Is Offered Only for Snapshot Collapsing and Partitioning, Not for the Missing Birse Elements**

Ground 4 similarly confirms that Kleinschnitz is not offered to cure any of the shortcomings of Ground 1 with respect to the independent claims. Petitioners' motivation-to-combine section focuses on two concepts: (1) "reconciling" as "nothing more than merging snapshots," and (2) storing system volumes and shadow volumes in different partitions "like in Kleinschnitz." Petition, 84. The element-by-element section then cites Kleinschnitz only for partitioning (claims 9 and 25) and incremental-image merging (claim 17). Petition, 85-86.

Nothing in Ground 4 suggests Kleinschnitz is being used to supply the missing proof for the requirements of the independent claims. Instead, Ground 4 proceeds on the premise that Birse already meets the independent claims and then layers on generic snapshot-collapsing and partitioning concepts from Kleinschnitz. Petition, 84-86. For institution purposes, this is dispositive. Ground 4 does not offer an alternative path to meeting the limitations of the independent claims.

#### 4. Grounds 2–4 Do Not Independently Establish Unpatentability

Grounds 2 through 4 do not provide an independent path to establishing unpatentability because Petitioners do not cite Ballew, Wu, or Kleinschnitz to cure the deficiencies in Birse's disclosure of the independent-claim architecture. The Petition's own structure confirms this. Ground 1 is asserted "over Birse" and begins with the premise that "Birse meets all claim elements." Petition, 26. Grounds 2 through 4 are then presented as combinations, each with a stand-alone "Motivation to Combine" section and a "Birse and [secondary reference] meet all claim elements" section. Petition, 74–86. In each of those grounds, the secondary reference is used only for discrete dependent-claim features (cluster context, a modification log, partitioning/snapshot merging), while the Petition continues to rely on Birse for the core limitations of independent claims 1 and 15, including the union block device and its low-level driver topology, the node-specific leaf image, and the claimed

block-level creation of the application environment. See, e.g., Petition, 74–86; EX1001, 7:24–33.

## VIII. CONCLUSION

Petitioner has not carried its burden to establish a reasonable likelihood that any challenged claim of the '282 Patent would have been obvious under 35 U.S.C. § 103 because the Petition fails to demonstrate that several limitations of the independent claims are met by Birse. For example, the Petition fails to demonstrate that Birse discloses a union block device comprising "a low-level driver for interfacing between the first and second storage units *and the file system of the compute node*," as required by independent claim 1.

In addition, Petitioner Southwest is advancing inconsistent claim constructions here and in the district court with respect to the term "leaf images" in independent claims 1 and 15 of the '282 Patent. While in these proceedings Southwest interprets "leaf image" according to its "ordinary and customary meaning," in the district court, Petitioner Southwest *opposes* interpreting "leaf images" according to its *plain meaning* and asserts that "a 'leaf image' is *a node-specific image of the application environment operating at the block level below the file system*." Ex. 2008, 12 (emphasis in original). The Petition fails to demonstrate

that Birse discloses a *node-specific* leaf image, as required by Petitioner Southwest's district court claim construction.

Petitioner American is also advancing inconsistent claim construction positions. While American's expert in these proceedings was able to interpret the claims according to their "ordinary and customary meaning," American contends in the district court that the phrases "appropriate persistent mapping" (in independent claims 1 and 15), "the modifying" (in claim 15) and "at an operational level" (in claim 26) are all indefinite. EX2009, 4-5. As Director Squires explained in *Tesla, Inc. v. Intellectual Ventures II LLC*, IPR2025-00340, Paper 18 (November 5, 2025) (informative), absent a sufficient explanation why inconsistent claim construction positions are warranted, a petitioner cannot not argue that a claim is indefinite in the district court and at the same time maintain that the same claim should be interpreted according to its plain and ordinary meaning in IPR proceedings. Here, the Petitioners fail to even acknowledge their existence of inconsistent claim construction positions, yet alone explain why inconsistent claim construction positions are warranted. This deficiency provides an independent basis for denial of institution due to the Petition's failure to satisfy its burden to explain how the challenged claims are to be construed under 37 CFR42.104(b)(3).

The Petition's allegations that Birse discloses the "application environment" recited in the independent claims of the '282 Patent are also defective. With respect

to that limitation, the mappings in the Petition are inconsistent and rely on shifting identifications of key claim concepts and conclusory expert assertions instead of record evidence. For example, Petitioner inconsistently characterizes the "application environment" in Birse, alternately treating it as a stored operating-system copy distributed from a server and as a "dynamically merged system environment" based on user preferences, without reconciling those positions or mapping either of them to the claimed cohesive, block-merged image. Petition, 18, 26, 47–53; EX1001, 6:10–16; EX1003, ¶¶217, 255–266. And Petitioner does not establish the claim-required interface topology for the "low-level driver," instead pointing to Birse's generic statement that requests are "redirected at a lower level of the operating system," which is not the same as a driver that interfaces between two image storage units and the compute node's file system as claimed.

Finally, Grounds 2 through 4 do not provide an independent path to unpatentability. Petitioners do not cite Ballew, Wu, or Kleinschnitz to cure any deficiency in Birse's disclosure of the independent-claim architecture and instead rely on those references only for discrete dependent-claim features. Petition, 74–86. Because the Petition's threshold showing on Birse fails, the additional grounds necessarily fail as well.

For the foregoing reasons, Patent Owner respectfully requests that the Board deny institution of inter partes review.

Respectfully submitted,

Dated: January 20, 2026 By: /Brandon R. Theiss/

Brandon R. Theiss
Registration No. 70,507
*Counsel for Patent Owner*
*Intellectual Ventures I LLC*

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT

Pursuant to 37 C.F.R. § 42.24(d), I certify that this Patent Owner Preliminary Response complies with the type-volume limits of 37 C.F.R. § 42.24(b)(1) because it contains 11,638 words, excluding the parts of this Patent Owner's Preliminary Response that are exempted by 37 C.F.R. § 42.24(a), according to the word processing system used to prepare this Patent Owner's Preliminary Response.

Respectfully submitted,

Dated: January 20, 2026

By: /Brandon R. Theiss/
Brandon R. Theiss
Registration No. 70,507
*Counsel for Patent Owner*
*Intellectual Ventures I LLC*

## CERTIFICATE OF SERVICE

The undersigned certifies that pursuant to 37 C.F.R. § 42.6(e), a copy of the foregoing **PATENT OWNER'S PRELIMINARY RESPONSE** was served via email (as consented to by counsel) on January 20, 2026 to lead and backup counsel of record for Petitioners as follows:

John B. Campbell
jcampbell@McKoolSmith.com
MCKOOL SMITH, P.C.
303 Colorado Street, Suite 2100
Austin, TX 78701

Casey Shomaker
cshomaker@mckoolsmith.com
McKool Smith, P.C.
300 Crescent Court, Suite 1200
Dallas, TX 75201

Emily R. Tannenbaum
etannenbaum@mckoolsmith.com
McKool Smith, P.C.
1301 Avenue of the Americas, 32nd Floor
New York, New York 10019

Keith D. Harden
kharden@munckwilson.com
Munck Wilson Mandala, LLP
2000 McKinney Ave., Ste. 1900
Dallas, Texas 75201

S. Wallace Dunwoody
wdunwoody@munckwilson.com
Munck Wilson Mandala, LLP
2000 McKinney Ave., Ste. 1900
Dallas, Texas 75201

Michael C. Wilson
mwilson@munckwilson.com
Munck Wilson Mandala, LLP
2000 McKinney Ave., Ste. 1900
Dallas, Texas 75201

AA_Intellectual_Ventures@mckoolsmith.com

SWA-IV@munckwilson.com

Dated: January 20, 2026 By: /Brandon R. Theiss/
Brandon R. Theiss
Registration No. 70,507
*Counsel for Patent Owner*
*Intellectual Ventures I LLC*

# EXHIBIT A-24

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

AMERICAN AIRLINES, INC. AND SOUTHWEST AIRLINES CO.,

Petitioners,

v.

INTELLECTUAL VENTURES II LLC,

Patent Owner.

Case No. IPR2025-00931

U.S. Patent No. 8,332,844

# PATENT OWNER'S PRELIMINARY RESPONSE

# TABLE OF CONTENTS


PATENT OWNER'S EXHIBIT LIST .................................................. iv

I. Introduction .................................................. 1

II. Summary Of The '844 Patent .................................................. 3

A. Background .................................................. 3

B. Summary And Advantages Of Disclosed Embodiments .................................................. 5

C. Detailed Description .................................................. 7

III. Claim Construction .................................................. 11

IV. Prior Art Cited .................................................. 12

A. Sapuntzakis (EX1005) .................................................. 12

B. Holzmann (EX1007) .................................................. 14

C. Birse (EX1006) .................................................. 16

D. Federwisch (EX1008) .................................................. 19

V. Ground 1 Should Be Denied: No Record-Supported Motivation to Combine, and Holzmann Does Not Teach the Claimed Root/Leaf Cache of Claim 1 .................................................. 21

A. Petitioner's Combination Theory Lacks a Record-Supported Rationale and Conflicts with the Opposing Design Philosophies of Holzmann and Sapuntzakis .................................................. 22

1. No motivation to combine under KSR and In re Kahn .................................................. 23

2. The references teach away and pursue opposite ends .................................................. 26

3. Architectural mismatch changes the principle of operation and risks inoperability .................................................. 28

4. No reasonable expectation of success .................................................. 30

5. The references pursue incompatible objectives and therefore there is no motivation to combine .................................................. 32

B. Holzmann's cache does not render claim 1 obvious under 35 U.S.C. §103 .................................................. 32

C. Claim 7 and the Dependent Claims Are Patentable For The Same Reasons As Claim 1 .................................................. 35

VI. Ground 2 Fails: Neither Sapuntzakis nor Federwisch Discloses or Suggests the Claimed Union Block Devices or the Cross-Node Root-Image Indexing Required by Claim 14 .......... 36

A. Sapuntzakis and Federwisch do not teach or suggest the claimed "plurality of union block devices … configured to create said file systems by merging" a shared root image with respective leaf images .......... 37

B. The Sapuntzakis/Federwisch combination does not disclose or motivate the "indexing" requirement in claim 14 .......... 41

1. Claimed indexing, at root-image scope, produced by one compute node and provided to another .......... 42

2. Sapuntzakis does not teach the claimed indexing .......... 43

3. Misreading of "index." .......... 44

4. The Sapuntzakis/Federwisch Combination Does Not Teach or Suggest Cross-Node Root-Image Indexing as Required by Claim 14 .......... 45

C. Claims 19 and 23 (and their dependents) stand for the same reasons as Claim 14 .......... 45

VII. Ground 3 Fails: Neither Birse nor Holzmann Discloses the Claimed Root/Leaf Cache Architecture, and the References Pull in Opposite Directions .......... 47

A. Holzmann and Birse Do Not Teach the Claimed Cache Within a Root/Leaf Architecture, and Petitioner's Theory Requires Wholesale Re-Engineering .......... 48

B. No motivation to combine: Birse's per-node images run counter to Holzmann's single-image model .......... 51

C. Claim 7 and the Dependent Claims Are Patentable For The Same Reasons As Claim 1 .......... 54

VIII. Ground 4 Fails: Birse and Federwisch Do Not Disclose the Claimed Leaf Images, the Index-Once/Share Requirement, or Provide Any Motivation to Combine Without Changing Their Principles of Operation .......... 55

A. Birse does not meet claim 14's negative limitation on the per-node "leaf images," and Federwisch does not cure the defect .......... 56

B. The references do not disclose or suggest claim 14's index once, share across nodes requirement .....................................57

C. No motivation to combine; the art addresses opposite problems and would require a change in principle of operation .............59

D. Claims 19 and 23 (and their dependents) stand for the same reasons as Claim 14.................................................................60

IX. Conclusion .........................................................................................61

**PATENT OWNER'S EXHIBIT LIST**

| | |
|---|---|
| Ex. 2001 | Reexamination Request No. 90/019,938 |
| Ex. 2002 | Order Granting Reexamination Request |
| Ex. 2003 | American Airlines Webpage - Information Technologies |
| Ex. 2004 | Reexamination Request No. 90/015,337 |
| Ex. 2005 | Petition in IPR2025-00785 |
| Ex. 2006 | https://www.unifiedpatents.com/faq |
| Ex. 2007 | https://www.unifiedpatents.com/members |
| Ex. 2008 | Abstract of Title for U.S. Patent No. 8,332,844 |
| Ex. 2009 | Docket from *Intellectual Ventures I LLC et al. v. Southwest Airlines*, Co., 7:24-cv-277 (WDTX) |
| Ex. 2010 | Agreed Scheduling Order in Southwest Litigation |
| Ex. 2011 | Docket from *Intellectual Ventures I LLC et al. v. American Airlines*, Inc., 4:24-cv-980 (EDTX) |
| Ex. 2012 | Defendant American Airlines, Inc.'s P.R. 3-3 Invalidity Contentions in *Intellectual Ventures I LLC et al. v. American Airlines*, Inc., 4:24-cv-980 (EDTX) |
| Ex. 2013 | Defendant Southwest Airlines Co.'s Preliminary Invalidity Contentions in *Intellectual Ventures I LLC et al. v. Southwest Airlines*, Co., 7:24-cv-277 (WDTX) |
| Ex. 2014 | Declaration of Dr. Richard Newman |
| Ex. 2015 | CV of Dr. Richard Newman |

## I. Introduction

Petitioner has not shown a reasonable likelihood of prevailing on any challenged claim. Challenged independent claims 1 and 7 recite a novel architecture that simultaneously combines at least the following four features: (i) a shared, root image that is separate from leaf images for individual compute nodes, (ii) storage of the shared root image and the leaf images at the "block" level, (iii) the exclusion of unchanged root blocks from the leaf images, and (iv) a cache that provides accelerated access to previously accessed blocks of the root image. Challenged independent claim 14 recites the first three features in combination with an index that is prepared once and shared across compute nodes. The claimed inventions solved long-standing inefficiencies in managing multiple compute nodes, enabling scalable, operating-system-independent deployment without the waste and duplication that characterized prior systems.

The Petition relies on disparate references that address different problems in different ways and that do not disclose the claim-critical features. Sapuntzakis is a capsule-migration system designed for WAN bandwidth constraints, with shadow copy on write (COW) disks for each host (per-host) and transient capsules that are destroyed at logout. Holzmann discloses a solid state drive (SSD) appliance for multi-server boot from a single operating system image, with a per-server cache that arbitrates both reads and writes at a cache-line level. Birse describes a net-boot

system that redirects reads and writes between a core, user, and per-client shadow volume, with shadow implementations that either duplicate unchanged data or store data at band-granularity. Federwisch is a snapshot replication reference focused on source-to-destination differencing and change-stream transmission, not on constructing per-node runtime file systems or cross-node sharing of root indexing results. None of these references, alone or in combination, discloses the claimed cache of root-image blocks, the negative-limitation leaf images, or the index-once/share functionality. Nor does Petitioner articulate any reasoned motivation with a rational underpinning to combine them.

As explained below, each asserted ground fails. Ground 1 does not show that Sapuntzakis and Holzmann disclose or suggest the claimed root/leaf limitations in combination with the claimed cache. Ground 2 fails because Sapuntzakis and Federwisch neither disclose union block devices that merge a root and leaf nor the indexing requirement of claim 14 where an index is prepared once and shared across compute nodes (referred to later as the index once/share functionality). Ground 3 fails because Birse's per-client shadows and Holzmann's single-image cache are fundamentally incompatible and still do not disclose the required cache of root-image blocks. Ground 4 fails because Birse does not meet the negative limitation on the leaf images (i.e., the exclusion of unchanged root blocks from the leaf images), and Federwisch does not disclose or suggest index-once/share functionality. In every

case, Petitioners' theories require wholesale re-engineering of the art, unpredictable substitutions, and conflict with the express teachings of the references themselves.

For these reasons, and for those explained in greater detail in the following sections, the Board should deny institution of inter partes review.

## II. Summary Of The '844 Patent

### A. Background

The '844 Patent is directed to "clustered computing" where, typically hundreds of "compute nodes may be clustered together to share the load of serving a high-traffic website." EX1001, 1:33-38. Such systems typically "centralize data management" using "a globally accessible file system." *Id.*, 1:38-40. In such systems, storage of "a boot image" containing the kernel and, in some cases, application software to be run on the compute node, was required for each compute node in the cluster. *Id.*, 1:45-49.

Low cluster "bring-up time" is a concern in clustered computing. *Id.*, 1:49-50. Typically, the cluster stores a master boot image from which it may "either pre-create clones" or create them "on the fly" which "involves copying the entire contents of the master image, which are typically in the range of 5-15 GB" resulting in "a large bring-up time." *Id.*, 1:50-58. "Pre-creating a boot image for each server" reduces cluster bring-up time but results "in wasted disk space." *Id.*, 1:61-63. Both methods suffer from the problem that updating "the boot image(s) for the cluster is

cumbersome" because it involves "updating a number of copies of the boot image." *Id.*, 1:64-67.

The '844 Patent also observed that, once compute nodes have booted, they often engage in redundant activities especially in cases where the cluster includes multiple compute nodes "each running the same operating system and using substantially similar hardware." *Id.*, 2:1-5. The '844 Patent also observed that such "compute nodes will generally need to access much of the same data (e.g., drivers, library files, etc.)," and while each of the compute nodes will index their file systems, the index results will only vary slightly. *Id.*, 2:5-11.

The '844 Patent explained that in a "branching store file system, a read-only base image (or "root" image) of the application environment is created" which "is accessible by all compute nodes in the cluster" and "[c]hanges made by a compute node to the root image are stored in a 'leaf' image unique to that compute node." *Id.*, 2:13-18. A filter operating between the compute nodes and the file systems "merges the changes recorded on the leaf images with the root image and delivers the result to the appropriate compute node," thereby permitting the computer to run "its own unique and cohesive instance of the application environment." *Id.*, 2:18-24. The '844 Patent observed that, while this approach allows for creation of boot images on the fly with less bring-up time, "a separate version of the system must be created for each unique operating system because data is stored at the file system level (i.e., on

a "per file basis"). Thus, migrating a computing cluster from one operating system to another is much more complicated than simply installing a new root image containing the new OS." *Id.*, 2:24-31.

## B. Summary And Advantages Of Disclosed Embodiments

The '844 Patent addressed the shortcomings associated with creating and storing a unique operating system for each compute node at the file system level through the use of "root image caching and indexing for block-level distributed application management." *Id.*, 2:35-37 (In the disclosed system, blocks of a root image are stored on a first storage unit and blocks of leaf images are stored on respective second storage units (e.g., one for each compute node). *Id.*, 2:39-40. The leaf images are reserved for "additional data blocks not previously contained in the root image and changes made by respective compute nodes to the blocks of the root image." *Id.*, 2:40-43. In the disclosed system, "blocks of the root image that have been accessed by at least one compute node" are cached to accelerate access time, and "indexing results pertaining to the root image" generated from one compute node are provided to the other compute nodes" in order to minimize the duplication of activities across compute nodes. *Id.*, 2:43-48.

The disclosed system provided a combination of at least *five* important advantages over prior systems.

*First*, the disclosed system was "operating system-independent." *Id*., 2:50-51.

*Second*, the system provided for the "creation of boot images on the fly without significantly diminishing bring-up time." *Id*., 2:50-56. In the disclosed system, "creating a new boot image does not require copying the contents of the root image" but instead involves only registering a new union block device (or UBD) with the system, which occurs very quickly. *Id*., 2:56-59.

*Third*, in the disclosed system, "[b]ring up time, and access time in general" are "further improved by caching commonly accessed portions of the root image." *Id*., 2:58-61.

*Fourth*, in the disclosed system, "updating the boot image for the entire cluster simply involves updating the root image." *Id*., 2:61-63.

*Fifth*, "because of the commonality of the root image and the fact that its contents are not directly changed, certain operations performed on the root image (e.g., indexing) only need to be performed once by one compute node" and "the results of that operation can be shared with the other compute nodes in the cluster, thus saving the other compute nodes valuable time and resources." *Id*., 2:63-3:2.

### C. Detailed Description

Figure 2 of the '844 Patent (reproduced below) depicts an exemplary system "for root image caching and indexing in a block-level distributed application environment." *Id.*, 5:12-14. Compute nodes 220*a-n* [blue boxes] are coupled to first storage unit 240 [orange box]. *Id.*, 5:19-20. In addition, each of the compute nodes 220*a-n* [blue boxes] is coupled to "a corresponding second storage unit 250*a*-n [green boxes] though a corresponding union block device (UBD) 230*a-n* [red boxes]." *Id.*, 5:20-22.




Using the techniques explained next, the system results in it appearing to each of the compute nodes 220 *a-n* "that they have access to their own version of a distributed application environment. However, a separate and complete boot image is not created and stored for each compute node 220 *a-n*." *Id.*, 5:22-26.

Storage unit 240 [orange box] stores blocks of a root image of an application environment that are "initially common to the compute nodes 220 *a*-*n*. The root image is not changed by compute nodes 220 *a*-*n*" (e.g., the compute nodes 220 *a*-*n* may have read-only access to the first storage unit 240.) *Id*., 5:27-32. "[E]ach compute node 220*a*-*n* [blue boxes] has a corresponding second storage unit 250 *a*-*n* for storing a leaf image [green boxes]." *Id*., 5:33-34. "The leaf image may contain blocks of new data, blocks of changed data, or other blocks of data unique to the individual compute node. The leaf image may also contain a block modification log" that "will describe the changes made by the respective compute node 220 *a*-*n* [blue boxes] to its instance of the application environment." *Id*., 5:40-45. "Thus, when a compute node (e.g., node 220 *a*) makes changes involving the root image, modifications are made to that compute node's leaf image (e.g., leaf image stored on second storage device 250 *a*). With respect to changes to the root image, only the specific blocks that are changed are stored in the leaf image." *Id*., 5:45-51.

"A compute node 220*a*-*n* [blue boxes] mounts its instantiation of the application environment via its respective UBD [or union block device] 230 *a*-*n* [red boxes]." *Id*., 5:59-60. "UBDs 230 *a*-*n* are effectively low-level drivers that operate as an interface between the first and second storage devices and the file system of each compute node 220 *a*-*n*. ... Because UBDs 230 *a*-*n* operate *below the file system, they are concerned merely with the blocks of data themselves, rather than files they*

*form*. As a result, system 200 is completely file system, and thus operating system, independent." *Id*., 5:61-6:3 (emphasis added). "UBDs 230*a-n* [red boxes] determine what leaf image (from the appropriate second storage unit 250 [green boxes]) is needed for portions of the application environment that their respective compute nodes 220*a-n* [blue boxes] have changed. UBDs 230*a-n* also locate the portions of the application environment that are not changed by their respective compute nodes 220 *a-n*. These portions may reside in the root image." *Id*., 6:3-10.

"UBDs 230*a-n* create a new leaf image on a respective second storage unit 250*a-n* when their respective compute nodes 220*a-n* make changes to their instantiations of the application environment." *Id*., 6:13-16. "UBDs 230 *a-n* may also modify the leaf image in response to their respective compute node's access to its instance of the application environment. For example, upon receiving a write request from their respective compute nodes for a sector X, the UBDs 230 *a-n* will create an appropriate persistent mapping for sector X and then write sector X onto their respective second storage units 250 *a-n*, where sector X can then be modified." *Id*., 6:20-26.

This disclosed system also "provides for caching of portions of the root image. Because several compute nodes in a cluster may often access the same data (e.g., same drivers, same library files, etc.) on the root image, tremendous speed improvements can be realized by caching such data in cache 260." *Id*., 6:38-43. In

"a first boot, the cache is empty. The first compute node to boot (e.g., compute node 220 *a*) will therefore load its data directly from the pertinent disks (e.g., first storage unit 240 and second storage unit 250*a*). While the first compute node is loading its data, its reads are intercepted and cached on a per-block basis in cache 260. Thereafter, when a second compute node (e.g., compute node 220*b*) goes to boot, any data required by the second compute node that was previously accessed by the first compute node can be served out of the cache 260 rather than the first storage unit." *Id*., 6:53-63. "As new data is accessed on the root image that is not currently stored in the cache 260, the cache 260 may thereafter be updated with the new data." *Id*., 7:6-8.

The disclosed system further "provides for indexing the root image." *Id*., 7:18-18. "In a traditional clustered computing situation, each compute node would independently index its file system. To the extent that each compute node in a cluster has similar operating environments to the others, indexing performed on common data is therefore redundant." *Id*., 7:21-25. Since, in the disclosed system, "the data stored in the root image is by definition common to all the compute nodes 220*a*-*n*, one compute node (e.g., compute node 220*a*) can index the contents of the root image and then provide the indexing results to the other compute nodes (e.g., compute nodes 220 *b*-*n*). Thereafter, the compute nodes 220 *a*-*n* need only be

concerned with indexing their respective leaf image, which are relatively small compared to the root image." *Id*., 7:26-34.

## III. Claim Construction

Consistent with Patent Owner's positions in the related district court litigations, the Board should apply plain and ordinary meaning to all challenged claim terms under the standard articulated in *Phillips v. AWH Corp*., 415 F.3d 1303 (Fed. Cir. 2005) (en banc). Applying these principles, the terms used in the challenged claims (including, for example, "root image," "leaf image," "cache configured to cache blocks of said root image," and "indexing results") should be afforded their plain and ordinary meaning in view of the specification and prosecution history. To the extent Petitioner advances extra-textual constructions that broaden or narrow the claims beyond what a skilled artisan would understand from the intrinsic record, those proposals should be rejected as inconsistent with Phillips and its progeny. See *Phillips*, 415 F.3d at 1312–14.

Accordingly, and in alignment with Patent Owner's positions in the parallel district court actions, the Board should resolve this IPR under the plain-and-ordinary-meaning standard without adopting any special constructions beyond what is necessary to address a concrete dispute.

## IV. Prior Art Cited

### A. Sapuntzakis (EX1005)

Sapuntzakis presents a capsule-migration system focused on moving the complete runtime state of a virtual computer—OS, applications, memory, and device state—over constrained networks, and introduces four WAN-oriented optimizations: copy-on-write (COW) disks, ballooning, demand paging, and hash-based copy (HCP). EX1005, Abstract; §1, Introduction; §4. The paper targets links "as slow as 384 kbps," with capsules moving "in at most 20 minutes and often much less." EX1005, §5.

The usage model is explicitly transient at the session boundary. In the university example, a user derives a personal capsule at login; "the capsule migrates with the student as he commutes, and is destroyed when he logs out." EX1005, §4.2, Capsule Hierarchies. This lifecycle favors portability and teardown, not cross-session persistence.

At the storage layer, Sapuntzakis builds a per-capsule COW hierarchy rooted at a full "root disk," with child layers that hold only differences; reads walk ancestor layers until a block is found, and the COW hierarchy is not exposed to the guest OS, which "see[s] a normal flat disk." EX1005, §4.2; Fig. 2. A promote primitive can copy a parent's blocks into a child to shorten chains—an optimization that explicitly moves unchanged blocks downward when desired. EX1005, §4.2. These mechanics

are internal to a capsule, not a cluster-level union device that merges a shared root with many nodes' leaves at runtime.

For I/O path and caching, the implementation interposes a shim beneath VMware and routes all disk I/O through a local disk server; "the latest COW disk is always local, so all writes are local," while reads may hit local or remote ancestors. EX1005, §4.3; Fig. 3. Each remote COW disk has a corresponding "shadow COW disk (one per compute server)" that caches remote blocks; cached blocks "can be reused for multiple capsules" on that host. EX1005, §4.3. This is host-local reuse, not a centralized, cross-node cache.

The system reduces startup latency by demand paging capsule disks page-by-page rather than prefetching multi-GB roots, relying on ordinary OS tolerance for disk latency (EX1005, §4.3); this again optimizes runtime paging under WAN constraints, not cluster-level image composition.

Its hash-based copy (HCP) keeps a persistent hash cache to avoid resending blocks already present at the destination, but the authors stress that HCP is intended for DSL-class links and, due to seeks, its effective throughput is well under 10 Mbps— "not intended for high-bandwidth LAN environments where the network is not the bottleneck." EX1005, §4.4.

Taken together, these disclosures show that Sapuntzakis is a session-scoped migration system with per-host shadow COW caching, on-demand paging,

ballooning, and WAN-tuned hashing. EX1005, §4.1–§4.4. It does not teach: (i) union block devices that create each node's live file system by merging a shared, read-only root image with per-node leaf images; (ii) a centralized, cross-node cache of root-image blocks; or (iii) an index-once/share model in which one compute node indexes the shared root image and provides those indexing results to other nodes. EX1005, §5, §4.2–§4.4. Instead, Sapuntzakis's caching is per host, its differencing is per capsule, and its state is routinely discarded at logout

**B. Holzmann (EX1007)**

Holzmann discloses a solid-state-disk (SSD) appliance that allows multiple servers to boot from a single operating-system image stored on the SSD. When any server boots, the controller allocates cache space in the SSD's volatile memory and serves OS data from that cache; as additional servers boot, they reuse OS data already in the cache. The Background criticizes maintaining "a separate operating system image … for each server" as "wasteful and expensive," and states the need to boot multiple servers from a single OS image. The Abstract repeats that the cache "is used to store data necessary for booting and operation" and is re-used as additional servers boot. EX1007 ¶¶[0009]–[0010]; Abstract; Fig. 4.

Architecturally, the SSD appliance includes a storage means 102, a memory module 104 (RAM), a control module 103, and an interface module 105 to the servers. The memory module 104 holds the operating-system data and the OS cache

that the controller allocates as servers boot. The controller "loads the required portion of the operating system image … into memory module 104" and "allocates a sub-portion of the memory … to be used as a cache" for OS operations. EX1007, ¶[0021].

Under Holzman's configuration, only a single copy of the OS data (400) is loaded, and the controller segments RAM into per-server cache spaces (401, 402, 403) to support each booted server. Holzmann also describes a non-associative cache 501 in RAM, organized into lines 507; each line stores a Data Tag (502), Validity Bit (503), Lock Bit (504), Server-Number Data (505), and Data (506). On a read, the controller checks the Validity Bit to determine a hit. On an OS write, the controller checks the Lock Bit and the Server-Number, and returns an error if a different server "owns" that cache line; if permitted, it writes into the cache and sets the Lock Bit. EX1007, Fig. 4; Fig. 5; ¶¶0032–0036.

Holzmann's cache is appliance-resident, OS-image-centric, and coordinated per server with read-and-write arbitration at the cache-line level. It does not disclose per-node leaf images, union block devices that merge a shared root image with per-node leaves to create each node's live file system, caching of "blocks of a root image" in a root/leaf architecture, or an index-once/share model in which one node indexes a shared root image and provides those results to other nodes. The Background itself emphasizes moving away from per-server images toward a single

shared OS image served via the SSD cache. EX1007, ¶¶[0009]–[0010]; Figs. 4–5; ¶¶0032–0036.

Accordingly, Holzmann solves a different problem in a different place: central OS boot caching inside an SSD appliance so many servers can reuse the same OS image data across boots. Its cache accepts and arbitrates writes, is partitioned by server, and is keyed to OS-image memory segments. That is fundamentally different from the challenged patent's block-level root/leaf composition with per-node leaf images that exclude unchanged root blocks, a cache of "blocks of the root image" used across nodes, and an index-once/share mechanism for the root image. Holzmann's disclosures therefore do not teach or suggest those claim-critical features and, if anything, discourage from architectures that re-introduce per-node images, as its Background labels per-server images "wasteful." EX1007, ¶¶[0009]–[0010]; Figs. 4–5; ¶¶0032–0036.

### C. Birse (EX1006)

Birse describes a net-booted network computer (NC) architecture in which clients boot a shared operating system image from an NC server and then operate with reads and writes redirected over the network by a client-side block device driver. The boot process is centrally administered: the server supplies the client with boot parameters and transfers a boot image; after RAM-boot, the client mounts remote system and application volumes, and administration tasks can replace the

shared images on the server so that subsequent boots pick up the new configuration. This model is presented as a remedy for the complexity of maintaining per-machine operating systems and emphasizes centralized image management rather than per-node, block-level storage composition.

At the heart of Birse's runtime organization is a SplitOS with three distinct volumes hosted on the server: a read-only core system volume (922), a read-write user system volume (924), and, for each connected client, a client-specific shadow system volume (930). The shadow "shadows the user system volume 924 by storing modifications that are made to the user system volume 924," while reads may be served from the core, user, or shadow volumes and writes are directed only to the shadow. EX1006, Col. 14:50-52. The client's block device driver implements this redirection transparently so that, from the user's perspective, modifications appear to be written to the user system volume. This is a read/write-redirection scheme between server-side volumes, not a union device that composes a shared root image with per-node deltas below the file system.

Birse discloses two distinct shadow embodiments, neither of which fits the claims' leaf-image negative limitation. In one embodiment, the shadow is a complete copy of the system volume with any user-modifications incorporated, necessarily including unchanged system data. In the other, the shadow is sparse and "written in band increments" (e.g., 128K bands) tracked by a band table; because storage occurs

at band granularity, unchanged blocks within a modified band are still present, defeating block-precise exclusion of unchanged content. EX1006, 15:21-32. These structures are shown and described with Fig. 10 (complete copy) and Fig. 11 (banded sparse shadow).

The read and write flows confirm the above. On a write, the client's file system generates a request that the block device driver redirects to the user's shadow volume on the NC server; on a read, the block device driver (or server-side logic) determines whether the requested portion has been modified, and retrieves from the system volumes if unchanged or from the shadow if changed. EX1006, 11:55-67. Birse also contemplates alternatives in which the server keeps separate full copies of the operating system per user, underscoring that the design is comfortable duplicating unchanged content when administratively convenient. None of these flows discloses a cache of blocks of a shared root image or any union block device that creates a live per-node file system by block-level merging of a read-only root with a node's delta.

Birse's administrative model further highlights its focus: a single server-resident master read-only OS image that can be replaced to upgrade the fleet; the system supports net-booting and maintains non-persistent client-specific data separately from persistent user data that is restored at next login. These teachings support centralized provisioning and per-client state management, not cluster-level

block-layer composition, root-block caching across nodes, or index-once/share mechanisms.

**D. Federwisch (EX1008)**

Federwisch is a remote, asynchronous snapshot-replication system. The reference teaches scanning two versions of a snapshot of a source file system to identify changed blocks and transmitting only those changes to a replicated destination snapshot. The scanner walks the logical file-block index of each snapshot, bypassing unchanged pointers and descending the inode tree only where volume block numbers differ; the resulting changes are sent as a system-independent data stream for the destination to apply. This is framed explicitly as "remote asynchronous replication or mirroring of changes" between snapshots, not as an in-path union that constructs a live per-node file system. See EX1008 Abstract, ¶[0014].

The source-side pipeline begins with a differencing scanner that compares volume block numbers at common file offsets across the base and incremental snapshots; where the numbers are the same, the worker can skip entire subtrees of indirect blocks, and where they differ, the worker descends to identify precisely which blocks changed. The reference explains this tree walk and "skip" behavior and illustrates it with a worker example. See EX1008, ¶[0081].

The scanner feeds an inode picker that filters by a selected sub-organization such as a qtree, and then enqueues changed inodes for a pool of inode workers. The picker's rules and the queue/worker flow are laid out, including detecting adds, deletes, and modified files, and using generation numbers to detect metadata changes. Federwisch emphasizes the qtree abstraction as a convenient unit of replication and describes how qtrees sit above the physical layout while offering flexible boundaries for mirroring subsets of a volume. See EX1008, ¶[0084]-[0086].

On the destination side, the received change stream is applied to build an updated snapshot image. The reference explains an inode map that correlates source inodes and generation numbers to destination inodes and generation numbers and describes a directory stage that temporarily moves deleted or modified files into a "purgatory" directory during rebuild. After directory reconstruction, file-data changes are written by offset to the corresponding replica files; when the transfer completes, the purgatory directory is removed and unlinked files are deleted. EX1008, ¶[0016]. Federwisch states that the destination file system is exported read-only to the user to ensure only the replicator can alter the replica, underscoring that its mechanisms are part of a replication pipeline, not a live composition layer serving client I/O. See EX1008, ¶[0015].

Accordingly, Federwisch repeatedly frames its invention as snapshot differencing and replication between a source and a destination; it does not disclose

union block devices that create live per-node file systems by merging a shared, read-only root image with per-node leaf images. Its "scanner," "inode picker," and "inode workers" generate a change stream between two snapshots of the same file system rather than a reusable index of a common root image produced by one compute node and provided to others. In addition, the read-only export of the destination during replication confirms that Federwisch operates out of band from client I/O, in contrast to the challenged claims' in-path union that presents a merged root/leaf view beneath the file system. Further, while Federwisch discusses sub-organizations such as qtrees, those are used to scope what gets replicated; they are not per-node leaf images that "do not include blocks of the root image that are unchanged," nor do they provide any cache configured to cache blocks of a root image for cross-node reuse

## V. Ground 1 Should Be Denied: No Record-Supported Motivation to Combine, and Holzmann Does Not Teach the Claimed Root/Leaf Cache of Claim 1

In Ground 1, Petitioner asserts that claims 1–13 are obvious in view of Sapuntzakis and Holzmann. The Board should reject this ground for two independent reasons. First, Petitioner fails to supply the record-supported rationale that *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007) and *In re Kahn*, 441 F.3d 977 (Fed. Cir. 2006), requires. The combination theory is driven by hindsight rather than evidence and collides with the references' opposing design goals: Holzmann's

centralized, persistent, single-image boot cache versus Sapuntzakis's session-scoped capsules with host-local shadow Copy on Write (COW) caching and Wide Area Network (WAN) oriented migration techniques.

Second, even if one assumed a combination, the references do not disclose the claim 1 cache. Holzmann describes an appliance-resident, per-server operating-system cache tied to a single, shared OS image, not the claimed cache that operates within a root and leaf image architecture to store previously accessed root-image blocks for cross-node reuse. Because Petitioner's mapping does not meet this limitation, claim 1 is not rendered obvious, and the dependent claims that incorporate this limitation likewise fail under §103.

### A. Petitioner's Combination Theory Lacks a Record-Supported Rationale and Conflicts with the Opposing Design Philosophies of Holzmann and Sapuntzakis

Petitioner's obviousness challenge rests on the flawed premise that Holzmann's centralized, multi-boot cache could simply be transplanted into Sapuntzakis's ephemeral capsule architecture. The Federal Circuit, however, requires more than hindsight-driven assertions. Under *KSR* and *In re Kahn*, the law demands a record-supported rationale that explains why a skilled artisan would have been motivated to pursue the combination with a reasonable expectation of success. The present record instead reveals fundamental mismatches in lifecycle, placement and consistency, and problem framing that make Holzmann and Sapuntzakis

incompatible. Holzmann advances persistence across boots through a central cache tied to a shared OS image, while Sapuntzakis deliberately discards capsule state at logout and achieves reuse through per-host shadow COW caches and WAN-optimized techniques such as ballooning and hashed copy migration. These differences are not incidental engineering details but reflect opposite design philosophies. As explained in the analysis below, Petitioner has not shown an articulated reason with rational underpinning to combine the references, and the proposed modification would teach away, alter principles of operation, and fail to provide a reasonable expectation of success.

### 1. No motivation to combine under KSR and In re Kahn

Petitioner's theory assumes a skilled artisan would substitute Holzmann's RAM-based operating-system cache into, or integrate it with, the capsule architecture described by Sapuntzakis so that frequently accessed, read-only blocks are retained and reused across sessions and machines. (see Petition, 33). That assumption lacks the "articulated reasoning with some rational underpinning" that the Federal Circuit requires. *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006). Although *KSR* allows flexible proofs of motivation, it still demands a reasoned explanation grounded in the record rather than hindsight reconstruction. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418–22 (2007). The record here shows Holzmann is designed to provide persistent, cross-boot reuse of operating-system data from a

single shared image via a centralized SSD-resident cache, with per-server coordination metadata such as a data-tag field, validity bit, lock bit, and server-number data (see EX1007 Fig. 4, depicting "Operating System Data 400," "Cache Space For First Server 401," and "Cache Space for Second Server 402").

By contrast, Sapuntzakis presents capsules that are purposefully transient at the session boundary and expressly "destroyed when he logs out," while relying for reuse on per-host shadow COW disks and on hashed-copy migration techniques, not on a central, persistent boot cache shared across machines (see EX1005 §4.2 and Fig. 1; §4.3 and Fig. 3). On this record, there is no "reason with rational underpinning" to graft Holzmann's centralized, multi-boot cache into Sapuntzakis's ephemeral, session-scoped capsules.

In fact, as Dr. Newman explains:

> … a POSITA would recognize at least three technical mismatches that would have discouraged grafting Holzmann's cache into Sapuntzakis's capsules. First, there is a lifecycle mismatch. Holzmann's benefit depends on persistent, cross-boot reuse of OS blocks from a centralized device memory with per-server coordination, whereas Sapuntzakis deliberately scopes each capsule to a user session that ends at logout and is reconstructed thereafter. EX1005 at 5 (Fig. 1); EX1007 ¶¶32–34. The premise of multi-boot reuse is orthogonal to Sapuntzakis's session-scoped lifecycle.
>
> Second, there is a placement and consistency mismatch. Sapuntzakis places I/O translation and caching at the host, below VMware, with immutable remote COWs and per-host shadow COW caches tied to the capsule's storage path, which

> keeps coherence simple and localized. EX1005 §4.3 at 6–7. Holzmann moves the caching locus into a central storage appliance's volatile memory and coordinates access across servers using validity/lock bits and server-number metadata at a cache-line granularity. EX1007 ¶34; Fig. 5; ¶37. Integrating Holzmann's central, mutable cache into Sapuntzakis's immutable-upstream COW chain would relocate the trust and concurrency boundaries and require new protocols to reconcile line-locked, multi-writer cache semantics with Sapuntzakis's per-host shadow-cache model. Those are architectural changes, not routine substitutions.
>
> Third, there is a problem-framing mismatch. Sapuntzakis optimizes for migration over constrained networks with per-host demand paging and a WAN-oriented HCP that is "not intended for high-bandwidth LAN environments," while Holzmann assumes a centrally attached SSD serving many boots from a single OS image in a storage-area-network context. EX1005 §4.4 at 7; EX1007 ¶¶30–34; Fig. 4. Dropping a centralized, multi-boot OS cache into Sapuntzakis's stack would not address the stated bottlenecks and would conflict with the design choices that favor per-host shadow caching of immutable COWs.
> EX2014 ¶ 96-98

As a result, Petitioner's proposed grafting of Holzmann's centralized, multi-boot operating-system cache into Sapuntzakis's deliberately transient, session-scoped capsule architecture rests on conjecture rather than "articulated reasoning with some rational underpinning," and thus runs afoul of the Federal Circuit's requirement in *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006), and KSR's admonition against hindsight, *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418–22 (2007). Holzmann is expressly designed for persistent, cross-boot reuse coordinated

via centralized device memory and per-server metadata (EX1007, Fig. 4), whereas Sapuntzakis teaches exactly the opposite: capsules that are torn down at logout and rebuilt per session, relying on immutable remote COW media with per-host shadow caching and WAN-oriented migration techniques (EX1005 §4.2, Fig. 1; §4.3, Fig. 3). As Dr. Newman explains, the record reflects fundamental lifecycle, placement/consistency, and problem-framing mismatches that would have discouraged a person of ordinary skill and would require non-routine redesign rather than a predictable substitution. EX2014 ¶99. The references thus teach away from Petitioner's theory, and Petitioner has not shown any reasoned motivation to combine with a reasonable expectation of success. On this record, the obviousness ground fails, and the Board should deny institution for lack of a reasonable likelihood of prevailing under §103.

### 2. The references teach away and pursue opposite ends

A reference teaches away when it "criticize[s], discredit[s], or otherwise discourage[s]" the path urged by the challenger. *Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC*, 825 F.3d 1373, 1381 (Fed. Cir. 2016); *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994). Holzmann criticizes the then-prevailing practice of maintaining "a separate operating system image … for each server," calling it "wasteful," and advances a single-image model specifically to enable persistent cross-server boot caching (EX1007 ¶[0009]–[0010]; Figs. 4–5). Sapuntzakis adopts

the opposite lifecycle and reuse strategy: users derive an individualized capsule, run it, then "the capsule … is destroyed when he logs out," with performance and reuse achieved via host-local shadow COW caches and transfer-time hashing and ballooning to minimize bandwidth, not via a central cross-node cache (see EX1005 §4.1 ballooning; §4.3 demand paging with "shadow COW disks (one per compute server)"; §4.4 hashing; and the university example in §4.2).

These disclosures point a POSITA away from persistent, shared boot-block caching across users and sessions. On this record, the proposed hybrid travels "in a direction divergent from" the teachings of Sapuntzakis and Holzmann. *Gurley*, 27 F.3d at 553. Specifically, Dr. Newman explains "a POSITA would understand that Holzmann discourages per-server or per-capsule duplication by labeling it "wasteful," while Sapuntzakis embraces individualized, session-scoped capsules with host-local caching and WAN-migration optimizations. EX1007 ¶¶0009–0010; EX1005 §§4.1–4.4." EX2014 ¶106. As a result, on this record, the evidence demonstrates that Holzmann and Sapuntzakis pursue divergent approaches that would have dissuaded a person of ordinary skill from combining them. Because both references teach away from the hybrid proposed by Petitioner, there is no reasoned motivation to combine, and the obviousness theory fails.

### 3. Architectural mismatch changes the principle of operation and risks inoperability

Even where references are combinable, obviousness fails if the proposed modification "renders the device inoperable for its intended purpose" or changes its "principle of operation." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1326 (Fed. Cir. 2009); *In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984). Holzmann's cache lives at a central SSD appliance, keyed to a single shared OS image and controlled through per-server validity, lock, and server-ID semantics (see EX1007 Figs. 4–5). Sapuntzakis's runtime I/O path, by contrast, depends on a host-scoped shadow-COW mechanism where "the latest COW disk is always local" and reads of remote immutable ancestors are cached per host for reuse "for multiple capsules" on that host (EX1005 Fig. 3; §4.3). Relocating the cache from each compute server's shadow COW to a central SAN-resident OS-cache would upend that path, forcing new cross-machine locking, coherency, and trust semantics that neither reference teaches. The Board should view this not as a "predictable variation," *KSR*, 550 U.S. at 417, but as changing fundamental aspects of the system: how reads are satisfied, how writes are controlled, and how reuse is achieved—thereby altering the capsule system's principle of operation.

A valid reason to combine must come from the evidence, not from ipse dixit or hindsight. *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380–81 (Fed. Cir.

2016). Sapuntzakis already claims to solve the very reuse and bandwidth problems Petitioner invokes: at runtime via host-local shadow COW caches and across migrations via ballooning and hashed-copy (HCP) to avoid retransmitting blocks that exist at the destination (EX1005 §§4.1, 4.3, 4.4; Figs. 3, 6, 8). That design leaves no "gap" that would have directed a POSITA to import Holzmann's central, multi-boot OS cache. Nor may "common sense" fill in a major missing element or rationale. *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1363 (Fed. Cir. 2016) (warning against using common sense to "supply a limitation that was admittedly missing from the prior art").

On this record, invoking generalities about caching cannot substitute for a concrete, evidence-based reason a POSITA would have re-architected Sapuntzakis's per-host shadow-COW model into Holzmann's centralized, cross-server boot cache. Further, Dr. Newman explains:

> "the proposed modification changes how reads are satisfied, how writes are controlled, and how reuse is achieved. It replaces Sapuntzakis's host-centric "immutable-upstream COW + per-host shadow" model with Holzmann's appliance-centric, lock-mediated OS cache. That is a change in principle of operation, not a predictable variation. And because Sapuntzakis already addresses reuse and bandwidth with ballooning, demand paging, and HCP (EX1005 §§4.1, 4.3, 4.4; Figs. 3, 6, 8), there is no evidence-based "gap" that would have directed a POSITA to re-architect the system into Holzmann's central, cross-server boot cache."
> EX2014 ¶112

Therefore, Petitioner's theory does not identify a mere "predictable variation" but instead proposes a wholesale re-architecture that would alter Sapuntzakis's fundamental principle of operation. Because Holzmann's centralized, lock-mediated cache would displace Sapuntzakis's host-local shadow COW model, undermine its runtime and migration strategies, and provide no incremental benefit over the mechanisms already disclosed, the combination would render the system inoperable for its intended purpose. Under *DePuy Spine, In re Gordon,* and *Arendi*, such a reconstruction cannot support a finding of obviousness, and the Board should reject Petitioner's ground.

**4. No reasonable expectation of success**

Obviousness also requires a reasonable expectation of success. *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367–68 (Fed. Cir. 2016). Here, success would have required reconciling Holzmann's per-server cache-coherency structures (e.g., data-tag, validity, lock, and server-ID fields in Fig. 5) with Sapuntzakis's layered, immutable-ancestor COW hierarchy and host-local shadow caches (EX1005 Fig. 3; §4.3). Neither reference teaches or suggests such a coherency protocol, and the record shows Sapuntzakis's correctness and responsiveness hinge on the host-local nature of the shadow COW and on the ephemeral capsule lifecycle. A POSITA would not have had any expectation that

transplanting a central, multi-server boot cache into that model would preserve the performance and isolation properties Sapuntzakis seeks.

Specifically, as Dr. Newman explains, "because neither reference teaches the missing coherence, placement, and lifecycle mechanisms needed to make such a transplant work, and because Sapuntzakis already solves reuse and bandwidth at the host via shadow COW caching and WAN-oriented ballooning/HCP (EX1005 §§4.1, 4.3, 4.4; Fig. 3), a POSITA would lack a sound, evidence-based expectation that importing Holzmann's centralized, multi-server boot cache would succeed." EX2014 ¶118

Further, Holzmann's Figures 4–5, illustrate an appliance-resident cache segmented by server, used "as additional servers … are booted," with metadata controlling reuse and write exclusion to protect a single shared OS image. Sapuntzakis's Figure 3 shows "shadow COW disks (one per compute server)" and states that cached blocks "can be re-used for multiple capsules" on that host, while the university example in §4.2 states that the capsule "is destroyed when he logs out." These concrete disclosures demonstrate that the two systems aim at different goals with different cache loci and scopes, reinforcing the *KSR/Kahn* requirement for an evidence-based rationale and supporting the "teaching away" and "principle-of-operation" doctrines discussed above.

### 5. The references pursue incompatible objectives and therefore there is no motivation to combine

Under *KSR* and *Kahn*, Petitioner needed a record-supported reason to merge Holzmann's centralized, persistent, single-image boot cache with Sapuntzakis's session-scoped, host-local capsule system. The evidence shows the opposite: the references pursue incompatible objectives. Sapuntzakis explicitly disposes of capsule state at logout and relies on per-host shadow COW and transfer-time hashing/ballooning rather than any cross-node boot cache, and Holzmann's cache mechanics presuppose a single shared OS image coordinated across servers. On this record, the combination would change Sapuntzakis's principle of operation and lacks both a motivation to combine and a reasonable expectation of success; it also runs afoul of teaching-away principles.

## B. Holzmann's cache does not render claim 1 obvious under 35 U.S.C. §103

Claim 1 of the challenged patent recites a system organized around a root/leaf image model and a cache "configured to cache blocks of said root image previously accessed by at least one compute node," in combination with plural second storage units holding per-node leaf images that contain only additional and changed blocks and "do not include blocks of said root image that are unchanged." Read together, these limitations place the cache in a context where unmodified, read-only root content is shared and reused across nodes, while node-specific modifications are

captured separately in leaf images. See claim 1; see also Figs. 2–4 (showing block-level root/leaf composition and cache population/eviction).

The Petitioner does not allege that Sapuntzakis teaches the claimed cache. (see Petition, 30). Instead, Petitioner alleges that Holzmann teaches the feature. However, Holzmann does not; Holzman teaches a central, SSD-resident operating-system cache designed to let many servers boot from a single OS image. The cache is carved out of the SSD's volatile memory and explicitly partitioned per server ("Cache Space for First Server 401," "Cache Space for Second Server 402" in Fig. 4), with each cache line tracked by per-line metadata—Data Tag 502, Validity Bit 503, Lock Bit 504, and Server No. Data 505—shown in Fig. 5. The control logic checks this cache on reads during boot and operation and even handles write requests to cached OS data by consulting the lock and server-ID bits, potentially returning an error if another server owns the line. See EX1007, Abstract; Background ¶¶[0009]–[0010]; Figs. 4–5; and ¶[0021], [0036] (e.g., "control module 103… allocates a sub-portion of the memory… as a cache," and "returns an error condition" when the lock/server-number ownership check fails).

Those architectural and semantic differences matter for §103. In the challenged patent, the cache is expressly tied to root-image reuse across nodes within a block-level root/leaf system that separates reads from writes: reads may hit the cache of root blocks, whereas writes go to the per-node leaf, and unchanged root

blocks are never duplicated in the leaves. See EX1001; Figs. 2–4 (root/leaf/cache behavior and LRU-style eviction). Holzmann neither provides per-node leaf images nor meets the claim's negative limitation on leaf content; indeed, Holzmann's stated objective is to avoid maintaining separate OS images per server by relying on a single OS image with a centrally managed cache, and its cache arbitrates reads and writes to cached OS data at the line level with server-specific metadata. See EX1007 ¶¶[0009]–[0010]; Figs. 4–5. These are different caching problems solved in different places with different rules, and Holzmann does not teach or suggest the claimed arrangement in which node-specific changes reside in separate leaf images and the cache is configured to store previously accessed root-image blocks for later reuse.

Because Holzmann's cache serves a different purpose, sits in a different place, and follows different semantics—namely, an SSD-internal, OS-image, per-server, read-and-write cache with lock/validity ownership checks—it does not disclose or suggest the claim 1 cache that operates within a root/leaf image system and is configured to cache root-image blocks for cross-node reuse while excluding unchanged root content from node-specific storage. On this record, Holzmann's disclosure does not render claim 1 obvious under §103.

### C. Claim 7 and the Dependent Claims Are Patentable For The Same Reasons As Claim 1

Independent claim 7 rises and falls with claim 1. It recites the same operative limitations in method form, including storing blocks of a shared root image, maintaining per-node leaf images that include only additional or changed blocks and do not include unchanged root blocks, and using a cache configured to cache blocks of the root image previously accessed so that later accesses benefit from prior reads. Petitioner's Ground 1 relies on the same Sapuntzakis/Holzmann combination and the same maps for claim 7 as for claim 1, but—just as with claim 1—those references do not teach the claimed cache in the required root/leaf architecture, nor do they satisfy the negative limitation on the leaf images. Holzmann's appliance-resident, OS-image cache is not a cache "of the root image" operating alongside per-node leaf images, and Sapuntzakis's capsule and shadow-COW scheme is per-host and per-session rather than a cluster-level root/leaf system. For the reasons set forth above for claim 1, the asserted combination likewise fails to disclose or render obvious the method steps of claim 7 that implement the same architecture and caching behavior. Accordingly, Ground 1 does not demonstrate a reasonable likelihood of prevailing on claim 7.

The same conclusion follows for the dependent claims. Each dependent claim incorporates the full set of limitations from its respective base claim, and Petitioner's

failure to show that the base limitations are taught or suggested is dispositive. At a minimum, claims depending from claim 1 (e.g., claims 2–6) and those depending from claim 7 (e.g., claims 8–13) are patentable by virtue of that dependency. Moreover, several dependent claims add further narrowing features beyond the already-missing base limitations (such as specific cache management behavior, read-only root storage, or explicit block-level composition details), which the Petition likewise does not substantively map to the art. On this record, Ground 1 should be denied as to claim 7 and all claims depending from claims 1 or 7.

## VI. Ground 2 Fails: Neither Sapuntzakis nor Federwisch Discloses or Suggests the Claimed Union Block Devices or the Cross-Node Root-Image Indexing Required by Claim 14

In Ground 2, Petitioner contends that claims 14–27 are obvious in view of Sapuntzakis and Federwisch. That theory, however, fails for two independent reasons.

First, the asserted combination does not teach or suggest the claimed plurality of union block devices configured to create each compute node's file system by merging a shared, root image with node-specific leaf images. Sapuntzakis discloses transient capsule disks and per-host COW layering, while Federwisch describes asynchronous snapshot replication between storage systems; neither reference discloses or motivates the in-path union block devices required by the claims.

Second, the combination fails to provide the claimed indexing functionality. Claim 14 requires that one compute node index the root image and provide those indexing results to another node, consistent with the specification's index-once/share model. Sapuntzakis never performs cross-node indexing of a shared root image, and Federwisch's differencing "index" is an internal input for replication bookkeeping, not an index that is ever distributed to other compute nodes. Attempting to graft these teachings into the claimed architecture would require wholesale re-engineering that neither reference suggests, and Petitioner offers no reasoned explanation for why a skilled artisan would have pursued such a path.

### A. Sapuntzakis and Federwisch do not teach or suggest the claimed "plurality of union block devices … configured to create said file systems by merging" a shared root image with respective leaf images

Claim 14 requires, among other things, "a plurality of union block devices … configured to interface between [the] compute nodes and [first and second storage units] to distribute said file systems to said compute nodes," where "said union block devices are configured to create said file systems by merging the blocks of said root image … with the blocks of respective leaf images." (EX1001, Claim 14). The patent further explains that the union block devices operate as low-level, block-layer drivers beneath the file system, "concerned merely with the blocks of data themselves," thereby presenting each node with its own merged, runtime file system

that unifies a shared, read-only root image with that node's private leaf image. The merging "occurs at an operational level between [the] file systems of the compute nodes and [the] storage units," i.e., in the I/O path of each node. EX1001, 8:15-18.

Neither Sapuntzakis nor Federwisch discloses or suggests this architecture. Sapuntzakis describes per-capsule copy-on-write ("COW") disk hierarchies used to migrate a self-contained virtual machine "capsule." In Sapuntzakis, reads are performed by searching the most-recent COW layer and then ancestors "until the required block is found," and the OS inside the capsule "see[s] a normal flat disk." EX1005 §4.2. That COW layering is internal to a single capsule image; it is not a union device deployed across a plurality of independent compute nodes to create their file systems by merging a common root with respective leaves. Sapuntzakis's own usage model reinforces the point: a user logs in, derives an individual capsule, and that capsule "migrates … and is destroyed when he logs out," which underscores a transient, per-capsule store—not a shared root image that is merged with respective leaf images for many different nodes via a "plurality of union block devices." EX1005 §4.2.

Federwisch is even further afield. It addresses "remote asynchronous replication or mirroring of changes" between snapshots by scanning two versions of a source snapshot to identify changed blocks and transmitting those changes to build a new, replicated destination snapshot. EX1008, ¶[0014] The described system

traverses snapshot trees, bypasses unchanged pointers, and ships only changed data in a file-system-independent stream; at the destination, the replica directory structure is rebuilt, and the destination file system is "exported read-only" to users so that "only the replicator can alter the state of the replica file system." EX1008, ¶[0015]. This is offline snapshot replication between a source and a destination filer, not a union block device that sits beneath each compute node's file system (functioning at the "block" layer) and merges a shared root image with respective leaf images to "create" a node's runtime file system.

As Dr. Newman explains "Technically, the gulf is decisive." EX2014 ¶122. Claim 14 calls for a block-layer *union device* for each node that merges a shared root image and respective leaf images, producing the node's file system view. Union *block* devices are "low-level drivers" that operate below the file system (at the block layer) and make the system "operating system-independent," which is how the claimed merging occurs "at an operational level between [each node's] file system and the storage units." By contrast, Federwisch's "snapshot mirroring application" communicates directly with networking and snapshot components to construct a *new snapshot image* on the destination, not to present a merged, per-node runtime file system. EX1005, ¶[0055].

The references also fail to disclose the "plurality of union block devices corresponding to said compute nodes" aspect, which means there is one union block

device per compute node. Sapuntzakis never deploys a union device per node; it manages layered capsule disks opaque to the guest OS and visible as a single flat disk inside an individual capsule. That is a per-capsule storage implementation detail, not a per-node union device that exposes a merged view derived from a shared root and respective leaves. Federwisch, for its part, describes two storage controllers (source and destination "filers") and a replication pipeline; it does not expose any union block device to client nodes, nor does it create respective leaf images that are merged with a shared root image to form each node's file system. See EX1008, ¶[0041]-[0043].

Finally, substituting or grafting Federwisch's snapshot-replication logic into Sapuntzakis would not yield the claimed structure or function. To meet Claim 14, a person of ordinary skill would have to re-architect Federwisch's out-of-band, asynchronous snapshot differencing engine into an in-band, block-layer union device instantiated *for each compute node*, and then supply a shared, root image with distinct per-node leaves that the device would merge on every I/O. Nothing in Federwisch suggests such a transformation; indeed, its destination is expressly "read-only" to users during replication, underscoring that the design is to manufacture replica snapshots, not to serve merged, mutable per-node file systems at runtime. In short, Sapuntzakis and Federwisch address different problems with different mechanisms—virtual-machine COW layering for capsule migration versus

asynchronous snapshot mirroring for disaster recovery—and neither alone nor in combination teaches or suggests the claimed plurality of union block devices configured to create file systems for compute nodes by merging a shared root image with respective leaf images.

Because the Petition's Ground 2 theory lacks a disclosure of the required union block devices and their specific block-level merging function, and because the proposed combination would demand wholesale re-engineering that the references neither contemplate nor motivate, Petitioner has not shown that Claim 14 would have been obvious over Sapuntzakis and Federwisch.

### B. The Sapuntzakis/Federwisch combination does not disclose or motivate the "indexing" requirement in claim 14

Claim 14 targets a specific cluster-level function: one compute node indexes the shared, root image and provides those indexing results to another node, which results in peers only needing to process their smaller, node-specific leaf portions (see EX1001, Fig. 5 and accompanying text). Petitioner's Ground 1 does not meet that requirement. Sapuntzakis describes per-host shadow COW caching and migration optimizations like ballooning, demand paging, and hash-based copy that operate within a transient, session-scoped capsule lifecycle, not cross-node indexing of a common root image provided to peers (see EX1005 §§4.2–4.4). Federwisch addresses snapshot differencing and replication between storage systems and

produces change lists for a destination replica, not an index created by one compute node and disseminated to others for filesystem operations (see EX1008, Abstract; Summary; Fig. 10). The combination supplies no record-supported rationale or mechanism to transform these teachings into the claimed cross-node indexing flow, and any attempt to equate Federwisch's logical file-block index with the claimed "indexing results" misreads both the reference and the claim. The sections that follow outline the claim's indexing requirement and its specification support, show why neither Sapuntzakis nor Federwisch teaches or suggests it, address Petitioner's anticipated misreading of "index," and explain why Ground 2 cannot render claim 14 obvious.

**1. Claimed indexing, at root-image scope, produced by one compute node and provided to another.**

Claim 14 requires that, in a system distributing per-node file systems by block-level merging of a shared, root image with respective leaf images, "at least one of said compute nodes is configured to index said root image and provide the indexing results to another of said compute nodes." The specification explains that because the root image is common and typically immutable, a single node can index the root portion once and share those results with other nodes, so those other nodes only need to index their much smaller leaf portions (see, e.g., EX1001, Fig. 5 and

accompanying text describing that operations performed on the root, such as indexing, need only be done once and the results can then be shared).

### 2. Sapuntzakis does not teach the claimed indexing

Sapuntzakis describes transient "capsules" that are derived, used, and explicitly "destroyed when [the user] logs out," and implements performance mechanisms aimed at capsule mobility: per-host shadow COW disks (one per compute server) for local reuse of remote blocks at runtime, ballooning to reduce memory to transfer, demand paging of capsule disks, and hash-based copy (HCP) to avoid retransmitting blocks that already exist at the destination. None of these mechanisms is "indexing" a shared, root image and providing the results to other compute nodes; rather, they are (i) per-host caching/reuse during a capsule's execution and (ii) migration-time deduplication. See EX1005, §4.2 ("Capsule Hierarchies") on the derive-use-destroy lifecycle (and the university example), §4.3 and Fig. 3 on per-host shadow COW disks and demand paging, and §4.4 on HCP.

Federwisch likewise does not disclose the claimed cross-node indexing flow. Federwisch is a snapshot differencing and replication system between a source and a destination file system. It scans a logical file-block index for each of two snapshots of the same source file system to detect changed volume block numbers, then streams only the changes to the destination, where an inode map is used to rebuild the replica (with a "purgatory" directory during reconciliation). That is replication

bookkeeping between storage systems—not creation of an index of a shared root image by one compute node for other compute nodes to consume. See EX1008 Abstract; Fig. 10; discussion of directory stage 1042, inode map 1400/1500, and purgatory directory 1050).

The proposed combination provides no reasoned path to the claimed cross-node sharing of indexing results. Even if Petitioner were to label Federwisch's "scanner" an "indexer," what it produces is a change list for replication between a source snapshot and a destination snapshot—not an index of a common root image created once by a compute node and then provided to other compute nodes. That function is absent from Federwisch's replication pipeline and from Sapuntzakis's capsule-mobility mechanisms. Sapuntzakis's optimizations already address reuse and bandwidth concerns within its own model: host-local shadow COW caches for runtime I/O, and HCP plus ballooning across migrations—none of which suggests or motivates cluster-level, cross-node reuse of a root-image index. See EX1005 §4.3 (shadow COW disks) and §4.4 (HCP), and EX1008 (Abstract; Summary; Fig. 10 and associated description of the replication stages).

**3. Misreading of "index."**

Petitioner may assert that Federwisch's "logical file-block index" satisfies "indexing." It does not. In Federwisch, the "index" is input to a differencing algorithm that yields a snapshot-to-snapshot delta stream for replication; it is not an

output "indexing result" that one compute node creates for other compute nodes. By contrast, claim 14 requires indexing the shared root image and providing these indexing results to another compute node, exactly as the specification contemplates in its index-once/share model for the root. Federwisch's scanner and inode-worker flow (e.g., EX1008, Figs. 8–9; Fig. 10) never creates nor disseminates such a reusable root-image index to peers.

#### 4. The Sapuntzakis/Federwisch Combination Does Not Teach or Suggest Cross-Node Root-Image Indexing as Required by Claim 14.

Because Sapuntzakis discloses capsule-mobility techniques (shadow COW, ballooning, demand paging, HCP) rather than cross-node indexing of a shared root image, and because Federwisch discloses snapshot differencing and replication between storage systems rather than compute-node-level indexing and sharing within a root/leaf union-block architecture, the combination does not teach or suggest the claim-14 limitation that "at least one … compute node … index[es] said root image and provide[s] the indexing results to another … compute node."

### C. Claims 19 and 23 (and their dependents) stand for the same reasons as Claim 14

Independent claims 19 and 23 recite the same root/leaf architecture and cross-node index-once/share concept as claim 14, expressed respectively in method and computer-readable-medium form. Like claim 14, they require distributing per-node

file systems formed by merging a shared root image with per-node leaf images and further require that at least one compute node indexes the root image and provides those indexing results to another compute node. The Petition's combination of Sapuntzakis and Federwisch fails here for the same reasons it fails for claim 14: Sapuntzakis is a session-scoped capsule-migration system with host-local shadow COW caching and no cross-node indexing of a shared root; Federwisch is a snapshot differencing/replication workflow that generates change streams between two snapshots, not a live union or a reusable root-image index shared across compute nodes. Nothing in either reference teaches or motivates the claimed root/leaf merge coupled with root-indexing and sharing among nodes. Accordingly, Ground 2 does not demonstrate a reasonable likelihood of prevailing on claims 19 and 23.

The same conclusion follows for the dependent claims. Claims 20–22 and 24–27 incorporate all limitations of their respective independent claims. Because Petitioner has not shown that the base limitations of claim 14 (and their method/CRM counterparts in claims 19 and 23) are taught or suggested, the dependent claims are at least patentable by virtue of that dependency. Several dependents add additional narrowing features beyond those already missing from the prior art, which provides an independent basis for patentability as well.

## VII. Ground 3 Fails: Neither Birse nor Holzmann Discloses the Claimed Root/Leaf Cache Architecture, and the References Pull in Opposite Directions

In Ground 3, Petitioner alleges that claims 1–13 are obvious in view of Birse and Holzmann. That theory is unsustainable. Claim 1 is expressly tied to a root/leaf architecture in which a shared root image is stored in a first storage unit, per-node leaf images are stored in plural second storage units, and a cache is configured to store previously accessed blocks of the root image for reuse across compute nodes. Neither Birse nor Holzmann discloses that architecture, and bridging the gap between them would require wholesale re-engineering that the art does not suggest or motivate. Holzmann describes an appliance-resident, per-server operating system cache tied to a single shared OS image, complete with line-level metadata and write-arbitration mechanisms. Birse, by contrast, implements a "SplitOS" model that proliferates per-client volumes, including full or sparse shadows, but never teaches caching of root image blocks for cross-node reuse. Attempting to retrofit these disparate teachings into the claimed root/leaf model would require relocating and rewriting the caching function, changing its scope, and discarding Holzmann's write-arbitration logic—all changes that alter the references' principles of operation.

Moreover, the two references point in opposite directions on the central design choice at issue. Holzmann is motivated by the perceived waste of per-server images and expressly seeks to eliminate them in favor of a single shared OS image with a

centrally partitioned cache. Birse, on the other hand, embraces per-client shadow volumes to preserve modifications on a per-user basis. A person of ordinary skill in the art would have had no record-based reason to combine a system that eliminates per-node artifacts with a system that proliferates them.

### A. Holzmann and Birse Do Not Teach the Claimed Cache Within a Root/Leaf Architecture, and Petitioner's Theory Requires Wholesale Re-Engineering

Claim 1 ties the cache to a specific root/leaf architecture. The claim requires a first storage unit that stores blocks of a root image, plural second storage units that store leaf images of respective compute nodes (referred to herein as per node leaf images) which "include only additional data blocks and changes" and "do not include blocks of said root image that are unchanged," and "a cache configured to cache blocks of said root image previously accessed by at least one … compute node."

As Dr. Newman explains "Holzmann teaches a different thing in a different place for a different purpose." EX2014 ¶128. For example, Holzmann "boot[s] multiple servers … from a single operating system image" by carving an OS cache out of the SSD's memory module and then partitioning that cache per server, complete with per line metadata — data tag, validity bit, lock bit, and server number data — to coordinate access (EX1007, ¶[0010], Fig. 4, i.e., labels "Operating System Data 400," "Cache Space for First Server 401," "Cache Space for Second Server

402"; Fig. 5 on p. 6 shows the per line fields). The detailed description of Holzmann explains that read hits from the cache and, critically, write behavior: upon an OS write request, the control module checks the lock and server number fields and may return an error if a different server owns the line; otherwise it writes into the cache and sets the lock (see EX1007, ¶[0034]-[0036]). Holzmann is therefore an appliance resident, per server coordinated OS image cache that arbitrates reads and writes at cache line granularity. It is not a cache that sits alongside per node leaf images and that is "configured to cache blocks of [a] root image" which are then fused with per node leaf blocks.

Birse likewise lacks the claimed cache and the claimed caching context. Birse's "SplitOS" provides a read only core system volume and a read write user system volume on the server, with a per client shadow system volume that stores client writes; reads go to the shadow if modified, otherwise to the system volume (see EX1006, Figs. 4–5; Fig. 9). One disclosed shadow embodiment is a complete copy of the system volume (see EX1006, Fig. 10), and another is a sparse, banded shadow with a band table (see EX1006, Fig. 11). None of this is a cache of root image blocks; it is a redirection scheme between core/user/shadow volumes, with the "shadow" holding modifications. Birse contains no disclosure of caching previously accessed root image blocks for cross node reuse, and nothing that utilizes a cache as recited in claim 1.

Bridging the gap from these references to the claim would require re architecting, not a predictable substitution of "a cache" for "a cache." As explained by Dr. Newman:

> … to meet the claim from Birse and Holzmann, a person of ordinary skill would have to: (i) introduce the patent's root/leaf composition model in which unchanged root blocks never appear in the leaf and writes go only to the leaf; (ii) relocate and re scope Holzmann's appliance cache so that it caches only blocks of the shared root image, not generic OS data, and so that it is consumed through a block level merge with each node's leaf beneath the file system; and (iii) strip out Holzmann's per line write semantics and server ownership locking — which exist precisely because Holzmann's cache is used as a read and write appliance cache for a single OS image — to conform to the claim's root read/leaf write division of responsibility. EX2014 ¶131

Neither reference teaches these transformations, and nothing in Birse suggests adding a root image block cache; nothing in Holzmann suggests reworking its SSD resident, per server, write arbitrated OS cache into a root only cache that operates inside a root/leaf union at the block layer. On this record, the Petitioner's theory depends on retrofitting both references to create the claimed cache in the claimed architectural context, which the art does not disclose or motivate.

As a result, Holzmann's per server, appliance resident OS image cache, with explicit write handling and lock/server ID ownership, is not the claimed cache of root image blocks operating within a root/leaf system; Birse provides no such cache

at all. Implementing claim 1 from Birse and Holzmann would require re locating, re scoping, and re writing the caching model and the I/O path entirely to fit the patent's root read/leaf write, block level merge architecture. This would be a wholesale re architecture that the cited references neither teach nor suggest.

### B. No motivation to combine: Birse's per-node images run counter to Holzmann's single-image model

Claim 1 is built around a root/leaf architecture in which a first storage unit stores blocks of a root image, plural second storage units store per-node leaf images that "include only additional data blocks and changes" and "do not include blocks of said root image that are unchanged," and a cache is "configured to cache blocks of said root image previously accessed by at least one … compute node." This arrangement affirmatively requires per-node leaf images persisting with a shared root.

Holzmann points in precisely the opposite direction. Its entire premise is to eliminate per-server OS images by booting many servers from a single operating system image kept on an SSD, with an SSD-resident cache to accelerate boot and operation. The Abstract and Background state the problem with "a separate operating system image … for each server" as "wasteful" and describe the "great need" for a system that boots multiple servers from one image. Figures 4–5 implement that model: a central OS image with per-server cache space and line-level

metadata (data tag, validity bit, lock bit, server-number data) to coordinate access, all keyed to a single shared image.

Birse is a per-client image system. Its "SplitOS" uses a read-only core system volume and a read-write user system volume, and for each client creates a shadow system volume to capture the client's modifications. Figure 9 shows core 922, user 924, and per-client shadow 930. See EX1006, 15:1-7. In one embodiment, the shadow is "a complete copy of the system volume … with any user-modifications incorporated therein" (Figure 10), and in another the shadow is a sparse, banded file maintained via a band table (Figure 11). EX1006, 15:10-17. In both cases, Birse's solution is to proliferate per-client volumes so that each client has its own persistent store of changes.

Those disclosures pull a person of ordinary skill in opposite directions on the core design choice at issue. Holzmann tells the reader that keeping per-server images is undesirable and should be replaced by a single, centrally managed image with a shared cache. Birse, by contrast, embraces per-client artifacts (including full copies in one embodiment) as the way to manage client changes. As Dr. Newman explains:

> …a "POSITA starting from Holzmann's model would have no record-based reason to re-introduce per-node, persistent image artifacts—precisely what claim 1 requires for the leaf images—because Holzmann's stated objective is to avoid them. Conversely, a skilled artisan starting from Birse's per-client shadow scheme would not be steered toward Holzmann's

> single-image boot appliance with a centrally partitioned OS cache.
> EX2014, ¶132

Therefore, the combination therefore lacks the *articulated reasoning with rational underpinning* that obviousness demands, and it teaches away from the path Petitioner proposes. See *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418–22 (2007) (requiring reasoned rationale to combine); *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994) (teaching away when the art criticizes the direction of the proposed modification).

Implementing claim 1 from these references would also change their principles of operation rather than yield a predictable variant. To reach the claim's architecture, one would have to take Holzmann's single-image, centrally cached boot system and re-introduce per-node images that persist with the shared root—precisely the approach Holzmann seeks to avoid—and then further adapt it to the patent's root/leaf division in which unchanged root blocks never appear in the leafs. Birse's per-client shadows are not disclosed as deltas against a cluster-wide root image shared across nodes, and Holzmann discloses no per-node leaves at all. Reworking either reference to accommodate the other's opposite premise is not a routine, predictable substitution; it is a retrofit that undermines the objectives each reference identifies. See *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567

F.3d 1314, 1326 (Fed. Cir. 2009) (modification that changes a reference's principle of operation is not obvious).

On this record, there is no motivation to combine Birse and Holzmann to arrive at claim 1's root image and per-node leaf images model, and the references pull in opposite directions with respect to per-node images versus a single shared image. The Petition therefore fails to show that a skilled artisan would have combined them to achieve the claimed configuration.

### C. Claim 7 and the Dependent Claims Are Patentable For The Same Reasons As Claim 1

Claim 7 mirrors claim 1 in method form: a shared root image, per-node leaf images that exclude unchanged root blocks, and a cache that stores root-image blocks for reuse. Birse's shadows fail the negative limitation, and Holzmann's SSD cache is not a root-image cache in a root/leaf system. The same gaps that defeat Ground 3 for claim 1 defeat it for claim 7.

The combination also lacks motivation: Holzmann rejects per-node images in favor of a single OS image, while Birse embraces per-client shadows (even full copies or banded stores). Reworking them into the claimed method would require a redesign, not a predictable tweak.

All dependent claims rise with their bases claims and, in many cases, add further narrowing features that Petitioner does not map. Ground 3 therefore fails for claim 7 and for all claims depending from claims 1 or 7.

## VIII. Ground 4 Fails: Birse and Federwisch Do Not Disclose the Claimed Leaf Images, the Index-Once/Share Requirement, or Provide Any Motivation to Combine Without Changing Their Principles of Operation

In Ground 4, Petitioner contends that claims 14–27 are obvious in view of Birse and Federwisch. The following sections explain why that theory is not supported by the record. Section A addresses the claim's negative limitation on the leaf images, showing that Birse's "shadow" embodiments either include unchanged system data or are band-granular in a way that does not exclude unchanged root blocks, and that Federwisch does not cure this defect. Section B turns to the indexing requirement, which calls for one compute node to index the root image and provide those results to other nodes, and explains why neither Birse nor Federwisch discloses or suggests this index-once/share-across-nodes functionality. Finally, Section C considers motivation to combine, showing that Birse and Federwisch solve fundamentally different problems in fundamentally different ways and that transforming them into the claimed root/leaf and index/share system would change their principles of operation rather than yield a predictable combination.

### A. Birse does not meet claim 14's negative limitation on the per-node "leaf images," and Federwisch does not cure the defect

Claim 14 requires "leaf images of respective compute nodes" that "compris[e] only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of said root image," and that "do not include blocks of said root image that are unchanged by respective compute nodes." The claim then requires union block devices that "create said file systems by merging the blocks of said root image … with the blocks of respective leaf images."

Birse's "shadow system volume" is not the claimed leaf. Birse discloses two different shadow embodiments: (i) a complete copy of the system volume with user modifications incorporated (its Fig. 10), and (ii) a sparse, banded shadow written in band increments (e.g., 128K bands) and tracked by a band table (see EX1006, Fig. 11). In the first embodiment, the shadow plainly contains unchanged system data. In the second, the band-granularity storage can and will store unchanged blocks within a modified band, which again fails the claim's block-precise exclusion of all unchanged root blocks from the leaf.

The problem is more fundamental: Birse's shadow "shadows the user system volume 924," not a cluster-wide root image. Reads are served from the system volume if unmodified and from the shadow otherwise, with writes redirected to the

shadow, but the "split OS" model is core 922 / user 924 / shadow 930 rather than the patent's root image and per-node leaves where the leaves are deltas strictly against the root. Birse's diagrams and text make that clear (Fig. 9; Figs. 4–5 read/write redirection).

Federwisch does not fix this and is directed to a fundamentally different problem. It addresses remote asynchronous replication between snapshots by scanning the logical file block index to detect changes and transmitting those changes to a destination snapshot, with inode mapping and even a temporary "purgatory" directory during rebuild. It is not a runtime, per-node union of a root and a node's delta, and it says nothing about constructing per-node leaf images that categorically exclude unchanged root blocks.

Because Birse's "shadow" either includes unchanged blocks (complete copy) or stores data at coarse band granularity, and because its delta is anchored to the user volume rather than to a shared root image, the combination with Federwisch does not disclose the claim-14 leaf limitation "as a whole."

### B. The references do not disclose or suggest claim 14's index once, share across nodes requirement

Claim 14 further requires that "at least one … compute node is configured to index said root image and provide the indexing results to another of said compute nodes." The method claims (19–21) reinforce that the root is indexed once, the

results are stored/provided for other nodes, and re-indexing proceeds by combining new leaf results with the previously shared root index. Neither reference, alone nor in combination, meets this limitation.

Birse never teaches any cross-node indexing of a shared root image, let alone providing indexing results from one client to another. Its discussion centers on net-boot, server-side volumes, and client-side redirection of reads and writes; the "block device driver" routes operations between the system and shadow volumes, but Birse does not perform the claimed root indexing or share those results with different clients. (see EX1006, Figs. 3–5; associated text.)

Federwisch's "scanner" is also not the claimed index-once, share mechanism. The scanner walks each snapshot's logical block index to identify changed LBNs between two snapshots and streams the differences to a remote replica. That is a replication primitive, not a cluster optimization in which one compute node indexes a shared root image and provides those indexing results to other compute nodes so they can avoid redundant work. Federwisch's outputs are change packets and inode/directory mappings used to update a replica, not reusable index artifacts for clients to mount or query. (EX1008, Abstract; "scanner," "inode picker," and replica rebuild with inode map and "purgatory").

On this record, Petitioner has not identified where Birse or Federwisch describes a compute node indexing a shared root image and providing those results

to another compute node as claim 14 requires. The index-and-share feature is a core element of the challenged claims and is missing from the cited art.

### C. No motivation to combine; the art addresses opposite problems and would require a change in principle of operation

Birse solves net-boot administration by centralizing a "split OS" and redirecting client reads/writes to a per-client shadow; it even contemplates a full copy shadow or a banded sparse variant and describes read/write routing between core/user/shadow volumes. (see EX1006, Fig. 9; Figs. 4–5; Figs. 10–11).

Federwisch, by contrast, is a snapshot differencing and replication system: it scans two versions of a source snapshot, packages changed blocks, and updates a destination—with features such as qtrees, inode maps, and a purgatory directory to manage replaced inodes during rebuild. (see EX1008, Abstract; ¶[0065], ¶[0086], ¶[0106]).

Nothing in Birse suggests replacing its per-client shadowing with Federwisch's replication pipeline, and nothing in Federwisch suggests deploying its snapshot scanner and replica updater inline in a live, per-client union of a root and leaf—much less to implement claim 14's root/leaf merge with leafs that exclude all unchanged root blocks and an index-and-share capability across compute nodes. Achieving the claim from Birse and Federwisch would require re-architecting both systems: recasting Federwisch's offline snapshot differencing as an online union

mechanism and reworking Birse's shadow model into the patent's root and per-node leaf architecture with the claim's indexing-once-and-sharing behavior. That is not a "predictable substitution"; it is a change in principle of operation lacking any articulated rationale. See *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418–22 (2007) (requiring "articulated reasoning with some rational underpinning"); *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1326 (Fed. Cir. 2009) (modification that changes a reference's principle of operation is not obvious).

### D. Claims 19 and 23 (and their dependents) stand for the same reasons as Claim 14

Independent claims 19 (method) and 23 (computer-readable medium) recite the same operative architecture as claim 14 in different statutory forms. Like claim 14, they require distributing per-node file systems formed by merging a shared root image with per-node leaf images that exclude unchanged root blocks, and they further require that at least one compute node indexes the root image and provides those indexing results to another compute node. Petitioner's Birse-plus-Federwisch mapping fails here for the same reasons it fails for claim 14. Birse's "shadow" volumes either copy unchanged system content or store data at coarse band granularity, and in all events are deltas against a user system volume rather than against a cluster-wide shared root; Birse is a read/write-redirection scheme, not a block-level root/leaf composition with leaves that categorically exclude unchanged

root blocks. Federwisch, for its part, is a snapshot differencing and replication workflow between a source and a destination; it is not an in-path union that creates a live per-node file system, and it does not teach an index-once/share model in which one compute node indexes a shared root image and provides those results to other nodes. Nothing in either reference supplies the missing limitations or a reasoned rationale to modify them to do so. Accordingly, Ground 4 does not demonstrate a reasonable likelihood of prevailing on claims 19 and 23.

The same conclusion applies to the dependent claims. Claims 20–22 and 24–27 incorporate all limitations of their respective independent claims, and Petitioner's failure to show those base limitations is dispositive. Several dependents also add further narrowing features beyond the already-missing elements, providing an independent basis for patentability. Ground 4 should therefore be denied as to claims 19–27.

## IX. Conclusion

The Petition should be denied on every ground and as to every challenged claim. Under *Phillips* and plain and ordinary meaning, Petitioner never identifies a teaching or reasoned rationale that would lead a person of ordinary skill to the claimed root-and-leaf architectures.

Ground 1 fails because Sapuntzakis's session-scoped migration with host-local shadows and Holzmann's single-image SSD appliance do not disclose a cache

of root-image blocks operating with per-node leaves that exclude unchanged root blocks, and Petitioner offers no record-supported motivation to merge these contrary designs without altering their principles of operation. Claim 7 rises and falls with claim 1, and the dependents add limitations the Petition does not meet.

Ground 2 fails because the Sapuntzakis and Federwisch pairing neither teaches union block devices that merge a shared root with per-node leaves nor the index-once and share requirement in which one node provides root-indexing results to another. Federwisch is snapshot differencing, not cross-node indexing. Claims 19 and 23 stand for the same reasons, as do the dependents.

Ground 3 fails because Birse's per-client shadows and Holzmann's centralized appliance pull in opposite directions and still do not provide the claimed root-block cache or the requirement that leaves omit unchanged root data. Claim 7 and its dependents are likewise patentable.

Ground 4 fails because Birse's shadows include unchanged data or coarse bands, and Federwisch does not cure that defect or teach index-once and share. Petitioner has not shown the missing limitations, a motivation to combine with a rational underpinning, or a reasonable expectation of success.

As a result, Petitioner has not shown the missing limitations, has not articulated a motivation to combine with a rational underpinning, and has not

demonstrated a reasonable expectation of success in achieving the claimed systems.

The Board should deny institution as to all challenged claims and all grounds.

Respectfully submitted,

Dated: August 29, 2025

By: /Brandon R. Theiss/
Brandon R. Theiss
Registration No. 70,507

*Counsel for Patent Owner*
*Intellectual Ventures II LLC*

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT

Pursuant to 37 C.F.R. §42.24(d), I certify that this **Patent Owner Preliminary Response** complies with the type-volume limits set forth in the Memorandum and 37 C.F.R. §42.24 because it contains 13,903 words, excluding the parts of the Brief that are exempted by 37 C.F.R. §42.24(a), according to the word processing system used to prepare this Brief.

Respectfully submitted,

Dated: August 29, 2025

By: /Brandon R. Theiss/
Brandon R. Theiss
Registration No. 70,507

*Counsel for Patent Owner*
*Intellectual Ventures II LLC*

## CERTIFICATE OF SERVICE

The undersigned certifies that pursuant to 37 C.F.R. §42.6(e), a copy of the foregoing **Patent Owner's Preliminary Response** was served via email (as consented to by counsel) on August 29, 2025 to lead and backup counsel of record for Petitioner as follows:


Keith D. Harden
kharden@munckwilson.com
Munck Wilson Mandala, LLP
2000 McKinney Ave., Ste. 1900
Dallas, TX 75201

Daniel E. Venglarik
dvenglarik@munckwilson.com
Munck Wilson Mandala, LLP
2000 McKinney Ave., Ste. 1900
Dallas, TX 75201

S. Wallace Dunwoody
wdunwoody@munckwilson.com
Munck Wilson Mandala, LLP
2000 McKinney Ave., Ste. 1900
Dallas, TX 75201

Michael C. Wilson
mwilson@munckwilson.com
Munck Wilson Mandala, LLP
2000 McKinney Ave., Ste. 1900
Dallas, TX 75201

John B. Campbell
jcampbell@McKoolSmith.com
McKool Smith, P.C.
303 Colorado Street
Suite 2100

Austin, TX 78701

Casey Shomaker
cshomaker@McKoolSmith.com
McKool Smith, P.C.
300 Crescent Court
Suite 1200
Dallas, TX 75201

Emily Tannenbaum
etannenbaum@McKoolSmith.com
McKool Smith, P.C.
1301 Avenue of the Americas
32nd Floor
New York, NY 10019

SWA-IV@munckwilson.com

AA_Intellectual_Ventures@mckoolsmith.com

Dated: August 29, 2025

By: /Brandon R. Theiss/
Brandon R. Theiss
Registration No. 70,507

*Counsel for Patent Owner*
*Intellectual Ventures II LLC*

# EXHIBIT A-25

Trials@uspto.gov
571-272-7822

Paper: 11
Entered: November 21, 2025

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

AMERICAN AIRLINES, INC. and SOUTHWEST AIRLINES CO.,
Petitioner,

v.

INTELLECTUAL VENTURES II LLC,
Patent Owner.

---

IPR2025-00931
Patent 8,332,844 B2

---

Before KEN B. BARRETT, GEORGIANNA W. BRADEN, and STEPHEN E. BELISLE, *Administrative Patent Judges*.

BRADEN, *Administrative Patent Judge*.

DECISION
Denying Institution of *Inter Partes* Review
*35 U.S.C. § 314*

# I. INTRODUCTION

American Airlines, Inc. and Southwest Airlines Co. (collectively, "Petitioner") filed a Petition (Paper 1, "Pet.") requesting an *inter partes* review of claims 1–27 ("Challenged Claims") of U.S. Patent No. 8,332,844 B2 (Ex. 1001, "the '844 patent"). Intellectual Ventures I LLC ("Patent Owner") filed a Preliminary Response. Paper 9 ("Prelim. Resp.").

We have authority to determine whether to institute an *inter partes* review. 35 U.S.C. § 314(b) (2024); 37 C.F.R. § 42.4(a) (2024). We may not institute an *inter partes* review "unless . . . there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a). The "reasonable likelihood" standard is "a higher standard than mere notice pleading" but "lower than the 'preponderance' standard to prevail in a final written decision." *Hulu, LLC v. Sound View Innovations, LLC*, IPR2018-01039, Paper 29 at 13 (PTAB Dec. 20, 2019) (precedential). When instituting *inter partes* review, the Board will authorize the review to proceed on all of the challenged claims and on all grounds of unpatentability asserted for each claim. 37 C.F.R. § 42.108(a).

Applying those standards, and based on the record before us, we determine Petitioner has not demonstrated a reasonable likelihood of success in proving that any one of the Challenged Claims is unpatentable. *See* 35 U.S.C. § 314; 37 C.F.R. § 42.4(a). Accordingly, we deny institution of an *inter partes* review of the '844 patent.

## II. BACKGROUND

### *A. Real Parties in Interest*

Petitioner identifies American Airlines, Inc.[1] and Southwest Airlines Co. as real parties in interest. Pet. 1. Patent Owner identifies itself as a real party in interest. Paper 5 (Patent Owner's Updated Mandatory Notices), 2.

### *B. Related Matters*

The parties state the '844 patent has been asserted in the following district court actions: *Intellectual Ventures I LLC v. American Airlines, Inc.*, No. 4:24-cv-980 (E.D. Tex. filed November 2, 2024); and *Intellectual Ventures I LLC v. Southwest Airlines, Co.*, No. 7:24-cv-277 (W.D. Tex. filed November 2, 2024). Pet. 3; Paper 5, 2.

Patent Owner also states that the '844 patent is or was involved in the following related matters: (1) *Intellectual Ventures I LLC et al., v. Liberty Mutual Holding Company Inc., et al.,* No. 23-cv-525 (E.D. Tex. Filed November 15, 2023); (2) *Intellectual Ventures I LLC et al., v. Comerica Incorporated,* No. 23-cv-524 (E.D. Tex. Filed November 15, 2023); (3) *Intellectual Ventures I LLC et al., v. JP Morgan Chase Bank, National Association et al.,* No. 23-cv-523 (E.D. Tex. Filed November 15, 2023); (4) *Intellectual Ventures I LLC et al., v. Nationwide Mutual Insurance Company,* No. 3:25-cv-632 (N.D. Tex. Filed March 15, 2025); and (5) *Intellectual Ventures I LLC et al., v. The Bank of New York Mellon*

---

[1] Petitioner states that American Airlines, Inc. is a wholly owned subsidiary of American Airlines Group, Inc., "which is not a real party in interest to this petition." Pet. 1.

*Corporation,* No. 3:25-cv-631 (N.D. Tex. Filed March 15, 2025). Paper 5, 2.

### *C. The '844 Patent*

The '844 patent is titled "Root Image Caching and Indexing for Block-Level Distributed Application Management," and issued December 11, 2012, from U.S. Patent Application No. 11/709,477, filed February 21, 2007. Ex. 1001, codes (10), (21), (22), (45), (54). The '844 patent claims priority to Continuation-In-Part Application Nos. 11/395,816, filed March 13, 2006, 11/026,622, filed December 30, 2004. *Id.* at code (60).

#### *1. Written Description*

The '844 patent generally relates to "clustered computing" involving multiple compute nodes with Operating System ("OS") software image management, where nodes are activated by diskless booting protocols or remote software installation to local storage, and where a boot image is required for each node in the cluster – and states that storing a boot image for each server results in wasted storage, and copying the entire master image at boot results in long boot times. *Id.* at 1:31–67. The '844 patent discloses branching-store file systems where a read-only "root" image is accessible by all nodes, and changes made by a node to the root image are stored in a "leaf" image unique to that node–a filter merges the leaf images with the root image to provide a cohesive instance of the application environment. *Id.* at 2:13–24.

One system embodiment of the'844 patent, as shown in Figure1 below, includes a general-purpose computing system environment with compute node 100. *Id.* at 4:27–36.




FIG. 1

According to the '844 patent, in its most basic configuration, compute node 100 shown in Figure 1 above, typically includes at least one processing unit 102 and memory 104. Ex.1001, 4:29–31. Another system embodiment of the'844 patent, shown in Figure 2 below, is implemented in a multi-computer system, such as an HPC cluster. *Id.* at 5:15–16.




FIG. 2

The ’844 patent discloses that system 200, shown in Figure 2 above, has multiple compute nodes 220a-n coupled to first storage unit 240 and corresponding second storage unit 250a-n through corresponding union block device (“UBD”) 230a-n. Ex.1001, 5:12–22. To the compute nodes 220a-n, it appears that they have access to their own version of the application environment. A separate boot image, however, is not created and stored for each node. *Id.* at 5:22–26.

Rather, according to the 844 patent, first storage unit 240 stores blocks of the root image. *Id.* at 5:27–32. The root image contains data initially common to compute nodes 220a-n, and is not changed by them. *Id.* Each compute node 220a-n also has access to second storage unit 250a-n for storing a leaf image, which includes “only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of [said/the] root image.” *Id.* at 5:33–34, 10:61–65, 11:32–35, 12:4–8, 12:47–50. The ’844 patent discloses that first storage unit 240 and second storage units 250a-n may each be contained on separate physical storage devices, on separate logical spaces on the same storage device, or any combination thereof. *Id.* at 5:34–38.

In one embodiment, the ’844 patent discloses that compute node 220a-n boots up an application using its respective UBD 230a-n, which are “effectively low level drivers that operate as an interface between the first and second storage devices and the file system of each compute node 220a-n.” *Id.* at 5:59–64. According to the 844 patent, UBDs 230a-n determine what “leaf image” (from second storage unit 250) is needed for portions of the image that their respective compute nodes 220a-n have changed, and locate the portions of the image not changed by their

respective node (which may reside in the root image or intermediate images comprising versions of the root image, not depicted in Figure 2). Ex.1001, 6:4–13. UBDs 230a-n also create a new leaf image on second storage unit 250an when their respective compute nodes 220a-n make changes to their version of the image (and may also modify the leaf image in response to their respective compute node's access to its instance of the image). *Id.* at 6:13–22.

The '844 patent discloses that the blocks of the root image, leaf image, and cache are merged "on the fly" to create the node's image. *Id.* at 8:13–15. From the node's perspective, the created image appears as one cohesive image even though a separate and complete image is not actually stored for the node. *Id.* at 8:18–55. According to the '844 Patent, this saves space without significantly impacting load times. *See id.* at 2:51–57.

The '844 Patent teaches improving speed by caching portions of the root image in cache 260 (as several nodes in a cluster may often access the same root image data). *Id.* at 2:59–61, 6:38–43. Because cache capacity is typically limited, older data can be removed (as the amount approaches a threshold) to make way for new data by techniques "known in the art." *Id.* at 7:1–16.

The '844 Patent also teaches an "added benefit" by which one compute node can index the contents of the (shared) root image and provide the results to the other compute nodes (e.g., by storing results on a shared storage unit or providing the results directly). *Id.* at 7:23–31.

*2. Illustrative Claim*

The '844 patent includes 27 claims, all of which are challenged. Claims 1, 7, 14, 19, and 23 are independent, and all other claims depend

from one of these independent claims. Claims 1 and 14 are illustrative of the claimed subject matter and are reproduced below.

> 1. A system for providing data to a plurality of compute nodes, the system comprising:
>
> a first storage unit configured to store blocks of a root image of said compute nodes;
>
> a plurality of second storage units configured to store leaf images of respective compute nodes, said leaf images including only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of said root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes; and
>
> a cache configured to cache blocks of said root image previously accessed by at least one of said compute nodes.

Ex. 1001, 10:56–11:3.

> 14. A system for indexing file systems for a plurality of compute nodes, the system comprising:
>
> a first storage unit configured to store blocks of a root image of said compute nodes;
>
> a plurality of second storage units configured to store leaf images of respective compute nodes, said leaf images comprising only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of said root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes; and
>
> a plurality of union block devices corresponding to said compute nodes, said union block devices configured to interface between said compute nodes and said first and second storage units to distribute said file systems to said compute nodes, wherein said union block devices are configured to create said file systems by merging the blocks

> of said root image stored on the first storage unit with the blocks of respective leaf images stored on respective second storage units, and wherein further at least one of said compute nodes is configured to index said root image and provide the indexing results to another of said compute nodes.

Ex. 1001, 11:66–12:22.

*D. Asserted Challenges to Patentability and Evidence of Record*

Petitioner challenges the patentability of claims 1–27 of the ’844 patent based on the following combination of references:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–6 | 102 | Sapuntzakis,[2] Holzmann[3] |
| 4, 6, 11, 16 | 103 | Sapuntzakis, Federwisch[4] |
| 1–3, 6–16 | 102 | Birse,[5] Holzmann |
| 4, 5, 11, 12, 15, 16 | 103 | Birse, Federwisch |

Pet. 7. In support of its patentability challenges, Petitioner relies on, *inter alia*, the Declaration of Erez Zadok, Ph.D. (“Dr. Zadok”). Ex. 1003. In support of its opposition to Petitioner’s patentability challenges, Patent Owner relies on, *inter alia*, the Declaration of Richard Newman, Ph.D. (“Dr. Newman”). Ex. 2014.

---

[2] Sapuntzakis C. P., et al., *Optimizing the Migration of Virtual Computers*, Proceedings of the 5th Symposium on Operating Systems Designs and Implementation (2002) (Ex. 1005) (“Sapuntzakis”).
[3] U.S. Patent Publication No. 2005/0283597 A1, filed June 22, 2004, published on December 22, 2005 (Ex. 1007) (“Holzmann”).
[4] U.S. Patent Publication No. 2003/0182313 A1, filed March 19, 2002, published on September 25, 2003 (Ex. 1008) (“Federwisch”).
[5] U.S. Patent No. 7,089,300 B1, issued on August 8, 2006 (Ex. 1006) (“Birse”).

## III. PRELIMINARY MATTERS

### *A. Principles of Law Regarding Obviousness and Burdens of Proof*

A claim is unpatentable under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) where in evidence, objective evidence of non-obviousness.[6] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). A patent claim "is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 550 U.S. at 418.

An obviousness determination based on a combination of references requires finding "both 'that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.'" *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367–68 (Fed. Cir. 2016); *see KSR*, 550 U.S. at 418. Furthermore, an assertion of obviousness "cannot be sustained by mere conclusory statements; instead, there must be some articulated

[6] At this stage of the proceeding, Patent Owner has not presented objective evidence of non-obviousness.

reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR*, 550 U.S. at 418; *In re NuVasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016) (a finding of a motivation to combine "must be supported by a 'reasoned explanation'").

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3)); *see Intelligent Bio-Sys.*, 821 F.3d at 1369. This burden of persuasion never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (discussing the burden of proof in *inter partes* review).

The Supreme Court has made clear that we apply "an expansive and flexible approach" to the question of obviousness. *Id.* at 415. Whether a patent claiming a combination of prior art elements would have been obvious is determined by whether the improvement is more than the predictable use of prior art elements according to their established functions. *Id.* at 417. To reach this conclusion, however, requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim under examination. *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011).

Instead, obviousness requires the additional showing that a person of ordinary skill at the time of the invention would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention. *Id.* "To satisfy its burden of proving obviousness, a petitioner cannot employ mere conclusory statements. The petitioner must instead articulate specific reasoning, based on evidence of

record, to support the legal conclusion of obviousness." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016). Therefore, to prevail in an *inter partes* review, Petitioner must explain how the proposed combination of prior art would have rendered the challenged claims unpatentable. At this preliminary stage, we determine whether the information presented in the Petition shows there is a reasonable likelihood that Petitioner would prevail in establishing that at least one of the challenged claims would have been obvious over the proposed combinations of prior art.

We analyze the challenges presented in the Petition in accordance with the above-stated principles.

### *B. Level of Ordinary Skill in the Art*

In determining the level of ordinary skill in the art, various factors may be considered, including the "type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field." *In re GPAC, Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995) (quoting *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962, (Fed. Cir. 1986)). Furthermore, the prior art itself can reflect the appropriate level of ordinary skill in the art. *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

Petitioner contends that a person of ordinary skill in the art, at the time of the invention of the '844 patent:

> would have had a bachelor's degree in computer science, computer engineering, electrical engineering, or related field, and at least two years of experience in the fields of networked

> data storage. Additional education could substitute for professional experience, and vice-versa.

Pet. 11 (citing Ex. 1003 ¶ 34). Petitioner's Declarant, Dr. Zadok, states:

> my opinion, a POSITA would have had a bachelor's degree in computer science, computer engineering, or an equivalent degree. A POSITA would also have had approximately two years of experience working in the fields of networked data storage, file systems, and operating systems. Additional experience might substitute for less education and *vice versa*.

Patent Owner does not address the level of skill in the art at the critical time. *See generally* Prelim. Resp. Patent Owner's Declarant, Dr. Newman, states that for his analysis he uses the definition provided by Dr. Zadok. Ex. 2014 ¶ 13.

We discern no meaningful difference between the definitions proffered by Petitioner or its Declarant. Neither party argues that the outcome of this case would differ based on our adoption of any particular definition of the level of ordinary skill in the art. Considering the subject matter of the '844 patent, the background technical field, the prior art, and Dr. Zadok's unopposed definition of the ordinarily skilled artisan (Ex. 1003 ¶ 35), which is adopted by Dr. Newman (Ex. 2014 ¶ 13) and is consistent with the asserted prior art references, we apply the level of skill set forth by Dr. Zadok.

### *C. Claim Construction*

We construe claims "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R.

§ 42.100(b); *see also Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).

In this context, claim terms "are generally given their ordinary and customary meaning" as understood by a person of ordinary skill in the art in question at the time of the invention. *Phillips*, 415 F.3d at 1312–13; *see CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (noting "a 'heavy presumption' that a claim term carries its ordinary and customary meaning"). "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17). Extrinsic evidence is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317.

Only those claim terms that are in controversy need to be construed, and only to the extent necessary to resolve the controversy. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (stating that "we need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

Petitioner contends "that the challenged claims are obvious under any reasonable interpretation under the *Phillips* standard, and thus Petitioners submit that the Board need not resolve any express constructions." Pet. 11

Patent Owner asserts "the Board should resolve this IPR under the plain-and ordinary-meaning standard without adopting any special constructions beyond what is necessary to address a concrete dispute." Prelim. Resp. 11.

Based on our review of the current record, we agree with parties that no express construction of any term is necessary to resolve this case.

## IV. ANALYSIS

### *A. Summary of References*

#### *1. Overview of Sapuntzakis (Ex. 1005)*

Sapuntzakis is a conference paper titled "Optimizing the Migration of Virtual Computer" and is directed to moving the state of a running computer across a network, including the state in its disks, memory, CPU registers, and I/O devices. Ex. 1005, 1. This "state" is called a capsule." *Id.* The capsule includes the entire operating system as well as applications and running processes. *Id.* Sapuntzakis teaches that it can take a significant amount of time to store, manipulate, and migrate lots of capsules. *Id.* at 2. Sapuntzakis then proposes a number optimizations in order to reduce the time. *Id.* at 4.

Once such optimization is storing disks in the capsules in a hierarchy. *Id.* at 5. According to Sapuntzakis, each child capsule in the hierarchy would "inherit" states from the parent capsule and any differences between the parent and child would be captured in a separate copy-on-write (COW) virtual disk. *Id.* Sapuntzakis explains that "[a]t the root of the hierarchy is a root disk, which is a complete capsule disk" while "[a]ll other nodes represent a COW disk." *Id.* Therefore, administrators can install and

maintain the same software set on multiple machines by creating one (inactive) capsule and distributing it to all machines. *Id.* at 6. Sapuntzakis further teaches that "once capsules have children, they become immutable; this property simplifies the caching of capsules." *Id.* at 5.

Figure 1, reproduced below, shows one example of Sapuntzakis's capsule hierarchy as set up in a university environment.




Figure 1: An example capsule hierarchy.

Figure 1, above, is a diagram illustrating Sapuntzakis's root capsule. The root capsule is shown as the University Capsule Disk in Figure 1, and contains all the software available to all students. According to Sapuntzakis, "[e]ach time a user logs in, he looks up the latest department capsule and derives his own individual capsule" and "[t]he capsule migrates with the student as he commutes, and is destroyed when he logs out." *Id.* at 5. Sapuntzakis discloses that if a capsule disk is updated, all the derived capsules containing custom installed software have to be ported to the updated capsule. *Id.*

Sapuntzakis teaches that each COW disk is made of a bitmap file and a sequence of extent files, which is a sequence of blocks of the COW disk. *Id.* An example of this is shown in Figure 2, reproduced below.




Figure 2: An example capsule disk.

Figure 2, above, is a diagram illustrating that Sapuntzakis's bitmap files, which contain one bit for each 16 KB block on the disk, indicating whether the block is present in the COW disk. *Id.* According to Sapuntzakis, "[w]rites to a capsule disk are performed by writing the data to the latest COW disk and updating its bitmap file," while "[r]eads involve searching the latest COW disk and its ancestor disks in turn until the required block is found." *Id.* at 5–6. Sapuntzakis explains "that the COW disk hierarchy is not visible to the VMM, or to the OS and applications inside the capsule; all of them see a normal flat disk as illustrated in the figure." *Id.* at 6.

Another optimization technique taught by Sapuntzakis is that COW disks corresponding to a capsule disk are read page-by-page on demand,

rather than being pre-fetched. *Id.* According to Sapuntzakis, this reduces the start-up time of a capsule. *Id.* Sapuntzakis discloses that another technique to speed up data transfer over low-bandwidth links and decrease transfer time is to send a hash of data blocks instead of the data itself. *Id.* at 7. Sapuntzakis call this technique HCP, for Hashed Copy. *Id.* HCP uses a hash cache to map hashes to data and the cache is persistent. *Id.* The cache is implemented using a hash table whose size is fixed at creation. *Id.* And when the cache reads file data referenced by the table, it always checks that it matches the 20-byte SHA-1 hash provided. *Id.* According to Sapuntzakis, this maintains integrity and allows for a couple of performance improvements. *Id.*

*2. Overview of Holzmann (Ex. 1007)*

Holzmann is a U.S. Patent Application Publication titled "System and Method for Booting Multiple Servers from a Single Operating System Image" and is directed to storing an operating system ("OS") image on a solid-state disk and using that single image to boot up multiple other servers or resources across a network. Ex. 1007, codes (12), (54), (57), ¶ 17. One embodiment of Holzmann is show in Figure 1, reproduced below.




Fig. 1

Figure 1, above, is a functional block diagram illustrating solid state disk system 101 for storing data, including OS images disposed on memory module 104 where control module 103 automatically manipulates the copying and writing of data between the memory module and storage means 102. Ex.1007 ¶¶ 17–20. Holzmann discloses that control module 103 can allocates a sub-portion of the memory portion to be used as a cache for the OS. *Id.* ¶ 21. Holzmann further discloses if a second server or other external device sends a boot request to control module 103, the module allocates additional space in the cache for a second cache. *Id.* ¶ 33. Then if additional servers require boot operations, additional cache space

can be allocated for those servers. *Id.* According to Holzmann, by "allocating separate cache space for each server or other network resource, the inventive system prevents corruption of data, overwriting of data, and other harmful actions that would lead to resource malfunction." *Id.*

In one embodiment of Holzmann control module 103 monitors requests for OS data, and determines whether a particular OS data block requested by external devices 106 has previously been loaded into OS cache. *Id.* ¶ 24. According to Holzmann, "[i]f the data block has been loaded into the cache, and that data block has not been overwritten subsequent to being loaded into the cache, the requested data block is provided from the cache in memory module 104 to interface module 105 for transmission to the appropriate external device 106." *Id.* If, however, the requested data has not been loaded into cache, then a control module copies the data from the OS data stored in a memory portion of cache. *Id.*

*3. Overview of Federwisch (Ex. 1008)*

Federwisch is a U.S. Patent Application Publication titled "System and Method for Determining Changes in Two Snapshots and for Transmitting Changes to Destination Snapshot," and is directed to mirroring changes between source and destination snapshots by comparing two snapshots and identifying differences in "the logical file block index of each snapshot." Ex. 1008, codes (19), (54), (57). The system compares the indexes to file block numbers between two snapshots to identify changed data. *Id.* ¶ 14. Trees of blocks associated with the files are traversed, bypassing unchanged pointers between versions and walking down to identify the changes in the hierarchy of the tree. *Id.* These changes are transmitted to the destination mirror or replicated Snapshot. *Id.* This

technique allows regular files, directories, inodes and any other hierarchical Structure to be efficiently scanned to determine differences between versions. *Id.* The "scanner searches the index for changed base/incremental inode file snapshot blocks, comparing volume block numbers or another identifier . . . Hence, scanned blocks at the same index in both snapshots can be efficiently bypassed." *Id.* at code (57), ¶¶ 71–72.

Each snapshot (the "leaf image") has its own index of file blocks. *Id.* ¶ 109. Federwisch discloses that "[i]f the information is not in memory, the file system layer 450 indexes into the inode file using the inode number to access an appropriate entry and retrieve a volume block number." *Id.* ¶ 53. According to Federwisch, the existence of a changed volume block number at a given offset in the index between the base snapshot inode file and incremental Snapshot inode file generally indicates that one or more of the underlying inodes and files to which the inodes point have been changed. *Id.* ¶ 71. A scanner searches the index for changed base/incremental inode file snapshot blocks, comparing volume block numbers or another identifier. *Id.* ¶ 72. If blocks are unchanged the files, they are scanned over without further processing. *Id.* "Hence, scanned blocks at the same index in both snapshots can be efficiently bypassed, reducing the scan time." *Id.*

The system performs re-indexing when updating destination snapshots' index maps. *Id.* ¶¶ 134, 137. It uses NVRAM and buffer caches for both snapshots and active file systems. *Id.* ¶¶ 48, 53, 58, 70. Data is shared ("exported" over a network), thus "allowing source and destination systems of different vendors to share the information." *Id.* ¶¶ 15, 86, 120.

*4. Overview of Birse (Ex. 1006)*

Birse is a U.S. Patent titled "Method and Apparatus for Administering the Operating System of a Net-Booted Environment," and directed to a network computer ("NC") system that includes an NC servers and multiple NC clients that are all managed by a single NC client so that the any remaining NC clients that are booted later receive OS software that is configured differently than the one currently in effect. Ex. 1006, codes (12), (54), (57). According to Birse, this is accomplished by replacing one or more system volumes on the NC server containing the OS software with one or more different system volumes. *Id.* at code (57).

In one embodiment of Birse, a server in a NC system maintains a copy of the OS that cannot be corrupted by ordinary users of the NC system. Ex. 1006, 1:18–21. Additionally, the NC system may preserve user customizations (e.g., preferences) by maintaining individual, user, storage areas. When an NC client boots from the network and accesses a stored copy of the OS from an NC server, the user's preferences are dynamically merged with the system environment provided to the NC client. *Id.* at 2:56–65. Advantageously, because of these features, a user may login to any NC client on the network and have the same user experience. *Id.* at 2:65–3:3.

One such embodiment of Birse is shown in Figure 1, reproduce below.




FIG. 1

Figure 1, above, is a simplified block diagram illustrating NC system 100, which includes an NC client 150 (e.g., personal computer) coupled to an NC server 170 via data communication line 140. Ex. 1006, 2:8–10, 4:65–5:8. NC server 170 can include one or more system volumes 174 (including a protected, read-only, master copy of the OS software), one or more application volumes 176, user registry 178, non-persistent client-specific data 184 (temporary data storage), and persistent user data 186 (long-term storage for user information, e.g., preferences, browser bookmarks, other desktop environment customizations). *Id.* at 5:9–29, 6:43–48.

Birse teaches that NC server 170 also includes a boot server process 172 (managing access to the system volumes 174 and the application volumes 176), a server software process 180 (managing access to the non-

persistent client-specific data 184), and a user environment process 182 (maintaining the persistent user data 186). Ex. 1006, 5:46–6:34. Birse explains that NC client 150 also includes a file system 152 (logical structures and software routines to control access to and from local and remote storage media), a block device driver 154 (servicing file system read/write requests to the system volume 160 or shadow volumes, discussed below), a network stack 156 (used to access the data communication link 140), and a network device driver 158. *Id.* at 7:6–60.

According to Birse, when an NC client boots from the network and accesses the operating system from an NC server, the user's preferences are dynamically merged with the system environment provided to the NC client. *Id.* at 2:62–65. In one embodiment, one or more shadow volumes is created from the NC client 150 and stored with the nonpersistent client-specific data 184 for the purpose of storing user preferences and/or changes to the operating system. *Id.* at 7:41–46.

### *B. Alleged Obviousness of Claims 1–13 over the Combination of Sapuntzakis and Holzmann*

Petitioner contends claims 1–13 would have been unpatentable under 35 U.S.C. § 103 as obvious over the combination of Sapuntzakis (Ex. 1005) and Holzmann (Ex. 1007). Pet. 23–47 (citing Ex. 1003 ¶¶ 336–89). Patent Owner opposes Petitioner's contentions. Prelim. Resp. 21–36. Based on our review of the record before us, we determine Petitioner has not established a reasonable likelihood that it would prevail in showing that independent claims 1 or 7 (and thus any Challenged Claim) would have been unpatentable as obvious over the combination of Sapuntzakis and Holzmann, as discussed below.

*1. Analysis of Independent Claims 1 and 7*

*a. "a cache configured to cache blocks of said root image previously accessed by at least one of said compute nodes" or "caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory."*

Claim 1 recites, in relevant part, "a cache configured to cache blocks of said root image previously accessed by at least one of said compute nodes." Ex. 1001, 11:1–3. Claim 7 recites, in relevant part, "caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory." *Id.* at 11: 39–40. This is the only disputed limitation for these claims. The parties specifically dispute whether the combination of Sapuntzakis and Holzmann would have taught or suggested this limitation to the ordinarily skilled artisan at the critical time. *See* Pet. 30–33; Prelim. Resp. 32–34.

Petitioner argues that a person of ordinary skill in the art would have recognized that Holzmann's memory module 104 is describing a cache memory "because RAM is often used as a fast volatile cache and (SSD) storage devices are used as relatively fast non-volatile caches." Pet. 32 (citing Ex. 1003 ¶¶ 86–101, 329, 412). This statement, however, appears to be at odds with other testimony from Petitioner's declarant, Dr. Zadok.

Dr. Zadok specifically testifies that a "memory cache stores the contents of frequently accessed RAM locations and the addresses where these data items are stored" and a "cache is useful when RAM accesses are slow compared with the microprocessor speed, because cache memory is always faster than main RAM memory." Ex. 1003 ¶ 90 (citing Ex. 1011, 72). Dr. Zadok testifies that a "RAM cache" is "[c]ache memory that is used

by the system to store and retrieve data from the RAM." *Id.* ¶ 93 (citing Ex. 1011, 395). Dr. Zadok explains in any cache hierarchy, "typically the cache (above) is faster and smaller than the backend location (below) from where the data was retrieved." *Id.* ¶ 94. According to Dr. Zadok, if a data item is found in a cache it is called a "cache hit," meaning that there was a "successful retrieval of data from a cache rather than from the slower hard disk or RAM." *Id.* (citing Ex. 1011, 234–235).

Regardless of Dr. Zadok's apparent inconsistent or ill-explained testimony, Holzmann does teach allocating a sub-portion of the memory to be used as a cache for the operating system. *See* Ex. 1007 ¶ 21. Holzmann also teaches that control module determines whether particular OS data blocks have been loaded into the OS cache. *Id.* ¶ 24. Yet, as argued persuasively by Patent Owner, Holzmann's cache does not meet the claim limitation because it is an OS cache that contain a single OS image accessible by multiple servers to allow the multiple servers to boot up faster. *See id.* ¶¶ 9–10, 21, 36, Figs. 4–5; Prelim. Resp. 33–34.

Based on our reading of Holzmann, it does not disclose or teach per-node leaf images nor does it meet the claim's negative limitation on leaf content. Rather, Holzmann is directed to avoiding maintaining separate OS images per server and instead relies on a single OS image with a centrally managed cache, and its cache arbitrates reads and writes to cached OS data at the line level with server-specific metadata. *See* Ex. 1007 ¶¶ 9–10; Figs. 4–5. Therefore, we are unpersuaded that Holzmann's cache operations would have rendered the claim limitation obvious to an ordinarily skilled artisan.

*b. Rationale to Combine the References*

Petitioner contends that "[b]oth Sapuntzakis and Holzmann are concerned with the management of whole OS images being shared by users on a network, particularly efficient storage/transfer of such images" and "[b]oth disclose caching blocks of the root/boot disk images to improve efficiency." Pet. 23. According to Petitioner, "a POSITA would have been motivated to modify Sapuntzakis with Holzmann's caching techniques, including because, while Sapuntzakis discloses caching, a POSITA would have known there are many different caching techniques with associated benefits and drawbacks (several disclosed in Holzmann) – and Holzmann details how to cache data for each OS (e.g., Sapuntzakis' virtual machine)." *Id.* at 23–24. Petitioner argues that "[m]odifying Sapuntzakis with Holzmann's caching teachings would have been simple to a POSITA, and would not have required extensive experimentation or imposed undue burden – especially when both disclose caching." *Id.* at 24. For the same reasons, Petitioner concludes that the combination would have yielded predictable results and there would have been a high expectation of success, because "Holzmann merely describes caching in greater detail than Sapuntzakis." *Id.* (citing Ex.1003 ¶¶ 336–55).

Petitioner further addresses the cache memory issue, arguing that when the cache of Holzmann is used to cache blocks of the read-only shared OS image 660 of Sapuntzakis, there would be no need to create separate caches for each client because the read-only image is not subject to "corruption of data, overwriting of data, and other harmful actions that would lead to resource malfunction." Pet. 33 (citing Ex.1007 ¶ 33). According to Petitioner, such "read-only data can be easily shared with

multiple users and they will all see the same consistent data." *Id.* (citing Ex.1003 ¶ 333).

Patent Owner contests Petitioner's position, arguing that Petitioner fails to provide an adequate rationale as to why a person of skill in the art would combine Holzmann's centralized, multi-boot cache with Sapuntzakis's "ephemeral capsule architecture," especially in light of the opposing design philosophies of the references. Prelim. Resp. 22–24. Patent Owner specifically argues that Holzmann is designed expressly for persistent, cross-boot reuse coordinated through a centralized device memory and per-server metadata (Ex. 1007, Fig. 4), whereas "Sapuntzakis teaches exactly the opposite: capsules that are torn down at logout and rebuilt per session, relying on immutable remote COW media with per-host shadow caching and WAN-oriented migration techniques (Ex. 1005 § 4.2, Fig. 1; § 4.3, Fig. 3)." Prelim. Resp. 26.

Patent Owner further argues that an ordinarily skilled artisan would have been forced to "re-architected" Sapuntzakis's per-host shadow-COW model to accommodate Holzmann's centralized, cross-server boot cache in order to meet all the claim limitations as proffered by Petitioner. Prelim. Resp. 29. Yet, according to Patent Owner, such an ordinarily skilled artisan would not have done so "because Sapuntzakis already claims to solve the very reuse and bandwidth problems Petitioner invokes: at runtime via host-local shadow COW caches and across migrations via ballooning and hashed-copy (HCP) to avoid retransmitting blocks that exist at the destination (Ex. 1005 §§ 4.1, 4.3, 4.4; Figs. 3, 6, 8)." *Id.* That design leaves no "gap" that would have "directed a POSITA to import Holzmann's central, multi-boot OS cache." *Id.*

Patent Owner relies on the testimony of Dr. Newman to support its position. Dr. Newman testifies that the "fundamental lifecycle, placement/consistency, and problem-framing mismatches" between Sapuntzakis and Holzmann actually would have discouraged a person of ordinary skill and would require non-routine redesign rather than a predictable substitution. Ex. 2014 ¶ 99. Therefore, Patent Owner concludes that the references teach away from Petitioner's theory, which is based on hindsight analysis and lacks any reasoned motivation to combine with a reasonable expectation of success. Prelim. Resp. 26.

We agree with Patent Owner that Petitioner fails to offer sufficient explanation as to why a person of ordinary skill in the art would have combined the teachings of Sapuntzakis and Holzmann. Rather, Petitioner appears to argue that, based on the advantages described by Holzmann (Ex. 1007 ¶ 33), and using well-known techniques with unspecified predictable results, a person of ordinary skill in the art would have had sufficient reason to combine these disparate elements taught in the prior art references to render the challenged claims obvious. Pet. 23–24, 33. Yet, other than Petitioner's cursory assertion of advantageously incorporating the memory module from Holzmann to provide a caching mechanism (Pet. 33), which cites equally cursory and unsupported testimony by Dr. Zadok (Ex. 1003 ¶¶ 329, 333, 336–355), Petitioner fails to identify what particular advantages or efficiencies would have prompted a person of ordinary skill in the art to combine Holzmann's memory module with Sapuntzakis's system.

Although we agree with the Petitioner that a person of ordinary skill would have been *capable* of making the proposed combination, Patent Owner persuasively demonstrates that the Petitioner has not identified *why* a

person of ordinary skill would do so. As the Supreme Court has said, "a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). [I]t can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does. This is so because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known. *KSR*, 550 U.S. at 418-19. For example, the Federal Circuit has held that testimony "succumbed to hindsight bias" when it "primarily consisted of conclusory references to her belief that one of ordinary skill in the art *could* combine these references, not that they *would* have been motivated to do so." *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014). Such is the case here where Petitioner has found a person of ordinary skill *could* combine the references, but has not sufficiently explained whether a person of ordinary skill *would* do so.

Furthermore, Dr. Zadok's testimony regarding predictable results and "obvious to try" are similarly lacking in elaboration and substantiation. *See* Ex. 1003 ¶¶ 329, 333, 336–355. Such conclusory statements and unspecific testimony without evidence on the record cannot satisfy the Petitioner's burden of demonstrating obviousness. *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016); *I/P Engine, Inc. v. AOL Inc.*, 576 Fed. Appx. 982, 999 (Fed. Cir. 2014) ("The testimony of the Defendants' expert amounts to a 'mere conclusory statement' that may not serve as a basis for

finding the asserted claims obvious."); *see InTouch Techs., Inc.*, 751 F.3d at 1352; *see also* 37 C.F.R. 42.65(a) ("Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight.").

We have considered Petitioner's arguments and cited evidence concerning whether the combination of Sapuntzakis and Holzmann would have taught or suggested to the ordinarily skilled artisan the features of claims 1 and 7, and do not find them sufficiently persuasive on the record before us. Rather, we find Patent Owner's arguments and cited evidence outlined above sufficiently persuasive to demonstrate Petitioner failed to meet its burden of proof in this case. Accordingly, for the reasons expressed above and based on the record before us, we determine that Petitioner has not established a reasonable likelihood that it would prevail in showing that independent claim 1 is unpatentable as obvious under 35 U.S.C. § 103(a) in view the combination of Sapuntzakis and Holzmann.

*2. Dependent Claims 2–6, 8–13*

Claims 2–6 and 8–13 depend, directly or indirectly, from independent claims 1 or 7. Ex. 1001, 11:4–26, 11:41–65. Based on the record before us, we determine that Petitioner's analysis for claims 2–6 and 8–13 does not remedy the deficiencies identified above with respect to independent claims 1 and 7. *See* Pet. 33–46. Thus, for the same reasons discussed in connection with the challenge to independent claims 1 and 7, we determine that Petitioner has not established a reasonable likelihood that it would prevail in showing that any of claims 2–6 and 8–13 is unpatentable as obvious over the combination of Sapuntzakis and Holzmann.

*C. Alleged Obviousness of Claims 14–27 over the Combination of Sapuntzakis and Federwisch*

Petitioner contends claims 14–27 would have been unpatentable under 35 U.S.C. § 103 as obvious over the combination of Sapuntzakis (Ex. 1005) and Federwisch (Ex. 1008). Pet. 47–58. Patent Owner opposes Petitioner's contentions. Prelim. Resp. 36–47. Based on our review of the record before us, we determine that Petitioner has not established a reasonable likelihood that it would prevail in showing that independent claims 14, 19, or 23 (and thus any Challenged Claim) would have been unpatentable as obvious over the combination of Sapuntzakis and Federwisch, as discussed below.

*1. Analysis of Independent Claims 14, 19, 23*

The parties dispute whether the combination of Sapuntzakis and Federwisch would have taught or suggested to the ordinarily skilled artisan the required union block devices or the cross-node root-image indexing limitations recited in claims 14, 19, or 23. *See* Pet. 49–52 (citing Pet. 36–39; Ex. 1003 ¶¶ 439, 479, 492); Prelim. Resp. 36–41.

*a. Union Block Devices Limitation*

Claims 14 recites a "plurality of union block devices corresponding to said compute nodes, said union block devices configured to interface between said compute nodes and said first and second storage units to distribute said file systems to said compute nodes, wherein said union block devices are configured to create said file systems by merging the blocks of said root image stored on the first storage unit with the blocks of respective leaf images stored on respective second storage units." Ex. 1001, 12:11–19. Claim 19 recites "merging the blocks of said root image with the blocks of respective leaf images stored on respective second storage units to create

respective file systems for respective compute nodes." *Id.* at 12:54–57. Claim 23 recites "wherein said file system is the result of merging said root image portion and said leaf image portion together at the block-level." *Id.* at 13:14–16.

Petitioner contends these "elements are substantially similar to elements recited in claims 4 and 11 regarding UBDs and merging" and that Sapuntzakis discloses these elements. Pet. 50. According to Petitioner, "none of the individual COW disks in [Sapuntzakis's] hierarchy are visible to the client user; instead, a single cohesive (logical) storage image corresponding to the '844 Patent's merged root and leaf blocks presenting cohesive respective application environments." Pet. 38 (citing Ex.1003 ¶¶ 390–96, 426–28). Therefore, Petitioner argues that Sapuntzakis must render union block devices obvious because an ordinarily skilled artisan "would have recognized that such a system component is necessary to provide features," that "taken together, embody the union block device" recited in the claims. Pet. 38–39 (citing Ex. 1003 ¶¶ 426–28). Petitioner further notes that it was well-known for storage systems to use single storage appliances. *Id.* at 39.

Patent Owner persuasively responds (and we agree for the same reasons):

> Neither Sapuntzakis nor Federwisch discloses or suggests this architecture. Sapuntzakis describes per-capsule copy-on-write ("COW") disk hierarchies used to migrate a self-contained virtual machine "capsule." In Sapuntzakis, reads are performed by searching the most-recent COW layer and then ancestors "until the required block is found," and the OS inside the capsule "see[s] a normal flat disk." EX1005 §4.2. That COW layering is internal to a single capsule image; it is not a union device

> deployed across a plurality of independent compute nodes to create their file systems by merging a common root with respective leaves. Sapuntzakis's own usage model reinforces the point: a user logs in, derives an individual capsule, and that capsule "migrates … and is destroyed when he logs out," which underscores a transient, per-capsule store—not a shared root image that is merged with respective leaf images for many different nodes via a "plurality of union block devices." EX1005 §4.2.

Prelim. Resp. 38.

Patent Owner further argues that Federwisch cannot teach union block devices because it addresses "remote asynchronous replication or mirroring of changes" between snapshots by scanning two versions of a source snapshot to identify changed blocks and transmitting those changes to build a new, replicated destination snapshot. *Id.* (citing Ex. 1008 ¶ 14). Patent Owner is again persuasive when it asserts that Federwisch using offline snapshot replication between a source and a destination filer, which is not a union block device that sits beneath each compute node's file system (functioning at the "block" layer) and merges a shared root image with respective leaf images to "create" a node's runtime file system. *Id.* at 39.

In addition to the persuasive argument provided by Patent Owner, we find that Petitioner's position is merely conclusory and insufficiently supported by the record. Specifically, Petitioner fails to explain sufficiently *how* or *why* Sapuntzakis's disclosure allegedly teaches or suggests the features of the union block devices within the context of the disputed claims as a whole. Thus, we are unpersuaded that Sapuntzakis's invisible hierarchy somehow would have rendered the claim limitation obvious to an ordinarily skilled artisan.

*b. Cross-Node Root-Image Indexing Limitation*

Each of claims 14, 19, and 23 require indexing a root image or root image portion and providing the indexing results to another of said compute nodes. Ex. 1001, 12:20–22, 12:58–61, 13:17–19.

Petitioner contends that the combination of Sapuntzakis with Federwisch discloses these elements. Pet. 50–51. Petitioner specifically argues that Sapuntzakis discloses that data is indexed and that an ordinarily skilled artisan "interested in building a system based on Sapuntzakis would have been motivated to seek out additional details on indexing storage systems, files, and caches thereof." *Id.* at 51. According to Petitioner, "[t]his is particularly so because indexing of data items was a well known technique. A POSITA would have found Federwisch relevant, which discloses greater details of indexing." *Id.* at 51–52. Petitioner further asserts that:

> A person of ordinary skill in the art] would have understood that the scanner of Federwisch ***could*** be implemented on any of the compute nodes of Sapuntzakis, as part of the Union Block Device. As described, *supra* §§VI, VIII.A, a [person of ordinary skill in the art] would further have understood that such scanner ***could*** be used to index the root image and to provide the index results to other compute nodes, because such indexing and sharing of data over networks was well known. Ex.1003, ¶¶434-37,480-81,493-94.

Pet. 51 (emphasis added). Petitioner proffers these conclusory statements regarding what an ordinarily skilled artisan *could* do given the disclosures of Sapuntzakis and Federwisch, but does so without sufficiently explaining *why* such a skilled artisan *would* perform the features of the challenged limitation based on these disclosures.

Additionally, as argued persuasively by Patent Owner, Petitioner fails to show sufficiently how or when an index would be provided to another compute node. *See* Prelim. Resp. 41–45. Other than making generalized statement regarding indexing and Federwisch identifying changed and unchanged blocks (Pet. 51–52), Petitioner fails to make a showing of such indexing being sent to or provided to another node. Thus, we find Petitioner does not show sufficiently how the disclosures in Federwisch and Sapuntzakis teaches or suggests indexing a root image or root image portion and providing the indexing results to another of said compute nodes.

*c. Combined Teachings and Summary*

As for the *combined* teachings of Sapuntzakis and Federwisch, the full extent of Petitioner's argument is that

> a [person of ordinary skill in the art] would have been motivated to modify Sapuntzakis with Federwisch's indexing – including because, while Sapuntzakis discloses that data is indexed, it does so only in connection with a hash table that indexes cached entries for faster access. A POSITA building a Sapuntzakis system, and knowing indexing of data items was a well-known technique, would have been motivated to seek additional details on indexing storage systems, files, and caches thereof (supplied by Federwisch). A [person of ordinary skill in the art] would also have known that indexing of data is an age-old technique long utilized in computer systems.
>
> Modifying Sapuntzakis to include Federwisch's indexing would have been simple to a POSITA, and would not have required extensive experimentation or imposed undue burden – including because Sapuntzakis already indexed data objects and a POSITA would not have expected Sapuntzakis to provide details of such a basic concept. For the same reasons, the combination would have yielded predictable results, as indexes are well understood to structure and locate data objects efficiently and a POSITA would have had a high expectation of

> success, because indexing techniques were well understood for decades beforehand. Ex.1003, ¶¶449-471.

Pet. 47 (emphasis added). But Petitioner does not sufficiently explain what is missing in the combination of Sapuntzakis that Federwisch allegedly would add nor does Petitioner explain how details from Federwisch would be implemented in Sapuntzakis. Rather, Petitioner merely concludes that an ordinarily skill artisan could have done so and, therefore, would have do so.

Our reviewing courts have warned us that "[o]bviousness may not be established using hindsight or in view of the teachings or suggestions of the inventor." *Para-Ordnance Mfg. v. SGS Importers Int'l*, 73 F.3d 1085, 1087 (Fed. Cir. 1995) (citing *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1551, 1553 (Fed. Cir. 1983)). "The mere fact that the prior art may be modified in the manner suggested . . . does not make the modification obvious unless the prior art suggested the desirability of the modification." *In re Fritch*, 972 F.2d 1260, 1266 (Fed. Cir. 1992) (citing *In re Gordon,* 733 F.2d 900, 902, 221 USPQ 1125, 1127 (Fed. Cir. 1984)). "It is impermissible to use the claimed invention as an instruction manual or 'template' to piece together the teachings of the prior art so that the claimed invention is rendered obvious." *Fritch*, 972 F.2 at 1266 (citing *In re Gorman*, 933 F.2d 982, 987 (Fed. Cir. 1991)). Without the challenged claims as a guide, we are not persuaded an ordinarily skill artisan at the critical time would have combined the prior art as suggested by Petitioner.

We have considered Petitioner's arguments and cited evidence concerning whether the combination of Sapuntzakis and Federwisch would have taught or suggested to the ordinarily skilled artisan the features of the disputed limitation, and do not find them sufficiently persuasive on the

record before us. Rather, we find Patent Owner's arguments and cited evidence outlined above sufficiently persuasive to demonstrate Petitioner failed to meet its burden of proof in this case. Accordingly, for the reasons expressed above and based on the record before us, we determine that Petitioner has not established a reasonable likelihood that it would prevail in showing that independent claims 14, 19, and 23 are unpatentable as obvious over the combination of Sapuntzakis and Federwisch.

*2. Dependent Claims 15–18, 20–22, and 24–27*

Based on the record before us, we determine that Petitioner's analysis for dependent claims 15–18, 20–22, and 24–27 does not remedy the deficiencies identified above with respect to independent claims 14, 19, and 23. *See* Pet. 52–58. Thus, for the same reasons discussed in connection with the challenge to independent claims 14, 19, and 23, we determine that Petitioner has not established a reasonable likelihood that it would prevail in showing that any of claims 15–18, 20–22, and 24–27 are unpatentable as obvious over the combination of Sapuntzakis and Federwisch.

*D. Alleged Obviousness of Claims 14–27 over the Combination of Birse and Federwisch*

Petitioner contends claims 1–13 would have been unpatentable under 35 U.S.C. § 103 as obvious over the combination of Birse (Ex. 1006) and Holzmann (Ex. 1007). Pet. 58–74 (citing Ex. 1003 ¶¶ 537–66). Patent Owner opposes Petitioner's contentions. Prelim. Resp. 21–36. Based on our review of the record before us, we determine Petitioner has not established a reasonable likelihood that it would prevail in showing that independent claims 1 or 7 (and thus any Challenged Claim) would have been

unpatentable as obvious over the combination of Birse and Holzmann, as discussed below.

*1. Analysis of Independent Claims 1 and 7*

a. *"a cache configured to cache blocks of said root image previously accessed by at least one of said compute nodes" or "caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory"*

The parties dispute whether the combination of Birse and Holzmann would have taught or suggested to the ordinarily skilled artisan the required "caching blocks" limitations recited in claims 1 or 7. *See* Pet. 67 (citing Pet. 21–22, 24–33; Ex. 1003 ¶¶ 534–36, 582); Prelim. Resp. 47–51.

Petitioner specifically relies on the disclosure in Holzmann to meet the "caching blocks" claim element. Pet. 67. Petitioner argues that it would have been obvious to an ordinarily skill artisan at the critical time to combine the cache system of Holzmann with the system of Birse to improve the performance of Birse. *Id.* (citing Ex. 1003 ¶¶ 534–36, 582).

Patent Owner contests Petitioner's position, arguing that Petitioner fails to provide an adequate rationale as to why a person of skill in the art would combine Holzmann's "single, centrally managed image with a shared cache" with Birse's "per-client artifacts (including full copies in one embodiment) as the way to manage client changes," especially in light of the opposing design philosophies of the references. Prelim. Resp. 52. Patent Owner specifically argues that Holzmann describes "an appliance-resident, per-server operating system cache tied to a single shared OS image, complete with line-level metadata and write-arbitration mechanisms, whereas Birse teaches a "SplitOS" model that "proliferates per-client

volumes, including full or sparse shadows, but never teaches caching of root image blocks for cross-node reuse." Prelim. Resp. 47.

Patent Owner further argues that under Petitioner's proffered combination, an ordinarily skilled artisan would have been forced to re-engineer the entire system. *Id.* at 48. According to Patent Owner, much of the re-engineer would due to Birse lacking the claimed cache and claimed caching context. *Id.* at 49. Patent Owner's position is supported by the testimony of Dr. Newman, who testifies that:

> to meet the claim from Birse and Holzmann, a person of ordinary skill would have to: (i) introduce the patent's root/leaf composition model in which unchanged root blocks never appear in the leaf and writes go only to the leaf; (ii) relocate and re scope Holzmann's appliance cache so that it caches only blocks of the shared root image, not generic OS data, and so that it is consumed through a block level merge with each node's leaf beneath the file system; and (iii) strip out Holzmann's per line write semantics and server ownership locking — which exist precisely because Holzmann's cache is used as a read and write appliance cache for a single OS image — to conform to the claim's root read/leaf write division of responsibility.

Ex. 2014 ¶ 131.

As discussed previously, based on our reading of Holzmann, it does not disclose or teach per-node leaf images nor does it meet the claim's negative limitation on leaf content. Rather, Holzmann is directed to avoiding maintaining separate OS images per server and instead relies on a single OS image with a centrally managed cache, and its cache arbitrates reads and writes to cached OS data at the line level with server-specific metadata. *See* Ex. 1007 ¶¶ 9–10; Figs. 4–5. Therefore, we are unpersuaded

that Holzmann's cache operations would have rendered the claim limitation obvious to an ordinarily skilled artisan.

*b. Rationale to Combine the References*

Petitioner contends that an ordinarily skill artisan at the critical time would have combine the teachings of Birse and Holzmann to arrive at the challenged claims. *See* Pet. 58–59 (citing Ex. 1003 ¶¶ 537–555). According to Petitioner, both Birse and Holzmann are concerned with efficient management of whole OS images and booting systems over a network, and Birse discloses caching as a feature on some embodiments of its system's server and client computers. *Id.* at 58. Yet, Birse it lacks detail on how caching may be applied to its boot images. Therefore, Petitioner asserts that a person of ordinary skill in the art would have looked to Holzmann for greater details of caches for each system/server being booted, as well as different cache configurations. *Id.* (citing Ex.1003 ¶¶ 537–555).

Petitioner further argues that an ordinarily skill artisan "would have been motivated to modify Birse with Holzmann's caching techniques, including because, while Birse discloses typical caching, Holzmann offers details of how to cache data for the OS distribution purpose (*e.g.*, Birse's boot images)." *Id.* Petitioner concludes that combining the teachings of these references would have been simple, inexpensive, and would have yielded predictable results for the ordinarily skill artisan. *Id.* at 59.

Patent Owner disputes Petitioner's position. Prelim. Resp. 51–54. Patent Owner contends the two references "pull a person of ordinary skill in opposite directions on the core design choice at issue." *Id.* at 52. According to Patent Owner, "Holzmann tells the reader that keeping per-server images is undesirable and should be replaced by a single, centrally managed image

with a shared cache," while Birse "embraces per-client artifacts (including full copies in one embodiment) as the way to manage client changes." *Id.* Patent Owner further argues that "[i]mplementing claim 1 from these references would also change their principles of operation rather than yield a predictable variant." *Id.* at 53. Patent Owner's position is supported by the testimony of Dr. Newman, who testifies that a person of ordinary skill in the art:

> starting from Holzmann's model would have no record-based reason to re-introduce per-node, persistent image artifacts—precisely what claim 1 requires for the leaf images—because Holzmann's stated objective is to avoid them. Conversely, a skilled artisan starting from Birse's per-client shadow scheme would not be steered toward Holzmann's single-image boot appliance with a centrally partitioned OS cache.

Ex. 2014 ¶ 132.

We agree with Patent Owner that Petitioner fails to offer sufficient explanation as to why a person of ordinary skill in the art would have combined the teachings of Birse and Holzmann. Rather, Petitioner appears to argue that, based on the advantages described by Holzmann, and using well-known techniques with unspecified predictable results, a person of ordinary skill in the art would have had sufficient reason to combine these specific elements taught in the prior art references in the specific manner recited in the challenged claim, thereby rendering such claims obvious. Pet. 58–59. Petitioner walks a narrow path in arguing that Birse's disclosure of caching techniques is both sufficient enough to lead an ordinarily skilled artisan to want caching, but insufficient enough to require more detail.

Although we agree with the Petitioner that a person of ordinary skill would have been *capable* of making the proposed combination, Patent

Owner persuasively demonstrates that the Petitioner has not identified *why* a person of ordinary skill would use Holzmann's caching details or its caching configurations when it is so different from Birse. As the Supreme Court has said, "a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). [I]t can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does. This is so because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known. *KSR*, 550 U.S. at 418-19. For example, the Federal Circuit has held that testimony "succumbed to hindsight bias" when it "primarily consisted of conclusory references to her belief that one of ordinary skill in the art *could* combine these references, not that they *would* have been motivated to do so." *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014). Such is the case here where Petitioner has argued that a person of ordinary skill *could* combine the references, but has not sufficiently explained whether a person of ordinary skill *would* do so.

Furthermore, Dr. Zadok's testimony regarding predictable results and obviousness to try are similarly lacking in elaboration and substantiation. *See* Ex. 1003 ¶¶ 553–555. Such conclusory statements and unspecific testimony without evidence on the record cannot satisfy the Petitioner's burden of demonstrating obviousness. *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016); *I/P Engine, Inc. v. AOL Inc.*, 576 Fed.

Appx. 982, 999 (Fed. Cir. 2014) ("The testimony of the Defendants' expert amounts to a 'mere conclusory statement' that may not serve as a basis for finding the asserted claims obvious."); *see InTouch Techs., Inc.*, 751 F.3d at 1352; *see also* 37 C.F.R. 42.65(a) ("Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight.").

We have considered Petitioner's arguments and cited evidence concerning whether the combination of Birse and Holzmann would have taught or suggested to the ordinarily skilled artisan the features of claims 1 and 7, and do not find them sufficiently persuasive on the record before us. Rather, we find Patent Owner's arguments and cited evidence outlined above sufficiently persuasive to demonstrate Petitioner failed to meet its burden of proof in this case. Accordingly, for the reasons expressed above and based on the record before us, we determine that Petitioner has not established a reasonable likelihood that it would prevail in showing that independent claim 1 is unpatentable as obvious under 35 U.S.C. § 103(a) in view the combination of Birse and Holzmann.

*1. Dependent Claims 2–6, 8–13*

Claims 2–6 and 8–13 depend, directly or indirectly, from independent claims 1 or 7. Ex. 1001, 11:4–26, 11:41–65. Based on the record before us, we determine that Petitioner's analysis for claims 2–6 and 8–13 does not remedy the deficiencies identified above with respect to independent claims 1 and 7. *See* Pet. 33–46. Thus, for the same reasons discussed in connection with the challenge to independent claims 1 and 7, we determine that Petitioner has not established a reasonable likelihood that it would

prevail in showing that any of claims 2–6 and 8–13 is unpatentable as obvious over the combination of Birse and Holzmann.

*E. Alleged Obviousness of Claims 14–27 over the Combination of Birse and Federwisch*

Petitioner contends claims 14–27 would have been unpatentable under 35 U.S.C. § 103 as obvious over the combination of Birse (Ex. 1006) and Federwisch (Ex. 1008). Pet. 74–79. Patent Owner opposes Petitioner's contentions. Prelim. Resp. 36–47. Based on our review of the record before us, we determine that Petitioner has not established a reasonable likelihood that it would prevail in showing that independent claims 14, 19, or 23 (and thus any Challenged Claim) would have been unpatentable as obvious over the combination of Birse and Federwisch, as discussed below.

*1. Analysis of Independent Claims 14, 19, 23*

*a. cross-node root-image indexing limitations*

The parties dispute whether the combination of Birse and Federwisch would have taught or suggested to the ordinarily skilled artisan the required the cross-node root-image indexing limitations recited in claims 14, 19, or 23. *See* Pet. 76–77 (citing Pet. 74–75; Ex. 1003 ¶¶ 639–40); Prelim. Resp. 57–59.

Petitioner relies on the disclosure in Federwisch for the disputed limitation. Pet. 76–77 (citing Pet. 74–75; Ex. 1003 ¶¶ 639–40). As explained previously, Petitioner proffers only conclusory statements regarding what an ordinarily skilled artisan *could* do given the disclosure of Federwisch, but does so without sufficiently explaining *why* such a skilled artisan *would* perform the features of the challenged limitation based on the disclosure.

Additionally, we also previously found that Petitioner fails to show sufficiently how or when an index in Federwisch would be provided to another compute node. Other than making generalized statement regarding indexing and Federwisch identifying changed and unchanged blocks (*see* Pet. 51–52), Petitioner fails to make a showing of such indexing being sent to or provided to another node. Thus, we find Petitioner does not show sufficiently how the disclosures in Federwisch and Birse teaches or suggests indexing a root image or root image portion and providing the indexing results to another of said compute nodes.

*a. Combined Teachings and Summary*

As for the *combined* teachings of Birse and Federwisch, the full extent of Petitioner's argument is that

> Both Birse and Federwisch operate at and recognize disk blocks at the block layer (while also recognizing that file systems interoperate and work atop the block layer), disclose/use CoW snapshots (a POSITA would have known CoW techniques enable snapshots), and disclose caching blocks of the root/boot disk images. Further, a POSITA would have been motivated to modify Birse with Federwisch's indexing – including because, while Birse suggests that the boot images are indexed and organized through boot file selection and a registry, a POSITA building a Birse system, and knowing that indexing of data items was a well-known technique, would have been motivated to seek additional details on indexing storage systems, files, and caches thereof (supplied by Federwisch). A POSITA would also have known that indexing of data is an age-old technique long utilized in computer systems. Ex.1003, ¶¶617-638.
>
> Modifying Birse to include Federwisch's indexing would have been simple to a POSITA, and would not have required extensive experimentation or imposed undue burden – including because Birse likely already supported the use indexing tools and a POSITA would not have expected Birse to provide details of

> such a basic concept. For the same reasons, the combination would have yielded predictable results, as indexes are well understood to structure and locate data objects efficiently and a POSITA would have had a high expectation of success, because indexing techniques were well understood for decades beforehand. Ex.1003, ¶¶639-40.

Pet. 74–75 (emphasis omitted). But Petitioner does not sufficiently explain how details from Federwisch would be implemented in Birse and to what extent. Rather, Petitioner merely concludes that an ordinarily skill artisan could have done so and, therefore, would have do so.

Our reviewing courts have warned us that "[o]bviousness may not be established using hindsight or in view of the teachings or suggestions of the inventor." *Para-Ordnance Mfg. v. SGS Importers Int'l*, 73 F.3d 1085, 1087 (Fed. Cir. 1995) (citing *W.L. Gore & Assocs., Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1551, 1553 (Fed. Cir. 1983)). "The mere fact that the prior art may be modified in the manner suggested . . . does not make the modification obvious unless the prior art suggested the desirability of the modification." *In re Fritch*, 972 F.2d 1260, 1266 (Fed. Cir. 1992) (citing *In re Gordon,* 733 F.2d 900, 902, 221 USPQ 1125, 1127 (Fed. Cir. 1984)). "It is impermissible to use the claimed invention as an instruction manual or 'template' to piece together the teachings of the prior art so that the claimed invention is rendered obvious." *Fritch*, 972 F.2 at 1266 (citing *In re Gorman*, 933 F.2d 982, 987 (Fed. Cir. 1991)). Without the challenged claims as a guide, we are not persuaded an ordinarily skill artisan at the critical time would have combined the prior art as suggested by Petitioner.

We have considered Petitioner's arguments and cited evidence concerning whether the combination of Birse and Federwisch would have taught or suggested to the ordinarily skilled artisan the features of the

disputed limitation, and do not find them sufficiently persuasive on the record before us. Rather, we find Patent Owner's arguments and cited evidence outlined above sufficiently persuasive to demonstrate Petitioner failed to meet its burden of proof in this case. Accordingly, for the reasons expressed above and based on the record before us, we determine that Petitioner has not established a reasonable likelihood that it would prevail in showing that independent claims 14, 19, and 23 are unpatentable as obvious over the combination of Birse and Federwisch.

#### 2. *Dependent Claims 15–18, 20–22, and 24–27*

Based on the record before us, we determine that Petitioner's analysis for dependent claims 15–18, 20–22, and 24–27 does not remedy the deficiencies identified above with respect to independent claims 14, 19, and 23. *See* Pet. 52–58. Thus, for the same reasons discussed in connection with the challenge to independent claims 14, 19, and 23, we determine that Petitioner has not established a reasonable likelihood that it would prevail in showing that any of claims 15–18, 20–22, and 24–27 are unpatentable as obvious over the combination of Birse and Federwisch.

## V. CONCLUSION

Petitioner has not demonstrated a reasonable likelihood of prevailing with respect to any of claims 1–27 of the '844 patent under any of its proffered challenges.

## VI. ORDER

For the reasons given, it is hereby

ORDERED that the Petition is *denied*, and an *inter partes* review of U.S. Patent No. 8,332,844 B2 is not instituted.

For PETITIONER:

John B. Campbell
Alan Block
Casey Shomaker
MCKOOL SMITH, P.C.
jcampbell@McKoolSmith.com
ablock@mckoolsmith.com
cshomaker@mckoolsmith.com

Keith D. Harden
Daniel E. Venglarik
MUNCK WILSON MANDALA, LLP
kharden@munckwilson.com
dvenglarik@munckwilson.com

For PATENT OWNER:

Brandon R. Theiss
Daniel H. Golub
Ryan W. O'Donnell
Dawn C. Kerner
VOLPE KOENIG
BTheiss@vklaw.com
DGolub@vklaw.com
RODonnell@vklaw.com
DKerner@vklaw.com

Russell J. Rigby
INTELLECTUAL VENTURES I LLC
rrigby@intven.com

# EXHIBIT A-26

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

AMERICAN AIRLINES, INC. AND SOUTHWEST AIRLINES CO.,

Petitioners,

v.

INTELLECTUAL VENTURES I LLC,

Patent Owner.

Case No. IPR2025-00785
U.S. Patent No. 7,257,582

# PATENT OWNER'S PRELIMINARY RESPONSE

## Table of Contents

PATENT OWNER'S EXHIBIT LIST ....................v

I. INTRODUCTION ....................1

II. THE SPECIFICATION OF THE '582 PATENT ....................3

III. THE CLAIMS OF THE '582 PATENT ....................6

IV. CLAIM CONSTRUCTION ....................8

V. APPLICABLE LEGAL STANDARDS ....................12

VI. A PERSON HAVING ORDINARY SKILL IN THE ART ....................13

VII. PRIOR ART RELIED ON IN PETITION ....................13

A. Chow ....................13

B. Reiffin ....................17

C. Kurowski ....................18

VIII. GROUND 1 OF THE PETITION FAILS TO DEMONSTRATE A REASONABLE LIKELIHOOD OF SUCCESS ....................19

A. The Petition Fails To Demonstrate That Chow Alone Meets All Of The Limitations Of Claim 1 Of The '582 Patent ....................19

1. The Petition Erroneously Attempts To Combine Aspects Of Systems Disparaged By Chow With Aspects of Chow's Proposed Solution In Attempting To Map Element [1a] To Chow ....................20

2. The Petition Presents Grossly Inconsistent Mappings Of Aspects Of Claim 1 To Chow ....................22

3. The Petition Has Failed To Explain How Chow Distributes Descriptions Of All Of Said Partitions To The Subtask Processors As Recited In Element [1b] ....................23

4. The Petition Has Failed To Explain How Chow Meets The Sequential Requirements Of Claim 1 of the '582 Patent ....................25

B. The Petition Fails To Demonstrate That Reiffin Alone Meets All Of The Limitations Of Claim 1 Of The '582 Patent ....................28

1. The Petition Fails To Explain How Reiffin Logically Subdivides Records Of A Preexisting Input File Into A Plurality Of Partitions As Recited In Element [1a] ....................28

2. The Petition Fails To Explain How Reiffin Distributes Descriptions Of All Of Said Partitions To The Subtask Processors As Recited In Element [1b] ..............................30

C. The Petition Fails To Demonstrate That Claim 1 Is Obvious Over The Combination Of Chow And Reiffin .........................32

1. Both Chow And Reiffin Are Deficient With Respect To Elements [1a] And [1b] ..................................................32

2. The Petition's Purported Motivation For Combining Chow And Reiffin Is Deficient ..................................................33

a) The Fact That References Relate To The Same Field Standing Alone Is Insufficient To Establish A Motivation To Combine ..............................................................35

b) The Lack Of A Non-Conclusory Explanation "Why" Chow And Reiffin Would Have Been Combined Is Fatal ..........................................................................36

c) A Reasonable Expectation Of Success Is Insufficient To Establish A Motivation To Combine............................38

d) The Testimony Of Petitioners' Declarant Parrots The Words Of The Petition And Provides No Additional Explanation Or Citations Supporting The Alleged Motivation To Combine .............................................39

3. There Is No Nexus Between The Purported Motivation To Combine Chow And Reiffin And Each Of The Numerous Ways The Petition Alleges The References Could Be Combined.....................................................................39

D. Ground 1 Is Deficient...........................................................41

IX. GROUND 2 OF THE PETITION FAILS TO DEMONSTRATE A REASONABLE LIKELIHOOD OF SUCCESS.........................................41

A. The Petition Fails To Demonstrate That Kurowski Alone Meets All Of The Limitations Of Claim 1 Of The '582 Patent...........42

1. The Petition Fails To Explain How Kurowski Logically Subdivides Records Of A Preexisting Input File Into A Plurality Of Partitions As Recited In Element [1a]............42



9276988.7

2. The Petition Fails To Explain How Kurowski Distributes Descriptions Of All Of Said Partitions To The Subtask Processors As Recited In Element [1b] ..............................44

B. The Petition Fails To Demonstrate That Claim 2 Is Obvious Over The Combination Of Chow, Reiffin, And Kurowski ......45

1. Both Chow And Reiffin Are Deficient With Respect To Elements [1a] And [1b] ....................................................45

2. The Petition's Purported Motivation For Combining Chow And Reiffin Is Deficient ..................................................46

a) The Fact That Chow And Kurowski Are Similar Is Insufficient To Establish A Motivation To Combine...49

b) The Lack Of A Non-Conclusory Explanation Of "Why" Chow And Reiffin Would Have Been Combined Is Fatal ........................................................................50

c) The Testimony Of Petitioners' Declarant Parrots The Words Of The Petition And Provides No Additional Explanation Or Citations Supporting The Alleged Motivation To Combine .............................................51

3. There Is No Nexus Between The Purported Motivation To Combine Kurowski With Chow and Reiffin And Each Of The Numerous Ways The Petition Alleges The References Could Be Combined........................................................52

C. Ground 2 Is Deficient.............................................................54

X. THE DECLARATION OF PETITIONERS' EXPERT IS ENTITLED TO LITTLE IF ANY WEIGHT..................................................................54

XI. CONCLUSION..........................................................................56

**PATENT OWNER'S EXHIBIT LIST**

| | |
|---|---|
| Ex. 2001 | https://www.unifiedpatents.com/faq |
| Ex. 2002 | https://www.unifiedpatents.com/members |
| Ex. 2003 | Reexamination Request challenging U.S. Patent 7,257,582 filed by Unified Patents (No. 90/015,337) |
| Ex. 2004 | Reexamination Request challenging U.S. Patent 8,332,844 filed by Unified Patents (No. 90/019,938) |
| Ex. 2005 | Petition filed in IPR2025-00931 |
| Ex. 2006 | Docket from *Intellectual Ventures I LLC et al. v. Southwest Airlines*, Co., 7:24-cv-277 (WDTX) |
| Ex. 2007 | www.txwd.uscourts.gov/for-attorneys/judge-albright-courtroom-faq/ |
| Ex. 2008 | Docket from *Intellectual Ventures I LLC et al. v. American Airlines*, Inc., 4:24-cv-980 (EDTX) |
| Ex. 2009 | Defendant American Airlines, Inc.'s P.R. 3-3 Invalidity Contentions in *Intellectual Ventures I LLC et al. v. American Airlines*, Inc., 4:24-cv-980 (EDTX) |
| Ex. 2010 | Defendant Southwest Airlines Co.'s Preliminary Invalidity Contentions in *Intellectual Ventures I LLC et al. v. Southwest Airlines*, Co., 7:24-cv-277 (WDTX) |
| Ex. 2011 | Agreed Scheduling Order *Intellectual Ventures I LLC et al. v. Southwest Airlines*, Co., 7:24-cv-277 (WDTX) |
| Ex. 2012 | Order Denying Motion to Sever and Stay Claims Against Viasat's In-Flight Connectivity Systems by Defendant American Airlines<br>*Intellectual Ventures I LLC et al. v. American Airlines*, Inc., 4:24-cv-980 (EDTX) |
| Ex. 2013 | Declaration of Dr. Daniel Abadi |
| Ex. 2014 | CV of Dr. Daniel Abadi |

# I. INTRODUCTION

The Petition challenges claims 1-14 of U.S. Patent No. 7,257,582 (the '582 Patent) under two grounds. Institution should be denied for at least the following reasons:

First, the Petition's mappings of Chow to claim 1 in Ground 1 are grossly deficient, and fail to explain how Chow meets elements [1a], [1b] and [1c] of claim 1. The mappings fail to explain how Chow discloses the claimed elements "arranged as in the claim," and inconsistently map the "partitions" recited throughout the claim to different disclosures in Chow. In addition, the Petition fails to explain how Chow meets the sequence of operations required by claim 1 in which the ***subdividing of an input file into a number of partitions greater than the number of subtask processors*** occurs ***before executing any of the subtasks on the partitions***.

Second, the Petition's mappings of Reiffin to claim 1 in Ground 1 are also deficient. In purporting to map Reiffin to Element [1a] which expressly refers to logically subdividing a preexisting input *file*, the Petition relies solely on Reiffin's division of *tasks* and *subtasks*, but fails to offer *any* explanation whatsoever why, in the context of the claim language which clearly distinguishes between a *file* and *subtasks*, Reiffin's division of *tasks* and *subtasks* equates to the logical the partitioning of the "preexisting input *file*" as recited in the claim language. Moreover, in purporting to map Reiffin to Element [1b], the Petition relies on one

of Reiffin's computers accessing "*the next subtask identifier*" waiting in a queue, but fails to explain how a computer accessing "*the next subtask identifier* waiting in the queue" equates with *distribution* of descriptions of *all* of said partitions to each processor, as claimed.

Third, the Petition's mappings of Kurowski to claim 1 in Ground 2 suffer from similar deficiencies. Again, rather than addressing the language of Element [1a] which expressly refers to logically subdividing a preexisting input *file*, the Petition simply points to Kurowski's division of "a very large computing problem into" *tasks*, and fails to offer *any* explanation whatsoever why Kurowski's division of "a very large computing problem" into *tasks* equates to the logical the partitioning of the "preexisting input *file*." In connection with Element [1b] which requires *the distribution of descriptions* of all of the partitions of the preexisting input file to *subtask processors*, the Petition points to Kurowski's web interface that allows *users* to view summary reports but fails to explain how such a user-interface equates to the machine-level distribution of descriptions of all partitions to the subtask *processors* as claimed.

Finally, the purported motivations set forth in the Petition for combining the references in Grounds 1 and 2 are limited to conclusory allegations that fall short of what is required to establish obviousness. Both Grounds 1 and 2 lack a non-conclusory explanation as to how or why the references would be combined to

produce the claimed invention.

For all of these reasons, and as explained more fully below, institution should be denied.

## II. THE SPECIFICATION OF THE '582 PATENT

The Summary of the '582 Patent describes "a method which distributes the load of a process that normally reads an *input file* sequentially and *processes its records* one by one between a plurality of potentially heterogeneous processors through *the logical partition of the input* and the activation of a plurality of *sub tasks* in said plurality of processors, *each said sub task processing the partitions defined by said logical partition* in a first come first serve basis." Ex. 1001, 1:62-2:2. As explained in the specification and claims of the patent, the "input file" and the "sub tasks" are *different*. Ex. 2013, ¶ 69. More specifically, *the input file includes records that are logically partitioned*, while *the sub tasks process the logical partitions*.

An example of the logical partitioning of input files is depicted in Figure 1 of the '582 Patent, reproduced below with colored annotations added by Patent Owner. In Figure 1, "[i]nput files 9 are, thus, logically partitioned into n logical partitions where n is a number the split step 102 has decided upon. In FIG. 1, these logical partitions [red box] are numbered as 1 to 6."




The specification explains that, in the content of the '582 Patent, a logical partition is a _well-defined_ part of the input file:

> A logical partition in this context is _a well-defined part of the input_ or output. A very simple way to define a partition, which in many cases is the most efficient, would be to define the partitions as consecutive ranges on the input or output, _ranging from one relative byte address to another relative byte address or from one relative track address to another_. ...
>
> Note that the _logical partition does not rely on actual reading of the file_. _The actual reading of the file is reserved to the subtasks which read the partitions allocated to them_. A splitting function may be allocating offset 0 to offset 100000 to a first partition, offset 100001 to 200000 to the second partition, offset 200001 to 300000 to the third partition and 300001 to the end of the file to a fourth partition. *Id.*, 3:36-59 (emphasis added).

Thus, in the parlance of the '582 Patent, the logical partitions correspond to well-defined portions of an input file, and the logical partitions are *different* from the sub tasks which, *inter alia*, read and process the logical partitions.

The specification also explains that the activation of the sub tasks occurs only *after* the logical partitioning of the input file (referred to in the '582 Patent as "the split step") is finished. In this regard, the specification provides:

> *When the split step terminates*, the various *Sub Tasks* (in this case: 103, 202,203) *can be activated*. This activation can be initiated by the split step 102 itself or by an external scheduler. *Id.*, 3:64-67 (emphasis added).

As explained more fully below, the requirement that the *logical partitioning* of the input file into partitions occur *before* any of the *subtasks are activated* is expressly reflected in the claims of the '582 Patent. Ex.2013, ¶¶ 31-32.

After being activated, each sub task is provided with a description of the subdivisions of the input file (reflecting the logical partitions) and uses such information "to allocate for itself and then process, an input partition that has not been allocated yet." *Id.*, 3:67-4:3.

After the sub tasks have terminated, a merge step merges "the outputs of the various Sub Tasks into the result output file or files." *Id.*, 4:40-61.

## III. THE CLAIMS OF THE '582 PATENT

Claim 1 of the '582 Patent is the only independent claim, and recites as follows:

> 1. A method of effecting on a preexisting *input file* a computer-executable process comprised of a *plurality of subtasks*, the method comprising the steps of:
>
> (a) automatically determining file allocation and *logically subdividing records of said input file into a plurality of partitions*;
>
> (b) *distributing descriptions of all of said partitions* to each of a plurality of subtask processors
>
> (c) simultaneously *executing at least a respective one of the subtasks* of the computer-executable process *in each of at least some of said processors on a respective one of the partitions with each subtask reading and processing the respective partition* so as to process the respective partition and produce respective subtask output and;
>
> (d) *thereafter repeating step (c) in at least some of the subtask processors each with another unprocessed partition* on a first-come/first-served basis; and
>
> (e) generating at least one output combining all of the subtask outputs and reflecting the processing of all of said subtasks.

Several aspects of the plain and ordinary meaning of claim 1 are worthy of note.

First, the preamble separately introduces an "input file" and "subtasks," indicating that the two are *different*. The body of the claim goes on to explain the differences between the two. More specifically, step (a) of the claim recites that *the input file includes records that are logically partitioned*, while step (c) recites that *the subtasks process the logical partitions*. Moreover, in the parlance of the '582

Patent, the logical partitions correspond to "well-defined" portions of the preexisting input file such as "ranging from one relative byte address to another." Ex. 1001, 3:36-41.

Second, step (a) of the claim recites "logically subdividing records" of "said input file" into "***a*** plurality of partitions."

Third, step (b) of the claim introduces "a plurality of subtask processors" which are used in steps (c) and (d) to execute subtasks on "***the*** partitions."

Fourth, in step (c) each of the subtask processors simultaneously executes a subtask on "a respective ***one*** of ***the*** partitions."

Fifth, step (d) specifies "thereafter ***repeating*** step (c)" with "at least some of the subtask processors" on "***unprocessed***" partitions. Because it is a repetition of step (c), step (d) repeats the requirement of step (c) that some of the subtask processors each simultaneously execute a subtask on "a respective ***one*** of ***the*** partitions."

Based on the above, the claim language requires that "***the*** partitions" initially subdivided from the input file in step (a) be ***greater in number than the number of subtask processors***. This result must hold because in the first iteration of step (c) ***each of the subtask processors*** simultaneously executes a subtask on "a respective ***one*** of ***the*** partitions" and in the repetition of step (c) called for by step (d) ***some of the subtask processors*** each simultaneously execute a subtask on "a respective ***one***

of ***the*** partitions" ("***unprocessed***" partitions). Thus, in order for there to be sufficient partitions to meet the processing recited in steps (c) and (d), "***the*** partitions" initially subdivided from the input file in step (a) must be ***greater in number than the number of subtask processors***. *See also*, Ex.2013, ¶¶31, 33.

Finally, the claim requires that the subdividing of the input file in step (a) into a number of partitions greater in number than the number of subtask processors occur ***before*** executing ***any*** of the subtasks on the partitions in steps (c) and (d). The claim language requires this sequence because the "executing" of the subtasks in steps (c) and (d) is performed on "***the*** partitions" that resulted from the subdividing recited earlier in step (a). This aspect of the claim language is consistent with the specification which discloses that "[w]hen the split step terminates, the various Sub Tasks (in this case: 103, 202, 203) can be activated." *Id.*, 3:64-67; Ex. 2013, ¶ 32.

## IV. CLAIM CONSTRUCTION

The claim limitations at issue must be construed under *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005). Claim language is not read in isolation. *Phillips*, 415 F.3d at 1315. Rather, the claim language, when read in light of the specification and the prosecution history, elucidates the meaning of the claim language.

As explained in the previous section, the plain and ordinary meaning of the claim language makes clear that a "preexisting input file" and "subtasks" are *different*. In this regard, the claim specifies that *the input file includes records that*

*are logically partitioned*, while *the subtasks process the logical partitions*. In addition, as explained in the previous section, the plain and ordinary meaning of the claim language requires that the *subdividing of an input file into a number of partitions greater than the number of subtask processors* occurs *before executing any of the subtasks on the partitions*. *See*, Section III, *supra*.

Under 37 C.F.R. § 42.104(b)(3), a petitioner must provide a clear articulation of "[h]ow the challenged claim is to be construed." The Petitioners asserted that they "do not believe explicit construction is needed to resolve this petition." Petition, 6. However, as explained more fully below, the Petition fails to explain how the relied on references meet the plain and ordinary meaning of the aspects of the claim language emphasized above. Even worse, the Petition is predicated on claim construction positions that cannot be reconciled with those advanced by Petitioners in the parallel district court litigations. In the district courts, Petitioners have taken the position that key claim terms of the '582 Patent are "indefinite under 35 U.S.C. § 112, ¶ 2" because they "fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." Ex. 2009, 36-37 and Ex. 2010, 200-201. Yet, in this IPR, the Petitioners have abandoned those positions in favor of interpretations intended to support invalidity arguments in this IPR—without acknowledging, let alone justifying, the inconsistency.

As detailed below, Petitioners indefiniteness allegations in the district courts cannot be reconciled with Petitioners' position here that, under *Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed. Cir. 2005), "*Petitioners do not believe* explicit construction is needed to resolve this petition." Petition, 6 (emphasis added). Under *Phillips*, claim terms are typically given their "ordinary and customary meaning" which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id*., at 1313. Petitioners' indefiniteness positions in the district courts are irreconcilable with those taken by Petitioners in this IPR because a claim term cannot be both "indefinite under 35 U.S.C. § 112, ¶ 2" because it fails "to inform, with reasonable certainty, those skilled in the art about the scope of the invention" and, at the same time, have an "ordinary and customary meaning" as understood by "a person of ordinary skill in the art in question at the time of the invention."

By way of example, in the district court, Petitioner Southwest Airlines alleges that "automatically determining file allocation" in claim 1 "is vague and undefined" because the criteria that "define "automatic" allocation" is unclear, and raises questions such as whether the allocation is "based on file size, content, metadata, or another heuristic," whether "manual intervention" can "be involved at any stage and still meet this limitation." Ex. 2010, 200-201. Petitioner American Airlines asserts that the same phrase is indefinite in the district court. Ex. 2009, 37. Similarly, in the

district court, Petitioner Southwest Airlines alleges that the phrase "logically subdividing records" is "also ambiguous," and raises questions such as "[w]hat constitutes a logical subdivision," "[d]oes the subdivision require a specific algorithm or data structure," and [i]f different methods (e.g., fixed-size vs. content-based) could be used, which ones fall under the claim scope." Ex. 2010, 200-201. Again, Petitioner American Airlines asserts that the same phrase is indefinite in the district court. By contrast, in this IPR, Petitioners purport to convey their "*belief*" that, under *Phillips*, no explicit construction is necessary because the very same claim terms can be given their "ordinary and customary meaning." *Phillips,* 415 F.3d 1303, 1313. These positions are diametrically opposed. A claim term that is "vague and undefined" does not have any "ordinary and customary meaning" as understood by a POSITA. Congress did not create the IPR process to provide an accused infringer with a mechanism for simultaneously advancing irreconcilable positions in different forums.

Petitioner's indefiniteness positions in the district court are not limited to the terms described above but extend to other terms in claim 1 of the '582 Patent. More specifically, in the district courts, Petitioners contend that a POSITA would not have been able to understand the meaning of (i) "simultaneously executing at least a respective one of the subtasks of the computer-executable process in each of at least some of said processors on a respective one of the partitions with each subtask

reading and processing the respective partition so as to process the respective partition and produce respective subtask output" and (ii) "repeating step (c) in at least some of the subtask processors each with another unprocessed partition on a first-come/first-served basis." Ex. 2009, 36-37 and Ex. 2010, 200-201. Again, these distinct claim construction positions are diametrically opposed to ones taken by Petitioners in this IPR, and provide a further basis for denial of institution.

Under 37 C.F.R. § 42.104(b)(3), a petitioner must provide a clear articulation of "[h]ow the challenged claim is to be construed." Here, the Petitioners failed to meet this burden by basing the Petition on claim constructions that Petitioners believe are incorrect. These aspects of the Petition favor denial of institution.

## V. APPLICABLE LEGAL STANDARDS

The Board may only grant a petition for IPR where "the information presented in the petition ... shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a); 37 C.F.R. § 42.108(c). Accordingly, the Petitioner bears the burden of showing this statutory threshold has been met. *See* Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,756 (Aug. 14, 2012) ("The Board ... may institute a trial where the petitioner establishes that the standards for instituting the requested trial are met...").

## VI. A PERSON HAVING ORDINARY SKILL IN THE ART

The Petition alleges that a POSITA would have had a bachelor's degree in computer science, computer engineering, electrical engineering, or related field, and at least two years of experience in computer networking and parallel computing, or a person with a master's degree in one of the foregoing and at least one year of experience in the aforementioned fields. Additional education could substitute for professional experience, and vice-versa. Petition, 7. For purposes of this Patent Owner Preliminary Response only, Patent Owner does not contest Petitioner's proposed definition of a POSITA. However, Patent Owner reserves the right to contest Petitioner's proposed definition of a POSITA should this challenge be instituted.

## VII. PRIOR ART RELIED ON IN PETITION

Ground 1 of the Petition alleges that claims 1-14 of the '582 Patent are "[o]bvious over Chow (Ex. 1003) in view of Reiffin (Ex. 1004)." Petition, 7. Ground 2 alleges that claims 1-14 of the '582 Patent are "[o]bvious over Chow (Ex. 1003) in view of Reiffin (Ex. 1004) and further in view of Kurowski (Ex. 1005)." *Id*. Each of these references is discussed below.

### A. Chow

Chow begins with a "Description of the Related Art." There, Chow <u>*disparages*</u> systems that partition data by logically dividing the data *a priori* so that

each thread can process a separate portion of the data. Chow explained that such systems resulted in a "significant problem" known as "workload skew." From Chow:

> Reducing task completion time is especially challenging in "multiprocessing environments" ... Typically, workload is apportioned by somehow logically dividing the data to be processed. For example, *a block of data might be divided evenly into a number of parts equal to the number of available threads, so that each thread can independently process a separate portion of the data. This is called "static" or "a priori" partitioning*.
>
> Such apportionment of work is *rarely completely balanced*. One reason is that the extent of the data may be difficult to ascertain, or the data's processing time may be otherwise difficult to predict. Furthermore, even equisized data subparts may require comparatively different processing times. As a result of this lack of balance, some threads finish early, and other threads labor for longer periods. Still, the overall job is not complete until all threads have finished, including the last to finish its respective task. Thus, even though some threads complete their work early, other threads linger on, delaying completion of the ultimate task. *One name for this phenomenon is called "workload skew."* For users seeking faster execution of their multi-thread application programs, *workload skew is a significant problem area*. Ex. 1003, 1:26-58 (emphasis added).

In contrast to systems that partition data by logically dividing the data *a priori*, Chow proposed a "multiprocessing system [that] operates like multiple people drinking water from a common glass through individual straws—although each drinker works independently, all finish simultaneously, thus completing the aggregate task as expeditiously as possible." *Id.*, 2:15-20. Among other advantages,

Chow explained that this approach resulted in "minimum workload skew among independently operating processing elements." *Id.*, 2:44-45.

Rather than logically dividing *all* of the data to be processed *before* execution of the subtasks begins, in Chow's solution the data is divided into subtasks *after* processing by the task execution units commences. As Chow explains, *after* a task execution unit completes a subtask, "*the task execution unit* 200 in step 418 *determines a unit of granularity for the next sub-task to be processed, and then, using the determined granularity, obtains the sub-task from the aggregate task*. ... *The size of the next sub-task to be processed is dictated by a corresponding granularity unit*, also determined [by the task execution unit 200] in step 418." *Id.*, 5:29-37 (emphasis added); *see also*, Ex. 2013, ¶ 43.

Chow's division of an aggregate task into subtasks *after* processing by the task execution units commences is depicted in Figure 4 of Chow (reproduced below with colored annotations added by Patent Owner).




*FIG. 4*

Chow explains that the process of Figure 4 is initiated in task 402, and "step 404 receives the aggregate task." *Id.*, 4:7-8. Each task execution unit "starts in step 410 [red boxes]." *Id.*, 4:24. Significantly, *no logical division of the aggregate task is shown between receipt of the aggregate task in step 404 and the starting of the task execution units in step 410*. Rather, after the task execution units start in step 410, "step 416 asks whether any work from the aggregate task remains to be processed" and "if step 416 finds work remaining," *the task execution unit 200 in step 418 [blue boxes] determines a unit of granularity for the next sub-task to be processed*, and then, using the determined granularity, obtains the sub-task from the aggregate task." *Id.*, 4:24- 33. Thus, in Chow's solution, *partitioning of each*

*subsequent sub-task* from the aggregate task occurs *after* each task execution unit completes a prior sub-task.

Simply put, Chow's proposed solution does not logically divide a "preexisting input file" into *all* of its partitions *before* (or "*a priori*") execution of the subtasks. On the contrary, Chow eschewed such an approach because "the data's processing time may be ... difficult to predict" and "even equisized data subparts may require comparatively different processing times." Ex. 1003, 1:44-48. Instead, Chow performs *partitioning of each subsequent sub-task* from the aggregate task only *after* each task execution unit *completes a prior sub-task*. Ex. 2013, ¶¶ 43, 65-68, 70.

**B. Reiffin**

Reiffin discloses that "[i]f a computer has a task which is both large and compute-intensive, the task is partitioned into a plurality of smaller subtasks to be executed simultaneously in parallel by the other computers of the network. Each of these subtasks is assigned its respective identifier." Ex. 1004, 2:19-23. Reiffin's "subtasks" let an idle workstation fetch a self-contained code module, run it, and return results. Nothing in Reiffin discloses logically *subdividing records of "a preexisting input file"* into "a plurality of partitions" wherein each partition is a "well-defined" part of the input file such as "ranging from one relative byte address to another relative byte address." Ex. 1001, 3:36-41; Ex. 2013, ¶¶ 47, 73.

### C. Kurowski

Kurowski discloses a system "where very large computation intensive tasks are broken down into thousands of sub-tasks and then distributed to thousands of clients running on a variety of computers across the Internet." Ex. 1005, Abstract. "The idle CPU time of each of these thousands of client computers is used to perform these computations by running custom application modules in a low priority. A task server keeps track of information associated with each of the clients and uses the information to assign one or more tasks associated with a computing problem to each client computer." *Id*.

Nothing in Kurowski discloses logically *subdividing records of "a preexisting input file"* into "a plurality of partitions" wherein each partition is a "well-defined" part of the input file such as "ranging from one relative byte address to another relative byte address." Ex. 1001, 3:36-41; Ex. 2013, ¶¶ 81, 83. Also absent from Kurowski is *the distribution of descriptions of all of the partitions* of such a preexisting input file to subtask processors. Instead of distributing all of such descriptions to Kurowski's thousands of processors, Kurowski simply assigns one task at a time to each client and provides it with the code and input needed to complete that individual computation. The Petition's reliance on paragraph [0188] of Kurowski —which describes a web interface that allows *users* to view summary

reports — has no relevance to the machine-level distribution of descriptions of all partitions to the subtask *processors* as required by claim 1 of the '582 Patent.

## VIII. GROUND 1 OF THE PETITION FAILS TO DEMONSTRATE A REASONABLE LIKELIHOOD OF SUCCESS

In identifying the "Grounds Raised," the Petition describes Ground 1 as alleging that claims 1-14 of the '582 Patent are "[o]bvious over Chow (Ex. 1003) *in view of* Reiffin (Ex. 1004)." Petition, 7 (emphasis added). However, at the end of Ground 1, the Petition alleges that claim 1 is "obvious over *Chow and Reiffin separately* and *over their combination*." Petition, 19 (emphasis added). Thus, in actuality, Ground 1 is not a single ground, but rather comprises multiple Grounds separately alleging that: (i) claim 1 is obvious over Chow alone, (ii) claim 1 is obvious over Reiffin alone, and (iii) claim 1 is obvious over some combination of Chow and Reiffin. As explained below, the Petition has failed to demonstrate a likelihood of success with respect to any of these theories.

### A. The Petition Fails To Demonstrate That Chow Alone Meets All Of The Limitations Of Claim 1 Of The '582 Patent

The Petition's mappings of claim 1 to Chow alone in Ground 1 are deficient for at least four reasons. First, the Petition's mappings of claim 1 to Chow fail to explain how Chow discloses the claimed elements "arranged as in the claim." Second, the Petition's mappings of claim 1 to Chow are plagued with gross inconsistencies. Third, the Petition's mappings fail to explain how Chow discloses

"distributing descriptions of all of said partitions" to the processors as recited in Element [1b] of claim 1. Fourth, the Petition fails to explain how Chow discloses the sequence recited in claim 1 which requires that the *subdividing of an input file into a number of partitions* greater than the number of subtask processors occur *before executing any of the subtasks on the partitions*.

**1. The Petition Erroneously Attempts To Combine Aspects Of Systems Disparaged By Chow With Aspects of Chow's Proposed Solution In Attempting To Map Element [1a] To Chow**

In an attempt to map Chow to Element [1a], the Petition erroneously attempts to link statements from Chow's "Description of the Related Art" where Chow *disparages* systems that partition data by logically dividing the data *before* (or "*a priori*") execution of the subtasks begins, with aspects of Chow's *solution* which performs *partitioning of each subsequent sub-task* only *after* each task execution unit completes a prior sub-task. However, in connection with the Petition's allegation that Chow alone meets the limitations of claim 1, it was Petitioner's burden to explain how Chow discloses the claim elements "arranged as in the claim." *See*, e.g., *Lindemann Maschinenfabrik GMBH v. Am. Hoist & Derrick Co*., 730 F.2d 1452, 1458, 1459 (Fed. Cir. 1984) (explaining that the prior art elements themselves must be "arranged as in the claim").

More specifically, in purporting to map Chow to Element [1a] which recites "logically subdividing records of said *input file* into a plurality of partitions", the Petition attempts to link aspects of (i) Chow's description of "static" or "a priori" partitioning systems (*disparaged* by Chow) where "*a block of data* might be divided evenly into a number of parts equal to the number of available threads" and (ii) aspects of Chow's disclosed *solution* which *divide an aggregate task* into sub-tasks. Petition, 13, citing Ex. 1003, 1:38-42 (disparaging "static" or "a priori" partitioning systems) and Petition, 14, citing Ex. 1003, 1:66-2:15 (summarizing aspects of Chow's proposed solution). As explained above, in the '582 Patent, an "input *file*" and "*subtasks*" are *different*. In purporting to bridge this difference and allege that Chow alone meets Element [1a], the Petition erroneously attempts to link Chow's discussion of dividing a *block of data* (which the Petition appears to analogize to an "*input file*") in the systems *disparaged* by Chow with aspects of Chow's disclosed *solution* that divide *an aggregate task* into *subtasks*. However, the Petition has failed to explain how these disparate aspects of Chow are arranged as claimed. Moreover, other than relying on an erroneous linkage between the "static" or "a priori" partitioning systems disparaged by Chow and Chow's proposed solution, the Petition fails to offer any explanation whatsoever how Chow's disclosure of dividing *an aggregate task* into *subtasks* equates to "logically *subdividing records* of said *input file* into a plurality of partitions" as recited in Element [1a] of claim 1.

For this reason alone, the Petition's mapping of Chow alone to claim 1 is deficient.

### 2. The Petition Presents Grossly Inconsistent Mappings Of Aspects Of Claim 1 To Chow

In addition, the Petition fails to present a consistent mapping to Chow for the "partitions" recited throughout claim 1 of the '582 Patent. For example, in mapping Element [1a] to Chow, the Petition purports to equate Chow's discussion of dividing a *block of data* (in the systems disparaged by Chow) "into a *number of parts* equal to the number of available threads" to "logically subdividing records of said *input file* into a plurality of *partitions*." Thus, in mapping Element [1a] to Chow, the Petition analogizes "*the number of parts*" of the "block of data" (in the systems disparaged by Chow) to the "*partitions*" recited in the claim element. However, in mapping "*said* partitions" referenced in Element [1b] to Chow, the Petition does *not* reference back to the "partitions" identified in connection with the mapping of Element [1a] to Chow (e.g., "*the number of parts*" of the "block of data" in the systems disparaged by Chow) but instead appears to map "said partitions" in Element [1b] to entirely different disclosures in Chow, namely, Chow's "common partition" or Chow's division of an aggregate task into subtasks. Petition, 15-16.

In Element [1c], the inconsistencies in the Petition's mappings of the claimed "partitions" get even worse. More specifically, in Element [1c], the Petition states:

> ... Chow discloses that "[g]enerally, the method sequence 400 is used to perform an aggregate database processing task, by breaking the task down into smaller units, and executing the units with multiple concurrently operating *task execution units*." Ex.1003 (5:1-5). *A POSITA would understand Chow's "units" to be the claimed "partitions."* Ex.1022 ¶ 153. Petition, 16-17 (emphasis added).

Thus, in mapping "*the* partitions" referenced in Element [1c] to Chow, the Petition does *not* reference back to its mapping of "partitions" in Element [1a] to "*the number of parts*" of the "block of data" (in the systems disparaged by Chow), or its mapping of "said partitions" in Element [1b] to Chow's "*common partition*" or Chow's *division of an aggregate task into subtasks*, but instead identifies yet another aspect of Chow, namely, Chow's *execution units*, as the claimed partitions. The Petition's grossly inconsistent mappings of the "partitions" recited in claim 1 to Chow are further evidence that the Petition has failed to demonstrate that Chow alone meets all of the elements of claim 1.

### 3. The Petition Has Failed To Explain How Chow Distributes Descriptions Of All Of Said Partitions To The Subtask Processors As Recited In Element [1b]

In purporting to map the requirement in Element [1b] that "descriptions of all of said partitions" be "distributed" to the subtask processors to Chow, the Petition states only the following:

> Chow teaches or suggests claim [1b]. Ex.1022 ¶ 149. Chow discloses that partitions are accessible by all subtask processors. For example, Chow discloses that "[t]he common partition is accessible by all task execution units 101-104." Ex.1003 (9:37-38). As such, each of

> the task execution units have access to information about the partition." Ex.1022 ¶ 149. Chow further discloses: "[a] command is received to perform a machine-executed task divisible into multiple sub-tasks, i.e., an 'aggregate task'. Then, multiple task execution units are independently operated on-demand to sequentially self-allocate and execute sub-tasks of the aggregate task. Ex.1003 (1:66-2:15). Petition, 15-16.

These statements fail to explain how the claim language is met.

Starting with the Petition's references to "*the* common partition" set forth above, the language of claim 1 makes abundantly clear that a plurality of partitions are defined in Element [1a] and descriptions "of *all* of *said* partitions" (*plural*) are distributed in to the processors in Element [1b]. The Petition fails to explain how Chow's disclosure of *a common partition* (*singular*) or providing task execution units access to information about *only a single partition* meets the claim language, which explicitly requires distribution of information describing a *plurality* of partitions.

Turning next to the Petition's reference to Chow's disclosure that "[a] command is received to perform a machine-executed task divisible into multiple sub-tasks, i.e., an 'aggregate task'. Then, multiple task execution units are independently operated on-demand to sequentially self-allocate and execute sub-tasks of the aggregate task." The Petition fails to explain how this disclosure equates to "*distributing descriptions of all of said partitions*" to the processors as recited in Element [1b]. The Petition fails to point to any express disclosure in Chow that

Chow's execution units are provided with "*descriptions of all of said partitions*" in connection with their sequential self-allocation of sub-tasks; nor does the Petition allege, let alone demonstrate, that this feature is inherent in Chow.

For this further reason, the Petition's mapping of Chow alone to claim 1 is deficient.

#### 4. The Petition Has Failed To Explain How Chow Meets The Sequential Requirements Of Claim 1 of the '582 Patent

As explained in Sections III and IV, *supra*, the plain and ordinary meaning of the language of claim 1 requires that the *subdividing of an input file into a number of partitions greater than the number of subtask processors* occurs *before executing any of the subtasks on the partitions*. The Petition fails to explain how Chow discloses this sequence of operations. In purporting to map Chow to Element [1c] of claim 1, the Petition relies on Chow's "method sequence 400" and states *only* the following:

> Chow discloses that "[g]enerally, the method sequence 400 is used to perform an aggregate database processing task, by breaking the task down into smaller units, and executing the units with multiple concurrently operating task execution units." Ex.1003 (5:1-5). A POSITA would understand Chow's "units" to be the claimed "partitions." Ex.1022 ¶ 153. Chow describes the concurrent execution of subtasks to produce a resulting output. Ex.1022 ¶ 153; Ex.1003 (7:46-48). Petition, 16-17.

Thus, the Petition fails to even allege -- let alone demonstrate -- that, in Chow, the *subdividing of an input file into a number of partitions greater than the number of subtask processors* occurs *before executing any of the subtasks on the partitions*. In any event, Chow's "method sequence 400" (relied on by the Petition to map Chow to Element [1c]) fails to meet the sequence of operations required by the claim language. As explained in Section VII, *supra*, rather than logically dividing *all* of the data to be processed *before* execution of the subtasks begins, in Chow's solution the data is divided into subtasks *after* processing by the task execution units commences. Ex. 2013, ¶¶ 43, 65-68, 70. Chow's "method sequence 400" is depicted in Figure 4 of Chow, which was discussed previously and is reproduced again below with colored annotations added by Patent Owner:




FIG. 4

As Chow explains, each task execution unit "starts in step 410 [red boxes]." Ex. 1003, 4:24. As shown, "method sequence 400" *lacks any logical division of the aggregate task prior to the starting of the task execution units in step 410*. Rather, after the task execution units start in step 410, "step 416 asks whether any work from the aggregate task remains to be processed" and "if step 416 finds work remaining," *the task execution unit 200 in step 418 [blue boxes] determines a unit of granularity for the next sub-task to be processed*, and then, using the determined granularity, obtains the sub-task from the aggregate task." *Id*., 4:24- 33. Thus, Chow performs *partitioning of each subsequent sub-task* from the aggregate task only *after* each task execution unit *completes a prior sub-task.* As a result, Chow's "method sequence 400" (relied on by the Petition to map Chow to Element [1c]) fails to meet the sequence of operations required by claim 1 in which *a preexisting input file is logically subdivided into partitions greater in number than the number of subtask processors before execution of the subtasks on the partitions occurs* in steps [1c] and [1d].[1] Ex. 2013, ¶¶ 43, 65-68, 70.

For this further reason, the Petition's mapping of Chow alone to claim 1 is deficient.

---

[1] Moreover, it is clear that Chow's "p-sort" or "round robin sort" do not meet the sequence of operations required by Elements [1c]-[1d] because they rely on the same straw model discussed above in connection with Figure 4. Ex. 2013, ¶ 44.

### B. The Petition Fails To Demonstrate That Reiffin Alone Meets All Of The Limitations Of Claim 1 Of The '582 Patent

The Petition's mappings of claim 1 to Reiffin alone in Ground 1 are deficient for at least two reasons. First, in purporting to map Reiffin to Element [1a] which expressly refers to logically subdividing a preexisting input *file*, the Petition relies solely on Reiffin's division of *tasks* and *subtasks*. The Petition fails to offer *any* explanation whatsoever why, in the context of the claim language which clearly distinguishes between a *file* and *subtasks*, Reiffin's division of *tasks* and *subtasks* equates to the logical partitioning of the "preexisting input *file*" as recited in Element [1a]. Second, in purporting to map Reiffin to Element [1b], the Petition relies on one of Reiffin's computers accessing "*the next subtask identifier* waiting in the queue." However, the Petition fails to explain how a computer accessing "*the next subtask identifier* waiting in the queue" equates with *distribution* of descriptions of *all* of said partitions" to the processors as claimed.

#### 1. The Petition Fails To Explain How Reiffin Logically Subdivides Records Of A Preexisting Input File Into A Plurality Of Partitions As Recited In Element [1a]

As explained in Section III, *supra*, the preamble of claim 1 of the '582 Patent separately introduces a "preexisting input *file*" and "*subtasks*," indicating that the two are *different*. The body of the claim goes on to explain the differences between the two. More specifically, Element (a) of the claim recites that *the input file includes records that are logically partitioned*, while Element (c) *the subtasks*

*process the logical partitions*. Moreover, in the parlance of the '582 Patent, the logical partitions correspond to "well-defined" portions of the preexisting input file such as "ranging from one relative byte address to another." Ex. 1001, 3:36-41.

Claim Element [1a] is directed to the logical partitioning of the "preexisting input *file*" introduced in the preamble, and recites as follows:

> (a) automatically determining file allocation and logically subdividing records of said input *file* into a plurality of partitions

The Petition's attempt to map Reiffin to Element [1a] is limited to the following discussion of *tasks* and *subtasks*:

> Reiffin also discloses claim [1a]. Ex.1022 ¶ . (sic) For example, Reiffin discloses that "[t]his invention relates to computer networks, and more particularly, to a distributed parallel processing network system wherein a large compute-intensive *task* may be partitioned into *subtasks*." Ex.1004 (1:8-10). Reiffin further discloses: "If a computer has a *task* which is both large and compute-intensive, the *task* is partitioned into a plurality of smaller *subtasks* to be executed simultaneously in parallel by the other computers of the network. Each of these *subtasks* is assigned its respective identifier" (Ex.1004 (2:19-23)) and "[t]he workstations or personal computer originally given such a *task* may partition the data and program code into a plurality of *subtasks*. A plurality of subtask identifiers corresponding to the partitioned *subtasks* are stored in a network directory of a disk drive of one of the computers to constitute a pool or queue identifying remote *subtasks* to be executed" (Ex.1004 (4:64-5:3)). Reiffin, therefore, discloses determining file allocation and logically subdividing records of said input file into a plurality of partitions. Ex.1022 ¶ 146. Petition, 14-15.

Rather than addressing the language of Element [1a] which expressly refers to logically subdividing a preexisting input *file*, the Petition simply points to

Reiffin's division of *tasks* and *subtasks* followed by the conclusory assertion that Reiffin meets the claim language. The Petition fails to offer *any* explanation whatsoever why, in the context of the claim language which clearly distinguishes between a *file* and *subtasks*, Reiffin's division of *tasks* and *subtasks* equates to the logical the partitioning of the "preexisting input *file*" as recited in Element [1a]. Moreover, the specification of the '582 Patent makes clear that the file partitions resulting from Element [1a] correspond to "*well-defined*" portions of the preexisting input file such as "ranging from one relative byte address to another." Ex. 1001, 3:36-41. Completely absent from the Petition's purported mapping of Reiffin to Element [1a] is *any* explanation as to how Reiffin's subtasks correspond to portions of a preexisting input file such as "ranging from one relative byte address to another." Ex. 2013, ¶¶ 72-73.

For this reason alone, the Petition's mapping of Reiffin alone to claim 1 is deficient.

### 2. The Petition Fails To Explain How Reiffin Distributes Descriptions Of All Of Said Partitions To The Subtask Processors As Recited In Element [1b]

Element [1b] recites "*distributing* descriptions of *all* of said partitions" to the processors. In purporting to map Reiffin to Element [1b]:

> Further, Reiffin teaches or suggests claim [1b]. Ex.1022 ¶ 150. Reiffin discloses that "[i]f a computer has a task which is both large and compute-intensive, the task is partitioned into a plurality of smaller

> subtasks to be executed simultaneously in parallel by the other computers of the network. Each of these subtasks is assigned its respective identifier. *One of the network disk drives has a directory constituting a pool for storing all of the subtask identifiers, preferably in the form of a queue.*" Ex.1004 (2:19-25). Reiffin therefore discloses providing descriptions of the partitions to each of the subtask processors. Ex.1022 ¶ 150. Petition, 16 (emphasis added).

Omitted from the Petition's mapping is a more complete explanation of how Reiffin's pool actually functions. Reiffin explains that "[i]f no remote subtask is being concurrently executed then the computer searches the network directory pool for *the next subtask identifier waiting in the queue*, copies from the originating computer the subtask program corresponding to said next identifier, and then proceeds with the execution of this remote subtask. Ex. 1004, 2:52-58 (emphasis added). Thus, in Reiffin, the *only* "description" of a "partition" accessed by the computer is "*the next subtask identifier waiting in the queue*." *Id*.

The Petition fails to explain how a computer accessing "*the next subtask identifier* waiting in the queue" meets the plain language of Element [1b] which requires *distribution* of descriptions of *all* of said partitions to the processors. Moreover, there is no explanation why in Reiffin's system it would *even be useful* for the computers to have distributed to them descriptions of *all* partitions. For example, there is no disclosure in Reiffin that each computer is performing any analysis of all of the "partitions" in the pool and then selecting the "partition" that is best suited for execution on the computer.

Simply put, the Petition fails to point to any express disclosure in Reiffin that Reiffin's computers are provided with descriptions of *all* of the "partitions." Nor does the Petition allege, let alone demonstrate, that this feature is inherent in Reiffin.

For this additional reason, the Petition's mapping of Reiffin alone to claim 1 is deficient.

### C. The Petition Fails To Demonstrate That Claim 1 Is Obvious Over The Combination Of Chow And Reiffin

Turning now to the portion of Ground 1 alleging that claim 1 is obvious over the combination of Chow and Reiffin, this aspect of Ground 1 is deficient for several reasons. First, since both Chow and Reiffin are deficient with respect to Elements [1a] and [1b] of claim 1, the combination of Chow and Reiffin is necessarily deficient with respect to those claim elements. Second, the Petition's motivation to combine argument for Chow and Reiffin is deficient. Third, there is no nexus between the purported motivations to combine Chow and Reiffin and each of the numerous variations in which the Petition alleges that the references could be combined.

#### 1. Both Chow And Reiffin Are Deficient With Respect To Elements [1a] And [1b]

As explained in Sections VIII(A)(1)-(3), the Petition has failed to explain how Chow meets the requirements of Elements [1a] and [1b]. Similarly, as explained in Sections VIII(B)(1)-(2), the Petition has failed to explain how Reiffin meets the

requirements of Elements [1a] and [1b]. Since the Petition has failed to show that either of the relied on references satisfies Elements [1a] and [1b], the Petition fails to demonstrate that claim 1 is obvious over the combination of Chow and Reiffin.

### 2. The Petition's Purported Motivation For Combining Chow And Reiffin Is Deficient

The Petition's argument purporting to establish a motivation for combining Chow and Reiffin is deficient. After alleging that Chow and Reiffin are "in the same field of endeavor" (Petition, 8) and "share" the same goal (Petition, 11), the Petition makes only limited and conclusory allegations with respect to any motivation to combine the references. The <u>*totality of the Petition's motivation to combine argument for Chow and Reiffin*</u> is limited to the following conclusory statements:

> Chow is ready for improvement. Ex. 1022 ¶ 134. Chow focuses on multiprocessing systems consisting of a single computer with multiple processors executing programs in parallel. *Id.* Reiffin expands this concept to multiple networked computers. *Id.* A POSITA would have recognized that benefit of combining Reiffin with Chow would be increased computational power and the ability to solve larger problems. *Id.*
>
> Combining Chow's multi-processing system with Reiffin's teachings of a distributed parallel processing network would have been the simple combination of known elements to obtain a predictable result and thus obvious to a POSITA. Ex.1022 ¶ 135.
>
> It would have been routine to add the features of Reiffin to the system of Chow. Ex.1022 ¶ 136. A POSITA would have thus been motivated to combine Chow and Reiffin with a reasonable expectation of success. *Id.* Petition, 10-11.

The Petition's conclusory statements fail to establish the necessary motivation to combine the references. Instead of providing reason and evidence of ***why*** a POSITA would be motivated to combine Chow and Reiffin, the Petition offers only a conclusory allegation that "Chow is ready for improvement" -- without any evidence or explanation to support that conclusion or show ***why*** a POSITA would have considered Chow "ready for improvement." Petitioners' next two sentences which allege that "*Chow focuses on* multiprocessing systems consisting of a *single computer* with multiple processors executing programs in parallel" while "Reiffin expands this concept to multiple networked computers," is factually incorrect. Petition, 10-11 (emphasis added). Rather, Chow clearly disclosed "'multiprocessing environments'... where *multiple computers*, digital data processing units, threads, or other processes perform concurrent tasks." Ex. 1003, 1:27-30 (emphasis added). Given that Chow was *already* directed to the use of multiple computers to perform concurrent tasks, why would a POSITA have looked to Reiffin for this same concept? The Petition doesn't say.

Petitioners' allegations that the references each supposedly belong to the same field is insufficient to establish a motivation to combine. In sum, the Petition offers nothing more than unsupported conclusions regarding motivation to combine, which fail to add up to a reasonable likelihood of prevailing. *See Johns Manville Corp. v. Knauf Insulation, Inc.,* Case IPR2018-00827, Paper 9, at 10-13 (PTAB Oct. 16,

2018) (designated informative) (rejecting a similar same-field, beneficial-combination rationale and denying institution); *In re Magnum Oil Tools Int'l, Ltd.,* 829 F.3d 1364, 1380 (Fed. Cir. 2016) (a petitioner cannot satisfy its burden of proving obviousness by employing "mere conclusory statements," but "must instead articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness").

**a) The Fact That References Relate To The Same Field Standing Alone Is Insufficient To Establish A Motivation To Combine**

Petitioners' contentions that Chow and Reiffin purportedly relate to the same field or goal (Petition at 8, 11) do not by themselves establish a reason to combine the references. *Securus Techs., Inc. v Glob. Tel*Link Corp.,* 701 F. App'x 971, 976-77 (Fed. Cir. 2017) (non-precedential) (holding that "[s]uch short-cut logic would lead to the conclusion that any and all combinations of elements known in [a] broad field would automatically be obvious, without the need for further analysis"); *Microsoft Corp. v. Enfish, LLC,* 662 F. App'x 981, 990 (Fed. Cir. 2016) (non-precedential) (holding that "the Board correctly concluded" that the petitioner "did not articulate a sufficient motivation to combine" where the only reason given was "that the references were directed to the same art or same techniques"); *Johns Manville,* IPR2018-00827, Paper 9 at 10-11 (rejecting the argument that two references were similar and belonged to the same field as an insufficient reason to

combine those references). Petitioners' same field/same goal argument is "simply too conclusory" to show that a POSITA would have combined the references in the manner claimed. *Securus Techs., Inc.,* 701 F. App'x at 976.

#### b) The Lack Of A Non-Conclusory Explanation "Why" Chow And Reiffin Would Have Been Combined Is Fatal

The remainder of Petitioners' arguments for combining Chow and Reiffin fares no better. The Petition (at 11) makes the conclusory assertion that "[a] POSITA would have recognized that [the] benefit of combining Reiffin with Chow would be increased computational power and the ability to solve larger problems" -- but provides no evidence or explanation demonstrating how or why a POSITA would have recognized such a benefit. For example, Chow was already directed to "'multiprocessing environments'... where multiple computers, digital data processing units, threads, or other processes perform concurrent tasks." Ex. 1003, 1:27-30. Given that combining multiple computers to increase computational power was a concept ***already present in Chow***, why would a POSITA have looked to Reiffin for this same concept? The Petition doesn't say. Similarly, what "larger problems" existed that required computational power beyond what Chow already provided, and how would the supposed combination of Chow and Reiffin be any better at solving such "larger problems" than Chow alone? Again, the Petition doesn't say. *TP-Link Corp. Ltd. v. Netgear*, IPR2023-01429, Paper #10, 2024 Pat.

App. LEXIS 1168 (non-precedential) (finding the petition lacked sufficient explanation "why the integration would have been an improvement, let alone why Sinha was ready for improvement").

In the present case, the lack of a "why" is dispositive: a determination of obviousness cannot be reached where the record lacks an "explanation as to how or why the references would be combined to produce the claimed invention." *TriVascular, Inc. v. Samuels,* 812 F.3d 1056, 1066 (Fed. Cir. 2016); *Virtek Vision Int'l ULC, Inc.,* 97 F.4th at 886 ("These disclosures, however, do not provide any reason why a skilled artisan would use 3D coordinates instead of angular directions in a system").

Petitioners' conclusory assertion that "[c]ombining Chow's multi-processing system with Reiffin's teachings of a distributed parallel processing network would have been the simple combination of known elements to obtain a predictable result and thus obvious to a POSITA" (Petition, 11-12) also lacks supporting evidence or an explanation demonstrating how or why a POSITA would have combined the references. Given that Chow already disclosed an implementation using parallel computing, why would a POSITA have looked to Reiffin for "distributed" parallel computing? Again, the Petition doesn't say. In addition, the Petition fails to explain <u>*how*</u> Chow's parallel computers would be combined with Reiffin's distributed parallel computers to solve "larger problems" that Chow alone would have been

unable to solve. For example, what aspects of Reiffin would be substituted into Chow in order to solve "larger problems" that Chow alone could not solve? Again, the Petition doesn't say. All the Petition includes is the conclusory statement that Chow and Reiffin represented a "simple combination of known elements" that could be combined "to obtain a predictable result" -- which is too conclusory to support a motivation to combine.

**c) A Reasonable Expectation Of Success Is Insufficient To Establish A Motivation To Combine**

The Petition's conclusory assertion that "[a] POSITA would have thus been motivated to combine Chow and Reiffin with a reasonable expectation of success" (Petition, 12) addresses the wrong issue and is also totally conclusory. "The obviousness inquiry does not merely ask whether a skilled artisan could combine the references, but instead asks whether 'they would have been motivated to do so.'" *Adidas AG v. Nike, Inc.,* 963 F.3d 1355, 1359 (Fed. Cir. 2020) (quoting *InTouch Techs., Inc. v. VGO Commc'ns, Inc.,* 751 F.3d 1327, 1352 (Fed. Cir. 2014)). In other words, a reasonable expectation of success ("could combine references") does not establish a motivation to combine ("would have been motivated to do so"). An expectation of success cannot cure the deficiencies of Petitioners' conclusory allegations that a POSITA would have been motivated to combine Chow and Reiffin.

**d) The Testimony Of Petitioners' Declarant Parrots The Words Of The Petition And Provides No Additional Explanation Or Citations Supporting The Alleged Motivation To Combine**

The cited testimony from Petitioner's declarant, Dr. Shamos, does not cure the Petition's deficiencies. Ex.1022 ¶¶ 134-136. The cited testimony largely repeats (word-for-word) the petition's conclusory assertions. *Compare* Pet. at 11-12 *with* Ex. 1022, ¶¶134-136. For that reason, the testimony of Dr. Shamos is entitled to little if any weight. *Xerox Corp. v. Bytemark, Inc.,* IPR2022-00624, Paper 9 at 15-17 (PTAB Aug. 24, 2022) (designated precedential) (according "little weight" to declaration testimony that contains a verbatim restatement of a petition's conclusory assertions without additional supporting evidence or reasoning).

In summary, the Petition's argument purporting to establish a motivation for combining Chow and Reiffin is deficient.

**3. There Is No Nexus Between The Purported Motivation To Combine Chow And Reiffin And Each Of The Numerous Ways The Petition Alleges The References Could Be Combined**

In Ground 1, the Petition purports to map each of Elements [1pre], [1a], [1b], [1c], [1d] and [1e] to both Chow and Reiffin, and seems to argue that if any element is not met by one of the references, then the element is met by the other reference, and vice versa. This approach to Ground 1 encompasses at least 64 possible ways of combining the references. Just like the fact that flipping a coin six times can result

in $2^6$ or 64 possible outcomes, Ground 1 purports to advance at least 64 different possibilities for combining Chow and Reiffin:

2 possibilities (Chow or Reiffin) for 1[pre] ×
2 possibilities (Chow or Reiffin) for 1[a] ×
2 possibilities (Chow or Reiffin) for 1[b] ×
2 possibilities (Chow or Reiffin) for 1[c] ×
2 possibilities (Chow or Reiffin) for 1[d] ×
2 possibilities (Chow or Reiffin) for 1[e] =

$2^6$ or 64 possible combinations

This "spaghetti on the wall" approach fails explain how Petitioners' purported motivation for combining Chow and Reiffin fits with each of the at least 64 different possibilities for combining Chow and Reiffin.

For example, consider an exemplary permutation where disclosures from Chow are purportedly mapped to elements [1 pre], [1a] and [1c] and disclosures from Reiffin are purportedly mapped to elements [1b] and [1d]-[1e]. The Petition provides no explanation why a POSITA would have been motivated to combine these *specific* aspects of each of the references with one another. The Petition's conclusory assertion that "A POSITA would have recognized that (sic) benefit of combining Reiffin with Chow would be increased computational power and the ability to solve larger problems" is not tied to this specific combination. For example, there is no explanation why or how taking aspects of Chow purportedly mapped to [1 pre], [1a] and [1c] and combining them with disclosures from Reiffin

purportedly mapped to elements [1b] and [1d]-[1e] would result in increased computational power or the ability to solve larger problems.

The failure of the Petition to articulate specific motivations to combine that are *particularized* for each of the at least 64 different possibilities for combining Chow and Reiffin advanced in Ground 1 renders the Petition's "spaghetti on the wall" approach for combining Chow and Reiffin deficient.

### D. Ground 1 Is Deficient

In summary, for at least the reasons set forth above, Ground 1 fails to demonstrate a reasonable likelihood of success with respect to independent claim 1 of the '582 Patent because the Petition fails to demonstrate that: (i) claim 1 is obvious over Chow alone, (ii) claim 1 is obvious over Reiffin alone, or (iii) claim 1 is obvious over the combination of Chow and Reiffin. Since Ground 1 fails to demonstrate a likelihood of success with respect to independent claim 1, the Petition similarly fails to demonstrate a likelihood of success in Ground 1 with respect to claims 2-14, all of which depend directly or indirectly from independent claim 1.

## IX. GROUND 2 OF THE PETITION FAILS TO DEMONSTRATE A REASONABLE LIKELIHOOD OF SUCCESS

In identifying the "Grounds Raised," the Petition describes Ground 2 as alleging that claims 1-14 of the '582 Patent are "[o]bvious over Chow (Ex. 1003) *in view of* Reiffin (Ex. 1004) and further in view of Kurowski (Ex. 1005)." Petition, 7 (emphasis added). However, within Ground 2, the Petition alleges that every

element of claim 1 is met by Kurowski alone." Petition, 37-42. Thus, in actuality, Ground 2 is not a single ground, but rather comprises multiple Grounds separately alleging that: (i) claim 1 is obvious over Kurowski alone, and (ii) claim 1 is obvious over some combination of Chow, Reiffin and Kurowski. As explained below, the Petition has failed to demonstrate a likelihood of success with respect to any of these allegations.

### A. The Petition Fails To Demonstrate That Kurowski Alone Meets All Of The Limitations Of Claim 1 Of The '582 Patent

The Petition's mappings of claim 1 to Kurowski alone in Ground 2 are deficient because the mappings fail to explain how Kurowski meets Elements [1a] and [1b].

#### 1. The Petition Fails To Explain How Kurowski Logically Subdivides Records Of A Preexisting Input File Into A Plurality Of Partitions As Recited In Element [1a]

As explained in Section III, *supra*, claim 1 of the '582 Patent differentiates a "preexisting input *file*" from "*subtasks*." For example, the claim explains that *the input file includes records that are logically partitioned*, while *the subtasks process the logical partitions*. Claim Element [1a] is directed to the logical partitioning of the "preexisting input *file*" introduced in the preamble, and recites as follows:

> (a) automatically determining file allocation and logically subdividing records of said input *file* into a plurality of partitions

The Petition's attempt to map Kurowski to Element [1a] is limited to the following discussion of *tasks*:

> ... Kurowski discloses claim [1a]. Ex.1022 ¶ 259. For example, Kurowski discloses that "[t]he client 200 is one of the pieces in the larger picture of how the distributed computing system 100 described herein provides a highly distributed environment for large scale computing problems. One goal of all these different pieces is to enable the system to take on a very large computing problem, break it down into thousands of *tasks* and distribute it to tens of thousands of computers across the internet so this large computation could be performed by tens of thousands of parallel sub-computations and the results brought back from all these different clients 200." Ex.1005 ([0192]) Kurowski, therefore, discloses automatically identifying a large computing *task* and partitioning it. Petition, 38-39 (emphasis added).

Rather than addressing the language of Element [1a] which expressly refers to logically subdividing a preexisting input *file*, the Petition simply points to Kurowski's division of "a very large computing problem" into *tasks*. The Petition fails to offer *any* explanation whatsoever why, in the context of the claim language which clearly distinguishes between a *file* and *subtasks*, Kurowski's division of "a very large computing problem" into *tasks* equates to the logical the partitioning of the "preexisting input *file*" as recited in Element [1a].

Moreover, the specification of the '582 Patent makes clear that the file partitions resulting from Element [1a] correspond to "*well-defined*" portions of the preexisting input file such as "ranging from one relative byte address to another." Ex. 1001, 3:36-41. Completely absent from the Petition's purported mapping of

Kurowski to Element [1a] is *any* explanation as to how Kurowski's tasks correspond to well-defined portions of a preexisting input file such as "ranging from one relative byte address to another." Ex. 2013, ¶¶80-83.

For this reason alone, the Petition's mapping of Kurowski alone to claim 1 is deficient.

### 2. The Petition Fails To Explain How Kurowski Distributes Descriptions Of All Of Said Partitions To The Subtask Processors As Recited In Element [1b]

Element [1b] recites "distributing descriptions of *all* of said partitions" to the subtask processors. In purporting to map Kurowski to Element [1b]:

> ... Kurowski teaches or suggests claim [1b]. Ex.1022 ¶¶ 262-263. Kurowski discloses that "[s]pecifically, all machine, user, team, and task information, summaries of such information, or subsets of such information, *may be made available through reports and interactive pages on an "integrated" web site.*" Ex.1005 ([0188]). As such, partition descriptions are distributed and made available to all of the processors. Ex.1022 ¶ 263. Petition, 39 (emphasis added).

The Petition fails to explain how Kurowski discloses *the distribution of descriptions* of all of the partitions of the input file to *subtask processors*. The Petition's reliance on Kurowski's web interface that allows *users* to view summary reports has no relevance to the machine-level distribution of descriptions of all partitions to each of the subtask *processors* as required by Element [1b].

The Petition fails to point to any express disclosure in Kurowski that Reiffin's computers are provided with descriptions of *all* of the "partitions." Nor does the Petition allege, let alone demonstrate, that this feature is inherent in Kurowski.

For this additional reason, the Petition's mapping of Kurowski alone to claim 1 is deficient.

### B. The Petition Fails To Demonstrate That Claim 2 Is Obvious Over The Combination Of Chow, Reiffin, And Kurowski

Turning now to the portion of Ground 2 alleging that claim 1 is obvious over the combination of Chow, Reiffin, and Kurowski, this aspect of Ground 1 is deficient for several reasons. First, since Chow, Reiffin, and Kurowski are each deficient with respect to Elements [1a] and [1b] of claim 1, the combination of Chow, Reiffin, and Kurowski is necessarily deficient with respect to those claim elements. Second, the Petition's motivation to combine argument for Chow, Reiffin, and Kurowski is deficient. Third, there is no nexus between the purported motivations to combine Chow, Reiffin, and Kurowski and each of the numerous variations in which the Petition alleges that the references could be combined.

#### 1. Both Chow And Reiffin Are Deficient With Respect To Elements [1a] And [1b]

As explained in Sections VIII(A)(1)-(3), the Petition has failed to explain how Chow meets the requirements of Elements [1a] and [1b]. Similarly, as explained in Sections VIII(B)(1)-(2), the Petition has failed to explain how Reiffin meets the

requirements of Elements [1a] and [1b]. Finally, as explained in Sections IX(A)(1)-(2), the Petition has failed to explain how Kurowski meets the requirements of Elements [1a] and [1b]. Since the Petition has failed to show that any of the relied on references satisfies Elements [1a] and [1b], the Petition fails to demonstrate that claim 1 is obvious over the combination of Chow, Reiffin, and Kurowski in Ground 2.

#### 2. The Petition's Purported Motivation For Combining Chow And Reiffin Is Deficient

The Petition's argument purporting to establish a motivation for combining Chow, Reiffin and Kurowski is deficient. In arguing that it would have been obvious to combine all three references, the Petition relies on its reasoning in Ground 1 for combining Chow and Reiffin. Petition, 34-35 ("*For all of the reasons previously stated* it would have been simple to combine Chow's multi-processing system with Reiffin's teachings of a distributed parallel processing network ... ") (emphasis added). As explained in Section VIII(C)(2), *supra*, the Petition's argument purporting to establish a motivation for combining Chow and Reiffin is deficient. Since the Petition fails to establish a motivation for initially combining Chow and Reiffin, the Petition necessarily fails to establish that it would have been obvious to add a further reference (i.e., Kurowski) to Chow and Reiffin.

Moreover, after alleging that Kurowski is "directed to the '582 Patent's goal"

(Petition, 35), the Petition proffers _nothing_ beyond the statement underlined below even purporting to explain _why_ a POSITA would have been motivated to combine Kurowski with Chow and Reiffin:

> Both Chow and Reiffin were ready for improvement. Ex.1022 ¶ 249. Chow focuses on multiprocessor systems consisting of multiple processors. *Id.* Reiffin focuses on multiprocessor systems consisting of multiple separate computers connetce (sic) via a local area network. *Id.* _*Kurowski expands the concept to "thousands of clients running on a variety of computers across the Internet*_." *Id*. Petition, 35 (emphasis added).

The Petition's conclusory statement that "Kurowski expands the concept" fails to establish the necessary motivation to combine the references. Even if it were true that "Kurowski expands the concept" (to be clear, that is not true), this fact does not explain ***why*** a POSITA would be motivated to combine Kurowski with Chow and Reiffin.

Petitioners' allegation that Kurowski "expands" the concepts in Chow and Reiffin to more computers is also factually incorrect. Chow disclosed "'multiprocessing environments'... where _*multiple computers*_, digital data processing units, threads, or other processes perform concurrent tasks." Ex. 1003, 1:27-30 (emphasis added). Chow did not place any limit on the number of computers deployed in its multiprocessing environment. Moreover, according to the Petition, Reiffin already "expands" Chow's "concept to multiple networked computers" resulting in "increased computational power and the ability to solve larger

problems." Petition, 10-11. Again, Reiffin did not place any limit on the number of computers deployed.

Given that Chow was *already* directed to the use of multiple computers to perform concurrent tasks and Reiffin already "expanded Chow's "concept to multiple networked computers" resulting in "increased computational power and the ability to solve larger problems," why would a POSITA have looked to Kurowski for this same concept? Petition, 11. The Petition doesn't say.

Moreover, Petitioners' allegations that "the architectures of Chow and Kurowski are very similar" (Petition, 36) is not only wrong,[2] but fails to explain ***why*** a POSITA would be motivated to combine Kurowski with Chow and Reiffin. The fact that references are similar is insufficient to establish a motivation to combine.

[2] The Petition (at 36) attempts to argue that Chow and Kurowski have similar architectures by comparing Figure 1 from Chow with Figure 3 from Kurowski. Aside from having rectangles and cylinders in approximately the place, these figures could not be more different. The middle row of rectangles in the Chow figure are all equal task execution units, working in parallel to perform a task. The middle row of rectangles in the Kurowski figure are not equals --- rather they are three different components running fundamentally different tasks --- a file server, and task server, and an app server. Furthermore, they are running on the same computer in Chow, and explicitly labeled as separate machines in Kurowski. The top rectangle in Chow is a shared-memory that every task execution unit can read from. The top rectangle in Kurowski is a separate client machine that is not directly accessible from any of the other rectangles in the figure. In short, the figure in Chow is showing a traditional shared memory architecture. The figure in Kurowski is showing a shared-nothing architecture --- the extreme opposite of a shared memory architecture. Ex. 2013, ¶¶ 78-79.

In sum, the Petition offers nothing more than unsupported conclusions regarding motivation to combine, which fail to add up to a reasonable likelihood of prevailing. *See Johns Manville Corp.,* Case IPR2018-00827, Paper 9, at 10-13 (designated informative) (rejecting a similar same-field, beneficial-combination rationale and denying institution); *In re Magnum Oil Tools Int'l, Ltd.,* 829 F.3d 1364, 1380 (a petitioner cannot satisfy its burden of proving obviousness by employing "mere conclusory statements," but "must instead articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness").

**a) The Fact That Chow And Kurowski Are Similar Is Insufficient To Establish A Motivation To Combine**

Petitioners' contention that Chow and Kurowski "are very similar" (Petition, 36) is not a sufficient reason to combine the references. *Securus Techs.,* 701 F. App'x 971, 976-77 (non-precedential) (holding that "[s]uch short-cut logic would lead to the conclusion that any and all combinations of elements known in [a] broad field would automatically be obvious, without the need for further analysis"); *Microsoft Corp.,* 662 F. App'x 981, 990 (non-precedential) (holding that "the Board correctly concluded" that the petitioner "did not articulate a sufficient motivation to combine" where the only reason given was "that the references were directed to the same art or same techniques"); *Johns Manville,* IPR2018-00827, Paper 9 at 10-11 (rejecting an argument that two references were similar and belonged to the same field as an

insufficient reason to combine those references). Petitioners' assertion that "the architectures of Chow and Kurowski are very similar" is "simply too conclusory" to show that a POSITA would have combined the references in the manner claimed. *Securus Techs., Inc.,* 701 F. App'x at 976.

**b) The Lack Of A Non-Conclusory Explanation Of "Why" Chow And Reiffin Would Have Been Combined Is Fatal**

The remainder of Petitioners' purported motivations for combining Chow, Reiffin, and Kurowski fare no better. After making the conclusory statement that "Kurowski expands the concept...," the Petition includes the following additional conclusory remarks:

> It would have been routine to add the features of Reiffin to the system of Chow. Ex.1022 ¶ 250. It would have also been routine to add the features of Kurowski to Chow and Reiffin. *Id*. Petition, 35.

Even if the Petition had established that it would have "been routine to add the features of Kurowski to Chow and Reiffin," (to be clear, it did not) this fact would fail to explain ***why*** a POSITA would be motivated to combine Kurowski with Chow/Reiffin. Again, the lack of a "why" is dispositive: a determination of obviousness cannot be reached where the record lacks an "explanation as to how or why the references would be combined to produce the claimed invention." *TriVascular,* 812 F.3d 1056, 1066; *Virtek Vision,* 97 F.4th at 886 ("These

disclosures, however, do not provide any reason why a skilled artisan would use 3D coordinates instead of angular directions in a system”).

The Petition’s conclusory assertion that “[a] POSITA would have thus been motivated to combine Chow, Reiffin, and Kurowski with a reasonable expectation of success” (Petition, 37) addresses the wrong issue and is also totally conclusory. “The obviousness inquiry does not merely ask whether a skilled artisan could combine the references, but instead asks whether ‘they would have been motivated to do so.’” *Adidas AG,* 963 F.3d 1355, 1359. A reasonable expectation of success (“could combine references”) does not establish a motivation to combine (“would have been motivated to do so”). An expectation of success cannot cure the deficiencies of Petitioners’ conclusory allegations that a POSITA would have been motivated to combine Chow and Reiffin.

**c) The Testimony Of Petitioners’ Declarant Parrots The Words Of The Petition And Provides No Additional Explanation Or Citations Supporting The Alleged Motivation To Combine**

The cited testimony from Petitioner’s declarant, Dr. Shamos, does not cure the Petition’s deficiencies. Ex.1022 ¶¶ 248-252. The cited testimony largely repeats (word-for-word) the petition’s conclusory assertions. *Compare* Pet. at 34-37 *with* Ex. 1022, ¶¶248-252. For that reason, the testimony of Dr. Shamos is entitled to little if any weight. *Xerox Corp. v. Bytemark, Inc.,* IPR2022-00624, Paper 9 at 15-17

(PTAB Aug. 24, 2022) (designated precedential) (according "little weight" to declaration testimony that contains a verbatim restatement of a petition's conclusory assertions without additional supporting evidence or reasoning).

In summary, the Petition's argument purporting to establish a motivation for combining Kurowski with Chow and Reiffin is deficient.

### 3. There Is No Nexus Between The Purported Motivation To Combine Kurowski With Chow and Reiffin And Each Of The Numerous Ways The Petition Alleges The References Could Be Combined

In Ground 2, the Petition purports to map each of Elements [1pre], [1a], [1b], [1c], [1d] and [1e] to Chow, Reiffin, and Kurowski, and seems to argue that if any element is not met by either Chow or Reiffin, then the element is met by Kurowski. This approach to Ground 2 encompasses at least 729 possible ways of combining the references. Just like the fact that flipping a three-headed coin six times can result in $3^6$ or 729 possible outcomes, Ground 2 purports to advance at least the same number of different possibilities for combining Chow, Reiffin, and Kurowski:

3 possibilities (Chow, Reiffin, or Kurowski) for 1[pre] ×
3 possibilities (Chow, Reiffin, or Kurowski) for 1[a] ×
3 possibilities (Chow, Reiffin, or Kurowski) for 1[b] ×
3 possibilities (Chow, Reiffin, or Kurowski) for 1[c] ×
3 possibilities (Chow, Reiffin, or Kurowski) for 1[d] ×
3 possibilities (Chow, Reiffin, or Kurowski) for 1[e] =

$3^6$ or 729 possible combinations

As was the case in Ground 1, the Petition fails explain how Petitioners' purported motivation for combining Kurowski with Chow/Reiffin fits with each of the at least 729 different possibilities for combining the references.

For example, consider an exemplary permutation where disclosures from Chow are purportedly mapped to elements [1 pre], [1a] and [1c], disclosures from Reiffin are purportedly mapped to element [1b] and disclosures from Kurowski are purportedly mapped to elements [1d]-[1e]. The Petition provides no explanation why a POSITA would have been motivated to combine these ***specific*** aspects of each of the references with one another. The Petition's conclusory assertions that "A POSITA would have recognized that benefit of combining Reiffin with Chow would be increased computational power and the ability to solve larger problems" and that "Kurowski expands the concept ..." are not tied to this specific combination. For example, there is no explanation why or how taking aspects of Chow purportedly mapped to [1 pre], [1a] and [1c] and combining them with disclosures from Reiffin purportedly mapped to elements [1b] and [1d]-[1e] would result in increased computational power or the ability to solve larger problems.

The failure of the Petition to articulate specific motivations to combine that are ***particularized*** for each of the at least 729 different possibilities for combining Kurowski with Chow and Reiffin advanced in Ground 2 renders the Petition's approach for combining Kurowski with Chow and Reiffin deficient.

### C. Ground 2 Is Deficient

In summary, for at least the reasons set forth above, Ground 2 fails to demonstrate a reasonable likelihood of success with respect to independent claim 1 of the '582 Patent because the Petition fails to demonstrate that: (i) claim 1 is obvious over Kurowski alone, or (ii) claim 1 is obvious over Kurowski in combination with Chow/Reiffin. Since Ground 2 fails to demonstrate a likelihood of success with respect to independent claim 1, the Petition similarly fails to demonstrate a likelihood of success in Ground 2 with respect to claims 2-14, all of which depend directly or indirectly from independent claim 1.

## X. THE DECLARATION OF PETITIONERS' EXPERT IS ENTITLED TO LITTLE IF ANY WEIGHT

The Petition extensively relies on a 96-page expert declaration that largely parrots *verbatim* the wording of the Petition. For example, as set forth below, the following paragraphs of the expert declaration essentially parrot the Petition word-for-word:

| Argument In Petition | Argument Repeated Almost Verbatim In Expert Declaration (Ex. 1022) |
|---|---|
| Ground 1 - Motivation to combine Chow and Reiffin (Pet., 11-12). | ¶¶133-136. |
| Ground 1 - Discussion of [1pre] (Pet., 12). | ¶¶140-142. |
| Ground 1 - Discussion of [1a] (Pet., 13-15). | ¶¶144-146. |

| | |
|---|---|
| Ground 1 - Discussion of [1b] (Pet., 15-16). | ¶¶ 149-151 |
| Ground 1 - Discussion of [1c] (Pet., 16-17). | ¶¶ 152-155 |
| Ground 1 - Discussion of [1d] (Pet., 17-18). | ¶¶ 156-159 |
| Ground 1 - Discussion of [1e] (Pet., 19). | ¶¶ 161-165 |
| Ground 1 - Discussion of Claim 2 (Pet., 20-21). | ¶¶ 168-171 |
| Ground 1 - Discussion of Claim 3 (Pet., 21-22). | ¶¶ 172-176 |
| Ground 1 - Discussion of Claim 4 (Pet., 22-23). | ¶¶ 177, 179-181 |
| Ground 1 - Discussion of Claim 5 (Pet., 23-24). | ¶¶ 188-190 |
| Ground 1 - Discussion of Claim 6 (Pet., 24-25). | ¶¶ 191, 193-196 |
| Ground 1 - Discussion of Claim 7 (Pet., 25-26). | ¶¶ 197, 199-201 |
| Ground 1 - Discussion of Claim 8 (Pet., 26-27). | ¶¶ 202, 204-208 |
| Ground 1 - Discussion of Claim 9 (Pet., 25-26). | ¶¶ 209, 211-214 |
| Ground 1 - Discussion of Claim 10 (Pet., 28-29). | ¶¶ 215, 217-228 |
| Ground 1 - Discussion of Claim 11 (Pet., 29-30). | ¶¶ 221-227 |
| Ground 1 - Discussion of Claim 12 (Pet., 30-32). | ¶¶ 228, 230-234 |
| Ground 1 - Discussion of Claim 13 (Pet., 32-33). | ¶¶ 235-240 |
| Ground 1 - Discussion of Claim 14 (Pet., 33-34). | ¶¶ 241-246 |
| Ground 2 (Pet. 34-37). | ¶¶ 247-252 |
| Ground 2 - Discussion of [1pre] (Pet., 37-38). | ¶¶253, 255-256 |
| Ground 2 - Discussion of [1a] (Pet., 38-39). | ¶¶257, 259-260 |
| Ground 2 - Discussion of [1b] (Pet., 39). | ¶¶ 262-264 |
| Ground 2 - Discussion of [1c] (Pet., 40). | ¶¶ 265, 267-268 |

| | |
|---|---|
| Ground 2 - Discussion of [1d] (Pet., 41). | ¶¶ 269, 271-272 |
| Ground 2 - Discussion of [1e] (Pet., 42). | ¶¶ 273, 275-276 |
| Ground 2 - Claim 2 (Pet., 43-44). | ¶¶ 277-278, 281-282 |
| Ground 2 - Claims 3-14 (Pet., 44). | ¶¶ 283-285 |

Since the expert declaration contains essentially a verbatim restatement of the allegations in the Petition, the declaration relied on by the Petition is entitled to little if any weight. *Xerox Corp. v. Bytemark, Inc.,* IPR2022-00624, Paper 9 at 15-17 (PTAB August 24, 2022) (designated precedential) (according "little weight" to declaration testimony that contains a verbatim restatement of a petition's conclusory assertions without additional supporting evidence or reasoning); *Facebook* v. *Windy City Innovations, LLC*, 973 F.3d 1321, 1340-41 (Fed. Cir. 2020) (affirming the Board's holding that a claim was not unpatentable when "the Board considered Facebook's expert's testimony but determined that it did not add materially to Petitioner's unpersuasive attorney argument," because it merely repeated Petitioner's argument, nearly verbatim, without citation to the basis for his testimony").

## XI. CONCLUSION

For the reasons set forth above, the Petition does not come close to meeting the statutory threshold for institution under 35 U.S.C. § 314(a). The Petition's two asserted grounds are each predicated on multiple legal and factual deficiencies that

cannot be cured by further argument or expert testimony. In Ground 1, the Petition fails to show that Chow alone, Reiffin alone, or the combination of Chow and Reiffin meets all limitations of claim 1 as arranged in the claim. The cited disclosures are not only incomplete, but also internally inconsistent with respect to critical elements such as [1a] and [1b]. The Petition does not explain how Chow's ***post-execution*** subdivision of an aggregate task could satisfy the claim's requirement for logically subdividing a preexisting input file into more partitions than subtask processors ***before*** any subtasks are executed. Nor does the Petition explain how Reiffin's next-in-queue subtask fetching could satisfy the requirement to distribute descriptions of ***all*** partitions to the subtask processors. These are central deficiencies that undermine the entirety of Ground 1.

In Ground 2, the Petition fares no better. The attempt to rely on Kurowski either alone or in combination with Chow and Reiffin suffers from the same fundamental gap: the failure to identify any disclosure of logically subdividing a preexisting input file into well-defined partitions, and the failure to identify any disclosure of distributing descriptions of all such partitions to the subtask processors. Petitioners' reliance on a web-based reporting interface in Kurowski is misplaced, as such functionality is not relevant to the machine-level distribution required by the claims.

The Petition also fails to establish any non-conclusory reason why a person of ordinary skill in the art would have been motivated to combine the cited references in the specific manners advanced. Petitioners rely on broad statements that the references are in the same field, pursue similar goals, or could be combined to achieve greater computational capacity. These statements are unsupported by evidence, fail to address the particular elements at issue, and do not explain why such combinations would have been pursued by a skilled artisan. Federal Circuit and Board precedent makes clear that mere conclusory assertions of a possible benefit or an alleged similarity between references are insufficient to satisfy the burden of proving a motivation to combine.

Petitioners' approach compounds these deficiencies by presenting a "mix and match" theory that implicitly advances dozens or even hundreds of different permutations of the references without articulating a tailored reason to combine for any specific permutation. This scattershot method does not satisfy the requirement for a clear, particularized explanation of how and why a skilled artisan would have made the proposed combination to arrive at the claimed invention.

The Petition is further undermined by Petitioners' contradictory positions on claim construction. In parallel district court litigation, Petitioners contend that key claim terms are indefinite and cannot be understood by a person of ordinary skill in the art. Here, Petitioners assert that no explicit construction is required because those

same terms have an ordinary and customary meaning. These positions cannot be reconciled, and they weigh against granting institution.

Finally, the Petition's heavy reliance on an expert declaration that merely repeats the Petition's assertions without additional reasoning or evidentiary support offers no substantive reinforcement of Petitioners' arguments. The Board has repeatedly held that such parroting testimony is entitled to little, if any, weight.

Taken together, these deficiencies demonstrate that Petitioners have not shown, and cannot show, a reasonable likelihood of prevailing with respect to any challenged claim. Because neither Ground 1 nor Ground 2 meets the statutory standard, and because both are undermined by the same fundamental factual and legal flaws, the Petition should be denied.

Respectfully submitted,

Dated: August 11, 2025

By: /Daniel H. Golub/
Daniel H. Golub
Registration No. 33,701

*Counsel for Patent Owner*
*Intellectual Ventures I LLC*

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT

Pursuant to 37 C.F.R. § 42.24(d), I certify that this **PATENT OWNER'S PRELIMINARY RESPONSE** complies with the type-volume limits set forth in the Memorandum and 37 C.F.R. § 42.24 because it contains 13,627 words, excluding the parts of the Brief that are exempted by 37 C.F.R. § 42.24(a), according to the word processing system used to prepare this Brief.

Respectfully submitted,

Dated: August 11, 2025

By: /Daniel H. Golub/
Daniel H. Golub
Registration No. 33,701

*Counsel for Patent Owner*
*Intellectual Ventures I LLC*

**CERTIFICATE OF SERVICE**

The undersigned certifies that pursuant to 37 C.F.R. § 42.6(e), a copy of the foregoing **PATENT OWNER'S PRELIMINARY RESPONSE** was served via email (as consented to by counsel) on August 11, 2025 to lead and backup counsel of record for Petitioner as follows:

John B. Campbell
jcampbell@McKoolSmith.com
MCKOOL SMITH, P.C.
303 Colorado Street, Suite 2100
Austin, TX 78701

Alan Block
ablock@mckoolsmith.com
McKool Smith, P.C.
300 South Grand Avenue, Suite 2900
Los Angeles, California 90071

Casey Shomaker
cshomaker@mckoolsmith.com
McKool Smith, P.C.
300 Crescent Court, Suite 1200
Dallas, TX 75201

Keith D. Harden
kharden@munckwilson.com
Munck Wilson Mandala, LLP
2000 McKinney Ave., Ste. 1900
Dallas, Texas 75201

S. Wallace Dunwoody
wdunwoody@munckwilson.com
Munck Wilson Mandala, LLP
2000 McKinney Ave., Ste. 1900
Dallas, Texas 75201

Michael C. Wilson
mwilson@munckwilson.com
Munck Wilson Mandala, LLP
2000 McKinney Ave., Ste. 1900
Dallas, Texas 75201

AA_Intellectual_Ventures@mckoolsmith.com

SWA-IV@munckwilson.com

Dated: August 11, 2025

By: /Daniel H. Golub/
Daniel H. Golub
Registration No. 33,701

*Counsel for Patent Owner*
*Intellectual Ventures I LLC*

# EXHIBIT A-27

US008811356B2

(12) **United States Patent**
**Howard**

(10) **Patent No.: US 8,811,356 B2**
(45) **Date of Patent: Aug. 19, 2014**

(54) **COMMUNICATIONS IN A WIRELESS NETWORK**

(75) Inventor: **Paul Howard**, Bristol (GB)

(73) Assignee: **Intellectual Ventures Holding 81 LLC**, Las Vegas, NV (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 172 days.

(21) Appl. No.: **13/176,298**

(22) Filed: **Jul. 5, 2011**

(65) **Prior Publication Data**

US 2011/0280165 A1 Nov. 17, 2011

**Related U.S. Application Data**

(63) Continuation of application No. 11/646,692, filed on Dec. 27, 2006, now Pat. No. 8,009,639.

(51) **Int. Cl.**

*H04W 74/04* (2009.01)
*H04B 1/56* (2006.01)
*H04W 28/04* (2009.01)
*H04W 72/04* (2009.01)

(52) **U.S. Cl.**

USPC ........... **370/337**; 370/280; 370/329; 370/442

(58) **Field of Classification Search**

CPC ...... H04B 1/56; H04B 7/2656; H04B 7/2643; H04W 80/04; H04W 88/06; H04W 28/04; H04W 72/04; H04W 72/0446; H04W 84/12; H04W 74/04; H04L 12/2801
USPC ................. 370/280, 328, 329, 336, 337, 442
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,056,109 | A | 10/1991 | Gilhousen et al. |
| 5,265,119 | A | 11/1993 | Gilhousen et al. |
| 5,485,486 | A | 1/1996 | Gilhousen et al. |
| 6,061,784 | A | 5/2000 | Tarsky et al. |
| 6,567,459 | B1 | 5/2003 | Hakkinen et al. |
| 6,611,509 | B1 | 8/2003 | Hayashi et al. |
| 6,978,151 | B2 | 12/2005 | Choi et al. |
| 7,120,134 | B2 | 10/2006 | Tiedemann, Jr. et al. |
| 7,215,657 | B2 | 5/2007 | Toshimitsu et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 10201270 | 8/2002 |
| EP | 1467582 | 10/2004 |

(Continued)

OTHER PUBLICATIONS

3rd Generation Partnership Project, “Technical Specification Group Radio Access Network; Radio Resource Control (RRC); Protocol Specification (Release 7),” 3GPP TS 25.331 V7.3.0, Dec. 2006.

(Continued)

*Primary Examiner* — Ronald Abelson
(74) *Attorney, Agent, or Firm* — Volpe and Koenig, P.C.

(57) **ABSTRACT**

Receiving resource allocation information associated with an uplink physical control channel is disclosed. The uplink physical control channel and a physical uplink shared channel may have different resources. Data may be sent over the physical uplink shared channel in assigned time intervals. A signal may be sent over the uplink physical control channel based on the received resource allocation information in a time interval that the UE is not sending data over the physical uplink shared channel.

**46 Claims, 5 Drawing Sheets**



(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 8,009,639 | B2 | 8/2011 | Howard | |
| 8,072,916 | B2 | 12/2011 | Dateki | |
| 2002/0061005 | A1 | 5/2002 | Lee et al. | |
| 2002/0075891 | A1 | 6/2002 | Souissi | |
| 2002/0077151 | A1 * | 6/2002 | Matthews et al. | 455/561 |
| 2002/0119798 | A1 | 8/2002 | Hamabe | |
| 2002/0150058 | A1 * | 10/2002 | Kim et al. | 370/280 |
| 2002/0168993 | A1 | 11/2002 | Choi et al. | |
| 2002/0196766 | A1 | 12/2002 | Hwang et al. | |
| 2003/0022683 | A1 * | 1/2003 | Beckmann et al. | 455/518 |
| 2003/0069020 | A1 * | 4/2003 | Speight | 455/450 |
| 2004/0152473 | A1 | 8/2004 | Kuwano et al. | |
| 2004/0203419 | A1 | 10/2004 | Crocker et al. | |
| 2006/0093026 | A1 | 5/2006 | Montojo et al. | |
| 2006/0211417 | A1 | 9/2006 | Pedlar | |
| 2007/0173256 | A1 | 7/2007 | Laroia et al. | |
| 2007/0265017 | A1 * | 11/2007 | Ishii et al. | 455/453 |
| 2008/0090528 | A1 * | 4/2008 | Malladi | 455/70 |
| 2008/0144600 | A1 * | 6/2008 | Anderson | 370/350 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 1615384 | | 1/2006 |
| EP | 1681780 | | 7/2006 |
| JP | 11-261544 | | 9/1999 |
| JP | 2006-197318 | | 12/2011 |
| WO | 2006019263 | A2 | 2/2006 |
| WO | 2006/063138 | A2 | 6/2006 |

OTHER PUBLICATIONS

Non-Final Rejection issued by USPTO, dated May 14, 2009 for U.S. Appl. No. 11/646,692.
Final Rejection issued by USPTO, dated Nov. 19, 2009 for U.S. Appl. No. 11/646,692.
Non-Final Rejection issued by USPTO, dated May 28, 2010 for U.S. Appl. No. 11/646,692.
Notice of Allowance issued by USPTO, dated Feb. 2, 2011 for U.S. Appl. No. 11/646,692.
Notice of Allowance issued by USPTO, dated May 17, 2011 for U.S. Appl. No. 11/646,692.
Office Action, Japanese Patent Application No. 2009-543459, dated Dec. 18, 2012.
"3 UMTS Interfaces," UMTS Protocols and Protocol Testing, pp. 9-14, located at <http://www.tek.com/Measurement/App.sub.--Notes/2F.sub.--14251/eng/int- erfaces.pdf>.
"3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Feasibility Study for Evolved UTRA and UTRAN (Release 7)," (Mar. 2006). 3GPP:Valbonne, France, TS 25.912 v0.0.4:1-13.
"3rd Generation Partnership Project; Technical Specification Group Services and System Aspects; 3GPP System Architecture Evolution: Report on Technical Options and Conclusions (Release 7)," (Jul. 2005). 3GPP:Valbonne, France, TS 23.882 v0.3.0:1-13.
"3rd Generation Partnership Project; Technical Specification Group Services and System Aspects; General UMTS Architecture (3G TS23.101 version 3.0.1)," (Apr. 1999). 3GPP:Valbonne, France, TS 23.101 v3.0.1:1-13.
3rd Generation Partnership Project; Technical Specification Group Services and System Aspects; Multimedia Broadcast/Multicast Service (MBMS); Architecture and Functional Description (Release 6); 3GPP: Valbonne, France; 3GPP TS 23.246 v.6.4.0 (Sep. 2004).
"UMTS Protocols and Protocol Testing," Tektronix, The International Engineering Consortium, pp. 1-45, located at <http://www.rfpeople.com/docs/umts.pdf>.
Ghadialy, Z. "Tutorial: Medium Access Control (MAC) in 3G/UMTS Protocol Stack," located at <http://www.3g4g.co.uk/Tutorial/ZG/zg.sub.--mac.html> visited on Jun. 20, 2007. (9 pages).
International Engineering Consortium. "Universal Mobile Telecommunications System (UMTS) Protocols and Protocol Testing," located at <http://www.iec.org/online/tutorials/umts/topic02.html> visited on Jun. 20, 2007. (7 pages).
International Preliminary Report on Patentability issued on Jun. 30, 2009 from PCT Application No. PCT/EP20071064483.

* cited by examiner


External network
124
CN
GGSN
122
SGSN
120
116
Iu
RNC
118
RRM
114
Iub
Node-B
Node-B
Node-B
112
Uu
UE
110
Core network (CN) domain
Radio access network (RAN) domain
UE domain

FIG. 1

Case 3:25-cv-02885-L-BN Document 167 Filed 08/28/26 Page 816 of 1002 PageID 5973






FIG. 2


310
312
314
316
Frame #0
PLCCH
Frame #1
PLCCH
Frame #2
PLCCH
Frame #3
PLCCH
UL Beacon
UL Beacon
UL Beacon
UL Beacon
Frame #0
PLCCH
Frame #1
Frame #2
Frame #3
PLCCH
UL Beacon
UL Beacon
PLCCH
UL Beacon
PLCCH
UL Beacon
DL
UL
DL
UL
DL
UL
DL
UL
Basestation
302
Terminal
304
Terminal
306
Terminal
308

FIG. 3


GSM connected mode
Establish RR connection
Release RR connection
GPRS packet transfer mode
Initiation of temporary block flow
Release of temporary block flow
GPRS packet idle mode[1]
Camping on a GSM/GPRS cell[1]
UTRA: inter-RAT handover
GSM: handover
Cell reselection
UTRA RRC connected mode
CELL_PCH
Out of service
In service
CELL_FACH
404
CELL_ACTIVE
406
URA_PCH
CELL_DCH
Establish RRC connection
Release RRC connection
Camping on a UTRAN cell[1]
Idle mode

FIG. 4


500
Processor
504
Memory
508
Storage devices
510
Media drive
512
Media
518
Storage unit
I/F
Storage unit
520
522
Bus
502
Communications
I/F
Channel
524
528

FIG. 5

# COMMUNICATIONS IN A WIRELESS NETWORK

This application is a continuation of U.S. patent application Ser. No. 11/646,692, flied Dec. 27, 2006, now U.S. Pat. No. 8,009,639 which issued on Aug. 30, 2011. The content of this document is incorporated herein in its entirety.

## BACKGROUND OF THE INVENTION

Time division-code division multiple access (TD-CDMA) is an air interface technology that combines the benefits of the three elemental concepts in a universal mobile telecommunication system (UMTS): time division multiple access (TDMA); code division multiple access (CDMA); and time division duplex (TDD). TDD, in particular, uses the same radio channel for both uplink and downlink communications, and discriminates between signals by separating the transmissions in time. One of the benefits obtained by operating both links on the same frequency is the ability to exploit channel reciprocity.

Channel reciprocity gives equipment the ability to derive information about uplink channel conditions from downlink channel conditions based upon signals received by the user equipment (UE). Pathloss is one example of channel information that can be obtained from channel reciprocity. Knowledge of the uplink pathloss enables open-loop power control to be employed for uplink transmissions. For example, uplink power control is important for the operation of the CDMA element of TD-CDMA as it counteracts the near-far effect that would otherwise be encountered if all UEs transmitted at a fixed power regardless of the uplink pathloss.

The open-loop uplink power control feature provides a significant advantage when coupled with a multiple access data transmission system that is used for packet-based communication and/or shared channels. When access to a limited number of uplink channels is shared between a large population of terminals it is imperative that access to the channels can be switched between terminals with minimal latency. A data terminal that can derive information needed to access uplink channels from the downlink transmissions (beacon signals) has a significant advantage over a terminal that relies on the (lengthy) configuration of a dedicated channel in order to establish a feedback channel.

However, channel reciprocity cannot always be guaranteed. For example TDD transmissions may not be permitted in certain frequency spectrum allocations; this is a regulatory issue and may be used to protect other wireless equipment in the same or adjacent frequency bands. In these situations the correlation between uplink and downlink channels is lost because the channels are transported on carrier frequencies that are separated in frequency by an amount that is greater than the coherence bandwidth of the channel (usually, only a few MHz separation is sufficient to cause the uplink and downlink fading profiles to be independent).

In high speed mobile applications, the time delay between downlink and uplink transmissions may exceed the coherence time of the channel. The maximum time delay that can be tolerated is a function of the mobile speed and the RF carrier frequency used, with the coherence time reducing with increasing speed and RF carrier frequency. Also, the use of multiple transmit and/or receive antennas at the network and/or the mobile terminal can introduce unintentional decorrelation between the uplink and downlink channels.

If the TD-CDMA air interface is to be used in applications where the correlation between the uplink and downlink path



loss is not guaranteed, then it would be advantageous to find a substitute for channel reciprocity.

## BRIEF SUMMARY OF THE INVENTION

Although it is desirable to support air interfaces where the pathloss is not reciprocal, known conventional methods do not deal directly with the evolution or adaptation of an air interface that uses channel reciprocity to deliver key features and advantages where channel reciprocity is not guaranteed. The adaptation provided in embodiments of the invention introduces a new technique for uplink channel control that uses a feedback scheme as a substitute for the absence of channel reciprocity, with minimal impact on the ability of the air interface to support uplink shared channels.

Embodiments of the present invention enable active feedback control between a base station and user equipment (UE). In particular, the operation of a system designed for TDD, or unpaired operation, is expanded to operate in FDD, or paired, mode. For example, an uplink beacon function (for power control) and a modified random access process substitute for the information lost due to the lack of channel reciprocity in paired operation. Embodiments of the invention allow a terminal to transmit the uplink physical channel control signal (UL_Beacon) independently from the uplink physical channel. Therefore, the implementation of closed loop feedback may operate in the absence of an uplink physical channel. In one embodiment, a UE allocates a time slot for a beacon signal separated from the time slots for data in a frame. A second time slot is allocated within the frame for the base station to transmit a control signal in response to the beacon signal. The control signal instructs the UE to adjust a transmission parameter.

A UL_Beacon signal may be combined with a physical layer common control channel (PLCCH) to form a feedback system. A dedicated timeslot groups all of the UL_Beacon signals from multiple UEs in a specific uplink timeslot. By grouping the UL_Beacon signals together, embodiments obtain separation between the UL_Beacon signals and the standard uplink physical channels. Additionally, in a synchronous system embodiments of the invention detect and cancel the UL_Beacon signals from other cell sites (inter-cell interference). The PLCCH carries feedback information to the UEs that are transmitting UL_Beacon signals. The PLCCH can share a timeslot with other physical channels by exploiting the CDMA aspect of the system.

In other embodiments, the number of supported UEs can be increased by fractionating the use of the UL_Beacon and PLCCH across a multiframe period. Fractionation may also prevent timeslot blocking where half duplex UEs have a long UL/DL switching time. Additionally, support for half duplex terminals is implicit due to the nature of the TDMA frame structure. The system may manage the allocation of resource across the population of terminals such that the full capacity of the base station can be utilized even when only half-duplex terminals are deployed. In embodiments of the invention, full-duplex terminals can be still be supported along with half duplex UEs.

Moreover, in other embodiments, a radio resource control (RRC) connected state covers the subset of terminals that are in cell forward access channel (Cell_FACH), which are also transmitting UL_Beacon and receiving PLCCH, thus creating an active control feedback channel. Management of the UEs that are in Cell_Active state may remove users that are

less active, and may add users that are newly active while retaining users that may have on-going data transfer requirements.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** illustrates a cellular communication system according to embodiments of the invention;

FIG. **2** illustrates a timeslot arrangement for uplink and downlink messages supporting the UL_Beacon and its corresponding PLCCH within a TD-CDMA frame structure modified to support FDD according to embodiments of the invention;

FIG. **3** illustrates fractionation in different frames at the base station according to embodiments of the invention;

FIG. **4** illustrates UTRA RRC connected modes according to embodiments of the invention;

FIG. **5** illustrates a computer system that may be employed to implement embodiments of the invention.

## DETAILED DESCRIPTION OF THE INVENTION

FIG. **1** illustrates an example of a cellular communication system according to embodiments of the invention. The network includes a user equipment (UE) domain, a radio access network (RAN) domain, and a core network domain. The UE domain includes user equipment **110** that communicate with at least one base station **112** in the RAN domain via a wireless interface. The RAN domain may also include a network controller (RNC) **118** (e.g., radio network controller), such as that used in UMTS systems. Alternatively, such functionality may be distributed between the Node Bs and an access gateway (AGW) (not shown) or other controller in the core network. FIG. **1** also illustrates an optional radio resource manager (RRM) **114**. The RRM may perform functions otherwise performed by the Node Bs or an AGW in some embodiments.

The core network (CN) **116** includes, in this example, a serving GPRS support node (SGSN) **120**, and a gateway GPRS support node (GGSN) **122**. The core network is coupled to an external network **124**. The SGSN **120** is responsible for session control, including keeping track of the location of the UEs. The GGSN **122** concentrates and tunnels user data within the core network **116** to the ultimate destination (e.g., an Internet service provider) in the external network **124**. Further details may be found in the 3GPP UMTS technical specifications, such as TS23.246 v6.4.0 "3rd Generation Partnership Project; Technical Specification Group Services and System Aspects; Multimedia Broadcast/Multicast Service (MBMS); Architecture and Functional Description (Release 6)," published by the 3GPP Support Office, 650 Route des Lucioles—Sophia Antipolis, Valbonne—FRANCE, which are incorporated by reference herein.

Further details regarding exemplary communications systems that may implement embodiments of the invention may be found in 3GPP UMTS technical specifications, such as TR 23.882, "3GPP System Architecture Evolution: Report on Technical Options and Conclusions"; TR 25.912, "Feasibility Study for Evolved UTRA and UTRAN"; TS 23.101, "General Universal Mobile Telecommunications System (UMTS) Architecture," all of which are incorporated by reference herein.

TDD to FDD Evolution

A system designed for operation in Time Division Duplex (TDD) mode has base stations and terminals that transmit and receive at orthogonal points in time. In normal operation terminals are in receive mode when the base station is transmitting, and base stations are in receive mode when terminals are transmitting. In conventional TDD implementations, neither base stations nor the terminals are able to transmit and receive at the same points in time because the same frequency is used for uplink and downlink communication.

Such a system can be adjusted to operate in Frequency Division Duplex (FDD) mode, where the uplink and downlink communications occur on different frequencies. According to embodiments of the invention, to make full and efficient use of the frequency spectrum resources, the base stations are adapted to transmit and receive at the same time. This is possible since the uplink and downlink communications now occur on different frequencies. The terminals, however, retain the restriction of transmitting and receiving at orthogonal points in time to retain the simplicity of not having to transmit and receive at the same time (e.g., no duplexer required). The full use of the frequency spectrum is then obtained by allocating the resource across a plurality of terminals.

Additional measures may be needed if there are aspects of the air interface that rely on the channel reciprocity that can be assumed for TDD systems. In the case of TD-CDMA, modifications may be made for the correct operation of uplink power control and rate adaptation. This can be achieved by defining an uplink physical control channel used for estimating the uplink channel conditions and a downlink channel used to feed back control information to the terminal. These channels may not need an associated data physical channel to be operational.

Modifications may be made to the random access channel. This may be achieved by introducing an additional indicator step at the start of any physical random access. A new uplink physical channel carries the random access indicators. A new downlink physical channel carries the response to received uplink indicators.

Uplink Physical Channel Control Signal

When pathloss reciprocity is not available, the combination of an uplink physical channel control signal with a downlink feedback channel may be used to keep the terminal informed of the condition of the uplink channel. The uplink physical control signal is referred to herein as an "Uplink Beacon" (UL_Beacon).

In general, a system that supports shared channels may also support shared access to a large number of terminals. To extract the maximum benefit from the resulting trunking gain, shared channels can be quickly and efficiently re-allocated between the population of UEs. To obtain rapid access to the uplink shared channels, terminals can transmit at the correct power with their first transmission so that latency can be kept to a minimum.

According to embodiments of the invention, the RNC or other controller (e.g., other controller having its functionality in the core network) allocates resources so that the physical channel control signal is separate from the uplink (shared) physical channel. Thus, terminals are able to transmit an UL_Beacon independently of their access to the uplink shared channel. The system may implement a closed loop control system, in which the base station detects the received power and/or other channel information from the UL_Beacon, and sends controlling commands back to each terminal to keep the terminal informed of the channel conditions observed at the base station.

In certain embodiments, the closed loop control system is simply based on the UL_Beacon power received at the base station. The base station may send power control commands on a shared downlink channel to each terminal based on the power received from the UL_Beacon signal. Each power control command may, for example, indicate whether terminal power should be increased or decreased by a predeter-

mined amount. This downlink channel is referred to as the "Physical Layer Control Channel" (PLCCH). The capacity of the PLCCH may be matched to the number of bits required in the feedback field and the number of UL_Beacon signals that can be simultaneously supported. That is, each UL_Beacon may correspond to one bit of the PLLCH. All terminals transmitting UL_Beacon signals may receive this channel and extract the relevant feedback field.

It is possible to extend the complexity of the control loop by sending control commands based on other aspects of the UL_Beacon signal as received by the base station, such as time-of-arrival, and channel impulse response. The amount of resource that is required for the feedback channel increases with the size (in bits) of the feedback information to each UE.

For example, for air interface technologies with a TDMA element, it is possible to adapt the TDMA frame structure to provide separation between the UL_Beacon and the normal physical channels by dedicating at least one uplink time slot per frame (or at least one time slot per multi-frame) to carrying UL_Beacon signals.

By placing UL_Beacon signals in a dedicated timeslot, a dedicated detection scheme can be applied which may include performance enhancing features such as intra-cell cancelling (for alleviating the effects of cross-correlation interference between UL_Beacon signals transmitted by multiple terminals in the same cell), or inter-cell cancelling (for reducing the interference from neighboring cells in the case where the UL_Beacon timeslots are time synchronized). Cross-interference between UL_Beacon and normal uplink bursts is avoided by the separation obtained from the use of separate time slots.

Those skilled in the art will recognize that there are a large number of possibilities for the arrangement of a UL_Beacon and its associated PLCCH within the frame structure according to embodiments of the invention. More than one UL_Beacon and PLCCH per frame could be supported if the feedback update rate is required to be faster than the frame rate (at the expense of system capacity). For system applications that can tolerate a slower feedback rate, embodiments may fractionate the use of the UL_Beacon timeslot (and the associated PLCCH).

When fractionation is employed, the RNC or other controller may allocate the UL_Beacon timeslot in a given frame to a group of terminals depending on the current fractionation phase, thus increasing the number of terminals that can be supported with active physical channel feedback control. The maximum fractionation cycle length may be determined by the feedback update rate that the system requires in order to meet its performance targets.

FIG. **2** illustrates an example of a timeslot arrangement supporting the UL_Beacon and its corresponding PLCCH within a TD-CDMA frame structure modified to support FDD. In this example, the PLCCH **212** shares a timeslot with another downlink shared channel. This is possible since normal downlink physical channels are used to transmit the PLCCH. The downlink frame also comprises a downlink beacon timeslot **206**, an access control timeslot **208**, and normal traffic carrying timeslots **210**. The uplink frame comprises a UL_Beacon control timeslot **216**, an access control timeslot **218**, and normal traffic carrying timeslots **214**.

FIG. **3** illustrates an example where fractionation is employed. The UL-Beacon and PLCCH timeslots are active in every frame at the base station **302**. However, terminal **304**, terminal **306**, and terminal **308** have been assigned a different fractionation phase. FIG. **3** illustrates the case where the fractionation phase is 3. For example, the fractionation phase of terminal **304** occurs in frame #O **310**, the fractionation phase of terminal **306** occurs in frame #**1 312**, and the fractionation phase of terminal **308** occurs in frame #**2 314**. Since the fractionation phase is 3, the phase for terminal **304** occurs again in frame #**3 316**.

Half Duplex Terminals

Embodiments of the invention enable terminals to operate in half duplex or full duplex mode. In a half duplex system, base stations and terminals do not transmit and receive simultaneously. When such a system is evolved to operate in paired spectrum, it becomes inefficient if base stations retain their half duplex operation. It is not necessarily inefficient for the terminals to do so, however, since half duplex operation may have some advantages in the design and implementation of the terminal.

Nonetheless, there are some points that should be considered. For example, a single terminal may not be able to access all transmit and all receive slots. Therefore, the system may have to manage resources across the population of terminals to ensure all the available resources at the base station are efficiently utilized. To prevent blocking of timeslots, half duplex terminals may be operated with a fractionation cycle of greater than one. In particular, this may also apply for the case where there are more than one UL_Beacon timeslot per, frame. There is a time delay for half duplex terminals to switch between transmit and receive functions. In some cases this delay exceeds the guard period inserted between consecutive timeslots. In the half duplex terminal case, the terminal is unable to transmit and receive on adjacent timeslots. This will affect the locations of the UL_Beacon, PLCCH, and other common channels. Accordingly, the timeslot arrangement may be adjusted when the system is configured.

Terminal Management

Embodiments of this invention separate uplink control from the uplink physical traffic. This allows the control feedback to operate even when the terminal does not have data to send, with the consequence that uplink shared channels can be used with maximum efficiency.

To use shared channels efficiently, a relatively large user base may be needed. At the same time, the network resources required to support the control feedback channels for these terminals need to be minimized. In general, the number of users that can be supported with active control feedback channels is smaller than the typical number of users per cell. Therefore, the terminals in this active state may be managed.

In UMTS terminology, embodiments of the invention provide a new Universal Terrestrial Radio Access-Radio Resource Control-Connected (UTRA RRC-Control) substate into the system. UTRA systems already support the idea of different RRC-Connected states (see, TS25.331 Radio Resource Control (RRC) Protocol Specification, which is incorporated herein by reference), e.g., CELL_DCH, CELL_FACH etc. This sub-state is referred to as the CELL_ACTIVE state. FIG. **4** illustrates this sub-state in context with other UTRA RRC-connected states. A UE in a Cell_Active sub-state transmits the physical channel control part of the uplink physical channel only, and nothing else (i.e., no data).

As shown in FIG. **4**, CELL_ACTIVE sub-state is a substate of CELL_FACH state **404**. In general, UEs in CELL_FACH state have an RRC connection, but they may not be actively transferring data. Out of the population of UEs in CELL_FACH state **404**, a smaller number of UEs, determined by the network to be the most-active UEs, are supported in a CELL_ACTIVE state **406**. In this state, the UEs transmit the physical channel control signal and listen to the associated feedback channel from the network. Because the UE is aware of the uplink pathloss conditions from the feed-

back channel, it can have instant access to the uplink shared channels, and the resource allocator (controller) in the network can treat the UE accordingly.

The rules governing which UEs are maintained in CELL_ACTIVE state are decided by the network (e.g., through the RNC) and may be based on factors such as the volume of data transfer required by the UE, the data transfer rate required by a UE, the frequency of short bursts of data transfer, the total number of UEs in CELL_FACH state, the time since the last data transfer, the UE power saving requirements, etc.

Note that UEs in CELL_ACTIVE state have their transmitters active, therefore it is necessary for these UEs to monitor the status of the downlink and automatically come out of CELL_ACTIVE state if the downlink is deemed to be out-of-synchronization (for example, very high downlink errors or low received signal strength). This feature prevents UEs continuing to transmit in a state where the feedback channel may be unreliable and thus causing interference.

While the invention has been described in terms of particular embodiments and illustrative figures, those of ordinary skill in the art will recognize that the invention is not limited to the embodiments or figures described. Although embodiments of the present invention are described, in some instances, using UMTS terminology, those skilled in the art will recognize that such terms are also used in a generic sense herein, and that the present invention is not limited to such systems.

Those skilled in the art will recognize that the operations of the various embodiments may be implemented using hardware, software, firmware, or combinations thereof, as appropriate. For example, some processes can be carried out using processors or other digital circuitry under the control of software, firmware, or hard-wired logic. (The term "logic" herein refers to fixed hardware, programmable logic and/or an appropriate combination thereof, as would be recognized by one skilled in the art to carry out the recited functions.) Software and firmware can be stored on computer-readable media. Some other processes can be implemented using analog circuitry, as is well known to one of ordinary skill in the art. Additionally, memory or other storage, as well as communication components, may be employed in embodiments of the invention.

FIG. **5** illustrates a typical computing system **500** that may be employed to implement processing functionality in embodiments of the invention. Computing systems of this type may be used in the radio controllers, the base stations, and the UEs, for example. Those skilled in the relevant art will also recognize how to implement the invention using other computer systems or architectures. Computing system **500** may represent, for example, a desktop, laptop, or notebook computer, hand-held computing device (PDA, cell phone, palmtop, etc.), mainframe, server, client, or any other type of special or general purpose computing device as may be desirable or appropriate for a given application or environment. Computing system **500** can include one or more processors, such as a processor **504**. Processor **504** can be implemented using a general or special purpose processing engine such as, for example, a microprocessor, microcontroller or other control logic. In this example, processor **504** is connected to a bus **502** or other communications medium.

Computing system **500** can also include a main memory **508**, such as random access memory (RAM) or other dynamic memory, for storing information and instructions to be executed by processor **504**. Main memory **508** also may be used for storing temporary variables or other intermediate information during execution of instructions to be executed by processor **504**. Computing system **500** may likewise include a read only memory ("ROM") or other static storage device coupled to bus **502** for storing static information and instructions for processor **504**.

The computing system **500** may also include information storage system **510**, which may include, for example, a media drive **512** and a removable storage interface **520**. The media drive **512** may include a drive or other mechanism to support fixed or removable storage media, such as a hard disk drive, a floppy disk drive, a magnetic tape drive, an optical disk drive, a CD or DVD drive (R or RW), or other removable or fixed media drive. Storage media **518**, may include, for example, a hard disk, floppy disk, magnetic tape, optical disk, CD or DVD, or other fixed or removable medium that is read by and written to by media drive **512**. As these examples illustrate, the storage media **518** may include a computer-readable storage medium having stored therein particular computer software or data.

In alternative embodiments, information storage system **510** may include other similar components for allowing computer programs or other instructions or data to be loaded into computing system **500**. Such components may include, for example, a removable storage unit **522** and an interface **520**, such as a program cartridge and cartridge interface, a removable memory (for example, a flash memory or other removable memory module) and memory slot, and other removable storage units **522** and interfaces **520** that u allow software and data to be transferred from the removable storage unit **522** to computing system **500**.

Computing system **500** can also include a communications interface **524**. Communications interface **524** can be used to allow software and data to be transferred between computing system **500** and external devices. Examples of communications interface **524** can include a modem, a network interface (such as an Ethernet or other NIC card), a communications port (such as for example, a USB port), a PCMCIA slot and card, etc. Software and data transferred via communications interface **524** are in the form of signals which can be electronic, electromagnetic, optical or other signals capable of being received by communications interface **524**. These signals are provided to communications interface **524** via a channel **528**. This channel **528** may carry signals and may be implemented using a wireless medium, wire or cable, fiber optics, or other communications medium. Some examples of a channel include a phone line, a cellular phone link, an RF link, a network interface, a local or wide area network, and other communications channels.

In this document, the terms "computer program product," "computer-readable medium" and the like may be used generally to refer to media such as, for example, memory **508**, storage device **518**, or storage unit **522**. These and other forms of computer-readable media may store one or more instructions for use by processor **504**, to cause the processor to perform specified operations. Such instructions, generally referred to as "computer program code" (which may be grouped in the form of computer programs or other groupings), when executed, enable the computing system **500** to perform functions of embodiments of the present invention. Note that the code may directly cause the processor to perform specified operations, be compiled to do so, and/or be combined with other software, hardware, and/or firmware elements (e.g., libraries for performing standard functions) to do so.

In an embodiment where the elements are implemented using software, the software may be stored in a computer-readable medium and loaded into computing system **500** using, for example, removable storage drive **522**, drive **512** or

communications interface **524**. The control logic (in this example, software instructions or computer program code), when executed by the processor **504**, causes the processor **504** to perform the functions of the invention as described herein.

It will be appreciated that, for clarity purposes, the above description has described embodiments of the invention with reference to different functional units and processors. However, it will be apparent that any suitable distribution of functionality between different functional units, processors or domains may be used without detracting from the invention. For example, functionality illustrated to be performed by separate processors or controllers may be performed by the same processor or controller. Hence, references to specific functional units are only to be seen as references to suitable means for providing the described functionality, rather than indicative of a strict logical or physical structure or organization.

Although the present invention has been described in connection with some embodiments, it is not intended to be limited to the specific form set forth herein. Rather, the scope of the present invention is limited only by the claims. Additionally, although a feature may appear to be described in connection with particular embodiments, one skilled in the art would recognize that various features of the described embodiments may be combined in accordance with the invention.

Furthermore, although individually listed, a plurality of means, elements or method steps may be implemented by, for example, a single unit or processor. Additionally, although individual features may be included in different claims, these may possibly be advantageously combined, and the inclusion in different claims does not imply that a combination of features is not feasible and/or advantageous. Also, the inclusion of a feature in one category of claims does not imply a limitation to this category, but rather the feature may be equally applicable to other claim categories, as appropriate.

What is claimed is:

**1**. A user equipment (UE) comprising:

a processor configured to receive resource allocation information associated with an uplink physical control channel, wherein the uplink physical control channel and a physical uplink shared channel have different resources;

the processor is further configured to send data over the physical uplink shared channel in assigned time intervals;

the processor is further configured, in a time interval that it is not sending information over the physical uplink shared channel, to send a signal over the uplink physical control channel based on the received resource allocation information; and

the processor is further configured to receive feedback information from a downlink control channel.

**2**. The UE of claim **1** wherein the processor is further configured to receive data on a physical downlink shared channel.

**3**. The UE of claim **2** wherein the downlink control channel and the physical downlink shared channel are time multiplexed.

**4**. The UE of claim **1** wherein the feedback information includes power control information.

**5**. The UE of claim **4** wherein the downlink control channel includes power control information for a plurality of UEs using different bits.

**6**. The UE of claim **1** wherein in the time interval that the signal on the uplink physical control channel is sent by the UE, a plurality of UEs each transmit on respective uplink physical control channels in the time interval.

**7**. The UE of claim **1** further comprising the uplink physical control channel, the physical uplink shared channel, or the downlink control channel is any one of a time division multiple access (TDMA), code division multiple access (CDMA), time division duplex (TDD), frequency division duplex (FDD), time division-code division multiple access (TD-CDMA), or universal mobile telecommunication system (UMTS) physical channel.

**8**. A network device comprising:

a processor configured to send resource allocation information associated with an uplink physical control channel, wherein the uplink physical control channel and a physical uplink shared channel have different resources;

the processor is further configured to receive data over the physical uplink shared channel in assigned time intervals;

the processor is further configured, in a time interval that it is not receiving information over the physical uplink shared channel, to receive a signal over the uplink physical control channel based on the sent resource allocation information; and

the processor is further configured to send feedback information on a downlink control channel.

**9**. The network device of claim **8** wherein the processor is further configured to send data on a physical downlink shared channel.

**10**. The network device of claim **9** wherein the downlink control channel and the physical downlink shared channel are time multiplexed.

**11**. The network device of claim **8** wherein the feedback information includes power control information.

**12**. The network device of claim **11** wherein the downlink control channel includes power control information for a plurality of UEs using different bits.

**13**. The network device of claim **8** wherein in the time interval that the signal on the uplink physical control channel is received by the network device, signals are received on other uplink physical control channels in the time interval from a plurality of UEs.

**14**. The network device of claim **8** further comprising the uplink physical control channel, the physical uplink shared channel, or the downlink control channel is any one of a time division multiple access (TDMA), code division multiple access (CDMA), time division duplex (TDD), frequency division duplex (FDD), time division-code division multiple access (TD-CDMA), or universal mobile telecommunication system (UMTS) physical channel.

**15**. A wireless network comprising:

a network device comprising:

circuitry configured to send resource allocation information associated with an uplink physical control channel, wherein the uplink physical control channel and a physical uplink shared channel have different resources;

and

a user equipment (UE) comprising:

circuitry configured to send data over the physical uplink shared channel in assigned time intervals;

the circuitry is further configured, in a time interval that it is not sending information over the physical uplink shared channel, to send a signal over the uplink physical control channel based on the sent resource allocation information; and

the UE receives feedback information on a downlink control channel.

**16**. The wireless network of claim **15** wherein the network device is configured to send data on a physical downlink shared channel.

**17**. The wireless network of claim **16** wherein the downlink control channel and the physical downlink shared channel are time multiplexed.

**18**. The wireless network of claim **15** wherein the feedback information includes power control information.

**19**. The wireless network of claim **18** wherein the network device is configured to send, on the downlink control channel, power control information for a plurality of UEs using different bits.

**20**. The wireless network of claim **15** wherein in the time interval that the signal is sent on the uplink physical control channel by the UE, a plurality of UEs each transmit on respective uplink physical control channels in the time interval.

**21**. The wireless network of claim **15** further comprising the uplink physical control channel, the physical uplink shared channel, or the downlink control channel is any one of a time division multiple access (TDMA), code division multiple access (CDMA), time division duplex (TDD), frequency division duplex (FDD), time division-code division multiple access (TD-CDMA), or universal mobile telecommunication system (UMTS) physical channel.

**22**. A method performed by a user equipment (UE), the method comprising:

receiving, by the UE, resource allocation information associated with an uplink physical control channel, wherein the uplink physical control channel and a physical uplink shared channel have different resources;

sending, by the UE, data over the physical uplink shared channel in assigned time intervals;

sending, by the UE in a time interval that it is not sending information over the physical uplink shared channel, a signal over the uplink physical control channel based on the received resource allocation information; and

receiving, by the UE, feedback information from a downlink control channel.

**23**. The method of claim **22** further comprising:

receiving, by the UE, data on a physical downlink shared channel.

**24**. The method of claim **23** wherein the downlink control channel and the physical downlink shared channel are time multiplexed.

**25**. The method of claim **22** wherein the feedback information includes power control information.

**26**. The method of claim **25** wherein the downlink control channel includes power control information for a plurality of UEs using different bits.

**27**. The method of claim **22** wherein in the time interval that the signal on the uplink physical control channel is sent by the UE, a plurality of UEs each transmit on respective uplink physical control channels in the time interval.

**28**. The method of claim **22** further comprising the uplink physical control channel, the physical uplink shared channel, or the downlink control channel is any one of a time division multiple access (TDMA), code division multiple access (CDMA), time division duplex (TDD), frequency division duplex (FDD), time division-code division multiple access (TD-CDMA), or universal mobile telecommunication system (UMTS) physical channel.

**29**. A method performed by a network device, the method comprising:

sending, by the network device, resource allocation information associated with an uplink physical control channel, wherein the uplink physical control channel and a physical uplink shared channel have different resources;

receiving, by the network device, data over the physical uplink shared channel in assigned time intervals;

receiving, by the network device in a time interval that it is not receiving information over the physical uplink shared channel, a signal over the uplink physical control channel based on the sent resource allocation information; and

sending, by the network device, feedback information on a downlink control channel.

**30**. The method of claim **29** further comprising:

sending, by the network device, data on a physical downlink shared channel.

**31**. The method of claim **30** wherein the downlink control channel and the physical downlink shared channel are time multiplexed.

**32**. The method of claim **29** wherein the feedback information includes power control information.

**33**. The method of claim **32** wherein the downlink control channel includes power control information for a plurality of UEs using different bits.

**34**. The method of claim **29** wherein in the time interval that the signal on the uplink physical control channel is received by the network device, signals are received on other uplink physical control channels in the time interval from a plurality of UEs.

**35**. The method of claim **29** further comprising the uplink physical control channel, the physical uplink shared channel, or the downlink control channel is any one of a time division multiple access (TDMA), code division multiple access (CDMA), time division duplex (TDD), frequency division duplex (FDD), time division-code division multiple access (TD-CDMA), or universal mobile telecommunication system (UMTS) physical channel.

**36**. A method performed by a wireless network, the method comprising:

sending, by a network device, resource allocation information associated with an uplink physical control channel, wherein the uplink physical control channel and a physical uplink shared channel have different resources;

sending, by a user equipment (UE), data over the physical uplink shared channel in assigned time intervals;

sending, by the UE in a time interval that it is not sending information over the physical uplink shared channel, a signal over the uplink physical control channel based on the sent resource allocation information; and

receiving, by the UE, feedback information on a downlink control channel.

**37**. The method of claim **36** further comprising:

sending, by the network device, data on a physical downlink shared channel.

**38**. The method of claim **37** wherein the downlink control channel and the physical downlink shared channel are time multiplexed.

**39**. The method of claim **36** wherein the feedback information includes power control information.

**40**. The method of claim **39** further comprising:

sending, by the network device on the downlink control channel, power control information for a plurality of UEs using different bits.

**41**. The method of claim **36** wherein in the time interval that the signal is sent on the uplink physical control channel by the UE, a plurality of UEs each transmit on respective uplink physical control channels in the time interval.

**42**. The method of claim **36** further comprising the uplink physical control channel, the physical uplink shared channel, or the downlink control channel is any one of a time division multiple access (TDMA), code division multiple access

(CDMA), time division duplex (TDD), frequency division duplex (FDD), time division-code division multiple access (TD-CDMA), or universal mobile telecommunication system (UMTS) physical channel.

**43**. A user equipment (UE) comprising:

a processor configured to receive resource allocation information associated with an uplink physical control channel, wherein the uplink physical control channel and a physical uplink shared channel have different resources;

the processor is further configured to send data over the physical uplink shared channel in assigned time intervals;

the processor is further configured, in a time interval that it is not sending information over the physical uplink shared channel, to send a signal over the uplink physical control channel based on the received resource allocation information; and

wherein in the time interval that the signal on the uplink physical control channel is sent by the UE, a plurality of UEs each send respective signals on respective uplink physical control channels in the time interval.

**44**. The UE of claim **43** further comprising the uplink physical control channel, the respective uplink physical control channels, or the physical uplink shared channel is any one of a time division multiple access (TDMA), code division multiple access (CDMA), time division duplex (TDD), frequency division duplex (FDD), time division-code division multiple access (TD-CDMA), or universal mobile telecommunication system (UMTS) physical channel.



**45**. A method performed by a user equipment (UE), the method comprising:

receiving, by the UE, resource allocation information associated with an uplink physical control channel, wherein the uplink physical control channel and a physical uplink shared channel have different resources;

sending, by the UE, data over the physical uplink shared channel in assigned time intervals;

sending, by the UE in a time interval that it is not sending information over the physical uplink shared channel, a signal over the uplink physical control channel based on the received resource allocation information; and

wherein in the time interval that the signal on the uplink physical control channel is sent by the UE, a plurality of UEs each send respective signals on respective uplink physical control channels in the time interval.

**46**. The method of claim **45** further comprising the uplink physical control channel, the respective uplink physical control channels, or the physical uplink shared channel is any one of a time division multiple access (TDMA), code division multiple access (CDMA), time division duplex (TDD), frequency division duplex (FDD), time division-code division multiple access (TD-CDMA), or universal mobile telecommunication system (UMTS) physical channel.

* * * * *

# EXHIBIT A-28

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

TOYOTA MOTOR CORP. and
CONTINENTIAL AUTOMOTIVE SYSTEMS, INC.

Petitioners,

v.

INTELLECTUAL VENTURES II LLC

Patent Owner.

Case No. IPR2022-01130
U.S. Patent No. 8,811,356

# PATENT OWNER'S PRELIMINARY RESPONSE

## TABLE OF CONTENTS

TABLE OF CONTENTS .......... i
PATENT OWNER'S EXHIBIT LIST .......... ii
I. INTRODUCTION .......... 1
II. THE PROBLEM AND SOLUTION PRESENTED IN THE '356 PATENT .......... 2
A. The Problem Presented: How to Control the Uplink Channel in the Absence of Channel Reciprocity .......... 2
B. Summary of the Invention – A New Feedback Technique For Use In Applications Where Channel Reciprocity Cannot Be Guaranteed .......... 3
C. Detailed Description of the Novel Feedback Technique .......... 4
D. Claims of the '356 Patent .......... 9
E. Claim Construction .......... 10
III. INSTITUTION MUST BE DENIED WITH RESPECT TO GROUND 1 .......... 15
A. The Petition Does Not Explain How The "Ranging Code" Is A Control Channel Signal .......... 15
B. The Standard Fails To Disclose Transmission of a Control Signal Interposed Between Data Transmissions .......... 20
IV. INSTITUTION SHOULD BE DENIED UNDER GROUNDS 2 AND 3 BECAUSE THE STANDARD, EITHER BY ITSELF OR IN COMBINATION WITH MAHANTY, FAILS TO RENDER THE CHALLENGED CLAIMS OBVIOUS .......... 22
V. CONCLUSION .......... 23

**PATENT OWNER'S EXHIBIT LIST**

| | |
|---|---|
| Ex. 2001 | Declaration of Dr. Gary Lomp |
| Ex. 2002 | CV of Dr. Gary Lomp |
| Ex. 2003 | "Interval" - *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/interval, (captured on October 4, 2022) |

## I. INTRODUCTION

The Petition challenges claims 1-7, 22-28 and 43-46 ("Challenged Claims") of U.S. Patent No. 8,811,356 (" '356 Patent," Ex. 1001) under three grounds of unpatentability. The Board should deny the institution for at least the following reasons.

Institution should be denied with respect to Ground 1 because IEEE Std 802.16-2004, IEEE Standard for Local and metropolitan area networks, Part 16: Air Interface for Fixed Broadband Wireless Access Systems (Ex. 1005) ("the Standard") fails to teach all of the elements of the Challenged Claims.

Institution should be denied with respect to Grounds 2-3 because the Challenged Claims are not obvious over the Standard alone or in combination with U.S. Patent App. Pub. No. 2007/0105600 to Mohanty (Ex. 1009).

This Preliminary Response is accompanied by the Expert Declaration of Dr. Gary Lomp, Ex. 2001 ("Lomp Declaration").

## II. THE PROBLEM AND SOLUTION PRESENTED IN THE '356 PATENT

### A. The Problem Presented: How to Control the Uplink Channel in the Absence of Channel Reciprocity

Cellular systems are often able to control the uplink channel based on the conditions of the downlink channel, when "channel reciprocity" exists. As explained in the '356 Patent:

> Channel reciprocity gives equipment the ability to derive information about uplink channel conditions from downlink channel conditions based upon signals received by the user equipment (UE). Pathloss is one example of channel information that can be obtained from channel reciprocity. Knowledge of the uplink pathloss enables open-loop power control to be employed for uplink transmissions. … A data terminal that can derive information needed to access uplink channels from the downlink transmissions (beacon signals) has a significant advantage over a terminal that relies on the (lengthy) configuration of a dedicated channel in order to establish a feedback channel. Ex. 1001, Col. 1, Ll. 23-45.

While channel reciprocity provides significant advantages, situations exist where channel reciprocity cannot be guaranteed. As the '356 Patent explains:

> However, channel reciprocity cannot always be guaranteed. For example TDD transmissions may not be permitted in certain frequency spectrum allocations; this is a regulatory issue and may be used to protect other wireless equipment in the same or adjacent frequency bands. In these situations the correlation between uplink and downlink channels is lost because the channels are transported on carrier frequencies that are separated in frequency by an amount that is greater than the coherence bandwidth of the channel (usually, only a few MHz separation is sufficient to cause the uplink and downlink fading profiles to be independent). *Id.*, Col. 1, Ll. 46-56.

The '356 Patent goes on to explain further situations where there is decorrelation between the uplink and downlink channels, resulting in a loss of reciprocity. For example, "the use of multiple transmit and/or receive antennas at the network and/or the mobile terminal can introduce unintentional decorrelation between the uplink and downlink channels." *Id*., Col. 1, Ll. 62-65.

One of the stated goals of the '356 Patent is to "find a substitute for channel reciprocity" for applications "where the correlation between the uplink and downlink path loss is not guaranteed." *Id*., Col. 1, L. 66 – Col. 2, L. 2.

**B. Summary of the Invention – A New Feedback Technique For Use In Applications Where Channel Reciprocity Cannot Be Guaranteed**

The first paragraph of the "Summary of the Invention" provides an exemplary description of the '356 Patent's solution - a new feedback technique for use where reciprocity cannot be guaranteed:

> Although it is desirable to support air interfaces where the pathloss is not reciprocal, known conventional methods do not deal directly with the evolution or adaptation of an air interface that uses channel reciprocity to deliver key features and advantages where channel reciprocity is not guaranteed. *The adaptation provided in embodiments of the invention introduces a new technique for uplink channel control that uses a feedback scheme as a substitute for the absence of channel reciprocity, with minimal impact on the ability of the air interface to support uplink shared channels*. *Id*., Col. 2, Ll. 6-16 (emphasis added).

The Summary of the Invention provides further details of this feedback scheme, which "enable active feedback control between a base station and user

equipment (UE)." *Id.*, Col. 2, Ll. 17-18. As explained in the Summary of the Invention, the solution includes a closed loop feedback scheme, where *a timeslot for transmission of a control signal (referred to as 'UL-Beacon') is inserted in the uplink frame between time slots used for transmitting data*:

> … an uplink beacon function (for power control) and a modified random access process substitute for the information lost due to the lack of channel reciprocity in paired operation. Embodiments of the invention allow a terminal to transmit the uplink physical channel control signal (UL_Beacon) independently from the uplink physical channel. Therefore, the implementation of *closed loop feedback* may operate in the absence of an uplink physical channel. In one embodiment, *a UE allocates a time slot for a beacon signal separated from the time slots for data in a frame. A second time slot is allocated within the frame for the base station to transmit a control signal in response to the beacon signal. The control signal instructs the UE to adjust a transmission parameter*. *Id.*, Col. 2, Ll. 21-34. (emphasis added).

**C. Detailed Description of the Novel Feedback Technique**

The Detailed Description discloses an active feedback control system in which user equipment (UE) (e.g., a cell phone) transmits an uplink beacon (UL_Beacon) to a base station. "When pathloss reciprocity is not available, the combination of an uplink physical channel control signal with a downlink feedback channel may be used to keep the terminal informed of the condition of the uplink channel. The uplink physical control signal is referred to herein as an 'Uplink Beacon' (UL_Beacon)." *Id.*, Col. 4, Ll. 35-40. In the closed loop feedback system, "the base station detects the received power and/or other channel

information from the UL_Beacon, and sends controlling commands back to each terminal to keep the terminal informed of the channel conditions observed at the base station." *Id.*, Col. 4, Ll. 56-60. For example, the "base station may send power control commands on a shared downlink channel to each terminal based on the power received from the UL_Beacon signal." *Id.*, Col. 4, Ll. 63-65. This disclosed closed loop power control maintains the uplink channel for the duration of a communication session or sub-session. This "always on" aspect is what enables the invention to "substitute" for the reciprocity that would be available in, for example, a TDD system. Ex. 2001, ¶ 29.

The Detailed Description discloses the invention in the context of TDMA/CD-TDMA systems ('356 Patent (Ex. 1001), Col. 5, Ll. 50-52), where a base station assigns timeslots in the uplink frame to individual UE's serviced by the base station. Since multiple UEs can communicate with the base station using this framework, the patent describes using the "physical uplink shared channel" in the uplink frame. Of particular significance, the patent teaches that each UE transmits the UL-Beacon in a dedicated timeslot of the uplink frame, between time slots used for sending data to the base station. *Id.*, Col. 2, Ll. 29-33. This design is especially advantageous because, as explained more fully below, it allows the feedback control to operate during normal operation of the uplink channel even when a UE does not have data to send. Ex. 2001, ¶ 30.

An example of the patented uplink frame structure is illustrated in Fig. 2 of the '356 Patent:




FIG. 2

In the uplink frame, data traffic (blue boxes) is carried in assigned intervals (timeslots) 214 of the frame. The UL-Beacon (red box) is transmitted in a timeslot that is between timeslots used for data traffic, i.e., in control timeslot 216 of the frame. *Id*., Col. 5, Ll. 58-60. In this way, the UL-Beacon (time interval 216) is between the timeslots used by the UE for data traffic (assigned to time slots 214). Ex. 2001, ¶ 31.

Another example of the patented uplink frame structure is described in connection with Fig. 3 of the '356 Patent, where fractionalization is used for sending the UL_Beacon signal. "When fractionation is employed, the RNC or other controller may allocate the UL_Beacon timeslot in a given frame to a group of terminals depending on the current fractionation phase, thus increasing the

number of terminals that can be supported with active physical channel feedback control. The maximum fractionation cycle length may be determined by the feedback update rate that the system requires in order to meet its performance targets." '356 Patent, Col. 5, Ll. 42-49; *see also* Ex. 2001, ¶ 32.




FIG. 3

Fig. 3 shows an example "where the fractionation phase is 3. For example, the fractionation phase of terminal 304 occurs in frame #0 310, the fractionation phase of terminal 306 occurs in frame #1 312, and the fractionation phase of terminal 308 occurs in frame #2 314. Since the fractionation phase is 3, the phase for terminal 304 occurs again in frame #3 316." '356 Patent, Col. 5, Ll. 66 – Col.

6, Ll. 4 (emphasis added). Again, in Fig. 3, the UL-Beacon is separated from the timeslots used by the UE for data traffic in the same frame.

The '356 Patent describes advantages of including the UL-Beacon within a dedicated time slot between data time slots in the frame:

> By placing *UL_Beacon signals in a dedicated timeslot*, a dedicated detection scheme can be applied which may include performance enhancing features such as intra-cell cancelling (for alleviating the effects of cross-correlation interference between UL_Beacon signals transmitted by mutiple terminals in the same cell), or inter-cell cancelling (for reducing the interference from neighboring cells in the case where the UL_Beacon timeslots are time synchronized). Ex. 1001, Col. 5, Ll. 21-28 (emphasis added).

The '356 Patent describes the UL_Beacon as a "physical control channel signal" (*Id.*, Col. 4, Ll. 39-40), and explains that, since "the physical channel control signal is separate from the uplink (shared) physical channel, … terminals are able to transmit a UL_Beacon independently of their access to the uplink shared channel." *Id.*, Col. 4, Ll. 51-55. This is significant, because it "allows the control feed-back to operate even when the terminal does not have data to send, with the consequence that uplink shared channels can be used with maximum efficiency." *Id.*, Col. 6, Ll. 34-37.

**D. Claims of the '356 Patent**

Independent claim 1 of the '356 Patent captures the active feedback control system, reciting:

> 1. A user equipment (UE) comprising:
> a processor configured to receive resource allocation information associated with an uplink physical control channel, *wherein the uplink physical control channel and a physical uplink shared channel have different resources*;
> the processor is further configured to *send data over the physical uplink shared channel in assigned time intervals*;
> the processor is further configured, *in a time interval that it is not sending information over the physical uplink shared channel, to send a signal over the uplink physical control channel* based on the received resource allocation information; and
> *the processor is further configured to receive feedback information from a downlink control channel*.

Independent claim 1 recites an uplink physical control channel (e.g., data slots 214 in Fig. 2) and a physical uplink shared channel (e.g., time slot 216 in Fig. 2), which have different resources (e.g., different time slots). A UE "sends data over the physical uplink shared channel in assigned time intervals" (e.g., time slots 214 assigned by the base station). The "signal [sent] over the physical control channel" recited in claim 1 corresponds to the UL_Beacon, which is sent in a time slot between data times slots. Challenged independent claims 22, 43 and 45 recite similar subject matter. Ex. 2001, ¶ 37.

### E. Claim Construction

| Claim Term | Proposed Construction |
|---|---|
| "the processor is further configured, *in a time interval that it is not sending information over the physical uplink shared channel*, to send a signal over the uplink physical control channel" | the processor is further configured to send a signal over the uplink physical control channel *between transmissions of information over the physical uplink shared channel* |

The claim recites that transmission of the uplink physical control channel occurs "in a time interval" that the UE is not transmitting information (data) over the uplink shared channel. The plain meaning of an "interval" is "a period of time *between* events or states."[1] In the context of the '356 Patent, the recited "interval" is the period of time *between transmissions* over the physical uplink shared channel. Ex. 2001, ¶38 ("[a] person of ordinary skill in the art, reading the '356 Patent, would understand that the recited "interval" is the period of time *between transmissions* over the physical uplink shared channel.") This interpretation aligns with the description in the '356 Patent's specification.

A feature of the '356 Patent is a feedback control technique for controlling an uplink channel where channel reciprocity cannot be guaranteed. The feedback control technique *maintains the uplink channel during operation* of the channel

[1] "Interval" - *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/interval, (captured on October 4, 2022) (Ex. 2003).

(rather than at a set-up phase) *by interposing an uplink control channel (UL_Beacon) between data slots* to maintain channel conditions during operation. Ex. 2001, ¶ 39.

The term "time interval" and "time slot" are used synonymously in the '356 Patent. In *every* instance, the term refers to *a time slot within a frame*, e.g., a TD-CDMA frame, where *data* is sent by a UE "over the physical uplink shared channel in *assigned time intervals within a frame*," while *another time interval between the data slots* – i.e., "a time interval that it is not sending information over the physical uplink shared channel" – is used by the UE to send control information over the uplink physical control channel. Ex. 2001, ¶ 41. The specification is replete with statements that the timeslot used by the UE for the UL-Beacon is interposed in a frame structure between data time slots:

> "a UE allocates *a time slot for a beacon signal [UL_Beacon] separated from the time slots for data in a frame*. A second time slot is allocated within the frame for …" '356 Patent, Col. 2, Ll. 29-33 (emphasis added).
>
> * * *
>
> "FIG. 2 illustrates a timeslot arrangement for uplink and downlink messages supporting the UL_Beacon and its corresponding PLCCH *within a TD-CDMA frame* structure …" *Id*., Col. 3, Ll. 9-11 (emphasis added).
>
> * * *
>
> "[I]t is possible to adapt the TDMA frame structure to provide separation between the UL_Beacon and the normal physical channels

by *dedicating at least one uplink time slot per frame … to carrying UL_Beacon signals*. *Id*., Col. 5, Ll. 15-19 (emphasis added).

* * *

"Those skilled in the art will recognize that there are a large number of possibilities for the arrangement of a *UL_Beacon* and its associated PLCCH *within the frame structure* according to embodiments of the invention. More than one UL_Beacon and PLCCH *per frame* could be supported if the feedback update rate is required to be faster than the frame rate ( at the expense of system capacity). For system applications that can tolerate a slower feedback rate, embodiments may fractionate the use of the UL_Beacon timeslot (and the associated PLCCH)." *Id*., Col. 5, Ll. 32-41. (emphasis added).

* * *

"When fractionation is employed, the RNC or other controller may allocate the *UL_Beacon timeslot in a given frame* to a group of terminals…" *Id*., Col. 5, Ll. 42-45. (emphasis added).

* * *

FIG. **2** illustrates an example of a timeslot arrangement supporting the UL_Beacon and its corresponding PLCCH *within a TD-CDMA frame structure* … The *uplink frame comprises a UL_Beacon control timeslot* ***216****, an access control timeslot* ***218****, and normal traffic carrying timeslots* ***214*****.** *Id*., Col. 5, Ll. 50-60 (emphasis added).

* * *

"FIG. **3** illustrates an example where fractionation is employed. The *UL-Beacon and PLCCH timeslots are active in every frame* … fractionation phase of terminal 304 occurs *in frame #0* 310, the fractionation phase of terminal 306 occurs *in frame #1* 312, and the fractionation phase of terminal 308 occurs *in frame #2* 314. Since the fractionation phase is 3, the phase for terminal 304 occurs again *in frame #3* 316" *Id*., Col. 5, L. 61-Col. 6, L. 4. (emphasis added).

* * *

> "[t]his may also apply for the case where there are more than one UL_Beacon timeslot *per frame*." *Id*., Col. 6, Ll. 22-24 (emphasis added).

Petitioners – as well as their expert Dr. Akl -- recognize that, in the '356 Patent, the uplink control signal (UL-Beacon) is interposed in the same frame with timeslots used by the UE for data:

> "… *in the '356 patent the BS allocates* … ***regions of the uplink subframe*** *for both uplink data transmissions and uplink control transmissions*, as Figure 2 shows. … *The allocated regions for uplink data transmission* are called the 'physical uplink shared channel,' shown as *'PUSCH' 214*. *The allocated region for uplink control transmissions* is called the "uplink physical control channel," shown as "*UL-Beacon 216*." Pet., at 30-31; Akl Decl. (Ex. 1003), ¶¶ 68-69 (emphasis added; citations omitted).

In IPR proceedings, claims must be construed under *Phillips v. AWH Corp*., 415 F.3d 1303, 1312 (Fed. Cir. 2005). "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societe' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). Here, Patent Owner proposes that the limitation requiring "the processor if further configured, *in a time interval that it is not sending information over the physical uplink shared channel*, to send a signal over the uplink physical control channel" be construed to mean "the processor is further configured to send a signal over the uplink physical

control channel *between transmissions of information over the physical uplink shared channel*." This construction is supported by the plain meaning of "interval" and the intrinsic evidence, aligns with the operation of the feedback control system taught by the specification, and is in keeping with one of the stated goals of the '356 Patent, *i.e.*, to "find a substitute for channel reciprocity" for applications "where the correlation between the uplink and downlink path loss is not guaranteed." *Id.*, Col. 1, L. 66 – Col. 2, L. 2; *see* also Ex. 2001, ¶ 42 ("a person of ordinary skill in the art, reading Claim 1 in light of the Specification, would interpret the limitation requiring "the processor is further configured, *in a time interval that it is not sending information over the physical uplink shared channel*, to send a signal over the uplink physical control channel" to mean "the processor is further configured to send a signal over the uplink physical control channel *between transmissions of information over the physical uplink shared channel*.")

By contrast, the Petition, through its mappings, interprets this limitation in a manner divorced from the '356 Patent's specification. Through those mappings, Petitioner construes these limitations as -- control information is sent when a UE joins the network, and data is sent later during operation of the channel. Such a reading has nothing to do with the problem posed by the '356 Patent -- controlling an uplink channel in the absence of channel reciprocity – nor the active feedback solution taught by the '356 Patent. Nowhere does the Petition explain how such a

mapping aligns with the '356 Patent specification or the stated goal of the '356 Patent.

## III. INSTITUTION MUST BE DENIED WITH RESPECT TO GROUND 1

### A. The Petition Does Not Explain How The "Ranging Code" Is A Control Channel Signal

As explained above, '356 Patent is directed to an active feedback control system in which a UE (e.g., a cell phone) transmits an "*uplink physical control signal* [] referred to herein as [a] UL_Beacon." '356 Patent, Col. 4, Ll. 35-40 (emphasis added). The UL_Beacon is a *control* channel signal, because it is used to control the uplink channel as conditions change. *Id.*, Col. 4, Ll. 56-60 ("the base station detects the received power and/or other channel information from the UL_Beacon, and sends *controlling* commands back to each terminal to keep the terminal informed of the channel conditions observed at the base station.") This aspect of the '356 Patent is captured in the limitation of Claim 1 which recites that "the processor is further configured *to send a signal over the uplink physical control channel*." Interpreted in light of the Specification, this limitation requires, at a minimum, the transmission of a signal that is used in at least some way to *control the uplink channel*.

The Petition relies on IEEE Std 802.16-2004, IEEE Standard for Local and metropolitan area networks, Part 16: Air Interface for Fixed Broadband Wireless

Access Systems (Ex. 1005)("the Standard"). In Ground 1, the Petition maps the "Ranging Code" sent over the "ranging subchannel" in the Standard to the '356 Patent's claimed "uplink control channel signal." Pet., at 34, 40. The "Ranging Code" is discussed earlier in the Petition (at pp. 16-17), as follows:

> **2. Ranging Code Message**
>
> The SS then transmits a Ranging Code message in the Initial Ranging opportunity—that is, on the Ranging Subchannel—identified in the UL-MAP, as Table 121 shows. Standard, 49, 154, 175, 666.

**Table 121—CDMA initial Ranging and automatic adjustments procedure**




Standard, Table 121 (cropped and annotated); Akl, ¶55.

The Standard (shown above) simply refers to a "Ranging Code" – not a "Ranging Code Message" -- as the Petition alleges (Pet., at 40 (this distinction is discussed further below)). As shown in Table 121 above, in connection with the Ranging Code, the Standard discloses "Transmit randomly selected Initial Ranging code in a randomly selected Ranging Slot from available Ranging Region." The Petition does not provide any support for how a randomly selected Ranging Code transmitted in a randomly selected slot constitutes the claimed "uplink control channel signal."

Adding to this deficiency, the Petition cites to the Standard at pages 49, 154, 175 and 666 in connection with its description of the Ranging Code. Pet., 17. However, those pages of the Standard describe different messages, referred to in the Standard as the "Ranging Request (RNG-REQ) message"[2] and the "RNG-RSP message."[3] The following Figure from page 19 of the Petition (annotated by Patent Owner with blue boxes) clearly shows that the Ranging Code (which Petition maps to the "uplink control channel signal"), is a different message from the RNG-RSP and RNG-REQ messages, which come later in the sequence:

---

[2] Ex. 1005, Part 1, p. 49 (describing format of Ranging Request (RNG-REQ) message); p. 154 ("Via the Initial Ranging IE, the BS specifies an interval in which new stations may join the network. An interval, equivalent to the maximum round-trip propagation delay plus the transmission time of the RNG-REQ message …. Packets transmitted in this interval shall use the RNG-REQ MAC Management message format"); p. 175 ("… the SS shall put together a RNG-REQ message to be sent in an Initial Ranging Interval").

[3] Ex. 1005, Part 3, p. 666 (showing tables for RNG-RSP message encodings).

Table 121—CDMA initial Ranging and automatic adjustments procedure




Standard, Table 121 (cropped and annotated); Akl, ¶57.

As mentioned above, the Standard refers to a "Ranging Code" – not a "Ranging Code Message" -- as alleged at p. 16 of the Petition. That is because, as shown below, the Ranging Code is just a code – nothing more.

**8.4.7.3 Ranging codes**

The binary codes are the pseudonoise codes produced by the PRBS described in Figure 243, which implements the polynomial generator $1+X^1+X^4+X^7+X^{15}$. The PRBS generator shall be initialized by the seed b0...b15 = 0,0,1,0,1,0,1,1,s0,s1,s2,s3,s4,s5,s6 where s6 is the MSB, and s6:s0 = UL_IDcell.




**Figure 243—PRBS for ranging code generation**

The binary ranging codes are subsequences of the pseudonoise sequence appearing at its output $C_k$. The length of each ranging code is 144 bits. These bits are used to modulate the subcarriers in a group of six (eight for the permutation defined in 8.4.6.2.5) adjacent subchannels. The index of the lowest numbered sub-channel in the six (eight for the permutation defined in 8.4.6.2.5) shall be an integer multiple of six (eight for the permutation defined in 8.4.6.2.5). The six (eight for the permutation defined in 8.4.6.2.5) subchannels are called a ranging subchannel. The ranging subchannel is referenced in the ranging and Bandwidth Request messages by the index of lowest numbered subchannel.

For example, the first 144 bit code obtained by clocking the PN generator as specified, with UL_IDcell = 0, the first code shall be 011110000011111... The next ranging code is produced by taking the output of the 145th to 288th clock of the PRBS, etc.

Ex. 1005, Part 3, p. 578.

The totality of the Petition's explanation why the "Ranging Code" is an alleged "uplink control channel signal" is set forth on page 34 of the Petition:

> The ranging subchannel is an "uplink ... control channel" because it is part of the uplink subframe and is used by the SS to transmit the Ranging Code message, which <u>a POSA would have recognized is control information, not data</u>.

Petition, at 34 (emphasis added); *see also* Akl. Declaration, ¶ 73.

Dr. Akl's Declaration (at ¶73) makes the same conclusory remark (verbatim), without further explanation or citation to authority. Because it is conclusory, Dr. Akl's remark is entitled to no weight.

Petitioners have the burden of explaining how the "Ranging Code" sent over the ranging subchannel constitutes the claimed "uplink control channel signal." The diagrams in the Petition only allege that the Ranging Code is "randomly selected" and transmitted "in a randomly selected Ranging Slot." Such information -- combined with the Petition's citations to pages from the Standard describing *different* signals, and a one-sentence conclusory remark from Dr. Akl -- are insufficient to explain how the "Ranging Code" constitutes an "uplink control channel signal." Because of this deficiency, the Petition fails to demonstrate a reasonable likelihood of success with respect to Ground 1.

### B. The Standard Fails To Disclose Transmission of a Control Signal Interposed Between Data Transmissions

As shown in the Petition (at p. 35), the uplink portion of the Standard is implemented using the following framework:




The Standard explains that a ranging code is sent over the ranging subchannel (red box) at initialization for "Initial Ranging," that is, to allow a "new station to join the network." Pet. at 41-42 (citing Standard, at 49, 154). As the Petition explains, it is not until sometime after the ranging code message is sent that the device begins sending data (blue box) over the uplink (UL-bursts).:

> … at the time the Ranging Code message is sent by the SS, the SS has only received the First UL-MAP message, from which the SS determines the Ranging Subchannel over which to send the Ranging Code message. *Id.* *It is not until the SS receives the Second UL-MAP message that the SS is allocated its uplink burst in which to send information to the BS.* Pet., 41 (emphasis added).

The Petition maps the initial ranging code from the Standard to the claim limitation reciting "a signal [sent] over the uplink physical control channel," and maps the UL bursts from the Standard to the limitation reciting "data [sent] over the physical uplink shared channel in assigned time intervals." Simply put, this mapping fails because all of the Challenged Claims require that the "signal over the uplink physical control channel" be interposed *between* transmissions of data over the physical uplink shared channel. The Standard completely misses this aspect of the Challenged Claims. Ex. 2001, ¶44-45.

For this additional reason, the Standard does not anticipate the Challenged Claims.

## IV. INSTITUTION SHOULD BE DENIED UNDER GROUNDS 2 AND 3 BECAUSE THE STANDARD, EITHER BY ITSELF OR IN COMBINATION WITH MAHANTY, FAILS TO RENDER THE CHALLENGED CLAIMS OBVIOUS

In Grounds 2 and 3, Petitioner argues that the Standard by itself, or in combination with Mohanty, renders certain of the Challenged Claims obvious. As was the case for Ground 1, in Grounds 2 and 3 the Petition again maps the initial ranging code from the Standard to the claim limitation reciting "a signal [sent] over the uplink physical control channel," and again maps the UL bursts from the Standard to the limitation reciting "data [sent] over the physical uplink shared

channel in assigned time intervals." For the reasons set forth with respect to Ground 1 above, these mappings fail.

## V. CONCLUSION

The Board should deny the institution of the Petition. The Petition fails to demonstrate a reasonable likelihood of success with respect to Ground 1 for at least two reasons. First, the Petition fails to explain how the "Ranging Code" constitutes an uplink control channel signal. Second, the Standard fails to teach a "signal over the uplink physical control channel" that is interposed *between* transmissions of data over the physical uplink shared channel. The Petition also fails to demonstrate a reasonable likelihood of success with respect to Grounds 2 and 3, because the mappings in those Grounds suffer from the same deficiencies as Ground 1.

Respectfully submitted,

Dated: October 5, 2022

By: /Ryan W. O'Donnell /
Ryan W. O'Donnell
Registration No. 53,401

*Counsel for Patent Owner*
*Intellectual Ventures II LLC*

**CERTIFICATE OF COMPLIANCE WITH WORD COUNT**

Pursuant to 37 C.F.R. § 42.24(d), I certify that this Response complies with the type-volume limits of 37 C.F.R. § 42.24(b)(1) because it contains 4,560 words, excluding the parts of this Patent Owner's Preliminary Response that are exempted by 37 C.F.R. § 42.24(a), according to the word processing system used to prepare this Patent Owner's Preliminary Response.

Respectfully submitted,

Dated: October 5, 2022

By: /Ryan W. O'Donnell /
Ryan W. O'Donnell
Registration No. 53,401

*Counsel for Patent Owner*
*Intellectual Ventures II LLC*

# CERTIFICATE OF SERVICE

The undersigned certifies that pursuant to 37 C.F.R. § 42.6(e), a copy of the foregoing **PATENT OWNER'S PRELIMINARY RESPONSE** was served via email (as consented to by counsel) on October 5, 2022 to lead and backup counsel of record for Petitioner as follows:

David C. Reese
david.reese@finnegan.com

James R. Barney
Email: james.barney@finnegan.com

Joshua Goldberg
joshua.goldberg@finnegan.com

Karthik Kumar
kumark@finnegan.com

Grace K. Mills
gracie.mills@finnegan.com

Alex Harding
alexander.harding@finnegan.com

Finnegan, Henderson, Farabow,
Garrett & Dunner, LLP
901 New York Ave. NW
Washington, DC 20001

Dated: October 5, 2022

By: /Ryan W. O'Donnell /
Ryan W. O'Donnell
Registration No. 53,401

*Counsel for Patent Owner*
*Intellectual Ventures II LLC*

# EXHIBIT A-29

# United States District Court
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| INTELLECTUAL VENTURES I LLC and INTELLECTUAL VENTURES II LLC | § | |
| *Plaintiffs*, | § | |
| v. | § | Civil Action No. 4:24cv980<br>Judge Mazzant |
| AMERICAN AIRLINES, INC. | § | |
| *Defendant.* | § | |

## MEMORANDUM OPINION AND ORDER

On January 22, 2026, the Court held a hearing to determine the proper construction of the disputed claim terms in U.S. Patent No. 8,332,844 (the "'844 Patent"), U.S. Patent No. 8,407,722 (the "'722 Patent"), U.S. Patent No. 7,949,785 (the "'785 Patent"), U.S. Patent No. 7,324,469 (the "'469 Patent"), U.S. Patent No. 7,257,582 (the "'582 Patent") (collectively, the "Asserted Patents"). Having reviewed the arguments made by the parties at the hearing and in their claim construction briefing (Dkt. Nos. 77, 82, 86, 114, 120)[1], having considered the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence, the Court hereby issues this Claim Construction Memorandum and Order. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

[1] Citations to the parties' filings are to the filing's number in the docket (Dkt. No.) and pin cites are to the page numbers assigned through ECF.

TABLE OF CONTENTS

I. BACKGROUND .......... 3

II. APPLICABLE LAW .......... 8

III. LEVEL OF ORDINARY SKILL IN THE ART .......... 13

IV. CONSTRUCTION OF AGREED TERMS .......... 14

V. CONSTRUCTION OF DISPUTED TERMS .......... 14

A. "root image" .......... 14

B. "input source" .......... 18

C. "identify a category of the update message based on the input source" .......... 20

D. "network address" .......... 21

E. "network route director" .......... 26

F. "a remote location experiencing a relatively high volume of transient traffic" .......... 30

G. "a relatively high volume of transient traffic" .......... 32

H. "partition" .......... 36

I. "description of all said partitions" .......... 38

J. "simultaneously executing at least a respective one of the subtasks of the computer-executable process in each of at least some of said processors on a respective one of the partitions" .......... 42

K. "on a first-come/first-served basis" .......... 44

VI. CONCLUSION .......... 45

## I. BACKGROUND

Plaintiffs Intellectual Ventures I LLC and Intellectual Ventures II LLC ("IV" or "Plaintiff") alleges that Defendant American Airlines, Inc.'s ("AA" or "Defendant") infringes the Asserted Patents. Before the start of the January 22, 2026 hearing, the Court provided the parties with preliminary constructions with the aim of focusing the parties' arguments and facilitating discussion.

The '884 Patent, titled "Root Image Caching and Indexing for Block-Level Distributed Application Management," was filed on February 21, 2007, and issued on December 11, 2012. The '884 Patent relates to providing "an operating system-independent system and method for distributing an application environment to a compute node." '844 Patent at 2:49–51.

The Abstract of the '884 Patent states:

> Described herein is technology for, among other things root image caching and indexing for block-level distributed application management. The technology involves storing blocks of a root image on a first storage unit and storing blocks of leaf images on respective second storage units. The leaf images include additional data blocks not previously contained in the root image and changes made by respective compute nodes to the blocks of the root image. The technology includes caching blocks of the root image that have been accessed by at least one compute node. The technology also includes receiving indexing results pertaining to the root image from one compute node and providing the results for other compute nodes.

Claim 7 of the '884 Patent is an illustrative claim and recites the following elements (disputed term in italic):

> 7. A method for providing data to a plurality of compute nodes, comprising:
> storing blocks of a *root image* of said compute nodes on a first storage unit;
> storing leaf images for respective compute nodes on respective second storage units, said leaf images including only additional data blocks not previously contained in said *root image* and changes made by respective compute nodes to the

> blocks of the *root image*, wherein said leaf images of respective compute nodes do not include blocks of said *root image* that are unchanged by respective compute nodes; and
> caching blocks of said *root image* that have been accessed by at least one of said compute nodes in a cache memory.

The ’722 Patent, titled “Asynchronous Messaging Using a Node Specialization Architecture in the Dynamic Routing Network,” was filed on March 30, 2006, and issued on March 26, 2013. The ’722 Patent relates “to transferring information through digital networks and in particular to transferring information for remotely updating content at client devices through the digital networks.” ’722 Patent at 1:24–27.

The Abstract of the ’722 Patent states:

> A network routes update messages containing updates to properties of live objects from input sources to clients having the objects. When the clients receive live objects, the clients identify the object IDs associated with the objects and register the object IDs with the routing network. The routing network is adapted to selectively send update messages to nodes in the network and the nodes forward the messages to the clients. One implementation uses a hierarchy of registries to indicate which nodes and clients receive which update messages. Another implementation assigns update messages to one or more of N categories and nodes to one or more of M types, and the gateways maintain mapping between categories and types. To ensure that clients receive all of the update messages for which they register, the clients connect to client proxies that in turn connect to at least one node of each type.

Claim 14 of the ’772 Patent is an illustrative claim and recites the following elements (disputed terms in italic):

> 14. A method comprising:
> providing, using a processing device of an *input source*, a data representation to a client device, different from the *input source*, coupled to a routing network, wherein the data representation includes at least one live object recognizable by the client device, and causing the client device to respond to the live object of the data representation by determining an object identifier (ID) of the live object and to register for updates of the live object with the routing network, such that registering the client device with the routing network provides

> client connection information to a node in the routing network; and
>
> sending, using the processing device of the *input source*, an update message to the routing network, wherein the update message identifies the live object and contains update data that updates a property of the live object,
>
> wherein a gateway device at the routing network is configured to *identify a category of the update message based on the input source*, to determine a node type to which the identified category maps, and to route the update message to the node, having the node type, at the routing network,
>
> wherein the node is configured to identify the client device as a registered device and to route the update message to the client device, and
>
> wherein the client device processes the update message upon receipt to update the property of the live object at the client device.

The '785 Patent, titled "Secure Virtual Community Network system," was filed on March 31, 2003, and issued on May 24, 2011. The '785 Patent relates to a network services system "that allows local and remote entities to communicate and collaborate from various locations." '785 Patent at 5:48–49.

The Abstract of the '785 Patent states:

> A private virtual dynamic network is provided for computing devices coupled to public networks or private networks. This enables computing devices anywhere in the world to join into private enterprise intranets and communicate with each other. In one embodiment, the present invention provides a separate private virtual address realm, seen to each user as a private network, while seamlessly crossing public and private network boundaries. One implementation of the present invention uses an agent to enable an entity to participate in the network without requiring the member to add new hardware or software.

Claim 30 of the '785 Patent is an illustrative claim and recites the following elements (disputed terms in italic):

> 30. A virtual network manager, comprising:
>
> a network interface configured for data communication via a virtual network that is defined by a domain name having an associated public *network address*;

> a memory and a processor to implement a register module configured to register devices in a virtual network, the register module further configured to:
> receive a registration request from an agent associated with a device;
> distribute a virtual *network address* to the device when the device is registered in the virtual network, the device being identified to other devices in the virtual network by the virtual *network address*; and
> a DNS server for the virtual network, the DNS server configured to receive a DNS request from a first device in the virtual network, and return a *network address* associated with a *network route director*, a private *network address* associated with a second device in the virtual network, and a virtual *network address* associated with the second device.

The ’469 Patent, titled “Satellite Distributed High Speed Internet Access,” was filed on September 27, 2004, and issued on January 29, 2008. The ’469 Patent relates to “rural ‘Hotspots’ (such as Wi-Fi access, for example) to enable wireless and hardwired, satellite distributed Internet access for anyone with a PC or other web-ready device (wireless ready or cabled) and a valid credit card.” ’469 Patent at 1:34–38.

The Abstract of the ’469 Patent states:

> A satellite distributed high-speed Internet “Hotspot” enables wireless and hardwired, satellite distributed Internet access for anyone with a PC or other web-ready device (wireless ready or cabled) and a valid credit card or prepaid coupon. The Hotspots can be located anywhere there is 120 volt electricity available or access to the sun for a solar panel and enough space to house the transceiver and mount a satellite dish. Upon connecting to the Hotspot, the user is directed to a remote server for log-on and validation of the user's account. During validation, the remote server verifies that prepaid access time remains in the user's account. Upon validation, the user may browse the web until the prepaid access time runs out. Alternatively, an account may be set up on a "continue until canceled" basis, wherein the user's credit card will be charged for the amount of time used during each session.

Claim 24 of the ’469 Patent is an illustrative claim and recites the following elements (disputed terms in italic):

> 24. An Internet Hotspot comprising:
> a satellite dish communicating with the Internet via one or more data links with a satellite;
> at least one router operatively coupled to the satellite dish;
> a subscriber access unit operatively coupled between the satellite dish and the at least one router, the subscriber access unit being capable of authenticating a subscription account associated with a user prior to allowing the user access to the Internet; and
> a web-ready device operatively coupled to the at least one router, the web-read device having a browser application operating thereon for accessing the Internet;
> wherein the satellite dish, at least one router and the subscriber access unit are located in *a remote location a experiencing a relatively high volume of transient traffic*;
> wherein the user may authenticate the subscription account and access the Internet at the remote location by establishing a data connection between the web-ready device and the router.

The ’582 Patent, titled “Load Balancing with Shared Data,” was filed on February 27, 2003, and issued on August 14, 2007. The ’582 Patent relates “to the field of sharing data and workload between possibly heterogeneous computer systems.” ’582 Patent at 1:11–13.

The Abstract of the ’582 Patent states:

> The input of a computer executable process, is logically subdivided, without reading, into a plurality of partitions which are distributed to a plurality of processors in which respective subtasks including the reading of those partitions, are carried out. The method allows distribution of processing of a large amount of data to a plurality of processors cooperating in a way that the load imposed on each processor is proportional to its capacity to do the work.

Claim 1 of the ’582 Patent is an illustrative claim and recites the following elements (disputed terms in italic):

> 1. A method of effecting on a preexisting input file a computer-executable process comprised of a plurality of subtasks, the method comprising the steps of:
> (a) automatically determining file allocation and logically subdividing records of said input file into a plurality of *partitions*;
> (b) distributing *descriptions of all of said partitions* to each of a plurality of subtask processors

(c) *simultaneously executing at least a respective one of the subtasks of the computer-executable process in each of at least some of said processors* on a respective one of the partitions with each subtask reading and processing the respective *partition* so as to process the respective *partition* and produce respective subtask output and;

d) thereafter repeating step (c) in at least some of the subtask processors each with another unprocessed *partition on a first-come/first-served basis*; and

(e) generating at least one output combining all of the subtask outputs and reflecting the processing of all of said subtasks.

## II. APPLICABLE LAW

### A. Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) (quotation marks omitted) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") *cert. granted, judgment vacated,* 135 S. Ct. 1846 (2015).

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)) *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id*.

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But,

"'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alts., Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the

particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are not helpful to a court. *Id*. Extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*. The Supreme Court has explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331–32 (2015).

### B. Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."[2] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Sols.*, 750 F.3d at 1309.

[2] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

### C. Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA)

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). If it does not, the claim fails § 112, ¶ 2 and is therefore invalid as indefinite. *Id.* at 901. Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application for the patent was filed. *Id.* at 911. As it is a challenge to the validity of a patent, the failure of any claim in suit to comply with § 112 must be shown by clear and convincing evidence. *BASF Corp. v. Johnson Matthey Inc.,* 875 F.3d 1360, 1365 (Fed. Cir. 2017). "[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012).

When a term of degree is used in a claim, "the court must determine whether the patent provides some standard for measuring that degree." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015) (quotation marks omitted). Likewise, when a subjective term is used in a claim, "a court must determine whether the patent's specification supplies some standard for measuring the scope of the [term]." *Ernie Ball, Inc. v. Earvana, LLC*, 502 F. App'x 971, 980 (Fed. Cir. 2013) (citations omitted). The standard "must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

## III. LEVEL OF ORDINARY SKILL IN THE ART

It is well established that patents are interpreted from the perspective of one of ordinary skill in the art ("POSITA"). *See Phillips*, 415 F.3d at 1313 ("[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."). The Federal Circuit has advised that the "[f]actors that may be considered in determining the level of skill in the art include: (1) the educational level of the inventors; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; (5) sophistication of the technology; and (6) education level of active workers in the field." *Env'tl Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 696 (Fed. Cir. 1983). "These factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art." *Daiichi Sankyo Co. Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

Defendant's expert, Dr. Michael Goodrich, opines that a POSITA "would have had a Bachelor's degree in electrical engineering, computer science, or the like, and/or two or more years of industry experience in networking and distributed computing. Additional experience may make

up for a lack of education and vice versa." (Dkt. No. 82-6 at ¶ 21). Plaintiff's expert, Dr. Joseph Camp, states that "[f]or purposes of this declaration, I have applied the standard described in Dr. Goodrich's declaration." (Dkt. No. 77-12 at ¶ 36).

Having considered Defendant's proposal, and the factors that may be considered in determining the level of skill in the art, the Court finds a POSITA would have a Bachelor's degree in electrical engineering, computer science, or the like, and/or two or more years of industry experience in networking and distributed computing. Additional education may substitute for industry experience, or vice versa.

## IV. CONSTRUCTION OF AGREED TERMS

The Parties informed the Court that they currently do not agree on any constructions. (Dkt. No. 67 at 1).

## V. CONSTRUCTION OF DISPUTED TERMS

The parties dispute the meaning and scope of eleven terms or phrases in the Asserted Patents. Each dispute is addressed below.

### A. "root image"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "root image" | Plain and ordinary meaning, no construction necessary. | "a read-only base set of data blocks, operating beneath the file system, that provide the common portion of the application environment" |

#### 1. Analysis

The term "root image" appears in Asserted Claims 7 and 11 of the '844 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The parties dispute whether the term "root image" requires construction. The parties agree that a root image includes "blocks" as recited in Claim 7. (Dkt. No. 86 at 4).

Plaintiff argues that Defendant's construction incorrectly relies on partial lexicography that does not apply, and imports limitations into the claims from embodiments. (Dkt. No. 77 at 11). Specifically, Plaintiff contends that Defendant incorrectly introduces multiple additional limitations including the language "read-only," "operating beneath the file system," and "common portion of the application environment." *Id.*

The '844 Patent discloses storing data blocks of a root image on a first storage unit and storing data blocks of leaf images on a second storage unit, where the leaf image includes additional data blocks that are not contained in the root image, including changes made to the blocks of the root image. '844 Patent at Abstract. Claim 7 recites that if blocks are unchanged, then they are not stored on the leaf image. *Id*. at 11:35–38. The specification further states that "[t]he root image contains data initially common to the compute nodes 220a-n," and "[t]he root image is not changed by compute nodes 220a-n." *Id.* at 5:28–30.

The specification also states that "the data stored in the root image is *by definition common to all the compute nodes* 220a-n." *Id.* at 7:27–28 (emphasis added). Similarly, the specification discloses that "because of the commonality of the root image and the fact that its contents are not directly changed, certain operations performed on the root image (e.g., indexing) only need to be performed once by one compute node." *Id.* at 10:37–40; *see also*, *id.* at 9:17–19 ("Since the root image is common to all the computer nodes, any re-indexing of the root image would be redundant and a waste of resources."). The commonality of the root image addressed the "major problem" with the prior art of having to update "a number of copies of the boot image." *Id.* at 1:64–67.

These aspects of the disclosure are generally captured in the language of Claim 7. Claim 7 recites, in part, "*storing blocks of a root image* of said compute nodes on a first storage unit," and "storing leaf images" that "*includ[e]* only additional data blocks not previously contained in said

root image and *changes made by respective compute nodes to the blocks of the root image*." *Id.* at 11:29–34 (emphasis added). Per the claim language, a root image includes blocks of data, and any changes to those blocks are stored in the leaf image. Claim 7 further recites that the "leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes." *Id.* at 11:36–38. Accordingly, a "root image" is "a common set of data blocks that are unchanged by the plurality of compute nodes."

Defendant argues that the patentees defined "root image" in the specification as "a *read-only base image* (or 'root' image) *of the application environment*[.]" (Dkt. No. 82 at 10) (citing '844 Patent at 2:13–14) (emphasis added in original). According to Defendant, the specification teaches that the root image contains data "initially common to the compute nodes," and that this commonality is essential to the claimed system's efficiency. *Id.* (citing '844 Patent at 5:27–32, 10:37–43). The Court agrees that the intrinsic evidence indicates that the commonality of the root image is the claimed system. However, as discussed above, this is captured in the claim language and the Court's construction.

Defendant did not provide a persuasive reason to explicitly redraft the claims to include a "read-only" limitation. *See Lionra Techs. Ltd. v. Cisco Sys., Inc.,* No. 2:24-CV-00097-JRG, 2025 U.S. Dist. LEXIS 90408, at *8 (E.D. Tex. May 10, 2025) ("To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term.") (quoting *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014)). Indeed, Claims 6, 13, 18, and 22 recite that it is the "first storage unit" that is read-only. Likewise, Claim 27 recites that the "root image portion is read-only." Thus, when the patentees wanted to recite "read-only," they explicitly did so in the claims.

Defendant next argues that the specification teaches that "by storing data at the block level,

embodiments are able to operate beneath the file system and thus are designed to be file system and operating system independent." (Dkt. No. 82 at 10) (citing '844 Patent at 7:58–62). According to Defendant, this is the definition of what it means to store "data at the block level" (*i.e.*, "operate beneath the file system"). *Id.* at 10 (citing *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1051-52 (Fed. Cir. 2010)). Defendant further argues that the specification distinguishes root images from the files themselves. *Id.* (citing '884 Patent at 5:51–3, 7:58–62). Defendant contends that using images to operate at the block level is a fundamental aspect of the invention that enables the claimed advantages. *Id.* at 11 (citing Dkt. No. 80-6 at ¶ 10; Dkt. No. 82-7 at ¶¶ 35-36).

The Court notes that Defendant's limitation is not based on any claim language. Claim 7 does not recite the language "file system." Instead, Defendant's construction improperly incorporates one embodiment. Specifically, the disclosure at column 7, lines 58-62 describes an embodiment shown in Figure 3, and recites step 310 that "involves storing blocks of a root image of the compute node on a first storage unit. By storing data at the block level, *embodiments are able to operate beneath the file system and thus are designed to be file system and operating system independent*." '844 Patent at 7:58–62 (emphasis added).

Notably, the specification indicates that this embodiment is *able* to operate at a layer beneath the file system, not that it must do so. Claim 7 recites that blocks of data are stored, it does not require "operating beneath the file system." This would introduce an unwarranted limitation. The patentees appeared to understand a "file system level" to mean a "per file basis." '844 Patent at 2:27–28. As discussed above, a "root image" is "a common set of data blocks unchanged by the plurality of compute nodes." It is the commonality of the root image that is the claimed system, and overcomes the "per file basis."

Finally, regarding Defendant's "common portion of the application environment"

proposal, the Court rejects it. The specification does not recite "common" and "portion" in combination. Instead, it refers to "the commonality of the root image and the fact that its contents are not directly changed." '844 Patent at 10:37–38. As recited in Claim 7, a root image includes blocks of data, and changes to those blocks are stored in the leaf image. Claim 7 further recites that the "leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes." *Id.* at 11:36–38. Accordingly, a "root image" is "a common set of data blocks unchanged by the plurality of compute nodes."

#### 2. Court's Construction

For the reasons set forth above, the Court construes the term **"root image"** to mean **"a common set of data blocks that are unchanged by the plurality of compute nodes."**

### B. "input source"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "input source" | Plain and ordinary meaning, no construction necessary. | "information provider and/or dynamic content provider" |

#### 1. Analysis

The term "input source" appears in Asserted Claim 14 of the '722 Patent. The parties dispute whether the term "input source" requires construction. Plaintiff argues that Defendant's construction is wrong because there is no lexicography, and it unnecessarily limits the meaning of "input source" to an embodiment. (Dkt. No. 77 at 14).

Defendant contends that the patentees expressly defined the term "input source" twice in the specification. (Dkt. No. 82 at 12) (citing '722 Patent at 3:15–16, 11:21–24). Defendant further contends that the patentees used the notation "i.e.," which means "that is," and indicates what follows is a definition of "input source." *Id.* at 13 (citing '722 Patent at 13:26–28). Defendant argues that the patentees are bound by their express definition of "input source." *Id.*

The Court finds that the patentees did not explicitly define the term "input source" in the specification. Claim 14 recites sending, "an update message to the routing network" using the processing device of the input source. While the specification provides examples of an input source including an "information provider" and a "dynamic content provider," it does not limit an "input source" to those examples. Instead, the specification "*generically refer[s]*" to an "information provider" or a "dynamic content provider" as an "input source," but it does not limit an input source to these two examples. '722 Patent at 3:15–18 (emphasis added). Indeed, the specification states that "FIG. 7 illustrates multiple input sources (labeled 710A-D) representative of sources providing messages to the routing network 110, *such as* an information provider 710A and a dynamic content provider 710B." *Id.* at 15:44–47 (emphasis added).

Thus, Figure 7 illustrates various "input sources 710" that are involved in sending messages to clusters, including an information provider 710A, dynamic content provider 710B, and other unnamed input sources 710C and 710D. Similarly, Figure 3 illustrate a "high-level diagram" of "[m]ultiple input sources (labeled 210A-C)" that send update messages to the routing network. *Id.* at 12:23–28, Figure 3. Another portion of the specification also states "that the information provider 108 or *other entity*" can provide the update message. *Id.* at 9:41–43 (emphasis added). This indicates that an input source may be an information provider, a dynamic content provider, or another input source. It would be improper to limit an "input source" to the two examples Defendant proposes. *Thorner*, 669 F.3d at 1366 ("We do not read limitations from the specification into claims; we do not redefine words.").

### 2. Court's Construction

For the reasons set forth above, the terms **"input source"** is given its **plain and ordinary meaning.**

### C. "identify a category of the update message based on the input source"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "identify a category of the update message based on the input source" | Plain and ordinary meaning, no construction necessary. | "identify a category of the update message based on the information provider or dynamic content provider but not on the category/topic of the message content" |

#### 1. Analysis

The phrase "identify a category of the update message based on the input source" appears in Asserted Claim 14 of the '722 Patent. The parties dispute whether Defendant's proposal "but not on the category/topic of the message content" is required based on prosecution estoppel. Defendant argues that the patentees distinguished prior art on the grounds that the prior art "teaches identifying categories based on category/topic of the message content." Specifically, the patentees argued the following:

> This section of Chandra [prior art reference], relied on by the Examiner, discloses that if the ***data content of the message*** matches the specified values of the subscription, then the message is delivered to the one or more subscribers (or clients) of that subscription. This is not the same as "identify a category of the update message based on the input source," as recited in claims 26, 33, 39, 45, 51, and 57, using their respective language.
>
> The Examiner, for example, on page 3 of the Office Action, relies on the above sections of Chandra to allegedly show "identifying each category based on the category/topic of the message content." By this statement, the Examiner appears to agree that Chandra teaches identifying categories **based on category/topic of the message content**. In contrast, claims 26, 33, 39, 45, 51, and 57 recite, *inter* alia, "identify a category of the update message based on the input source," using their respective language.

Dkt. No. 82-8 at 19-20 (emphasis in original). The Court agrees that the patentees clearly and unmistakably argued that the phrase "identify a category of the update message based on the input source" is "not the same" as the "***data content of the message.***" *Id.* This is a clear characterization on what this limitation is not. *Comput. Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374

(Fed. Cir. 2008) ("A patentee could [make a disclaimer], for example, by clearly characterizing the invention in a way to try to overcome rejections based on prior art").

Plaintiff argues that Defendant's construction "is wrong because it would re-write this term to require that the category identification can be based ***only*** on the input source." (Dkt. No. 86 at 6) (emphasis in original). Plaintiff contends that Defendant cites no authority that "based on" should mean "based only on." *Id.* According to Plaintiff, there is nothing in the claims, specification, and prosecution that limits this term to Defendant's construction, in particular the language "but not on the category/topic of the message content." *Id.*

As discussed above, the patentees clearly and unmistakably argued that the phrase "identify a category of the update message based on the input source" is "not the same" as "***data content of the message.***" (Dkt. No. 82-8 at 19) (emphasis in original). To the extent that Plaintiff argues that they are the same, the Court rejects that argument. Claim 14 requires the recited gateway device to be configured to "identify a category of the update message based on the input source." However, neither the claim language nor the prosecution history require that the category identification be based only on the input source, as Defendant's construction would require. Finally, the Court addressed the parties' dispute regarding the definition of "input source" in the previous section.

**2. Court's Construction**

For the reasons set forth above, the Court construes the phrase **"identify a category of the update message based on the input source"** to mean **"identify a category of the update message based on the input source, which is not the same as the data content of the message."**

**D. "network address"**

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "network address" | Plain and ordinary meaning, no construction necessary. | "Internet protocol or IP address" |

**1. Analysis**

The term "network address" appears in Asserted Claims 30 and 37 of the '785 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The parties dispute whether a "network address" is necessarily an IP address.

The '785 Patent discloses private virtual dynamic networks and enabling communications within such networks. '785 Patent at Abstract. The specification provides a block diagram in Figure 4, which shows a Virtual Community Network (VCN) that allows devices, such as devices A, B, and X, to communicate as if they were on the same physical local network.




*Id.* at Figure 4. As illustrated, devices A, B, and X may direct connections to each other through an application IP interface ("IPa," "IPb," and "IPx") within a virtual domain, where "dashed lines

represent direct communication paths seen to applications running on A, B and X." *Id.* at 9:36–41. Devices A and B may have dynamic or static private network addresses, and device X may be coupled directly to the Internet and may have a public network address. *Id*. at 9:15–17. The Summary of the Invention further states the following:

> A system is disclosed that allows local and remote entities to communicate and collaborate from various locations. In one embodiment, the system makes use of a virtual subnet with a virtual address realm. The virtual address realm allows two or more users to communicate securely via at least one public network, whether the users are both coupled directly to the public network, both coupled directly to separate private networks or whether one is in a public network and one is in a private network. *The virtual address realm uses virtual addresses to identify the devices on the virtual subnet.* Although the devices are in different physical subnets, from the point of view of the applications the devices of the virtual subnet appear to be in one local subnet.

*Id.* at 5:48–60 (emphasis added). As indicated, the system disclosed is a Virtual Community Network ("VCN"") that is in essence "a private dynamic network which acts as a private LAN for computing devices coupled to public networks or private networks." *Id.* at 8:67–9:3. To do this, the VCN has to be able to identify the respective devices, and it does so with network addresses. Specifically, Claim 30 recites the following "network address[es]':

> 30. A virtual network manager, comprising:
> a network interface configured for data communication via a virtual network that is defined by a domain name having *an associated public network address;*
> a memory and a processor to implement a register module configured to register devices in a virtual network, the register module further configured to:
> receive a registration request from an agent associated with a device;
> distribute *a virtual network address* to the device when the device is registered in the virtual network, the device being identified to other devices in the virtual network by *the virtual network address*; and
> a DNS server for the virtual network, the DNS server configured to receive a DNS request from a first device in the virtual network, and return *a network address* associated with a network route director, *a private network address* associated

> with a second device in the virtual network, and *a virtual network address* associated with the second device.

*Id.* at 36:37–56 (emphasis added). Each of these addresses identifies a device in a network. Indeed, that is the purpose of a network address, whether it be a virtual, public, or private network address. *See, e.g., id.* at 12:9–11 ("Virtual IP addressing is used to establish unique connection identities for community connected devices."), 12:55–57 ("The virtual address realm is the set of addresses that can be used to identify and send communications to other members of the VCN."), 14:15–17 ("The virtual IP address received is used to identify the member in the VCN."), 33:4–6 ("The destination address would be equal to the private IP address in the LAN that is used to identify device $M_9$"). Accordingly, the Court construes "network address" to mean "address that identifies a device in a network."

Defendant contends that the only term in dispute is the "network address" associated with a network route director as recited in Claim 30. (Dkt. No. 82 at 19). Plaintiff correctly argues that this is problematic, because it proposes to construe "network address" for one instance, but ignores the other instances where a type of "network address" is recited in Claim 30. (Dkt. No. 77 at 20). Plaintiff contends that without a compelling reason to do so, it is wrong to construe the same term in different ways. *Id.* The Court agrees. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning."). Moreover, neither the intrinsic nor extrinsic evidence indicates that the term "network address" should be construed as Defendant proposes.

Defendant first argues that at Step 656 in Figure 7, the VCN Manager provides a triplet of addresses: (1) a public IP address for the Network Route Director; (2) a private IP address; and (3) a virtual IP address for the destination. (Dkt. No. 82 at 17) (citing '785 Patent at 8:16–17).

According to Defendant, this step directly tracks the language of Claim 30, which recites that the DNS server "return[s] *a network address associated with a network route director*, a private network address associated with a second device in the virtual network, and a virtual network address associated with the second device." *Id.* (citing '785 Patent at 36:52–56) (emphasis in original). Defendant contends that Figure 7 and Claim 30 show that "network address" refers to an IP address. *Id.* Defendant further argues that the same is confirmed in Step 2406 of Figure 24. *Id.* (citing '785 Patent at 14:34–40, 31:24–33).

The Court agrees that the only embodiments of the VCN disclosed refers to using an IP address. However, the claim language that Defendant argues "tracks" the specification indicates that the patentees intentionally choose to use the term "network address," and not the term "IP Address." Contrary to Defendant's contention, the terms "network address" and "IP address" are not used interchangeably in the specification. (Dkt. No. 82 at 18). In fact, the term "network address" only appears in the claims, and the term "network addresses" appears in only two locations in the specification. '785 Patent at 1:57–59, 10:45–48. Neither recitation is definitional, and neither instance expressly refers to an "Internet protocol or IP address." There is no indication that the patentees intended to define a network address to mean an IP address. Instead, Defendant relies on a single embodiment to argue that a "network address" should be redrafted as an IP address. It is well established that "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

Finally, Defendant argues that in its response to an Office Action during reexamination, the patentees explained that "the response from the DNS server includes a numeric IP address,"

and further explained that "a DNS request is responsible for resolving a domain name, such as www.example.com, into its corresponding IP address (e.g., 93.184.216.34) so that devices can locate and communicate with the server hosting the desired resource." (Dkt. No. 82 at 18) (citing Dkt. No. 82-9 at 13-14). According to Defendant, this shows that the "network address" described in the claims is defined as an IP address associated with the Network Route Director returned by a DNS server. *Id.* at 18. Defendant also argues that this definition is consistent with the general definition of "network address" *Id.* (citing Dkt. No. 82-10 at 2). Defendant contends that IP addresses are the core type of network addresses used to locate devices on the Internet or within an internal network. *Id.* at 19.

The Court finds that Defendant's own extrinsic evidence contradicts its argument. The computer-dictionary.org definition defines "network address" as a "portion" of an IP address and not the IP address itself. (Dkt. No. 82-10 at 2). Defendant does not persuasively address this inconsistency. Regarding the prosecution history, the Court finds that the patentees distinguished an HTTPS request from a DNS request. To the extent that Plaintiff argues that an HTTPS request is the same as a DNS request, the Court rejects that argument. Other than the HTTPS request disclaimer, the Court finds that the patentees did not define or limit the term "network address" to an "IP address." Accordingly, the Court rejects Defendant's construction.

**2. Court's Construction**

For the reasons set forth above, the Court construes the term **"network address"** to mean **"address that identifies a device in a network."**

**E. "network route director"**

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "network route director" | Plain and ordinary meaning, no construction necessary.<br><br>Alternatively,<br>"one or more components that interface with the public side of the Internet and allow communication to a device that is in a private network"<br>(Dkt. No. 120 at 1). | "a publicly addressable device configured to route encapsulated packets to and from entities located in a private network portion of a virtual network" |

**1. Analysis**

The term "network route director" appears in Asserted Claim 30 of the '785 Patent. The parties dispute whether the term "network route director" requires construction. The Court agrees with Defendant that "Network Route Director" is a coined term. Plaintiff does not reasonably dispute this conclusion. Given this, the analysis begins by determining "whether the intrinsic evidence provides objective boundaries to the scope of the term." *Iridescent Networks, Inc. v. AT&T Mobility, LLC*, 933 F.3d 1345, 1353 (Fed. Cir. 2019).

The specification includes a section titled "Route Directors" that provides the following description:

> Route Directors
>
> *Route directors allow communication to a member that is in a private network.* The PRD resides within a private network, behind the NAT device. *The NRD resides on the public side of the NAT device.* The NAT device can be a Network Address Port Translation (NAPT) NAT device or a basic NAT where only addresses are translated.
>
> Note that devices with public addresses do not require Route Directors (RDs). In the context of FIG. 5B, devices $M_A$ and $M_E$ do not require either a PRD or NRD, since they reside in the public address space. Likewise, $M_X$ does not require the PRD for its domain 540, since it has a public address (or is statically mapped to a public address at the NAT device 515).

'785 Patent at 25:30–40 (emphasis added). Similarly, the specification states that "[t]he Network

Route Director (NRD) 520 is a stand-alone unit that runs on the public side of the Internet enabling Member Agents and Group Agents (discussed below) to be reached inside one or more private networks from the public network." *Id.* at 11:9–13; *see also*, *id.* at 13:51–54 ("As noted above, Network Route Directors (NRDs) 520 facilitate routing traffic into and out of private address domains without requiring reconfiguration of a firewall 517 protecting the domain 550"). The specification contrasts an NRD with "Private Route Director ('PRD') 530," which "is an element that runs *inside a private network* enabling access to machines inside the private network from machines outside the private network." *Id.* at 11:13–17 (emphasis added). An example of an NRD and PRD is illustrated in Figure 5a.

Fig. 5a




*Id.* at Figure 5a (highlight added). Accordingly, a POSITA would understand that the claimed "network route director" is a unit that runs on the public side of the Internet that allows communication to a device that is in a private network.

Plaintiff argues that if the term requires construction, it should be construed to mean a "device configured to facilitate routing traffic into and out of private address domains." (Dkt. No. 88 at 8-9) (citing '785 Patent at 13:51–59). Given Plaintiff's construction, the parties dispute whether the "network route director" is "a publicly addressable device," and whether it must be "configured to route encapsulated packets to and from entities located in a private network portion of a virtual network."

As discussed above, the specification distinguishes between a Network Route Directors (NRD) and a Private Route Director (PRD), with the NRD residing on the public side of the NAT device (*i.e., "*public side of the Internet."). '785 Patent at 25:30–40. Plaintiff argues that Claim 39 recite a "network route director" that is "public," and thus it is incorrect to include "a publicly addressable device." (Dkt. No. 86 at 8). The Court notes that Claim 39 depends on Claim 38. Claim 38 does not recite a "network route director," but instead recites a "route director." Claim 39 further recites "the route director" is "a public network route director." As indicated in the specification, a router director may either be public or private. There is nothing inconsistent with further limiting the "route director" in Claim 38, to a "public network route director" versus a "private route director."

Regarding Defendant's "configured to route encapsulated packets to and from entities located in a private network portion of a virtual network" language, the Court finds that there is nothing in the claims that require the network route director to be configured in such a manner. The claims only require that the DNS server return a network address that is associated with the network route director. Likewise, the specification does not require that the route director actually route packets. The specification states that the "Network Route Director" "*enable[es]* Member Agents and Group Agents … to be reached inside one or more private networks from the public

networks." '785 Patent at 11:10–14 (emphasis added). Likewise, the specification states that the network route director "facilitat[es]" routing traffic. *Id.* at 13:51–54. Defendant's reliance on an *ex parte* proceeding where the Applicant stated that the "problem of the current invention [ ] is how to route through a route director to the virtual address" is not particularly relevant, because this statement does not conflict with the specification's disclosures, nor does it define the term "network route director." (Dkt. No. 82 at 20) (citing Dkt. No. 82-9 at 20). Accordingly, the Court rejects this aspect of Defendant's construction.

Finally, during the claim construction hearing Plaintiff argued for a modification to the Court's preliminary construction for this term. Plaintiff suggested changing "a unit that runs on" to "one or more components that interface with." (Dkt. No. 120 at 1). To supports it change, Plaintiff argued that the specification states that "[a]ny combination of NRDs and PRDs may be used to improve network efficiency." '785 Patent at 34:19–20. The Court agrees with Plaintiff's suggestion of "one or more" based on the intrinsic evidence. Accordingly, the Court construes "network route director" to mean "one or more units that run on the public side of the Internet that allow communication to a device that is in a private network."

**2. Court's Construction**

For the reasons set forth above, the Court construes the term **"network route director"** to mean **"one or more units that run on the public side of the Internet that allow communication to a device that is in a private network."**

**F. "a remote location experiencing a relatively high volume of transient traffic"**

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "a remote location experiencing a relatively high volume of transient traffic" | Plain and ordinary meaning, no construction necessary. | "a fixed remote location experiencing a relatively high volume of transient traffic" |

**1. Analysis**

The phrase "a remote location experiencing a relatively high volume of transient traffic" appears in Asserted Claim 24 of the '469 Patent. The parties dispute whether a "remote location" must be a permanent "fixed" location. The specification states that a "Hotspot" as recited in Claim 24, is focused on "enabl[ing] wireless and hard-wired, satellite distributed Internet access for anyone with a PC or other web-ready device (wireless ready or cabled) and a valid credit card." '469 Patent at 1:34–38. The specification further discloses that the Hotpots can be located virtually anywhere. Specifically, the specification states that "[t]he 'Hotspots' *can be located anywhere there is 120 volt electricity available or access to the sun for a solar panel and enough space to house the transceiver and mount a satellite dish*." *Id.* at 1:38–41 (emphasis added). The specification provides a list of potential locations including "rest areas, restaurants, truck stops, rural hotels, conference centers, motels and state park lodges." *Id.* at 1:41–44.

As indicated, the specification does not restrict the Hotspots from being located at non-fixed locations, as long as there is electricity available or solar access and sufficient space to house equipment. Indeed, the background of the '469 Patent explains that in the past, "[a]nyone in transmit, such as salesman, executive, truckers and private individuals ha[d] virtually no access while traveling, especially in rural areas." *Id.* at 1:21–30. Defendant's "fixed" language is not recited in the claim or the specification, and contradicts the disclosure that "[h]otspots can be located anywhere." *Id.* at 1:38. Simply stated, there is nothing in the intrinsic evidence that indicates that Claim 24 should be redrafted as "a fixed remote location," instead of the recited "remote location."

Defendant argues that the specification contemplates only fixed remote locations, *i.e.*, "areas that experience high volume transient traffic, such as rest areas, restaurants, truck stops,

rural hotels, conference centers, motels and state park lodges." *Id.* at 1:42–44. Defendant contends that a POSITA "would have understood 'remote location' in the context of claim 24 of the '469 Patent to mean 'a fixed remote location.'" (Dkt. No. 82 at 22) (citing Dkt. No. 82-6 at ¶ 89). According to Defendant, the specification confirms that the hotspot remains stationary, while the user moves to and from it. *Id.* (citing '469 Patent at 3:55–59). Defendant contends that every "remote location" contemplated by the specification is a fixed remote location from which users come and go. *Id.*

As discussed above, the Court agrees that a POSITA would understand that a remote location need not be "fixed." The plain and ordinary meaning of a "remote location" does not require a fixed or non-fixed location. Instead, Claim 24 only requires that it must be a remote location. Dkt. No. 77-13 at ¶¶ 43–49; Dkt. No. 86-3 at ¶¶ 16-19. Indeed, the specification discloses that "*[t]he 'Hotspots' can be located anywhere* there is 120 volt electricity available or access to the sun for a solar panel and enough space to house the transceiver and mount a satellite dish." '469 Patent at 1:38–41. It would be improper to limit the types of "remote locations" *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004) ("As we explained above, it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited."). Accordingly, the Court finds that Defendant failed to provide a persuasive reason to redraft Claim 24 as it proposes.

**2. Court's Construction**

For the reasons set forth above, the phrase **"a remote location experiencing a relatively high volume of transient traffic"** is given its **plain and ordinary meaning.**

**G. "a relatively high volume of transient traffic"**

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "a relatively high volume of transient traffic" | Plain and ordinary meaning, no construction necessary. Not indefinite. | Indefinite as to "relatively high" and "transient" |

**1. Analysis**

The phrase "a relatively high volume of transient traffic" appears in Asserted Claim 24 of the '469 Patent. The parties dispute whether the phrase is indefinite under Section 112. When a term of degree is in a claim, "the patent must provide some standard for measuring that degree such that the claim language provides enough certainty to one of skill in the art when read in the context of the invention." *GE Lighting Sols., LLC v. Lights of Am., Inc.*, 663 Fed. App'x 938, 940 (Fed. Cir. 2016) (cleaned up). In other words, "the patent must provide that additional information in the form of objective boundaries" to be sufficiently definite. *Id.* The Court finds that the intrinsic and extrinsic evidence does not provide any "objective baseline" to enable a POSITA to differentiate "a relatively high volume of transient traffic" from other levels of volume and non-transient traffic.

Plaintiff argues that the specification provides multiple examples of locations that experience "high volume transient traffic," including "rest areas, restaurants, truck stops, rural hotels, conference centers, motels and state park lodges." (Dkt. No. 77 at 25) (citing '469 Patent at 1:41–44, 1:52–54, 3:2–4, 3:6–8, 3:52–55). Plaintiff contends that a POSITA would appreciate and readily understand that some of these exemplary locations have different volumes of traffic, and whether that traffic is transient or not. *Id.* Plaintiff also argues that extrinsic sources confirm that the terms "relatively high" and "transient" have well-understood meanings that are consistent with the '469 Patent specification. *Id.* (citing Dkt. No. 77-10, Dkt. No. 77-11).

Plaintiff further contends that "[a]n example of a location having a proportionally high volume of transitory traffic could be for example a rural truck stop that has hundreds of daily

unique visitors." (Dkt. No. 77 at 26). Plaintiff argues that Defendant fails to consider the claims as a whole, and needs to evaluate surrounding claim language to understand its scope. *Id.* Plaintiff contends that a claim term reciting a relative degree of a thing (*e.g.*, a relatively high volume of transient traffic) does not require specific threshold values or quantile values to be definite. *Id.* at 27.

Defendant argues that neither Claim 24 nor the specification provide any boundaries on what constitutes "a relatively high volume of transient traffic." (Dkt. No. 82 at 23). Defendant contends that a rural restaurant may see a few dozen patrons per day, while a conference center may see many thousands. *Id.* at 24. Defendant further argues that a rural restaurant's patrons may visit for an hour, and a conference center's patrons may stay for days on end. *Id.* Defendant questions if both quantities are "a relatively high volume," and if both visits are "transient?" *Id.* at 24 (citing Dkt. No. 82-11 at 83:19-84:12; Dkt. No. 82-6 at ¶ 98).

The Court finds that the specification does not provide guidance that would clarify the meaning of the term "a relatively high volume of transient," or provide a baseline of comparison to allow a POSITA to differentiate between a "relatively high volume" from different volumes of traffic. The specification fails to identify any objective metes and bounds of "relatively high" or "transient." Accordingly, a POSITA cannot determine whether traffic is high enough or transient enough to infringe, which renders Claim 24 indefinite under Section 112.

Indeed, adding "relatively" to "high" does nothing to clarify the scope of what is claimed, because a POSITA cannot differentiate between "relatively high" and other volumes of traffic. *Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1381 (Fed. Cir. 2018) ("[A] term of degree that is purely subjective and depends on the unpredictable vagaries of any one person's opinion is indefinite.") (cleaned up). Neither the specification nor Plaintiff explain what

the boundary is between "relatively high" and not relatively high, and between "transient" and not transient. Indeed, the only reference to "transient" in the specification is by reference to the varied examples above. These are insufficient to provide a standard for measuring the scope of the term. *Cypress Lake Software, Inc. v. Samsung Electronics America, Inc.*, 382 F. Supp. 3d 586, 610 (E.D. Tex. 2019) (finding a term indefinite where the "intrinsic evidence does not provide an objective criterion for determining what is 'more convenient' or 'permits a user to conveniently enter' the second user input").

Plaintiff argues that Defendant "fails to consider the claims as a whole," because it fails to "evaluate surrounding claim language to understand its scope." Dkt. No. 77 at 21. But the "surrounding claim language" fails to provides objective benchmarks by which "relatively high" or "transient" could be measured. Instead, Plaintiff hypothesizes new examples that only further confuse the analysis, concluding that "a residential manager of a rural hotel" would "not be included," but failing to explain by what analysis it came to this conclusion. *Id.* Indeed, Plaintiff's expert suggests that a "residential manager of a rural hotel" would be included if his residence lasted a "season." *See* Dkt.77-13 at ¶ 55. This begs the question of the difference between "relatively high volume of transient traffic" and normal or low volume of non-transient traffic. Finally, Plaintiff does not present any argument that the prosecution history addresses the "relatively high volume of transient traffic" phrase in any meaningful way that would give clarity to its scope.

In discussing "how much imprecision" Section 112(2) tolerates, the Supreme Court considered "the inherent limitations of language" on the one hand, and "afford[ing] clear notice of what is claimed" on the other hand. *Nautilus*, 572 U.S. at 899. Applying this, courts require claims to "provide objective boundaries for those of skill in the art." *Interval Licensing*, 766 F.3d at 1371.

Here, the "inherent limitations of language" are not at issue, and the patentee could have provided some objective boundaries for what he considered "a relatively high volume of transient traffic" to mean. He did not. Accordingly, the Court finds that "the claim language might mean several different things and no informed and confident choice is available among the contending definitions." *Id.* (quoting *Nautilus,* 572 U.S. at 911 & n.8) (internal quotations omitted). Thus, the Court finds that nothing in the record provides objective boundaries for those of skill in the art.

**2. Court's Construction**

The phrase **"a relatively high volume of transient traffic"** is indefinite for failing to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

**H. "partition"**

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "partition" | Plain and ordinary meaning, no construction necessary. | "well-defined part of the input file" |

**1. Analysis**

The term "partition" appears in Asserted Claim 1 of the '582 Patent. The parties dispute whether the patentee acted as his own lexicographer by defining "partition" as a "well-defined part of the input file." Defendant argues that the patentee expressly defined the term "partition" as follows:

> A logical partition in this context *is* a well-defined part of the input or output. A very simple way to define a partition, which in many cases is the most efficient, would be to define the partitions as consecutive ranges on the input or output, ranging from one relative byte address to another relative byte address or from one relative track address to another.

'582 Patent at 3:36–41 (emphasis added). Defendant contends that the patentees use of the term "is" signifies that the patentee was acting as his own lexicographer. (Dkt. No. 82 at 28). According to Defendant, the patentee clearly, deliberately, and precisely defined the term "partition" as a

"well-defined part of the input file." *Id.*

Plaintiff argues that "the patent uses partition in accordance with its plain meaning, for example, 'the input file 0 is logically partitioned into six partitions,' and 'output partitions are logically allocated on an output file.'" (Dkt. No. 77 at 28-29) (citing '582 Patent at 5:34–35, 6:17–18). Plaintiff contends that the same paragraph states that "*other partition definitions* can be used with no impact on the rest of the embodiment." (*Id.* at 29) (citing '582 Patent at 3:46–47) (emphasis in original). Plaintiff further argues that Defendant's construction limits "partition" to a particular embodiment. *Id.*

The Court finds that the term "partition" should be construed to mean a "defined part of the input file." The specification discloses parallel processing and includes logically subdividing an input file into partitions that are distributed to processors that execute subtasks in parallel, including reading the partitions. '582 Patent at Abstract. The specification states that this efficiently uses "any number of potentially heterogeneous computers, taking the available capacity of each of these computers into account while optimizing execution." *Id.* at 1:51–54. As Defendant correctly argues, the specification states that "[a] logical partition in this context is a well-defined part of the input or output." *Id.* at 3:36–37. The Court agrees that this provides context for the disputed term.

However, Plaintiff correctly argues that the specification further states that "[o]ther partition definitions can be used with no impact on the rest of the embodiment." *Id.* at 3:46–47. The specification provides examples of how the partitions can be defined. *See, e.g.*, 582 at 3:37-41 ("A very simple way to define a partition, which in many cases is the most efficient, would be to define the partitions as consecutive ranges on the input or output, ranging from one relative byte address to another relative byte address or from one relative track address to another."). Thus, the

intrinsic evidence indicates that a partition is "defined part of the input file." Requiring the partitions to be "well-defined" would appear to limit the claims to an embodiment.

### 2. Court's Construction

For the reasons set forth above, the Court construes the term **"partition"** to mean **"defined part of the input file."**

## I. "description of all said partitions"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "description of all said partitions" | Plain and ordinary meaning, no construction necessary. | "statements giving a characteristic(s) of all of the well-defined parts of the input file for use in distributing the load without a special load process, wherein such statements are distinct from the input file itself" |

### 1. Analysis

The term "description of all said partitions" appears in Asserted Claim 1 of the '582 Patent. The parties dispute whether the term "description of all said partitions" requires construction. Defendant contends that the proper construction includes the following four parts: (i) statements giving a characteristic(s) of; (ii) well-defined parts of the input file; (iii) for use in distributing the load without a special load process; and (iv) wherein such statements are distinct from the input file itself.

Regarding Defendant's first proposal of "statements giving a characteristic(s) of," the Court finds that it is unnecessary. Defendant argues that the patentees did not provide a special definition for the term "descriptions" in the specification. (Dkt. No. 82 at 30). Defendant contends that a POSITA would have understood that the term "descriptions" to have its ordinary meaning, which as defined by Merrian-Websters, is "a statement or account giving the characteristics of someone or something." *Id.* (citing Dkt. No. 82-13; Dkt. No. 82-6 at ¶ 73). Plaintiff argues that

Defendant does not justify how the definition from a single layman dictionary definition applies to the technical nature of this patent and term. (Dkt. No. 86 at 12). The Court agrees, and rejects this portion of Defendant's construction. *See U.S. Surgical Corp. v. Ethicon, Inc.,* 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy.").

Regarding Defendant's second proposal of "all of the well-defined parts of the input file," the Court addressed the dispute with the previous term. As discussed above, the intrinsic evidence indicates that a partition is a "defined part of the input file." Requiring the partitions to be "well-defined" would appear to limit the claims to an embodiment.

Regarding Defendant's negative limitation of "for use in distributing the load without a special load process," the Court finds that the patentee clearly and unmistakably disavowed using load information. Specifically, the patentee responded to the examiner's rejection of the claims by distinguishing prior art and arguing the following:

> *The primary difference between the instant invention and the process disclosed in [the prior art]* is that *these systems rely on a special control process that uses load information to distribute the load between processors that share the load. With the instant invention as defined in the claims there is no such process*. The prior art's load information is not created with the process of the instant invention. Instead, the load sharing is done as a byproduct of the fact that the load-sharing process take parts of the load on a first-come/first-served basis.
>
> A comparison would be to a road intersection where, according to the prior art, there is a traffic light that determines who can go when. The instant is more like such an intersection with a four-way stop so that the individual drivers determine who can go and when.
>
> This is a major improvement since in addition to *eliminating the control process it also eliminates the need to collect and*

> *maintain load information*, which it is very difficult to do and almost impossible to define so as to anticipate all possible processors that might execute the subtasks."
>
> *The amended claims, refer to a distribution of a description of the work to be done. The sharing process can use such a description to distribute the load without a special load process.*
>
> For these reasons the instant invention is clearly allowable over the cited art.

(Dkt. No. 82-14 at 7-8) (emphasis added). The Court agrees that this argument to overcome the prior art is a clear and unmistakable disclaimer. *Comput. Docking Station Corp. v. Dell, Inc.,* 519 F.3d 1366, 1374 (Fed. Cir. 2008) ("A patentee could [make a disclaimer], for example, by clearly characterizing the invention in a way to try to overcome rejections based on prior art"). Accordingly, "description of all said partitions" is "for use in distributing the load without a special load process"

Plaintiff contends that there was no disclaimer of claim scope, because "[w]hile the text of the file history removes the requirement for a centralized load process that uses load information to make scheduling decisions, it does not preclude centralized coordination or the use of load information in making scheduling decisions." (Dkt. No. 77 at 31). Plaintiff's argument ignores the prosecution history statement. As discussed above, the patentee argued during prosecution that the prior art required a "special control process that uses load information to distribute the load," whereas, with "the instant invention as defined in the claims there is no such special process." (Dkt. No. 82-14 at 7). The patentee argued this distinction to the examiner, and there by excluded this from the scope of the claims.

Regarding Defendant's final proposal of "wherein such statements are distinct from the input file itself," the Court rejects it. Defendant argues that its proposal is necessary, because the patentee disclaimed claim scope by amending the claims from requiring "distributing said

partitions" to requiring "distributing descriptions of all of said partitions." Defendant contends that the originally filed, claim 1(b) referred to distributing the partitions themselves: "(b) *distributing said partitions* to a plurality of processors and activating respective subtasks of the computer-executable process in each of said processors, each subtask reading and processing said partitions on a first come first serve basis." (Dkt. No. 82 at 32) (citing Dkt. No. 82-15). Defendant argues that after the examiner rejected Claim 1 over the cited prior art, the applicant amended claim 1(b) to specify that *descriptions* of the partitions are distributed, not the partitions themselves. *Id.* (citing Dkt. No. 82-14 at 2).

The Court notes that the claim language as amended requires that "descriptions" of the partitions are distributed to the subtask processors. The plain and ordinary meaning of the amendment is both clear and included in the claim language. Defendant argues that the specification shows that "descriptions" of partitions are different from the partitions themselves. *Id.* (citing '582 Patent at 3:52–59). The Court finds that Defendant's reliance on the specification does not lead to a different conclusion. That disclosure relates to determination of a "logical partition," and that the reading and processing of the partition is recited in step 1(c) in Claim 1. The only limitation that was not captured by the claim amendment was the "description of all said partitions without a special load process." Accordingly, the Court rejects this portion of Defendant's construction.

**2. Court's Construction**

For the reasons set forth above, the Court construes the term **"description of all said partitions"** to mean **"description of all said partitions for use in distributing the load without a special load process."**

### J. "simultaneously executing at least a respective one of the subtasks of the computer-executable process in each of at least some of said processors on a respective one of the partitions"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "simultaneously executing at least a respective one of the subtasks of the computer-executable process in each of at least some of said processors on a respective one of the partitions" | Plain and ordinary meaning, no construction necessary. Not indefinite. | Indefinite. |

#### 1. Analysis

The phrase "simultaneously executing at least a respective one of the subtasks of the computer-executable process in each of at least some of said processors on a respective one of the partitions" appears in Asserted Claim 1 of the '582 Patent. The parties dispute whether the phrase is indefinite. Defendant argues that Claim 1(c) requires "*simultaneously* executing *at least a respective one of the subtasks* of the computer-executable process in each of at least some of said processors on a respective one of the partitions." (Dkt. No. 82 at 33) (emphasis in original). Defendant contends that a POSITA would have understood that simultaneously executing sub tasks can only occur when there are at least two sub task processors executing at the same time, by the plain and ordinary meaning of "simultaneously." *Id.* (citing Dkt. No. 82-6 at ¶ 82).

Defendant further argues that the phrase "*at least* a respective *one* of the subtasks" includes instances where there is only *one* sub task. *Id.* (emphasis in original). According to Defendant, a POSITA would be unable to reasonably determine what it means to *simultaneously* execute *one* subtask by itself, as is encompassed by claim 1(c). *Id.* at 34 (citing Dkt. No. 82-6 at ¶ 82; Dkt. No. 82-7 at ¶¶ 58-59). The Court disagrees with Defendant's analysis.

The preamble of Claim 1 of the '582 Patent recites, in part, a method of "effecting" a "computer-executable process comprised of *a plurality of subtasks*." '582 Patent at 6:44–46 (emphasis added). Claim 1 further recites "distributing descriptions of all of said partitions to each

of *a plurality of subtask processors*" and "simultaneously executing *at least a respective one of the subtasks* of the computer-executable process *in each of at least some of said processors* on a respective one of the partitions." *Id*. at 6:50–55. For the "simultaneously …" limitation recited in step (c), the language "the subtasks" refers to the "a plurality of subtasks" recited in the preamble, and the language "said processors" refers to the "plurality of subtask processors" recited in step (b) of Claim 1. Thus, Claim 1 can be understood to require at least two subtasks and at least two subtask processors. *See SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*, 983 F.3d 1367, 1377 (Fed. Cir. 2021) ("'[A] plurality of' requires two or more.").

As recited in the claim, the disputed phrase requires executing, *in "each" of the subtask processors*, at least one subtask. In other words, each subtask processor has at least one subtask being executed, with that execution of two or more subtasks on two or more subtask processors occurring "simultaneously." The language "at least some of said processors" does not change the meaning of this term because a "plurality" of processors means there can be two *or more* processors, and "some" includes at least two, but possibly more processors. This meaning is consistent with the specification's description of performing processes in parallel or simultaneously. '582 Patent at 1:29–54, 5:54–65.

The Court agrees that Defendant's entire argument is based on its incorrect interpretation that the claim only requires one subtask to execute. As discussed, the phrase requires executing, *in "each" of the subtask processors,* at least one subtask. Defendant ignores that Claim 1 recites both a plurality of subtasks and a plurality of subtask processors. A plurality requires two or more, and therefore Claim 1 requires at least two subtasks and at least two subtask processors. Defendant's interpretation is incorrect and inconsistent with the claim language and specification. Accordingly, the Court finds that Defendant failed to prove by clear and convincing evidence that

the term is indefinite.

### 2. Court's Construction

The Court finds that the phrase **"simultaneously executing at least a respective one of the subtasks of the computer-executable process in each of at least some of said processors on a respective one of the partitions"** is not indefinite, and is given its **plain and ordinary meaning**.

## K. "on a first-come/first-served basis"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "on a first-come/first-served basis" | Plain and ordinary meaning, no construction necessary. | "selecting the earliest unprocessed partition for execution without the use of a control process that uses load information for such selection" |

### 1. Analysis

The phrase "on a first-come/first-served basis" appears in Asserted Claim 1 of the '582 Patent. The parties dispute whether the term "on a first-come/first-served basis" requires construction. Defendant contends that the proper construction includes the following two parts: "(i) selecting the earliest unprocessed partition for execution (ii) without the use of a control process that uses load information for such selection." (Dkt. No. 82 at 34).

Regarding Defendant's proposal of "selecting the earliest unprocessed partition for execution," the Court finds that it is unnecessary and unwarranted. Defendant argues that Claim 1(d) provides no guidance as to how to determine which "unprocessed partition" is "first-come," because the specification teaches that some sub tasks may run faster than others. (Dkt. No. 82 at 35). Defendant further contends that without any construction, the phrase "on a first-come/first-served basis" would be indefinite, because it provides no guidance for determining which unprocessed partition is "first-come." *Id.* The Court disagrees.

Step (c) of Claim 1 recites "simultaneously executing at least a respective one of the subtasks of the computer-executable process in each of at least some of said processors on a respective one of the partitions with each subtask reading and processing the respective partition so as to process the respective partition and produce respective subtask output." Step (d) of Claim 1 further recites "thereafter repeating step (c) in at least some of the subtask processors each with another unprocessed partition on a first-come/first-served basis." Thus, as recited in the claim, the partition that is processed next is the unprocessed partition that was created first in time. That is the plain and ordinary meaning of "on a first-come/first-served basis." Indeed, the specification provides an example of this claim language by disclosing the processing order of Input 1-6. '582 Patent at 6:14–37 ("Input 1" is processed first, then "Input 2," then "Input 3," then "Input 4," then "Input 5," and, last, "Input 6.").

Regarding Defendant's negative limitation of "without the use of a control process that uses load information for such selection," the Court addressed the disclaimer with the disputed term "description of all said partitions." As discussed above, the patentee explicitly referred to "description of all said partitions" language in distinguishing the prior art. Specifically, the patentee argued that "[t]he amended claims, refer to a distribution of a description of the work to be done. The sharing process can use such a description to distribute the load without a special load process." (Dkt. No. 82-14 at 8). Accordingly, the Court resolved the parties dispute when addressing the disputed term "description of all said partitions."

### 2. Court's Construction

For the reasons set forth above, the phrase **"on a first-come/first-served basis"** is given its **plain and ordinary meaning.**

## VI. CONCLUSION

The Court adopts the constructions above for the disputed terms of the Asserted Patents. Furthermore, the parties should ensure that all testimony that relates to the terms addressed in this Order is constrained by the Court's reasoning. However, in the presence of the jury the parties should not expressly or implicitly refer to each other's claim construction positions and should not expressly refer to any portion of this Order that is not an actual construction adopted by the Court. The references to the claim construction process should be limited to informing the jury of the constructions adopted by the Court.

**IT IS SO ORDERED.**

**SIGNED this 19th day of February, 2026.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

# EXHIBIT A-30

# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| INTELLECTUAL VENTURES I LLC and INTELLECTUAL VENTURES II LLC | § | |
| *Plaintiffs*, | § | |
| v. | § | Civil Action No. 4:24cv980<br>Judge Mazzant |
| AMERICAN AIRLINES, INC. | § | |
| *Defendant.* | § | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

On July 8, 2026, the Court held a hearing to determine the proper construction of the disputed claim terms U.S. Patent Nos. 7,822,841 ("'841 Patent"); 8,352,584 ("'584 Patent"); 7,721,282 ("'282 Patent"); 7,712,080 ("'080 Patent"); and 11,032,000 ("'000 Patent") (collectively, the "Asserted Patents").[1] Having reviewed the arguments made by the parties at the hearing and in their supplemental claim construction briefing (Dkt. Nos. 139, 141, 142, 144)[2], having considered the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence, the Court hereby issues this Claim Construction Memorandum and Order. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

---

[1] This is the second claim construction hearing in this case. The first claim construction hearing was held on January 22, 2026. The Court issued a Memorandum Opinion and Order on February 19, 2026, construing the disputed claim terms in U.S. Patent No. 8,332,844 (the "'844 Patent"), U.S. Patent No. 8,407,722 (the "'722 Patent"), U.S. Patent No. 7,949,785 (the "'785 Patent"), U.S. Patent No. 7,324,469 (the "'469 Patent"), U.S. Patent No. 7,257,582 (the "'582 Patent"). (Dkt. No. 127).

[2] Citations to the parties' filings are to the filing's number in the docket (Dkt. No.) and pin cites are to the page numbers assigned through ECF.

TABLE OF CONTENTS

I. BACKGROUND ... 3

II. APPLICABLE LAW ... 8

III. LEVEL OF ORDINARY SKILL IN THE ART ... 14

IV. CONSTRUCTION OF AGREED TERMS ... 15

V. CONSTRUCTION OF DISPUTED TERMS PRESENTED BUT NOT BRIEFED OR ARGUED BY DEFENDANT ... 16

VI. CONSTRUCTION OF DISPUTED TERMS ... 18

A. "high performance [computing] cluster" ... 18

B. "operational and[/or] connectivity problems" / "hardware and[/or] software problems" ... 20

C. "communications within the first and second clusters are isolated" / "communications between the first [HPC] cluster and the second [HPC] cluster are isolated" ... 23

D. "appropriate persistent mapping" ... 26

E. "low-level driver" ... 29

F. "root image" ... 30

G. "the modifying" ... 33

H. "at an operational level" ... 36

I. "distributed parallel computing program" ... 37

J. "time interval" / "time intervals" ... 40

K. "a processor" / "the processor"; "a receiver" / "the receiver"; "a transmitter" / "the transmitter" ... 45

L. "in the same time interval that the uplink physical signal is sent, a plurality of UEs transmit uplink physical signals in the same time interval" ... 48

VII. CONCLUSION ... 50

## I. BACKGROUND

Plaintiffs Intellectual Ventures I LLC and Intellectual Ventures II LLC ("IV" or "Plaintiff") alleges that Defendant American Airlines, Inc. ("American" or "Defendant") infringes the Asserted Patents. Before the start of the July 8, 2026 hearing, the Court provided the parties with preliminary constructions with the aim of focusing the parties' arguments and facilitating discussion.

The '584 Patent is a continuation of the '841 Patent, and two patents share the same specification. The '841 Patent, titled "Method and System for Hosting Multiple, Customized Computing Clusters," was filed on October 30, 2007, and issued on October 26, 2010. The '584 Patent, titled "System for Hosting Customized Computing Clusters," was filed on September 30, 2010, and issued on January 8, 2013. The patents relate "to distributed computing and clustered computing environments, and, more particularly, to computer software, hardware, and computer-based methods for hosting a set of computer clusters that are uniquely configured or customized to suit a number of remote customers or clients." '841 Patent at 1:8–13; '584 Patent at 1:15–20.

The Abstract of the patents state:

> A computer system for hosting computing clusters for clients. The system includes clusters each including a set of computing resources and each implemented in custom or differing configurations. Each of the configurations provides a customized computing environment for performing particular client tasks. The configurations may differ due to configuration of the processing nodes, the data storage, or the private cluster network or its connections. The system includes a monitoring system that monitors the clusters for operational problems on a cluster level and also on a per-node basis such as with monitors provided for each node. The system controls client access to the clusters via a public communications by only allowing clients to access their assigned cluster or the cluster configured per their specifications and performing their computing task. Gateway mechanisms isolate each cluster such that communications within a cluster or on a private cluster communications network are maintained separate.

Claim 1 of the '841 Patent is an illustrative claim and recites the following elements (disputed term in italic):

> 1. A computer system for hosting computing clusters for clients, comprising:
> a private communications network linked to a public communications network;
> a first cluster comprising a set of computing resources, including at least one hardware processor, in a first configuration, wherein the first cluster is communicatively linked to the private communications network;
> a second cluster comprising a set of computing resources, including at least one hardware processor, in a second configuration, wherein the second cluster is communicatively linked to the private communications network; and
> a monitoring system monitoring operations of the first and second clusters, identifying *operational and connectivity problems*, and issuing an alert in response to the identified problems indicating a corresponding one of the first and second clusters associated with the identified problems;
> wherein the first configuration differs from the second configuration and wherein the first configuration provides a first computing environment for performing a first client task and the second configuration provides a second computing environment for performing a second client task;
> wherein the monitoring system comprises a main monitor that operates to monitor the first and second clusters to identify the operation and connectivity problems and further comprises monitors for each node of the first and second clusters operating to check for *hardware and software problems* within a particular node and to report the *hardware and software problems* to the main monitor.

Claim 1 of the '584 Patent is an illustrative claim and recites the following elements (disputed term in italic):

> 1.A computer system, comprising:
> a private communications network linked to a public communications network;
> a first cluster comprising a set of computing resources, including at least one hardware processor, in a first configuration, wherein the first cluster is communicatively linked to the private communications network;
> a second cluster comprising a set of computing resources, including at least one hardware processor, in a second configuration,

> wherein the second cluster is communicatively linked to the private communications network; and
> a monitoring system to monitor operations of the first cluster and the second cluster for communications problems;
> wherein the first configuration differs from the second configuration;
> wherein the first configuration provides a first computing environment to perform a first client task and the second configuration provides a second computing environment to perform a second client task; and
> wherein the computing resources comprise processing nodes, data storage shared by the processing nodes, and at least one communications network to link the processing nodes to each other and to the data storage;
> wherein the first cluster establishes communications between the set of computing resources of the first cluster and a first gateway communicatively linked between the first cluster and the private communications network;
> wherein the second cluster establishes communications among the set of computing resources of the second cluster and a second gateway communicatively linked between the second cluster and the private communications network;
> wherein *communications between the first cluster and the second cluster are isolated*;
> wherein the first cluster is a *high performance cluster*; and
> wherein the second cluster is a *high performance cluster*.

The ’282 Patent, titled “Block-Level I/O Subsystem for Distributed Application Environment Management,” was filed on March 30, 2006, and issued on May 18, 2010. The ’282 Patent relates “relate to distributed application environment deployment in a multi-computer system.” ’282 Patent at 1:18–19.

The Abstract of the ’282 Patent states:

> An embodiment of the present invention is directed to a system for distributing an application environment to a compute node. The system includes a first storage unit for storing blocks of a root image of the compute node and a second storage unit for storing a leaf image comprising new data blocks and changes to the blocks of the root image. The system further includes a union block device for interfacing between the compute node and the first and second storage units to distribute the application environment to the compute node. The union block device creates the application environment by merging the blocks of the root image stored on the

> first storage unit with the leaf image stored on the second storage unit.

Claim 1 of the '282 Patent is an illustrative claim and recites the following elements (disputed terms in italic):

> 1.A system for distributing an application environment comprising:
> a compute node comprising a computer system;
> a first storage unit for storing blocks of a *root image* of the compute node, wherein the first storage unit comprises a first non-volatile memory, wherein the *root image* comprises a computer program, wherein the blocks comprise sections of data, and wherein a file of the *root image* comprises at least one block;
> a second storage unit for storing a leaf image, the leaf image comprising new data blocks and changes to the blocks of the *root image*, wherein the second storage unit comprises a second non-volatile memory; and
> a union block device for interfacing between the compute node and the first and second storage units to distribute the application environment to the compute node, wherein the union block device comprises a driver, wherein the union block device creates the application environment by merging the blocks of the *root image* stored on the first storage unit with the blocks of the leaf image stored on the second storage unit; the union block device comprises a *low-level driver* for interfacing between the first and second storage units and the file system of the compute node; and the union block device, upon receiving a write request from the compute node for a sector X, creates an *appropriate persistent mapping* for sector X.

The '080 Patent, titled "Systems and Methods for Parallel Distributed Programming," was filed on May 21, 2004, and issued on May 4, 2010. The '080 Patent relates to a network services system "to systems and methods for parallel distributed programming." '080 Patent at 1:14–15.

The Abstract of the '080 Patent states:

> The present invention relates generally to computer programming, and more particularly to systems and methods for parallel distributed programming. Generally, a parallel distributed program is configured to operate across multiple processors and multiple memories. In one aspect of the invention, a parallel distributed program includes a distributed shared variable located across the multiple memories and distributed programs capable of operating

across multiple processors.

Claim 1 of the ’080 Patent is an illustrative claim and recites the following elements (disputed terms in italic):

> 1.A method of developing a *distributed parallel computing program*, comprising steps of:
> establishing at least one distributed shared variable, wherein the at least one distributed shared variable is a single variable that includes several variables that may be physically distributed across multiple memories;
> developing at least one *distributed sequential computing program* to access the at least one distributed shared variable; and
> transforming the at least one *distributed sequential computing program* into at least one *distributed parallel computing program* by spawning at least one child *distributed sequential computing program* from the at least one *distributed sequential computing program* when at least one intermediate condition occurs within the at least one *distributed sequential computing program*, wherein the at least one *distributed parallel computing program* concurrently uses the at least one *distributed sequential computing program* and the at least one spawned child *distributed sequential computing program* to perform *parallel processing and/or operations*, wherein the at least one intermediate condition comprising one intermediate result that will be required by the at least one spawned child *distributed sequential computing program* to continue computation.

The ’000 Patent, titled “Communications in a Wireless Network,” was filed on November 13, 2019, and issued on June 8, 2021. The ’000 Patent generally relates to wireless communications between user equipment (“UEs”) and a base station.’000 Patent at 2:20–24.

The Abstract of the ’000 Patent states:

> A user equipment (UE) may, in a time interval that it is not sending information over a physical uplink shared channel, send an uplink physical signal based on received resource allocation information. The uplink physical signal may be used to determine channel conditions by a base station. The UE may receive, on a downlink control channel, control information. The control information may be based on the determined channel conditions.

Claim 1 of the ’000 Patent is an illustrative claim and recites the following elements

(disputed terms in italic):

> 1.A user equipment (UE) comprising:
> a *receiver* and a *processor* are configured to receive resource allocation information associated with an uplink physical signal, wherein the uplink physical signal and a physical uplink shared channel have different resources;
> a *transmitter* and the *processor* are configured to send, over the physical uplink shared channel, data in assigned *time intervals*;
> the *transmitter* and the *processor* are further configured, in a *time interval* that it is not sending information over the physical uplink shared channel, to send the uplink physical signal based on the received resource allocation information, wherein the uplink physical signal is used to determine channel conditions by a base station and *in the same time interval that the uplink physical signal is sent, a plurality of UEs transmit uplink physical signals in the same time interval*; and
> the *receiver* and the *processor* are further configured to receive, on a physical control channel, control information, wherein the control information is based on the determined channel conditions, wherein physical control channels are transmitted in a same time slot with other physical channels in a plurality of predetermined time slots in a downlink frame, wherein other time slots of the downlink frame do not include a physical control channel, wherein a number of bits sent over the physical control channel is based on a number of fields of control information to be sent to the UE.

## II. APPLICABLE LAW

### A. Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the

specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) (quotation marks omitted) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") *cert. granted, judgment vacated,* 135 S. Ct. 1846 (2015).

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)) *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v.*

*Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id*.

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic*

*Alts., Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are not helpful to a court. *Id*. Extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*. The Supreme Court has explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331–32 (2015).

### B. Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either

in the specification or during prosecution."[3] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Sols.*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

### C. Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA)

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. A claim, when viewed in light of the intrinsic evidence,

[3] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). If it does not, the claim fails § 112, ¶ 2 and is therefore invalid as indefinite. *Id.* at 901. Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application for the patent was filed. *Id.* at 911. As it is a challenge to the validity of a patent, the failure of any claim in suit to comply with § 112 must be shown by clear and convincing evidence. *BASF Corp. v. Johnson Matthey Inc.,* 875 F.3d 1360, 1365 (Fed. Cir. 2017). "[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012).

When a term of degree is used in a claim, "the court must determine whether the patent provides some standard for measuring that degree." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015) (quotation marks omitted). Likewise, when a subjective term is used in a claim, "a court must determine whether the patent's specification supplies some standard for measuring the scope of the [term]." *Ernie Ball, Inc. v. Earvana, LLC*, 502 F. App'x 971, 980 (Fed. Cir. 2013) (citations omitted). The standard "must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

### D. Means-Plus-Function Limitations

Where a claim limitation is expressed in "means plus function" language and does not recite definite structure in support of its function, the limitation is subject to 35 U.S.C. § 112, ¶ 6. *Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). In relevant part, 35 U.S.C. § 112, ¶ 6 mandates that "such a claim limitation 'be construed to cover the corresponding structure . . . described in the specification and equivalents thereof.'" *Id.* (citing 35 U.S.C. § 112, ¶ 6). Accordingly, when faced with means-plus-function limitations, courts "must turn to the written

description of the patent to find the structure that corresponds to the means recited in the [limitations].” *Id*.

Construing a means-plus-function limitation involves multiple steps. “The first step in construing [a means-plus-function] limitation is a determination of the function of the means-plus-function limitation.” *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). Once a court has determined the limitation’s function, “the next step is to determine the corresponding structure described in the specification and equivalents thereof.” *Id.* A “structure disclosed in the specification is ‘corresponding’ structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim.” *Id.* Moreover, the focus of the “corresponding structure” inquiry is not merely whether a structure is capable of performing the recited function, but rather whether the corresponding structure is “clearly linked or associated with the [recited] function.” *Id*.

## III. LEVEL OF ORDINARY SKILL IN THE ART

It is well established that patents are interpreted from the perspective of one of ordinary skill in the art (“POSITA”). *See Phillips*, 415 F.3d at 1313 (“[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application.”). The Federal Circuit has advised that the “[f]actors that may be considered in determining the level of skill in the art include: (1) the educational level of the inventors; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; (5) sophistication of the technology; and (6) education level of active workers in the field.” *Env’tl Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 696 (Fed. Cir. 1983). “These factors are not exhaustive but are merely a guide to determining the level

of ordinary skill in the art." *Daiichi Sankyo Co. Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

Plaintiff's expert, Dr. Mahdi Eslamimehr, proposes that "a POSITA would have a bachelor's degree in electrical engineering, computer science, or a similar area of study, and two or more years of industry experience in networking and distributed computing. Additional experience may make up for a lack of education, and vice versa." (Dkt. No. 139-3 at ¶ 31).

Defendant's expert, Dr. Michael Goodrich, opines that a POSITA "would have had a Bachelor's degree in electrical engineering, computer science, or the like, and/or two or more years of industry experience in networking and distributed computing. Additional experience may make up for a lack of education and vice versa" (Dkt. No. 139-5 at ¶ 18).

The parties essentially agree on the level of skill in the art. Given the parties' agreement, and the factors that may be considered in determining the level of skill in the art, the Court finds a POSITA would have a Bachelor's degree in electrical engineering, computer science, or the like, and/or two or more years of industry experience in networking and distributed computing. Additional education may substitute for industry experience, or vice versa.

## IV. CONSTRUCTION OF AGREED TERMS

During the claim construction hearing, the parties agreed to the construction of the following terms:

| Claim Term/Phrase | Agreed Construction |
|---|---|
| "means ... to limit access ..."<br><br>('584 Patent: Claim 8) | **Function:** limit access to the first cluster to communication access from a first client associated with the first client task and limit access to the second cluster to communication access from a second client associated with the second client task. |

| | |
|---|---|
| | **Structure:** firewall and authentication system/mechanism (e.g., 210 in Figure 2; 410/411/412 in Figure 4). |
| "distributed sequential computing program"<br><br>('080 Patent: Claims 1, 9) | "program using a single locus of computation over distributed data" |
| "parallel processing and/or operations"<br><br>('080 Patent: Claims 1, 9) | "processing that enables calculations to be carried out simultaneously" |

In view of the parties' agreement on the proper construction of the identified term, the Court hereby **ADOPTS** the parties' agreed constructions.

## V. CONSTRUCTION OF DISPUTED TERMS PRESENTED BUT NOT BRIEFED OR ARGUED BY DEFENDANT

Plaintiff briefed a number of terms and phrases in its Supplemental Opening Claim Construction Brief that were not included in Defendant's brief. The terms and phrases included the following:

- "wherein the first configuration differs from the second configuration" ('841 Patent, Claim 1; '584 Patent, Claims 1 and 10);
- "new data blocks" ('282 Patent, Claims 1 and 15);
- "sector" ('282 Patent, Claims 1, 10, and 15);
- "multiple nodes" ('080 Patent, Claim 6);
- "distributed shared memory system" ('080 Patent, Claims 17 and 18); and
- "a plurality of predetermined time slots in a downlink frame, wherein other time slots of the downlink frame do not include a physical control channel" ('000 Patent Claim 13)

Defendant did not brief any of these terms, but instead provided a footnote for some of these terms stating that "[t]his term does not require construction at this time, but if IV applies it in a way that creates a dispute, American will raise that dispute when appropriate." *See, e.g.*, Dkt. No. 141 at 9, n.1. For others terms, Defendant did not even bother to provide a footnote.

After the briefing was completed, the parties identified these terms and phrases in their P.R. 4-5(d) Supplemental Joint Claim Construction Chart as disputed, and indicated that "[t]he parties discussed, but did not reach agreement, regarding dropping any terms identified in the Supplemental Joint Claim Construction Statement (Dkt. 124)." (Dkt. No. 146 at 2, n.2). As indicated during the July 8, 2026 hearing, the Court does not follow a wait-and-see approach. To the extent that Defendant later attempts to raise a claim construction dispute related to these terms and phrases, the Court finds that Defendant waived that argument. *Bettcher Indus., Inc. v. Bunzl USA, Inc.*, 661 F.3d 629, 640 (Fed. Cir. 2011) (affirming decision not to perform supplemental claim construction where court "issued a Markman order premised on the express belief that there were no other claim construction disputes"). Accordingly, the Court construes the terms and phrases as follows:

| Claim Term/Phrase | Agreed Construction |
|---|---|
| "wherein the first configuration differs from the second configuration"<br><br>('841 Patent: Claim 1)<br>('584 Patent: Claims 1, 10) | Plain and ordinary meaning, not indefinite. |
| "new data blocks"<br><br>('282 Patent: Claims 1, 15) | Plain and ordinary meaning. |
| "sector"<br><br>('282 Patent: Claims 1, 10, 15) | Plain and ordinary meaning. |
| "multiple nodes"<br><br>('080 Patent: Claim 6) | Plain and ordinary meaning. |
| "distributed shared memory system"<br><br>('080 Patent: Claims 17, 18) | Plain and ordinary meaning. |

| | |
|---|---|
| "a plurality of predetermined time slots in a downlink frame, wherein other time slots of the downlink frame do not include a physical control channel"<br><br>('000 Patent: Claim 13) | Plain and ordinary meaning, not indefinite. |

## VI. CONSTRUCTION OF DISPUTED TERMS

The parties dispute the meaning and scope of sixteen terms or phrases in the Asserted Patents. Each dispute is addressed below.

### A. "high performance [computing] cluster"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "high performance [computing] cluster" | Plain and ordinary meaning, not indefinite. | Indefinite. |

#### 1. Analysis

The term "high performance [computing] cluster" appears in Asserted Claim 9 of the '841 Patent, and Asserted Claims 1 and 10 of the '584 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The parties dispute whether the term "high performance [computing] cluster" is indefinite.

Defendant argues that "high" is a classic term of degree. (Dkt. No. 144 at 6). Defendant contends that the intrinsic record fails to state how a POSITA would distinguish a "high performance" cluster from a "medium" or "low" performance cluster, or an "average" or "poor" performance cluster. *Id.* at 10 (citing Dkt. No. 139-5 at ¶ 63). According to Defendant, the specification uses "high performance" as an undefined marketing label untethered to measurable attributes. (Dkt. No. 141 at 10) (citing '841 Patent at 1:32–2:18, 2:5–18, 5:1–11; '584 Patent at 2:12–25, 5:10–20; Dkt. No. 139-5 at ¶¶ 61, 63, 71).

Defendant further contends that the indefiniteness problem is compounded by the breadth of the underlying "cluster" concept. (Dkt. No. 141 at 11). Defendant argues that the same

architecture, running different workloads or configured with modest hardware upgrades, might be called "high performance" by one POSITA and not another. (Dkt. No. 141 at 11) (citing *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014)). According to Defendant, the specifications fail to provide an objective boundary as to what constitutes a "high" vs. "average" vs. "low" performance clusters. (Dkt. No. 144 at 7).

The Court disagrees with Defendant's analysis. The specification describes different cluster configurations, including High Performance Computing ("HPC") clusters. The specification contrasts HPC clusters with descriptions of load balancing clusters and high availability clusters. '841 Patent at 2:10–18. The specification further states that "HPC systems allow a set of computers to work together to solve a single problem. The large problem is broken down into smaller independent tasks that are assigned to individual computers in the cluster allowing the large problem to be solved faster." '841 Patent at 1:51–55. In other words, an HPC clusters "solve large problems that would take an inordinate amount of time to solve with a single computer." '841 Patent at 1:38–39.

The specification's subsequent recitations of HPC clusters are consistent with this description. *See, e.g.*, '841 Patent at 2:19–44, 3:4–25, 4:51–5:11, 10:3–12. Indeed, Plaintiff's expert, Dr. Eslamimehr, opines that "'high performance' refers to computing systems designed or configured to achieve high throughput, speed, and/or computational capability as compared to conventional systems, 'computing' refers to the execution of computational tasks and 'cluster' refers to a group of interconnected computers or computing nodes that operate together as a system." (Dkt. No. 139-3 at ¶ 95). Dr. Eslamimehr further opines that the phrase "high performance computing cluster" would be understood by a POSITA to mean a cluster of interconnected computing resources configured to perform computationally intensive tasks,

typically using parallel or distributed processing." *Id.* Thus, the evidence before the Court indicates that the term "high performance [computing] cluster" should be construed to mean "cluster of interconnected computing nodes configured to use parallel processing to solve large problems faster than a single computer."

In summary, the thrust of Defendant's argument is that the claims are ambiguous because it is not clear whether the claims read on the accused products. But definiteness "does not require that a potential infringer be able to determine *ex ante* if a particular act infringes." *Nevro Corp. v. Bos. Sci. Corp.*, 955 F.3d 35, 40 (Fed. Cir. 2020);*see also SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1340-41 (Fed. Cir. 2005) ("The test for indefiniteness does not depend on a potential infringer's ability to ascertain the nature of its own accused product to determine infringement, but instead on whether the claim delineates to a skilled artisan the bounds of the invention."). Accordingly, the Court finds that Defendant failed to prove by clear and convincing evidence that the term is indefinite.

**2. Court's Construction**

For the reasons set forth above, the Court construes the term **"high performance [computing] cluster"** to mean **"cluster of interconnected computing nodes configured to use parallel processing to solve large problems faster than a single computer."**

**B. "operational and[/or] connectivity problems" / "hardware and[/or] software problems"**

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "operational and[/or] connectivity problems" | Plain and ordinary meaning, not indefinite. | Indefinite. |
| "hardware and[/or] software problems" | Plain and ordinary meaning, not indefinite. | Indefinite. |

**1. Analysis**

The term "operational and[/or] connectivity problems" appears in Asserted Claim 1 of the

’841 Patent, and Asserted Claims 5 and 6 of the ’584 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The term “hardware and[/or] software problems” appears in Asserted Claim 1 of the ’841 Patent, and Asserted Claim 6 of the ’584 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The parties dispute whether the terms are indefinite.

Defendant argues that both sets of terms are indefinite because the shared specification does not provide objective boundaries for what counts as a “problem.” (Dkt. No. 141 at 11-12). Defendant contends that the specification only describes what happens *after* a “problem” is detected. *Id.* at 12 (citing ’841 Patent at 3:26–31, 8:27–9:6). According to Defendant, the specifications never gives an example, threshold, or metric for what qualifies as a “problem.” (Dkt. No. 141 at 12). Defendant contends that POSITAs could disagree about whether the same cluster behavior is a “problem” or normal operation and nothing in the specification resolves that disagreement. *Id.* at 13. Defendant argues that “problems” is no less subjective than “aesthetically pleasing” or “significant.” *Id.* at 5 (citing *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005); *Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372 (Fed. Cir. 2018)).

The Court finds Defendant’s analysis lacking, because it attempts to consider the term “problem” in isolation. *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) (“We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history.”). When considered in the proper context, the terms “operational and/or connectivity problems” and “hardware and/or software problems” are neither purely subjective nor dependent on personal

opinion. The specifications identify Intelligent Platform Management Interface ("IPMI") as a per-node monitoring mechanism that "monitors the hardware and software components," and Simple Network Management Protocol ("SNMP") as a mechanism that "operate to notify the central monitoring system … of the problem." '841 Patent at 7:43–52; 8:36–48. The specification further states that "[t]he clients have the option of having additional monitoring components on each node to monitor additional components as requested by the client." '841 Patent at 9:2–4. Thus, Defendant's argument that the scope of a type of "problem" cannot be reasonably determined by a POSITA is contradicted by the specification, which anchor the claim terms to industry protocols.

More importantly, the Asserted Claims of the '841 Patent and '584 Patent recite that the monitoring system identifies operational and connectivity problems, and issues "an alert in response to the identified [operational or connectivity] problems." '841 Patent at Claim 1; '584 Patent at Claim 5. Similarly, the Asserted Claims recite that the monitoring system monitors each node to check for hardware and software problems within a particular node, and reports the hardware and software problems to the main monitor. '841 Patent at Claim 1, '584 Patent at Claim 6. Thus, the scope of "problems" is limited by the surrounding claim language, which requires identifying the problem and sending an alert or a report of the problem. In other words, the claim are not required to specify a "level" of the problems, because that may differ from one organization to another. '841 Patent at 6:24–7:8. Instead, the system will be preconfigured to the level specified by the client or the staff of the hosting facility. Otherwise, the system would not provide "a customized computing environment for performing particular client tasks." '841 Patent at Abstract.

To be sure, a POSITA would have understood that operational "problems" are issues affecting cluster operations, for example execution failures and performance degradation. '841

Patent at 3:26–29; *see also* Dkt. No. 139-3 at ¶ 48. Similarly, the specification describes "connectivity" as relating to the ability of clusters to communicate using connections over a network. '841 Patent at 1:19-22, 5:12–26; *see also* Dkt. No. 139-3 at ¶¶ 48, 55-56. A POSITA would have thus understood that connectivity "problems" relate to issues affecting cluster network communications, for example loss of network availability, communication failures, and network connectivity interruptions. '841 Patent at 5:12–26, 7:43–52; *see also* Dkt. No. 139-3 at ¶ 48.

Likewise, a POSITA would have understood that hardware "problems" refer to problems arising from malfunction or failure of physical components of a computing node, such as processor faults, memory errors, storage device failures, and other similar problems. '841 Patent at 7:43–50; *see also* Dkt. No. 139-3 at ¶ 64. Similarly, a POSITA would have understood that software "problems" refer to problems arising from malfunction or failure of software executing on a node, such as software crashes, execution errors, misconfiguration, or other failures in software operation. '841 Patent at 7:43–50; *see also* Dkt. No. 139-3 at ¶ 65. The threshold or metric for what qualifies as a "problem" would be preconfigured by the system based on the client needs, and this configuration would allow a POSITA to determine the scope of the disputed terms. Accordingly, the Court finds that Defendant failed to prove by clear and convincing evidence that the terms are indefinite.

#### 2. Court's Construction

The Court finds that the term **"operational and[/or] connectivity problems,"** and the term **"hardware and[/or] software problems"** are not indefinite, and are given their **plain and ordinary meaning**.

### C. "communications within the first and second clusters are isolated" / "communications between the first [HPC] cluster and the second [HPC] cluster are isolated"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "communications within the first and second clusters are isolated" | Plain and ordinary meaning. | "network traffic within each cluster is maintained separate from other clusters by a gateway positioned between the private cluster network and the private company network that manages traffic destined for its corresponding cluster" |
| "communications between the first [HPC] cluster and the second [HPC] cluster are isolated" | Plain and ordinary meaning. | "network traffic within each cluster is maintained separate from other clusters by a gateway positioned between the private cluster network and the private company network that manages traffic destined for its corresponding cluster" |

**1. Analysis**

The phrase "communications within the first and second clusters are isolated" appears in Asserted Claim 8 of the '841 Patent. The phrase "communications between the first [HPC] cluster and the second [HPC] cluster are isolated" appears in Asserted Claims 1 and 10 of the '584 Patent. The parties dispute whether the phrases require construction. Plaintiff argues that Defendant's construction are wrong for a plethora of reasons. (Dkt. No. 139 at 11). Plaintiff also argues that the claim language does not recite any specific structure that isolates communications "within the first and second clusters." *Id.* According to Plaintiff, the specification recites other potential components that may be involved with isolating communications within clusters. *Id.*

The Court agrees that other components may be involved in isolating. However, the intrinsic evidence ties "isolation," at a minimum, to gateway-based segregation. For example, the specification states that "[g]ateway mechanisms isolate each cluster such that communications within a cluster or on a private cluster communications network are maintained separate (*e.g.*, do not have to share bandwidth of a single system network)." '841 Patent at Abstract, *see also id.* at 3:43–47. The specification further states that gateway 240 provides "efficient separation of the individual cluster network traffic to prevent one cluster from interfering with other clusters." '841

Patent at 5:27–36. Thus, the recited "communications … are isolated" language refers to this gateway-based separation described in the specification. A POSITA would understand that clusters are not isolated from all external communication; rather gateway mechanisms maintain separation so clusters do not interfere with one another. (*See* Dkt. No. 139-5 at ¶¶ 55–57). Accordingly, the recited isolation is achieved by at least the recited gateway mechanism or gateway.

Plaintiff also argues that Claim 8 recites a "gateway mechanism" that has a different and broader meaning than a "gateway." The Court finds that the specification uses the terms "gateway mechanism" and "gateway" interchangeably. For example, the specification states that "*[g]ateway mechanism* isolate each cluster such that communications within a cluster or on a private cluster communications network are maintained separate." '584 Patent at Abstract (emphasis added). Similarly, the specification states that "[t]he embodiment shown with system 200 provides efficient separation of the individual cluster network traffic to prevent one cluster from interfering with other clusters. The traffic separation is achieved through *the gateway 240, 241, and/or 242* located between each cluster 250, 251, and 252 and the company network 230." *Id.* at 5:37–42 (emphasis added). As discussed above, this indicates that the recited isolation is achieved by at least the recited gateway mechanism or gateway.

Plaintiff further argues that the claims do not recite a "private company network." (Dkt. No. 139 at 11). The Court agrees that this language is improper. The claim language explicitly recites the location of the recited gateway mechanism or gateway. Claim 8 of the '841 Patent recites that the gateway mechanism is "positioned between the private cluster network and the private communications network." Likewise, Claims 1 and 10 of the '584 Patent recite that the first gateway is "communicatively linked between the first cluster and the private communications

network," and the second gateway is "communicatively linked between the second cluster and the private communications network." Accordingly, it would be improper to read into the claims an unrecited "private company network."

Finally, Plaintiff contends that the disputed terms in the '584 Patent recite communications "between" the first and second clusters, whereas the similar term in Claim 1 of the '841 Patent recites communications "within" the recited clusters of that claim. (Dkt. No. 139 at 13). Plaintiff argues that these terms are different in scope, but Defendant proposes the same construction for both terms. *Id.* The Court finds that the difference is whether the claim focuses on intra-cluster traffic ('841 Patent, Claim 8) or inter-cluster traffic ('584 Patent, Claims 1 and 10). Regardless, the intrinsic evidence indicates that the recited isolation is achieved by at least the recited gateway mechanism or gateway.

#### 2. Court's Construction

For the reasons set forth above, the Court construes the phrase **"communications within the first and second clusters are isolated"** to mean **"communications within the first and second clusters are isolated by at least the gateway mechanism."** The Court construes the phrase **"communications between the first [HPC] cluster and the second [HPC] cluster are isolated"** to mean **"communications between the first [HPC] cluster and the second [HPC] cluster are isolated by at least the respective gateway."**

### D. "appropriate persistent mapping"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "appropriate persistent mapping" | Plain and ordinary meaning, no construction necessary. | Indefinite. |

#### 1. Analysis

The term "appropriate persistent mapping" appears in Asserted Claims 1 and 15 of the '282

Patent. The parties dispute whether the term is indefinite. Defendant argues that the '282 Patent does not provide objective boundaries for what makes a mapping "appropriate persistent." (Dkt. No. 141 at 18) (citing Dkt. No. 139-5 at ¶¶ 108–113). Defendant contends "appropriate" is a term of degree, and the specification never supplies the degree. (Dkt. No. 141 at 19). According to Defendant, a POSITA would recognize multiple reasonable mapping strategies, and the intrinsic record provides no thresholds, correctness conditions, or algorithmic constraints separating "appropriate" and inappropriate mappings. *Id.* (citing Dkt. No. 139-5 at ¶ 110). Defendant argues that one engineer might deem a particular mapping approach "appropriate," another might not, and the patent gives no way to choose between them. (Dkt. No. 141 at 19). Defendant contends that the term leaves infringement to subjective judgment rather than objective boundaries. *Id.* (citing *Datamize,* 417 F.3d at 1350–51). Defendant argues that there is no intrinsic boundary between infringing ("appropriate") and non-infringing ("inappropriate") implementations. (Dkt. No. 141 at 20).

Plaintiff argues that in the context of Claims 1 and 15, a "mapping" refers to an association between the sector specified by the write request and a particular storage location, such that read and write operations for that sector are directed to the appropriate storage unit, and a "persistent" mapping refers to one that is maintained so that subsequent accesses to the same sector continue to be directed to the same storage location. (Dkt. No. 139) (citing Dkt. No. 139-3 at ¶¶ 180-181; '282 Patent at 5:3–11). Plaintiff further argues that the language "appropriate" does not render this claim indefinite because it reflects that the mapping created depends on the state of the system. (Dkt. No. 139 at 19). Specifically, Plaintiff contends that "appropriate" indicates whether the sector is already stored in the leaf image or must be newly mapped from the root image before modification. *Id.* (citing Dkt. No. 139-3 at ¶¶ 184-186; '282 Patent at 5:1–11). In other words, "if

sector X is not yet recorded in the leaf image, the UBD creates a new mapping redirecting that sector's writes to the second storage unit; if sector X already exists in the leaf image, no new mapping is needed because the persistent mapping already exists." (Dkt. No. 142 at 12).

The Court agrees that a POSITA would understand that "mapping" refers to an association between the sector specified by the write request and a particular storage location, such that read and write operations for that sector are directed to a storage unit. (Dkt. No. 139-3 at ¶ 181). Likewise, a POSITA would understand that "persistent" mapping refers to one that is maintained so that subsequent accesses to the same sector continue to be directed to the same storage location. (139-3 at ¶ 181). The Court further agrees that the specification discloses an embodiment that "upon receiving a write request from their respective compute nodes for a sector X, the UBDs 130 a-n will create an appropriate persistent mapping for sector X and then write sector X onto their respective second storage units 150 a-n, where sector X can then be modified." '282 at 5:3–7.

However, in the context of the claim language, this embodiment fails to inform those skilled in the art about the scope of the invention with reasonable certainty, because Claims 1 and 15 do not require a "new mapping if necessary." Instead, the claim language requires an "appropriate" mapping with no guidance as to what the term "appropriate" means. The specification does not tell a POSITA when or how a mapping is "appropriate," and fails to provide boundaries distinguishing an "appropriate" mapping from an "inappropriate" one.

The Court agrees with Defendant that different people consider different things "appropriate" or "inappropriate," which makes the term "completely dependent on a person's subjective opinion." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005). Accordingly, Defendant proved by clear and convincing evidence that the term "appropriate" is indefinite, because the specification does not provide objective criteria for what

makes a mapping "appropriate."

### 2. Court's Construction

The term **"appropriate persistent mapping"** is indefinite for failing to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

## E. "low-level driver"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "low-level driver" | Plain and ordinary meaning, no construction necessary. | "driver that operates below the file system" |

### 1. Analysis

The term "low-level driver" appears in Asserted Claim 1 of the '282 Patent. The parties dispute whether the term "low-level driver" requires construction. Claim 1 recites in part "the union block device comprises *a low-level driver* for interfacing between the first and second storage units and the file system of the compute node." As recited in Claim 1, the recited "driver" provides an interface between the storage units and the file system and managing write operations directed to specific storage locations.

By using the specific phrase "low-level driver" instead of just "driver," the patentees intended to define the layer at which the driver operates as part of the claim. The specification states that the UBDs are "effectively low-level drivers" that interface between the storage devices and the file system, and that "[b]ecause UBDs 130a–n *operate below the file system*, they are concerned merely with the blocks of data themselves, rather than files they form." '282 Patent at 4:42–51 (emphasis added). This informs a POSITA that a "low-level driver" is a driver that operates beneath the file system that handles blocks and sectors while the file system manages files. (*See* Dkt. No. 139-5 at ¶¶ 119–121).

Plaintiff argues that "operate below the file system" describes only one embodiment. (Dkt.

No. 139 at 20). The Court disagrees, because the specification's use of "low-level driver" equates it with operation below the file system, and the claim repeats that same role. '282 Patent at 4:42–51, 7:32–34. There is no disclosure of a "low-level driver" that sits at or above the file-system layer, nor any disclosure of a driver at another layer labeled "low-level." (*See* Dkt. No. 139-5 at ¶¶ 119–120). Plaintiff would have the Court ignore the "below the file system" language in the specification and read to the term "low-level" out of the claims. This would be improper. *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim."). Accordingly, the Court finds that the term "low-level driver" should be construed to mean "driver that operates below the file system."

### 2. Court's Construction

For the reasons set forth above, the Court construes the term **"low-level driver"** to mean **"driver that operates below the file system."**

### F. "root image"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
| --- | --- | --- |
| "root image" | Plain and ordinary meaning, no construction necessary. | "a read-only base set of data blocks, operating beneath the file system, that provide the common portion of the application environment" |

### 1. Analysis

The term "root image" appears in Asserted Claims 1, 4, 5, 15, 17, 20, and 21 of the '282 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The parties dispute whether the term "root image" requires construction. The Court previously construed "root image" as recited in certain claims of U.S. Patent No. 8,332,844 (the "'844 Patent") as "a common set of data blocks unchanged by the plurality of compute nodes." The '844 Patent, is a continuation-in-part of the '282 Patent, and the

parties agree that the term carries a consistent meaning across the patent family. (Dkt. No. 141 at 21) (citing *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005)).

Like the ’844 Patent, the ’282 Patent discloses storing data blocks of a root image on a first storage unit and storing data blocks of leaf images on a second storage unit, where the leaf image includes additional data blocks that are not contained in the root image, including changes made to the blocks of the root image. ’282 Patent at Abstract. The specification states that “[t]he leaf image may contain blocks of new data, blocks of changed data, or other blocks of data unique to the individual compute node.” *Id.* at 4:22–24. The specification further states that “[t]he root image contains data initially common to the compute nodes 120a-n,” and “[t]he root image is not changed by compute nodes 120a-n.” *Id.* at 4:12–14. Thus, the commonality of the root image addressed the “major problem” with the prior art of having to update “a number of copies of the boot image.” *Id.* at 1:54–57.

These aspects of the disclosure are generally captured in the language of independent Claims 1 and 15. Claims 1 and 15 recite, in part, “storing blocks of a root image of the compute node,” and “storing a leaf image” where the leaf image comprises “new data blocks and changes to the blocks of the root image.” ’282 Patent at 7:14–24, 8:5–15. Per the claim language, a root image includes blocks of data, and any changes to those blocks are stored in the leaf image. Accordingly, a “root image” is “a common set of data blocks that are unchanged by the plurality of compute nodes.”

Defendant argues that the specification expressly characterizes the root image as “a read-only base image (or ‘root’ image) of the application environment” that is “accessible by all compute nodes in the cluster,” with changes stored in a “‘leaf’ image unique to that compute node.” (Dkt. No. 141 at 22) (citing ’282 Patent at 1:62–67). Defendant contends that the specification

equates the "root image" with a "read-only base image," and does so in definitional, not merely descriptive, language. (Dkt. No. 141 at 23) (citing *Cultor Corp. v. A.E. Staley Mfg. Co.*, 224 F.3d 1328, 1331 (Fed. Cir. 2000)).

Defendant argues that if compute nodes could modify the root image blocks directly, the entire root/leaf overlay scheme would lose its storage benefits and coherence guarantees. (Dkt. No. 141 at 22) (citing Dkt. No. 39-5 at ¶ 99). The Court agrees that the intrinsic evidence indicates that the commonality of the root image is the claimed system. However, as discussed above, this is captured in the claim language and the Court's construction. Defendant did not provide a persuasive reason to explicitly redraft the claims to include a "read-only" limitation. *See Lionra Technologies Ltd. v. Cisco Systems, Inc.*, No. 2:24-CV-00097-JRG, 2025 WL 1384261, at *3 (E.D. Tex. May 13, 2025) ("To act as his own lexicographer, the patentee must 'clearly set forth a definition of the disputed claim term,' and 'clearly express an intent to define the term.'") (quoting *GE Lighting Sols.*, 750 F.3d at 1309). Indeed, Claims 13 and 29 recite that it is the "first storage unit" that is read-only. Thus, when the patentees wanted to recite "read-only," they explicitly did so in the claims.

Defendant next argues that the specification teaches that "by storing data at the block level, embodiments are able to operate beneath the file system and thus are designed to be file system and operating system independent." (Dkt. No. 141 at 22) (citing '282 Patent at 5:65–6:2). According to Defendant, a POSITA would understand that the blocks of the root image necessarily operate beneath the file system. (Dkt. No. 141 at 22) (citing Dkt. No. 39-5 at ¶¶ 95–98).

The Court finds that Defendant's construction improperly incorporates one embodiment. Specifically, the disclosure at column 5, line 65 to column 6, line 2 describes an embodiment shown in Figure 3, and recites step 310 "is storing blocks of a root image of the compute node on

a first storage unit. By storing data at the block level, *embodiments are able to operate beneath the file system and thus are designed to be file system and operating system independent.*" '282 Patent at 5:65–6:2 (emphasis added).

Notably, this specification indicates that this embodiment is *able* to operate at a layer beneath the file system, not that it must do so. Claims 1 and 15 recite that blocks of data are stored, it does not require "operating beneath the file system." This would introduce an unwarranted limitation in the "root image" term. Defendant's argument that the root image must be characterized as operating beneath the file system because of the UBD improperly conflates two distinct elements: the UBD (a driver/interface component) and the root image (a set of data blocks stored on a first storage unit). As discussed above, the disputed term "low-level driver" defines the layer at which the driver operates.

Finally, regarding Defendant's "common portion of the application environment" proposal, the Court rejects it. The specification does not recite "common" and "portion" in combination. As recited in Claims 1 and 15, a root image includes blocks of data, and changes to those blocks are stored in the leaf image. Accordingly, a "root image" is "a common set of data blocks unchanged by the plurality of compute nodes."

#### 2. Court's Construction

For the reasons set forth above, the Court construes the term **"root image"** to mean **"a common set of data blocks that are unchanged by the plurality of compute nodes."**

### G. "the modifying"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "the modifying" | Plain and ordinary meaning, not indefinite. | Indefinite. |

#### 1. Analysis

The term "the modifying" appears in Asserted Claim 15 of the '282 Patent. The parties

dispute whether Claim 15 is indefinite because "the modifying" lacks antecedent basis. As shown below, the disputed claim language originally appeared as dependent Claim 19 during prosecution.[4] Claim 19 depended on dependent Claim 18, which depended on independent Claim 17 (Final Claim 15). Dependent Claim 18 provided antecedent basis for "the modifying" in dependent Claim 19.

> 17. (Currently amended) A method for distributing an application environment ~~to a compute node~~ comprising:
>
> storing blocks of a root image of a[[the]] compute node on a first storage unit, wherein the compute node comprises a computer system, and wherein the first storage unit comprises a first non-volatile memory, wherein the root image comprises a computer program, wherein the blocks comprise sections of data, and wherein a file of the root image comprises at least one block;
>
> storing a leaf image comprising new data blocks and changes to the blocks of the root image on a second storage unit, wherein the second storage unit comprises a second non-volatile memory;
>
> merging the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit to create the application environment; and
>
> delivering the application environment to the compute node.
>
> 18. (Original) The method as recited in Claim 17 further comprising:
>
> modifying the leaf image in response to the compute node's access to the application environment.
>
> 19. (Original) The method as recited in Claim 18 wherein the modifying comprises:
>
> upon receiving a write request from the compute node for a sector X, creating an appropriate persistent mapping for sector X; and
>
> writing sector X on the second storage unit.

Court Exhibit A at 12 (highlight added). In the Notice of Allowance, the examiner amended independent Claim 17 by bringing up dependent Claim 19 into Claim 17, but did not bring up

[4] The Court finds that certain documents in the prosecution history of the '282 Patent provide insight into the parties' dispute. Accordingly, as indicated during the claim construction hearing, the Court takes judicial notice of relevant documents from the prosecution history, which can be found at https://patentcenter.uspto.gov/. The relevant documents are entered with this Order as Court Exhibit A, and citations to this exhibit are to the page numbers assigned through ECF.

Claim 18. Thus, it was the examiner's amendment in the Notice of Allowance that created the lack of antecedent basis for the term "the modifying."

Application/Control Number: 11/395,816 Page 2
Art Unit: 2191

**EXAMINER'S AMENDMENT**

An examiner's amendment to the record appears below. Should the changes and/or additions be unacceptable to applicant, an amendment may be filed as provided by 37 CFR 1.312. To ensure consideration of such an amendment, it MUST be submitted no later than the payment of the issue fee.

Authorization for this examiner's amendment was given in a telephone interview with Jeffery Lehman registration no. 65,494 on 1/11/10.

The application has been amended as follows:

**In Claims**

**Claim 17**

Last line, after node delete - - , - -

Last line, after node insert - - ; wherein the modifying comprises: upon receiving a write request from the compute node for a sector X, creating an appropriate persistent mapping for sector X; and writing sector X on the second storage unit.

Court Exhibit A at 6-7 (highlight added). With this background, the Court turns to the parties' dispute.

Claim 15 recites in part "the modifying comprises: upon receiving a write request from the compute node for a sector X, creating an appropriate persistent mapping for sector X; and writing sector X on the second storage unit." In other words, upon receiving a write request for a sector X, an appropriate persistent mapping for sector X is created and sector X on the second storage unit is written to. Thus, the "modifying" unambiguously refers to modifying the second storage unit based on the received write request. (Dkt. No. 139-3 at ¶¶ 205-207). This understanding is consistent with the specification, which discloses modifying the leaf image's storage unit by

writing to a sector X in response to a write request for sector X:

> UBDs 130a-n may also *modify the leaf image* in response to their respective compute node's access to its instance of the application environment. For example, *upon receiving a write request from their respective compute nodes for a sector X, the UBDs 130a-n will create an appropriate persistent mapping for sector X and then write sector X onto their respective second storage units 150a-n, where sector X can then be modified*. It will be appreciated that the data block being modified may already exist in the leaf image, in which case it does not need to be mapped and copied from the root image before modification.

'282 Patent at 5:1–11 (emphasis added). It is not disputed that the term lacks antecedent basis, but a claim term with an antecedent basis error is still valid when it provides reasonable certainty to persons of ordinary skill in the art. *See Cheetah Omni LLC v. Alcatel-Lucent Inc.,* 939 F.Supp.2d 649 (E.D. Tex. 2013) (finding claims were not indefinite despite lacking explicit antecedent basis because a term had "reasonably ascertainable meaning" and "an antecedent basis may be present by implication."). As discussed, the specification and prosecution history is consistent with the language in Claim 15, and a POSITA would have understood with reasonable certainty the meaning of this limitation given the intrinsic evidence. (Dkt. No. 139-3 at ¶ 211). Accordingly, Defendant failed to prove by clear and convincing evidence that the term is indefinite.

**2. Court's Construction**

The Court finds that the term **"the modifying"** is not indefinite, and is given its **plain and ordinary meaning**.

**H. "at an operational level"**

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "at an operational level" | Plain and ordinary meaning, not indefinite. | Indefinite. |

**1. Analysis**

The term "at an operational level" appears in Asserted Claim 26 of the '282 Patent. The

parties dispute whether the term "at an operational level" is indefinite. Claim 26 recites "wherein merging occurs at an operational level between the first and second storage units and file system of the compute node." '282 Patent at 8:51–53. The word "operational" is not in the specification. Defendant argues that a POSITA would have no guidance on whether "operational level" refers to block level versus file-system-level operation, kernel-mode versus user-mode execution, or some other abstraction. (Dkt. No. 141 at 25) (citing Dkt. No. 139-5 at ¶¶ 131–132). The Court agrees.

Plaintiff suggests that "operational" refers to the system's functioning during normal use. (Dkt. No. 139 at 22) (citing Dkt. No. 139-3 at ¶¶ 212-214). Plaintiff's argument does not distinguish any particular technical layer and collapses into a vague statement that the system works. The specification discusses low-level drivers operating below the file system, but it never equates "operational level" with any layer. '282 Patent at 4:42–51. Indeed, Plaintiff does not argue for that understanding, but instead argues "operational" refers to the system's functioning during normal use. (Dkt. No. 139 at 22). This does not provide an objective boundary for the term "at an operational level." Thus, the term "might mean several different things and no informed and confident choice is available among the contending definitions." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) (internal citations omitted). Accordingly, Defendant proved by clear and convincing evidence that the term "at an operational level" is indefinite,

**2. Court's Construction**

The term **"at an operational level"** is indefinite for failing to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

**I. "distributed parallel computing program"**

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "distributed parallel computing program" | Plain and ordinary meaning, not indefinite. | "program that computes using multiple concurrent distributed sequential computing programs configured to operate across multiple processors/nodes and multiple memories" |

**1. Analysis**

The term "distributed parallel computing program" appears in Asserted Claims 1, 4, 5, 6, 9, 17, and 18 of the '080 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The parties dispute whether the term "distributed parallel computing program" requires construction.

Claim 1 is directed to "[a] method of developing a distributed parallel computing program." The claim recites that a distributed parallel computing program is created by "transforming the at least one distributed sequential computing program into at least one distributed parallel computing program by spawning at least one child distributed sequential computing program from the at least one distributed sequential computing program." '080 Patent at 11:14–18. The specification further provides the meaning of the term "distributed parallel computing program." Specifically, the specification states that "[a]nother aspect of navigational programming is distributed parallel computing ('DPC'), *which is* computing using multiple concurrent DSC programs." '080 at 5:57–59 (emphasis added).

A POSITA would understand this to be the patentees' intended meaning for the term "distributed parallel computing program." Indeed, Plaintiff's expert opines that this "description is consistent with the ordinary technical meaning of distributed parallel computing because it focuses on concurrency and parallel execution through the composition of distributed sequential programs." (Dkt. No. 139-3 at ¶ 224).

Likewise, Defendant agrees that patentees defined the term "distributed parallel computing" as "computing using multiple concurrent DSC programs." (Dkt. No. 141 at 27) (citing '080 Patent at 5:58–59). Accordingly, the Court construes the term "distributed parallel computing program" to mean "program that computes using multiple concurrent distributed sequential computing programs."

Defendant further attempts to equate "distributed parallel computing" and "parallel distributed program," without explain how the terms are synonymous. (Dkt. No. 141 at 27) (citing Dkt. No. 139-9 at ¶ 53). Defendant argues that the patentees defined the term "parallel distributed program" in the specification as "a software application for operation on multiple processors that uses multiple memory areas may be more complex." (Dkt. No. 141 at 27) (citing '080 Patent at 1:25–30, 2:10–12).

The Court agrees that this indicates how the patentees understood the term "parallel distributed program," but disagrees that the patentees used the terms "distributed parallel computing" and "parallel distributed program" synonymously. In fact, the specification states that distributed parallel programs may operate in environments involving multiple processors, nodes, and memories, but does not state that every distributed parallel computing program must operate across each of those resources. '080 Patent at 2:10–12 ("Generally a parallel distributed program includes at least one distributed shared variable located across multiple memories and one or more distributed programs configured to operate across multiple processor"). Moreover, the specification expressly discloses that the execution environment of a DPC application may vary. In particular, it states that "a DPC application targeted to multi-processor environments may be utilized on a uni-processor and operates as a multi-threaded application." '080 Patent at 6:1–4; *see also* Dkt. No. 139-3 at ¶ 227.

A POSITA would understand that this disclosure demonstrates that a distributed parallel computing program is not limited to execution across multiple processors or multiple nodes. (Dkt. No. 139-3 at ¶ 228). In other words, the specification discloses that the same DPC program may be deployed in different environments and still operate as a parallel application through multi-threaded execution. Accordingly, the Court rejects this portion of Defendant's construction.

**2. Court's Construction**

For the reasons set forth above, the Court construes the term **"distributed parallel computing program"** to mean **"program that computes using multiple concurrent distributed sequential computing programs."**

**J. "time interval" / "time intervals"**

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "time interval" / "time intervals" | Plain and ordinary meaning. | "time slot" and "time slots" |

**1. Analysis**

The term "time interval" / "time intervals" appears in Asserted Claims 1, 6, and 13 of the '000 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. Defendant argues that Plaintiff clearly and unmistakably told the patent office that "time interval" is synonymous with "time slot," in an IPR proceeding for the '000 Patent's grandparent (U.S. Patent No. 8,811,356, the "'356 Patent"). (Dkt. No. 141 at 31-32) (citing Dkt. No. 141-4 at 15). Defendant contends that Plaintiff should be held to that express disclaimer. (Dkt. No. 141 at 33).

Defendant further argues that the '000 Patent itself confirms that "time interval" should be construed as "time slot." *Id.* (citing Dkt. No. 139-14 at ¶ 39). Defendant contends that the term "time interval" appears only in the '000 Patent's abstract and claims, not in its specification. (Dkt. No. 141 at 33). According to Defendant, the UE is configured to send the uplink physical signal

(*i.e.*, UL_Beacon) and data at different time intervals, reflecting the claims' use of "time interval." *Id.* (citing '000 Patent at 2:37–39, 5:28–32).

The Court agrees that the intrinsic record indicates that the terms "time interval" and "time slot" are used synonymously. Defendant correctly argues that the '000 Patent shares a specification with its grandparent '356 Patent, and the claims of both patents use "time interval" in similar limitations. Both patents claim a UE with a processor configured to send data "in assigned time intervals" and send uplink physical signals "in a time interval that it is not sending information over the physical uplink shared channel." '000 Patent at Claim 1; '356 Patent at Claim 1. Thus, Plaintiff's statements in the '356 Patent prosecution history "appl[y] with equal force" to the '000 Patent. *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999) ("When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation."); *see also LT v. Bright Data Ltd.*, No. 2:22-cv-011-JRG-RSP, 2022 U.S. Dist. LEXIS 236653, at *3 (E.D. Tex. Dec. 19, 2022), report and recommendation adopted, 2023 U.S. Dist. LEXIS 12791 ("The prosecution history also includes . . . inter partes review") (citing *Aylus Networks, Inc. v. Apple, Inc.*, 856 F.3d 1353, 1362 n.3 (Fed. Cir. 2017)) (other internal citation and quotation omitted).

However, when considered in the proper context, the Court disagrees that Plaintiff limited the terms "time interval" or "time slot" to a single time slot in a single frame, as Defendant appears to contend. Specifically, the claim language at issue in the IPR was "the processor is further configured, in a time interval that it is not sending information over the physical uplink shared channel, to send a signal over the uplink physical control channel." (Dkt. No. 141-4 at 14). Plaintiff argued that "[i]n the context of the '356 Patent, the recited 'interval' is the period of time *between*

*transmissions* over the physical uplink shared channel." *Id.* (emphasis added).

Plaintiff further argued that "[t]he specification is replete with statements that the timeslot used by the UE for the UL-Beacon is interposed in a frame structure between data time slots." *Id.* at 15) (citing '356 Patent at 2:29–33, 3:9–11, 5:15–19, 5:32–45, 5:50–6:4, 6:22–24). Plaintiff contended that "Petitioners – as well as their expert Dr. Akl -- recognize that, in the '356 Patent, the uplink control signal (UL-Beacon) is interposed in the same frame with timeslots used by the UE for data." (Dkt. No. 141-4 at 17).

However, Plaintiff also argued that the Petitioner "construes these limitations as -- control information is sent when a UE joins the network, and data is sent later during operation of the channel." *Id.* at 18. Plaintiff contended that "[s]uch a reading has nothing to do with the problem posed by the '356 Patent." *Id.* Thus, Plaintiff did not clearly and unambiguously argue that the terms "time interval" or "time slot" are limited a single time slot in a single frame. *DDR Holdings, LLC v. Hotels.com, L.P.*, No. 2:06–CV–42–JRG, 2012 WL 4742809, at *4 (E.D. Tex. Oct. 3, 2012) (holding that, "[w]hile the isolated statements made by DDR before the USPTO initially appear to support Digital River's arguments for prosecution history estoppel, Digital River's arguments lose much of their persuasive force when read within the full context of the reexamination file," which showed that the patent holder was "la[ying] out a different premise to overcome" the specific reference at issue).

Indeed, Plaintiff correctly argues that the '000 Patent specification discloses multiple embodiments relevant to understanding the term "time interval" that demonstrate flexibility in how uplink transmission opportunities are allocated. (Dkt. No. 139 at 29). In Figure 2, the uplink beacon is transmitted within a single time slot. *See* '000 Patent at 6:3–6 ("The uplink frame comprises a UL_Beacon control timeslot 216"); *see also* Dkt. No. 139-13 at 45:12-47:8, 59:1-9.




FIG. 2

'000 Patent at Figure 2 (showing the UL-Beacon transmitted within a time slot) (highlight added). Defendant's argument appears to focus on this embodiment. Even if this was the only embodiment, there are no disclaimers or disavowals in the specification that would serve to limit this one embodiment to define the broader term "time interval." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1328 (Fed. Cir. 2002) (holding absent lexicographic definition or disclaimer "We have 'cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification.'") (citation omitted).

More importantly, this is not a single embodiment case. In the second embodiment (Figure 3), the specification describes a "fractionation" approach in which the same UL_Beacon timeslot is reused across different frames with different UEs transmitting in different frames. *See* '000 Patent at 6:7 ("Figure 3 illustrates the case where the fractionation phase is 3" explaining that terminals 1, 2, and 3 occur in different frames).




FIG. 3

'000 Patent at Figure 3. Finally, in the third embodiment, instead of reusing a single slot across frames, the system provides multiple UL_Beacon slots within the same frame. '000 Patent at 5:44–50 ("Those skilled in the art will recognize that there are a large number of possibilities for the arrangement of a UL_Beacon and its associated PLCCH within the frame structure according to embodiments of the invention. More than one UL_Beacon and PLCCH per frame could be supported if the feedback update rate is required to be faster than the frame rate (at the expense of system capacity"), 6:35–37; ("In particular, this may also apply for the case where there are more than one UL_Beacon timeslot per, frame.")

Thus, the specification discloses different approaches to allocating uplink beacon resources, including (1) using a single time slot, (2) "fractionating" that slot across multiple frames so different UEs transmit at different times, and (3) providing multiple beacon time slots within a single frame to accommodate additional UEs. These distinct embodiments demonstrate that the

claimed "time interval" is not limited to a single time slot in a single frame as Defendant argues is required by the '000 Patent specification. Contrary to Defendant's argument, the specification describes a flexible temporal framework, not a rigid one-timeslot-per-transmission structure. Accordingly, to the extent that Defendant contends that the terms "time interval" or "time slot" are limited to a single time slot in a single frame, the Court rejects that argument. As recited in the claims, the "interval" or "slot" is when the UE is not sending or receiving information over the physical uplink shared channel.

### 2. Court's Construction

For the reasons set forth above, the Court construes the term **"time interval" / "time intervals"** to mean **"time slot within a frame."**

## K. "a processor" / "the processor"; "a receiver" / "the receiver"; "a transmitter" / "the transmitter"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "a processor" / "the processor" | Plain and ordinary meaning. | "one or more processors, at least one of which is configured to receive resource allocation information ..., send, over the physical uplink shared channel, data ..., send the uplink physical signal ..., and receive, on a physical control channel, control information ..." |
| "a receiver" / "the receiver" | Plain and ordinary meaning. | "one or more receivers, at least one of which is configured to receive resource allocation information..., and receive, on a physical control channel, control information..." |
| "a transmitter" / "the transmitter" | Plain and ordinary meaning. | "one or more transmitters, at least one of which is configured to send, over the physical uplink shared channel, data ..., and send the uplink physical signal ..." |

### 1. Analysis

The term "a processor" / "the processor" appears in Asserted Claims 1, 2, and 4 of the '000 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The term "a receiver" / "the receiver" appears in Asserted

Claims 1, 2, and 4 of the ’000 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The term “a transmitter” / “the transmitter” appears in Asserted Claim 1 of the ’000 Patent. The parties dispute whether a single component (*i.e.,* one processor, receiver, or transmitter) must perform all recited functions.

Defendant argues that Claim 1 requires at least *one* processor, receiver, and transmitter configured *to perform all* of the corresponding claimed functions. (Dkt. No. 141 at 35) (emphasis added). Defendant contends that the Federal Circuit recently construed claims precisely like this one, explaining that while the indefinite article “a” does allow for “one or more,” the rule of antecedent basis still applies. *Id.* (citing *Finjan LLC v. SonicWall, Inc.*, 84 F.4th 963, 975 (Fed. Cir. 2023)). The Federal Circuit in *Finjan* stated that “[e]ven if an infringing system can use ‘one or more computers,’ the plain language of the claims requires at least one of those computers to perform all the functions listed in the claims”). Similarly, the Federal Circuit in *Salazar* stated that “while the claim term ‘a microprocessor’ does not require there be only one microprocessor, the subsequent limitations referring back to ‘said microprocessor’ require that at least one microprocessor be capable of performing each of the claimed functions.” *Salazar v. AT&T Mobility LLC*, 64 F.4th 1311, 1317 (Fed. Cir. 2023).

Defendant argues that the claims here are like those the Federal Circuit construed in *Finjan* and *Salazar*, by reciting “a processor,” and then reciting the processor’s additional characteristics by using the definite article “the.” (Dkt. No. 141 at 35). According to Defendant, the claims require at least one processor that is configured to: “receive resource allocation information,” “send, over the physical uplink shared channel, data,” “send the uplink physical signal,” and “receive, on a physical control channel, control information.” *Id.* at 36. Defendant argues that this antecedent basis rule also applies to “a/the receiver” and “a/the transmitter.” *Id.*

The Court agrees that the claim language requires a singular element to be capable of performing all of the recited functionality. However, that singular element is the user equipment (UE) that may include one or more processors, one or more receivers, and one or more transmitters. The ’000 Patent specification expressly states that the invention can use multiple processors in the context of performing the invention. For example, the specification states “that computing system 500 can include one or more processors” and the “processors can be a general or special purpose processing engine.” ’000 Patent at 8:4–8. Thus, the specification indicates that the tasks including receiving and sending information, is not restricted to a single processor performing all the recited functionality.

Moreover, the claim itself does not address the processor alone, it claims “a receiver and a processor are configured.” With regards to the receiver and transmitter, the specification also makes it clear that multiple antennas (receivers and transmitters) are also contemplated. ’000 Patent at 2:3–7 (“multiple transmit/ and/or receive antennas at the network and/or mobile terminal.”). There is nothing in the specification that would serve to limit the invention to require a single processor, transmitter, and/or receiver to perform all of the recited functionality.

Accordingly, the Court construes the disputed terms to mean “one or more processors/receivers/transmitters of the user equipment (UE).” As the Federal Circuit stated in *Salazar*, the disputed terms must be “read in the context of the full claim.” *Salazar* , 64 F.4th at 1318. Likewise, the Federal Circuit in *Finjan* focused on the “the plain language of the claims.” *Finjan*, 84 F.4th at 975. The plain language of the claim requires the user equipment (UE), which may include one or more processors, one or more receivers, and one or more transmitters that perform the recited functionality. The claims do not require only one processor, one receiver, and one transmitter perform each of the corresponding claimed functions. The claims only require the

user equipment (UE) to perform the claimed functions using at least one processor, one receiver, and one transmitter.

**2. Court's Construction**

For the reasons set forth above, the Court construes the term **"a processor" / "the processor"** to mean **"one or more processors of the user equipment (UE)."** The Court construes the term **"a receiver" / "the receiver"** to mean **"one or more receivers of the user equipment (UE)."** The Court construes the term **"a transmitter" / "the transmitter"** to mean **"one or more transmitters of the user equipment (UE)."**

**L. "in the same time interval that the uplink physical signal is sent, a plurality of UEs transmit uplink physical signals in the same time interval"**

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "in the same time interval that the uplink physical signal is sent, a plurality of UEs transmit uplink physical signals in the same time interval" | Plain and ordinary meaning, not indefinite. | Indefinite under *IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005) |

**1. Analysis**

The phrase "in the same time interval that the uplink physical signal is sent, a plurality of UEs transmit uplink physical signals in the same time interval" appears in Asserted Claim 1 of the '000 Patent. The parties dispute whether Claim 1 of the '000 Patent claims both a system and a method.

Defendant argues that a claim is invalid as indefinite when it "recites both a system and the method for using that system." (Dkt. No. 141 at 36) (citing *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005)). Defendant contends that Claim 1 recites the apparatus user equipment, with a number of structural limitations. (Dkt. No. 141 at 36). Defendant further contends that Claim 1 also recites a method step that "a plurality of UEs transmit

uplink physical signals in the same time interval" as the claimed UE. *Id.* According to Defendant, the claim's requirement that "a plurality of UEs transmit …" makes it unclear whether infringement "occurs when one creates a system that allows the user to [infringe the claims]," or "when the user actually [infringes the claims.]" (Dkt. No. 141 at 36) (citing *IPXL*, 430 F.3d at 1384). The Court disagrees.

The Federal Circuit has found that the term "configured to" constitutes permissible functional language, because it indicates the capability of using a claimed method but does not require performance of the method steps. *In re McFadden*, No. 2024-2107, 2025 LX 344436, at *11 (Fed. Cir. 2025). Claim 1 recites a UE in terms of conventional structural components, a "receiver," "transmitter," and "processor," "*configured to*" support uplink physical signaling and downlink control reception. '000 Patent at Claim 1; Dkt. No. 139-13 at 106:20-22. The use of the language "configured to" indicates the capabilities of the wireless signaling scheme, not required steps. A POSITA would find this limitation definite because it reasonably advises as to the scope of the claim and does not recite method steps performed by a user. Dkt. No. 139-12 at ¶ 71.

From the perspective of a POSITA, infringement analysis would focus on whether a UE includes the recited receiver, transmitter, and processor configured as claimed, not on when or how a user operates the device. Claim 1 does not require any user-performed action and does not mix apparatus and method requirements in a way that creates uncertainty. Accordingly, the Court finds that Defendant failed to prove by clear and convincing evidence that the term is indefinite.

**2. Court's Construction**

The Court finds that the phrase **"in the same time interval that the uplink physical signal is sent, a plurality of UEs transmit uplink physical signals in the same time interval"** is not indefinite, and is given its **plain and ordinary meaning.**

## VII. CONCLUSION

The Court adopts the constructions above for the disputed terms of the Asserted Patents. Furthermore, the parties should ensure that all testimony that relates to the terms addressed in this Order is constrained by the Court's reasoning. However, in the presence of the jury the parties should not expressly or implicitly refer to each other's claim construction positions and should not expressly refer to any portion of this Order that is not an actual construction adopted by the Court. The references to the claim construction process should be limited to informing the jury of the constructions adopted by the Court.

**IT IS SO ORDERED.**

**SIGNED this 28th day of July, 2026.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

# EXHIBIT A-31

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

AMERICAN AIRLINES, INC.,

and

SOUTHWEST AIRLINES, CO.,

Petitioners,

v.

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA
(INTELLECTUAL VENTURES I LLC),

Patent Owner

Case No. IPR2025-01511
U.S. Patent No. 7,712,080

**PATENT OWNER'S PRELIMINARY RESPONSE**

## TABLE OF CONTENTS

PATENT OWNER'S EXHIBIT LIST .......... iv

I. INTRODUCTION .......... 1

II. THE '080 PATENT .......... 2

A. Summary .......... 2

B. Prosecution History .......... 5

1. Fukuda '99 (EX2006) .......... 6

2. Fukuda '01 (EX1009) .......... 9

III. CLAIM CONSTRUCTION .......... 11

A. "wherein the at least one intermediate condition comprising one intermediate result" (Claims 1 and 9) .......... 12

B. "wherein the distributed parallel computing program is configured to operate across a distributed share[d] memory system" (Claims 17 and 18) .......... 13

C. Recent Director decisions confirm that Petitioners' failure to explain inconsistent claim scope positions is fatal .......... 14

IV. REFERENCES RELIED ON IN THE PETITION .......... 16

A. Declaration of Michael Ian Shamos (EX1003) .......... 16

B. Fukuda '98 (EX1008) .......... 18

V. PETITIONERS HAVE NOT MET THEIR BURDEN TO ESTABLISH ANTICIPATION UNDER 35 U.S.C §102 .......... 20

A. The Petition Fails To Explain How Fukuda '98 Discloses Establishing At Least Distributed Shared Variable That is A Single Variable That Includes Several Variables .......... 22

B. The Mappings In The Petition Impermissibly Pick And Choose Various Disclosures From Fukuda '98 And Fail To Demonstrate That The Reference Discloses All Of The Elements Of Claim 1 As Arranged In The Claim .......... 24

C. The Petition Fails To Present A Coherent Or Consistent Mapping Of The At Least One Intermediate Condition Recited Throughout Claim 1 ....27

D. The Petition Fails To Explain How Fukuda '98 Performs The Parallel Processing And/Or Operations Recited In Claim 1 ....30

E. The Petition's Erroneous Allegation That Fukuda '98 Is Not Cumulative Of The Art In Front Of The Examiner Is Predicated On A False Factual Assertion ....33

F. The Petition Fails To Present A Reasonable Likelihood Of Success With Respect To Any Of The Challenged Claims ....37

VI. CONCLUSION ....38

**PATENT OWNER'S EXHIBIT LIST**

| | |
|---|---|
| EX2001 | *American Airlines, Inc. and v. Intellectual Ventures II LLC*, IPR2025-00785 and IPR2025-00786, Paper 11 (PTAB August 29, 2025) (declining to exercise discretion to deny IPRs). |
| EX2002 | *American Airlines, Inc. and v. Intellectual Ventures II LLC*, IPR2025-00782 and IPR2025-00931, Paper 12 (PTAB September 19, 2025) (declining to exercise discretion to deny IPRs). |
| EX2003 | *American Airlines, Inc. and v. Intellectual Ventures II LLC*, IPR2025-00987 and IPR2025-01055, Paper 9 (declining to exercise discretion to deny IPRs). |
| EX2004 | Defendant Southwest Airline Co.'s Preliminary Invalidity Contentions |
| EX2005 | IAM 2014 - What's Inside IVs Patent Portfolio |
| EX2006 | Munehiro Fukuda, Lubomir F. Bic, Michael B. Dillencourt, and Jason M. Cahill, "Messages versus Messengers in Distributed Programming," Journal of Parallel and Distributed Computing, vol. 57, Issue 2, May 1999, pp. 1-8 (Fukuda '99) |

## I. INTRODUCTION

The Petition challenges claims 1-18 (the Challenged Claims) of U.S. Patent No. 7,712,080 (the '080 Patent) on a single statutory ground: that all of the Challenged Claims are anticipated by Fukuda '98. Institution should be denied for at least the following reasons.

First, the Petition is predicated on inconsistent claim construction positions. For example, in the district court, Petitioner Southwest contends that the limitation that recites "wherein the at least one intermediate condition comprising one intermediate result" in independent claims 1 and 9 is indefinite, while in this IPR, Petitioners purport to apply the *Phillips* standard and interpret the same language as having a workable meaning. The Petition never acknowledges these inconsistent claim construction positions, nor explains why inconsistent positions are warranted in this case.

Second, the Petition attempts to fill gaps in the prior art with expert testimony that lacks grounding in the evidence. The expert declaration is not prior art and cannot substitute for a missing disclosure in the asserted reference. That is especially the case here, where the aspects of expert declaration relied on to bridge gaps in the prior art largely restate word for word the Petition's conclusory assertions without providing additional substantive explanation.

Third, the purported mappings of the asserted reference to the Challenged Claims are seriously deficient. In some cases, the Petition either completely fails to address the claim language or fails to explain how the asserted reference meets the claim language. In other cases, the Petition relies on disparate aspects of the asserted reference for limitations that are connected by the claim language and, when doing so, fails to explain how the asserted reference discloses the claimed elements arranged as in the claim, as required to establish anticipation. In still other cases, the mappings in the Petition are inconsistent in that when the limitation first appears in the claim, the Petition maps one aspect of the asserted reference to the claim language, but when the same limitation is referenced later in the claim the Petition maps a different aspect of the asserted reference to the limitation.

For at least these reasons, and as explained more fully below, the Petition fails to demonstrate a reasonable likelihood of success on the merits.

## II. THE '080 PATENT

### A. Summary

The '080 Patent is directed to systems and methods for developing parallel distributed programs, including programs configured to operate across multiple processors or nodes and multiple memories. EX1001, 2:7-18. The '080 Patent identifies that conventional approaches such as message passing often require programmers to restructure code and data structures to handle inter-processor

communication, which can be complicated, tedious, and error-prone, and may cause the resulting program to lose algorithmic integrity and data structure integrity. EX1001, 1:30-52.

The ‘080 Patent describes an alternative programming model, referred to as “navigational programming,” that uses self-migrating threads or tasks capable of moving from one processor to another. EX1001, 3:12-26. The patent explains that such self-migrating threads can be programmed explicitly, including using a hop( ) command, and can migrate to another processor when needed to access memory belonging to that other processor, then resume computation. EX1001, 3:20-32.

The ‘080 Patent describes a foundational concept referred to as “distributed sequential computing” (“DSC”), which is computing using a single locus of computation over distributed data, where a self-migrating thread may perform DSC by migrating between processors to access distributed portions of the DSV. EX1001, 3:50-58.

The specification also emphasizes the “pivot-computes” principle, which it defines as the principle under which computation takes place on the node that owns the large-sized data, rather than moving the large portion of data to a different node for computation. EX1001, 4:1-13. In this way, navigational programming and DSC are presented as preserving original code structure and data structure while allowing the locus of computation to move to the data, reducing the need for the low-level

message-handling constructs that "pollute" source code in distributed memory programming. EX1001, 3:59-66 and 6:1-15.

The '080 Patent further explains that distributed parallel computing ("DPC") can be achieved by computing using multiple concurrent DSC programs, where the "intersection" between composing DSC programs may be minimal and may consist only of local synchronizations, thereby minimizing code pollution among the composing DSC programs. EX1001, 5:55-66. The patent discloses a distributed environment where a computing thread injects, or spawns, a separate DSC program to perform such that the two DSC threads of the DPC program run concurrently and operations are pipelined. EX1001, 6:25-64.

Consistent with this disclosure, independent claim 1 recites establishing at least one distributed shared variable, developing at least one DSC program to access the distributed shared variable, and transforming the DSC program into at least one DPC program by spawning at least one child DSC program when at least one intermediate condition occurs within the DSC program, where the DPC program concurrently uses the DSC program and the spawned child DSC program to perform parallel processing and/or operations. EX1001, 11:1-25. Claim 1 further requires that the intermediate condition comprises one intermediate result that will be required by the spawned child DSC program to continue computation. EX1001, 11:22-28. Independent claim 9 recites a corresponding system architecture,

including the same intermediate condition and intermediate result requirements. EX1001, 12:11-27.

### B. Prosecution History

The prosecution history for U.S. Appl. No. 10/850,842 reflects multiple Office Actions in which the Examiner repeatedly maintained rejections over prior art directed to mobile agents or threads and distributed programming. The first Office Action (dated May 21, 2007) rejected all pending claims, and included a rejection of claims 1–7, 9–17, and 20–23 as anticipated by Pan, a rejection of claim 8 as obvious over Pan in view of Fukuda '99, and a rejection of claims 18, 19, 24, and 25 as obvious over Pan in view of Pan2. EX1002, 161–162, 164 and 169–170. In a second non-final Office Action (dated October 18, 2007), pending claims 1–25 were rejected again. EX1002, 124.

In a final Office Action (dated July 22, 2008), the Examiner rejected the pending claims as obvious over Pan in view of Suzuki and further in view of Fukuda '99. EX1002, 97–100. After the Applicant filed a Request for Continued Examination, the Examiner issued a further Office Action (dated April 2, 2009) maintaining the rejection of claims 1–6, 9, 10, and 15–22 as obvious over Pan, Suzuki, and Fukuda '99. EX1002, 72–76. Prosecution continued thereafter and ultimately culminated in a Notice of Allowability allowing claims 1–6, 9, 10, 15–22, 26, and 27 (which were renumbered as 1–18). EX1002, 36.

### 1. Fukuda '99 (EX2006)

"Messages versus Messengers in Distributed Programming" (Fukuda '99) was cited by the Examiner as the basis for a 35 U.S.C. § 103 rejection in multiple Office Actions, including those dated 4/12/2009 (EX1002, 72–81), 7/22/2008 (EX1002, 97–106), 10/18/2007 (EX1002, 123–133), and 5/21/2007 (EX1002, 161–172).

Fukuda '99 lists Munehiro Fukuda, Lubomir F. Bic, Michael B. Dillencourt, and Jason M. Cahill as authors. EX2006, 188. The '080 Patent identifies inventors Lei Pan, Lubomir R. Bic, and Michael B. Dillencourt. EX1001, cover page. Thus, two of the authors of Fukuda '99 -- Lubomir Bic and Michael Dillencourt -- are also named inventors of the '080 Patent. EX2006, 188; EX1001, cover page.

Substantively, Fukuda '99 contrasts conventional message-passing distributed programming (send/receive primitives, RPC/rendezvous, passive data messages) with a "Messengers" approach based on autonomous "self-migrating" Messengers that have identity and behavior, actively navigate the computational network to perform tasks at visited nodes, and coordinate with other autonomous Messengers. EX2006, 188–189. Fukuda '99 explains that Messengers applications are written using navigational commands rather than send/receive primitives. The navigational style reduces the semantic gap between abstract algorithm descriptions

and their implementations and can simplify the construction, understanding, and maintenance of distributed programs. EX2006, 188.

Fukuda '99 describes a three-layer network model, including a physical network (LAN/WAN), a daemon network in which each daemon is a UNIX process running a MESSENGERS interpreter, and an application-specific logical network created on top of the daemon network. EX2006, 190–191. Fukuda '99 explains that, at system startup, an init logical node is created on each daemon node, and a Messenger may be injected into an init node and then create additional logical nodes and links on the current or other daemons. EX2006, 190–191. Fukuda '99 further describes Messenger programs (Messenger scripts) as written in a subset of C and compiled, and explains that each script is carried by the Messenger as it propagates through the network and is replicated when the Messenger needs to follow more than one logical link. EX2006, 190–191. Fukuda '99 emphasizes that the application consists of the logical network and the corresponding Messengers navigating this network, rather than user-supplied node programs typical of message passing. EX2006, 190–191.

Fukuda '99 also describes a scheduling policy for Messenger execution. It explains that a daemon will interrupt a Messenger only when the Messenger issues a navigational command or begins executing a native-mode function, and will not

interrupt a Messenger in the middle of a native-mode function or other computational command. EX2006, 191.

Fukuda '99 describes the variable model used by Messengers, distinguishing among messenger variables, node variables, and network variables. Messenger variables are described as private to, and carried by, each Messenger as it propagates through the logical network. Node variables are described as resident in nodes of the logical network and shared by all Messengers currently visiting the same logical node. Network variables are predefined at each logical node and provide access to local network information, including the current host address and the last traversed link. EX2006, 191–192. Fukuda '99 explains that this distinction provides software engineering and performance advantages, including avoiding the copying of data into and out of message buffers that occurs in message passing systems. EX2006, 191–192.

Finally, Fukuda '99 introduces the navigational statements central to Messengers-based programming, focusing on hop, create, and delete. EX2006, 192. Fukuda '99 explains that hop permits a Messenger to move around the logical network using a destination specification and that hop semantics replicate the Messenger to nodes matching the destination criteria, after which the Messenger executing the hop ceases to exist. EX2006, 192.

### 2. Fukuda '01 (EX1009)

As shown below, the Examiner expressly identified "MESSENGERS: Distributed Programming Using Mobile Agents" (Fukuda '01) as "considered pertinent to the applicant's disclosure" in the May 21, 2007 Office Action. EX1002, 171.

***Conclusion***

12. The prior art made of record and not relied upon is considered pertinent to applicant's disclosure.

- Fukuda et al., (Messengers: Distributed Programming Using Mobile Agents, Transactions of the SDPS, December 2001, Vol.5, No.4, page 95-112) discloses Messengers system using mobile agents.
- Stanislaw Chrobot, (Sharing Variables in Distributed Memory, Fundamenta Infomaticae 44 (2000) 63-81, IOS Press, pages 63-81) discloses shared variables in distributed system.
- Itzkovitz et al., (Thread migration and its applications in distributed shared memory, The journal of systems and software 42 (1998) 71-97) discloses thread migration.
- Wicke et al., (Compiling for Fast State Capture of Mobile Agents, Parallel Computing: Fundamentals & Applications, Proceedings of the International Conference ParCo'99, 17-20 August 1999, pages 1-8) discloses complier for compiling mobile agent.
- Pan et al., (Distributed Sequential computing using mobile code: Moving Computation to Data, IEEE 2001, pages 77-84) discloses distributed sequential computing using mobile code for moving computation to data.

Fukuda '01 describes the MESSENGERS distributed programming system, in which "Messengers" operate as mobile agents that carry executable behavior as they move through the system. Fukuda '01 explains that Messengers navigate among nodes, perform tasks at the nodes they visit, and coordinate with other Messengers. EX1009, 96. Fukuda '01 presents a three-layer network model that includes a physical network (e.g., LAN/WAN), a daemon network comprising UNIX processes

running MESSENGERS daemons on physical nodes, and an application-defined logical network constructed on top of the daemon network. EX1009, 96–97. Fukuda '01 further explains that daemons receive arriving Messengers, schedule and supervise their execution, and forward them to subsequent destinations based on the navigational operations invoked by the Messengers. EX1009, 97.

Fukuda '01 further describes Messenger scripts as written in a subset of C and compiled into native code, and categorizes script statements into computational statements, navigational statements, and task-control or coordination statements. EX1009, 97–99. As examples of navigational statements, Fukuda '01 describes hop as selecting one or more destination nodes and then moving the Messenger, with separate copies propagated when multiple destinations are selected, and it also describes create and delete operations for creating and deleting logical nodes or links in connection with Messenger movement. EX1009, 98–99. Fukuda '01 also explains how Messengers maintain and share state, distinguishing messenger variables carried with each Messenger from node variables that are resident at a logical node and shared among Messengers currently visiting that node. EX1009, 98. Finally, Fukuda '01 describes task-control mechanisms including inject, which initiates execution of one or more instances of another Messenger with specified initial parameters and optional starting destinations, as well as signal/wait operations for event-based synchronization among Messengers. EX1009, 99.

The authorship of Fukuda '01 also overlaps with the inventorship of the '080 Patent. Fukuda '01 lists four authors: Munehiro Fukuda, Lubomir F. Bic, Michael B. Dillencourt, and Fehmina Merchant. EX1009, 95. The '080 Patent identifies three inventors: Lei Pan, Lubomir R. Bic, and Michael B. Dillencourt. EX1001, cover page. Thus, two authors of Fukuda '01 -- Lubomir Bic and Michael Dillencourt -- are also named inventors of the '080 Patent. EX1009, 95; EX1001, cover page.

## III. CLAIM CONSTRUCTION

In this IPR, Petitioners state that they "apply the *Phillip*s . . . claim construction standard," and contend that the Petition "establishes that the challenged claims are obvious under any reasonable interpretation under the *Phillips* standard." Petition, 12. The claim construction positions advanced by Petitioner Southwest in this forum are inconsistent with the claim construction positions Petitioner Southwest has advanced in the district court.

In the district court, Southwest has argued that key claim terms of the '080 Patent are "indefinite under 35 U.S.C. § 112(b)" because, according to Southwest, such terms are "open to multiple interpretations, making the claim scope uncertain." EX2004, 302-303. Yet, in this IPR, Southwest abandons those indefiniteness positions in favor of purportedly workable interpretations intended to support invalidity arguments in this forum, without even acknowledging, let alone justifying, the inconsistency. While a petitioner is not strictly prohibited from advancing

inconsistent positions, when it does so it must explain why the inconsistent positions are warranted. *Cambridge Mobile Telematics, Inc. v. Sfara, Inc.*, IPR2024-00952, Paper 12 at 7-8 (PTAB Dec. 13, 2024) (informative) (requiring, "[a]t a minimum," an explanation "why the inconsistent positions are warranted"). Petitioners provide no such explanation here.

As detailed below, Southwest's district court contention that certain claim terms are indefinite because they are "open to multiple interpretations, making the claim scope uncertain," cannot be reconciled with Petitioners' positions in this IPR that the same terms can be construed and mapped to Fukuda '98 under *Phillips*. EX2004, 302-303; Petition, 12. A claim term cannot simultaneously be indefinite under § 112(b) due to multiple competing interpretations that render scope uncertain and also have a plain and ordinary meaning that Petitioners can confidently apply to build their anticipation theory, absent a reasoned explanation for why the positions differ. Petitioners' failure to present a consistent, legally sound position on claim scope undermines the integrity of the proceeding and independently demonstrates that Petitioners have not met their burden on claim construction and related showings.

### A. "wherein the at least one intermediate condition comprising one intermediate result" (Claims 1 and 9)

Southwest's inconsistency is clear from its treatment of the phrase "wherein the at least one intermediate condition comprising one intermediate result" in

independent claims 1 and 9. In district court, Southwest contends this phrase is indefinite and asserts:

> "What is meant by that at least one intermediate condition 'comprises' one intermediate result? Is the result the condition or vice versa? How can a condition comprise a result? Without a defined meaning, the phrase is open to multiple interpretations, making the claim scope uncertain." EX2004, 296.

In this IPR, however, Petitioners take the opposite position. Petitioners purport to apply the *Phillips* standard and interpret the same language as having a workable meaning, stating that "the intermediate condition is the receipt of the intermediate result from part of the computation on the current node," and then attempt to map that interpretation onto Fukuda '98. Petition, 35-38. The Petition never acknowledges these inconsistent claim construction positions, and the Petition never explains why the indefiniteness position advanced by Petitioner Southwest in the district court should be disregarded here. EX2004, 296; Petition, 35-38.

### B. "wherein the distributed parallel computing program is configured to operate across a distributed share[d] memory system" (Claims 17 and 18)

Southwest's inconsistent claim construction positions are also shown by its treatment of the phrase "wherein the distributed parallel computing program is configured to operate across a distributed share[d] memory system" in claims 17 and 18. In district court, Southwest alleges this limitation is indefinite and asserts:

> "What is meant by that the distributed parallel computing program operates across a shared memory system? The specification

> only makes passing mention to 'shared memory systems' as existing in prior systems, such as clusters and networks of workstations. However, it is unclear how the distributed parallel computing program that is the subject of the '080 Patent claims [is] configured to operate across a shared memory system. Without a defined meaning, the phrase is open to multiple interpretations, making the claim scope uncertain." EX2004, 296-297.

In this IPR, by contrast, Southwest again abandons that position. Petitioners do not contend, in this forum, that the term is indefinite or "open to multiple interpretations." Instead, Petitioners proceed as though the phrase has a sufficiently definite meaning under *Phillips* and purport to map claims 17 and 18 to Fukuda '98. Petition, 51-52. Petitioners again provide no explanation why these opposing positions are justified.

### C. Recent Director decisions confirm that Petitioners' failure to explain inconsistent claim scope positions is fatal

Recent Director decisions underscore that Petitioners cannot freely switch claim scope positions between the district court and the Board, particularly where Petitioners do so without explanation. In *Revvo Technologies, Inc. v. Cerebrum Sensor Technologies, Inc.*, IPR2025-00632, Paper 20 (Dir. Rev. Nov. 3, 2025) (precedential), the Director explained that the Board's claim construction rules are designed to minimize inconsistency between forums and discourage petitioners from seeking different constructions in different proceedings. The Director emphasized that, after the Office aligned PTAB claim construction with litigation, petitioners have "less flexibility to advance inconsistent arguments about claim scope," and

"will instead be required to choose a single claim construction that best captures the meaning of the patent claim." *Revvo*, Paper 20 at 4-5. Allowing petitioners to continue the practice of proposing different constructions across forums does not further the Office's goal of "providing greater predictability and certainty in the patent system." *Revvo*, at 4.

Similarly, in *Tesla, Inc. v. Intellectual Ventures II LLC*, IPR2025-00340, Paper 18 (Dir. Rev. Nov. 5, 2025) (informative), the Director vacated an institution decision where the petitioner argued in district court that certain terms were indefinite while simultaneously maintaining in the IPR that those same terms should be given their "plain and ordinary meaning." *Tesla*, Paper 18 at 2-3. The same defect exists here. Southwest has argued in district court that the terms above are indefinite because they are open to multiple interpretations, and that the claim scope is therefore uncertain. Yet Petitioners now proceed in this IPR as if those same terms have a plain and ordinary meaning that can be applied to support Petitioners' anticipation theory, without acknowledging or justifying the inconsistency. EX2004, 296-297, 302-303; Petition, 12, 35-38, 51-52.

Under *Cambridge Mobile Telematics*, Petitioners at a minimum were required to explain why inconsistent claim construction positions are warranted. Petitioners do not do so. That failure is an independent and sufficient basis to deny institution

because the Petitioners have not carried their burden to proffer coherent and legally sound claim construction positions.

## IV. REFERENCES RELIED ON IN THE PETITION

### A. Declaration of Michael Ian Shamos (EX1003)

Petitioners rely heavily on the Declaration of Michael Ian Shamos (EX1003) to supply technical "POSITA would have understood" bridges and other reasoning that must be grounded in record evidence, particularly where Petitioners' sole ground is anticipation. The expert declaration is not prior art. It cannot substitute for a missing disclosure in the asserted reference, and it should be afforded little weight to the extent it merely repeats Petitioners' attorney argument without independent technical analysis.

The Board has held, in a precedential decision, that where an expert declaration largely restates a petition's conclusory assertions without providing additional substantive explanation, the declaration warrants little evidentiary weight. *Xerox Corp. v. Bytemark, Inc.*, IPR2022-00624, Paper 9 at 15-17 (P.T.A.B. Aug. 24, 2022) (precedential). The Federal Circuit has likewise affirmed discounting expert testimony that "merely repeated" a petitioner's arguments "nearly verbatim" without meaningful independent analysis. *Facebook, Inc. v. Windy City Innovations, LLC*, 973 F.3d 1321, 1340-41 (Fed. Cir. 2020). These principles apply with full force here

because Petitioners repeatedly cite EX1003 for the very "bridging" inferences that must be supported by what the asserted prior art actually teaches.

A comparison of the Petition and the expert declaration confirms pervasive overlap across virtually every substantive portion of the Petition. This is not limited to shared, high-level background. The Petition's technical narrative is repeatedly keyed to specific EX1003 paragraph citations, and in multiple places the expert declaration tracks the Petition's wording and structure so closely that the Petition's narrative functions as a template for the expert declaration, which lacks any independent expert analysis of its own.

| **Topic** | **Petition Location** (by page number) | **Declaration Location** (by paragraph number) |
|---|---|---|
| **'080 Patent Overview** | § IV (pp. 5–7) | § V (¶ 28–35) |
| **Prosecution History Args** | § V (pp. 10–11) | § VIII.K (¶ 89–90) |
| **Fukuda '98 Description** | § X.A (pp. 14–19) | § VIII.F (¶ 61–73) |
| **Claim 1 Analysis** | § XI.A.1 (pp. 23–38) | § X.A (¶ 123–160) |
| **Claims 2–18 Analysis** | § XI.A.2–18 (pp. 38–52) | § X.B–R (¶ 162–239) |

Under *Xerox* and *Facebook*, that kind of rote repetition warrants little evidentiary weight because it does not provide independent expert analysis. This is

especially important here because Petitioners invoke EX1003 to support critical inferences that the asserted reference must disclose for anticipation, including foundational "POSITA would have understood" and similar bridging assertions offered in support of Petitioners' theory of "spawning," "intermediate condition," and concurrency. Petition, 33; EX1003, ¶¶146-153.

**B. Fukuda '98 (EX1008)**

Fukuda '98 (EX1008), titled "Distributed coordination with MESSENGERS," describes the MESSENGERS system as a distributed programming paradigm based on autonomous messages, called "Messengers," that carry their own behavior in program form. EX1008, 291. Fukuda '98 explains that Messengers navigate an underlying computational network, communicate, and invoke compiled node-resident C functions at the nodes they visit, such that a distributed application may be viewed as a collection of node functions whose invocation and interoperation are orchestrated by Messengers. EX1008, 291. Fukuda '98 further explains that MESSENGERS separates computation from coordination, where computation is performed by individual node functions and coordination is the ordering of those function invocations and the movement of information among them via Messengers. EX1008, 291; EX1008, 305. Fukuda '98 also describes a shared "state space" that contains functions and data and is structured by being mapped onto a logical network, and it explains that Messengers have state

information and migrate to nodes containing data they wish to read, write, or modify and to nodes containing functions they wish to invoke. EX1008, 292.

Fukuda '98, Fukuda '01, and Fukuda '99 are part of a single MESSENGERS research and publication lineage addressing the same distributed programming paradigm based on mobile agents ("Messengers") navigating a logical network and coordinating via shared state. Fukuda '98 and Fukuda '01 share the same four authors -- Munehiro Fukuda, Lubomir F. Bic, Michael B. Dillencourt, and Fehmina Merchant. EX1008, 291; EX1009, 95. Fukuda '99 is authored by Fukuda, Bic, and Dillencourt, with Jason M. Cahill. EX2006, 188.

Fukuda '01's reference list expressly includes both "Distributed coordination with MESSENGERS" (1998) and "Messages versus Messengers in distributed programming" (1999), confirming that Fukuda '01 builds on and synthesizes the earlier MESSENGERS disclosures of Fukuda '98 and Fukuda '99. EX1009, 111. In substance, the three publications describe the same foundational MESSENGERS system architecture and programming primitives. Each describes a daemon-based execution environment deployed across physical nodes and an application-level "logical network" used as the navigational space for Messengers. EX1008, 310; EX1009, 96–97; EX2006, 190–191. Each also describes the shared-state variable model that distinguishes messenger variables (carried by a Messenger as it propagates) from node variables (resident at a node and shared by Messengers co-

located at that node), with network variables providing local network information. EX1008, 301; EX1009, 98; EX2006, 191–192.

The publications likewise describe the same navigational and coordination mechanisms used to implement distributed applications through Messenger movement and replication. Fukuda '99 describes hop as a navigational statement that moves and replicates Messengers across destination nodes in the logical network. EX2006, 192. Fukuda '01 similarly describes the hop statement and also describes "inject" as a task-control mechanism for initiating execution of additional Messengers with parameters and optional starting destinations. EX1009, 98–99. Fukuda '98 describes complementary coordination and interaction in the same paradigm, including interaction via shared node variables at logical nodes and invocation of compiled native-mode functions at visited nodes, and it provides examples in which node variables are used for distributed simulation. EX1008, 291–292; EX1008, 302–305.

## V. PETITIONERS HAVE NOT MET THEIR BURDEN TO ESTABLISH ANTICIPATION UNDER 35 U.S.C §102

Petitioners bear the burden to demonstrate unpatentability on the sole ground they selected (i.e., that the challenged claims are anticipated by Fukuda '98), and they must do so in the Petition itself. As the Supreme Court has explained, "in an *inter partes* review the petitioner is master of its complaint," and "the statute envisions that a petitioner will seek an *inter partes* review of a particular kind, one

guided by a petition describing 'each claim challenged' and 'the grounds on which the challenge to each claim is based.'" *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018). Consistent with that framework, "[i]n an *inter partes* review, the burden of persuasion is on the petitioner to prove 'unpatentability by a preponderance of the evidence,' 35 U.S.C. § 316(e), and that burden never shifts to the patentee." *FanDuel, Inc. v. Interactive Games LLC*, 966 F.3d 1334, 1341 (Fed. Cir. 2020). Petitioners, therefore, must come forward with a coherent, record-supported anticipation theory that (i) identifies, for each challenged claim limitation, where the single asserted reference discloses the limitation, either expressly or by necessary implication, and (ii) demonstrates that the single asserted reference discloses each such limitation as arranged in the claim.

The governing regulations impose the same requirement. The Petition must include "[a] full statement of the reasons for relief requested, including a detailed explanation of the significance of the evidence including material facts," 37 C.F.R. § 42.22(a)(2), and must explain both "[h]ow the challenged claim is to be construed" and "[h]ow the construed claim is unpatentable." Id. § 42.104(b)(3)-(4). These requirements are particularly important where, as here, Petitioners rely on a single anticipation ground under § 102, because anticipation is an exacting, limitation-by-limitation inquiry that cannot be satisfied by shifting theories, conclusory expert ipse dixit, or unmoored "POSITA would have understood" bridges.

Here, Petitioners do not satisfy these statutory requirements. As set forth below, Petitioners' anticipation theory fails on the merits because it does not provide a coherent, limitation-by-limitation mapping to Fukuda '98 that accounts for all of the claim limitations. The purported mappings of Fukuda '98 to claim 1 are deeply flawed. In some cases, the Petition either completely fails to address the claim language or fails to explain how Fukuda '98 meets the claim language. In other cases, the Petition relies on disparate aspects of Fukuda '98 for limitations that are connected by the claim language and, when doing so, fails to explain how Fukuda '98 discloses the claimed elements "arranged as in the claim," as required to establish anticipation. In still other cases, the mappings in the Petition are inconsistent in that when the limitation first appears in the claim, the Petition maps one aspect of Fukuda '98 to the claim language, but when the same limitation is referenced later in the claim, the Petition maps a different aspect of Fukuda '98 to the limitation. Finally, some aspects of the mappings are so poorly explained that they are downright incoherent. Examples of the deficiencies in the mappings of Fukuda '98 to claim 1 are discussed next.

### A. The Petition Fails To Explain How Fukuda '98 Discloses Establishing At Least Distributed Shared Variable That is A Single Variable That Includes Several Variables

Element [1a] requires "at least one distributed shared variable, wherein the at least one distributed shared variable is <u>*a single variable that includes several*</u>

*variables*." Yet, in Ground 1 (the sole ground in the Petition), the Petition fails to address this requirement entirely. Indeed, the Petition's discussion of Element [1a] -- which spans pages 23-26 -- is devoid of any mention of the language in Element [1a] reciting that "the at least one distributed shared variable is *a single variable that includes several variables*."

In purporting to map Element [1a] to Fukuda '98, the Petition maps the "distributed shared variable" recited in Element [1a] to a "node variable" or the "virtual time" variable in Fukuda '98:

> Fukuda '98 discloses the "distributed shared variable" of claim [1a]. Consistent with the disclosures in the '080 specification and the distributed data of Pan, relied on by the Examiner, Fukuda '98 discloses "*node variables*," which are examples of "distributed shared variables": "Node variables are resident in nodes and shared by all Messengers currently running on the same logical node."...
>
> Fukuda '98 describes an example of a distributed shared variable, *i.e.*, *virtual time*, which is "a global time line consistent over all physical nodes," that is, "*a globally shared variable that simulates the passage of time*." Petition, 23-24 (emphasis added, citations omitted).

However, the Petition nowhere alleges that either a "node variable" or the "virtual time" variable in Fukuda '98 is "*a single variable that includes several variables*," as recited in Element [1a]. Despite having the burden to do so, the Petition provides no explanation whatsoever of how either a "node variable" or the "virtual time" variable in Fukuda '98 -- which the Petition maps to the "distributed shared variable" in Element [1a] -- is "a single variable that includes several variables."

Petitioners had the burden of explaining how the challenged claims were to be interpreted, as well as how Fukuda '98 disclosed *each and every* limitation in claim 1. With respect to the requirement that "the at least one distributed shared variable is *a single variable that includes several variables*" in Element [1a], Petitioners clearly failed to meet this burden, because the Petition completely fails to address this aspect of the claim language.

For this reason alone, the Petition fails to explain how Fukuda '98 discloses all of the limitations of claim 1.

### B. The Mappings In The Petition Impermissibly Pick And Choose Various Disclosures From Fukuda '98 And Fail To Demonstrate That The Reference Discloses All Of The Elements Of Claim 1 As Arranged In The Claim

Element [1c] recites:

> transforming the at least one distributed sequential computing program into at least one distributed parallel computing program by *spawning at least one child* distributed sequential computing program *from the at least one distributed sequential computing program* when at least one intermediate condition occurs within the at least one distributed sequential computing program ...

In connection with Element [1c], the Petition (i) relies on the *exec()* statement from Fukuda '98 for "*spawning at least one child*,"[1] and (ii) separately relies on *the*

[1] Petition, 32 (one of the statements disclosed in Fukuda '98, "exec(), contains a *main*() function "which is spawned as a separate Unix process, i.e., operating concurrently with the invoking Messenger.")

*distributed simulation of "styrene inhalation"* shown in Figure 4 of Fukuda '98 (and discussed at 304-305 of the reference) for "*the at least one distributed sequential computing program" from which the child program is spawned*.[2] Significantly, however, the distributed simulation of "styrene inhalation" (relied on in the Petition for the distributed sequential computing program from which the child program is spawned) *does not use* the *exec*() function (which the Petition alleges spawns the child program). The script for the distributed simulation of "styrene inhalation" is set forth in Figure 4 of Fukuda '98 and reproduced below:

```
styrene_sim(n_iter, inhaled_sty) {
  c_veinal == 0;
  for (i = 0; i < n_iter; i++) {
    func(name="new_lung_conc"; in=c_veinal, inhaled_sty; out = c_art);
    n_msgrs = number_of_organs;
    hop(link="arterial");
    func(name="new_organ_conc"; in=c_art; out=c_ven_o);
    hop(link="veinal");
    c_veinal += c_ven_o;
    if (--n_msgrs > 0)
      exit;
  }
}
```

Fig. 4. Messenger script for styrene inhalation.

As is plain from the script set forth above, the distributed simulation of "styrene inhalation" as disclosed in Fukuda '98 does *not* disclose that the *main*() function contained an *exec*() statement. In fact, there is no mention at all of the

[2] Petition, 32-33 ("The distributed simulation example in Fukuda '98 demonstrates claim [1c]. ... "the distributed simulation is a distributed sequential computing program.")

*main*() function contained in an *exec*() statement in *any* of the lines of the distributed simulation of "styrene inhalation." Simply put, the Petition fails to explain how the *main*() function contained in the *exec*() statement disclosed in Fukuda '98 is used to spawn a child program from the distributed simulation of "styrene inhalation" disclosed in the reference, because there is no mention at all of the *main*() function contained in an *exec*() statement in *any* of the lines of the distributed simulation of "styrene inhalation."

The sole ground in the Petition alleges that claim 1 is *anticipated* by Fukuda '98. "Because the hallmark of anticipation is prior invention, the prior art reference -- in order to anticipate under 35 U.S.C. § 102 -- must not only disclose all elements of the claim within the four corners of the document, but *must also disclose those elements "arranged as in the claim*." *Net MoneyIN, Inc. v Verisign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008) (emphasis added), *citing*, *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed. Cir. 1983). In order to anticipate, the prior art reference "must clearly and unequivocally disclose" the claimed invention "*without any need for picking, choosing, and combining various disclosures* not directly related to each other" in the reference. *Net MoneyIN,* 545 F.3d 1359, 1371 (citations omitted).

Thus, in order to establish anticipation, it was not enough for the Petition to point to the *main*() function contained in the *exec*() statement disclosed in one part

of Fukuda '98 for functionality that spawns a child program, and separately point to the distributed simulation of "styrene inhalation" disclosed in another part of Fukuda '98 for the distributed sequential computing program from which the child program is spawned. Instead, the Petition was additionally required to show that Fukuda '98 disclosed these teachings "arranged as in the claim." The Petition clearly failed to carry this burden because the Petition fails to explain how Fukuda '98 discloses the use of the *main*() function contained in an *exec*() statement within the distributed simulation of "styrene inhalation."

For this additional reason, the Petition fails to demonstrate that Fukuda '98 anticipates claim 1.

### C. The Petition Fails To Present A Coherent Or Consistent Mapping Of The At Least One Intermediate Condition Recited Throughout Claim 1

The "at least one intermediate condition" is introduced in Element [1c] and referenced later in Element [1e] which refers back to "*<u>the</u>* at least one intermediate condition." In connection with Element [1c], the Petition (at 33) alleges that the "intermediate condition" corresponds to "the arguments specified by *<u>in</u>*" in the *exec*() statement of Fukuda '98, while in connection with Element [1e], the Petition (at 37) alleges that the *<u>same</u>* "intermediate condition" comprises "the arguments specified by *<u>out</u>*" in the *exec*() statement. These mappings are inconsistent. Petitioners had the burden to identify a coherent, single "intermediate condition" in Fukuda '98 that

satisfies both limitations together, not one "intermediate condition" for element 1[c] and a different "intermediate condition" for element 1[e]. The Petition clearly failed to meet that burden.

While the Petition (at 33) alleges in connection with Element [1c] that the "intermediate condition" corresponds to "the arguments specified by *in,*" the Petition fails to explain how "the arguments specified by *in*" correspond to an "intermediate condition" as that term is used in the context of the '080 Patent. The Petitioners state that they "apply the *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) claim construction standard, but the Petition fails to provide a clear explanation of what Petitioners deem to be an "intermediate condition" or how "the arguments specified by *in*" in the exec() statement of Fukuda '98 equate to an "intermediate condition." Petition, 12. In discussing the '080 Patent, the Petition (at 31) alleges that "the intermediate condition is the *receipt of the intermediate result* from part of the computation on the current node," but the Petition never connects the dots by explaining how that proposition applies to "the arguments specified by *in.*" If the Petitioners' position for Element [1c] was that "*the receipt of*" the "*arguments specified by in*" by the *main*() function corresponds to the "*intermediate condition*," that point was nowhere clearly articulated in the Petition as required by the rules. More importantly, had the Petitioners actually taken the position in connection with Element [1c] that "*the receipt of*" the "arguments specified by *in*" by the *main*()

function corresponds to the "intermediate condition," doing so would have clearly *conflicted* with Petitioners' mapping of the "intermediate condition" in Element [1e] where Petitioners allege that the *same* "intermediate condition" comprises "the arguments specified by *out*." Petition, 37.

Unlike "*the receipt of*" the "arguments specified by *in*" which are provided to the *main* function *as inputs at the time when the function is invoked*, the "arguments specified by *out*" are provided *as outputs at a later point in time* when the function has *completed* its work. The Petition fails to explain how "the intermediate condition" which is alleged to occur at *one* point in time when "each cycle begins" can correspond to events that occur at *different* points in time, i.e., when the *main* function is invoked and again when the *main* function has completed its work.

These inconsistencies are outcome-determinative for anticipation. Petitioners cannot satisfy element 1[c] by treating the "intermediate condition" as something that occurs at the beginning of a cycle or at process creation ("in"), while separately satisfying element 1[e] by redefining the same "intermediate condition" as a later, extended window that ends only after a decrement and by shifting the relevant artifact to "out" and post-return updates. Petition, 17, 33, 37. The claim requires a single "intermediate condition" that both triggers spawning and comprises an intermediate result required by the spawned child to continue computation. EX1001, 11:13-20, 11:24-27. Because Petitioners' Petition advances inconsistent

identifications of the "intermediate condition" across elements 1[c] and 1[e], Petitioners have not provided the coherent, limitation-by-limitation showing required to establish anticipation. EX1001, 11:13-20, 11:24-27; Petition, 17, 33, 37.

Finally, the Petition appears to offer an alternative "distributed simulation cycle" narrative for the "intermediate condition" but fails to tie that theory to the remainder of the language of claim 1. Petitioners assert that the intermediate condition begins when each cycle begins and ends when the nmsgrs variable decrements, and they present this window as satisfying the "intermediate result" requirement. Petition, 37. Yet Petitioners do not identify the "one intermediate result" within that window, nor explain why any identified quantity is "required" by the spawned child to continue computation. EX1001, 11:22-27; Petition, 37.

In short, Petitioners fail to present a coherent and consistent identification of the claimed "one intermediate result" in Fukuda '98. For this additional reason, the Petition fails to explain how Fukuda '98 discloses all of the limitations of claim 1.

### D. The Petition Fails To Explain How Fukuda '98 Performs The Parallel Processing And/Or Operations Recited In Claim 1

Element [1d] recites: "wherein the at least one distributed parallel computing program *concurrently* uses the at least one *distributed sequential computing program* *and* the at least one *spawned child distributed sequential computing program* to perform *parallel processing and/or operations*." According to the

Petition, this limitation was the "point of novelty over the prior art." Petition, 14. However, the Petition has failed to explain how Fukuda '98 discloses Element [1d].

As noted above, the Petition relies on the distributed simulation "for styrene inhalation" (set forth at 304-305 of Fukuda '98) in connection with the "spawned" program first introduced into the claim in Element [1c]. Petition, 33 ("The distributed simulation example in Fukuda '98 demonstrates claim [1c]"). The script for the styrene inhalation simulation in Fukuda '98 is reproduced again below (red annotations added). As shown in the red boxes below, the script for the styrene inhalation simulation in Fukuda '98 (at 305) does not use an *exec*() statement but instead uses two *func* statements:

```
styrene_sim(n_iter, inhaled_sty) {
  c_veinal == 0;
  for (i = 0; i < n_iter; i++) {
    func(name="new_lung_conc"; in=c_veinal, inhaled_sty; out = c_art);
    n_msgrs = number_of_organs;
    hop(link="arterial");
    func(name="new_organ_conc"; in=c_art; out=c_ven_o);
    hop(link="veinal");
    c_veinal += c_ven_o;
    if (--n_msgrs > 0)
      exit;
  }
}
```

Significantly, Fukuda '98 explains the operation of the *func* statement as follows:

> *func*(*file*=*filename*; name=*func_name*[;*in*=*argument*][;*out*=*argument*]): Similar to *exec*, the parameter filename is a Unix path name specifying a file. This must contain one or more executable C functions (but not necessarily a complete program with a *main*() function). The function specified by the parameter *func_name* is invoked and the arguments

> specified by in are passed to it. Unlike with *exec*, the function executes as part of the current Messenger, that it, as part of the MESSENGERS interpreter process. *The invoking Messenger is blocked until the function terminates and returns its results to the Messenger* script via the out argument. Fukuda '98 [EX1008], 302 (emphasis added).

Thus, in the distributed simulation "for styrene inhalation" (set forth at 304-305 of Fukuda '98), the *func* statements do *not* result in parallel processing being performed by the "spawned" program and the invoking Messenger because, when the *func* statement "*spawns*" another program, the invoking Messenger is *blocked* until the function terminates. Given that the invoking Messenger and "spawned" program in the distributed simulation do not operate in parallel, the Petition fails to explain how the distributed simulation in Fukuda '98 "*concurrently* uses the at least one *distributed sequential computing program* *and* the at least one *spawned child distributed sequential computing program* to perform *parallel processing and/or operations*," as recited in Element [1d].

In a last ditch attempt to show that Element [1d] is met by Fukuda '98, the Petition cites to Figure 3 of Fukuda '98 (reproduced below) and alleges that it discloses Messengers that "are running concurrently." Petition, 35. However, nothing about Figure 3 -- or the description of that figure in Fukuda '98 (at 303-304) -- explicitly or inherently discloses Messengers that "are running concurrently."




Fig. 3. A toxicology model.

Fukuda refers to Figure 3 as "A toxicology model." What this model shows is that outputs of various boxes are provided as inputs to other boxes. However, the figure fails to expressly or inherently disclose that Messengers are running concurrently. On the contrary, as explained above, the script disclosed in Fukuda '98 (in Figure 4) for implementing the simulation illustrated in Figure 3 uses the *func* statement which does _not_ result in concurrent processing being performed by the "spawned" program and the invoking Messenger.

For these additional reasons, the Petition fails to explain how Fukuda '98 discloses all of the limitations of claim 1.

### E. The Petition's Erroneous Allegation That Fukuda '98 Is Not Cumulative Of The Art In Front Of The Examiner Is Predicated On A False Factual Assertion

Petitioners' assertion that "Ground 1 is not cumulative of the art of record" is predicated on Petitioners' false statement that: "When examining the '080 patent application, the Examiner did not have Fukuda '01." Petition, 13 and 20. That

statement is demonstrably false as evidenced by the face of the ‘080 Patent (reproduced below) which lists Fukuda ‘01 (highlighted in yellow) in the “Other Publications” section, with an asterisk indicating it was cited by the Examiner during examination.

(12) **United States Patent**
**Pan et al.**

(10) **Patent No.:** **US 7,712,080 B2**
(45) **Date of Patent:** **May 4, 2010**

(54) **SYSTEMS AND METHODS FOR PARALLEL DISTRIBUTED PROGRAMMING**

(75) Inventors: **Lei Pan**, Irvine, CA (US); **Lubomir R. Bic**, Irvine, CA (US); **Michael B. Dillencourt**, Irvine, CA (US)

(73) Assignee: **The Regents of the University of California**, Oakland, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1013 days.

(21) Appl. No.: **10/850,842**

(22) Filed: **May 21, 2004**

(65) **Prior Publication Data**

US 2005/0039159 A1 Feb. 17, 2005

Fukuda et al., Messengers: Distributed Programming Using Mobile Agents, Transactions of the SDPS, Dec. 2001, vol .5, No. 4, pp. 95-112.*

Stanislaw Chrobot, Sharing Varaibles in Distributed Memory, Fundamenta Infomaticae 44 (2000) 63-81, IOS Press, pp. 63-81.*

Suzuki et al., Self-Migrating Threads for Multi-Agent Applications, publication data: 1999, published by 1st IEEE computer socitiey international workshop, pp. 1-8.*

Fukuda t al., Messages versus Messengers in Distributed Programming, published by Hournal of Parallel and Distributed Computing vol. 57, Issue 2 May 1999, pp. 1-8.*

Lei Pan, et al., *Distributed Sequential Computing* (pp. 223-239), Applied Parallel and Distributed Computing (Advances in Computation: Theory and Practice, vol. 16), (Y. Pan and L.T. Yang, Eds.), Nova Science Publishers, Inc., New York, 2004.

Lei Pan, et al., *Facilitating Agent Navigation Using DSM—High Level Designs* (11 pages), The 7th Int'l Conf. on Integrated Design & Process Technology (IDPT03), Austin, Texas, Dec. 2003.

(Continued)

The Examiner identified Fukuda ‘01 as “pertinent to the applicant’s disclosure” in the May 21, 2007 Office Action. EX1002, 171. The Examiner also cited Fukuda ‘99 (highlighted in green above) during the prosecution history, which is likewise identified on the face of the ‘080 Patent with an asterisk. EX2006.

Fukuda ‘98, Fukuda ‘01, and Fukuda ‘99 are part of a single MESSENGERS research and publication lineage addressing the same distributed programming paradigm based on mobile agents (“Messengers”) navigating a logical network and coordinating via shared state. Fukuda ‘98 and Fukuda ‘01 share the same four authors, Munehiro Fukuda, Lubomir F. Bic, Michael B. Dillencourt, and Fehmina Merchant. EX1008, 291; EX1009, 95. Fukuda ‘99 is authored by Fukuda, Bic, and Dillencourt, with Jason M. Cahill. EX2006, 188. In substance, the three publications

describe the same foundational MESSENGERS system architecture and programming primitives. Each describes a daemon-based execution environment deployed across physical nodes and an application-level "logical network" used as the navigational space for Messengers. EX1008, 310; EX1009, 96–97; EX2006, 190–191. Each also describes the shared-state variable model that distinguishes messenger variables (carried by a Messenger as it propagates) from node variables (resident at a node and shared by Messengers co-located at that node), with network variables providing local network information. EX1008, 301; EX1009, 98; EX2006, 191–192.

The publications likewise describe the same navigational and coordination mechanisms used to implement distributed applications through Messenger movement and replication. Fukuda '99 describes hop as a navigational statement that moves and replicates Messengers across destination nodes in the logical network. EX2006, 192. Fukuda '01 similarly describes hop and also describes inject as a task-control mechanism for initiating execution of additional Messengers with parameters and optional starting destinations. EX1009, 98–99. Fukuda '98 describes complementary coordination and interaction in the same paradigm, including interaction via shared node variables at logical nodes and invocation of compiled native-mode functions at visited nodes, and it provides examples in which node

variables are used as shared coordination state for distributed simulation. EX1008, 291–292; EX1008, 302–305.

The Petition itself acknowledges that Fukuda '01 (identified as EX1009) is cumulative of Fukuda '98. See, e.g., Petition, 20 ("Like Fukuda '98, Fukuda '01 describes a programming paradigm called Messengers") and 23 ("Fukuda '01 describes the principles of operation and the programming of the MESSENGER system.") The Petition then <u>*uses Fukuda '01*</u> (falsely alleged as not being before the Examiner) in an attempt to explain <u>*what Fukuda '98 means*</u>. *See, e.g.*, Petition, 33, note 6 ("A POSITA would have confirmed, from Ex.1009 at 99, that the "inject" statement in MESSENGERS "initiates (injects) the execution of one or more instances of another Messenger") and 34, note 7 ("A POSITA would have confirmed, from Ex.1009 at 99, that, when invoking the "inject" statement in MESSENGERS, parameters are passed to the newly created Messenger: "[t]he parameters specify the Messenger script to be injected and the initial parameters to be passed to the newly created Messenger").

While the Petition (at 13) proffers a conclusory allegation that "Ground 1 is not cumulative of the art of record," the Petition never explains what Fukuda '98 allegedly adds over the MESSENGERS publications, such as Fukuda '99 and Fukuda '01, which the Examiner identified and found wanting. Given the numerous deficiencies in Petitioners' anticipation analysis based on Fukuda '98 -- which has

not been shown to be materially different from the other MESSENGERS publications like Fukuda '99 and Fukuda '01 which the Examiner found -- it is clear that the Examiner correctly concluded that the body of prior art encompassed by the MESSENGERS references fails to render the claims of the '080 Patent unpatentable. The fact that the Petition (at 20) needed to resort to a false narrative that "the Examiner did not have Fukuda '01" exemplifies the weaknesses in the case put forward by the Petitioners, and underscores why the Petition fails to present a reasonable likelihood of success on the merits.

### F. The Petition Fails To Present A Reasonable Likelihood Of Success With Respect To Any Of The Challenged Claims

For the reasons set forth in Sections V(A)-(E) above, the Petition has failed to demonstrate a reasonable likelihood of success with respect to independent claim 1. In connection with independent claim 9 which contains substantially the same language of claim 1, the Petition (at 44-47) relies on its analysis of claim 1. The Petition's mappings for claim 9 therefore suffer from the same deficiencies as those identified above for claim 1, and, for the same reasons, the Petition has failed to demonstrate a reasonable likelihood of success with respect to independent claim 9. The Petition's mappings for the remaining Challenged Claims (i.e., dependent claims 2-8 and 10-18) similarly fail to demonstrate a reasonable likelihood of success because the mapping for each such dependent claim is predicated on a deficient mapping of the base claim.

## VI. CONCLUSION

For the reasons set forth above, the Petition does not demonstrate a reasonable likelihood that Petitioners will prevail in proving that any challenged claim is anticipated by Fukuda '98 (EX1008) under 35 U.S.C. § 102. Petitioners chose a single-reference anticipation theory and, as the master of their Petition, were required to provide a complete and internally coherent statement of the reasons for relief, including a consistent claim construction premise and a limitation-by-limitation mapping grounded in what Fukuda '98 discloses. The Petition does not satisfy that burden.

First, the Petition fails on the claim limitations that matter most to the challenged independent claims. Petitioners do not identify what the claimed "at least one intermediate condition" is in Fukuda '98 in a manner that is tethered to the claim language requiring that the intermediate condition occur "within" the distributed sequential computing program. Instead, the Petition offers shifting descriptions, including a "cycle begins" formulation and other generalized characterizations, without explaining how those concepts constitute the claimed intermediate condition in the dependency-driven sense required by the claims. Relatedly, Petitioners' mapping is internally inconsistent: Petitioners use one conception of "intermediate condition" to satisfy the spawning requirement in element 1[c], but then rely on a

different conception or time window to satisfy element 1[e], even though the claim uses the same "intermediate condition" in both limitations. This inconsistency alone confirms that Petitioners have not provided the coherent, limitation-by-limitation showing required for anticipation.

Second, Petitioners never identify a concrete "one intermediate result" in Fukuda '98 that meets the claim's express dependency requirement. The Petition does not explain what specific "intermediate result" is produced at the intermediate condition and why that particular intermediate result is "required by the spawned child" to continue computation. Petitioners' reliance on process I/O concepts, counters, or cycle boundaries does not satisfy the claim language, and the Petition never closes the gap between generic concurrency and the claims' requirement that the child's continued computation depends on the intermediate result. In a single-reference anticipation case, that missing explanation is fatal.

Third, Petitioners' anticipation showing is not supported by a consistent, legally sound claim scope position. Petitioner Southwest, has taken the position in district court that key claim terms are indefinite because they are open to multiple interpretations and render the scope uncertain, while simultaneously taking the opposite approach here by asserting the same terms can be construed under *Phillips* and mapped to Fukuda '98. Petitioners provide no explanation for why these

inconsistent claim scope positions are warranted. That failure further undermines Petitioners' attempt to meet their burden in this proceeding.

Fourth, the Petition also fails to support the threshold prosecution-history propositions that Petitioners chose to advance. Petitioners assert that their ground is "not cumulative of the art of record" because Fukuda '98 was not before the Examiner, yet the prosecution history reflects that the Examiner considered closely related MESSENGERS publications, including Fukuda '01 (EX1009) and Fukuda '99 (EX2006), and the Petition never provides a comparison-based explanation of what Fukuda '98 allegedly adds beyond those record references and why any difference matters to the challenged claims. Petitioners' own reliance on Fukuda '01 to supply core MESSENGERS semantics only heightens the need for such an explanation. The Petition does not provide one.

Finally, Petitioners' heavy reliance on their expert declaration that parrots attorney argument verbatim does not cure the Petition's deficiencies. The Board and the Federal Circuit have repeatedly held that expert testimony is entitled to little weight where it merely repeats the Petition's advocacy without providing meaningful independent analysis, and an expert declaration cannot substitute for a missing disclosure in the asserted prior art in an anticipation challenge. Here, the declaration largely tracks the Petition's narrative and is cited to supply "POSITA

would have understood" bridges where the Petition's single-reference showing is otherwise lacking.

For all of these reasons, Petitioners have not met their burden to establish a reasonable likelihood of prevailing on their sole anticipation ground. Patent Owner therefore respectfully requests that the Board deny institution.

Respectfully submitted,

Dated: December 29, 2025

By: /Brandon R. Theiss/
Brandon R. Theiss
Registration No. 70,507
*Counsel for Patent Owner*
*Intellectual Ventures I LLC*

**CERTIFICATE OF COMPLIANCE WITH WORD COUNT**

Pursuant to 37 C.F.R. § 42.24(d), I certify that this Patent Owner Preliminary Response complies with the type-volume limits of 37 C.F.R. § 42.24(b)(1) because it contains 8,637 words, excluding the parts of this Patent Owner's Preliminary Response that are exempted by 37 C.F.R. § 42.24(a), according to the word processing system used to prepare this Patent Owner's Preliminary Response.

Respectfully submitted,

Dated: December 29, 2025

By: /Brandon R. Theiss/
Brandon R. Theiss
Registration No. 70,507
*Counsel for Patent Owner*
*Intellectual Ventures I LLC*

## CERTIFICATE OF SERVICE

The undersigned certifies that pursuant to 37 C.F.R. § 42.6(e), a copy of the foregoing **PATENT OWNER'S PRELIMINARY RESPONSE** was served via email (as consented to by counsel) on December 29, 2025 to lead and backup counsel of record for Petitioners as follows:

John B. Campbell
jcampbell@McKoolSmith.com
MCKOOL SMITH, P.C.
303 Colorado Street, Suite 2100
Austin, TX 78701

Alan Block
ablock@mckoolsmith.com
McKool Smith, P.C.
MCKOOL SMITH, P.C.
300 South Grand Avenue, Suite 2900
Los Angeles, California 90071

Casey Shomaker
cshomaker@mckoolsmith.com
McKool Smith, P.C.
300 Crescent Court, Suite 1200
Dallas, TX 75201

Keith D. Harden
kharden@munckwilson.com
Munck Wilson Mandala, LLP
2000 McKinney Ave., Ste. 1900
Dallas, Texas 75201

S. Wallace Dunwoody
wdunwoody@munckwilson.com
Munck Wilson Mandala, LLP
2000 McKinney Ave., Ste. 1900
Dallas, Texas 75201

Michael C. Wilson
mwilson@munckwilson.com
Munck Wilson Mandala, LLP
2000 McKinney Ave., Ste. 1900
Dallas, Texas 75201

AA_Intellectual_Ventures@mckoolsmith.com

SWA-IV@munckwilson.com

Dated: December 29, 2025

By: /Brandon R. Theiss/
Brandon R. Theiss
Registration No. 70,507
*Counsel for Patent Owner*
*Intellectual Ventures I LLC*