**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| INTELLECTUAL VENTURES I LLC and INTELLECTUAL VENTURES II LLC,<br><br>*Plaintiffs,*<br><br>v.<br><br>SOUTHWEST AIRLINES CO.,<br><br>*Defendant.* | **Civil Action No. 3:25-cv-02885-L-BN**<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFFS' OBJECTIONS TO THE FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .......... 1

II. LEGAL STANDARD .......... 2

III. ARGUMENT .......... 3

A. The R&R Errs in Recommending Dismissal of Claim 14 of the '722 Patent Under Section 101 .......... 3

1. The R&R Improperly Reduces Claim 14 to Two Generic Steps While Disregarding Express Claim Limitations. .......... 3

2. The R&R Incorrectly States That IV Failed to Identify Claim Limitations That Make Claim 14 Non-Abstract. .......... 6

3. At Minimum, IV's Allegations Preclude Resolution of Alice Step Two Against IV on a Rule 12 Motion. .......... 7

B. The R&R Errs By Recommending Dismissal With Prejudice Of IV's Claim For Pre-Suit Damages. .......... 9

1. The R&R Improperly Treats IV's Lack of Products and the Existence of Licenses as Resolving Whether Licensees Made or Sold Patented Articles. .......... 11

2. The R&R Assumes, Without a Factual Basis, That IV's Licensees Made or Sold "Patented Articles." .......... 13

3. At Minimum, the Intervening *VDPP* Decision Does Not Support Dismissal With Prejudice Without an Opportunity to Amend. .......... 15

IV. CONCLUSION .......... 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
876 F.3d 1350 (Fed. Cir. 2017)....................13

*Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*,
950 F.3d 860 (Fed. Cir. 2020)....................12

*Spence v. Am. Airlines, Inc.*,
718 F. Supp. 3d 612 (N.D. Tex. 2024) ....................2

*Texas Digital Sys., Inc. v. Telegenix, Inc.*,
308 F.3d 1193 (Fed. Cir. 2002)....................12

*VDPP, LLC v. Volkswagen Group of America, Inc.*,
No. 2024-2226 (Fed. Cir. Aug. 19, 2026).................... *passim*

**Statutes**

35 U.S.C. § 101....................1, 3

35 U.S.C. § 287.................... *passim*

**Other Authorities**

Fed. R. Civ. P. 8....................2

Fed. R. Civ. P. 12....................7, 8

Fed. R. Civ. P. 12(b)(6)....................2

Fed. R. Civ. P. 72(b) ....................2

# I. INTRODUCTION

Plaintiffs Intellectual Ventures I LLC and Intellectual Ventures II LLC (collectively, "IV" or "Plaintiffs") respectfully object to the Findings, Conclusions, and Recommendations of the United States Magistrate Judge entered on August 13, 2026 (Dkt. 159; the "R&R") regarding Defendant Southwest Airlines Co.'s ("Southwest" or "Defendant") Motion to Dismiss the Amended Complaint (Dkt. 99). Plaintiffs object only to the recommendations that (1) the Court dismiss Plaintiffs' claims regarding Claim 14 of the '722 Patent as invalid under 35 U.S.C. § 101 (Dkt. 159 at 27-33), and (2) the Court dismiss Plaintiffs' claims for pre-suit damages for infringement of non-method claims (Dkt. 159 at 37-40.)

The R&R correctly rejects Southwest's remaining challenges, including Southwest's § 101 challenges to the '582, '282, '844, and '080 Patents. But the same principles the R&R correctly applies to those patents compel a different result for Claim 14 of the '722 Patent.

