**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

INTELLECTUAL VENTURES I LLC and
INTELLECTUAL VENTURES II LLC,

*Plaintiffs,*

v.

SOUTHWEST AIRLINES CO.,

*Defendant.*

**Civil Action No. 3:25-cv-02885-L-BN**

**JURY TRIAL DEMANDED**

**PLAINTIFFS INTELLECTUAL VENTURES I LLC AND INTELLECTUAL VENTURES II LLC'S REPLY TO DEFENDANT'S RESPONSIVE CLAIM CONSTRUCTION BRIEF FOR**
**U.S. PATENT NOS. 8,332,844, 8,407,722, 7,257,582, AND 7,712,080**

# TABLE OF CONTENTS

**Page**


A. U.S. Patent No. 8,332,844 .......... 2

1. "blocks of a root image/leaf image" (Claim 7) .......... 2

2. "merging the blocks of said root image with the blocks of respective leaf images" ('844 Patent at Claim 11)" .......... 4

3. "caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory" (Claim 7) .......... 6

B. U.S. Patent No. 8,407,722 .......... 7

1. "input source" / "identify a category of the update message based on the input source" (Claim 14) .......... 8

2. "gateway device" (Claim 14) .......... 9

C. U.S. Patent No. 7,257,582 .......... 10

1. "distributing descriptions of all of said partitions to each of a plurality of subtask processors" (Claim 1) .......... 11

2. "first-come/first-served basis" (Claim 1) .......... 12

3. "description of all said partitions" (Claim 1) .......... 14

D. U.S. Patent No. 7,712,080 .......... 15

1. "distributed sequential computing program" (Claims 1 and 7) .......... 16

2. "distributed parallel computing program" (Claims 1,4,5,6, 9 and 17) .......... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chef America, Inc. v. Lamb-Weston, Inc.*,
358 F.3d 1371 (Fed. Cir. 2004)....................................................................................8

*Intellectual Ventures I LLC et al. v. American Airlines, Inc.*,
No. 4:24-cv-980, Dkt. 177 (E.D. Texas July 28, 2026).......................................... *passim*

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)............................................................................ *passim*

*Thorner v. Sony Computer Ent. Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012)....................................................................................3

Plaintiffs Intellectual Ventures I LLC and Intellectual Ventures II LLC (collectively, "Plaintiffs" or "IV") submit this reply to Defendant Southwest Airlines Co.'s ("Defendant" or "Southwest" or "SW") Responsive Claim Construction Brief (Dkt. 166 or "Resp. Br.) to IV's Opening Claim Construction Brief (Dkt. 161 or "Opening Br."). Southwest repeatedly characterizes IV's proposed plain-and-ordinary-meaning constructions as an effort to avoid resolving genuine claim-scope disputes. Resp. Br. at 1–2. They are not. As IV explained in its Opening Brief, Southwest's proposed constructions repeatedly add limitations not required by the claim language, import restrictions from particular embodiments, or rely on prosecution history that does not establish the clear and unmistakable disclaimer necessary to narrow the claims. Opening Br. at 1–2. The Court should resolve the parties' disputes, but it should do so based on the language the patentees actually claimed and the scope clearly established by the intrinsic record—not by rewriting otherwise clear claim language through additional limitations that the intrinsic record does not require.[1]

Southwest's own prior positions further undermine its suggestion that its present narrowing constructions are compelled by the intrinsic record. As IV noted in its Opening Brief, Southwest challenged the '844 Patent before the PTAB under the same *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) standard without proposing the narrowing constructions it now advances. Opening Br. at 4, 6. Southwest instead told the PTAB that the claims could be evaluated under "any reasonable interpretation under the Phillips standard" and that "the Board need not resolve any express constructions." IPR2025-00931, Pet. at 11–12. Southwest now asks this Court to

---

[1] Submitted herewith is the September 14, 2025 Declaration of Jonathan K. Waldrop with exhibits thereto ("Ex. __").

impose narrowing constructions it did not contend were necessary when challenging the same patent under the same claim-construction standard.