The recommendation to dismiss IV's claim for pre-suit damages based on non-method claims with prejudice should also be rejected because the record does not establish that IV's pleadings are deficient or that an amendment would be futile. Plaintiffs do not make or sell products under the asserted patents. Although Plaintiffs have licensed the asserted patents as part of portfolio licenses containing thousands of patents, the licensees have asserted that they do not infringe the asserted patents and therefore do not assert that they make products under the patents at issue. The R&R nevertheless concluded that IV "did not and cannot" satisfy § 287 because IV did not require its licensees to mark. But the Federal Circuit's intervening decision in *VDPP, LLC v. Volkswagen Group of America, Inc.*, No. 2024-2226 (Fed. Cir. Aug. 19, 2026) ("*VDPP*")[1], expressly leaves open the possibility that a licensor may establish reasonable efforts to ensure

[1] Attached as Exhibit 1 to the Declaration of Jonathan K. Waldrop.

licensee compliance even in the absence of a contractual marking obligation. Because *VDPP* issued after the Amended Complaint, the briefing, and the R&R, IV has never had an opportunity to amend its pleading under that standard. Thus, even if the Court concludes that IV's existing allegations are insufficient under *VDPP*, the record does not support the R&R's categorical conclusion that IV "cannot" satisfy § 287 or that amendment would be futile.

## II. **LEGAL STANDARD**

A party may file written objections to a magistrate judge's recommended disposition, and the district judge must determine de novo any portion of the disposition to which a proper objection is made. Fed. R. Civ. P. 72(b). The district judge may accept, reject, or modify the recommended disposition. *Id*.

Rule 8 only requires a short and plain statement showing entitlement to relief; it does not require detailed factual allegations. Fed. R. Civ. P. 8. To survive a Rule 12(b)(6) motion, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Spence v. Am. Airlines, Inc*., 718 F. Supp. 3d 612, 616 (N.D. Tex. 2024) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).) In applying Rule 12(b)(6), the Court accepts well-pleaded facts as true and views them in the light most favorable to the plaintiff, but it need not accept legal conclusions as true. *Spence*, 718 F. Supp. 3d at 616 (*citing Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).) Federal courts may not impose a heightened pleading standard more onerous than Rule 8 when the Federal Rules do not require one.

## III. ARGUMENT

### A. The R&R Errs in Recommending Dismissal of Claim 14 of the ’722 Patent Under Section 101.

#### 1. The R&R Improperly Reduces Claim 14 to Two Generic Steps While Disregarding Express Claim Limitations.

The R&R concludes that Claim 14 is directed to the abstract idea of “providing updated information.” R&R at 30 (“There are only two steps in Claim 14. The first is informing the system which user wants what kind of live update. The second is sending an update when the information changes. Considering all the elements individually and as an ordered combination in the whole, the undersigned finds that these two steps are directed toward the abstract concept of providing updated information.”) (internal citations in parenthetical omitted). The Magistrate’s findings are respectfully incorrect. The R&R reached this conclusion by finding that there are only two steps in Claim 14 and then treating the remaining limitations as not steps and as generic. This analysis, however, abstracts away the limitations that define the claimed invention, before determining what the claim is directed to. The resulting formulation, “providing updated information,” describes only the ultimate result of the claim and does not capture the particular technological mechanism Claim 14 requires to accomplish that result.

The problem addressed by the ’722 Patent was not simply that users wanted updated information. Existing computer systems already provided updates. The identified technological problem was how to update dynamic content efficiently and at scale across client devices. ’722 Patent at 2:36-44; Dkt. 112 at 13-14. The specification explains that prior approaches to updating content relied on periodic refreshing or custom applets. Periodic refreshing could resend entire pages even when little or nothing had changed, creating an efficiency tradeoff between update frequency and bandwidth use. Custom applets could limit updates to particular page

components, but required separate development and did not scale well to large numbers of clients and webpages. ’722 Patent at 2:46–3:3; Dkt. 112 at 13–14.

The ’722 Patent addresses that computer-network problem through a different architecture: a dynamic content routing network that routes update messages concerning “live objects” to the appropriate clients. ’722 Patent at 3:9–13 (“The above need is met by a dynamic content routing network that routes messages containing data for updating properties of live objects to clients displaying web pages or other representations of data containing live objects … This routing utilizes bandwidth efficiency because the update messages are provided to the clients only when the live objects change.”). In this case, the web server does not need to keep track of which clients are displaying which live objects because the “input source” sends an update message into the routing network when the live object changes. *Id.* at 3:13–18. The specification explains that this routing architecture uses bandwidth more efficiently because update messages are provided to clients only when the live objects change. *Id.* at 3:18–20; Dkt. 112 at 14.