Southwest also attempts to turn statements made in Patent Office proceedings into broad disclaimers that sweep beyond the particular claim limitations and prior-art distinctions those statements addressed. Resp. Br. at 2–5. But Southwest stretches those statements beyond the specific claim limitations and prior-art distinctions they addressed. Read in context, they do not clearly and unmistakably surrender the broader claim scope Southwest now seeks to exclude.

### A. U.S. Patent No. 8,332,844

The ’844 Patent and its relevant architecture are described in IV’s Opening Brief. Opening Br. at 1–2. Southwest’s response does not dispute that background; the dispute is whether the intrinsic record supports the additional limitations Southwest now seeks to impose on the asserted claim terms.

#### 1. “blocks of a root image/leaf image” (Claim 7)

| Plaintiff’s Proposed Construction | Defendant’s Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | **“a base image of the application environment operating at the block level below the file/system”/ “a node-specific image of the application environment operating at the block level below the file system”** |

SW’s construction of blocks of a root image/leaf image is improper. SW attempts to use the negative limitation in claim 7 – “only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes,” as justification for its construction. Resp. Br. at 12. But that argument conflates Claim 7’s express requirements concerning the blocks stored in the root

and leaf images with the meaning of the separate terms "root image" and "leaf image." IV does not dispute that Claim 7 requires storing and caching blocks, or that the claimed leaf images exclude unchanged root-image blocks. Those requirements are already stated in the claim. The dispute is whether those requirements also mean that a "root image" or "leaf image" must operate below the file system. Nothing in the claim language requires a "root image" or "leaf image" itself to operate "below the file system." Opening Br. at 4–6.

SW's lexicography argument is further belied by its use of embodiments from the specification (Resp. Br. at 11), which do not define the disputed terms as SW proposes. SW is attempting to import the additional "below the file system" limitation from the disclosed architecture into the meaning of "blocks of a root image" and "leaf image." SW's reliance on the embodiment disclosed at 7:58-62 is misplaced because that disclosure states that "*embodiments are able to operate* beneath the file system," not that they *must* operate below the file system. *See Thorner v. Sony Computer Ent. Am. LLC,* 669 F.3d 1362, 1365 (Fed. Cir. 2012) ("A patentee may not 'simply disclose a single embodiment or use a word in the same manner in all embodiments' but rather 'must clearly express an intent to redefine the term.'").

Judge Mazzant already considered and rejected the same basic argument in *Intellectual Ventures I LLC et al. v. American Airlines, Inc.*, No. 4:24-cv-980, Dkt. 177 (E.D. Texas July 28, 2026). There, American likewise argued that "root image" must operate beneath the file system because the specification states that, "[b]y storing data at the block level, embodiments are able to operate beneath the file system," and because block-level operation was a fundamental aspect of the invention. Ex. 1, *American* CC Order at 16–17. The Court rejected that argument because Claim 7 "does not recite the language 'file system,'" the cited disclosure states only that the embodiment is "able to operate" beneath the file system, and Claim 7 "recites that blocks of data

are stored, it does not require 'operating beneath the file system.'" *Id.* at 17. The Court concluded that such a proposed requirement "would introduce an unwarranted limitation." *Id.*

SW's reliance on statements from the '844 IPR does not warrant a different result. Resp. Br. at 14–15. SW takes those statements out of context. IV expressly stated that "root image" and "leaf image" should receive their plain and ordinary meanings and that extra-textual constructions narrowing those terms should be rejected. Ex. 2 at 11. Indeed, IV told the Board that all challenged claim terms should receive their plain and ordinary meaning under *Phillips*. SW likewise told the Board that no express construction was necessary under *Phillips*. Ex. 2 at 11–12. Thus, neither party treated "root image" or "leaf image" as requiring SW's present "below the file system" construction in the IPR. The passages SW relies upon elsewhere describe features of the claimed system involving blocks and, in several instances, the operation of the separately recited UBDs. SW now attempts to recast those contextual statements as a clear and unmistakable disclaimer requiring a narrowing construction that neither party advanced before the Board. They are not. Those statements do not clearly and unmistakably redefine "root image" or "leaf image" to require operation beneath the file system. *See, e.g.,* Ex. 2 at 37–40.