Claim 14 recites specific, interdependent routing limitations relevant to that architecture through specific interdependent limitations. First, the client receives a representation containing a “live object,” determines an object identifier for that object, and registers for updates with the routing network. Claim 14 further requires that the registration provide client connection information to a node in the routing network. ’722 Patent, Claim 14. Thus, the claim does not merely say that a user wants an update; it requires the network to establish what object the client wishes to track and information enabling the network to route future updates to that client.

Second, when the underlying information changes, the input source sends an update message identifying the live object into the routing network. ’722 Patent, Claim 14; Dkt. 112 at 14-15. The claimed architecture therefore differs from the prior client-driven approach in which

the client repeatedly asks whether new information exists. *See* '722 Patent at 2:36–53; Dkt. 112 at 13-14. The routing network does not simply forward the update generically, Claim 14 requires a gateway to identify a category of the update message based on the input source, determine the node type to which that category maps, and route the message to a node having that node type. '722 Patent, Claim 14.

Further, the selected node must identify the client as a registered device and route the update to that client, where the client processes the message to update the property of the live object. '722 Patent, Claim 14; Dkt. 112 at 14-15. The claim thus specifies not merely that an update reaches a user, but a particular mechanism for establishing the recipient, categorizing the incoming update, selecting the appropriate type of network node, and then delivering the update based on the earlier registration.

The R&R, however, abstracted Claim 14 down to the general idea of providing updated information. The R&R's boss-and-employee analogy therefore misses the claimed invention. A boss may ask an employee to provide information when something changes. But that analogy accounts only for the desired result. It does not account for a routing network in which: (1) a live object is assigned an object identifier and registered for updates; (2) client connection information is maintained at a network node; (3) an input source sends an object-specific update to the routing network; (4) a gateway categorizes the update based on the input source; (5) that category maps to a particular node type; and (6) that node identifies a previously registered client and routes the update to it. Claim 14, viewed as a whole, is directed to that particular computer-network architecture, not the generalized human activity of telling someone when information changes. *See* Dkt. 112 at 15–16 (explaining that when the source sends an update, the routing network directs the update to a specific node, which then routes it to the registered client, thereby avoiding manual

or periodic refreshing); *id*. at 16 (explaining that the claims "expressly describe how the routing network only sends an update message for a live object to client devices based on the category of the input source of the update and subject to whether the client devices are registered").

The R&R's Step One analysis therefore begins at too high a level of abstraction. After stripping away the claimed registration, categorization, mapping, node-selection, and routing architecture, virtually all that remains is "request information and receive an update." Indeed, in addressing the '582 Patent, the R&R itself recognized that a court "should not overly abstract a patent claim" and must consider the ordered combination of elements as a whole together with the improvements provided by the claimed method. R&R at 21 (*citing In re TLI Commc'ns LLC Patent Litig*., 823 F.3d 607, 611 (Fed. Cir. 2016)). The R&R likewise recognized that claims directed to improving "the functioning of [a] computer itself" or "an existing technological process" may be patent eligible. R&R at 8–9 (*citing Enfish, LLC v. Microsoft Corp*., 822 F.3d 1327, 1335–36 (Fed. Cir. 2016)). Claim 14 should be analyzed at that level of specificity, rather than reduced to the ultimate result of "providing updated information." The Court should sustain IV's objection and decline to adopt the R&R's recommendation as to Claim 14.