### 2. "merging the blocks of said root image with the blocks of respective leaf images" ('844 Patent at Claim 11)"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "combining the root image and the leaf image at the block level below the file system" |

SW's construction of "merging the blocks of said root image with the blocks of respective leaf images" as "combining the root image and the leaf image at the block level below the file system" is wrong because it adds a "below the file system" requirement that does not appear in Claim 11. Claim 11 already specifies both what is merged—"the blocks of said root image" and

"the blocks of respective leaf images"—and the result of that merging—"cohesive respective application environments." Opening Br. at 6–8. The claim therefore already requires merging the blocks of the root and leaf images; the dispute is whether that merging must additionally occur below the file system.

The '844 specification states that:

> Step 330 involves merging the blocks of the root image, the blocks of the leaf image, and the relevant blocks of the cache, if any, to create the application environment. In other words, the merging occurs at an operational level between the file system of a compute node and the first storage unit, the corresponding second storage unit, and the cache.

'844 Patent at 8:13-18. That passage describes where the disclosed embodiment performs the merging, but it does not define "merging" as requiring operation "below the file system," nor does it state that all claimed merging must occur there. *See Phillips,* 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.").

SW's reliance on the Patent Office proceedings does not establish the additional "below the file system" limitation either. Resp. Br. at 15-16. IV does not dispute that it repeatedly described the claims as requiring the merging of root-image and leaf-image as described by the plain meaning of the claim. That is unsurprising: Claim 11 expressly recites "merging the blocks" of the root and leaf images. But SW goes further and treats those statements as a disclaimer requiring that merging to occur below the file system. That is difficult to reconcile with SW's present contention that the intrinsic record clearly requires that very limitation.

The IPR record does not support that leap. IV expressly advocated plain and ordinary meaning, while SW told the Board that no express construction was necessary under the same *Phillips* standard. Ex. 2 at 11–12. Neither party argued that "merging the blocks" required a special construction limiting the operation to below the file system. SW now relies on statements made

concerning block-level merging and the operation of UBDs, and recasts them as a clear and unmistakable disclaimer of Claim 11's scope. Read in context, those statements do not clearly and unmistakably state that all merging satisfying Claim 11 must occur beneath the file system.

SW's own treatment of Claim 11 in the IPR further undermines its present position. In mapping this limitation, SW characterized it as "common snapshotting behavior" involving "logically merging all blocks to produce a cohesive image that can be mounted as a file system for applications to use." Ex. 2 at 37. SW did not contend that Claim 11 required a special construction limiting the merging to operation below the file system.

That distinction matters because Claim 11 does not recite a union block device, a low-level driver, or operation below the file system. Where the '844 claims require those additional structural or architectural features, they say so expressly. SW's construction would import those separately recited features into Claim 11 merely because Claim 11 requires merging blocks. The intrinsic record does not establish a clear and unmistakable disclaimer requiring that additional limitation.

#### 3. "caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory" (Claim 7)

| Plaintiffs | Defendant |
|---|---|
| Plain and ordinary meaning | caching blocks of the root image that have been accessed by at least one of said compute nodes in a cache memory at the block level below the file system |

The Court should reject SW's construction of "caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory," as "caching blocks of the root image that have been accessed by at least one of said compute nodes in a cache memory at the block level below the file system," because it again imports an embodiment that is unnecessary. SW fails to address why the addition of "at the block level below the file system" is necessary or proper considering the specification or claim of the '844 Patent do not require

"caching" as occurring beneath the file system. As stated in the opening brief, Claim 11 already specifies exactly what is cached, where it is cached, and the condition triggering that caching: "caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory." '844 Patent at 11:39-40. Opening Br. at 8. Additionally, SW also fails to address where the specification establishes lexicography or clear and unmistakable disavowal requiring SW's additional limitation.