**2. The R&R Incorrectly States That IV Failed to Identify Claim Limitations That Make Claim 14 Non-Abstract.**

The R&R separately states that IV "does not identify any elements that make Claim 14 not abstract" and instead relies only on implementation details from the specification. R&R at 31–32 ("Intellectual Ventures, in its briefing, does not identify any elements that make Claim 14 not abstract."). That is incorrect. IV's opposition identified specific limitations and explained "in plain terms … when a client device receives data that includes a live object, such as a sports game score, the client device registers for updates with a node in a routing network. When the source of the live object sends an update (i.e. the score changes), the routing network directs the update to a

specific node, which then routes the update to the registered client device. Thus, the user does not need to manually refresh or use unnecessary bandwidth automatically refreshing at set interval, unlike in prior art solutions for updating information, as described above." Dkt. 112 at 15. IV then expressly explained that the claims themselves describe "how the routing network only sends an update message for a live object to client devices based on the category of the input source of the update and subject to whether the client devices are registered." *Id*. at 16.

While IV's opposition refers to the specification, IV did not rely only on implementation details from the specification. IV first identified the limitations of Claim 14 itself and explained how those limitations operate. Dkt. 112 at 15-16. IV then cited the specification in further support of that argument. *See id*. at 16-17. Thus, in stating that IV failed to identify claim limitations that make Claim 14 non-abstract and instead relied only on details found in the specification. IV identified the relevant limitations in the claim itself; its specification citations provided additional support for that claim-based argument.

### 3. At Minimum, IV's Allegations Preclude Resolution of Alice Step Two Against IV on a Rule 12 Motion.

Even assuming Claim 14 were directed to an abstract idea, dismissal is independently improper at Alice Step Two. IV specifically alleged that identified limitations of Claim 14, individually and in their ordered combination, were not well-understood, routine, or conventional. Dkt. 97 ¶ 59, as well as explaining the claimed improvement (above). *See* Dkt. 112 at 17–18 (arguing that the ordered combination recites an inventive concept). IV also argued that, regardless of whether individual limitations recite "generic" or "conventional" components, Claim 14's ordered combination recites an inventive concept. *Id*. at 17–18.

Whether a claim element or ordered combination was well-understood, routine, and conventional is a question of fact and must be proved by clear and convincing evidence. R&R at

9 (*citing Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). The R&R itself recognizes that such factual disputes can preclude Rule 12 dismissal. *Id.* (*citing Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1317 (Fed. Cir. 2019); *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018)). And IV's Opposition specifically invoked the same principle, arguing that Southwest's conventionality arguments presented "a fact dispute that cannot be resolved on the pleadings." Dkt. 112 at 18 (*citing Berkheimer*, 881 F.3d at 1369; Dkt. 97 ¶ 59).

The R&R resolves this issue in Southwest's favor, characterizing the limitations as generic computing components, and ultimately finding that Southwest proved invalidity. R&R at 31-32. In doing so, the R&R resolves against IV the very question of conventionality that it recognizes is factual, notwithstanding IV's allegation that the identified limitations and their ordered combination were not well-understood, routine, or conventional and IV's identification of the particular ordered combination alleged to provide an inventive concept. That conclusion cannot rest merely on the fact that individual components are generic because step two requires consideration of the elements "both individually and as an 'ordered combination.'" R&R at 8 (*quoting Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 78–79 (2012)); *see also* Dkt. 112 at 17 (*citing Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1302 (Fed. Cir. 2016), and *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016)). Thus, at minimum, IV's allegations concerning the identified claim limitations and their ordered combination is a factual dispute that cannot be resolved against IV on the pleadings. *See* Dkt. 112 at 18-19 (*citing Berkheimer*, 881 F.3d at 1369; Dkt. 97 ¶ 59). The Court should reject the recommendation that Claim 14 be dismissed.

**B. The R&R Errs By Recommending Dismissal With Prejudice Of IV's Claim For Pre-Suit Damages.**

The R&R also recommends dismissing with prejudice IV's claim for pre-suit damages based on non-method claims. (Dkt. 159 at 39-41.) The R&R concluded that IV's existing allegations did not establish compliance with § 287 because IV alleged that it had no products to mark and had not required its licensees to mark. *Id*. at 39–40. It then recommended dismissal of pre-suit damages for non-method claims with prejudice. *Id*. at 40–41.