SW also does not address the fact that Judge Mazzant in *American* refused to impose a requirement that the claimed architecture operate below the file system for the term "root image." Opening Br. at 9. Therefore, the Court should construe "caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory" as having its plain and ordinary meaning and not requiring an additional limitation. As stated previously, SW has not met its burden to justify departing from the term's plain and ordinary meaning.

### B. U.S. Patent No. 8,407,722

U.S. Patent No. 8,407,722 ("'722 Patent") is titled "Asynchronous Messaging Using a Node Specialization Architecture in the Dynamic Routing Network" and was filed as Application No. 11/396,251 on March 30, 2006. The '722 Patent discloses transferring information for remotely updating content at client devices through digital networks. '722 Patent at 1:24-27. A client device receives a live object from an input source, and in response identifies object IDs associated with the object and registers the object IDs with a routing network that is adapted to send update messages to nodes in the network that then forward the messages to the client. *Id.* at Abstract. Messages from an input source are assigned to one or more categories that are tracked by a gateway, such that when a gateway receives update messages from input sources and identifies a category of the update message, it routes the messages to the appropriate client(s). This routing

"utilizes bandwidth efficiently because the update messages are provided to the clients only when the live objects change." *Id.* at 3:18-20.

**1. "input source" / "identify a category of the update message based on the input source" (Claim 14)**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | identify a category of the update message based on the information provider dynamic content provider but not on category/topic of the message content" |

SW's construction should be rejected because it both improperly narrows "input source," as discussed below, and overstates the effect of the prosecution history. The parties do not dispute that identifying a category of the update message must be based on the input source (which "input source" should be construed consistent with the arguments above). Rather, the only dispute is whether the category identification of the update message can also be based on other information, such as the category/topic of the message content (or other techniques for identifying a category of the update message). It can.

SW's proposed construction is wrong because it would re-write this term to require that the category identification can be based only on the input source. *See id.; see also Chef America, Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("[W]e construe the claim as written"). SW's argument rests entirely on an incorrect interpretation of the '722 Patent file history. During prosecution, the Applicant distinguished prior art by noting that the prior art did not disclose the limitation "identify a category of the update message based on the input source," but instead disclosed "identifying categories based on category/topic of the message content." Dkt. 77-9 at 12 (emphasis in original). SW cites no authority that "based on" should mean "based <u>only</u> on" because no such authority exists.

Judge Mazzant already rejected SW's exclusivity argument in construing this same phrase in *American*. The Court agreed that the prosecution history distinguished identifying a category based on the input source from identifying based on the data content of the message, but expressly held that "neither the claim language nor the prosecution history require that the category identification be based only on the input source, as Defendant's construction would require." Ex. 1, American CC Order at 21. The same "but not on" limitation should be rejected here.

The specification also confirms that the recited identification need not be based exclusively on the input source. As explained in IV's Opening Brief, the '722 Patent states that "[t]here are multiple ways to assign the messages into categories" and describes an embodiment in which the gateway "uses a combination of multiple techniques to determine the message categories." Opening Br. at 13–14. Thus, the requirement that the identification be "based on the input source" does not preclude the identification from also relying on other information.

SW's IPR position further undermines its present exclusivity argument. In challenging the '722 Patent under the same Phillips standard, SW proposed an express construction only for "activation module" and did not seek a construction requiring that category identification be based exclusively on the input source. Opening Br. at 14–15.SW's failure to identify that purportedly necessary limitation when challenging the patent further undermines its contention that the intrinsic record requires it now.