The R&R's conclusion goes beyond the allegations and facts before the Court. IV alleged that it makes and sells no products of its own, that the relevant agreements were portfolio settlement licenses, and that the licensees did not admit that they were practicing the Patents-in-Suit. R&R at 38-39 (quoting Dkt. 97 ¶¶ 168, 170–171). But the R&R did not identify any particular licensee product or implementation that constituted a "patented article" under a non-method claim. *See id.* at 39-40. Nor did it have facts establishing whether any such implementation actually practiced the properly construed claim, whether the particular activity or implementation fell within the scope of the relevant license, or what marking obligations and efforts followed from those facts. *See id.* Those are distinct inquiries that cannot be resolved merely from the existence of a portfolio license. Yet the R&R nonetheless concluded categorically that IV "did not and cannot mark any patented products either directly or through its licensees." *Id*. at 39.

That distinction is especially important here because the relevant asserted technologies include backend and distributed computing implementations, not simply discrete customer-facing products whose operation is not necessarily apparent from publicly observable features. Whether a particular third-party implementation practices a claim may depend on technical configuration and interactions among software, infrastructure, and system components that are not public or otherwise available to IV. IV is not accusing those third-party licensees of infringement in this

action, and discovery directed to Southwest therefore would not ordinarily provide IV access to those unrelated licensees' nonpublic implementation details. And even if an implementation practices a claim, that does not by itself establish that the particular implementation or activity falls within the scope of a given portfolio license. The R&R nevertheless effectively treated the absence of allegations concerning those unknown third-party implementations as sufficient to conclude that IV necessarily failed to satisfy § 287 when it concluded that IV "did not and cannot mark any patented products either directly or through its licensees." *Id*. at 39. Whatever those circumstances may mean for the sufficiency of IV's existing allegations, they do not establish that particular licensee products necessarily practiced the asserted claims, that the relevant activities necessarily fell within an applicable license, or, critically, that IV could not plead additional facts concerning § 287 if afforded leave to amend.

The Federal Circuit's intervening decision in *VDPP* clarifies IV's pleading burden, but does not support the R&R's determination that IV "cannot satisfy" Section 287. *VDPP*, issued six days after the R&R, confirms that a patentee seeking pre-suit damages bears a pleading burden concerning § 287 compliance by its licensees where the statute applies. It further holds that the settlement character of a license and a licensee's denial of infringement do not themselves excuse the patentee from pleading compliance or reasonable efforts to ensure licensee compliance. *Id*. at 4–6. Critically, however, *VDPP* expressly declined to hold that the absence of a contractual marking obligation necessarily precludes a licensor from establishing reasonable efforts to ensure licensee compliance. *Id*. at 7. Its futility determination instead rested on the particular facts before it, including an actual proposed amended complaint, eleven licenses authorizing the making, use, and sale of licensed products, VDPP's own position that the licensed products infringed, and the absence of allegations supporting reasonable efforts to ensure marking. *Id*. at 4–7. Thus, the

absence of a contractual marking requirement, the fact on which the R&R principally relied as to IV's licensees, does not itself establish that IV could not satisfy § 287 through reasonable efforts or that amendment would be futile. And because the Amended Complaint, Southwest's motion, the parties' briefing, and the R&R all preceded *VDPP*, IV has never had an opportunity to address that intervening precedent through an amended pleading.

For the reasons described below, the Court should decline to adopt the recommendation that IV's claim for pre-suit damages based on non-method claims be dismissed with prejudice. At minimum, even if the Court concludes that IV's existing allegations do not provide the specificity required by *VDPP*, that conclusion would establish a pleading deficiency, not futility. The Magistrate had no proposed amended pleading before him from which to determine whether IV could allege additional facts concerning licensee compliance, reasonable efforts to ensure compliance, or the circumstances bearing on whether particular licensee products were patented articles subject to § 287. The R&R therefore provides no basis to conclude that amendment would be futile.

#### 1. The R&R Improperly Treats IV's Lack of Products and the Existence of Licenses as Resolving Whether Licensees Made or Sold Patented Articles.