**2. "gateway device" (Claim 14)**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "a component of the routing network situated between the input source and the node" |

SW's construction of "gateway device" as "a component of the routing network situated between the input source and the node is incorrect because Claim 14 specifies both the location

and functions of the device. SW argues that there is a "prosecution disclaimer" that distinguished the gateway device from other network components. However, the disclaimer that SW points to is not clear and unmistakable as to SW's proposed "situated between" requirement. SW cannot import a particular network topology into otherwise clear claim language absent lexicography or clear disavowal. *See Phillips,* 415 F.3d at 1323. The prosecution history on which SW relies distinguishes the gateway and node and their respective functions: the gateway routes update messages to a node, while the node identifies the registered client device and routes the update message to that client. Resp. Br. at 21-23. But nothing in those statements requires the additional topological limitation that the gateway be "situated between the input source and the node." Accordingly, "gateway device" should receive its plain and ordinary meaning. SW's IPR position further undermines its newly asserted topological limitation as described above.

As explained in IV's Opening Brief, when challenging the '722 Patent under the same *Phillips* standard, SW proposed an express construction only for "activation module" and stated that "[n]o express construction of the other challenged claims is necessary." Opening Br. at 16. SW did not contend that "gateway device" required the particular "situated between the input source and the node" configuration it now seeks to impose.

### C. U.S. Patent No. 7,257,582

U.S. Patent No. 7,257,582 ("'582 Patent") is titled "Load Balancing with Shared Data" and was filed as Application No. 10/375,893 on February 27, 2003.

The '582 Patent discloses parallel processing and includes logically subdividing an input file into partitions that are distributed to processors that execute subtasks in parallel, including reading the partitions. '582 Patent at Abstract. Upon executing a partition, a processor may obtain an unprocessed partition, including on a first-come/first-served basis, until subtask execution

completes and output is combined. *Id.* at 1:61-2:14. The input file can be stored in a "directly attached storage" or on a "network attached storage." *Id.* at 2:28-30. The parallel processing can involve various types of processes, including sort processes, statistical analysis processes, report generation processes, and database query processes. *Id.* at 2:30-33. The processors can be associated with their own respective computer or can be part of a multi-processor system. *Id.* at 2:33-37.

**1. "distributing descriptions of all of said partitions to each of a plurality of subtask processors" (Claim 1)**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | providing each subtask processor with a control file specifying the logical partitions of the input file |

SW's proposed construction improperly rewrites the claimed "descriptions" as a particular "control file." Claim 1(b) already states what is required: "distributing descriptions of all of said partitions to each of a plurality of subtask processors." '582 Patent at 6:50–51. Nothing in that language requires the descriptions to take the form of a "control file," much less a particular control file "specifying the logical partitions of the input file."

SW's reliance on Judge Mazzant's order does not support that additional limitation. Judge Mazzant construed the related phrase "description of all said partitions" and recognized that the amended claim language itself requires that "descriptions" of the partitions be distributed to the subtask processors. The Court explained that "[t]he plain and ordinary meaning of the amendment is both clear and included in the claim language." Ex. 1, American CC Order at 41. Nothing in that construction requires those descriptions to be embodied in a "control file."

SW attempts to avoid that result by emphasizing that American construed "description of all said partitions," rather than the entire step requiring those descriptions to be distributed "to each

of a plurality of subtask processors." Resp. Br. at 29-31. But that distinction does not supply the missing "control file" requirement. The claim itself already specifies to whom the descriptions are distributed. SW's construction adds a particular implementation not found in the claim language.

Nor does the specification convert the disclosed control-file implementation into a mandatory limitation. SW relies on passages describing subtasks consulting a control file to identify and claim unallocated partitions. Resp. Br. at 24-27. Those passages describe how particular embodiments implement the claimed process; they do not define "distributing descriptions" as necessarily providing each processor with a control file.

SW's IPR position further undermines its proposed narrowing construction. As explained in IV's Opening Brief, applying the same *Phillips* standard, Petitioners stated that they "do not believe explicit construction is needed to resolve this petition." Opening Br. at 18. SW did not contend there that "distributing descriptions" required providing each processor with a particular control file. The term should receive its plain and ordinary meaning.