The Magistrate recognized that Plaintiffs pled that (1) they "do not make or sell products and thus have no products to mark," and (2) they have entered into settlement licenses with other entities, including portfolio settlement licenses in which the licensees did not admit that they infringed the Patents-in-Suit or that they were producing patented articles under those patents. (Dkt. 159 at 38 (*citing* Amended Compl., (Dkt. 97 ¶¶ 168-171).) Despite recognizing these well-pleaded allegations, the Magistrate asserted that IV "provides no legal support for its conclusion that a patent owner with no products to mark is excused from the consequences of failing to mark described in Section 287(a) with respect to non-method patent claims." (Dkt. 159 at 39-40.)

That reasoning collapses a number of distinct inquiries. IV's allegation that it makes and sells no products means there are no IV products to mark. IV's allegations regarding the portfolio licenses also do not establish that the licenses were directed to particular products or implementations of particular Patents-in-Suit. Nor do they establish that IV possessed information showing whether a particular licensee's products or backend implementations actually practiced a particular asserted claim.

The separate question is whether any licensee made or sold a "patented article" subject to § 287. In *Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*, 950 F.3d 860 (Fed. Cir. 2020) ("*Arctic Cat II*"), the Federal Circuit held Section 287's notice provisions to not apply to patents directed to processes or methods "[n]or do they apply when a patentee never makes or sells a patented article." *Id*. at 864 (*citing Wine Ry. Appliance Co. v. Enterprise Ry. Equip. Co*., 297 U.S. 387, 395 (1936) ("Penalty for failure implies opportunity to perform."); *see also Texas Digital Sys., Inc. v. Telegenix, Inc*., 308 F.3d 1193, 1220 (Fed. Cir. 2002) (same). The *Arctic Cat II* Court elaborated that "a patentee who never makes or sells a patented article may recover damages even absent notice to an alleged infringer." *Arctic Cat*, 950 F.3d at 864. That principle does not eliminate § 287 obligations arising from patented articles made or sold by licensees. Indeed, *VDPP* confirms that a patentee's § 287 obligations extend to licensees making or selling patented articles where the statute applies. The separate inquiry remains whether particular licensees made or sold particular articles that practiced the relevant non-method claims. The R&R therefore moved too quickly from the undisputed fact that IV has no products of its own to the conclusion that IV necessarily failed to satisfy § 287 through its licensees.

### 2. The R&R Assumes, Without a Factual Basis, That IV's Licensees Made or Sold "Patented Articles."

Section 287 concerns the making and selling of a "patented article." The Magistrate's recommendation is flawed because it assumes that the existence of a portfolio patent license establishes as a matter of law that the portfolio licensees must therefore practice the asserted claims. A portfolio license may contractually authorize a broad range of products and activities without establishing that every licensed product or implementation actually practices every patent included within the portfolio. Thus, at least three distinct factual questions remain:

1. What particular licensee product or implementation is alleged to constitute the "patented article"?

2. Does that product or implementation actually practice a relevant non-method claim??

3. If so, did the relevant making, sale, or other activity fall within the scope of the applicable license such that § 287 applied to the licensee's activity?

Those substantive predicates are distinct from the allocation of the pleading burden. *VDPP* places the burden on IV to plead § 287 compliance, including compliance or reasonable efforts with respect to licensees where the statute applies; it does not eliminate the antecedent requirement that there be a patented article to which § 287 applies. The Federal Circuit's decision in *Arctic Cat I* confirms that the existence of a license does not itself establish that a licensee product is a patented article. There, it was undisputed that Honda sold unmarked products pursuant to a license that included the patents-in-suit, but the parties separately disputed whether those products were actually "covered by the patent claims at issue." *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1367 (Fed. Cir. 2017) ("*Arctic Cat I*"). The Federal Circuit therefore treated claim practice as a distinct factual question. *Id.* at 1367-68. IV does not rely on *Arctic Cat I* to eliminate its own pleading burden under § 287. Rather, the case confirms the substantive point that must precede any marking obligation: a licensee's product must actually practice the relevant

patent claim before its making or sale implicates § 287 as a "patented article." Nothing in *VDPP* holds otherwise.