### 2. "first-come/first-served basis" (Claim 1)

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "a subtask processor independently selects the next available partition to process without coordination from any central controller or scheduler and without relying on load information" |

For its proposed construction, SW relies on the '582 Patent file history, in particular the "four-way stop" example. This example, along with the context in which the statement was made, is provided below with annotations.

> The primary difference between the instant invention and the processes disclosed in US 5,603,028 of Kitsuregawa and 5,357,632 of Pian is that these systems rely on a special control process that uses load information to distribute the load between processors that share the load. With the instant invention as defined in the claims there is no such special process. The prior art's load information is not created with the process of the instant invention. Instead, the load sharing is done as a byproduct of the fact that the load-sharing process take parts of the load on a first-come/first-served basis.
>
> A comparison would be to a road intersection where, according to the prior art, there is a traffic light that determines who can go when. The instant invention is more like such an intersection with a four-way stop so that the individual drivers determine who can go and when.
>
> This is a major improvement since in addition to eliminating the control process it also eliminates the need to collect and maintain load information, which it is very difficult to do and almost impossible to define so as to anticipate all possible processors that might execute the subtasks.

The "four-way stop" example provided in the file history is illustrative of an approach that does not rely on the "special control process" used by the prior art. As the Applicant explained, load sharing instead occurs "as a byproduct" of the first-come/first-served basis and helps eliminate the need to "collect and maintain load information," as described in the passage above.

Nor does Judge Mazzant's order require SW's construction. In *American*, Judge Mazzant gave "first-come/first-served basis" its plain and ordinary meaning and rejected as "unnecessary and unwarranted" additional language specifying how the next unprocessed partition must be selected. Ex. 1, *American* CC Order at 44–45. Although Judge Mazzant addressed the prosecution-history disclaimer in connection with the separate term "description of all said partitions," nothing in that ruling construed "first-come/first-served basis" to require operation "without coordination from any central controller or scheduler," as SW now proposes.

Additionally, SW's proposed construction is inconsistent with the multiple descriptions in the '582 Patent specification that allow for the inclusion of an internal or external scheduler that considers dependencies:

> The various parts of the Equivalent Process 101 are depicted here as consecutive steps in one procedure but alternative embodiments could replace them by dependent tasks controlled by a job scheduler. In this case, the wait step would be replaced by a dependency of the Merge step 105 on the completion of Sub Task 103, Sub Task 201 and Sub Task 202.

582 Patent at 3:13-19.

> When the split step terminates, the various Sub Tasks (in this case: 103, 202.203) can be activated. This activation can be initiated by the split step 102 itself or by an external scheduler.

*Id.* at 3:64-67.

These disclosures directly undermine SW's categorical requirement that processing occur "without coordination from any central controller or scheduler." The patent expressly contemplates both a job scheduler and an external scheduler without stating that the use of such scheduling is incompatible with processing partitions on a first-come/first-served basis. Accordingly, SW has not shown that "first-come/first-served basis" requires its proposed additional limitations, and the term should receive its plain and ordinary meaning.

### 3. "description of all said partitions" (Claim 1)

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "Statements giving a characteristic(s) of all of the well-defined parts of the input file for use in distributing the load without a special load process, wherein such statements are distinct from the input file itself" |

SW's proposed construction of "description of all said partitions" is unsupported and unnecessarily confusing to the jury. It is also not the plain and ordinary meaning of the term.

Judge Mazzant already considered substantially the same proposed construction in American and rejected most of it. The Court rejected "statements giving a characteristic(s) of" as unnecessary, rejected "well-defined" as improperly limiting the claims to an embodiment, and rejected the requirement that the descriptions be "distinct from the input file itself."

SW nevertheless asks this Court to adopt those same rejected limitations. Resp. Br. at 29-31. It provides no basis for reaching a different result. The ordinary claim language already requires "descriptions" of the partitions, and replacing that language with "statements giving a characteristic(s)" adds unnecessary wording without clarifying claim scope. Likewise, requiring "well-defined" partitions and that the descriptions be "distinct from the input file itself" adds restrictions that are not found in the claim language.