The Magistrate focused on IV's statements in its opposition to the Motion to Dismiss, that "IV expressly excluded licensed products from the products or systems it is accusing." (Dkt. 112 at 26.) But that statement addressed what IV accused Southwest of infringing; it did not establish that unrelated licensees necessarily made or sold products practicing the Patents-in-Suit. In fact, IV alleged in the Complaint that no licenses it entered concerning the Patents-in-Suit "were to produce a patented article for Plaintiffs or under the Patents-in-suit." *See* Dkt. 97 ¶ 170.) The Complaint further alleged that each settlement licensee denied infringing the Patents-in-Suit. (*Id.*; *see also* Dkt. 97 ¶ 171.) Under *VDPP*, the settlement character of those licenses and the licensees' denial of infringement do not themselves establish compliance with § 287. But neither do those allegations establish the converse, that particular licensee products practiced the asserted claims and constituted patented articles subject to marking.

That distinction is particularly important for the backend and distributed-computing technologies at issue. Whether an unrelated licensee's particular implementation practices a claim may turn on technical configuration and interactions among software, infrastructure, and system components that are not customer-facing or publicly observable. IV is not accusing those unrelated licensees of infringement in this action, and discovery directed to Southwest would not ordinarily provide IV access to those licensees' nonpublic implementation details. Those circumstances do not excuse IV's pleading burden under *VDPP*, but they bear directly on what efforts reasonably could be expected of IV. The reasonableness inquiry concerns IV's efforts under the circumstances which necessarily may include what IV knew or reasonably could determine concerning whether particular licensee products or implementations practiced a Patent-in-Suit; it is not resolved solely

by asking whether IV imposed a contractual marking requirement. *VDPP* expressly left open the possibility that reasonable efforts may be established even in the absence of such a contractual requirement. *Id*. at 7.

### 3. At Minimum, the Intervening *VDPP* Decision Does Not Support Dismissal With Prejudice Without an Opportunity to Amend.

Days after the R&R issued, the Federal Circuit issued its precedential decision in *VDPP*.

IV recognizes that *VDPP* governs and requires a patentee seeking pre-suit damages to plead facts supporting § 287 compliance, including as to licensees where the statute applies. Where licensees are implicated, *VDPP* further requires factual allegations showing compliance or reasonable efforts to ensure licensee compliance; a bare assertion that the statutory requirements have been satisfied is insufficient. *VDPP*, slip op. at 4–6. But the operative complaint, Southwest's motion, the parties' briefing, and the R&R all preceded *VDPP*. IV therefore has never had an opportunity to amend its pleading in light of that intervening precedent.

Nor does *VDPP* hold that dismissal with prejudice follows whenever a patentee's existing allegations fail to satisfy that standard. To the contrary, its affirmance of futility rested on the particular record before the district court. *VDPP* had submitted a proposed amended complaint after Volkswagen specifically raised the marking issue. The record also included eleven settlement agreements licensing the patent, all fashioned as standard agreements permitting the licensees to make, use, and sell licensed products; one agreement expressly provided that the licensee had no marking obligation; and *VDPP* continued to maintain that all licensed products covered by those agreements infringed. *Id*. at 4–6. On that record, the Federal Circuit concluded that, "[u]nder the facts of this case," it saw "no way for *VDPP* to amend its complaint to plausibly allege it made reasonable efforts" to ensure compliance. *Id*. at 6. The Federal Circuit nevertheless expressly declined to adopt a categorical rule based on the absence of a contractual marking requirement,

stating that it did "not foreclose the possibility that a licensor can ever establish it made reasonable efforts to ensure licensee compliance with 35 U.S.C. § 287 in the absence of a marking obligation." *Id*. at 7. That reservation is directly relevant here because the R&R treated IV's failure to require its licensees to mark as a basis for concluding that IV "did not and cannot" satisfy § 287.