As to SW's proposed "for use in distributing the load without a special load process" limitation, IV preserves its position that the prosecution history does not warrant narrowing the plain claim language. *See* Opening Br. at 20–22. Although Judge Mazzant reached a different conclusion on that issue, his order does not support the remainder of SW's proposed construction.

Accordingly, the Court should reject SW's proposed construction and give "description of all said partitions" its plain and ordinary meaning.

**D. U.S. Patent No. 7,712,080**

U.S. Patent No. 7,712,080 ("'080 Patent") is titled "Systems and Methods for Parallel Distributed Programming" and was filed as Application No. 10/850,842 on May 21, 2004. The '080 Patent generally relates to computer programming and specifically to systems and methods for parallel distributed programming, making them more efficient. The '080 Patent makes parallel distributed programming efficient by including at least one distributed shared variable located across multiple memories and one or more distributed programs configured to operate across

multiple processors. The parallel distributed programs can also include one or more self-migrating threads configured to migrate from one processor to another. ’080 Patent at 2:8-19.

#### 1. “distributed sequential computing program” (Claims 1 and 7)

| Plaintiff’s Proposed Construction | Defendant’s Proposed Construction |
|---|---|
| Plain and ordinary meaning | “a program that executes sequentially across distributed memory by navigating to the processor that owns the needed memory and then resuming execution there” |

SW’s attempt to construe “distributed sequential computing program” as “a program that executes sequentially across distributed memory by navigating to the processor that owns the needed memory and then resuming execution there” fails because it imports specific navigation and migration requirements that are not required by the claim language or the specification.

IV agreed in *American* that the term means a “program using a single locus of computation over distributed data.” Resp. Br. at 35. SW’s construction goes materially beyond that construction by requiring the program to navigate to the processor that owns the needed memory and then resume execution there. Judge Mazzant adopted the parties’ agreed construction without adding either requirement. Ex. 1, American CC Order at 16. Furthermore, the specification describes distributed sequential computing as “computing using a single locus of computation over distributed data, possibly stored in a DSV.” ’080 Patent at 3:50–53. It then provides an example in which, if an algorithm operating on Processor 1 needs data stored on Processor 2, “a single thread, M, can migrate to Processor 2 to access the data in the memory of Processor 2 and then continue the computations.” *Id.* at 3:53–59 (emphasis added). The word “can” describes one implementation; it does not require processor-to-processor migration for every distributed sequential computing program.

SW asserts that "distributed sequential computing" is a "coined term" that has no ordinary meaning but that does not justify SW's additional navigation requirement. Even accepting SW's position that the specification informs the meaning of the term, the specification describes DSC using a "single locus of computation over distributed data"; it does not define DSC as requiring navigation to the processor that owns the needed memory and resumption of execution there.

SW's construction should be rejected under the principle of claim differentiation because SW also does not overcome the fact that nothing in claim 1 requires the program to navigate to the processor that owns particular memory or to resume execution at that processor. SW also does not rebut the fact that Claim 2 expressly requires that each distributed sequential computing program include "at least one self-migrating thread" that is "capable of migrating among at least one processor." Thus, when the patentees intended to require a self-migrating thread, they expressly recited that limitation. Claim 1 does not.

As used in the '080 Patent, "distributed sequential computing program" describes the manner of computation, sequential execution, rather than imposing a rigid structural or architectural limitation on how or where computation must occur. SW's construction should be rejected. SW's present position is also inconsistent with the position taken in IPR2025-01511, which SW still has not addressed. There, SW applied the plain and ordinary meaning and did not contend that the term required navigation to the processor owning the needed memory or resumption of execution there.

Accordingly, the Court should reject SW's proposed construction. To the extent the Court determines that an express construction is necessary, the construction already adopted in American—"program using a single locus of computation over distributed data"—accurately

reflects the intrinsic record without importing SW's additional navigation and migration requirements.