The procedural posture is therefore materially different. In *VDPP*, the patentee had sought leave to amend and presented a proposed amended complaint, enabling the court to determine whether the proposed amendment itself was futile. Here, IV has never had the opportunity to address *VDPP's* requirements through a proposed amended pleading. The R&R therefore had no proposed amendment before it from which it could determine whether IV could cure the alleged pleading deficiency or whether amendment would be futile.

Dismissal with prejudice is therefore particularly inappropriate. If the Court concludes that IV's existing allegations are insufficient under the newly issued *VDPP* decision, IV should at minimum be given leave to amend before the Court concludes that amendment would be futile. If amendment is required, IV should be permitted to plead the facts relevant to the inquiry *VDPP* leaves open. Because *VDPP* had not yet issued, neither IV's pleading nor the R&R addressed those matters under the standard the Federal Circuit subsequently articulated.

IV recognizes that *VDPP* confirms its pleading burden. But *VDPP* also makes clear that the absence of a contractual marking obligation does not, standing alone, foreclose a showing of reasonable efforts. The R&R did not consider what other efforts IV undertook, what information concerning licensee practice was available to IV, or whether IV's conduct constituted reasonable efforts under the circumstances. Nor could it assess whether IV could plead such facts under a standard that had not yet been articulated. The existing pleading therefore may present a question of sufficiency under *VDPP*, but the record before the Magistrate did not establish futility. If the

Court concludes that *VDPP* requires greater specificity than IV's pre-*VDPP* allegations provide, IV should be permitted to amend before its claim to pre-suit damages is permanently foreclosed.

## IV. CONCLUSION

For the foregoing reasons, the R&R should be rejected solely with respect to the recommendations regarding dismissal of Plaintiffs' claims regarding Claim 14 of the '722 Patent and the entitlement to pre-suit damages for infringement of non-method claims. Alternatively, if the Court concludes that IV's current allegations concerning § 287 are insufficient in light of the Federal Circuit's intervening decision in *VDPP*, IV respectfully requests leave to amend.

Dated: September 8, 2026

RESPECTFULLY SUBMITTED,

By: */s/ Jonathan K. Waldrop*

Jonathan K. Waldrop (CA Bar No. 297903)
(Admitted in this District)
jwaldrop@kasowitz.com
Marcus A. Barber (CA Bar No. 307361)
(Admitted in this District)
mbarber@kasowitz.com
John W. Downing (CA Bar No. 252850)
(Admitted in this District)
jdowning@kasowitz.com
Heather S. Kim (CA Bar No. 277686)
(Admitted in this District)
hkim@kasowitz.com
ThucMinh Nguyen (CA Bar No. 304382)
(Admitted in this District)
tnguyen@kasowitz.com
**KASOWITZ LLP**
101 California Street, Suite 3950
San Francisco, California 94111
Telephone: (415) 421-6140
Facsimile: (415) 358-4408

Jeceaca An (NY Bar No. 5849898)
(Admitted in this District)
jan@kasowitz.com
**KASOWITZ LLP**
1633 Broadway
New York, NY 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800

Paul G. Williams (GA Bar No. 764925)
(Admitted in this District)
pwilliams@kasowitz.com
**KASOWITZ LLP**
1230 Peachtree Street, N.E., Suite 2445
Atlanta, Georgia 30309
Telephone: (404) 260-6102
Facsimile: (404) 393-9752

Mark D. Siegmund (TX Bar No. 24117055)
msiegmund@cjsjlaw.com
**Cherry Johnson Siegmund James PLLC**
7901 Fish Pond Rd., 2nd Floor
Waco, Texas 76710
Telephone: 254-732-2242
Facsimile: 866-627-3509

***Attorneys for Plaintiffs***
***INTELLECTUAL VENTURES I LLC***
***INTELLECTUAL VENTURES II LLC***

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing instrument was served or delivered electronically to all counsel of record on this 8th day of September, 2026, via the Court's CM/ECF system.

*/s/ Jonathan K. Waldrop*
Jonathan K. Waldrop