**2. "distributed parallel computing program" (Claims 1,4,5,6, 9 and 17)**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "a program that computes using multiple concurrent distributed sequential computing programs operating without terminating and resuming thread processes" |

SW's attempt to construe "distributed parallel computing program" as "a program that computes using multiple concurrent distributed sequential computing programs operating without terminating and resuming thread processes" fails because it adds a limitation that is not part of the intrinsic definition of "distributed parallel computing." The '080 Patent describes distributed parallel computing as "computing using multiple concurrent DSC programs," and Judge Mazzant accordingly construed "distributed parallel computing program" to mean "program that computes using multiple concurrent distributed sequential computing programs." Ex. 1, American CC Order at 38–40.

SW attempts to add the further requirement "operating without terminating and resuming thread processes" based on prosecution statements concerning "parallel processing." Resp. Br. at 39–40. But those statements distinguished Suzuki's sequential migrate-and-resume framework from parallel processing that permits calculations to occur simultaneously. They did not redefine the separate term "distributed parallel computing program" to include SW's proposed negative limitation.

Indeed, SW acknowledges that Judge Mazzant construed this exact term without the "terminating and resuming" limitation, but argues that the Court did not consider the prosecution

history. Resp. Br. at 40. That does not establish the clear and unmistakable disclaimer required to add SW's new limitation to this separate claim term.

The phrase "without terminating and resuming thread processes" appears in the prosecution history as part of the Applicant's explanation of parallel processing; it is not part of the '080 Patent's description of "distributed parallel computing," which is simply "computing using multiple concurrent DSC programs." Accordingly, even if express construction is appropriate, SW has not justified adding "operating without terminating and resuming thread processes." At most, the term should be construed consistently with Judge Mazzant's construction: "program that computes using multiple concurrent distributed sequential computing programs."

Dated: September 14, 2026

RESPECTFULLY SUBMITTED,

By: */s/ Jonathan K. Waldrop*

Jonathan K. Waldrop (CA Bar No. 297903)
(Admitted in this District)
jwaldrop@kasowitz.com
Marcus A. Barber (CA Bar No. 307361)
(Admitted in this District)
mbarber@kasowitz.com
John W. Downing (CA Bar No. 252850)
(Admitted in this District)
jdowning@kasowitz.com
Heather S. Kim (CA Bar No. 277686)
(Admitted in this District)
hkim@kasowitz.com
ThucMinh Nguyen (CA Bar No. 304382)
(Admitted in this District)
tnguyen@kasowitz.com
**KASOWITZ LLP**
101 California Street, Suite 3950
San Francisco, California 94111
Telephone: (415) 421-6140
Facsimile: (415) 358-4408

Jeceaca An (NY Bar No. 5849898)
(Admitted in this District)
jan@kasowitz.com
**KASOWITZ LLP**
1633 Broadway
New York, NY 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800

Paul G. Williams (GA Bar No. 764925)
(Admitted in this District)
pwilliams@kasowitz.com
**KASOWITZ LLP**
1230 Peachtree Street N.E., Suite 3750
Atlanta, Georgia 30309
Telephone: (404) 260-6102
Facsimile: (404) 393-9752

William D. Ellerman (TX Bar No. 24007151)
wellerman@CJSJLAW.com
Cherry Johnson Siegmund James PLLC 8140
Walnut Hill Lane
Suite 105
Dallas, TX 75231
Telephone: 254-732-2242
Facsimile: 866-627-3509

Mark D. Siegmund (TX Bar No. 24117055)
msiegmund@cjsjlaw.com
**CHERRY JOHNSON SIEGMUND JAMES PLLC**
7901 Fish Pond Rd., 2nd Floor
Waco, Texas 76710
Telephone: 254-732-2242
Facsimile: 866-627-3509

***Attorneys for Plaintiffs***
***INTELLECTUAL VENTURES I LLC and INTELLECTUAL VENTURES II LLC***

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing instrument was served or delivered electronically, via email, to all counsel of record, on this 14th day of September, 2026.

*/s/ Jonathan K. Waldrop*
Jonathan K. Waldrop (CA Bar No. 297903)